1                   United States District Court

2                 Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )
                                      )
6         vs.                         ) Case No. 08-CR-2386 JM
                                      ) Jury Trial
7    RYAN WEDDING,                    ) Volume 2
                                      )
8                    Defendant.       ) Tuesday, November 17, 2009
     _____)

9

10            Before the Honorable Jeffrey T. Miller
                 United States District Judge

11

12   Appearances:

13   For the Plaintiff:      Karen P. Hewitt
                             UNITED STATES ATTORNEY
14                           Orlando B. Gutierrez
                             ASSISTANT U.S. ATTORNEY
15                           880 Front Street, Suite 6293
                             San Diego, CA  92101
16
     For the Defendant:      David R. Denis, Esq.
17                           CENTER FOR EXTREME JUSTICE
                             707 Wilshire Boulevard, Suite 3600
18                           Los Angeles, CA  90017

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           940 Front Street, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25            Record produced by certified stenographic reporter

1          San Diego, California - Tuesday, November 17, 2009

2                THE COURT:  Good morning, ladies and gentlemen.  We

3    have everyone here at the present time, and we are ready to

4    proceed with swearing you in, and then we are going to hear

5    the opening statements from counsel.  So if you would all

6    stand at this time, please, and raise your right hand to be

7    sworn.

8                THE CLERK:  Ladies and gentlemen, you, and each of

9    you, do solemnly swear or affirm that you will well and truly

10   try the cause now before the Court and a true verdict therein

11   render according to the evidence.  If so, please say yes.

12          (The jurors answered in the affirmative.)

13               THE COURT:  All right.  Thank you, ladies and

14   gentlemen.  Please be seated.  As I mentioned to you

15   yesterday, opening statements are not evidence; they are the

16   ability or opportunity counsel have to tell you what they

17   think the evidence will show in the case and to paint that

18   coherent picture for you of where the case is going.  Mr.

19   Gutierrez, are you ready to proceed?

20               MR. GUTIERREZ:  Yes, your Honor.  Thank you.

21               THE COURT:  All right.

22               MR. GUTIERREZ:  Good morning, ladies and gentlemen.

23   This case is about an agreement, an agreement to buy cocaine,

24   an agreement that this man made to buy 24 kilograms of

25   cocaine here in the Southern District of California, and once

1    that cocaine was purchased, it was to be transported to

2    Canada and distributed.

3         Now, Mr. Wedding, the defendant, didn't do this

4    alone.  He had the benefit of some people who were helping

5    him with the process, two people that you will hear about, a

6    Mr. Michael Krapchan and a Mr. Hassan Shirani.  Those two

7    individuals are also Canadian, and together the three of them

8    came up with a plan, an agreement, to purchase cocaine.

9         You see, Mr. Krapchan was familiar with somebody

10   who lived in the Southern District of California.  That

11   person agreed to sell them cocaine, agreed to sell them

12   cocaine that they were looking to buy.  But those three

13   people, the defendant, Shirani, and Krapchan, didn't know

14   that this person in the Southern District of California was a

15   confidential informant; they didn't know that he was working

16   for FBI; they didn't know when they contacted him by

17   telephone they were being recorded; they didn't know when

18   they went to the airport to start the plan to purchase the

19   cocaine that they were being recorded.  And, ladies and

20   gentlemen, you will hear those recordings.  You will hear the

21   recordings of when Krapchan, Shirani, and Ryan Wedding were

22   at the LA International Airport to start the plan to get

23   money and buy cocaine.

24        You will hear the defendant talk about how the

25   money wasn't immediately available.  You see, the plan was

1    that they were supposed to go to San Diego that night and

2    purchase the cocaine; that is what the confidential informant

3    negotiated.  But there seems to have been a miscommunication

4    because Mr. Shirani, Mr. Wedding, and Mr. Krapchan weren't

5    ready.

6             You will hear testimony that the money was

7    transfered from Canada in US dollars in cash with what's

8    called -- and maybe I'm pronouncing this incorrectly -- a

9    havale; it's a money transportation system that Mr. Shirani

10   was familiar with to get cash across international borders

11   quickly.  And Mr. Wedding used Mr. Shirani to transport the

12   money to Los Angeles.  So by the time they flew to there to

13   meet the confidential informant, the money was waiting for

14   them.  But they couldn't pick it up right away.  In fact, the

15   defendant was recorded saying "Did you expect me to put the

16   money in my fucking suitcase?"

17            So, ladies and gentlemen, this is a case about an

18   agreement, whether this individual knew about the agreement

19   that he participated in.  So after Mr. Shirani and Mr.

20   Wedding were allowed to go and pick up their money, they also

21   ultimately traveled to San Diego.  And while Mr. Shirani and

22   Mr. Wedding stayed at a hotel room, Mr. Krapchan went to

23   purchase the first of 24 kilograms that were negotiated.

24            Mr. Shirani will tell you that his understanding of

25   Canadian law was that if he wasn't there, he couldn't be

1    prosecuted, so he thought he was safe at the hotel.  So when

2    Mr. Krapchan went to meet the confidential informant, he

3    traded $17,000 cash money for one kilogram of cocaine, a

4    sample, to make sure it was quality, and then once that

5    sample was purchased, they were going to buy it in smaller

6    increments starting at five, five, five, and then three.

7            You will hear that Mr. Shirani was concerned not

8    knowing who the CS was, the confidential informant, not

9    knowing San Diego; he didn't want to be in a place with a lot

10   of money and a lot of cocaine all in one shot.  But as soon

11   as that transfer was made of one kilogram and $17,000,

12   Mr. Krapchan was arrested.  Ultimately, so was Mr. Wedding

13   and Mr. Shirani.

14           You will hear that after the individuals were

15   arrested, a search warrant was executed on a hotel room in

16   Mr. Wedding's name, a hotel in Los Angeles close by to where

17   the money was retrieved, and you will hear that FBI agents

18   found $100,000 cash stuffed into a cabinet, $100,000 that was

19   going to be used to purchase the additional quantities of

20   cocaine.  You will also hear that this havale had more money

21   coming in, but they only picked up $100,000 initially.

22           So, ladies and gentlemen, this case will be

23   relatively straightforward.  You will hear testimony of

24   people that were involved; you will hear testimony -- excuse

25   me -- recordings of what the defendant said when he arrived

1    in Los Angeles International Airport; you will hear "I
2    figured all we were doing today was coming to meet and maybe
3    like have people get our money today and meet tomorrow and
4    take care of that.  I had no idea.  Nobody said anything
5    about six o'clock.  Otherwise we would have come yesterday,
6    right," words that you will hear the defendant speaking about
7    the agreement he had.
8            After you hear all the evidence, ladies and
9    gentlemen, after you hear all the recordings, you will see
10   that it's not a trick or deceit of a friend, but it's about
11   three men traveling to San Diego to buy 24 kilograms of
12   cocaine for distribution.  Thank you.
13           THE COURT:  Mr. Denis?
14           MR. DENIS:  Thank you, your Honor.  Good morning,
15   ladies and gentlemen.  What this case is truly about is an
16   Olympian Snowboarding National Canadian Champion of Canada
17   being duped by a career criminal drug dealer and con man.
18   That's what this case is about.
19           Mr. Wedding was about 25 years old when these
20   events happened.  You're going to hear testimony from
21   Shirani, who was 33 years old or 34 years old, you're going
22   to hear testimony about individuals Michael Krapchan, who was
23   50 something years old, and you're going to hear testimony
24   from perhaps the informant, Yuri Trofimov, who is
25   approximately 50 something years old, former KGB,

1   military-trained, part of the Secret Service in Kazakhstan, a

2   very good manipulator.

3           What you're going to hear is that on June 5 -- I'm

4   sorry -- June 6 through June 9, Mr. Wedding, 25 years old,

5   summertime, was in Las Vegas on a bachelor party, from the

6   6th through the 9th.  You're going to hear or from -- you're

7   going to hear evidence that on the 10th Mr. Wedding is

8   invited to come to Los Angeles on a paid trip, free, paid

9   trip:  Come with me, keep me company, paid trip.  He accepts

10  that offer to Los Angeles to have a good time.  He was --

11  flies in with Shirani.  You're going to hear the recordings.

12  This -- you're going to hear the recordings, and these are

13  the recordings at LAX.  I want you when you listen just to

14  pretend that Shirani told Mr. Wedding that he's going to come

15  here to do a car deal for his brother; I want you to listen

16  to that with that perspective.  The government's going to say

17  this is a drug deal.  I want you to listen as though he was

18  told he was coming for a car deal.

19          MR. GUTIERREZ:  Objection, argumentative.

20          THE COURT:  The objection is sustained.

21          MR. DENIS:  Okay.

22          THE COURT:  Ladies and gentlemen, it's not your

23  obligation to put yourselves in the shoes of any hypothetical

24  individual or situation.

25          MR. DENIS:  You're going to hear the testimony

1   when -- you're going to hear in the recordings that Mr.

2   Wedding comes out basically from the stag party in sweat

3   pants, looking terrible, coming right off the airplane and

4   meeting supposedly -- supposed to be introduced to these

5   major drug dealers at LAX.

6           As Mister -- you're also going to hear testimony

7   that there was a prearranged deal, and supposedly there was

8   supposed to be money brought through the airplane, okay.

9   That was a deal that was worked out weeks ago.  This is a

10  deal between Hassan -- you're going to hear about an

11  individual named Hassan, and there's going to be discussions

12  with a guy named -- I'm just throwing out names -- Elmar

13  Akhundov, which is part of Michael Krapchan.  These names are

14  most significant; you're going to hear about these

15  individuals.

16          You're going to hear -- you're going to see Mr.

17  Wedding come in to LAX.  You're going to -- Shirani and

18  Michael Krapchan and the guy, you're -- they're going to be

19  discussing about this supposed deal that's supposed to happen

20  today.  You're not going to hear anything from Ryan Wedding

21  at all for at least an hour or something.  He hears all these

22  things that are going on.  And then you're going to hear

23  Shirani getting on the phone because he's waiting to get

24  information about the money from his brother, who you will

25  see is part of this conspiracy, who is the money person

1    behind this.

2         After -- and this is on the 10th -- after they

3    leave from LAX Ryan Wedding wants -- has nothing to do with

4    any of these individuals, wants nothing to do with them, no

5    phone calls, no text messages, nothing.  He's here on

6    vacation.  They go to -- they -- from LAX they rent a car

7    because there was supposed to be a car there waiting for

8    them.  They were supposed to grab a car and test it out or

9    whatever and then pick of the rest two by two by two.  You're

10   going to hear these things in the recordings.

11        You're going to -- you're going to -- there is

12   evidence that you will see that Mr. Wedding rented the car in

13   his name, okay, something typically done on vacation; you go

14   on vacation, you rent a car.  Mr. Shirani asked Mr. Wedding

15   to rent the car and put it in his name and added Mr. Shirani

16   as a driver.

17        You're going to have evidence that Mr. Wedding went

18   to a hotel room, used his credit card and paid for the room.

19   Also through this case you're going to hear that Mr. Wedding

20   is accused of being the money person from Shirani, and you're

21   going to learn the rules of the game.  In a drug deal the

22   money person or the person involved in drugs, they don't put

23   their names in the room, they don't put their names on the

24   car; they use unsuspecting dupes.

25        MR. GUTIERREZ:  Objection, argumentative.

1          THE COURT:   The objection is overruled.

2          MR. DENIS:   They put -- they ask -- they get people

3    who don't know what's going on to -- hey, you'll hear

4    evidence that people -- sophisticated drug dealers use

5    unsophisticated people to cover their tracks; you're going to

6    hear this evidence.

7          When Mr. Wedding is in Los Angeles, you're going to

8    hear he did -- that his activities were typically what you

9    would do on any vacation; he will be in a hotel, he's going

10   to sleep in, get up, have breakfast at Denny's.  He's going

11   to meet -- he's going to go with Shirani -- Shirani brings a

12   friend, they go -- show him around in LA, they eat at

13   different restaurants, they go to Westwood, they go to hookah

14   lounges, they eat at other restaurants.  You'll hear that Mr.

15   Wedding was in the process of selling a very large house in

16   Canada during this process and got some bad news about that.

17   But all this happens from the 10th, the 11th, and the 12th.

18         During this time -- and let me get back.  When

19   you're -- when you hear the testimony or the recordings at

20   LAX, you're going to hear that Michael Krapchan and Yuri are

21   speaking in Russian the whole time.  You may be seeing

22   transcripts in English, but they're all speaking Russian.

23   You're going to hear evidence that Mr. Wedding, he doesn't

24   speak any other language besides a little bit of French --

25   he's from Canada.  You're going to hear Mr. Shirani talk in

1    Farsi in the background, running off to talk privately,

2    ra-ra-ra-ra.  There's going to be all this mix-up, Russian

3    speaking, Iranian, you're going to hear all this commotion,

4    and Mr. Wedding kind of caught in the middle of this trying

5    to calm the situation down.  You're going to hear it in the

6    recordings.

7         And, ladies and gentlemen, what you're going to

8    hear is when the arrest happens on the 13th, you're going to

9    hear what I call Shifty Shirani, who is in the recordings,

10   the boss, the main guy, and these are recordings that you're

11   going to be hearing from Yuri Trofimov, who's the informant,

12   speaking with Michael Krapchan.  And you'll see he's the

13   boss, he's the main guy.  But once he gets arrested, once he

14   gets a deal offered to him, which he has to cooperate and

15   give -- have a benefit for the government, he shifts his

16   story.  And you're going to hear that it's Ryan Wedding who

17   is the money guy, Ryan Wedding is the main guy, Ryan Wedding

18   is the rich guy, Ryan Wedding was part of this whole deal.

19        I want you to pay particular attention to

20   cross-examination.  I can't give everything here.  Keep your

21   minds open.  It's a drug case; I know it's very -- everybody

22   automatically assumes guilt, but at the end of this trial,

23   you're going to be able to wake this young man up and say

24   wake up from your nightmare and go home to your family.

25   Thank you.

1          THE COURT:  Mr. Gutierrez, you may call your first

2     witness.

3          MR. GUTIERREZ:  Thank you.  United States would

4     call Oleksandra Johnson, your Honor.

5          THE COURT:  May I see counsel, please, at the side

6     of the bench.

7       (Following is a sidebar conference.)

8          THE COURT:  Ms. Johnson -- now, you may -- you

9     probably are aware of this, but I don't -- are you aware that

10    Ms. Johnson, who is the first witness, is a law clerk for

11    Judge Huff?

12          MR. DENIS:  Right.

13          MR. GUTIERREZ:  I believe we stipped to -- okay.

14          THE COURT:  I didn't know.

15          MR. DENIS:  I was aware, yeah.  We --

16          THE COURT:  I don't know if you intended on

17    eliciting any information about where she's presently

18    employed --

19          MR. GUTIERREZ:  We don't intend to.

20          THE COURT:  All right.  I think that would be

21    unfair, an unfair advantage for the government to have the

22    jury hear that she's working with a U.S. District Judge at

23    the present time because I wouldn't want that to be used as

24    an argument to buttress her credibility.

25          Ms. Johnson in the past has been an interpreter in

1  my courtroom several times on some major cases where there

2  was a need for an interpreter, a Russian interpreter; she's

3  externed for me in the past, a couple of years ago; she has

4  externed for Judge McKeown, a Circuit judge --

5           MR. DENIS:  So she's disqualified now?

6           THE COURT:  No, no, no.  So you know what I'm

7  saying?  I don't want to see the government loading up on all

8  of that and --

9           MR. GUTIERREZ:  It's not my intention.  I would

10 allow -- I would let her to know not to mention that at all

11 if the Court would allow me.

12          MR. DENIS:  Maybe --

13          THE COURT:  I don't think you need to confer with

14 her right now.  I didn't think she'd be called this early in

15 the case.  I should have had more of an opportunity to

16 discuss this with you.  Just direct her by leading questions;

17 direct the examination such that --

18          MR. GUTIERREZ:  If I could have a little bit of

19 leeway so I can make sure --

20          THE COURT:  Yes.  If you'd --

21          MR. DENIS:  Your Honor, I do have a question now

22 because I believed we had a stipulation as to the Russian

23 translations.  Are we -- do we not?  I didn't call a

24 translator to --

25          THE COURT:  Let's not deal with that.  We don't

```
 1    need to get that resolved right now.  I want to keep the
 2    sidebar just as short as possible just --
 3              MR. DENIS:  Your Honor, the thing that I --
 4              THE COURT:  -- and we can discuss the other thing
 5    if we need to.
 6        (Sidebar conference concludes.)
 7              THE CLERK:  Would you raise your right hand to be
 8    sworn, please.  Do you solemnly swear or affirm that the
 9    evidence you shall give in the cause now before the Court
10    shall be the truth, the whole truth, and nothing but the
11    truth?
12              THE WITNESS:  I do.
13                        Oleksandra Johnson
14    was called by the government and testified as follows:
15              THE CLERK:  Please state your name for the record
16    and spell your full name.
17              THE WITNESS:  My name is Oleksandra Johnson,
18    O-l-e-k-s-a-n-d-r-a  J-o-h-n-s-o-n.
19                        Direct Examination
20              BY MR. GUTIERREZ:  Q.  Good morning, Ms Johnson.
21    A.  Good morning.
22    Q.  I'd like to talk to you about the languages you speak.
23    Do you speak another language besides English?
24    A.  I do.
25    Q.  And during the course of your time here in San Diego,
```

1    have you had a chance to professionally utilize your language

2    skills?

3    A.   Yes.

4    Q.   What languages do you speak?

5    A.   I speak Russian and I speak Ukrainian.

6    Q.   And specifically with regard to your language skills in

7    Russian and Ukrainian only, what sort things have you done in

8    the past?

9    A.   I have worked as a court-certified interpreter.

10   Q.   And court certification, the certification process, is

11   that a licensing type?

12   A.   Yes.  The State of California, the Judicial Council

13   specifically, has a test that individuals can take in order

14   to become certified to work in the court system.

15   Q.   Now, did you have to study these two languages in school

16   to become proficient and take the test or did you perhaps

17   grow up speaking the language?

18   A.   I am a native speaker of both of those languages.

19   Q.   Those were I guess your first and second language?

20   A.   You could say that, yes.  I spoke both of them at home

21   and at school.

22   Q.   So would it be fair to say that you've grown up speaking

23   Russian?

24   A.   Yes.

25   Q.   Do you have an opportunity to speak Russian on a daily

1    basis even now?

2    A.   Yes.

3    Q.   And would that be at home or related to your

4    professional --

5    A.   I have Russian-speaking friends with whom I communicate

6    in Russian exclusively, and as far as professionally, up

7    until August or the end of August, I was working --

8    Q.   Let me stop you right there if I could.  Speaking from

9    personal experience, and maybe this is pretty well known is

10   that if you don't use a language regularly, you can become

11   rusty.

12   A.   That's true.

13   Q.   Would you feel that your daily amount of Russian that you

14   speak now with your friends and what you do as a translator

15   and interpreter, would you characterize your Russian as

16   rusty?

17   A.   No.

18   Q.   Not at all?  Okay.  Were you asked to do some translation

19   work from the United States Attorney's Office?

20   A.   Yes, several times.

21   Q.   In the past?

22   A.   Yes.

23   Q.   More specifically in regard to this case?

24   A.   Yes.

25   Q.   Were you provided with audiotapes?

1    A.   I was provided with audio CDs.

2    Q.   Excuse me.   I'm dated.   Audio recordings; is that

3    correct?

4    A.   Yes.

5    Q.   And they were in predominantly Russian?

6    A.   Yes.

7    Q.   And was there English spoken as well?

8    A.   Some, yes.

9    Q.   What were you asked to do with regard to these recordings

10   that you were provided?

11   A.   I was asked to listen to them and also check the

12   transcripts that I was provided at the same time.

13   Q.   When you say check, what do you mean?

14   A.   My understanding was that the audio recordings were

15   already listened to and transcribed by other linguists, who

16   then created transcripts; and my job was to read the

17   transcript, at the same time listen to the recording and make

18   sure that it's correct, and make any changes that I deem

19   necessary.

20   Q.   And did you do that with all the recordings that were

21   provided to you in the first instance?

22   A.   Yes.

23   Q.   Were you provided with a lot of material?

24   A.   Probably around -- somewhere in between six or eight

25   hours of recording I think.

1          MR. GUTIERREZ:  I'd state for the record, your

2    Honor, I'm showing counsel what has previously been marked as

3    Government's Exhibit 16.  Your Honor, may I approach?

4          THE COURT:  Certainly.

5          BY MR. GUTIERREZ:  Q.  Ma'am, I've placed before

6    you what's been previously marked as Government's Exhibit 16.

7    What is Government's Exhibit 16, at least at first glance?

8    A.  It appears to be a CD.

9       (Exhibit No. 16 identified.)

10   Q.  Have you seen that CD before?

11   A.  Yes, I have.

12   Q.  How do you know that you've seen that particular CD

13   before?

14   A.  Because I initialed it.

15   Q.  And your initials appear on the actual CD?

16   A.  Yes.

17   Q.  And when did you see this CD before?

18   A.  I first saw it on Friday, last Friday, and I worked with

19   it over the weekend and gave it back to your office Monday

20   morning.

21   Q.  And what were you asked to do with regard to that CD,

22   Government's Exhibit 16?

23   A.  I was asked to go over once again the calls that I had

24   already checked and compare them to the transcripts that were

25   provided.  I was told that this was going to be introduced at

1    trial, and you wanted me to make sure everything is correct.

2    Q.   Were the audio recordings on Government's Exhibit 16 a

3    smaller subset of the recordings that you had listened to

4    earlier?

5    A.   Yes.

6              MR. GUTIERREZ:   Your Honor, I'll state for the

7    record I'm showing counsel what's been previously marked as

8    17 through 27.

9              MR. DENIS:   Your Honor, what he's showing me was

10   previously marked.   I don't have any exhibit book by the

11   defense side.   I don't know what he's showing me.

12             THE COURT:   You can just state for the record what

13   you're showing counsel.   If he doesn't have an exhibit list,

14   that's fine.

15             MR. GUTIERREZ:   For the record, your Honor, I

16   provided counsel an exhibit list at the outset of trial.

17             THE COURT:   Why don't you proceed, Mr. Gutierrez,

18   please.

19             MR. GUTIERREZ:   Your Honor, may I approach?

20             THE COURT:   Certainly.   You don't need -- you have

21   continuing permission, as do you, Mr. Denis, to approach

22   witnesses with exhibits.

23             MR. DENIS:   Thank you.

24             MR. GUTIERREZ:   Thank you, your Honor.

25             BY MR. GUTIERREZ:   Q.   I'm placing before you a

1   stack of documents.  Do you recognize those documents?

2   A.  Yes.

3   Q.  Let's take the first document marked on top.  Do you see

4   it say Government's Exhibit 17?

5   A.  Yes.

6   Q.  Have you seen Government's Exhibit 17 before?

7   A.  Yes, I have.

8   Q.  Where have you seen Government's Exhibit 17 before?

9   A.  I have seen it on Friday when you gave it to me together

10  with the audio CD, and I took it home over the weekend and

11  proofread everything and initialed every page of it.

12      (Exhibit No. 17 identified.)

13  Q.  You recognize those as exact documents you reviewed

14  because you've initialed every page?

15  A.  Yes.

16  Q.  And do you see your initials on every page of that

17  document?

18  A.  Counsel, there's 19 pages.  I can --

19  Q.  Just for the first one.

20  A.  Yes, it appears that I have initialed every page.

21  Q.  Now, on Government's Exhibit 17, how did you use that in

22  relation to the audio CD, Government's Exhibit 16?  If you

23  could describe to the jury, please.

24  A.  I came home, put the CD in my laptop, and selected the

25  audio file named 17 or 17 something.  I knew that each file

1    was corresponding to the numbered exhibits, so it was easy to

2    identify.  I played the file and read the transcript at the

3    same time --

4    Q.  Okay.

5    A.  -- listening and reading to make sure that --

6    Q.  And did you do that exact process with every single

7    transcript that is before you?

8    A.  Yes.

9    Q.  Now, if you could look, after 17, is 18 there as well?

10   A.  Yes.

11   Q.  And did you do that with 18?

12   A.  Yes.

13   Q.  And did you find 19 there?

14   A.  Yes.

15   Q.  Did you do that with 19?

16   A.  Yes.

17   Q.  With 20?

18   A.  Yes.

19   Q.  With 21?

20   A.  Yes.

21   Q.  With 22?

22   A.  Yes.

23   Q.  With 23?

24   A.  Yes.

25   Q.  And 24?

1    A.   Yes.

2    Q.   Twenty-five?

3    A.   Yes.

4    Q.   Twenty-six?

5    A.   Yes.

6    Q.   And 27?

7    A.   Yes.

8         (Exhibit Nos. 18-27 identified.)

9    Q.   Now, would it be fair to say that some of those

10   transcript have some English in them; is that right?

11   A.   The transcripts are entirely in English.

12   Q.   Excuse me.   Some of the audio recordings were in English;

13   portions of them had English aspects to it.   Is that fair to

14   say?

15   A.   Yes.

16   Q.   And did you double check the Russian and the English?

17   A.   Yes.

18   Q.   Now, based on your training and experience as a

19   Russian-language interpreter, did you -- do the documents

20   that exist in Government's Exhibit 17 through 27, are they

21   accurate transcriptions of the audio recordings that are

22   there on Government's Exhibit 16?

23   A.   Yes.

24        MR. GUTIERREZ:   Thank you.   I have nothing no

25   further questions, your Honor.

```
 1              THE COURT:  Cross-examination.
 2              MR. DENIS:  Thank you, your Honor.
 3                      Cross-Examination
 4              BY MR. DENIS:  Q.  Ms. Johnson, before I approach,
 5   you were given a CD on just this last Friday?
 6   A.  That's correct.
 7   Q.  That was Exhibit No. 16?
 8   A.  Yes.
 9   Q.  And that had six to eight hours of recording?
10   A.  No.
11   Q.  How many hours of recording did it have?
12   A.  I can't tell you.  I would have to look.
13   Q.  So when Mr. Gutierrez indicated it had six to eight
14   hours, you weren't sure if it was six to eight hours; is that
15   true?
16   A.  With regard to Exhibit 16 --
17   Q.  Yes.
18   A.  -- it was a -- I believe my answer was to how many total
19   hours of recordings I had heard, and my answer was a total of
20   six to eight hours approximately.
21   Q.  So you listened -- okay.  So Exhibit 16 has how -- okay.
22   Strike that.  You listened to six to eight hours of
23   recording, correct?
24   A.  Correct.
25   Q.  Does that represent Exhibit 17 through 26 I believe?
```

1    A.   That includes but -- it includes but is not limited to

2    Exhibit 17 through 27.

3    Q.   What's the last one, 27?

4    A.   It's 27.

5    Q.   Okay.  So -- so the document that was handed to you.  Do

6    you have any idea what's there in front of you?

7    A.   Which specific document are you referring to?

8    Q.   Seventeen through 27.

9    A.   I have an idea what it says.

10   Q.   You were handed a stack of documents this morning just

11   now by counsel, correct?

12   A.   Correct.

13   Q.   Do you know what's there?

14   A.   Yes.  I've read each page of each document in this stack.

15   Q.   Were there more -- did you -- on Friday did you do more

16   translations or transcriptions beyond -- strike that.  The

17   stack that you have in front of you, is that what you

18   reviewed on Friday?

19   A.   I was given this stack on Friday, and I reviewed it over

20   the weekend.

21   Q.   Okay.  And when was it complete, your review?

22   A.   My review was complete on Sunday evening.

23   Q.   And do you recall -- and was it just -- strike that.

24   What were you asked to review from Exhibit CD No. 16?

25   A.   I was asked to go over the exhibits as they were prepared

1    for trial to make sure that everything that I had reviewed

2    before and the corrections that I had made were correctly

3    reflected in the government's exhibits.

4    Q.   Okay.  And how did you do that?  What did you do on

5    Friday through Sunday?

6    A.   I played each file on the audio CD while reading the

7    corresponding transcript.

8    Q.   And as it was accurate, you initialed each page?

9    A.   Yes.

10   Q.   You were originally given a number of CDs several months

11   ago to translate; isn't that true?

12   A.   That's true with one correction.  I was given the CDs and

13   the corresponding transcripts, and my job was not translate

14   and type everything but to compare the two and do what was

15   called a quality check or quality control.

16   Q.   So you were given a draft of a transcript prepared by

17   someone else, correct?

18   A.   I was given a transcript prepared by someone else.  I'm

19   not sure I would call it a draft.

20   Q.   And the transcript that you -- that was prepared by

21   someone else, you did not prepare?

22   A.   That's correct.

23   Q.   And so you then listened to CDs and made corrections to

24   that transcript you did not prepare, correct?

25   A.   That's -- that's correct.  I just would like to clarify.

1   There were multiple transcripts, so for each call or each

2   recording, there would be a transcript.  So when you say a

3   transcript, I viewed it as, you know, much like today,

4   several exhibits.  There were separate transcripts.

5   Q.  And you took those transcripts and you listened to the

6   CD, correct?

7   A.  Correct.

8   Q.  You didn't -- you didn't transcribe anything; you added

9   to another transcript; is that right?

10   A.  Well, I transcribed some stuff.  For example, if I heard

11   and recognized a word or a phrase and I looked and in the

12   transcript there was a bracketed sign "unintelligible" but I

13   could hear what was being said, in that instance I

14   transcribed.  In other instances, if I saw that the

15   transcribed version was incorrect in my opinion, I corrected.

16   Q.  Okay.  Do you recall the dates that you were asked to

17   transcribe or quality-check?

18   A.  The dates that I worked or the dates of the recordings?

19   Q.  The day dates of the recordings.  I apologize.

20   A.  Some dates I recall.  I probably couldn't tell you all of

21   them, but they ranged from I believe June 1st through June 13

22   of 2008.

23   Q.  And the recordings that you were asked to translate over

24   the weekend, which was just this last weekend, do you recall

25   what dates those were for?

1    A.   I can tell you the date is on each --

2    Q.   That's fine.

3    A.   -- exhibit.

4    Q.   Sure?

5              THE COURT:   Ms. Johnson, you mentioned 2008.   Did

6    you mean 2009?

7              THE WITNESS:   No, your Honor.   The recordings to my

8    knowledge were made in 2008.

9              THE COURT:   Okay.   That's fine.   I thought

10   that's --

11             THE WITNESS:   I worked on the project in 2009.

12             THE COURT:   Right.   I thought that's what you

13   mentioned, that you had worked on it in 2008.   Thank you.

14             BY MR. DENIS:   Q.   Now, what were the dates on

15   those transcripts that you did last weekend, this weekend?

16   A.   Government's 17, June 1st; 18 is June 2nd; 19 is

17   June 3rd; 20 is June 4th; 21 says June 5th through June 8th;

18   22, June 6th; 23, once again, says June 5th through June 8th;

19   24, June 5th through June 8th; 25 doesn't appear to have a

20   date; 26, June 10th; and 27 is June 13th.

21   Q.   Exhibit 23 and 24 where it has two dates of June 5th

22   through June 8th, are those the same exhibits or are those

23   different calls on those dates?

24   A.   Nothing in here is repetitive; these are all different

25   calls.

1   Q.   Okay.  And you also transcribed in Exhibit 27 June 13th,

2   correct?

3   A.   I checked Exhibit 27.  I think we can agree I didn't

4   necessarily transcribe 27, but I checked it.

5   Q.   Okay.  And was -- you never spoke with the individual

6   that prepared the original transcript; is that true?

7   A.   No, I never did.

8   Q.   So you didn't know their ability to translate in Russian

9   into English, correct?

10  A.   That's correct.

11  Q.   And you indicated that you there were English portions of

12  the transcripts, is that true, English portions?

13  A.   The entire transcript is in English.

14  Q.   Forgive me.  The recordings that were not in Russian but

15  were in English -- strike that.  In the recordings that you

16  listened to, there was portions that there was English

17  speaking, correct?

18  A.   That's correct.

19  Q.   And on those English-speaking portions, did you check --

20  quality check or transcribe that portion?

21  A.   Yes.

22  Q.   Did you put anything in a different format like italics

23  to differentiate what's spoken in Russian and what's spoken

24  in English?

25  A.   I didn't.

1   Q.  So is it fair to say that if someone were to look at all

2   of the transcripts that you prepared, someone could -- strike

3   that.  Is it fair to say if I were to read your transcripts,

4   I wouldn't know who was speaking in Russian and who was

5   speaking in English; is that true?

6   A.  Let me clarify something.  You are talking about the

7   government's exhibits?

8   Q.  Ms. Johnson, when I ask the question, just answer it, and

9   if you have something further, we can try to address it.  If

10  I were to read those transcripts --

11  A.  That's what I was trying to clarify.  The government's

12  exhibits as they are here now, no, you wouldn't be able to

13  tell.

14  Q.  All right.

15  A.  May I clarify now?

16  Q.  Yes.

17  A.  The original transcripts I was given that were prepared

18  by other linguists had the English portions of the dialog in

19  italics; I was given paper transcripts at first, and the

20  italics were there.  Now, I'm not seeing any italics here,

21  so -- but the original transcripts you could tell.

22  Q.  So the original ones, if I were to read those, I could

23  see what was in Russian and what was being spoken in English,

24  correct?

25  A.  That's correct.

1   Q.   And what you've testified is you were given those

2   transcripts, you made changes on the actual transcripts --

3   was that with a red pen?

4   A.   At what time?

5   Q.   Okay.  Fair.  When you were originally given these

6   transcripts months ago, you were given transcripts and a

7   recording, correct?

8   A.   The first time, yes.

9   Q.   And when you listened to the recording, if you found

10  something not correct or you were quality-checking, you would

11  make changes on the -- let's consider it the draft

12  transcript, correct?

13  A.   On the paper, yes.

14  Q.   And you would do that with a pen?

15  A.   Yes.

16  Q.   And you would write it in red?

17  A.   Yes.

18  Q.   And then when you were done -- and you didn't type it up;

19  isn't that true?

20  A.   That's correct.

21  Q.   You gave the to the government's office?

22  A.   Yes.

23  Q.   And you don't know what happened after that, correct?

24  A.   No.  I was given the typed-up version to proofread after

25  that.

1   Q.   Was that what you have here today?

2   A.   Some of it, yes.   This entire stack is something that I

3   had worked on before, so this includes --

4   Q.   So when you were given the stack back to proofread again

5   your changes, did you relisten to the recordings again?

6   A.   I believe I did.   I can't be certain.   I know that I

7   verified -- in fact, I probably didn't because I was given

8   both my original red-pen transcript and the file that had my

9   corrections incorporated, and I checked the transcript with

10  each change, which I tabbed so I could easily go to the page

11  where I corrected something, and the new -- the new

12  transcript created by the government.

13  Q.   And when you looked at the new transcript, the italics

14  were gone; isn't that true?   Okay.   Strike that.   In terms of

15  the English portion that were in italics, when you got a

16  final typed-up copy, those italics were gone; isn't that

17  true?

18  A.   I'm not certain.   It was -- this was -- this was in

19  August; I reviewed that in August, so I couldn't tell you

20  which font style was used then.   They may have been there,

21  they may have been gone; I don't remember.

22  Q.   Fair.   But then you were given this stack over the

23  weekend, correct?

24  A.   On Friday I was given this stack.

25  Q.   And there were English portions on those transcripts?

1    A.   Yes.

2    Q.   And those transcripts are not in italics; isn't that

3    true?

4    A.   That's true.

5    Q.   So, again -- I just want to be clear -- if I were to read

6    that transcript, I don't know who's speaking Russian, I don't

7    know who's speaking English, true?

8    A.   That's true.

9    Q.   Now, Ms. Johnson, you've already testified you didn't

10   actually translate the CDs, you just quality-checked them,

11   correct?

12   A.   I would -- I wouldn't be able to answer affirmatively

13   because in my quality-checking, I necessarily have to

14   translate, even if my head, to make sure that the transcript

15   is correct.

16   Q.   Okay.  But you didn't actually -- you personally --

17   listen and from your mind type out what you heard from your

18   translation -- strike that.  You did not listen to the CDs

19   and prepare a transcript of what you, Ms. Johnson, heard in

20   Russian and translate into English; isn't that true?

21   A.   That's true, except --

22   Q.   Okay.  That's it.

23              THE COURT:  Go ahead.  You may finish your answer,

24   Ms. Johnson.

25              THE WITNESS:  That's true except for those portions

1    where I did make corrections; I did correct some language

2    that I deemed incorrect, and I did add some language that I

3    could hear that was marked as "unintelligible" or

4    "inaudible."

5            BY MR. DENIS:   Q.   Okay.   You also transcribed the

6    date of 13th, correct, June 13, 2008?

7    A.   I quality-checked the date of the 13th, yes.

8    Q.   Okay.   And when you say quality-checked, again, you were

9    just -- was this something that you worked on previously?

10   A.   Yes.   All of these I have seen before, and I have checked

11   them back in August.

12   Q.   Okay.   And including the 13th --

13   A.   Yes.

14   Q.   -- June 13th?   Okay.   On the 13th were you given, as far

15   as you could recall, any specific instructions -- strike

16   that.   Do you -- okay.   On the 13th, for the recording on

17   June the 13th, were you given any instructions on how to

18   translate something in terms of its order; do you recall?

19   A.   I was not given any instructions as to the 13th or any

20   other date with regard to how I should translate.

21   Q.   Okay.   Fair.   Now, you also listened to a number of

22   recordings that were given to you, you indicated from

23   June 1st through June 13th, correct?

24   A.   Yes.

25   Q.   And when you were listening to all these conversations in

34

1    Russian and in English, you didn't have any idea what they
2    were selling; isn't that true?
3    A.   When I was first listening or --
4    Q.   Yes.  When you -- after you finished your quality check
5    and you'd listened to the whole thing, you did not know what
6    these people were selling; isn't that true?
7    A.   No, that's not true.  I knew that they were selling an
8    illegal substance.  I didn't know which substance, but I
9    could gather from the verbal clues, namely words like "street
10   dealer," "I'm not a street dealer," I could figure out that I
11   was not dealing with a sale -- and they joked about how, you
12   know, "this is not a store where you buy tomatoes," so I
13   could figure out that something illegal was going on and most
14   likely involved an illegal substance.
15   Q.   And this was all spoken in Russian, correct?
16   A.   When you say all, what do you mean?  For example --
17   Q.   You gave --
18   A.   -- the words "street dealer" were said in English if I
19   recall correctly.
20   Q.   And was this during the Russian conversations?
21   A.   Yes, most of the recordings are conversations in Russian.
22   Q.   And those were recordings between Michael Krapchan and
23   Yuri Trofimov, correct?
24   A.   Correct.
25   Q.   Okay.  And isn't it true at some point you had to ask the

1    government what are they selling, what is the illegal

2    substance; isn't that true?

3    A.   I did ask.   I didn't have to; I was curious.

4    Q.   Because you didn't know from listening to all of the

5    recordings what they were selling; isn't that true?

6    A.   That's correct.

7    Q.   They never used the word "cocaine" or "drugs" in all of

8    the recordings that you listened to from June 1st all the way

9    to June 13th; isn't that true?

10            MR. GUTIERREZ:   Compound as phrased, your Honor.

11            THE COURT:   I'm sorry?

12            MR. GUTIERREZ:   Compound as phrased.

13            THE COURT:   The objection is overruled.   You may

14   answer that, Ms. Johnson, if you're able to.

15            THE WITNESS:   I recall one instance where the

16   person you're calling Yuri did say the word ko-ka-een

17   (phonetic), which is cocaine, but I probably heard it towards

18   the end of the date range of the transcripts that I was

19   given.   So when I first started with the beginning

20   recordings, you are correct, nothing was mentioned.

21            BY MR. DENIS:   Q.   So the only time you heard it

22   was at the end.   If you recall, was it right before the

23   arrest took place?

24   A.   I don't know when the arrest took place.

25   Q.   Okay.   But it was at the end of the transcript, correct?

36

1   A.   It was closer to the end of the date range.   When you say

2   the end of the transcript, I think you mean -- I don't know

3   if you mean the end like the last page of the transcript

4   or -- what I'm trying to explain is I heard on the recording

5   Yuri saying "Do you want to take the cocaine" --

6   Q.   Correct.

7   A.   -- "are you ready to..."  Something like that.  It's from

8   my memory.  You can verify.

9   Q.   Correct.  And that's what you just listened to this

10  weekend, correct?

11  A.   Yes.

12  Q.   Okay.  So you don't recall if it was on the 13th, the

13  last date?

14  A.   I don't recall.

15          MR. DENIS:  Nothing further.

16          THE COURT:  Anything further, Mr. Gutierrez?

17          MR. GUTIERREZ:  If I may briefly, your Honor.

18                    Redirect Examination

19          BY MR. GUTIERREZ:  Q.  At any time did the

20  government tell you how to translate?

21  A.   No.

22  Q.   Did they tell you what they wanted you to put into the

23  transcript?

24  A.   No.

25  Q.   Would it be fair to say that everything in the transcript

1   is an accurate translation based on your language skills?

2   A.   Yes.

3   Q.   And does the fact that the transcripts you were provided

4   are not in italics at all affect the accuracy of your quality

5   check?

6   A.   No.

7   Q.   You were asked that if you were to read the transcript on

8   cross-examination, you wouldn't be able to tell the English

9   and the Russian; is that correct?  Do you remember being

10  asked that?

11  A.   Yes.

12  Q.   But you didn't just read the transcript when you were

13  given these this weekend; is that fair to say?

14  A.   That's fair to say.

15  Q.   Did you listen to anything while you were reading the

16  transcripts?

17  A.   Yes, I listened to Government's Exhibit 16.

18  Q.   And when you hear the English and Russian language

19  spoken, could you tell the difference between the two

20  languages?

21  A.   Yes.

22           MR. GUTIERREZ:   I have no further questions, your

23  Honor.

24           THE COURT:   Anything further, Mr. Denis?

25           MR. DENIS:   Just very briefly.

1                        Recross-Examination

2              BY MR. DENIS:  Q.  Now, Ms. Johnson, if the

3      government had told you "don't translate this one portion,"

4      that would be unusual, wouldn't it?

5      A.  Most likely, yes.

6              MR. DENIS:  Nothing further.

7              THE COURT:  Thank you, Ms. Johnson.  You are

8      excused.  Mr. Gutierrez, next witness, please.

9              MR. GUTIERREZ:  We'd call FBI Agent Kalina, your

10     Honor.

11             THE CLERK:  Would you raise your right hand to be

12     sworn, please.  Do you solemnly swear or affirm that the

13     evidence you shall give in the cause now before the Court

14     shall be the truth, the whole truth, and nothing but the

15     truth?

16             THE WITNESS:  I do.

17                            Brett Kalina

18     was called by the government and testified as follows:

19             THE CLERK:  Please state your name for the record

20     and spell your full name.

21             THE WITNESS:  Brett Kalina, B-r-e-t-t  K-a-l-i-n-a.

22                        Direct Examination

23             BY MR. GUTIERREZ:  Q.  Good morning.

24     A.  Good morning.

25     Q.  Sir, what is your occupation?

1   A.   I'm a Special Agent with the FBI.

2   Q.   And how long have you been employed in that capacity?

3   A.   In excess of five years.

4   Q.   And before becoming an FBI agent, did you have any sort

5   of law enforcement or legal background?

6   A.   I went to law school and practiced as an attorney for

7   seven years prior to becoming an agent.

8   Q.   And what sort of law did you practice?

9   A.   I did different types of things when I first started out;

10  I did various areas, some criminal defense, and then

11  eventually moved into medical malpractice.

12  Q.   As an FBI agent have you received a certain amount of

13  training?

14  A.   Yes, sir.

15  Q.   Would it be fair to say that you've had on-the-job and

16  formalized training?

17  A.   Yes, sir.

18  Q.   Could you please briefly describe for the jury what the

19  extent is of your formalized training.

20  A.   We attend a training at Quantico, Virginia, and it's --

21  at that time it was 17 weeks of training on campus there at

22  Quantico.

23  Q.   And what is your current assignment with the FBI,

24  currently?

25  A.   I'm assigned to a Organized Crime squad in San Diego.

1    Q.   But prior to that did you have another assignment,

2    specifically around June 2008?

3    A.   At that time I was on the Organized Crime squad.   Prior

4    to that, I had been on the Major Mexican Drug Task Force.

5    Q.   Okay.   During the Major Mexican Drug Task Force in your

6    time with the Organized Crime Unit, did you have an

7    opportunity to participate in drug investigations?

8    A.   Yes, sir.

9    Q.   Can you briefly describe the extent of your experience in

10   that general regard to the jury.

11   A.   Well, there was various different types of

12   investigations, including all the way ranging from buy-walks

13   to --

14   Q.   Let me stop you if I could.   You mentioned the term

15   buy-walk.   What is a buy-walk?

16   A.   A buy-walk is where we, either utilizing an undercover

17   operator or a confidential informant, give that individual

18   money to purchase drugs, and we take the drugs and then the

19   individual takes the money and we let them go; we don't

20   necessarily do an arrest at that time.

21   Q.   Are you familiar with the term "a reverse"?

22   A.   Yes, sir.

23   Q.   What is a reverse?

24   A.   A reverse is when our organization supplies the illegal

25   substance and we are selling that to our subjects.

1  Q.   Is that an investigative technique that -- used by FBI in

2  the past?

3  A.   Yes, sir.

4  Q.   And when you say your organization, do you mean the FBI?

5  A.   Yes.

6  Q.   Now, you indicate on a buy-walk that you would buy drugs

7  and let the money walk; is that right?

8  A.   That's correct.

9  Q.   Do you let the drugs walk on a reverse?

10 A.   Never.

11 Q.   And why is that?

12 A.   It's a safety issue.

13 Q.   What do you mean by that?

14 A.   Well, we don't allow -- we do not want the drugs to get

15 into the hands of the public, so -- it's not necessarily for

16 the subject but the subject could take that quantity of

17 drugs, sell it to other individuals that are unknown, so it's

18 a safety issue for the public.

19 Q.   And when you acquire the drugs, is there like just a

20 little cabinet in the FBI office where you can just check the

21 drugs out or is it a more in-depth process?

22 A.   No, it's an in-depth process that we have to do a request

23 for a certain amount of drugs.  We request it from a

24 laboratory that's set up by the DEA, and we get approval and

25 then have to go through a process of just obtaining the drugs

1   at that time.

2   Q.   And while you're in possession of the drugs, are you

3   under any sort of obligations or heightened security or --  I

4   mean what's different about when you're just normally on duty

5   and when you're on duty and you have drugs checked out to

6   you?

7   A.   Well, we have the -- there's two people involved; there's

8   always two individuals that are transporting the drugs.   And

9   when we are not using the drugs, they are placed in a safe.

10  Q.   Does the amount of care that those two people take depend

11  on the quantity of the drugs that are checked out?

12  A.   Generally, it doesn't matter how much.   We always have

13  two people when there's any drugs involved, even if it's

14  smaller amounts.

15  Q.   So would there be the same level of concern at FBI if you

16  checked out one kilogram versus 24 kilograms of actual

17  cocaine?

18  A.   Well, yeah.   It's the same procedure.   Certainly it's a

19  little more important when you have a lot more drugs, but we

20  do the same procedure either way.

21  Q.   Are you familiar with the term "bunk"?

22  A.   Yes, sir.

23  Q.   What does bunk mean?

24  A.   Bunk is drugs that are packaged as if they appear to be

25  real drugs.   And in this case we would have had kilos of

1    cocaine that looked very similar to the cocaine -- the one

2    kilogram that we did check out.

3    Q.  You indicated that in this case you used bunk?

4    A.  We had it prepared.  We did not use any bunk in this

5    case.  We had it prepared in the event it would be needed.

6    Q.  And how much bunk and how much cocaine did you have

7    relative to this case prepared?

8    A.  We had one kilogram of pure cocaine and we had

9    23 kilograms of bunk.

10   Q.  Now, you indicated earlier that you used I think you said

11   a confidential informant or undercover; do you remember those

12   were the terms you used?

13   A.  Yes.

14   Q.  Is an undercover sometimes referred to as a UC?

15   A.  Correct.

16   Q.  And a confidential informant, a CI or a CS, depending on

17   the agency?

18   A.  We've used CI, CS, CW.  There's multiple names that could

19   be used.

20   Q.  What do you call a law enforcement officer who is

21   pretending to be, pursuant to investigation, not a law

22   enforcement officer?

23   A.  An undercover employee.

24   Q.  What do you call a civilian who is not a law enforcement

25   officer who for whatever reason is cooperating with the FBI?

1    A.   A confidential informant, confidential source,

2    cooperating witness.   There's various ways that it's phrased.

3    Q.   Did you have to do -- during 2008, specifically June,

4    during that month, did you have a chance to participate in

5    the investigation of a Michael Krapchan?

6    A.   Yes, sir.

7         MR. GUTIERREZ:   Your Honor, if I could use the

8    projector?

9         THE COURT:   Certainly.

10        MR. GUTIERREZ:   I believe it's turned on.   I'll

11   state for the record I'm showing counsel what's been

12   previously marked as Government's Exhibit 1, and I'm showing

13   counsel 2 and 3 as well.

14        BY MR. GUTIERREZ:   Q.   I'm placing face down before

15   you three documents.   Could you please take a look at the one

16   on top, the one on top, which was Government Exhibit 1 before

17   I flipped it over.   Excuse me.

18   A.   I have 2, 3, and 4 here.

19   Q.   All right.   Number 2.

20   A.   Yes.

21   Q.   And you have No. 1?

22   A.   I have 2, 3, and 4 sitting in front of me.

23   Q.   I must have an old list.   Excuse me.   I apologize, Agent

24   Kalina.   I gave you the wrong document.   Do you see

25   Government's Exhibit 1 before you?

1    A.   Yes, sir.

2    Q.   What is Government's Exhibit 1 generally?

3    A.   It's a picture of Michael Krapchan.

4    Q.   It's a photograph?

5    A.   Yes.

6        (Exhibit No. 1 identified.)

7    Q.   Do you recognize the person depicted in the photograph?

8    A.   Yes.

9    Q.   Who is depicted in the photograph?

10   A.   Michael Krapchan.

11   Q.   Is that a fair and accurate representation of Michael

12   Krapchan during June 2008 when you were investigating him?

13   A.   Yes, sir.

14            MR. GUTIERREZ:  Your Honor, I request permission to

15   publish Government's Exhibit 1.

16            THE COURT:  Are you moving it into evidence?

17            MR. GUTIERREZ:  And we'll move it into evidence at

18   this time as well, your Honor, and then ask to publish.

19            THE COURT:  Okay.  Exhibit 1 is admitted.

20            MR. DENIS:  And just for the record I'll object as

21   to foundation.

22            THE COURT:  The objection is overruled.  You may

23   publish it.

24            BY MR. GUTIERREZ:  Q.  Is that Government's

25   Exhibit 1 that you just identified a moment ago?

46

1   A.   Yes, sir.

2   Q.   Have you personally seen Mr. Krapchan --

3   A.   Yes.

4   Q.   -- during the course of the investigation?

5   A.   Yes.

6   Q.   And what was the nature of the investigation into

7   Mr. Krapchan at the outset generally?

8   A.   At the beginning, we began an investigation into

9   Mr. Krapchan and other associates in January of 2007

10  regarding money laundering and a drug investigation.

11  Q.   And without getting into details, was there a specific

12  event or happening that initiated your investigation?

13  A.   Yes.  A -- the confidential informant came to us and

14  explained that he had been in contact with Mr. Krapchan.

15  Q.   Had the FBI had any dealings with the confidential

16  informant before the confidential informant contacted you?

17  A.   No, sir.

18  Q.   The confidential informant that was used by the FBI, was

19  he ultimately signed up as an official confidential informant

20  with the FBI?

21  A.   Yes.

22  Q.   Is that a process or what does that mean?

23  A.   Well, we have -- we have to do some paperwork, some

24  background checks, that type of thing, prior to formally

25  setting him up as a source with our organization, including

1    giving them admonishments.

2    Q.   And did you use the confidential informant in an

3    undercover capacity given his express relationship with

4    Mr. Krapchan?

5    A.   Well, we didn't use it as an undercover; we used him as a

6    confidential informant.   Certainly Mr. Krapchan knew of our

7    source prior to us.

8    Q.   And at any point in time, did you have an opportunity to

9    place a recording device on the CS when he met with

10   Mr. Krapchan?

11   A.   Many times, yes.

12   Q.   And did you ever -- how did you instruct him in that

13   regard?   Could you explain what it was you told the CS with

14   regard to recording Mr. Krapchan?   Was he given a particular

15   device or --

16   A.   Throughout the course of the investigation, I believe the

17   informant used two different types of devices throughout the

18   year and a half or so.

19   Q.   What was he instructed to do with those devices

20   generally?

21   A.   To record any and all conversations as possible between

22   himself and any of the subjects of the investigation.

23   Q.   All right.   And how is it that these recordings that were

24   made wind up in your possession?   Was there a procedure or

25   practice that you had with the confidential informant?

48

1   A.   Yes.   As soon as a recording would be done, if I wasn't

2   there, I would then meet with the source and then he would

3   give me the recording device, I would take the recording

4   device and download the information.

5   Q.   And that was when you weren't there?

6   A.   Well, if I wasn't there, I would be in contact with the

7   source; I'd arrange for a time to pick up the recorder.   Or

8   if I was there, I would take it at that time.

9   Q.   Now, during the course of your investigation, did you

10  have the opportunity to have the CS call Mr. Krapchan?

11  A.   Yes.

12  Q.   How would you use the recording device in that instance

13  where you were asking him to place a call while you were

14  present?

15  A.   Well, the source would make a phone call using the

16  device, again, with a recorder and an earpiece and place a

17  call to Krapchan and record the call.

18  Q.   And then after the call was complete, what would happen

19  with regard to the recording?

20  A.   Again, the recorder would go to me, and then I would take

21  that to our office and we would download the information,

22  download the recordings.

23  Q.   Now, could you be with the confidential informant

24  throughout every day of his life?

25  A.   No, sir.

1    Q.   And were there times during those -- during the
2    investigation that you would receive recordings from him when
3    you weren't present?
4    A.   Yes, sir.   Early on in the investigation with the source,
5    we tried to be present during almost all of the recordings,
6    and once there was some rapport established with the source
7    and we felt a little more trust with the source, at that
8    point in time, we would allow him to take the recording
9    device with him in case there was communications with the
10   subjects in the evening or at odd hours of the day that it
11   was not feasible for us to be together all the time.
12   Q.   Now, were there ever times when a recording device was
13   used in conjunction with surveillance of the confidential
14   informant?
15   A.   Yes.
16   Q.   Could you please describe in conjunction with
17   surveillance how the recording device was used with regard to
18   this CI.
19   A.   Well, there were certain instances in which when the
20   source would meet with the subjects of the investigation --
21   most likely it was with either Krapchan or Mr. Akhundov --
22   and we would give him a recording device and then at the same
23   time there would also be a surveillance group that would be
24   conducting some surveillance on those meetings.   Those
25   surveillances generally only occurred when there was actual

1    meetings between the source and the subjects of the

2    investigation.

3    Q.   And then after the meeting or during the meeting, the

4    recording device would be recording what was being said?

5    A.   That's correct.

6    Q.   And do you have a number of those recorded meetings --

7    A.   Yes, sir.

8    Q.   -- that were completed by the CI?

9    A.   Yes, sir.

10   Q.   And then after their meeting where there was

11   surveillance, would the CI meet with you again?

12   A.   Always, yes.

13   Q.   And at that point in time, would you take the recorder?

14   A.   Yes.

15   Q.   And you would download the recording?

16   A.   Yes.

17   Q.   Would you often listen to that recording after you

18   completed the surveillance?

19   A.   I always listened to the recording, but sometimes it was

20   in Russian.  A lot of -- most of the time it was in Russian.

21   So although I would listen to it and listen to the voices, I

22   didn't necessarily understand all of it myself.

23   Q.   You mentioned the name Mr. Akhundov earlier.  Who is Mr.

24   Akhundov?

25   A.   Mr. Akhundov was the subject of the investigation early

51

1    on based upon our recordings and the information that

2    Mr. Krapchan provided us, including meetings with Mr.

3    Akhundov as well.

4    Q.   Were there recorded meetings of the CI, Mr. Krapchan, and

5    Mr. Akhundov together?

6    A.   There is one recording of a meeting between Mr. Akhundov,

7    Mr. Krapchan, and our source.   There are many calls between

8    Mr. Akhundov and our source, but those are just recorded

9    calls.   There's only one meeting where all three were

10   present.

11   Q.   Okay.   And you said this investigation was initiated in

12   2007; is that right?

13   A.   Correct.

14   Q.   And it was an investigation of Mr. Krapchan and Mr.

15   Akhundov?

16   A.   That is how it began, yes.

17   Q.   At the outset of the investigation in 2007, were you

18   aware of a name Hassan Shirani?

19   A.   No, sir.

20   Q.   I'd like you to take a look at Government's Exhibit 2 for

21   identification.   Do you see that?   And Government's Exhibit

22   3?

23   A.   Yes.

24   Q.   Now, do you recognize the individual depicted in

25   Government's Exhibit 3?

1    A.   Yes.

2    Q.   Who is that?

3    A.   That is Hassan Shirani.

4         (Exhibit No. 3 identified.)

5    Q.   Is that a fair and accurate representation of Mr. Shirani

6    as you know him first in 2008?

7    A.   Yes, sir.

8              MR. GUTIERREZ:  Your Honor, I'd ask that

9    Government's Exhibit 2 be received?

10             THE COURT:  The exhibit -- I think this is 3

11   actually.

12             MR. GUTIERREZ:  I apologize.  Yes, 3, your Honor.

13             THE COURT:  Okay.  Exhibit 3 is admitted in the

14   absence of objection.

15        (Exhibit No. 3 admitted.)

16             MR. GUTIERREZ:  Your Honor, I'd ask if we could

17   publish to the jury.

18             THE COURT:  You may do so.

19             MR. DENIS:  Your Honor, I do object as to the

20   foundation.  He didn't take the photos.

21             THE COURT:  The objection did come late.  But in

22   any event, if it had been timely, it would be overruled.  The

23   foundation has been established.

24             MR. DENIS:  Okay.

25             BY MR. GUTIERREZ:  Q.  Is this Mr. Hassan Shirani?

53

1    A.   Yes, sir.

2    Q.   And you were not aware of his presence until our -- you

3    were not aware of who he was until what date?

4    A.   June 10 of 2008.

5    Q.   Was that the first time you ever saw Mr. Shirani?

6    A.   Yes.

7    Q.   And where was it that you saw him for the first time?

8    A.   First time I saw him in person was at LAX.

9    Q.   And would that be Los Angeles International Airport?

10   A.   Yes.  I apologize.

11   Q.   Is that a yes?

12   A.   Yes.

13   Q.   Now, after you saw him, did he become part of the

14   investigation?

15   A.   Yes, sir.

16   Q.   I'd like you now to look at Government's Exhibit 2 for

17   identification.  Do you have that before you?

18   A.   Yes.

19   Q.   What is Government's Exhibit 2?

20   A.   It's a photograph.

21        (Exhibit No. 2 identified.)

22   Q.   Is it a photograph of somebody you recognize?

23   A.   Yes, it is Mr.  Ryan Wedding.

24   Q.   Is that a fair and accurate representation of Mr. Wedding

25   on about June 2008?

54

1    A.   Yes.

2         MR. GUTIERREZ:  Your Honor, we'd ask that

3    Government's Exhibit 2 for identification be received.

4         THE COURT:  Exhibit 2 is admitted.

5      (Exhibit No. 2 admitted.)

6         MR. GUTIERREZ:  We'd ask permission to publish it.

7         THE COURT:  You may publish it.

8         BY MR. GUTIERREZ:  Q.  Have you seen this

9    individual before?  Excuse me.  When Mr. Krapchan came --

10   excuse me.  When the CS came to you and you were initiating

11   the investigation of Mr. Krapchan and Mr. Akhundov, were you

12   aware of who Mr. Ryan Wedding was?

13   A.   No, sir.

14   Q.   Now, when was the first time that you became aware of

15   Mr. Ryan Wedding?

16   A.   That -- it was Mr. Wedding himself was June 10 of 2008.

17   Q.   Was that the first time you actually laid eyes on Mr.

18   Wedding?

19   A.   Yes.

20   Q.   And was Mr. Wedding in the company of anybody when you

21   saw him on June 10, 2009 (sic)?

22   A.   He and Hassan Shirani arrived through the Customs gate at

23   LAX.  I saw them arrive together, yes.

24   Q.   You were personally present when you saw them arrive?

25   A.   Yes, sir.

1   Q.   Now, when they arrived at the Los Angeles International

2   Airport, did they meet with anybody?

3   A.   Yes.

4   Q.   Who did they meet with?

5   A.   They met with Mr. Krapchan and our confidential

6   informant.

7              MR. DENIS:  Objection, foundation.

8              THE COURT:  The objection is overruled.

9              BY MR. GUTIERREZ:  Q.  Did you personally see them

10  meet?

11  A.   I personally saw them shake hands, yes.

12  Q.   And how far away were you from them when you saw that?

13  A.   Maybe from here to the door, approximately 20, 25 yards.

14             MR. GUTIERREZ:  Your Honor, does the Court have

15  premeasured locations in the courtroom?

16             THE COURT:  Well --

17             MR. GUTIERREZ:  Twenty to 25 yards.  I'm sorry.

18             THE COURT:  -- he mentioned 20 to 25 yards, but he

19  also as an example indicated the distance between himself and

20  -- did you see the exit doors or the entry doors to the

21  courtroom?

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Okay.

24             BY MR. GUTIERREZ:  Q.  Where were you before you

25  saw them meet at the Los Angeles International Airport?

1  A.  Myself and other individuals had been conducting

2  surveillance most of the day.

3  Q.  Now, was this a surveillance operation on the 10th?

4  A.  It was a combination -- I mean we ended up doing

5  surveillance, but there was anticipation for other things as

6  well, so it was --

7  Q.  Where did the operation start?

8  A.  In San Diego.  We met with the informant in the

9  morning --

10  Q.  When you met with the informant in the morning, did you

11  provide him or did you discuss with him the recording device.

12  A.  Yes, sir.

13  Q.  And did he have a recording device at the outset of the

14  operation?

15  A.  Yes, sir.  He actually had two that day.

16  Q.  And can you describe the two recording devices he had.

17  A.  Yes.  He had one recording device that was more -- that

18  he placed in his pocket that was easier to start and stop.

19  Q.  Did you see him put it in his pocket?

20  A.  Yes.

21  Q.  And the other one?

22  A.  And the other was a recording device in a key fob.

23  Q.  After you gave him the recording device, did you have the

24  opportunity to follow him?

25  A.  Yes, sir.

1    Q.   When you followed him from San Diego, in what direction

2    did he drive?

3    A.   Well, first he picked up Mr. Krapchan at his hotel at the

4    Hampton Inn in San Diego.

5    Q.   He went to the direction of the Hampton Inn in San Diego?

6    A.   Correct.

7    Q.   Did you personally -- or was there a surveillance

8    operation ongoing at that time?

9    A.   There was --

10   Q.   And how many --

11   A.   -- surveillance, but I'm not a hundred percent sure if

12   anyone exactly saw that portion of it.  I don't remember.  I

13   know I personally did not see that.

14   Q.   How many agents were involved in the surveillance

15   operation approximately?

16   A.   On June 10?

17   Q.   Yes.

18   A.   Approximately eight to ten.

19   Q.   And once you picked up Mr. Krapchan, did you continue

20   to -- was he continued to be followed?

21   A.   Yes.

22   Q.   And where did he go?

23   A.   The source and Mr. Krapchan drove north on the 5 up to LA

24   again, Los Angeles International Airport.

25   Q.   And at some point in time during the trip I think you

1    said on the 5 to LAX. did you have an opportunity to see who

2    was in the vehicle?

3    A.   Yes.

4    Q.   And who was in the vehicle?

5    A.   The informant and Mr. Krapchan.

6    Q.   At any point in time from San Diego to the Los Angeles

7    International Airport, did they stop to take on any

8    additional passengers or let anybody off?

9    A.   No, sir.

10   Q.   Was it the two of them from San Diego to Los Angeles?

11   A.   Yes.

12            THE COURT:  Are you at a convenient time to

13   break --

14            MR. GUTIERREZ:  Yes, your Honor.

15            THE COURT:  -- Mr. Gutierrez?  All right.  Ladies

16   and gentlemen, we'll take on your midmorning recess at this

17   time, 15 minutes, resume at 10:45.  Please remember the

18   admonition not to discuss the case or make any decisions at

19   this time.  Thank you.

20        (There was a break in the proceedings.)

21            THE COURT:  We have everyone present.  Mr.

22   Gutierrez?

23            MR. GUTIERREZ:  Thank you, your Honor.

24            BY MR. GUTIERREZ:  Q.  During the June 10, 2008

25   meeting at LAX, you indicated before that you were present;

1  is that right?

2  A.  Yes.

3  Q.  Now, at certain times during that surveillance operation

4  at LAX, were you close enough to ever actually hear what was

5  being said?

6  A.  At times, yes.

7  Q.  And other times no; would that be fair to say?

8  A.  That's fair.

9  Q.  And, in fact, wasn't there an instance where the CS

10  actually called you on your phone?

11  A.  Yes, I --

12  Q.  Could you describe that for the jury.

13  A.  I was in a vehicle near where the informant's vehicle

14  was -- all four of the individuals were meeting outside and

15  having certain discussions.  The informant did not know where

16  I was located within the garage during any surveillance, and

17  contacted me -- I apologize -- contacted me, and I literally

18  was maybe ten feet away when he placed the call.

19  Q.  Was your ringer on?

20  A.  It was on vibrate.

21  Q.  Were you able to hear portions of that conversation when

22  they were at the car?

23  A.  Yes, sir.

24  Q.  All right.  Let me describe to you, LAX, it's like any

25  airport, there's arriving and departing areas?

60

1    A.   Yes.

2    Q.   Where did they meet when they first met each other at the

3    airport?

4    A.   Where Mr. Shirani Mr. Wedding met Mr. Krapchan and the

5    informant?

6    Q.   Yes.

7    A.   They met coming out of the Customs gate for that

8    terminal.

9    Q.   When you say Customs gate, do you mean it was an

10   international flight as opposed to a domestic?

11   A.   Yes, it was our -- it was our understanding -- we didn't

12   learn that till later that they were coming directly from

13   Vancouver.

14   Q.   Okay.  And did they have some conversation out by the

15   gate?

16   A.   They introduced each other, and after a short time they

17   headed towards the baggage claim.

18   Q.   And were you still present at the baggage claim or close

19   by?

20   A.   Yes.

21   Q.   Did they continue to have what could be fairly

22   characterized as small talk?

23   A.   Yes.

24   Q.   And after the baggage claim, did you follow them to where

25   they went?

1   A.   Yes.

2   Q.   Where did they go?

3   A.   They left the baggage claim area after one bag was

4   retrieved, they exited the terminal area, went to the parking

5   ramp, which is directly across from the terminal area, went

6   up to the second floor, and went to the informant's vehicle.

7   Q.   Did they have conversations outside of the informant's

8   vehicle?

9   A.   Yes, they did.

10  Q.   Now, were you able to hear portions of that conversation?

11  A.   Yes, I was.

12  Q.   After they had those conversations by the car in the

13  parking garage, what happened next?

14  A.   They spoke for approximately 25 to 30 minutes around the

15  informant's vehicle.  After that, they -- all four of the

16  individuals got into the informant's vehicle, they left the

17  parking ramp, they then went to -- drove to a hotel not far

18  from the airport, and that's where Mr. Wedding and

19  Mr. Shirani exited the source's vehicle and -- and that's

20  where the surveillance, all four of them at the same time,

21  discontinued.

22  Q.   After Mr. Shirani and Mr. Wedding got out of the car,

23  what did the CI do?

24  A.   When they got to the hotel?

25  Q.   Yes.

1    A.  Both the informant and Mr. Krapchan also got out of the

2    vehicle, they shook hands, and then they got back -- the

3    luggage was retrieved from the vehicle, Mr. Shirani and Mr.

4    Wedding's luggage was retrieved, and then they got back into

5    the vehicle.

6    Q.  Who is they?

7    A.  Mr. Krapchan and the informant.

8    Q.  And what happened with the CS next?

9    A.  Mr. Krapchan and the informant, with the informant

10   driving, drove back to San Diego.

11   Q.  Were they under surveillance as they drove back?

12   A.  Yes.

13   Q.  At some point in time, did the CS drop Mr. Krapchan off

14   at his hotel?

15   A.  Yes, he dropped him off back at the Hampton Inn in San

16   Diego.

17   Q.  And then what happened after he dropped him off?

18   A.  We had a meeting with the informant at that time.

19   Q.  What if anything did you do relative to the recording

20   device at that meeting?

21   A.  Retrieved both of the recording devices.

22   Q.  Did you have a chance to listen to that entire recording

23   that was made from those recording devices on June 10, 2008?

24   A.  I would have listened to the entire recording of the

25   recording from -- when Mr. Krapchan and the informant left

1   their vehicle and parked at LAX and met with Mr. Shirani and

2   Wedding and then dropped them off, and to the end of that

3   recording.   The other device was all in Russian, and so I may

4   have listen to portions of it, but I don't know that I

5   listened to the entire one.

6   Q.   Well, the one that was in the vehicle at the outset when

7   they drove to Los Angeles, did you hear a portion of that?

8   A.   Yes, sir.

9   Q.   Did it sound like they were in a quiet room or what did

10  it sound like?

11  A.   Well, the one that was in the vehicle?

12  Q.   Yes.

13  A.   When they first got in, that would have been one that you

14  could hear that it was in the vehicle; you could hear that

15  they were driving.

16  Q.   And with what you heard with regard to while they were

17  driving to LAX, was that consistent with what the

18  surveillance saw, what you saw, two of them in a car?

19  A.   Yes.

20  Q.   And in the conversations were there two people conversing

21  in that initial recording?

22  A.   Yes, I heard the two voices that I recognized.

23  Q.   Okay.   And let me ask you also, when you listened to the

24  recording of when they were at LAX, did you -- did it make

25  sense with what you observed at LAX?

1    A.   Yes.

2    Q.   Did you hear the things that happened -- did you hear

3    them meet at the gate?

4    A.   I was able to hear -- I wouldn't be able to say exactly

5    what they said throughout the entire time, no, but I was able

6    to hear certain things at certain times during my

7    surveillance.  We just didn't get so close.

8    Q.   But it was consistent -- when they got their luggage,

9    were you able to hear that?

10   A.   Again, portions.  I had to maintain some distance; I had

11   to walk around a little bit.

12   Q.   I'm talking about the recording.  Did you listen to the

13   recording?

14   A.   Oh, yes.

15   Q.   And what you heard on the recording, was that consistent

16   with what you experienced while on surveillance?

17   A.   Yes, sir.

18   Q.   And the point in time when you indicated that the CS left

19   the group to make a call to you, was that also on the

20   recording?

21   A.   Yes.

22   Q.   And you heard that on the recording?

23   A.   Yes.

24   Q.   And did you hear them get into the car consistent with

25   when you saw all four of them get into the car in the parking

1    garage?

2    A.   Yes.

3    Q.   And did the recording also have them going to the hotel?

4    A.   It did.

5    Q.   And did the recording contain audio information that was

6    consistent with your observations at the hotel?

7    A.   Yes.

8    Q.   And then after they dropped them off, was it consistent

9    with your surveillance of two people talking on the way back

10   to San Diego?

11   A.   Yes.

12   Q.   All right, sir.   I'm going to place before you

13   Government's Exhibit 16, which has been received, and

14   Government's Exhibit 26 for identification.

15             MR. DENIS:   Your Honor, I'm going to object and

16   request a sidebar.

17             THE COURT:   No, not at this point.   Now, Exhibit --

18             MR. GUTIERREZ:   I'm sorry.   Exhibit 16 hasn't been

19   received.

20             THE COURT:   No, I didn't think so.   So if you're

21   intending to lay the foundation at this point, you may do so.

22             BY MR. GUTIERREZ:   Q.   Do you recognize --

23             MR. DENIS:   I apologize, but my standing

24   objection's going to be regarding Crawford, Melendez-Diaz,

25   and the confrontation clause.

```
 1              THE COURT:  Okay.
 2              MR. DENIS:  That will be the issue at the sidebar.
 3              THE COURT:  Okay.
 4              BY MR. GUTIERREZ:  Q.  I'd ask you to take a look
 5  at Government's Exhibit 16 marked for identification.  Do you
 6  see it?
 7  A.  Yes.
 8  Q.  What is it generally?
 9  A.  It's a CD.
10  Q.  Have you seen that CD before?
11  A.  I have.
12  Q.  How did you know that you've seen that CD before?
13  A.  I initialed it.
14  Q.  And have you listened to that CD?
15  A.  I have.
16  Q.  Generally what does it contain on that CD?
17  A.  It contains numerous audio recordings.
18  Q.  And did you listen to each of the audio recordings?
19  A.  I did.
20  Q.  On the CD were there a number of files?
21  A.  Yes.
22  Q.  And did they have numbers assigned to those files?
23  A.  Yes.
24  Q.  And did those numbers of the audio files correspond to
25  any transcripts?
```

1    A.   Yes.

2              MR. DENIS:   Objection; foundation, language.   Does

3    he understand?

4              THE COURT:   The objection is overruled on each of

5    the grounds asserted.

6              BY MR. GUTIERREZ:   Q.   Was there a recording of the

7    June 10, 2008 meeting at LAX?

8    A.   Yes.

9    Q.   That was the recording that you listened to?

10   A.   Yes.

11   Q.   A recording that was consistent with your observations?

12   A.   Yes.

13   Q.   And your having overheard parts of the conversations?

14   A.   That's correct.

15   Q.   And that recording is contained on Government's Exhibit

16   16 --

17   A.   Yes.

18   Q.   -- amongst others?

19   A.   Yes.

20   Q.   Could you please look at Government's Exhibit 26 marked

21   for identification.   Do you recognize Government's Exhibit

22   26?

23   A.   I do.   Without reviewing each and every page, but I

24   did --

25             MR. DENIS:   I'm going to make another objection.   I

 1    don't have those exhibits.  They've never been produced to

 2    the defense.

 3              THE COURT:  Mr. Gutierrez, have you produced the

 4    transcripts?

 5              MR. GUTIERREZ:  Your Honor, the defense has had the

 6    recordings and transcripts in this case for over a year.

 7              THE COURT:  That was my understanding.  I'm going

 8    to provisionally overrule the objection.

 9              MR. DENIS:  Your Honor, just to lay additional

10    foundation, we did not receive --

11              THE COURT:  No, no.  That's a speaking objection.

12    It's not additional foundation.

13              MR. DENIS:  Okay.

14              THE COURT:  I'm going to overrule the objection at

15    this time, Mr. Denis.

16              BY MR. GUTIERREZ:  Q.  Now, you said that you were

17    able to recognize the voices on the recordings; is that

18    correct?

19    A.  Yes.

20    Q.  And specifically the recording of the June 10, 2009 (sic)

21    day?

22    A.  Yes.

23    Q.  And who was speaking at the outset of the recording on

24    the way up to Los Angeles?

25    A.  The first thing noted is Mr. Krapchan.

1   Q.   Well, you're familiar with the CS; is that fair to say?

2   A.   Yes.

3   Q.   Have you had the opportunity to hear his voice?

4   A.   Yes.

5   Q.   Would it be fair to say that you're familiar with his

6   voice?

7   A.   Yes.

8   Q.   Are you capable based on your familiarity to identify a

9   recording of his voice?

10  A.   Yes.

11  Q.   Was he speaking during the 6-10 recording?

12  A.   The informant?  Yes.

13  Q.   Now, you've also had a chance to -- let me ask you,

14  during the same part of the recording when they were in the

15  car, did you hear somebody else talking besides the CS?

16  A.   Yes, Mr. Krapchan.

17  Q.   When you say it's Mr. Krapchan, how do you know it was

18  Mr. Krapchan?

19  A.   From the many hours of recordings that I have listened to

20  with Mr. Krapchan that correspond with times that we've done

21  the surveillance on him while those recordings were taking

22  place.

23  Q.   Did you take into consideration that he was the only

24  other person in the car on the way to Los Angeles?

25  A.   That's one, yes.

1           THE COURT:  Keep your voice up, sir.

2           BY MR. GUTIERREZ:  Q.  Now, the other person that

3    you -- when you heard on 6-10, the recording for 6-10, who

4    else was on that recording besides CS-1 and Mr. Krapchan?

5    A.   There was Mr. Wedding, Mr. Shirani, and from time to time

6    there might be a various person that might be walking by at

7    the airport or those types of things; but other than that, it

8    was Mr. Wedding and Mr. Shirani.

9    Q.   And did Mr. Wedding and Mr. Shirani speak any other

10   language when they were recorded?

11   A.   On June 10 at the airport you're referring to, correct?

12   Q.   Yes.  Excuse me.

13   A.   There was a small portion of which Mr. Shirani spoke in a

14   foreign language which we later determined to be Farsi.

15   Q.   And what language did Mr. Wedding speak?

16   A.   English.

17   Q.   Now, I'd ask you to look through Government's Exhibit 26.

18   Do you see any situation where it's marked MK?

19           MR. DENIS:  Again, objection.  Defense counsel

20   doesn't have the exhibit that the witness is reviewing.

21           THE COURT:  The objection is overruled.  The

22   exhibits have been produced.

23           THE WITNESS:  It says "Krapchan" for Mr. Krapchan.

24           BY MR. GUTIERREZ:  Q.  All right.  And were

25   Mr. Krapchan's speaking in the transcript consistent with

1   what you heard?

2   A.   Yes.

3   Q.   And you've reviewed that transcript previously; is that

4   fair to say?

5   A.   Many times, yes.

6   Q.   Well, would the same go for when the confidential

7   informant is speaking?  Was he noted where you heard him

8   speaking on the CD?

9   A.   Either overheard him speaking or recognized his voice,

10  yes.

11  Q.   And where Mr. Wedding is attributed to be speaking in the

12  transcript, is that consistent with the recording?

13  A.   Yes.

14  Q.   And the same for Mr. Shirani:  Where he's indicated to be

15  speaking in the transcript, is that consistent with the

16  recording?

17  A.   Yes.

18  Q.   When you do a reverse operation, that's, you indicated, a

19  sale, right, of narcotics?

20  A.   Yes, from us to subjects.

21  Q.   When they were meeting, when did you plan -- or when was

22  the sale planned?

23  A.   We believed it could be a possibility very soon after Mr.

24  Wedding and Mr. Shirani arrived at the airport.

25  Q.   Did you give the confidential informant any instructions

1   about that particular point?

2   A.   Yes.

3   Q.   What was he supposed to do in regard to that particular

4   point of timing of the transaction?

5   A.   Well, the operation -- the actual transfer of the money

6   for the kilo, if that was to be a time, or all 24, depending

7   upon the situation, was not to occur until they arrived in

8   San Diego.  So they were supposed to meet them, pick them up.

9   It was our understanding based upon previous conversations

10  between Mr. Krapchan and the source that that money would be

11  ready; in fact, Mr. Krapchan said that they may even have a

12  courier deliver it to them right there at the airport.

13  Q.   Well, when was the first time you learned that they

14  didn't have the money immediately available.

15  A.   At the -- at the -- when they arrived at the airport.

16  Q.   Did that cause you an operational concern?

17  A.   Well, it certainly changed the plans.

18  Q.   And are plans particularly important when it comes to a

19  reverse sale of cocaine?

20  A.   Very important.

21  Q.   Why is that?

22  A.   Because the drugs have to be monitored very closely.

23  They cannot be let out into the public at all; there has to

24  be an arrest immediately after if there's any transfer of the

25  drugs, and also there's always concerns for the safety of the

1    informant.

2    Q.   But that aspect of the operation was not going to be able

3    to occur as planned?

4    A.   Not necessarily.   We knew that it wasn't going to happen

5    at the airport anyway because there -- we did not even bring

6    it with us to the airport.   The source did not have the drugs

7    at any point in time on the 10th.   So we knew they were going

8    to have to come to San Diego eventually for that to happen.

9    So although we anticipated that we might be able to take a

10   look at the money at the airport, and then eventually they

11   would come down to San Diego and purchase the cocaine.

12   Q.   So the -- what was the planned purpose for the meeting in

13   Los Angeles?

14   A.   Well, Mr. Krapchan had arranged that he and the informant

15   would go there to pick them up, have a meeting, discuss it,

16   take a look at the money so that we knew that they were

17   prepared and ready to go forward, and then arrange for a time

18   to come down to San Diego and do the transfer.

19   Q.   Were they able to show you any money?

20   A.   Not at the airport.

21   Q.   Did Mr. Wedding make statements regarding the money?

22   A.   Yes, he did.

23   Q.   Do those appear on the recording?

24   A.   They do.

25   Q.   Did Mr. Shirani make statements regarding the money?

1    A.   Yes.

2    Q.   Do those also appear on the same recording we talked

3    about earlier?

4    A.   They do.

5    Q.   Specifically the recording designated No. 26 on

6    Government's Exhibit 16?

7    A.   That's my understanding, yeah, No. 26.  I don't have it,

8    again, in front of me.  The thick one that you just had was

9    at the airport, yes.

10          MR. GUTIERREZ:  Your Honor, at this time with

11   regard to Government's Exhibit 16, specifically Exhibit 26-A,

12   which is a recording on Government's Exhibit 16, we'd ask

13   that 26-A, the recording, the audio recording, of the CI's

14   recording device, be admitted into evidence for the limited

15   purpose of the statements of Mr. Wedding to the confidential

16   informant, which we have excerpts for.

17          THE COURT:  Okay.  The Exhibit 26-A is admitted for

18   the limited purpose indicated.

19       (Exhibit No. 26-A identified.)

20          MR. DENIS:  Your Honor, I am making the same

21   objection, Crawford, Melendez-Diaz, Montgomery as well for

22   the recordings --

23          THE COURT:  The objection --

24          MR. DENIS:  -- and confrontation clause.  You need

25   the informant to have this factual basis establish this

 1   foundation.

 2           THE COURT:  The objections are overruled, subject

 3   to a motion to strike.  You'll always reserve a motion to

 4   strike, Mr. Denis.

 5           MR. DENIS:  Thank you, your Honor.

 6       (Exhibit No. 26-A admitted.)

 7           MR. GUTIERREZ:  Your Honor, at this point in time,

 8   we'd ask to play the first clip, which is from 26-A on

 9   Government's Exhibit 16, which is a statement of --

10   purportedly of the defendant.

11           THE COURT:  All right.  You have these into

12   excerpts; is --

13           MR. GUTIERREZ:  Transcripts.

14           THE COURT:  You have them into excerpts; is that --

15           MR. GUTIERREZ:  Yes, your Honor.

16           THE COURT:  All right.  And do you have a running

17   transcript at the bottom of it?  How are you going to do

18   that?

19           MR. GUTIERREZ:  We have the Sanctions program,

20   which will display the text that Ms. Johnson --

21           THE COURT:  That's fine.  As long as the Sanctions

22   program.  All right.  Ladies and gentlemen of the jury, from

23   time to time you're going to hear various audio excerpts, and

24   you're not furnished with a transcript of audio excerpts that

25   go in with you, for example, when you're deliberating;

1    transcripts themselves don't come in as exhibits.  The

2    evidence consists of the actual audio that you will hear.

3    Now, there is a program here, software program, called

4    Sanctions that you heard referred to by counsel, and that's a

5    program that will allow for the rolling or scrolling

6    transcript, written transcript, which will correspond to the

7    audio that you're hearing at any given point in time.  You

8    may certainly be aided by that, but that rolling transcript

9    that you'll see on the scene -- on the screen, excuse me --

10   is not later made a part of a transcript that is given to

11   you.  Of course, if the defense wishes to play any excerpts

12   themselves for further context or to complete a particular

13   conversation, the same would apply for them as well, that you

14   could have -- whatever audio portions you might hear at that

15   point would be the actual evidence, that the rolling script

16   would be an aid for you but that there would be no transcript

17   provided to you.  Of course, the defense is under no

18   obligation to play any portions of these audios.  26-A then.

19          MR. GUTIERREZ:  26-A, clip 1, for the sake of the

20   record, your Honor.

21          BY MR. GUTIERREZ:  Q.  Mr. Kalina, I'd like you to

22   listen carefully.  It's a short clip --

23          THE COURT:  Now, hold on.  Do you have, just to

24   perfect the record, transcripts of these individual clips

25   that can be placed in the file to preserve the record of what

1    the jury is hearing?

2              MR. GUTIERREZ:  Yes, your Honor.  For the limited

3    purpose, we have 26, which Ms. Johnson has indicated -- is

4    being marked for identification.  We would ask that it be

5    received for the limited purpose of perfecting the record,

6    not to go back to the jury during deliberations.

7              THE COURT:  But are the individual clips also

8    identified?

9              MR. GUTIERREZ:  They're not at this present time.

10   However, your Honor, I do have them memorialized in another

11   document which I could file with the Court.

12             THE COURT:  I think you better do that because it

13   probably will not be possible for the court reporter to

14   report what the jury is about to hear, so I'm going to

15   request of your office that individual clips of whatever the

16   jury hears from a particular audio excerpt is made a part of

17   the record.

18             MR. GUTIERREZ:  Certainly.  We do definitely have

19   the audio that's on the disk.  I could have the whole

20   transcript and then I could also notate which portions were

21   used from the whole transcript for the excerpts.

22             THE COURT:  Okay.  I think that should be done.

23   That would be appreciated.  Thank you.

24             BY MR. GUTIERREZ:  Q.  Okay.  So, Agent, this is

25   going to be literally seven lines, and then I'm going to stop

 1    it and I'll ask you questions about who is speaking and

 2    whatnot.  So if you could please listen carefully to Exhibit

 3    26-A, clip 1.

 4             MR. DENIS:  Your Honor, continuing objections and

 5    continuing motions to strike.

 6             THE COURT:  Well, your -- I don't know about

 7    continuing motions and continuing objections.  If you're

 8    objecting to what is being played as a part of 26-A, you may

 9    object on the basis of the grounds earlier stated; those

10    objections are overruled.

11         (The audio recording was played.)

12             MR. GUTIERREZ:  Your Honor, if I can inquire if the

13    panel was able to hear that or if the volume should be

14    raised.

15             THE COURT:  I think the volume should be raised if

16    you're capable of raising it.

17             BY MR. GUTIERREZ:  Q.  Agent Kalina, were you able

18    to hear that?

19    A.  Yes.

20    Q.  And have you heard this call before?

21    A.  Yes.

22    Q.  Is this excerpt from the 6-10 recording that you

23    testified about earlier --

24    A.  It is.

25    Q.  -- that exists in Exhibit 26?

1    A.   It is.

2         (The audio recording was played.)

3              BY MR. GUTIERREZ:   Q.   Now, the first indication on

4    this excerpt is that Krapchan says welcome to California.

5    Did you hear -- did you recognize the voice saying welcome to

6    California?

7    A.   Yes.

8    Q.   And who was speaking?

9    A.   Mr. Krapchan.

10   Q.   And the person who says thank you, thank you, Hassan, did

11   you recognize who that was?

12   A.   Hassan Shirani.

13   Q.   And the person who said nice to meet you and introduced

14   himself as Yuri, do you know who's speaking there?

15   A.   The -- yes, Yuri.

16   Q.   Is that the CS?

17   A.   That's the informant.

18   Q.   And lastly where it says RW, and it says Ryan, nice to

19   meet you, do you know who's speaking there?

20   A.   Mr. Wedding.

21   Q.   When you say Mr. Wedding, is that somebody you see in

22   court right now?

23   A.   Yes, sir.

24   Q.   And using your hand in this fashion, could you please

25   indicate towards that person and describe an article of

1    clothing he or she may be wearing.

2    A.   He's sitting next to counsel in a black suit with a white

3    shirt.

4         MR. GUTIERREZ:  Your Honor, I ask the record to

5    reflect that this witness has indicated towards and

6    identified the defendant.

7         THE COURT:  Yes, the record will reflect the

8    identification of Mr. Wedding.

9         BY MR. GUTIERREZ:  Q.  Now, during the course of

10   your investigation into the purchase of narcotics, was this

11   the first time that you saw Mr. Wedding and Mr. Shirani?

12   A.   Yes.

13   Q.   I'm going to play clip 2, 26-A.  I'm going to play all

14   the way through it, and then I'm going to ask you questions

15   about it if I could.  Please listen carefully, Agent.

16       (The audio recording was played.)

17         BY MR. GUTIERREZ:  Q.  Do you recognize the voices

18   of the people speaking here?

19   A.   Yes.

20   Q.   The person who said well, we have to grab the money, we

21   didn't bring the money with us, indicated by the HS, is

22   that -- do you know who's speaking?

23   A.   That is Hassan Shirani.

24   Q.   And where it says CS, do you recognize who's speaking

25   there?

1   A.   Yes, that's the informant.

2   Q.   And where it says Krapchan?

3   A.   That's Mr. Krapchan.

4   Q.   Now, you indicated that the purpose of -- or the

5   investigation was for the purchase of drugs; is that right?

6   A.   At this phase, yes.

7   Q.   And a reverse operation was to occur shortly thereafter?

8   A.   It was -- we were planning for one.

9   Q.   Was this the first indication relative to your

10  investigation that the money was not immediately available?

11  A.   Yes.

12  Q.   I'm now at this time going to play excerpt 26-A clip 3.

13  Agent, I'm going to play it all the way through and if you

14  could listen carefully.

15       (The audio recording was played.)

16            BY MR. GUTIERREZ:   Q.   Okay.   There on the board it

17  says 60:12.   There's an indication of RW where a person says

18  no, we -- we understood very clearly that we're not -- we're

19  not doing it in LA, but -- do you see what I'm referring to?

20  A.   Yes, sir.

21  Q.   Did you hear that just a moment ago?

22  A.   Yes.

23  Q.   Who was speaking?

24  A.   Mr. Wedding.

25  Q.   The defendant?

1   A.   Yes.

2   Q.   Now, lower down at 60:16 where it says RW, and it says

3   either way, this is where the paper is.  Do you see that?

4   A.   I see that, yes.

5   Q.   Did you hear it just a moment ago?

6   A.   I heard that.

7   Q.   And who is speaking there?

8   A.   Mr. Wedding.

9   Q.   Now, based on your training and experience as a FBI

10   agent, have you heard the term "paper" before?

11   A.   Yes.

12   Q.   What does the term "paper" refer to generally in your

13   experience?

14   A.   Money.

15            MR. DENIS:  Objection, your Honor.  I think this

16   was a basis of a motion in limine that was granted.

17            THE COURT:  The objection is overruled.

18            BY MR. GUTIERREZ:  Q.  Okay.  A little further on

19   it says we get here, we need to pick it up.  Do you see that

20   reference there at the bottom of the screen.

21   A.   Yes, sir.

22   Q.   Did you hear that just a moment ago?

23   A.   I did.

24   Q.   And who was speaking there?

25   A.   Mr. Wedding.

83

1       MR. GUTIERREZ:  Could you please play excerpt 26-A,

2  clip 4.

3       (The audio recording was played.)

4       BY MR. GUTIERREZ:  Q.  Did you hear that

5  conversation?

6  A.  Yes, sir.

7  Q.  Specifically with regard to -- starting at 62:25 where

8  there's an RW reference, do you see that?

9  A.  I do.

10 Q.  Where the person's starting, I figured all we were going

11 to do today -- all we were doing today was coming to meet and

12 maybe like have people get our money today and meet up

13 tomorrow and take care of that.  I had no idea -- nobody said

14 anything about six o'clock, unintelligible, otherwise we

15 would have come yesterday, right.  Do you see that reference?

16 A.  Yes.

17 Q.  Did you hear that reference?

18 A.  I did.

19 Q.  Do you know who said that?

20 A.  Mr. Wedding.

21 Q.  Was that still at the airport?

22 A.  Yes.

23 Q.  Where at the airport did this conversation take place?

24 A.  This was all occurring right outside of the informant's

25 car in the parking garage.

1   Q.   After they had picked up their baggage?

2   A.   That's correct.

3   Q.   Okay.

4        MR. GUTIERREZ:   Play clip -- excerpt 26-A, clip

5   No. 5.

6        (The audio recording was played.)

7        BY MR. GUTIERREZ:   Q.   Did you hear that recording

8   that we just played?

9   A.   Yes.

10  Q.   The first reference there at 72:13 that's led by an RW

11  saying all we need is a car so we can go see our friend and

12  pick up our money.   Did you hear that reference?

13  A.   I did.

14  Q.   And who was speaking in that reference?

15  A.   Mr. Wedding.

16  Q.   Later on, two lines down, starting with an RW, very

17  simple, we just -- we just got here, we need a couple of

18  hours to go pick up our money.   Do you see that reference?

19  A.   Yes.

20  Q.   Did you hear that reference on the audio recording?

21  A.   I did.

22  Q.   Do you know who spoke that reference?

23  A.   Mr. Wedding.

24  Q.   Also where it says that Mr. Krapchan said to my hotel,

25  there was a response here that says RW of affirmative yes.

1    Did you hear that yes on the recording?

2    A.  Yes.

3    Q.  Could you tell who spoke that?

4    A.  Yes.

5    Q.  And who was it?

6    A.  Mr. Wedding.

7            MR. GUTIERREZ:  If we could play excerpt 26-A, clip

8    No. 6.  Excuse me.  Please play clip 6.

9        (The audio recording was played.)

10            BY MR. GUTIERREZ:  Q.  Did you hear that audio

11   recording?

12   A.  Yes.

13   Q.  We're going to put it back to the beginning for you,

14   Agent.  Did you see the reference where it says no nightclub,

15   okay, just Russian mentality, you know, Russians,

16   unintelligible, is go all night, and then there's laughter.

17   Did you hear that just a moment ago?

18   A.  Yes.

19   Q.  And whose voice was speaking that?

20   A.  The voice was Krapchan's.

21   Q.  And afterwards where it says no, we've got work to do,

22   who said that?

23   A.  Mr. Wedding.

24            MR. DENIS:  Mr. Gutierrez, what clip is that?

25            MR. GUTIERREZ:  26-A, clip 6.

```
 1            BY MR. GUTIERREZ:  Q.  After you dropped Mr.
 2   Wedding off at the -- after he was dropped off by the CI at
 3   the hotel that you saw, when was the next time that you saw
 4   Mr. Wedding?
 5   A.  The next time I saw Mr. Wedding was when he came out of
 6   the Hampton Inn on June 13.
 7   Q.  And on June 13 before seeing Mr. Wedding, had something
 8   happened immediately before that?
 9   A.  Just prior Mr. Krapchan had conducted a purchase of one
10   kilo of cocaine.
11   Q.  Was that purchase observed by you?
12   A.  Yes.
13   Q.  What did you -- where did that purchase occur?
14   A.  It occurred at the Spanish Landing just outside of the
15   airport, the San Diego Airport.
16   Q.  Was at some point in time the CS there waiting for
17   Mr. Krapchan to show up?
18   A.  Yes.
19   Q.  Did you see that with -- yourself?
20   A.  Yes.
21   Q.  And this was on the 13th --
22   A.  That's correct.
23   Q.  -- before you saw Mr. Wedding?
24   A.  That's correct.
25   Q.  And after he was waiting there for a while, did
```

1    Mr. Krapchan ever show up?

2    A.  He did.

3    Q.  And when Mr. Krapchan showed up, what did Mr. Krapchan

4    do?

5    A.  He drove up in the Prius and got out of his vehicle with

6    his case and walked over to the informant, who was sitting on

7    a park bench just between the parking area at Spanish Landing

8    and the water.

9    Q.  Was that conversation recorded?

10   A.  Yes.

11   Q.  And was there an exchange?

12   A.  Yes.

13   Q.  What did you see exchanged?  Not what was in maybe a bag

14   or a box but what did you see actually exchanged?

15   A.  Well, Mr. Krapchan opened up his briefcase, they counted

16   the money, and the informant took the money and placed it

17   into a little McDonald's bag that he had with him.  At that

18   point in time, they walked to the informant's vehicle, they

19   opened up the trunk, Mr. Krapchan reached into the trunk to

20   pull out the bag that we had the cocaine in and took out the

21   bag, opened up the bag to take a look at it, closed it up,

22   and then shortly after that made a phone call.

23   Q.  So in the bag that you gave the CS, was there something

24   in that bag that he was supposed to exchange with

25   Mr. Krapchan?

1   A.   The kilo of cocaine was in that bag.

2   Q.   Now, you say it was a kilo, but you didn't test it

3   yourself, did you?

4   A.   I did not.

5   Q.   But where did you get that kilo?

6   A.   From the DEA laboratory.

7   Q.   Can you briefly describe for the jury the process you had

8   to go through to get that kilogram.

9   A.   Well, I had to write a formal request explaining the

10  operation that we were planning make a request for the one

11  kilogram of pure cocaine and then 23 kilograms of the fake

12  cocaine, bunk as it was referred to.  That paperwork had to

13  go through a DEA supervisor, who approved it, and then sent

14  it up to their higher-ups, and then they gave the okay to the

15  lab to go ahead and release that to us.

16  Q.   And the kilo that you received from the lab, kilo of

17  cocaine, was that what was in the bag that was given to the

18  CS?

19  A.   Yes, it was.

20  Q.   And while the CS had that bag, was he under constant

21  surveillance?

22  A.   Yes.

23  Q.   And was that the bag that he ultimately gave to

24  Mr. Krapchan?

25  A.   Yes.

1  Q.  And not knowing what was said -- he placed a phone call

2  you said.  Who was he?

3  A.  Mr. Krapchan placed a phone call.

4  Q.  And did you instruct the CS to do anything with regard to

5  a phone call?

6  A.  Yes.

7  Q.  What -- well, I'll withdraw that for a moment.  After the

8  phone call was made, what happened next?

9  A.  Mr. Krapchan placed a phone call, and --

10  Q.  Once the phone call was complete.

11  A.  Once the phone call was complete, grabbed the bag and was

12  walking towards with Prius, that vehicle that he arrived at

13  Spanish Landing in, and before he was able to get into the

14  vehicle, he was arrested.

15  Q.  At the time that Mr. Krapchan was arrested, did the FBI

16  or did you know where Mr. Hassan Shirani and Mr. Wedding

17  were?

18  A.  I did, yes.

19  Q.  And where were they?

20  A.  They -- they were at the Hampton Inn.

21  Q.  Here in San Diego?

22  A.  Correct.

23  Q.  And did the FBI respond to that location?

24  A.  We did.

25  Q.  And were Mr. Shirani and Mr. Wedding also taken into

1    custody?

2    A.   They were.

3    Q.   When Mr. Wedding -- you saw him at the airport, did he

4    have a particular type of suitcase that he was using?

5    A.   Not when he arrived, but when he got his bag from the

6    baggage claim, I was able to see that -- the bag that he took

7    at that time.

8    Q.   What kind of bag was it?  Was it a backpack, shoulder, or

9    do you recall?

10   A.   It was a larger, more of a hard case suitcase, dark in

11   color.

12          MR. GUTIERREZ:  I'll state for the record that I'm

13   showing counsel what is marked as Government's Exhibit 5 for

14   identification.

15          MR. DENIS:  This was never produced in discovery or

16   to the defense at all.  We just checked it yesterday.

17          MR. GUTIERREZ:  Your Honor, we produced all the

18   photographs over a year ago.  I could double check our

19   records, but.

20          THE COURT:  All right.  If there is an objection on

21   the basis of it not having been discovered, I'll overrule it

22   provisionally.  You can approach the witness if you'd like

23   with that.

24          MR. GUTIERREZ:  Certainly, your Honor.

25          THE COURT:  This is marked as Exhibit 5?

1           MR. GUTIERREZ:  Exhibit 5 for identification.

2        (Exhibit No. 5 identified.)

3           THE COURT:  Okay.  Very good.  I'm placing before

4    you what's been marked as Exhibit 5 for identification.  Do

5    you recognize what's depicted there?

6    A.  I do.

7    Q.  What's depicted there generally?

8    A.  A suitcase.

9    Q.  Have you seen that suitcase before?

10   A.  Yes.

11   Q.  Where have you seen that suitcase before the first time

12   you saw it?

13   A.  First time I saw it was at the airport, LAX.

14   Q.  Is that a fair and accurate representation of the

15   suitcase that you saw at the airport, at LAX?

16   A.  Yes, it is.

17   Q.  Was that the one being used by Mr. Wedding?

18   A.  Yes.

19           MR. GUTIERREZ:  Your Honor, I'd ask that Government

20   Exhibit 5 be provisionally received.

21           THE COURT:  Exhibit 5 is admitted at this time.

22        (Exhibit No. 5 admitted.)

23           MR. GUTIERREZ:  Thank you, Agent Kalina.  Your

24   Honor, I have no further questions.

25           THE COURT:  Cross-examination?

1           MR. DENIS:  Thank you, your Honor.

2                   Cross-Examination

3           BY MR. DENIS:  Q.  Good afternoon -- good morning,

4    Agent Kalina.

5    A.  Good morning, Mr. Denis.

6    Q.  You indicated that you were a -- you were a -- before

7    becoming a federal FBI agent, you were an attorney, correct?

8    A.  Correct.

9    Q.  What year was that?

10   A.  I graduated law school in 1996.

11   Q.  And you practiced law for how long?

12   A.  Up until 2004, beginning of 2004 when I took my current

13   job.

14   Q.  And you also practiced law in different states, correct?

15   A.  That is correct.

16   Q.  Where did you practice?

17   A.  I had a license in North Dakota, Minnesota, and Arizona.

18   Q.  And why did you move to those different states?

19           MR. GUTIERREZ:  Objection, relevance.

20           THE COURT:  Sustained.

21           BY MR. DENIS:  Q.  You decided to join the FBI in

22   what year?

23   A.  2004 is when I was accepted.

24   Q.  Prior to that, were you applying to work with the FBI?

25   A.  Yeah.  The exact length and when I filed my original

1    application I'm not exactly sure; I just know that I was

2    accepted in 2004.

3    Q.   And you participated in some training, correct, to become

4    an agent?

5    A.   Yes, sir.

6    Q.   And that included drug investigations?

7    A.   Yes.

8    Q.   Was that a 16-week course or was it longer?

9    A.   The drug -- I guess I don't understand.

10   Q.   I apologize.  The training at the FBI that you received,

11   how long was that training?

12   A.   Seventeen weeks.

13   Q.   And as part of that training, you were trained in some

14   drug trafficking activities, correct?

15   A.   It was a part of the training.

16   Q.   And also part of that training, you were taught how to be

17   a witness in front of a jury, correct, how to testify?

18   A.   I don't know that we were told how to testify.  I think

19   they put us through certain circumstances where we may be

20   able to testify to give us some idea of -- they can't tell us

21   how to testify because it would have been irrelevant at that

22   time.

23   Q.   But part of that training, you were taught how to take

24   the stand, face the jury, look at the jury when you talk,

25   things of that nature, correct?

1    A.   I don't specifically remember if that's something I

2    learned at that training or from prior experience.

3    Q.   Okay.  But you did take some training on being persuasive

4    on the stand, correct?

5    A.   I don't think I ever had any particular training in being

6    persuasive on the stand.

7    Q.   Okay.  Now, you were involved in this investigation which

8    began in approximately end of 2006, correct?

9    A.   The end of 2006, beginning of 2007, yes.

10   Q.   Okay.  And was this your first case that you worked on?

11   A.   No, sir.

12   Q.   Okay.  So you had done previous cases?

13   A.   Yes, sir.

14   Q.   Did those involve drugs?

15   A.   Yes, sir.

16   Q.   Have you been doing drug investigations exclusively or

17   were there other types of cases that you're working on?

18   A.   At that point in time of my career, I think -- I'd only

19   been doing drug investigations since I came to San Diego.

20   Q.   Okay.  And as part of your training and experience in

21   drug cases and things you've read, you've heard of

22   individuals placing drugs and money in unsuspecting people's

23   suitcases; isn't that true?

24              MR. GUTIERREZ:  Vague; calls for speculation, your

25   Honor.

1          THE COURT:  I'm going to overrule the objection.

2    If counsel wants to open that door, he may do so.

3          THE WITNESS:  Have I heard of that type of thing?

4    I'm sorry.

5          BY MR. DENIS:  Q.  Yes.  Do you personally of your

6    own experience, have you heard of people, drugs transactions,

7    drug transactions where you had drug dealers placing money

8    and drugs in unsuspecting individuals' suitcases?

9          MR. GUTIERREZ:  Compound as phrased, your Honor.

10         THE COURT:  Sustained.  You may want to break that

11   down.

12         MR. DENIS:  I will.  Thank you, your Honor.

13         BY MR. DENIS:  Q.  As part of your training and

14   experience --

15         THE COURT:  Perhaps I could see you at the side of

16   the bench for just a moment with counsel obviously, with all

17   counsel.  Ladies and gentlemen, let me take this opportunity

18   to advise everyone in the courtroom actually, from time to

19   time you may have a sensation that the courtroom is bouncing

20   a little bit, and that's because it is.  There's construction

21   of a new courthouse going on adjacent to us.  And I just

22   detected a few very, very minor movements, and there have

23   been times in the not-to-recent past when they've been very

24   noticeable, and people who are not familiar with what's going

25   on have become actually alarmed; you can just see their

1    facial expressions indicating some real concern.  So from

2    time to time, you may have that sensation that we're bouncing

3    up and down a little bit.  Now, if we start to move sideways,

4    that may be another issue, but slight movements up and down

5    are just associated with what's going on there.

6             This is a sidebar, it's going to be very short, but

7    you're certainly free to just relax and chat amongst

8    yourselves if you'd like.

9         (Following is a sidebar conference.)

10            THE COURT:  Counsel, I've tried to signal to you in

11   a very subtle way -- perhaps it was too subtle -- that you

12   are opening up a door with this line of cross-examination

13   that Mr. Gutierrez could probably drive a tractor-trailer

14   through.  If you are going to ask this witness about people

15   secreting substantial quantities of drugs or money in

16   suitcases of innocent people, you're going to open up on

17   cross-examination by Mr. Gutierrez this witness's experience

18   with that, and I would surmise that this witness would

19   testify that that never happens, that he's familiar with

20   investigations and surveys done, including undercover

21   investigations and interviews he's had with many, many people

22   in the drug trade that they never do that, that any money or

23   drugs in a suitcase is always placed there with the knowledge

24   of the individual involved, the courier.  That's the kind

25   of -- I just want you to know that is the kind of evidence

1    you are opening up yourself to.  I've seen the government in

2    many other cases over the years take advantage of this kind

3    of an opening.  So that's the point I was trying to make.  I

4    don't think you want to go there, but if you do, you're

5    certainly free to do so if it's a matter strategy with you.

6                MR. GUTIERREZ:  I believe it's the blind courier.

7                THE COURT:  It's blind mule testimony, it's classic

8    blind mule, it's classic drug courier profile evidence that

9    you are going to open up if you pursue this line of

10   questioning.  I just want you to know that.

11               MR. DENIS:  Okay.

12               THE COURT:  Okay.

13               MR. DENIS:  Thank you.

14               THE COURT:  Give it some thought.  I mean it may be

15   your strategy, but I don't think you want to open up profile

16   evidence, courier profile evidence, or evidence of that type.

17               MR. DENIS:  Okay.  Thank you.

18               THE COURT:  Sure.

19           (Sidebar conference concludes.)

20               THE COURT:  Okay.  Thank you, ladies and gentlemen.

21   I think we're ready to resume here.

22               BY MR. DENIS:   Q.  Agent Kalina, in your experience

23   have you had cases or have heard of individuals placing drugs

24   or money in people's suitcases without them knowing?

25   A.  In my career as an FBI agent, I have not come across

1    that, whether it's my case or someone I'm working with.

2    Q.  So you've never heard of individuals placing drugs or

3    money in other people's suitcases?

4              MR. GUTIERREZ:  Objection; asked and answered.

5              THE COURT:  The objection is sustained.

6              BY MR. DENIS:  Q.  And, Agent Kalina, are you

7    familiar with any of the cases that deal with -- in your

8    training and experience dealing in individuals from Nigeria

9    putting in drugs in people's suitcases when they don't even

10   know about it?

11   A.  I have not had any experience as an agent with anything

12   like that.

13   Q.  Okay.  And you've been an agent since 2004, correct?

14   A.  Correct.

15   Q.  When did you graduate from the FBI academy?

16   A.  It would have been October of 2004.

17   Q.  And then you were -- just give me approximately how many

18   cases you've worked on as an FBI agent that dealt with drugs,

19   complete investigations.

20   A.  My own personal investigations?

21   Q.  Yes.

22   A.  Because we --

23   Q.  First let's start with your own.

24   A.  -- first start out -- well, I can give you a roundabout

25   number, but it ranges from small investigations to large

1    investigations.  So between five and ten.

2    Q.  And did some of those have to deal with border busts or

3    people in the border, coming through the border with drugs?

4    A.  Well, I don't conduct any investigations at the border;

5    that's a different agency.  However, I mean the flow of drugs

6    from Mexico to the United States is pretty well documented so

7    I mean we deal with the fact that it comes across the border

8    on a regular basis, but I don't do any investigations at the

9    border.

10   Q.  And based -- so in any of your training and experience,

11   you don't have any knowledge on how -- where individuals are

12   placed drugs unsuspectingly in their luggage or money?  You

13   don't --

14        MR. GUTIERREZ:  Objection; compound as phrased,

15   your Honor.

16        THE COURT:  The objection is overruled.  You may

17   answer that.

18        THE WITNESS:  Sure, I've come across a lot of ways

19   in which people bring it across the border.  We're alerted

20   very often to different mechanisms of how people bring drugs

21   across the border.

22        BY MR. DENIS:  Q.  And one of those mechanisms is

23   to place drugs or money into someone's luggage to have them

24   bring it through the border without them knowing; isn't that

25   true?

1   A.   I suppose that's possible.

2   Q.   And you've heard of those kinds of cases happening; isn't

3   that true?

4   A.   I can honestly say that during my career as an agent,

5   I've never come across a case where someone was accused of

6   not knowing that there were drugs in their suitcase coming

7   across the border.  I'm just saying -- I'm not saying that

8   that's not a possibility, I'm just saying I haven't come

9   across that as an agent.

10  Q.   Right.  And you've been doing that -- you've been

11  doing -- you've been an investigator now for about four or

12  five years, correct?

13  A.   Correct.

14  Q.   Okay.  And, again, you don't do the border, you don't

15  patrol the border; isn't that true?

16  A.   That's correct.

17  Q.   You never worked in Florida; isn't that true?

18  A.   That is correct.

19  Q.   Okay.  Have you met with agents who worked out of

20  Florida?

21  A.   Sure.

22  Q.   Drug agents?

23  A.   Well, again, in this case it would have been organized

24  crime, agents that were maybe assigned to an organized crime

25  squad, so we deal with not just drugs; there might be other

1    aspects, other criminal activities involved.

2    Q.   Okay.  And in this case, Agent Kalina, you were involved

3    when the negotiations between Michael Krapchan and Yuri were

4    being conducted, correct?  I'm sorry.  Strike that.  During

5    the days leading up to the June 10, 2008 arrival of Ryan

6    Wedding and Hassan, you were involved in those phone

7    conversations, correct?

8    A.   Not personally.

9    Q.   Okay.  Strike that.  You were aware that Mr. Trofimov was

10   negotiating with Michael Krapchan, correct?

11   A.   Yes, he had -- he had been doing that for a year and a

12   half.

13   Q.   Okay.  When you say they had been doing that for a year

14   and a half, Michael Krapchan didn't want to participate in

15   any drug dealing?

16   A.   No, that's not true.

17   Q.   And so it took about a year and a half of phone calls and

18   meetings and meetings to work something out?

19   A.   Well, there were many aspects of the investigation.  It

20   originally started as a combination of money laundering and

21   drug trafficking.  When Mr. Krapchan first contacted the

22   source back in late '06 and early '07, they wanted to move a

23   million dollars on a regular basis that was the result of

24   drug proceeds, and they were looking for someone in Southern

25   California to be able to help them to do that.  They also

1    discussed drug trafficking at that time, but it wasn't until

2    approximately April of '08 when they talked in earnest about

3    coming to San Diego to purchase cocaine.

4    Q.   But basically prior to that, all the money laundering

5    talk was just talk, correct?  Nothing ever happened?

6    A.   We did not launder -- the source did not launder any

7    money --

8    Q.   Okay.

9    A.   -- for the organization.

10   Q.   And prior to Michael -- and Michael Krapchan had come

11   down to San Diego one time previously, correct?

12   A.   He had been to Seattle twice and San Diego once prior to

13   June of '08, yes.

14   Q.   And during those conversations, nothing transpired, no

15   drug dealing or money laundering, correct?

16   A.   There were discussions of drug trafficking and money

17   laundering at those meetings as well.

18   Q.   But there was no money laundering or drug trafficking

19   that took place?

20   A.   There was no exchange --

21   Q.   Okay.

22   A.   -- or transfer.

23   Q.   And let's start at the -- on the June 10, 2008, you were

24   aware that Hassan Shirani was coming or you were aware that

25   an Iranian individual was coming to LAX, correct?

1    A.   That is correct.   We actually --

2    Q.   Okay.   Is it correct?

3    A.   No, that's not correct.

4    Q.   It wasn't an Iranian individual?

5    A.   We knew that it was an Iranian individual and we knew the

6    name was Hassan based upon a recording that occurred on

7    June 9; so we were able to determine Mr. Shirani prior to

8    that time because --

9    Q.   Okay.

10   A.   -- of the name being used.

11   Q.   You had a name of Hassan already, correct?

12   A.   That is correct.

13   Q.   And during the negotiation, you learned that there was

14   going to be a drug transaction that was going to happen on

15   June 10, 2008, correct?

16   A.   We were planned -- we had planned for that to be a

17   possibility to occur on the 10th, that's correct.

18   Q.   That was the plan for that day; isn't that true?

19   A.   That was what our source was told by Mr. Krapchan, yes.

20   Q.   Okay.   So -- and that source by Mr. Krapchan,

21   Mr. Krapchan was in Vancouver when that plan was established,

22   correct, in Canada?

23   A.   It began from phone conversations while Mr. Krapchan was

24   in Vancouver, yes.

25   Q.   And it was made clear that they were going to arrive, and

1    the money was going to be available at LAX to do the

2    transaction shortly thereafter; isn't that true?

3    A.   That -- that whole conversation, yes, started while

4    Mr. Krapchan was in Vancouver.

5    Q.   And you believe that to be so because you --

6    A.   Can I correct that?  Exactly where Mr. Krapchan was when

7    he placed those calls to the source, I can't say that he was

8    in the city of Vancouver; he might have been in a suburb; I

9    can't --

10   Q.   He was in Canada, correct?

11   A.   To my understanding he was in Canada, but he was, again,

12   on a phone.

13   Q.   And you relied on that information because you set up the

14   one kilo of coke and the 23 bunk kilos, correct?

15   A.   I had requested that, the drugs, yes.

16   Q.   And that transaction was going to take place on that day

17   on the 10th, correct?

18   A.   We were planning as if it would occur, yes.

19   Q.   And it was your understanding based on the CS that the

20   money was going to be available right when they arrived at

21   LAX, correct?

22   A.   Not based upon the source, based on what Mr. Krapchan

23   said.

24   Q.   And what Mr. Krapchan told the source, correct?

25   A.   That is correct.

1   Q.  And Michael Krapchan actually arrived a day early, on the

2   9th; isn't that true?

3   A.  That's correct.

4   Q.  And that plan was reconfirmed with the source; isn't that

5   true?

6   A.  That is correct.

7   Q.  Okay.  And actually Krapchan and the source went to LAX

8   on June 10, 2008, correct?

9   A.  Correct.

10  Q.  And when there -- when the -- when Hassan Shirani

11  arrived, Mr. Wedding was present, correct?

12  A.  Yeah, they were together.

13  Q.  And you observed -- you testified you did surveillance,

14  correct, and you observed them?

15  A.  I was there, yes.

16  Q.  Okay.  Before I get to that, was it your understanding --

17  was the source -- was the CS supposed to, based on the plan,

18  and -- strike that.  Leading up to where the source went to

19  LAX, was it the plan for the source to meet Hassan Shirani

20  and whoever was with him at LAX with Michael Krapchan?

21  A.  The plan was that the informant and Mr. Krapchan were

22  going up to LAX to meet two individuals.

23  Q.  Okay.  And when -- okay.  And you conducted surveillance

24  as you indicated, correct?

25  A.  Correct.

1   Q.   Do you recall what Mr. Wedding was wearing on that day

2   when he arrived?

3   A.   I do remember that he was wearing some jeans, he had a

4   jacket that had a skull on it, and I'd have to refer to

5   smaller articles of clothing that he may have been wearing at

6   that time --

7   Q.   Were there any --

8   A.   -- but I do remember those two specific things.

9   Q.   Were there any photos taken of -- of Hassan Shirani at

10  that time or Ryan Wedding at LAX?

11  A.   No.

12  Q.   No photos?  Any video surveillance done on them while

13  they were at LAX?

14  A.   No.

15  Q.   That could have been set up though, correct?

16  A.   It would have been very difficult to be as close as I was

17  to Mr. Shirani and Mr. Wedding and taking photographs of them

18  or video them without --

19  Q.   Did you --

20  A.   -- burning the investigation.

21  Q.   Did you request surveillance photos from LAX Security

22  about these individuals?

23  A.   I did not.

24  Q.   Was that available to you?

25  A.   I did not inquire.

1   Q.   As far as you know, does LAX have video surveillance?

2   A.   I would assume -- at certain parts of LAX, I would assume

3   they have some, but I do not know that.

4   Q.   Okay.  Is Yuri Trofimov here in the United States

5   currently?

6   A.   Are you asking if the informant is in the United States

7   right now?

8   Q.   Yes.  I mean is he?

9   A.   Yes.

10  Q.   He is able to testify?

11  A.   Physically?

12  Q.   Yes.

13  A.   Yeah.

14  Q.   And -- okay.  At the -- at the LA -- okay.  Once the

15  source and Krapchan met with Hassan Shirani and Ryan Wedding,

16  there was discussion going on amongst them, correct?

17  A.   From when they came out of the Customs area --

18  Q.   Yes.

19  A.   -- you're saying?  Yes.

20  Q.   Okay.  And there was talk in Russian, in the Russian

21  language, correct?

22  A.   Some Russian, yes.

23  Q.   And the -- Yuri and Michael Krapchan were talking to each

24  other in Russian, correct?

25  A.   Sometimes Russian, sometimes English.

1    Q.   And you indicated you'd listened to some of these

2    recordings, correct?

3    A.   Yes.

4    Q.   Okay.  And a lot of times --

5    A.   I listened to all of the recordings.

6    Q.   And a lot of times they were overlapping with each other;

7    people were speaking in English when two other people were

8    speaking in Russian?

9    A.   You mean at the airport?

10   Q.   At the airport.

11   A.   I guess, yeah, on the recording I would assume there's

12   some overlapping of conversation.

13   Q.   Okay.  So it's difficult to know who's talking to -- for

14   example, if you hear English talking and simultaneously you

15   hear two Russian individuals talking, you don't know who the

16   English person is talking to, isn't that true, if there's

17   overlapping?

18   A.   Yeah.  I mean without being able to observe and hear

19   exact what they were saying, I wouldn't know who was talking

20   to who every single point in time, just based upon my

21   observations.

22   Q.   Okay.  And at that meeting or at LAX, it was uncovered

23   that the money was not available, correct?

24   A.   Yeah, that's what Mr. Wedding and Mr. Shirani told --

25   Q.   And Michael Krapchan --

1    A.   -- the informant.

2    Q.   -- told the informant that there must have been some

3    problem or some problem happened with bringing the money,

4    correct?

5    A.   Exactly when I'm not sure.   I'd have to look at the exact

6    transcript or look at the transcript to see exactly who said

7    what.

8    Q.   Okay.   But you don't recall that sitting down here today,

9    correct?

10   A.   Well, there was a lot of discussion as to what was going

11   on, some miscommunication as to when the deal was actually

12   supposed to occur.   And Mr. Krapchan was trying to be a

13   go-between between the -- Mr. Shirani and Mr. Wedding and the

14   informant.

15   Q.   If the money was brought to LAX or was in Mr. Wedding's

16   suitcase, they could have had the transaction within four

17   hours, correct, a drug transaction?

18   A.   Possibly enough time to get back to San Diego.   That's --

19   Q.   They could do that?

20   A.   -- possible --

21   Q.   Okay.

22   A.   -- yes.

23   Q.   But the money was not available, correct?

24   A.   According to Mr. Wedding and Mr. Shirani, it was not

25   available.

1    Q.   And in chronology, the first person that talked about

2    picking up money or getting money was Hassan Shirani,

3    correct?

4    A.   I'd have to look at the recording and listen to the

5    recording to see exactly who first said that we have to go

6    grab our money or make mention of money.  But I'd have to

7    take a look --

8    Q.   Okay.  But you --

9    A.   -- and listen to the recording.

10   Q.   -- don't recall that right now, correct?

11   A.   Right as I sit here, I don't remember who first said it.

12   Q.   How long was the recording from when Mr. Hassan Shirani

13   and Mr. Wedding got off the airplane until they went to the

14   car and were dropped off at the hotel?

15   A.   From the time that they get out of Customs and they're

16   introduced?

17   Q.   Yes.

18   A.   Approximately 45 minutes to an hour.  Again, I'd have to

19   look to see exactly, but I remember it being about 1:15, and

20   I think it was a little after 2:00 that they were dropped off

21   at the hotel.  But I'm not sure without looking.

22   Q.   We're talking about approximately two hours of

23   conversations going on, correct?

24   A.   Not two hours, from approximately 1:15 to a little after

25   2:00, so between 45 minutes and an hour with Mr. Wedding

1   Mr. Shirani, the informant, and Mr. Krapchan.

2   Q.   And Mr. Wedding, he doesn't speak until very far -- other

3   than his introduction, he doesn't really participate in that

4   conversation with Michael Krapchan and Hassan for

5   approximately 30 minutes; isn't that true?

6   A.   No, that's not true.

7   Q.   After the introduction.

8   A.   No, that's not true.

9   Q.   Okay.

10  A.   There's numerous discussions.  They were talking about

11  where they lived and what parts of Vancouver they were

12  familiar with.  They talked about lots of different small

13  talk.

14  Q.   And Mr. Wedding -- after Mr. Shirani discussed about the

15  money, as far as you could recall, did Mr. Wedding go pick up

16  his suitcase or bag?

17  A.   No, none of the discussions about the money occurred

18  until after he had picked up his bag.

19  Q.   And the CS, he believed that the money was actually in

20  Mr. Wedding's bag, correct?

21  A.   No, he --

22            MR. GUTIERREZ:   Objection; calls for speculation.

23  I'll withdraw that, your Honor.

24            THE COURT:   Well, all right.  You're withdrawing?

25  Did you want to proceed with that question --

1        MR. DENIS:  Yes.

2        THE COURT:  -- counsel?  Do you recall the

3   question?

4        THE WITNESS:  Yes.

5        THE COURT:  Okay.  Please.

6        THE WITNESS:  Based upon the recordings from June 9

7   and from June 10, the source did not believe that it -- all

8   the money would be in Mr. Wedding's suitcase.

9        BY MR. DENIS:  Q.  Now -- so he thought it would be

10  a courier?

11  A.  Mr. Krapchan told the informant that the money would be

12  in LA before they arrived and that there was -- that there

13  may be -- it would be delivered in a bag to them at the

14  airport.

15  Q.  But -- so the CS just knew what Michael Krapchan told

16  him, correct?

17  A.  He was the only one he was in contact with at that time.

18        THE COURT:  Are you at a convenient --

19        MR. DENIS:  Yes.

20        THE COURT:  -- point to break?  All right.  Ladies

21  and gentlemen, we'll break for lunch, it's noon, and we will

22  resume at 1:30.  Please remember the admonition not to

23  discuss the case or make any decisions at this time.  Thank

24  you.

25        (The jury left the courtroom.)

1           THE COURT:  We're outside the presence of all

2    jurors.  Counsel, I just want to take a moment or two -- sir,

3    you may step down, certainly.  Thank you.  Just want to take

4    a moment for two to emphasize a couple of things.

5           First of all, I appreciate everyone being here on

6    time so we can get started right on time, nine o'clock in the

7    morning, 1:30 in the afternoon, and following recesses, so

8    please give yourself a few extra minutes to be here in a

9    timely way.

10          Mr. Denis, some of your objections to tapes or

11   transcripts were based upon the fact you had never been

12   provided them, you've never seen certain exhibits, and so on

13   and so forth.  I know for at least a year Mr. Gutierrez has

14   been making representations to this Court about what he has

15   provided, including tapes and transcripts, translations; he's

16   done so in the form of declarations.  Also bearing on this, I

17   note that in your opening statement to the jury, you

18   underscored with the jury -- you asked the jury to listen

19   very, very carefully to the tapes, to the audiotapes that

20   they would hear because there were certain words they would

21   not hear.  You examined Ms. Johnson in such a fashion that

22   strongly suggested that you had been supplied with the tapes

23   and the translations.  You, even before she made any

24   reference to making any corrections or additions, mentioned

25   to her that she'd done so in red ink; she confirmed that.

114

1    Just with this last witness you indicated that Mr. Wedding

2    doesn't say anything until well into this 45- or 60-minute

3    period of time they were together.  So it's clear to me at

4    least -- if the question is whose memory am I going to rely

5    on in ruling on these objections that you're making that

6    you've never received these documents, it's clear to me that

7    Mr. Gutierrez's recollection of what he has provided to you

8    is the more reliable memory at this point.  You seem to have

9    a pretty good working understanding of what's on the tapes

10   and what's in the transcripts.

11            MR. DENIS:  Let me clarify, your Honor.  When Mr.

12   Gutierrez is introducing stuff that Ms. Johnson had

13   rereviewed and was given a certain CD transcript 16-A, I've

14   never been provided with that.  I've never been provided

15   exactly what did she quality-check over the weekend from

16   Friday until Monday.  I never received --

17            THE COURT:  Well, you don't need to -- I don't

18   think the government has any responsibility to keep you

19   abreast of everything and anything they're doing to verify

20   the accuracy of what's already been provided to you.  You

21   have the materials.  It's clear to me that you've listened to

22   all of these.  You've seen the translations.  You've invited

23   the jury to look at them with a specific perspective.  And

24   you've examined witnesses in such a way that strongly

25   suggests that these materials have been provided to you.

1           MR. DENIS:  What --

2           THE COURT:  I do suggest -- and we're not going to

3    prolong this, but I do suggest -- as you indicated, you may

4    have to go back over your records to see what's been

5    provided -- that you go back over your records.  Mr.

6    Gutierrez was stating that with respect to the one photograph

7    that was in issue, you were provided with that quite some

8    time ago, so I do suggest you go back over your --

9           MR. GUTIERREZ:  Your Honor, if I could also

10   indicate to the Court, on the very first day of trial, I

11   provided a packet, which Mr. Denis has in front of him right

12   now, with all my intended trial exhibits which is contrary to

13   what he said in front of the jury.  But maybe he had another

14   time that we provided --

15          THE COURT:  Well, if necessary -- well, I'm just

16   suggesting at this point that you make sure that before you

17   make a statement like that that you make sure it's accurate

18   and that you, once again, go over what's been provided to

19   you.

20          MR. DENIS:  Your Honor, we have -- we were always

21   curious about the suitcase, but we never saw a picture of it,

22   nor were we ever produced it, and all of a sudden it's here

23   for the first time here on the day of trial.  I will double

24   check all the photos again.

25          THE COURT:  Okay.  Why don't you do that.

1          MR. DENIS:  And then this clearly for the

2   transcripts, the ones that Ms. Johnson was referring to

3   specifically.  Obviously I have a set of transcripts, but the

4   one that she re-did or whatever, I had no idea, and I did not

5   know what exhibits -- what transcripts each of those exhibits

6   are.

7          THE COURT:  No, she wasn't creating additional

8   transcripts.  I think her testimony was, all that she did was

9   go over the transcripts one last time over the weekend and

10  compare them to what was contained on the audio.

11         MR. DENIS:  That's not accurate.  She was given a

12  set, and then she reviewed those, whatever the government

13  asked her to do.  She reviewed a number of documents.  She

14  was just given some specific ones and I don't know what she

15  was given, and that's the only objection I was making.

16         THE COURT:  Okay.

17         MR. DENIS:  Exhibit 16 or 17, 18, 19, 20, 21, 22,

18  23, 24, 25, 26, 27 I had not received before, and to this

19  moment I have not seen those exhibits ever --

20         MR. GUTIERREZ:  Your Honor --

21         MR. DENIS:  -- and that's what I'm making.

22         MR. GUTIERREZ:  -- at the outset of the case

23  yesterday, I provided counsel with a list which specifically

24  stated the exhibit numbers, the date of the transcript, and

25  the recording, which would reference that which he's had for

1    over a year.  If there was any doubt, he had the material.  I

2    provided him with a list of what my exhibits were going to

3    be.

4            THE COURT:  Okay.  I'm satisfied that these --

5    these materials have been provided to the defense for a long,

6    long period of time.  And the examination was such that it

7    was clear to me counsel was very familiar with the contents

8    of the audiotapes and familiar with -- generally familiar

9    with the transcripts.  All right.  Let's start at 1:30 sharp

10   this afternoon.

11           MR. GUTIERREZ:  Thank you your Honor.

12       (There was a break in the proceedings.)

13           THE COURT:  Good afternoon, ladies and gentlemen.

14   I think we're waiting for Mr. Denis.  We'll wait.

15       (Mr. Denis entered the courtroom.)

16           MR. DENIS:  Your Honor, may we present -- we have

17   binders for the jury --

18           THE COURT:  No --

19           MR. DENIS:  -- of the excerpts?

20           THE COURT:  -- not at this point.  Please proceed

21   with your cross-examination.

22           BY MR. DENIS:  Q.  Agent Kalina, you've indicated

23   that there was recordings made on -- during this

24   investigation, correct?

25   A.  Yes.

1   Q.   And there was a transcript made from those recordings?

2   A.   Not on every single recording, I don't know that a full

3   transcript was made, no.

4   Q.   Okay.  But a number of the calls were transcribed,

5   correct?

6   A.   That is correct.

7   Q.   And you played some excerpts on a very few number of

8   calls, correct?

9   A.   The ones I --

10  Q.   I apologize.  Strike that.  Let me ask it again.  You

11  played -- you played a excerpt from just what occurred at

12  LAX, some very short five or ten seconds of what occurred at

13  LAX, correct?

14  A.   Yeah.  We just listened to those, correct.

15  Q.   Correct.  We just listened to that, correct.  And there

16  were phone calls that were made since June of '08 all the way

17  up until actually the 9th of June, June 1st through June 9,

18  correct?

19  A.   You're asking were there calls made during that time?

20  Q.   Yes.

21  A.   There were recorded calls during --

22  Q.   Okay.

23  A.   -- that time, yes.

24  Q.   And also the confidential source was wearing a wire;

25  isn't that true?

1    A.   When?

2    Q.   Or a fob during -- during -- okay.  Let me -- I

3    apologize.  Let me strike that.  On June 3 of 2008 -- well,

4    you indicated that you had listened to all of the calls,

5    correct?

6    A.   I had listened to the recordings.

7    Q.   And you listened to the recordings.  And do you speak

8    Russian?

9    A.   I do not.

10   Q.   Okay.  So were you listening to the Russian-speaking

11   portions?

12   A.   I would listen to the recordings, one, to verify the

13   voices, and two, to see if there's any English.  And then if

14   I wasn't able to obviously listen to the Russian stuff, we'd

15   have someone listen to the Russian stuff.

16   Q.   Okay.  And we indicated that at some point in time, you

17   would also debrief the informant; is that accurate?  I'm

18   sorry.  You would debrief -- Yuri Trofimov was the

19   confidential source in this case, correct?

20   A.   Yeah.  We debriefed him numerous times throughout the

21   course of the investigation.

22   Q.   For example, in June 3 of '08, do you recall what

23   transpired on that day --

24   A.   I believe --

25   Q.   -- in terms of an undercover call.  I apologize.

1    A.   Well, I believe that there was a recording of a call on

2    that date.

3    Q.   You do or you don't recall?

4    A.   I believe there's a recording on that date, yes.

5    Q.   All right.  And -- and, again, you reviewed the

6    transcripts that Ms. Johnson prepared for this case, correct?

7    A.   Yes.

8    Q.   And in preparation for your testimony, what other

9    documents did you read, did you review --

10   A.   All of the reporting documents --

11   Q.   All of the what?

12   A.   Reporting documents; they're called FD-302s.

13   Q.   Okay.

14   A.   All of the recordings and the transcripts.

15   Q.   Okay.

16   A.   I reviewed all of the additional documentation that --

17   whether it was the documentation from the searches that were

18   conducted, the search warrants --

19   Q.   And you actually executed -- you swore out a declaration

20   in this case, a number of declarations, correct?

21   A.   I don't know if it was a number of declarations.  I know

22   I did a declaration for the search warrant for the Comfort

23   Inn in -- in the LA area.  That was executed on the 15th of

24   June, 2008.

25   Q.   And you also did a number of search warrants for the

1   phone call -- phone -- the phones that were actually seized,

2   correct?

3   A.   That's correct.

4   Q.   And you were able to obtain the text messages from each

5   of the phones, correct?

6   A.   If there were text messages on the phone, then yes.

7   Q.   You obtained the contact lists, correct?

8   A.   If the phone contained it, then -- and if it was in the

9   documentation, then yes, I was able to.

10   Q.   If any email -- whatever data was stored on the phone,

11   you were able to retrieve that through your search warrant,

12   correct?

13   A.   Yeah.  If it was either accessible through our electronic

14   means or doing it by hand, yes.

15   Q.   Okay.  And now I'm going to bring you back.  As you

16   were -- and you were the lead investigator or the lead agent

17   in this case, correct?

18   A.   Myself and Natalie Lambert worked on this jointly.

19   Q.   And -- but you made the decisions, most of the decisions

20   in this case; is that true?

21   A.   I don't know that I would say I made most of the

22   decisioned.  I believe that we made most of the decisions

23   together.  We discussed everything.

24   Q.   And how long has Ms. Lambert been with the FBI, if you

25   know?

1   A.   To the best of my knowledge, it's in the four- to

2   five-year range, not much less than where -- than myself.

3   Q.   Do you have a little bit more experience than her?

4   A.   It'd be a short time.

5   Q.   Okay.  So is she No. 1 or is -- are you both No. 1 in

6   terms of making decisions in this case?

7   A.   We're co-case agents.  We made the decisions together

8   when we did things.

9   Q.   Okay.  So she could independently make decisions without

10  asking you and you could make -- you could independently make

11  decisions without asking her; is that accurate?

12  A.   Well, we could -- it depended on the situation and what

13  it called for.  Anything that was any -- of any importance in

14  the case, we discussed it together, we discussed it with our

15  supervisors, we discussed it with other case agents that had

16  dealt with similar cases, we reviewed it with anybody we

17  could to get the best advice possible on working the

18  investigation.

19  Q.   And who was the supervisor in this case?

20  A.   You want to know my supervisor?

21  Q.   Your supervisor, correct.

22  A.   Mr. Henry Nembach.

23  Q.   One second.  And you would report to him, correct?

24  A.   I do.

25  Q.   And Natalie would report to him as well?

1    A.   No.

2    Q.   Did Natalie have a different supervisor?

3    A.   Yes.

4    Q.   And your supervisor again was who?

5    A.   Mr. Henry Nembach.

6    Q.   Can you spell the last name for me.

7    A.   N-e-m-b-a-c-h.

8    Q.   And Natalie -- and he's familiar with this case, correct?

9    A.   Yes.

10   Q.   So whatever developments, you would inform your

11   supervisor what's going on?

12   A.   Yes.

13   Q.   And just for a preliminary matter, you -- you -- okay.

14   You know who Natalie's supervisor is?

15   A.   Right now or at the time of the investigation?  They

16   change from time to time.

17   Q.   At the time of the investigation.

18   A.   Well, again, I guess I'd need to know what time during

19   the investigation.  It was a year-and-a-half-long

20   investigation, so I think that may have changed during that

21   time frame.

22   Q.   Okay.  But during the time of the investigation, you were

23   on the case and you had one supervisor on the case, correct?

24   A.   That is correct.

25   Q.   On June 3 of 2008, the investigation was still ongoing,

1  correct?

2  A.  Yes.

3  Q.  The confidential source, as far as you know, was not

4  compromised, correct?  What I mean compromised, they didn't

5  know he was working for the government or he's recording

6  phone calls as far as you can tell from your investigation.

7  A.  Are you asking me if your client knew if the source or

8  anybody that was involved in the investigation knew that the

9  source was a source?  Because I can only tell you what I --

10  Q.  I understand.  Let me clarify.  On June 3 of 2008, you

11  had not heard of Ryan Wedding at that time, correct?

12  A.  I'd not heard the name "Ryan Wedding" at the time, no.

13  Q.  Okay.  And on June 3 there was a recorded call, which I

14  have a portion of --

15          MR. DENIS:  Your Honor, may I -- I believe this is

16  a portion of what's may have been already admitted.

17          THE COURT:  Why don't you show Mr. Gutierrez.

18          MR. DENIS:  Sure.

19          MR. GUTIERREZ:  Your Honor, this does appear to be

20  from 6-10.  However, the government would have a self-serving

21  hearsay objection.

22          THE COURT:  Well, if it's an out-of-court

23  statement, it would be hearsay.

24          MR. DENIS:  Your Honor, it's not a --

25          THE COURT:  Why don't you bring it forward, please,

1   to the court clerk.  This is one page?

2           MR. DENIS:  One page, your Honor.

3           THE COURT:  Okay.  The objection is overruled.

4           MR. GUTIERREZ:  Your Honor, will that be Defense

5   Exhibit 1 or A?

6           THE COURT:  Well, the record should be preserved on

7   that.

8           MR. DENIS:  All right.  I apologize.

9           THE COURT:  Are you offering it at this time?

10          MR. DENIS:  Yes, your Honor.

11          THE COURT:  All right.  Are you objecting on the

12  basis of hearsay?

13          MR. GUTIERREZ:  Just for the sake of the record,

14  but I'm aware of the Court's ruling.

15          THE COURT:  Well, you know, if there's -- spare me

16  the objection for the sake of the record.  If you're

17  objecting, then please go ahead and object, but if you don't

18  feel a good-faith objection is being made, then don't make

19  the objection.

20          MR. GUTIERREZ:  I will object as to hearsay, your

21  Honor.

22          THE COURT:  All right.  The objection is overruled.

23  I think this is part and parcel of the conversation between

24  Krapchan and the CS that may have related to the subject of

25  whether the transaction was to go forward on a specific date.

1          MR. GUTIERREZ:  Thank you, your Honor.

2          THE COURT:  Actually you know something?  It will

3     be marked as an exhibit, not introduced into evidence at this

4     point, but you can certainly project it to the jury and then

5     ask the -- you can leave it there.

6          MR. DENIS:  Leave it there?

7          THE COURT:  You can leave it there, but you can ask

8     the witness about it, and the jury can have access to it

9     while they're --

10         MR. DENIS:  I'm trying to zoom it in, your Honor.

11    Can I --

12         THE COURT:  Go ahead.  You can zoom it.

13         MR. DENIS:  I'm trying to figure out --

14         THE COURT:  Maybe the government's technician can

15    help you.

16         MR. DENIS:  At the next break we'll set up the

17    Sanctions.  I apologize.

18         BY MR. DENIS:  Q.  So, Agent Kalina, on June 3 you

19    were part of the investigation.  There was a recorded phone

20    conversation, correct?

21    A.  At least one on that day.  I don't remember exactly how

22    many.

23    Q.  Okay.  And on one of those -- and obviously you debriefed

24    with the informant after each of these calls what was going

25    on in the deal, correct?

1   A.   No, that's not correct.  We didn't debrief after each and

2   every phone call for the year and a half of the

3   investigation.

4   Q.   No?  Correct.

5   A.   So I can't tell you if I debriefed after this particular

6   call or not.

7   Q.   Okay.  But on June 3 -- okay.  I'm showing you -- there's

8   a portion of a conversation with the confidential source and

9   Michael Krapchan, okay, and there were a number of these

10   conversations, correct, throughout the course of the

11   investigation; isn't that true?

12   A.   Hundreds.

13   Q.   Okay.  And on June 3 there was a conversation between the

14   confidential source and Mr. Krapchan, correct, regarding --

15   on June 3 -- who was going to be flying in to Canada; is that

16   right?

17   A.   That conversation was held on a regular basis from May

18   through June 9 when Mr. Krapchan arrived.

19   Q.   And you indicated there were many, many plans that kept

20   changing, is that accurate, in terms of -- strike that.  You

21   indicated there were many plans that kept changing, is that

22   accurate, before Mister -- before even Mr. Krapchan arrived

23   in California; is that accurate?

24   A.   There were certain aspects of the transfer of the kilos

25   for the money that changed from, again, April through June of

1    2008 when they actually arrived.

2    Q.   And also they kept changing who -- which individuals

3    would be coming down to California; is that accurate?

4    A.   Well, I don't -- you know, during that time frame, we

5    were never 100 percent sure of who was coming down; Mr.

6    Akhundov had been mentioned as someone who was coming down,

7    they had talked about one or two other people coming

8    throughout that entire time.   And so we did not know who the

9    two individuals would be until they actually arrived.

10   Q.   So previous to the individuals arriving, there were --

11   you indicated Mr. Akhundov was possibly going to come down

12   with Michael Krapchan; is that accurate?

13   A.   Yes.

14   Q.   Okay.   There were conversations where Sam -- an

15   individual by the name of Sam was going to come down with

16   Michael Krapchan to California and meet with the CS -- with

17   Akhundov, correct?

18   A.   There -- yes, there was mention of this Sam, yes.

19   Q.   Many different individuals prior -- during the eight --

20   actually up until the June -- strike that.   And these

21   names -- and these individuals of coming down to California

22   kept changing up until June 10, 2008, correct?

23   A.   Well, there was always the two.   Whether it was Sam or

24   Akhundov, which we now know when they were -- it's our -- my

25   belief that at that point in time, they knew who Sam was;

1    there was some translation issues there -- but that there was

2    going to be two individuals, possibly three, with Akhundov

3    coming down with Krapchan.

4    Q.   Was Sam supposed to be Hassan?

5    A.   It's possible.  There was a translation issue at that

6    time.  We do not know for sure though.  I can't say.

7    Q.   Okay.  And after -- you've talked to a number of people

8    about this case, even Hassan Shirani --

9    A.   Yes.

10   Q.   -- and you've talked with the CS, correct?

11   A.   Correct.

12   Q.   And in some aspects you even spoke with Michael Krapchan

13   regarding this case, correct?

14   A.   Correct.

15   Q.   And Sam has never been completely identified?

16   A.   Well, I can just tell you just my discussions with

17   Mr. Shirani --

18   Q.   Just let me ask you, has Sam been completely identified?

19   A.   I would say definitively no.

20   Q.   Did Hassan say that he is the individual that was going

21   by the name of Sam?

22   A.   No, he did not say that.

23   Q.   Okay.  But on June 3 of '08, there was a phone call

24   between the confidential source and Michael Krapchan,

25   correct?

1    A.   You're referring to the same one --

2    Q.   I'm referring --

3    A.   -- you're talking about right here.

4    Q.   Yes, sir.  I apologize.  I'm referring to the exhibit

5    that I have on the projection.

6    A.   Yes.

7    Q.   And on that day the confidential source is asking Michael

8    Krapchan -- and I'll just read it in.  I'm going to start

9    from line 5 where it says Krapchan, that's the first time,

10   flying in alone.  And then the confidential source -- these

11   are overlapping conversations with the OV over there,

12   correct?

13   A.   Yes, that would be the OV; that's what the OV stands for.

14   Q.   Okay.  And the confidential source says he's -- that

15   Krapchan is flying in alone, correct?  He goes you fly in

16   with the person who is going to pick -- pick it up.  And

17   Mr. Krapchan says yes.

18   A.   He's says yeah.

19   Q.   Okay.  So Michael Krapchan was supposed to fly in with

20   someone who's going to pick up money, correct?

21   A.   Well, if you read it, the source say you are not flying

22   in alone, correct?  And that's where the overlapping part is.

23   And then they does say you fly in with the person who is

24   going to pick it up?  Yeah.

25   Q.   So he's flying -- he's basically flying in with someone

1   who's going to pick up the money; is that accurate?

2   A.   That's what Krapchan says.  He says yeah -- he responds

3   to the source asking you are not anything in alone, correct?

4   Q.   Okay.  So it means he's flying in with someone who's

5   going to pick up the money, correct?

6   A.   I would -- that would be a reasonable reading of that,

7   yes.

8   Q.   Okay.  And is there anyone else -- okay.  That's fine.

9   And that was on June 3 of '08, correct?

10   A.   If you say that that's where this transcript comes from,

11   I would say yes.

12   Q.   Okay.  All right.  As we indicated, there were a number

13   of other phone calls on June 4 --

14          MR. GUTIERREZ:  Your Honor, with the Court's

15   permission, I may be able to retrieve the transcripts so I

16   can review them while counsel's going over there from the

17   table.

18          THE COURT:  Yeah, certainly.

19          MR. DENIS:  Your Honor, could I get assistance from

20   my secretary?

21          BY MR. DENIS:  Q.   Now, at some point -- do you

22   recall just sitting here that there were discussions of other

23   individuals who had been in the business for like more than

24   ten years?

25   A.   Yes.

1    Q.   Okay.   During these conversations that -- did it come up

2    that these were the Iranian?   Do you recall?

3    A.   I think if you're referring to the call with Mr. Akhundov

4    in which he was referring to someone being in the business

5    for quite some time, he mentioned something about that,

6    possibly one of them being a neighbor.

7    Q.   I'm actually referring on the 4th, and I will show you in

8    one moment.   Mr. Kalina, I'm going to show you what defense

9    has for identification purposes -- this is a conversation

10   that occurred on --

11          MR. DENIS:   May I approach?

12          MR. GUTIERREZ:   Apologize, your Honor.   I didn't

13   make an objection as to lack of foundation.   Ms. Johnson --

14          THE COURT:   All right.   Let's not have speaking

15   objections in front of the jury.   Ladies and gentlemen, it

16   might be appropriate if I have a brief few minutes with

17   counsel just so we can get a few guidelines down here and

18   have the rest of the afternoon move smoothly.   So let's take

19   a short recess before we resume, and I'll ask you to take

20   that recess outside the courtroom if you could indulge us.

21   Remember the admonition not to discuss the case or make any

22   decisions at this time.   Thank you.

23       (The jury left the courtroom.)

24          THE COURT:   You may step down if you'd like, sir.

25   Thank you.   Couple of other matters seeing as how we're

1    outside the presence of the jury.  I had asked you earlier --

2    we waited for you this morning, Mr. Denis; we waited well

3    past nine o'clock, and I asked you to be here on time at

4    1:30, everybody was here, the jury was in the box, I'm on the

5    bench, it's another five minutes before you enter.  No

6    apology to the Court, to the jury.  You know, I can tell you

7    right now that does not impress the jury to keep them waiting

8    like that, so --

9            MR. DENIS:  Your Honor, it's in excusable.  I do

10   apologize.  I just -- just to whatever my defense is,

11   Mister -- I don't know the order that the government's

12   producing their witnesses.  I had some idea.  It's a little

13   bit different.  I mean I had the case agent come up --

14           THE COURT:  You know you're in the middle of

15   cross-examination with the case agent, you know it's going to

16   take a while, so you know what the working order is for a

17   good part of the afternoon.  And then you're right, it is

18   no -- there is no justification for that.

19           The other thing is this -- and let's get down to

20   the issue here -- I permitted your cross-examination of the

21   agent on that first go-around because arguably it related to

22   the subject of whether there was going to be a transaction at

23   LAX and whether there was any confusion about what was going

24   to go forward on that day.  The government was limited in

25   what it introduced; it introduced basically statements of a

1    co-conspirator, an alleged co-conspirator, in the preparatory

2    stage for a transaction, and those statements made to the CI

3    are all admissible under the Evidence Code; as you know,

4    they're statements made in relation to and in furtherance of

5    an alleged conspiracy.  But that doesn't open up the door to

6    evidence of out-of-court statements that are being offered by

7    you that are -- for the truth of the matter that don't deal

8    with any of the subjects that were explored by the government

9    and which don't in a sense round out that particular -- that

10    particular subject area.  So I know the objections are going

11    to come, and I'll be sustaining those objections.  I know you

12    don't want to have that happen excessively in front of the

13    jury, but just -- you've got to -- you've got to be

14    presenting this evidence in proper form and not in the form

15    of these transcript recordings.

16         MR. DENIS:  Correct, your Honor.  I believe it's

17    been established that Michael Krapchan was a co-conspirator,

18    the confidential source was obviously the undercover, and the

19    statements that I'm introducing are the statements of Michael

20    Krapchan, who is a co-conspirator, who is furthering this

21    conspiracy back on June 3, June 4, all the way leading up to

22    the 10th.  And I think it's appropriate.  I think the

23    foundation has been foundation by Ms. Johnson, who was here

24    first as --

25         THE COURT:  Well, you -- the government can offer

1    those statements but you can't.  They're out-of-court

2    statements.  You're not really trying to establish a

3    conspiracy that the government is seeking to establish in

4    this case involving Krapchan.  That can't be what you're

5    doing here.

6         MR. DENIS:  Well, no.  I mean what I'm doing --

7    obviously there is a conspiracy -- there is something that

8    happened, and there is a conspiracy here.  It's just who were

9    the members of the conspiracy, and that is the foundation

10   that I'm laying.  And I will -- if the Court will indulge us,

11   I mean we'll go through -- it's not going through every

12   single one of them, it's the pertinent ones.  And these are

13   statements by a co-conspirator, by a co-conspirator, Michael

14   Krapchan, your Honor.  I think it is admissible.

15        THE COURT:  Well, it may be, but rather than

16   displaying what you have there on the Elmo, what I would

17   suggest you do is show a particular portion of a transcript

18   to the witness --

19        MR. DENIS:  Correct.

20        THE COURT:  -- and see if that refreshes his memory

21   of what he overheard either directly as a conversation was

22   taking place or what he listened to at a later time or what

23   he has read and deems factual and ask him if that -- if that

24   statement took place rather than putting up an entire page of

25   a transcript.  Not even the government did that.  They were

1   very, very careful in excising the statements they were

2   using, and the only statements they were using were

3   statements that were purportedly made by Mr. Wedding.   So

4   you've got to be very careful about putting up an entire page

5   of translated material.

6          MR. DENIS:   Okay.

7          THE COURT:   That's about all I can tell you.   If

8   the objections come, then make a pinpointed objection.   If

9   you want -- Mr. Denis, if you want to get a specific

10   statement in, a particular line or two, I suggest that you

11   work with Mr. Gutierrez on this, identify that particular

12   limited statement; then, Mr. Gutierrez, you can ask whether

13   in good faith it qualifies either as possible impeachment of

14   a -- or bears on a statement made by the agent on direct

15   examination and is of the same subject, directly relates to

16   the same subject, or is a statement made by an alleged

17   co-conspirator pursuant to and in furtherance of the

18   conspiracy.

19          MR. GUTIERREZ:   I understand, your Honor.   If I

20   could raise one other concern.   At the outset the government

21   initially indicated to counsel that we would take a

22   stipulation for all the translations.   Counsel, which is the

23   right, refused to, and would not give me his excerpts

24   beforehand.   That is why we went to great expense --

25          THE COURT:   He doesn't have to give you his

1   excerpts beforehand.  You've got all of that material.  He

2   doesn't have to tell you what he is going to introduce by way

3   of his own excerpts.

4        MR. GUTIERREZ:  And I agree, your Honor.  However,

5   the translations as being accurate, Ms. Johnson did not

6   translate that which he's now putting in front of the jury;

7   there's no foundation through a translator, which I was

8   willing to stipulate to as long as I could have Ms. Johnson

9   prove whatever his translator did beforehand.

10        THE COURT:  Oh, so these are not part of the same

11   translations?

12        MR. GUTIERREZ:  The foundation that I laid were for

13   specific ones that we were using.  Mr. Denis indicated that

14   he would have his own translator.

15        THE COURT:  Well, I tell you what.  Under those

16   circumstances about the only way you can proceed, Mr. Denis,

17   is to show -- you can show anything to see if it refreshes a

18   witness's memory -- show something to the agent or any other

19   witness, ask if that independently refreshes the witness's

20   memory.  But having that transcript come in that has not

21   been -- for which there's been no foundation such as the

22   foundation laid by Ms. Johnson for what --

23        MR. DENIS:  Absolutely.

24        THE COURT:  -- she had created, then I think the

25   objection of the government is going to be well-taken and

1   will be sustained.

2          MR. DENIS:  As far as I understand, this is one of

3   the transcripts that she did translate.  I mean we're using

4   the ones that she did.

5          THE COURT:  Well, you may understand that, but I'm

6   not convinced that's the case.  So without establishing that

7   foundation, then I would be inclined to sustain the

8   objection.  And this may behoove you to get these excerpts

9   over to Mr. Gutierrez so he can verify that this was material

10  translated by Ms. Johnson as opposed by anyone else.

11         MR. DENIS:  Your Honor, also Mr. Gutierrez -- when

12  we did the translation, we gave -- you know, we were

13  discussing the stipulation, we actually reached a

14  stipulation.  I gave him the translations that were

15  translated by my translator --

16         THE COURT:  Okay.

17         MR. DENIS:  And they repaired -- they fixed those

18  translations, they approved them, and we agreed --

19         THE COURT:  You two work on that later.  We've got

20  a jury waiting outside, and I don't want to keep them any

21  longer.  What I would suggest you do is after today's session

22  you get together again and see what you can work out so this

23  trial keeps moving --

24         MR. DENIS:  Absolutely.  I apologize.

25         THE COURT:  -- smoothly.  And I don't want to

1    create downtime for the jury.  I also want to take this

2    opportunity to ask any members of Mr. Wedding's entourage in

3    the back not to come through those gates.  That gate there is

4    only for attorneys and parties or representatives of parties,

5    so I respectfully ask you not to do that.  The government is

6    here, they have their technician, they will aid you,

7    Mr. Denis, when it comes to the equipment, but I'm going to

8    ask that non attorneys remain behind the bar.

9            MR. DENIS:  Can my staff assist me, your Honor?

10           THE COURT:  Not in front of the bar, not in front

11   of the bar, but you've got Mr. Wedding there, and you can

12   certainly work with your staff during recesses, but I don't

13   want anyone sitting who's not a member of the Bar.

14           MR. DENIS:  Your Honor, we also have the Sanctions

15   program on our computer, and I need my technician to assist

16   me with that.  That's what we were getting, which ones.  Is

17   that okay, your Honor?  Because we are ready with Sanctions.

18   It's not like -- we've done all this for all these different

19   calls.

20           THE COURT:  Just have the government -- you're

21   using their equipment?

22           MR. DENIS:  No, absolutely not.

23           THE COURT:  Where is your equipment?  Well, it's

24   going to take a while to set up.  Why don't you just continue

25   on with your examination.  I don't want to use this as a --

1          MR. DENIS:  Your Honor, just five minutes.

2          THE COURT:  -- opportunity to -- not I'm going to

3     take five minutes now.  We've got the jury waiting, and I

4     just wanted to deal with these objections.  At the break your

5     technician can help you, so if you can just wait until a

6     regularly-scheduled recess, we'll do it then.  Meanwhile,

7     give whatever you need to give to the technician seated with

8     the government, and --

9          MR. DENIS:  And -- I'm so sorry.  I was thinking

10    about these transcripts.  I apologize.  What did the Court

11    say, the last comment?

12         THE COURT:  I'm just saying wait until a recess --

13         MR. DENIS:  And set it up?

14         THE COURT:  -- and then set it up there, set it up

15    at that time.  All right.  Let's get our jury in.  Counsel,

16    one of the reasons I asked you to be here early is so you can

17    set up.  You know, you should be here 15 minutes before the

18    jury comes in; you can set up what you need to set up and not

19    keep anyone waiting.

20         (The jury entered the courtroom.)

21         THE COURT:  All right, ladies and gentlemen.  We

22    are ready to resume.  We will take our regular afternoon

23    recess about three o'clock.  Thank you for your patience.

24    Counsel?

25         MR. DENIS:  Thank you, your Honor.

1          BY MR. DENIS:  Q.   Mr. Kalina, I -- you indicated

2    there was a conversation where the confidential source and

3    Mr. Krapchan were speaking regarding a group that was in

4    business for approximately ten years, correct?

5    A.   I did not say a group; I said just that there was --

6    there was talk of someone who had been in that business for

7    ten years.  That had been mentioned a few times throughout

8    the process.

9    Q.   And was it referred to as a they or a them?

10   A.   I don't -- again, it was used at different times in

11   different contexts.

12   Q.   Was it used to discuss Iranians who'd been in business,

13   this kind of business, for ten years?

14   A.   I don't remember the term "Iranians" being used.  I know

15   that the term "Iranian" was used to describe one of the

16   individuals that was coming along to purchase the cocaine,

17   but I don't think there was Iranians, plural; I think it was

18   just that one.

19   Q.   I showed you the exhibit, which just for identification

20   purposes will be defendant's exhibit -- and I apologize --

21   we'll make this 202, and the previous one will be 201.

22          THE COURT:  Well, no.  The defense exhibits are

23   lettered; they're not numbered --

24          MR. DENIS:  Lettered?

25          THE COURT:  -- Mr. Denis.  And the last exhibit

1  that you marked for identification was Exhibit A.  Would you

2  like this to be B?

3         MR. DENIS:  Yes, B, your Honor.  Thank you.  I

4  apologize.

5         BY MR. DENIS:  Q.  Mr. Kalina, if you're looking at

6  the statement by Mr. Krapchan, you see it up there starting

7  from line 6, that there is always two sides?

8  A.  I see that.

9  Q.  And that there's a buyer's side and a seller's side?

10 A.  That's not an exact -- I mean these words are there.  Do

11 you want --

12        THE COURT:  Well, this document is not in evidence

13 at this point, sir, so I don't want you to read from the

14 document at this time.

15        BY MR. DENIS:  Q.  You see starting from line 15?

16 A.  I see line 15, yes.

17 Q.  And they indicate that Michael Krapchan and the

18 confidential source are not that experienced in this

19 business, they're talking about another group, that they are

20 experienced in this business or have been in this business a

21 long time?

22 A.  Yes.

23 Q.  And that was about ten years?

24        MR. GUTIERREZ:  Objection; hearsay as phrased,

25 attorney testifying.

1          THE COURT:  Well, the objection is sustained on the

2    basis that this is hearsay at this point.  The document is

3    not in evidence, so it is not appropriate to make reference

4    to the document and ask questions about what the document

5    contains.

6          MR. DENIS:  Okay.  Well, let me just --

7          THE COURT:  The jury is admonished to disregard the

8    implication of the last question, ladies and gentlemen.

9          BY MR. DENIS:  Q.  You read these transcripts,

10   correct?

11   A.  Yes.

12   Q.  Okay.  And you also recall reading the transcripts from

13   June 4, correct?

14   A.  Yes.

15   Q.  And there were, like you indicated, conversations about

16   individuals or group, the buyer's side or the seller's side,

17   or -- strike that.  The buyer's side that was in business for

18   ten -- okay.  You testified there was the conversation of the

19   buyers being in business for more than ten years, correct,

20   more experienced than the confidential source and the

21   informant; is that true?

22   A.  There was some discussions about that, but I wouldn't say

23   exactly that -- whether there was more than ten years or

24   anything.  There were those similar type of discussions, yes.

25   Q.  And you have a document that I placed before you.  Would

1    that -- would looking at the transcript refresh your

2    recollection of what transpired on the -- on June 4?

3    A.  Well, I said I do remember that -- those conversations.

4    Q.  And does that document that I've placed before you

5    refresh your recollection of what was said between the

6    confidential source and Mr. Krapchan?  Just let me know if it

7    refreshes your recollection.

8    A.  Yes, but I -- yes, it refreshes it, but I knew about it.

9    Q.  You knew about it, correct?

10   A.  Yes.

11   Q.  So the confidential source and Mr. Krapchan referring to

12   someone -- the buyers who have been in business for more than

13   ten years, correct?

14          MR. GUTIERREZ:  Objection; hearsay, your Honor.

15          THE COURT:  Sustained.

16          BY MR. DENIS:  Q.  Is the -- does the document

17   refresh your recollection of what was said on that date?

18   A.  Yes.

19   Q.  Okay.  And were there buyers -- and I'm asking you now to

20   go from your memory -- were there buyers who were in business

21   for -- who were going to buy the product who had been in

22   business for more than ten years?

23          MR. GUTIERREZ:  Lack of foundation, hearsay, your

24   Honor.

25          THE COURT:  The objection is sustained.  Counsel,

1    once again, it relates to an out-of-court statement reflected

2    on whatever piece of paper this is that doesn't relate

3    directly to the witness's direct examination; for that it's

4    being offered for the truth of the matter.  The objection is

5    sustained.

6              MR. DENIS:  Your Honor, could we have a brief

7    sidebar on that issue?

8              THE COURT:  Not at that time.

9              MR. DENIS:  It's just --

10             THE COURT:  Not at this time, counsel.  We'll

11   discuss it later but not at this time.

12             BY MR. DENIS:  Q.  And on -- do you recall a

13   conversation where -- that was also on the 4th -- do you

14   recall a conversation where Michael Krapchan was going to

15   make sure he brings the boss down with him to California?  Do

16   you recall that?

17   A.  There were multiple recordings, multiple calls in which

18   that request was made by the informant, so it's very possible

19   on the 4th that that was one of those days, without it

20   sitting in front of me, but I know there was multiple days

21   where there was discussed about Mister --

22   Q.  Where they were going to bring the boss -- Michael

23   Krapchan was going to bring the boss down, correct, to

24   California?

25   A.  You referred to it as the boss.  There were discussions

1    about Mr. Akhundov, again, throughout that entire time in the

2    months leading up to this, so that was discussed in many

3    occasions.

4    Q.   But previously to the 10th, there was discussions to

5    bring the boss down to California, correct?

6    A.   Yes, it was -- that was one of them, yes.

7    Q.   Okay.  Okay.  And also on the recorded conversations from

8    June 5 through June 8 -- I'm going to mark for identification

9    purposes Defense Exhibit C.  Mister -- do you recall on the

10   recorded transcripts from June 5 through June 8 where Michael

11   Krapchan asks the confidential source to reserve a ticket for

12   him and that Michael Krapchan would pay him back?

13           MR. GUTIERREZ:  Objection; hearsay, your Honor.

14           THE COURT:  The objection is provisionally

15   overruled.  You may answer if you're able to, sir.

16           THE WITNESS:  I remember that discussion.

17           BY MR. DENIS:  Q.   Okay.  And that Mr. Krapchan

18   wouldn't -- doesn't want to do it himself, correct?

19   A.   If you're asking me for the exact phrase he used, he said

20   something to that effect from time to time, but I don't know

21   what his exact words were.

22   Q.   Okay.  But Michael Krapchan asked Yuri --

23           MR. DENIS:  And I'm going to ask that, your Honor,

24   that we -- this has been previously shown to government

25   counsel as Defense Exhibit C.  This was translated by Ms.

1   Johnson.

2           THE COURT:  Well, until you two have a chance to

3   really verify that, as I indicated previously, we're going to

4   leave that in a state of abeyance for a bit.  So put that

5   aside.  If there's something -- if there's a subject

6   particular subject matter or a particular question you want

7   to ask the witness, you can ask the witness; and if there is

8   any -- if he has any difficulty remembering and you want to

9   refresh his memory with a document -- and it didn't have to

10  be an exhibit admitted into evidence -- then you can do that,

11  but you have to establish the foundation that he has no

12  memory or that his memory needs to be refreshed.

13          MR. DENIS:  Oh.  I appreciate it, your Honor.  This

14  is an exhibit that was translated by Ms. Johnson.  If Mr.

15  Gutierrez --

16          THE COURT:  Well, ladies and gentlemen, please

17  disregard the reference to this being a document translated

18  by Ms. Johnson.  Ms. Johnson did not translate any documents.

19          MR. DENIS:  Your Honor, is there an objection by

20  the government with this document?

21          THE COURT:  Well, what I suggest you do is ask the

22  question, and if there's any difficulty with the witness

23  recalling and his memory needing to be refreshed, then you

24  might then show the document to Mr. Gutierrez and see if the

25  document refreshes the witness's memory.  That would be the

 1    appropriate thing.  The objection otherwise will come.

 2              BY MR. DENIS:  Q.  This was a statement you

 3    recall --

 4              MR. GUTIERREZ:  What's the date on this?

 5              MR. DENIS:  This is June 5 to June 8.

 6              BY MR. DENIS:  Q.  But you recall Mr. Krapchan

 7    asking Mister -- the confidential source to reserve the

 8    ticket for him, correct?  He didn't want to reserve it for

 9    himself?

10    A.  I -- I remember a discussion about that.  Like I said, I

11    wasn't there and it was in Russian, so -- I've read

12    transcripts, so I remember a discussion about that, yes.

13    Q.  Do you know why Michael -- do you have an opinion --

14    well, that's okay.  Strike that.  And in the same transcript

15    on June 5 through June 8 -- I'm going to show you a page of

16    the transcript -- I'm going -- it's a June 5 through June 8,

17    page 3 of a transcript, which I'll identify as Defendant's

18    Exhibit D.

19          (Exhibit No. D identified.)

20              BY MR. DENIS:  Q.  Can you take a look at that

21    document, sir.  Just from memory, you don't recall the entire

22    transcript that happened on June 5 through the 8th, correct?

23    A.  Well, it happened in that time frame, but the exact day I

24    don't remember; I'd have to look at it, but I do remember the

25    conversation of him giving us his flight information to San

1    Diego.

2    Q.   Correct.   And Mr. Krapchan was intending to fly into San

3    Diego on Monday and leave Tuesday at 6:30 in the evening,

4    correct?

5    A.   I think that was his original flight plan, yes.

6    Q.   Okay.   And this was in anticipation of coming in, doing a

7    drug transaction the following day before six o'clock, and

8    then flying back to Canada, correct?

9    A.   Well, that was our impression of what he had told us as

10   to what the plan was on their side of things, that when these

11   other two individuals arrived at the airport that we would

12   pick them up, they would have the money available, be able to

13   go back to San Diego and do the transaction.   And since the

14   transaction was going to occur in San Diego and that Mr.

15   Wedding and Mr. Shirani arrived Tuesday at about around one

16   o'clock that there was enough time to go to San Diego,

17   complete the transaction, and he could return to Vancouver

18   from San Diego.

19   Q.   Correct.   Okay.   And when this -- when this phone call --

20   phone conversation happened, this was on the 5th through the

21   8th, correct, based on the transcript, somewhere in there?

22   A.   Well, it's not on the 5th through the 8th.   It -- I

23   think -- I'm going to have to see page 1 of this to see the

24   exact date and time, and then if you look at -- if it's one

25   that's already been completed, it should have the exact date

1    and time of that particular recording.

2    Q.  So it was during the time frame of the 5th and the 8th;

3    that's when this --

4    A.  Yes.

5    Q.  Okay.  And as far as you know from your investigation of

6    this case, was Mr. Wedding in Las Vegas during that time?

7                MR. GUTIERREZ:  Calls for -- no, I'll withdraw.

8                BY MR. DENIS:  Q.  If you know.

9    A.  I did not know at that time.

10   Q.  Subsequently did you find out that Mr. Wedding was in San

11   Diego -- I'm sorry.  Strike that.  In Las Vegas during that

12   time frame?

13               MR. GUTIERREZ:  Foundation, your Honor.

14               THE COURT:  The objection is overruled.  You may

15   answer that if you are able to, sir.

16               THE WITNESS:  There's been nothing to show he was

17   in Las Vegas at that time.

18               BY MR. DENIS:  Q.  When you say nothing to show,

19   did you subsequently learn that Mr. Wedding was in Vegas

20   during the 5th through the 9th?

21   A.  I think in your opening statement you said something

22   about the 6th through the 9th, and that's when -- that's when

23   we heard of that.

24   Q.  Okay.  During the 6th through the 9th, okay.  But you had

25   nothing during your investigation where Mr. Wedding was prior

1    to that?

2    A.   We didn't know about Mr. Wedding until he showed up on

3    the 10th of June, and that's all that mattered to --

4    Q.   Correct.

5    A.   -- us at that time.

6    Q.   So during the -- during the 6th or during this transcript

7    of the purchasing of the flights and returning back on the

8    8th, you had never heard of Mr. Wedding during that time,

9    correct?

10   A.   During the time that Mr. Krapchan and the informant were

11   discussing flights?

12   Q.   Yes, right here on the --

13   A.   On this one.   Yeah, you're right.   I did not know about

14   any flight details of any of the other individuals.

15   Q.   Okay.   Or that the other individuals were coming at that

16   time.

17   A.   We knew that there was a couple other individuals coming

18   at that time; Krapchan had told our source numerous times

19   that there was two other people, and he had described them to

20   us.

21   Q.   That there was other individuals, correct?

22   A.   No, he said there was a Canadian who was an athlete

23   and --

24   Q.   Hold on.   There were other --

25           THE COURT:   Counsel, let him finish his answer.

1          BY MR. DENIS:   Q.   Okay.

2     A.   He had said numerous times -- I'm sorry, your Honor.   He

3     said that there was an Iranian and that there was a Canadian,

4     and he used the term "huge in height" and an athlete.

5     Q.   And that was subsequent to the 5th, correct?

6     A.   No, I believe that -- well, I'd have to look, but I

7     believe that those discussions about who those individuals

8     are occurred both just prior and then the main discussions

9     were afterwards as well, yes.

10    Q.   Okay.   And you learned during the course of your

11    investigation when he was -- when Mr. Krapchan was referring

12    to individuals that had been in business for ten years,

13    approximately how old was Mr. Wedding when he -- when he

14    arrived in LAX?

15    A.   Oh, he was in his mid 20s.   Exact date of birth I'd have

16    to look at my records.   I apologize.

17    Q.   So if Mr. Wedding was one of these individuals that had

18    been doing this for ten years, he was approximately 15 or in

19    his early, early teens when he was drug dealing?

20          MR. GUTIERREZ:   Argumentative.

21          THE COURT:   Sustained.

22          BY MR. DENIS:   Q.   And you indicated that there was

23    a mentioning --

24          MR. DENIS:   Your Honor, I'd like to move what the

25    defense has marked as Exhibit D into evidence.

1          MR. GUTIERREZ:  We'd have an objection and ask that

2   you defer that ruling until the break, your Honor.

3          THE COURT:  The objection will be dealt with at the

4   time.  As of right now based on what I know of it, it does

5   appear to be -- the government's objection based on hearsay

6   does appear to be well-founded.

7          MR. DENIS:  The Court will reserve it, right, on

8   co-conspirator and we'll argue it at a later time?

9          THE COURT:  Sure.

10          MR. DENIS:  Thank you, your Honor.

11          BY MR. DENIS:  Q.  And Mister -- Agent Kalina,

12   during that same time the 5th through the 8th, there was a

13   discussion regarding an Iranian being in the deal, correct?

14   A.  There -- there was numerous times where that was brought

15   up, and I know it was also brought up on the 9th, so there

16   was many times where an Iranian was brought up.

17   Q.  And going to show you a document which we'll mark as

18   Defendant Exhibit E.  And, again, these were conversations

19   between the confidential source and Michael Krapchan,

20   correct?

21   A.  If it was any time before June 10.  There was also a

22   recorded conversation earlier with Elmar Akhundov, so I'd

23   have to take a look at it to make sure it's not -- but if

24   it's between the 5th and 8th, I believe it was always between

25   the informant and Mr. Krapchan.

154

1          MR. GUTIERREZ:  What day is this?

2          MR. DENIS:  The transcript is the 5th through the

3  8th.

4          BY MR. DENIS:  Q.  And during this time you

5  believed Mr. Krapchan was potentially involved in a

6  conspiracy to distribute drugs, correct?  That was the nature

7  of this transaction; is that true?

8  A.  He had -- he had committed the conspiracy; he had already

9  arranged for the purchase of the cocaine.

10 Q.  Are you familiar with that document or that -- do you

11 recall that transcript where it indicates that Mister --

12         THE COURT:  Before you describe it, why don't just

13 have the witness testify as to whether he's familiar with

14 what it is or what it is a part of.

15         THE WITNESS:  I remember reading this, yes.

16         BY MR. DENIS:  Q.  And this was on the -- this is a

17 conversation that happened between the 5th and the 8th,

18 correct?

19 A.  Yeah.  The exact time and date again would be on page

20 No. 1 of this, so -- I don't have that front of me, so I

21 don't know the exact time of the call.

22    (Exhibit No. E identified.)

23 Q.  Okay.  But there was discussion that the Iranian, he's in

24 the deal, correct, he's in the deal?  That happened -- those

25 statements were made a number of times, correct?

1    A.   There was those discussions I believe, yes.

2    Q.   And also -- I apologize.   There is actually two pages on

3    that document.   And there was discussion that there was going

4    to be another individual coming with Mister -- with the

5    Iranian, correct, a Canadian?

6    A.   In those discussions around the time, yes --

7    Q.   Yes.

8    A.   -- there was.

9    Q.   And it indicated that Mister -- that the other

10   individual -- and I'll show that for you, which we'll mark as

11   Defense Exhibit F for identification purposes --

12            THE COURT:   Is that part of the same --

13            MR. DENIS:   Yes.

14            THE COURT:   -- conversation that Exhibit E related

15   to?

16            MR. DENIS:   Slightly further down.

17            THE COURT:   Okay.

18            BY MR. DENIS:   Q.   Yes.   Do you recall that, that

19   the Canadian was not any torpedo?

20   A.   Let me finish reading it.   I'm sorry.

21   Q.   I apologize.

22   A.   Yeah, I remember the discussion about the torpedoes.

23        (Exhibit No. F identified.)

24   Q.   And the torpedo was -- do you have it -- based on your

25   training and experience or during the conversation of this

1   case, did you learn what the term "torpedo" was supposed to

2   mean?

3   A.   Yes.

4   Q.   What was that?

5   A.   Muscles.

6   Q.   Okay.  And Michael Krapchan indicated that he is no

7   torpedo; isn't that true?  The individuals that were coming

8   were not any of these torpedoes, any muscle.

9   A.   He -- what he said -- if I can -- if you want me to

10  translate what -- how I read it is that Krapchan said that

11  these guys aren't muscle, said these are not any kind of

12  torpedoes, no.

13  Q.   And then the confidential source said no, and he's like

14  nah, and Mr. Krapchan reiterates these are not any kind of

15  torpedo, correct, the individuals that are coming?

16  A.   That they were not muscle, yes, that's correct.

17  Q.   Okay.  And in -- just previous to that we indicated that

18  the Iranian though was in the deal, correct?  The transcript

19  that I show you just before this one?

20          MR. GUTIERREZ:  Hearsay as phrased, your Honor.

21          THE COURT:  The objection is overruled.

22          THE WITNESS:  There was discussions that the

23  Iranian was in the deal.

24          BY MR. DENIS:  Q.  Okay.  And that these two

25  other -- oh, okay.  And the two individuals -- and these two

1  individuals were supposedly coming were not any kind of

2  torpedo, correct, any kind of muscle?

3          THE COURT:  That's been asked and answered,

4  counsel.

5          MR. DENIS:  Okay.

6          BY MR. DENIS:  Q.  And you recall at some point in

7  time between the 5th and the 8th the -- on June 5 the tickets

8  were bought.  Do you recall that conversation?  Whose --

9  A.  That Mr. Krapchan's tickets were purchased?

10  Q.  All the tickets.  Or do you recall that conversation,

11  that during the 5th and the 8th -- or on the 5th that the

12  tickets were purchased to come down to California?

13  A.  There was discussions about tickets throughout that time.

14  The source continually asked him for verification on that

15  information.  So as far as to which exact time you're talking

16  about, I'd have to take a look.

17  Q.  Okay.  I apologize.  I'll have to get back to that one.

18  But you do recall that at some point in time, the tickets

19  were purchased to come to California; is that true?

20  A.  Well, they came, so tickets were purchased.

21  Q.  Do you recall the date just from your investigation when

22  the tickets were purchased to come to California by

23  looking --

24  A.  Do I know when your client purchased his ticket?

25  Q.  No.  The question is do you know when the tickets were

1    purchased.

2    A.   I don't know when Mr. Wedding's, Mr. Krapchan's or --

3    Q.   Sir, I'm just asking, do you recall -- do you know when

4    either of the airline tickets for either Michael Krapchan or

5    Hassan Shirani or Ryan Wedding's tickets were purchased?

6    A.   No.

7    Q.   Okay.  I'm going to -- during that same conversation

8    there was discussion that an Alaska Airline -- that Michael

9    Krapchan had purchased -- got his ticket or the ticket was

10   purchased for him from Alaska Airlines, correct?  Do you

11   recall that?

12   A.   I remember a conversation that he had given us his Alaska

13   Airlines confirmation.

14   Q.   I'm going to show you a document, another transcript from

15   the 5th through the 8th, which we have marked for

16   identification purposes as Defense Exhibit G.

17   A.   I remember, yes.

18   Q.   Do you recall that transcript?

19   A.   Yes.

20        (Exhibit No. G identified.)

21   Q.   And on that transcript it was reiterated that two

22   individuals were coming to California, correct?

23   A.   I think there's a different way that you can review that,

24   that there's two and possibly Hassan's brother.

25   Q.   Well, then why don't we just read that portion of the

1    transcript.

2            MR. GUTIERREZ:  Objection, hearsay.

3            MR. DENIS:  Your Honor, I could show it to you.

4            THE COURT:  You've already made reference to that

5    part of the transcript in your previously answer without

6    objection, so just go ahead and read that portion of it, sir.

7            BY MR. DENIS:  Q.  Starting from line 10 through

8    line 16, sir.

9    A.  Alaska -- CS, Alaska --

10   Q.  I apologize.  Can you start at -- why don't you start

11   from line No. 2 through line No. 16.

12   A.  You want me to designate who's speaking as well?

13   Q.  Sure, please.

14   A.  Krapchan: The flight is 702.  CS: Seven.  Krapchan:

15   Alaska Airline.  CS: Hold on.  I'll note it down.  Krapchan:

16   Uh-huh.  CS:  Fucking A, this is, you know, 702, Alaska.

17   Krapchan: 702, Alaska Airlines.  CS: Alaska I got.  Are there

18   two of them?  Krapchan:  Yes, there will be two of them, and

19   he said that in that plane there will be his brother, who is

20   just flying to LA.  CS:  Uh-huh.  Krapchan:  Well, he -- he's

21   coming for another reason.  Yeah, there will be two of them,

22   yeah, uh-huh.

23   Q.  Okay.  So it indicated that there would be two people

24   flying in, someone and their brother, correct?  That's your

25   interpretation?

1   A.   That's your interpretation.

2   Q.   But the transcript, forgetting anybody's interpretation,

3   indicates that -- and we read that portion into the record,

4   there's two of them, and Mr. Krapchan indicates yes, there

5   would be two of them, and he said that -- that in that plane

6   there will be his brother, correct, who is just going to LA?

7   A.   That's what it says.

8   Q.   Okay.  Do you know if Mr. Wedding has a brother?

9   A.   I -- I know he has a brother, yes.

10  Q.   Mr. Wedding has a brother?

11  A.   I'm sorry.  I apologize.  I thought you said Mr. Shirani.

12  Q.   That's my next question.

13  A.   I'm ahead of you.  I do not know other -- any other

14  information about Mr. Wedding's family.  I know of two or

15  three of his family members just from discussions --

16  Q.   And those would be two sisters --

17  A.   And parents.

18  Q.   Okay.  But you know there's two sisters?

19  A.   I only know of one.  I know -- strike that.  I did hear

20  information that there was two sisters.

21  Q.   Okay.  And the follow-up question, Mister Hassan Shirani,

22  he does have a brother, correct?

23  A.   Yeah, at least one brother.

24  Q.   And you met him or spoken to him previously, correct?

25  A.   I have spoken to him, yes.

1   Q.   Is he an older brother?

2   A.   Yes.

3   Q.   How old is Hassan or how old was he when he was arrested?

4   A.   I believe he was 31 on the day of arrest, but, again,

5   without looking at his date of birth, I'm not --

6   Q.   Is it possible he was 33 or 34?

7           MR. GUTIERREZ:  Calls for speculation as phrased,

8   your Honor.

9           THE COURT:  Overruled.  You can answer if you're

10  able to.

11          THE WITNESS:  It's possible.  I would have to look

12  at his DOB.  I don't remember.

13          BY MR. DENIS:  Q.  Do you recall how old Hassan's

14  brother was?

15  A.   I do not, but I could look at the documents.

16  Q.   Was he -- did you meet him personally?

17  A.   I did not.

18  Q.   Okay.  But you were given his information in terms of his

19  date of birth, correct?

20  A.   I believe so.  And if so, it would be in -- it would be

21  documented.

22  Q.   Correct.  And you could -- okay.  And do you know -- as

23  far as you know, was he an older brother?

24  A.   Again, I don't know his date of birth.

25  Q.   Was he ever referred to as his older brother?

1   A.   I don't specifically remember him mentioning him as an

2   older brother.

3   Q.   Okay.  And on June 9 Michael Krapchan did arrive into San

4   Diego; isn't that true?

5   A.   That's true.

6   Q.   And he arrived alone, correct?

7   A.   To the best of my knowledge, he arrived alone, yes.

8   Q.   Were you present when Mr. Krapchan arrived on the 9th?

9   A.   I did not see him come out of the gates like I did the

10  other ones, but we did see him get into the vehicle.

11  Q.   So there was some surveillance at that time?

12  A.   There was surveillance on June 9, yes.

13  Q.   So he alone went into the -- when you said the vehicle,

14  he went into the CS's vehicle?

15  A.   That's correct.

16  Q.   And he was alone, correct?

17  A.   When --

18  Q.   When he went into the vehicle.

19  A.   To my understanding, yes.

20  Q.   I'm going to show you what we'll mark as Defense Exhibit

21  H.  This was a conversation -- you recall that there was a

22  body wire used by the confidential source, correct, on the

23  9th?

24  A.   There is a recording device used.

25       (Exhibit No. H identified.)

1    Q.  All right.  Do you recall that conversation, the portion

2    that's on the bottom of exhibit -- exhibit -- Defense Exhibit

3    H, which is marked for identification purposes.

4    A.  I remember that.

5    Q.  You do recall that, correct?

6    A.  Yes.

7    Q.  And Michael Krapchan would not call Elmar from San Diego;

8    isn't that true?

9    A.  No.  In fact, Mr. Krapchan himself stated that he called

10   Elmar at some time when he was in San Diego.

11   Q.  Okay.  But according to -- do you recall that the CS was

12   asking Michael Krapchan to call Elmar regarding this

13   transaction; isn't that true?

14   A.  I don't know that I would interpret this excerpt as

15   saying that -- saying that, no.

16   Q.  Okay.  Why don't you look at Exhibit F.  Read the -- from

17   line 8 to yourself, and see if that refreshes your

18   recollection of the document.  Just to yourself.  See if that

19   refreshes your recollection.

20   A.  I've read it, and the --

21   Q.  Why don't you read from line 8 to line 25 then and see

22   what this document --

23          MR. GUTIERREZ:  Out loud, your Honor, we'd have an

24   objection as to hearsay.

25          THE COURT:  Well, there's no foundation for the

1    document.  It could or could not be hearsay at this point.

2    But in terms of just reading the document into the record,

3    there's no foundation for that.  The objection is sustained

4    on that basis.

5              BY MR. DENIS:  Q.  But on this --

6              MR. DENIS:  Your Honor, could we have a sidebar on

7    this -- on the 9th issue?

8              THE COURT:  Not at this point.

9              MR. DENIS:  Okay.

10             BY MR. DENIS:  Q.  But you read the document to

11   yourself?

12   A.  I remember -- yes.

13   Q.  Okay.  You don't recall that Michael -- that the

14   confidential source asked Michael Krapchan to -- for Michael

15   Krapchan to call Elmar?

16             MR. GUTIERREZ:  It's been asked and answered, your

17   Honor.

18             THE COURT:  Sustained.

19             BY MR. DENIS:  Q.  You indicated at some point in

20   time that Michael Krapchan did call Hassan -- Michael

21   Krapchan did call Elmar after the 9th?

22   A.  At some point during his trip is what he told me in a

23   meeting with Mr. Krapchan; in a proffer he said that he made.

24             THE COURT:  Hold on.  Don't get into any of what

25   might have occurred after the arrest at this point because

1    that may well involve issues that the Court needs to screen.

2            BY MR. DENIS:  Q.  But in terms of the statements

3    that were made by Mr. Krapchan on the 9th to the confidential

4    source, he indicated that he would not call Michael -- Elmar

5    because of the rules of the game, correct?

6            MR. GUTIERREZ:  Objection; hearsay, lack of

7    foundation.

8            THE COURT:  Well, if the witness has an independent

9    recollection of that, he may answer; if not, then you can

10   indicate that, sir.

11           THE WITNESS:  I remember him discussing why Elmar

12   was a good partner and that he was safe and that --

13           BY MR. DENIS:  Q.  And that he wouldn't call him

14   while he was down here doing a drug transaction because that

15   was the rule of the game, correct?  You're nodding your head.

16   Is that a yes?

17   A.  No, I'm trying to review it.  I think if you read it,

18   what's on the transcript, it can be a different

19   interpretation.  He says -- he does say I won't be calling,

20   but --

21   Q.  He said he wouldn't be calling because of precautions and

22   because of the rules of game; he sticks to safety

23   precautions, correct?

24           MR. GUTIERREZ:  Compound as phrased, lack of

25   foundation, your Honor.

1          THE COURT:  There's a lack of foundation.  Ladies

2     and gentlemen, it's three o'clock; we'll take our recess at

3     this time and resume in 15 minutes.  Please remember the

4     admonition.  Thank you.

5          (The jury left the courtroom.)

6          THE COURT:  We are outside the presence of the

7     jury.  Agent, I know you're a practicing attorney or a former

8     practicing attorney.  The document Exhibit H is not in

9     evidence, and so until it is in evidence, then please don't

10    describe what it says.  The government has been objecting to

11    it coming into to evidence, and then for some reason the

12    question continues concerning it, and then you're willing to

13    paraphrase it at that point, and then Mr. Gutierrez objects

14    again, and it just makes for a very confusing Q and A.  So if

15    the objection is sustained, then please don't volunteer what

16    any document says.  And if the objection is sustained, you

17    need to move on to something else, Mr. Denis.

18         MR. DENIS:  Your Honor, I just --

19         THE COURT:  I also want to give you an opportunity

20    to set up any equipment you need because we're resuming in 15

21    minutes --

22         MR. DENIS:  Correct.

23         THE COURT:  -- and so you've got that time to have

24    your person come in and do that.

25         MR. DENIS:  I appreciate it.  And if the government

1    can assist us with some minor audio issues.  But basically

2    the exhibits that we're introducing are the exhibits -- are

3    the transcripts that Ms. Johnson actually laid the foundation

4    of what she transcribed or that have already been admitted

5    or --

6              THE COURT:  Well, there's been --

7              MR. DENIS:  The foundation has been laid.

8              THE COURT:  -- nothing admitted except a few lines

9    that were shown to the jury.  But the two of you could get

10   together while your technician is working, and I think

11   that's --

12             MR. DENIS:  Correct.  But, your Honor, I think this

13   is an issue because I obviously want to introduce these

14   excerpts.  The government has been able to introduce their

15   excerpts and publish them to the jury through the -- through

16   the Sanctions program and they're doing it assuming based on

17   an admission.  And I'm trying to admit the statements of a

18   co-conspirator, and I think these are admissible.

19             THE COURT:  You need to get together --

20             MR. DENIS:  I understand, but --

21             THE COURT:  -- and show him your particular pages.

22             MR. DENIS:  I've shown -- as I'm presenting the --

23   I'm showing them to him, and there shouldn't be an objection

24   that they're lacks foundation; these are the -- we're using

25   the translated copies by Ms. Johnson.

1          THE COURT:   Okay.   Mr. Gutierrez, take a look at

2   them.   Make sure that -- you know, why don't you give them --

3   just hand them all over to Mr. Gutierrez.   At this point he

4   can take a look at them and substantiate that they're

5   Johnson-reviewed excerpts.

6          MR. DENIS:   Right.   I mean can we -- I appreciate

7   that.   And then can we have that on the record before the

8   jury is entered?

9          THE COURT:   Have what on the record?

10          MR. DENIS:   That basically these were the Johnson

11   ones?

12          THE COURT:   I don't know.   It depends on what Mr.

13   Gutierrez determines, whether he confirms with you --

14          MR. DENIS:   Correct.   I'm just going to ask --

15          THE COURT:   And if he's in agreement with you, I

16   think the typical way that works is you proceed with a

17   particular portion of a transcript and there will or will not

18   be an objection.

19          MR. DENIS:   Thank you, your Honor.   I will do that.

20          THE COURT:   All right.

21       (There was a break in the proceedings.)

22          THE COURT:   All right, Mr. Denis.   Please continue.

23          BY MR. DENIS:   Q.   Mr. Kalina, on June 9 the

24   confidential source continued to have communication with

25   the -- with Mr. Krapchan, correct?

1  A.  Yes, sir.

2  Q.  And do you recall where Michael Krapchan indicated that

3  Hassan was the main one and that he wanted to talk to the

4  confidential source?

5  A.  I remember a conversation about that, yes.

6         MR. DENIS:  And at this point I will mark -- we'll

7  mark for identification purposes Defense Exhibit I, which has

8  previously been given to the defense -- to the prosecution.

9         BY MR. DENIS:  Q.  Familiar with that transcript?

10        MR. GUTIERREZ:  What's the date, counsel?

11        MR. DENIS:  It's June 9 of '08.

12        THE WITNESS:  I remember that, yes.

13     (Exhibit No. I identified.)

14        BY MR. DENIS:  Q.  And it indicated that -- that it

15  was -- Hassan was the main person, correct, as you indicated?

16        MR. GUTIERREZ:  Objection; lack of foundation,

17  hearsay.

18        THE COURT:  The objection is sustained on the first

19  ground.

20        MR. DENIS:  Okay.  And we'll identify -- it will be

21  marked for identification then.

22        THE COURT:  Counsel, you can still ask the

23  question.

24        MR. DENIS:  Correct.  I believe I established it.

25  So Mister -- Okay.  I've asked.  That's fine, your Honor.  I

1    appreciate it.

2            BY MR. DENIS:   Q.   And it indicated that Hassan is

3    the Iranian, and he's the main one, correct?   Yes?

4    A.   There was a conversation about that, yes.

5    Q.   Okay.   And also on that same conversation, you recall

6    that Hassan is the one that wants to speak or talk to the CS

7    regarding this deal, correct?   Do you recall that?

8    A.   I remember a conversation about that.

9    Q.   You do?

10   A.   I do.

11   Q.   Okay.   And Hassan was the one that wants to talk,

12   correct?

13   A.   I remember a conversation in that regard; exact words I

14   do not remember.

15   Q.   I'm going to show you what has been previously marked as

16   Defense Exhibit J, which has previously been shown to the

17   government.   I'll withdraw that one.

18           THE COURT:   Well, save the letter.

19           MR. DENIS:   Okay.   I haven't given that to the

20   government yet.

21           BY MR. DENIS:   Q.   And that was the day before Ryan

22   Wedding and Hassan Shirani came from Canada to LAX, correct?

23   That was on the 9th, that conversation?

24   A.   I believe so, but, again, without the exact time of that

25   conversation, I'm not sure.   But I believe that was on the

1  9th.

2  Q.  Okay.

3        JUROR BIRNBAUM:  Excuse me, your Honor.  May I be

4  excused?  I'm not feeling well.

5        THE COURT:  Certainly.  Can we have you back in

6  just a few minutes?  Did you just need a break?

7        JUROR BIRNBAUM:  I hope so.

8        THE COURT:  All right.  Thank you, Ms. Birnbaum.

9  We'll wait for you.  Okay.  Ladies and gentlemen, we'll take

10  a short recess so that we can wait for Ms. Birnbaum to feel a

11  little bitter or to see if she can continue.  So why don't we

12  take our recess.  We're starting and stopping today.  Things

13  are not going as smoothly as I'm sure any of us would like,

14  but we do appreciate your patience.  So let's take this

15  recess, hopefully a short one, with you outside the

16  courtroom, and we'll resume just as soon as we can.  Please

17  remember the admonition.  Thank you.

18     (There was a break in the proceedings.)

19     (Following is a sidebar conference.)

20        THE COURT:  Who is that fellow sitting at the

21  table?

22        MR. DENIS:  He's my Russian interpreter, and he's

23  the one that hears the Russian and he can sync it properly.

24  He did the syncing already, just making sure if something

25  goes haywire on the computer that -- we are having this issue

1    with the transcript.

2                THE COURT:  Hold on.  Hold on.

3                MR. DENIS:  Okay.

4                THE COURT:  This is really painful, it's painfully

5    slow, and this is really tough on everyone, including the

6    jury.  How much longer will you be with this witness?

7                MR. DENIS:  I'm almost done.  I'm almost done.

8                THE COURT:  Okay.  Mr. Gutierrez, did you have a

9    chance to look at the pages of transcript?

10               MR. GUTIERREZ:  Counsel was preoccupied with

11   getting ready with this.  He didn't spend any time with me.

12   He was busy.

13               THE COURT:  All right.

14               MR. DENIS:  But I did --

15               MR. GUTIERREZ:  He handed me some documents.

16               THE COURT:  Do they appear to be genuine pages out

17   of the group of transcript material that --

18               MR. GUTIERREZ:  We sent him a disk with everything

19   that Ms. Johnson did.  It has a Bates stamp number on the

20   bottom.  We PDF'd it, and that's what I have in my binder as

21   Ms. Johnson's work.  I don't see that on there.  Maybe

22   something got mixed up technically, but I'm willing -- if he

23   would just only show me what he wants to use, I can pair it

24   up and I'm more than happy to stipulate that it's accurate.

25   But because there was no stipulation, I had Ms. Johnson, as

1   you heard, on Friday double-check just those things that she

2   did for me so I can be prepared because counsel indicated

3   that he would be flying his interpreter from Russia.  He

4   agreed to a 98 percent of Ms. Johnson, so I was forced to do

5   this.  These transcripts that he's doing and he's handing in

6   now and cross-examining there is no foundation laid before

7   the Court.  I'm happy to stipulate, but it was more important

8   for him to not tell me.  And that's where we're at.  I'm more

9   than happy to stipulate.  I'll work with him.

10              THE COURT:  Let me tell you something, Mr. Denis.

11  Mr. Gutierrez -- I'm sure you're seeing him through one lens,

12  I've seen him through another lens for many years.  Say what

13  you will, but you can really rely upon his bonafides and his

14  willingness to cooperate if he makes that offer.  I have

15  never now in the course -- I tell you this:  In the course of

16  22 years on the bench, 22 plus years, including 12 over here,

17  I have never seen a process more awkward when it came to

18  authenticating pages of transcripts of translated material.

19              MR. DENIS:  Sure.

20              THE COURT:  Usually the parties just stipulate and

21  it comes --

22              MR. DENIS:  Of course.

23              THE COURT:  -- in seamlessly.

24              MR. DENIS:  Your Honor --

25              THE COURT:  So this is what I'm suggesting you

1    do --

2              MR. DENIS:  Your Honor, could I just -- because I'm

3    dying here just hearing this.  Mr. Gutierrez indicated to me

4    if am I okay with the translation.  I said yes, I'm okay with

5    the translation.  I said let's do it mutual.  There were

6    certain days that were not translated.  I had a translator

7    translate them, and he said why don't you give me what was

8    translated, I'll compare it.  We gave it to him, he's found

9    typographical errors, which I appreciate.  I said go ahead

10   and make those changes.  He goes it's pretty much the draft

11   with a couple of changes, and he okayed it.  I thought we

12   were fine and I was -- I told him not to bring Ms. Johnson

13   here and I thought we were proceeding --

14             THE COURT:  Meanwhile --

15             MR. DENIS:  I didn't want to have to --

16             THE COURT:  Hold on.  Let me stop you for a moment.

17   Meanwhile we're proceeding on under a real handicap here.  So

18   I'm going to ask the cooperation of both of you at this point

19   be extended to one another and that we just move this process

20   along as seamlessly as we can.

21             MR. DENIS:  Yes.

22             THE COURT:  Now, when it comes to the actual

23   content of these pages, these single pages of transcript

24   material, you're using those, it is true, without foundation

25   and without a stipulation.  You saw what the government did

1    because it had to do it with respect to laying the foundation

2    for the transcript material it wanted to introduce; it did

3    that because apparently there was no agreement reached, and

4    you haven't -- you haven't been doing that.  But that doesn't

5    mean you can't ask a question of this witness that relates to

6    a certain subject matter:  Do you recall as we've been

7    through these materials that a statement was made that Hassan

8    was the one --

9            MR. DENIS:  Correct.

10           THE COURT:  -- and if he says yes, you know,

11   there's no need for you to introduce any kind of transcript

12   or mark any kind of --

13           MR. DENIS:  Your Honor --

14           THE COURT:  If he says, you know, I'm having a hard

15   time remembering that, you mark it for identification, you

16   show it to him, you ask him if it refreshes his memory.  That

17   way even if the government has not agreed to it coming in,

18   you can still use it appropriately.

19           MR. DENIS:  I understand, but obviously just the --

20   from whatever experience that I have, it's better to -- you

21   know, the jurors aren't going to remember what was on or what

22   the exact testimony was, but if it's on the transcript, the

23   transcripts are there.  These were conspirators' statements.

24           THE COURT:  But the transcripts don't come in as

25   evidence; you need to know that.

1            MR. DENIS:  That's true, but --

2            THE COURT:  The government's won't.

3            MR. DENIS:  I think they --

4            THE COURT:  The audio form -- the audio form will.

5            MR. DENIS:  In Russian, right?

6            THE COURT:  No, no.  The audio form that you saw in

7     terms of the rolling script and what's actually heard on the

8     audiotapes, that comes in, that's in evidence.  Transcripts

9     don't go in with the jury.

10            MR. DENIS:  Exactly, right.  I mean I know that

11    you're right.  The English one -- this is my first

12    multi-language, Farsi, Russian, usually in English, you're

13    right, you have recordings, it's in English, you have the

14    transcripts.  Transcripts are just to help them decipher, and

15    you only give them the recording and the recordings come in

16    as evidence or they read it back.  I completely understand.

17    I wasn't sure, and I was going to try to bring this up before

18    with the Court and say how does the Court want to proceed

19    when you have Russian.  And we had the translator come up

20    here and she indicated what she translated, and we're going

21    by that, and I wasn't sure if we agreed to that, then just

22    would the transcript go in based on her translation --

23            THE COURT:  Well, you didn't have anything

24    translated that Sasha Johnson has not seen and provided to

25    the government.

1          MR. DENIS:  Right, no.  Whatever --

2          THE COURT:  So you should have gone just by what

3    she -- what was in those transcripts.  Didn't you agree as to

4    all those --

5          MR. DENIS:  Yes.  I'm going through those

6    transcripts.  Yes, I'm going through those transcripts, your

7    Honor.

8          THE COURT:  All right.  Listen, we're not getting

9    anywhere right now.  Let me just say this:  You're each aware

10   of the other's theory.  Cooperate to the extent you can.

11   Otherwise, you're just going to make this trial miserable for

12   one another.

13         MR. DENIS:  And especially the jury.

14         THE COURT:  You disserve everyone in the case,

15   including the principals and the jury, when that happens.  So

16   you each know what the other's theory of the case is; that's

17   no secret.  Cooperate to the extent you can; object in good

18   faith, good-faith objections --

19         MR. DENIS:  Okay.

20         THE COURT:  -- let come in the evidence that you

21   know is appropriately admissible, and then let the chips fall

22   where they may.  Give one another the option of arguing your

23   respective cases and getting a result in this case.

24   Otherwise, it's going to be pretty awkward throughout the

25   entire trial.

1          MR. GUTIERREZ:  I'll work with him about these

2    excerpts.  If they're from Ms. Johnson, as long as I can

3    compare them this evening, that's fine, then I will have no

4    problem.  If he could give them to me ahead of time, I'll

5    compare them, and I'll --

6          MR. DENIS:  I gave them to you.  Those are the ones

7    that -- I gave them to you.

8          MR. GUTIERREZ:  Of the six that you gave me --

9          MR. DENIS:  Yes, that's what we're going to be --

10   those are the remaining ones.

11         MR. GUTIERREZ:  If you would have told me

12   beforehand that that's what you were -- that you were going

13   to use them, I could have had them --

14         THE COURT:  Look, that's water over the dam.  Let's

15   cooperate from this point forward and let -- do what you can

16   to assist one another in getting the case on logistically.

17   You don't have to cooperate obviously when it comes to the

18   substance and the issues in the case, but in terms of

19   logistically.

20       (There was a break in the proceedings.)

21       (Following is a sidebar conference outside the presence

22   of the attorneys.)

23         DEPUTY U.S. MARSHAL:  I was under the impression

24   that there was supposed to be no contact as far as between

25   the family and the defendant.  I noticed the defendant was

1    writing notes, and I thought he was writing notes pertaining

2    to his case.  While I was -- I had gone to the restroom, I

3    came back, and I noticed that the paperwork that he'd been

4    writing was not there, and I'd seen him fold it.  I looked

5    back to the gallery, and it appeared that the attorney for

6    the defense, his assistant, I don't know her name, gave the

7    paper that I saw missing to the defendant's sister.  So I

8    went over and I spoke to the defendant's sister and I saw her

9    open it up and read it and was smiling at him.  It's really

10   of no substance.  However, I'm just trying to follow the

11   Court's direction on this.  Why we're passing notes I'm not

12   sure.

13          THE COURT:  Who's Jack?

14          DEPUTY U.S. MARSHAL:  I don't know.  But it's

15   signed with the defendant's name and was given to the sister,

16   like I said, I believe through the assistant to the attorney.

17          THE COURT:  Okay.  Well, I think at this point this

18   is probably something more in your bailiwick.  I think I'll

19   let you handle it.  You can tell him that this kind of

20   communication for the record -- I know we're keeping a record

21   here -- this appears to be just a -- it's one verse that's

22   repeated several times.  This is from the defendant, written

23   by the defendant to what, his girlfriend?

24          DEPUTY U.S. MARSHAL:  Given to his sister.

25          THE COURT:  Given to his sister.  See you soon,

1    dear.  Ha, ha.  Miss you, love you, Ryan.  All work and no

2    play makes Jack a dull boy, all work and no play makes Jack a

3    dull boy, repeated many times on one page.  So we'll just

4    stick that in the file as a court exhibit at this point next

5    in order, but you can tell -- look, he's apparently taking

6    this pretty lightly --

7              DEPUTY U.S. MARSHAL:  The real source of our

8    frustration in trying to facilitate our job, you know, and

9    what we're responsible for here is the fact that direction

10   that's been given to us here by the Court is being directly

11   undermined by defense counsel and his assistants, and it's

12   making our job just that much more difficult.

13             THE COURT:  How did this get from the defendant to

14   his sister?

15             DEPUTY U.S. MARSHAL:  Through the attorney's

16   assistant.

17             THE COURT:  This guy sitting at the table?

18             DEPUTY U.S. MARSHAL:  The female in the yellow

19   shirt, the defense counsel's assistant, whatever she is.  I

20   don't know her exact title.  It appeared that she handed it

21   to the sister.  So undoubtedly I'm assuming he or she took it

22   off the table from the defendant.

23             THE COURT:  Mr. Denis and Mr. Gutierrez, may I see

24   you one more time, please.

25             (Counsel approached sidebar.)

1          DEPUTY U.S. MARSHAL:  We've been real careful not

2   to allow contact between the defendant and his family, but --

3          THE COURT:  We seem to have a continuing problem

4   with your client and his effort to communicate with family

5   members and friends who are here.  He wrote some kind of a

6   poem or letter, which I've made a part of the record, and

7   apparently gave that to his assistant, the one in the yellow

8   shirt, your assistant, to give to a family member.  The

9   marshals have told him basically not to communicate with the

10  family --

11         DEPUTY U.S. MARSHAL:  As well as the family members

12  repeatedly.

13         THE COURT:  -- as well as family members and

14  friends repeatedly.  So you tell them, all of the friends,

15  your whole entourage here -- because I know he's got an

16  entourage -- that if anyone assists him in communicating in

17  that fashion, I will cite them for contempt.

18         MR. DENIS:  Okay.

19         THE COURT:  I have never cited anyone for contempt,

20  once again, in 22 years, but I will cite them for contempt.

21         MR. DENIS:  I will take care of it.

22         THE COURT:  Furthermore, I'll cite Ryan Wedding for

23  contempt as well.

24         MR. DENIS:  Okay, your Honor.  I'll take care of

25  that immediately.  Your Honor, I have binders.  I don't

 1   know -- some of them are a little elderly.  It's not that

 2   clear.

 3              THE COURT:  The binders --

 4              MR. DENIS:  You don't see it right in front of

 5   them?

 6              THE COURT:  No binders.

 7              MR. DENIS:  No?

 8              THE COURT:  No, no binders.  There's not that much

 9   material going in.  What they see is either projected on the

10   screen or comes from the witness stand.  The government

11   didn't use them and the defense isn't going to use them.

12              MR. DENIS:  Just because the government didn't use

13   them doesn't mean the defense can't use them.

14              THE COURT:  There's no need for it.

15              MR. DENIS:  They're easier to read.

16              THE COURT:  Don't wink at me.  The answer is no.

17              MR. DENIS:  You do winking.

18              THE COURT:  No, I don't.

19         (Following is a sidebar conference outside the presence

20         Of counsel.)

21              THE COURT:  So we have Ms. Birnbaum here at the

22   side of the bench, just the two of us and the CRD and court

23   reporter.  You're indicating you have a bit of a stomach

24   problem right now, and what I'm thinking is this.  It's

25   now -- have you had this kind of thing before, Ms. Birnbaum?

1              JUROR BIRNBAUM:  Uh-huh.

2              THE COURT:  Okay.  We can stop today, and if you

3    feel this is something that might pass overnight, we can give

4    you the option of coming back, and if you call in and say you

5    just can't go because you're sick, then we'll substitute an

6    alternate juror for you.

7              JUROR BIRNBAUM:  Okay.  Well, I'd like to serve if

8    I can.

9              THE COURT:  I believe that, and I want to give you

10   the chance to.  We'll be breaking in another 45 minutes

11   anyway, so we can stop a little early today --

12             JUROR BIRNBAUM:  Okay.

13             THE COURT:  -- and then see how you feel.

14             JUROR BIRNBAUM:  Okay.

15             THE COURT:  And if you get up in the morning and

16   you're okay --

17             JUROR BIRNBAUM:  I'll come on in.

18             THE COURT:  -- you come on in.  If you're not,

19   well, give us a call, and --

20             JUROR BIRNBAUM:  Okay.  I have that card.

21             THE COURT:  Are you okay to go by yourself?

22             JUROR BIRNBAUM:  I think I'm okay.  I'm going to

23   walk to the station train.  I take the train --

24             THE COURT:  Is there anyone who can pick you up?

25             JUROR BIRNBAUM:  Huh-uh.

1              THE COURT:  Why don't we have somebody drive you --

2              JUROR BIRNBAUM:  Oh, I don't want --

3              THE COURT:  We're going to stop anyway.  We'll see

4    if we can find somebody that can drive you to the station.

5    You say there's no one you can --

6              JUROR BIRNBAUM:  No, no.

7              THE COURT:  Okay.  Are you okay to wait outside the

8    courtroom on a bench?

9              JUROR BIRNBAUM:  Is it okay if I lay down on the

10   bench.

11             THE COURT:  Absolutely.  Did you want to be taken

12   to the nurse's station?

13             JUROR BIRNBAUM:  No.

14             THE COURT:  Are you sure?

15             JUROR BIRNBAUM:  Yeah.  I've got my water, and --

16             THE COURT:  Well, then why don't you lie down on

17   the bench out toward the CS officer, the Court Services

18   officer if you need to, and we'll try to get transportation

19   for you, and then you let us know.

20             JUROR BIRNBAUM:  I got your card, and I'll tell

21   you.

22             THE CLERK:  Yes.

23             JUROR BIRNBAUM:  I'll call you in the morning then

24   and tell you that I'm not coming or not coming.

25             THE CLERK:  You'll probably get the voicemail.

 1    I'll be here, but just leave a voicemail.

 2              JUROR BIRNBAUM:  Okay.

 3              THE COURT:  Laura, would you escort Ms. Birnbaum

 4    down there.  I'll have counsel over here and explain to them

 5    what's happening.

 6         (Counsel approached sidebar.)

 7              THE COURT:  That was Juror Birnbaum, who's not able

 8    to go on.  At this point she's having some stomach issues,

 9    and we're going to do what we can to get her transportation

10    to her train station so that she can get home, and she's

11    going to let us know in the morning if she can continue on.

12              It's pretty close to closing anyway, it's 3:45, and

13    I certainly had hoped to get a lot more done today than we

14    have, but I think probably because it's so early in the

15    trial, I don't want to start losing jurors.  I think the best

16    thing to do would be just to wait until tomorrow morning and

17    see what we have, adjourn for the day, let you two work on

18    some of these things, take advantage of the time that's now

19    become available, and we'll see where we are on the juror

20    tomorrow morning.

21              MR. DENIS:  I appreciate that.

22              MR. GUTIERREZ:  Your Honor, he just showed me some

23    excerpts, and I think we'll be able to come to an agreement

24    to let things go smoothly.  If we could be required to stay

25    here for about 20, 30 minutes, I will make sure that it gets

1    done.

2              THE COURT:  Okay.  Sure.  I will respectfully

3    request each of you to stay and work together on this so for

4    the remainder of the trial, we'll just kind of keep things

5    moving smoothly.

6              We'll bring the jurors back in -- before you do

7    that, we're going to bring the jurors back in, let them know

8    what's happened.  We're stopping for the day.  We have

9    another juror -- we have one or more jurors who are concerned

10   about the level of cologne that -- not you, even though

11   you're close to the jury -- the level of cologne that some

12   jurors are wearing, it's making others uncomfortable.

13             MR. DENIS:  I don't have any.  I haven't been that

14   close.

15             THE COURT:  Okay.  So that's pretty much where we

16   are at the present time.

17             MR. DENIS:  Just, your Honor, in terms of the

18   excerpts, problem is I don't know exactly which witnesses

19   their calling and what is the extent of what their testimony

20   is, and then I -- obviously I know the case, but depending on

21   what they say, what I have to counter, some of this -- I'm

22   bringing up a lot of -- I don't even whether the confidential

23   source will be called, and I was worried if he's not called,

24   I better get some of this stuff --

25             THE COURT:  Can you have your assistant look a

```
 1    little more professional?
 2             MR. DENIS:  Absolutely.  We didn't expect that.
 3             THE COURT:  Because when I saw him sitting there, I
 4    was thinking who is that because he --
 5             MR. DENIS:  I really apologize for that.  I'm just
 6    oh, my God, oh, my God.
 7             THE COURT:  I know you don't want to create that
 8    impression for the jury.
 9             MR. DENIS:  Oh, my God.
10             THE COURT:  It's not a favorable impression.
11             MR. DENIS:  No, not at all, not at all.
12             THE COURT:  Listen, I'll ask you what I typically
13    ask in virtually all cases.  Why don't you keep counsel
14    advised of the order of witnesses you'll be calling so that
15    at least he's with you on preparation and --
16             MR. DENIS:  And we could avoid this.
17             THE COURT:  That will help because --
18             MR. GUTIERREZ:  Okay.
19             MR. DENIS:  I was working on other witnesses, the
20    remainder --
21             THE COURT:  Mr. Denis, please don't --
22             MR. DENIS:  Apologize.  Thank you, your Honor.
23             THE COURT:  -- interrupt me.  Okay.
24             MR. GUTIERREZ:  We'll call the jury back in, then
25    we'll work.
```

```
 1                THE COURT:  Yes.  And I'm going to -- which juror's
 2   having the problem with cologne?
 3                THE CLERK:  Gaynes.
 4                THE COURT:  Who?
 5                THE CLERK:  Gaynes.
 6                THE COURT:  Ms. Gaynes?
 7                THE CLERK:  Ms. Gaynes.
 8                THE COURT:  Okay.  Why don't you have her come in.
 9                MR. GUTIERREZ:  Would you like us to stay here?
10                THE COURT:  Yes, why don't you hang around.
11                MR. GUTIERREZ:  I'll put this chair back.
12                MR. DENIS:  Can I get their excerpts?  I know he
13   threw some excerpts up there, and --
14                THE COURT:  Just a couple?  Is there just a couple?
15                MR. DENIS:  Three or four.
16                MR. GUTIERREZ:  The transcripts?  I'd be happy --
17                THE COURT:  Tell him which ones they are.
18           (Juror Gaynes approached sidebar.)
19                THE COURT:  Hi.  You're having --
20                JUROR GAYNES:  I was just wondering, there's some
21   people in the jury box that are wearing cologne that is
22   really strong.
23                THE COURT:  Do you know who they are?
24                JUROR GAYNES:  I don't know, and I don't want to go
25   around sniffing people, but if they happen to walk by me,
```

1    I'll take the initiative and I'll ask them to please tone it

2    down, but I know a couple of the ladies that I'm sitting by

3    also mentioned it too, and this morning I had a pounding

4    headache.

5           THE COURT:  Do you think it's perfume or is it

6    men's cologne?

7           JUROR GAYNES:  I think it's cologne.  It's just

8    kind -- we had pounding headaches this morning, and I'm --

9    it's got to be the cologne.

10          THE COURT:  Okay.  I'll mention it.

11          JUROR GAYNES:  I'm sorry.  Thank you.

12          THE COURT:  No problem at all.

13    (Sidebar conference concludes.)

14    (The jury entered the courtroom.)

15          THE COURT:  Okay.  We have all jurors with the

16    exception of Ms. Birnbaum present and counsel and the parties

17    are present as well.  Ladies and gentlemen, it is about

18    quarter to 4:00 right now.  We are going to stop for today,

19    and I want you to give you some information particularly as

20    it relates to Ms. Birnbaum.

21          First of all, as you know, as we were taking our

22    normal recess that extended into a rather lengthy recess,

23    counsel and I were discussing some matters concerning the

24    trial directly, but it came to our attention that

25    Ms. Birnbaum is not feeling well at all.  She's not -- it

1   doesn't sound like it's an illness that any of you should be

2   concerned about, contagious flu or anything like that, but

3   she was having -- she was pretty uncomfortable and, if at all

4   possible, would like to remain on the jury.  So rather than

5   excusing her from the case at this point and automatically

6   bringing in an alternate, who would be Mr. Garcia, our first

7   alternate, I wanted to give her a chance just to feel better

8   tomorrow morning, to let us know, she can call in, and if

9   she's not able to answer the bell, then we can do the

10  substitution at that time.  So that's the situation with

11  Ms. Birnbaum.  We will get started tomorrow morning at 9:00

12  a.m. one way or the other.

13          There is one other matter I wanted to discuss, and

14  I know this may sound like an unusual matter; it's fairly

15  unusual, but I've encountered it before having presided over

16  many hundreds of jury trials over a long, long period of

17  time.  For those who wear cologne and/or perfume, if you

18  can -- if you must wear it, wear it very, very lightly

19  because you're in a group of people where you're obviously

20  closely situated at this point and then once you're

21  deliberating on the case, you're in a jury deliberation room,

22  so it is important that everyone be thoughtful about that and

23  really, to the extent possible, tone it down or eliminate it

24  during this period of time.  I know some people really do

25  have a reaction to it that they really cannot help.  So be as

1    accommodating as you can in that regard.  It is appreciated.

2    We do want everyone to really track very carefully,

3    concentrate, and focus on what's happening in the courtroom

4    rather than having to overcome any feelings of discomfort.

5         So that's pretty much where we are at this point.

6    I can assure you that counsel and I will be working together

7    for the balance of the day trying to work on these issues

8    relative to exhibits so that things go a little more smoothly

9    tomorrow.  Oftentimes during the first day of a trial, it

10   takes a little while for things to kind of shake out, and

11   everything has its own rhythm, even including a trial, a jury

12   trial, so we're hopeful that things are going run a little

13   more smoothly and we won't have to be interrupting the

14   proceedings as much as we did today.

15        So thank you for your patience and your

16   understanding.  You all have a very good evening.  We will

17   see you back here at nine o'clock tomorrow, we'll get started

18   right on time hopefully with Ms. Birnbaum but if not

19   Mr. Garcia; we'll have you switch seats.  Okay.  All right.

20   Thank you.  Remember the admonition not to discuss the case

21   or make any decisions at this time.  Did anyone have any

22   questions about any of the matters I've brought up?  Okay.

23   Thank you.  Have a good evening.

24        (The jury left the courtroom.)

25        THE COURT:  Okay.  So, counsel, if you can work

1    together as we discussed, Mr. Gutierrez and Mr. Denis, it

2    would be appreciated.

3              MR. DENIS:  Thank you, your Honor.

4              THE COURT:  I'm not -- we're out of session now,

5    we're in recess until tomorrow morning, but I appreciate your

6    remaining together for that purpose.  Certainly it's not

7    necessary for Mr. Wedding to be here for that.

8              MR. GUTIERREZ:  Your Honor, can we use the

9    courtroom for next 20 minutes or so?

10             THE COURT:  Yes, the next 20 minutes, whatever it

11   takes, at least 20 minutes.  I guess that's the best estimate

12   what it's going to take in terms of going over these

13   materials.

14             MR. DENIS:  Your Honor, briefly can my assistant

15   assist me in -- she's very familiar with --

16             THE COURT:  Yes, but during session, you know, it's

17   just attorneys and parties.  And if you need your technician

18   there to run equipment, that's okay as well.

19             MR. DENIS:  Okay.  Thank you so much, your Honor.

20        (There was a break in the proceedings for the evening

21   recess.)

22

23

24

25

1                              I n d e x

2      Witnesses                                          Page
       **Oleksandra Johnson  (Government)**
3      Direct Examination by Mr. Gutierrez                 14
       Cross-Examination by Mr. Denis                      23
4      Redirect Examination by Mr. Gutierrez               36
       Recross-Examination by Mr. Denis                    38
5
       **Brett Kalina  (Government)**
6      Direct Examination by Mr. Gutierrez                 38
       Cross-Examination by Mr. Denis                      92
7
                               E x h i b i t s
8
       Exhibits         Description          For ID    In Evd
9      16               CD                     18
       17               Transcript             20
10     18               Transcript             21
       19               Transcript             21
11     20               Transcript             21
       21               Transcript             21
12     22               Transcript             21
       23               Transcript             22
13     24               Transcript             22
       25               Transcript             22
14     26               Transcript             22
       27               Transcript             22
15     1                Photograph             45
       3                Photograph             52        52
16     2                Photograph             53        54
       26-A             CD                     74        75
17     5                Photograph             91        91
       B                Transcript excerpt    142
18     D                Transcript excerpt    148
       E                Transcript excerpt    154
19     F                Transcript excerpt    155
       G                Transcript excerpt    158
20     H                Transcript excerpt    163
       I                Transcript excerpt    169
21

22

23

24

25

1                       <u>Certificate of Reporter</u>

2

3     I hereby certify that I am a duly appointed, qualified, and

4     acting Official Court Reporter for the United States District

5     Court; that the foregoing is a true and correct transcript of

6     the proceedings had in the mentioned cause on the date or

7     dates listed on the title page of the transcript; and that

8     the format used herein complies with the rules and

9     requirements of the United States Judicial Conference.

10

11    Dated  _____  at San Diego, California.

12
                              _____
13                            /s/ Debra M. Henson  (electronic)
                              Debra M. Henson
14                            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25