1                       United States District Court

2                      Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                       )
5                        Plaintiff,    )
                                       )
6         vs.                          ) Case No. 08-CR-2386 JM
                                       ) Jury Trial
7    RYAN WEDDING,                     ) Volume 3
                                       )
8                        Defendant.    ) Wednesday, November 18, 2009
     _____)

9

10               Before the Honorable Jeffrey T. Miller
                     United States District Judge

11

12   Appearances:

13   For the Plaintiff:        Karen P. Hewitt
                               UNITED STATES ATTORNEY
14                             Orlando B. Gutierrez
                               ASSISTANT U.S. ATTORNEY
15                             880 Front Street, Suite 6293
                               San Diego, CA  92101
16
     For the Defendant:        David R. Denis, Esq.
17                             CENTER FOR EXTREME JUSTICE
                               707 Wilshire Boulevard, Suite 3600
18                             Los Angeles, CA   90017

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                               U.S. Courthouse
22                             940 Front Street, Suite 5190
                               San Diego, CA  92101
23                             (619) 238-4538

24

25          Record produced by certified stenographic reporter

1        San Diego, California - Wednesday, November 18, 2009

2           (The following proceedings were outside the presence of

3     the jury.)

4           THE COURT:  Counsel, apparently you didn't resolve

5     your differences.

6           MR. GUTIERREZ:  Your Honor, I thought we had a

7     stipulation, and I came in this morning prepared to have it

8     signed.  Ms. Johnson received a call late in the evening

9     yesterday.  I don't know what the nature of the call was.

10    However, I was told this morning as Mr. Denis walked in that

11    he refuses to stipulate to the accuracy of the translations.

12    As such, I guess I could just leave it at that.  I would have

13    a motion to strike much of what when went on yesterday, but

14    as far as things that are laid today, I would therefore ask

15    for a foundation to be laid.

16          THE COURT:  Well, foundation -- in the absence of a

17    stipulation, a foundation will have to be established for any

18    evidence.  As I say, it may not even be necessary to

19    establish a foundation if transcript pages are being used to

20    refresh memory if in fact a witness does not have any

21    independent recollection of what might have occurred, a

22    conversation that might have occurred or a statement that

23    might be made.

24          MR. GUTIERREZ:  Thank you, your Honor.  I just

25    wanted to make sure that the Court was aware of the fact that

1    there was no stipulation.

2           THE COURT:  Well, that's unfortunate.  Okay.  We

3    have everyone present ready to go.  I understand Juror

4    Birnbaum is not going to be able to continue on because of

5    illness, so we're going to substitute for her; Mr. Garcia

6    will be the -- who is the first alternate then -- will

7    substitute for Ms. Birnbaum.  Do you need assistance in

8    running your equipment Mr. Denis?

9           MR. DENIS:  Yes, your Honor.

10          THE COURT:  All right.  And you're ready to go?

11   You have your equipment ready to go?

12          MR. DENIS:  Yes, your Honor.

13          THE COURT:  All right.  You should not be putting

14   any transcript pages up on the screen in advance of having

15   them marked for identification and offering them if in fact

16   you're going to offer anything.  Now, you may be offering

17   something that's already been provided to you by the

18   government, I don't know, but you indicated you're close to

19   finishing with this witness?

20          MR. DENIS:  Yeah.  Well, close, yes, but I mean

21   it's going to be a little while.

22          THE COURT:  Okay.  As soon as the jury comes in,

23   we'll proceed.

24       (The jury entered the courtroom.)

25          THE COURT:  Good morning, ladies and gentlemen.

1    Everyone is present except Ms. Birnbaum, who is unable to

2    continue on because of illness, ladies and gentlemen, so

3    we'll substitute Mr. Garcia at this time.  Mr. Garcia, you're

4    our first alternate juror, so if you could take the seat

5    vacated by Ms. Birnbaum there, we'll continue on.  Dr. Riste,

6    you're free to stay where you are, but if you'd like to move

7    over a seat, you can do that.

8              JUROR GARCIA:  What about her notepad?

9              THE COURT:  Yes, you can put it right there; we'll

10   collect that later.  Thanks a lot.  So we'll continue on then

11   with cross-examination.

12             MR. DENIS:  Thank you, your Honor.

13             THE COURT:  All right.  Agent Kalina, you have been

14   previously sworn; you are still under oath.

15             THE WITNESS:  Yes, sir.

16                  Cross-Examination, cont'd

17             BY MR. DENIS:  Q.  Good morning, Agent Kalina.

18   A.  Good morning.

19   Q.  Sir, yesterday we discussed on June 3 Michael Krapchan

20   was going to be flying in -- he indicated on a transcript

21   that he was going to be flying in to California with a person

22   with the money, correct?

23   A.  There was, again, many conversations of him saying that,

24   so -- I don't know of a specific date and time you might be

25   referring to, but he said that numerous times, yes.

1  Q.  So that -- okay.  And also in a telephone conversation he

2  discussed that he was doing business with -- with individuals

3  that were in business for ten years in this business,

4  correct?

5          MR. GUTIERREZ:  Objection; lack of foundation,

6  hearsay.

7          THE COURT:  The objection is overruled.  You may

8  answer that if you're able to, sir.

9          THE WITNESS:  There were conversations regarding

10  that.

11          BY MR. DENIS:  Q.  Okay.  And there was also

12  conversations that Michael Krapchan was going to bring or fly

13  in the boss; isn't that true?

14          THE COURT:  These questions were asked and answered

15  yesterday.

16          MR. DENIS:  I'm just --

17          THE COURT:  No, don't repeat them please.  Just

18  keep moving on now.  Thank you.

19          MR. DENIS:  Thank you, your Honor.

20          BY MR. DENIS:  Q.  And that Michael Krapchan asked

21  to have tickets reserved by the CS, and that was done,

22  correct?

23  A.  There were discussions of that.

24  Q.  And did the CS secure the tickets for Michael Krapchan?

25  A.  No, he did not.

1    Q.   Okay.   And Michael Krapchan indicated that he wanted to

2    come in on Monday and then fly in the next day at 6:30,

3    correct?

4    A.   There was a discussion that that was what he was looking

5    at, yes.

6    Q.   And that was because there was supposed to be money at or

7    around the airport, and they were supposed to do a drug

8    transaction that same day, within that same day, and then the

9    next day he was supposed to fly back; isn't that true?

10   A.   No, that's not true.

11           MR. GUTIERREZ:   Objection, your Honor; compound.

12           THE COURT:   Hold on.   If you see an objection come,

13   sir, just wait.   It is compound, but it's been asked and

14   answered; I'll sustain it on that basis.

15           BY MR. DENIS:   Q.   And you indicated that the

16   Iranian was in the deal, correct?

17           MR. GUTIERREZ:   Asked and answered.

18           THE COURT:   Sustained.   Ladies and gentlemen of the

19   jury, you're going to hear objections now being made that

20   questions have been asked and answered.   That's a perfectly

21   appropriate objection because what we don't want to engage in

22   is questions being asked and answered repetitively.   That

23   doesn't do anyone any good.   We like to keep the trial moving

24   forward, so neither side is permitted to keep asking the same

25   question over and over after it's been answered by a witness.

1           BY MR. DENIS:   Q.   Now, after -- on June 10 when

2    you were conducting the surveillance, Ryan Wedding, Hassan

3    Shirani, Michael Krapchan, and the informant were at the

4    airport; is that true?

5    A.   You're saying after --

6    Q.   No.

7    A.   -- June 10?

8    Q.   On June 10.

9    A.   On June 10 --

10   Q.   When you're doing the surveillance.

11   A.   Can you repeat that?   I'm sorry.

12   Q.   Yeah.   On June 10 at the airport, there was the

13   confidential source, Michael Krapchan, Hassan Shirani, and

14   Ryan Wedding; isn't that true?

15   A.   Yes.

16   Q.   Okay.   And during those discussions do you recall Michael

17   Krapchan telling Mr. Yuri that Michael Krapchan thought the

18   money would be in the bag but there appears to have been a

19   problem, it didn't work out?   Do you recall that?

20   A.   Are you saying what -- a conversation between the

21   informant and Mr. Krapchan about the money?   I'm sorry.

22   Q.   Correct, between the informant and Michael Krapchan.

23   A.   Well, there were numerous conversations about the money

24   at that time because that was the problem when they arrived,

25   that Mr. Krapchan had told the informant that they would be

1    arriving with the money, that the informant would be able to

2    take a look at the money at that time, verify that these guys

3    were serious about what they were doing, and then they would

4    go back to San Diego to purchase the cocaine; there would be

5    the transfer.  So throughout that time when Hassan Shirani

6    and Mr. Wedding --

7    Q.  Mister --

8              MR. DENIS:  Objection, narrative.

9              THE COURT:  Well, I think the answer is responsive.

10   I think the question was whether or not there was a

11   conversation in which Krapchan indicated he expected the

12   money to be at the airport.

13             MR. DENIS:  No, in his bag.  The question was did

14   he indicate the money was supposed to be in his bag.

15             BY MR. DENIS:  Q.  Do you recall that?

16             THE COURT:  You may answer that, sir.

17             THE WITNESS:  No, sir.

18             BY MR. DENIS:  Q.  Going to show you what's

19   previously marked as Defense Exhibit K.

20             MR. GUTIERREZ:  Might I see that before you show

21   the witness?

22             MR. DENIS:  It's previously been disclosed to the

23   government.

24             MR. GUTIERREZ:  What date is this one?

25             MR. DENIS:  This is the 10th.

1              BY MR. DENIS:   Q.   Do you see that document?

2    A.   Yes, I see the document.

3    Q.   Can you see if it refreshes your recollection of what was

4    said on June 10 between the confidential source and

5    Mr. Krapchan.

6    A.   I do remember this conversation, yes.

7         (Exhibit No. Court's K identified.)

8    Q.   And isn't it true that Michael Krapchan thought that the

9    money was going to arrive in a bag at the airport with the

10   two individuals that were coming down from Canada?

11   A.   No, I don't believe that.

12   Q.   No?

13             MR. DENIS:   Your Honor, may I publish for

14   impeachment purposes?

15             THE COURT:   No, not without a foundation.

16             MR. DENIS:   For impeachment?

17             THE COURT:   Is there any objection?

18             MR. GUTIERREZ:   Your Honor, the foundation was for

19   refreshing recollection; that was done and indicated, so lack

20   of foundation for impeachment.

21             THE COURT:   Sustained.

22             BY MR. DENIS:   Q.   Wasn't the statement by

23   Mr. Krapchan that -- he said -- at first he said the money

24   should be in this bag, something probably didn't work out

25   well at the end -- was that a statement made by Michael

1    Krapchan?

2            MR. GUTIERREZ:  Objection; hearsay, your Honor.

3    Attorney testifying.

4            THE COURT:  The objection is overruled on that

5    ground.  You may answer if you're able to, sir.

6            THE WITNESS:  I remember a conversation about that,

7    yes.

8            BY MR. DENIS:  Q.  And you saw a transcript

9    prepared by your transcribers?

10   A.  Yes, but I believe he was referring to something else.

11   Q.  Oh, he's referring to something else being in the bag at

12   the airport?

13   A.  No.  There was discussions at that time that there would

14   be a courier that would bring a bag to them at the airport

15   with the money because they realized that they could not

16   bring the money on an airplane.

17   Q.  What I'm asking you, do you recall reading through the

18   transcripts in this case that Michael Krapchan believed that

19   there was supposed to be money in the bag at the airport with

20   them.

21   A.  Well, I remember a conversation about that, yes.

22   Q.  And I showed you a transcript that has the verbatim

23   language from the -- from Michael Krapchan indicating that he

24   thought it was in the bag; isn't that true?

25           MR. GUTIERREZ:  Objection; lack of foundation,

1    improper impeachment.

2              THE COURT:  The objection is sustained.

3              BY MR. DENIS:  Q.  Mr. Kalina, these recorded

4    conversations -- obviously you don't speak Russian; isn't

5    that true?

6    A.  That's correct.

7    Q.  And you got the recordings after they were made from the

8    confidential source; isn't that right?

9    A.  That's correct.  The --

10   Q.  And then you took those recordings to the FBI

11   interpreters and had those Russian transcripts interpreted,

12   correct, for your purposes?

13   A.  Eventually we had that done, yes.

14   Q.  And that was so that you could actually understand what

15   was being said between the two Russian-speaking individuals,

16   correct?

17   A.  That wasn't the only way that I knew what was being said

18   on there, but that was one of the ways, yes.

19   Q.  So that was one way.  You also had another agent that

20   spoke Russian, isn't that true, that told you what was going?

21   A.  That's correct.

22   Q.  Okay.  And in preparation for your testimony here today,

23   you reviewed those transcripts; isn't that true?

24   A.  I've reviewed the --

25   Q.  Okay.

1  A.  -- transcripts, yes.

2  Q.  And as part -- and subsequent to that, you had given

3  those transcripts to a -- Ms. Johnson, who testified, who did

4  some work on those transcripts; isn't that right?

5  A.  Myself, that -- did I give them to her?

6  Q.  Not that you gave them to her, that Ms. Johnson was given

7  transcripts to check with the FBI transcript -- interpreter;

8  isn't that true?

9  A.  That is my understanding, yes.

10  Q.  Right.  And you were present here when she testified;

11  isn't that right?

12  A.  That is correct.

13  Q.  Okay.

14       MR. DENIS:  Your Honor, may I for impeachment

15  purposes?

16       THE COURT:  Counsel, it would be inappropriate for

17  me to give you authorization to do anything.

18       MR. DENIS:  Okay.

19       THE COURT:  You proceed in the manner you deem

20  appropriate, and if there's an objection, I'll need to rule

21  on it.

22       MR. DENIS:  Okay.

23       THE COURT:  If you're putting something -- if

24  you're putting a transcript -- before you put anything on the

25  screen, project anything on the screen, you've got to offer

1    it and give counsel an opportunity to object if there is

2    going to be an objection.

3              MR. GUTIERREZ:  Your Honor, we'd object as improper

4    impeachment, lack of foundation for impeachment.  This is one

5    of the copies that Ms. Johnson already said she translated.

6    It's in the record on the table.  But as far as lack of

7    foundation for improper impeachment, that would be the

8    government's objection at this point.  He is not the

9    declarant.

10             THE COURT:  Would you bring the document forward

11   please, Mr. Denis.  Is this Exhibit K now?

12             MR. DENIS:  Yes, your Honor.

13             THE COURT:  All right.  Let me take a look at it.

14   The objection is sustained.  This is not appropriate

15   impeachment; this is not of impeachment value.

16             MR. DENIS:  Your Honor --

17             THE COURT:  The document will be, however,

18   preserved as a court exhibit.

19             MR. DENIS:  Just for the record, your Honor, this

20   was after he reviewed the transcript, and --

21             THE COURT:  I know.  This particular portion of the

22   transcript does not impeach the witness's testimony; that's

23   what I'm saying.

24             MR. DENIS:  Can I get that back, and -- is that

25   okay, your Honor?

1        THE COURT:  Yes.

2        MR. DENIS:  Thank you.

3        THE COURT:  That's a court exhibit.  Please just

4  leave it on the table --

5        MR. DENIS:  Okay.

6        THE COURT:  -- and don't put it back in your own

7  notebook.  Thank you.  It's still available for your use at

8  this time.

9        MR. DENIS:  I appreciate that, your Honor.

10       BY MR. DENIS:  Q.  So, Mr. Kalina, even after

11 reviewing Defense Exhibit K -- and you read it, correct?

12 A.  Yes.

13 Q.  And it was what the translator purported Michael Krapchan

14 said at the airport; isn't that true?

15 A.  Yes.  There's two people in that conversation.  Yes.

16 Q.  Correct.  And you don't speak Russian, correct?

17 A.  No.

18 Q.  So based on the conversation that you're aware of, you

19 would have read a transcript to hear verbatim what was said;

20 isn't that true?

21 A.  Yes.

22 Q.  And you read that right here in front of the jury

23 verbatim to yourself, right?

24       MR. GUTIERREZ:  Objection; argumentative as

25 phrased.

1        THE COURT:   The objection is sustained.

2        BY MR. DENIS:   Q.   You read the -- you read the

3   transcript verbatim, correct?

4        MR. GUTIERREZ:   Asked and answered.

5        THE COURT:   Sustained.   Counsel, will you resume

6   the podium, please.   Thank you.

7        MR. DENIS:   Okay.

8        BY MR. DENIS:   Q.   And you indicated there were two

9   people talking, correct?

10  A.   Yes.

11  Q.   So do you believe the transcript is in error?

12  A.   I have no reason to believe the transcript's in error,

13  no.

14       BY MR. DENIS:   Q.   You didn't independently

15  quality-check the transcripts, correct?

16  A.   No, I did not.

17  Q.   Do you have any basis to believe that the transcript

18  would be in error?

19  A.   No, I do not.

20  Q.   Okay.   Do you think Ms. Johnson manipulated the

21  transcript?

22  A.   Not at all, no.

23  Q.   And you read the transcripts, correct?

24  A.   I did.

25  Q.   And you indicated it does not say that Mr. Krapchan

1    believed that the money would be with them or in a bag with

2    them at the airport?

3                MR. GUTIERREZ:  Asked and answered --

4                THE WITNESS:  That's.

5                MR. GUTIERREZ:  -- lack of foundation, and improper

6    impeachment.

7                THE COURT:  The objection is sustained.  The

8    document does not say that.

9                MR. DENIS:  May I, your Honor?

10               BY MR. DENIS:  Q.  So you -- reading it, it

11   indicated that at first he said the money should be --

12               THE COURT:  Counsel, the document is not in

13   evidence, and it's not proper impeachment.  I've already made

14   the ruling.  The record has been preserved on that.  Would

15   you please move to another line of questioning.

16               MR. DENIS:  Yes.

17               BY MR. DENIS:  Q.  Now, after -- after the

18   confidential source drove Ryan Wedding and Hassan Shirani to

19   a hotel, do you -- do you recall that happening?

20   A.   Yes.

21   Q.   And you conducted the surveillance for that, correct?

22   A.   I was one of the agents conducting the surveillance, yes.

23   Q.   Was there any further surveillance of -- of Hassan

24   Shirani and Ryan Wedding on that day of June 10?

25   A.   No, sir.

1    Q.   Okay.  So the surveillance was directed towards the
2    confidential source and Michael Krapchan?
3    A.   Yes.
4    Q.   And they were in the car driving back to San Diego,
5    correct?
6    A.   That is correct.
7    Q.   So Michael Krapchan and the confidential source, they
8    knew each other, correct?
9    A.   Yes.
10   Q.   The confidential source had never met or seen Hassan
11   Shirani or Ryan Wedding before, correct, prior to that
12   June 10 meeting?
13   A.   No.  I mean -- he did not tell me that he had seen them
14   before, no.
15   Q.   Okay.  And during the drive from LAX to San Diego, there
16   were conversations that took place in the car, correct?
17   A.   From LAX to San Diego?
18   Q.   Yes, on June 10, 2008.
19   A.   Yes.  Between the source and Mr. Krapchan, yes.
20   Q.   And prior to the meeting at LAX, you had met with the
21   confidential source, correct?
22   A.   On that day, yes.
23   Q.   And did you give your understanding that two individuals
24   were going to be arriving at LAX, correct?
25   A.   That was my understanding, that we would be -- that the

1    source and Mr. Krapchan would be picking up two individuals

2    at LAX, yes.

3    Q.   And these were individuals that you had never had known

4    about previously, correct?

5    A.   Well, we knew about two individuals, we knew a little bit

6    of information about those individuals --

7    Q.   Correct?

8    A.   -- but biographical and that type of full information on

9    them, no, we did not.

10   Q.   So did you instruct the source to get some information

11   about these two individuals?  Did you instruct the

12   confidential source to get some information from Michael

13   Krapchan regarding these individuals?

14   A.   On that day I don't believe I instructed the source to

15   get any information from them because we were working on that

16   ourselves.

17   Q.   Okay.  And during that conversation or during --

18   subsequent to that drive, did you meet with the source to

19   retrieve the recordings?

20   A.   Yes.

21   Q.   And did you debrief the confidential source?

22   A.   Yes.

23   Q.   And did you ask the confidential source what he had

24   learned about Hassan Shirani or Ryan Wedding?

25   A.   I'm sure I did, yes.

1   Q.   Okay.   And during that conversation, did you learn that

2   Hassan Shirani was in the deal?

3   A.   Well, we knew Hassan Shirani was in the deal at that

4   time, yes.

5   Q.   My question was when you were talking with the

6   confidential source after the drive from San Diego, did you

7   confirm that Hassan Shirani was in the deal?

8   A.   Yes.

9   Q.   And based on conversations or the debriefings, did you

10  learn from the confidential source that Ryan Wedding was not

11  part of the deal?

12  A.   No, that's not true.

13  Q.   And at some point in time, you transcribed -- you had the

14  recordings transcribed, correct?

15  A.   Correct.

16  Q.   And you reviewed those transcripts before coming here and

17  testifying today, correct?

18  A.   That's correct.

19  Q.   And you're clear about the -- the day that I'm talking

20  about, the June 10 recording, the recording from LAX to San

21  Diego, correct?

22  A.   From LAX to San Diego.   Yes, I've reviewed that.

23  Q.   And you testified that you did -- and you reviewed those

24  transcripts before coming here today you indicated, correct?

25  A.   Yes.

1    Q.  And there was -- you don't recall a conversation where

2    Michael Krapchan told the confidential source that Mr.

3    Wedding was not involved in the deal?

4                MR. GUTIERREZ:  Asked and answered, your Honor.

5                THE COURT:  The objection is sustained.

6                BY MR. DENIS:  Q.  I want to show you an exhibit

7    that's been previously marked as Defendant's Exhibit L.  It's

8    a two-page document from a transcript of June 10, 2008.

9                MR. GUTIERREZ:  Can I see the document before you

10   show it to the witness, please?

11       (Exhibit No. Court's L identified.)

12               BY MR. DENIS:  Q.  Can you take a moment to review

13   that.

14   A.  Yes.

15   Q.  Does that refresh your recollection?

16   A.  Yes, I remember it very well.  I didn't -- I was

17   well-aware of that conversation.

18   Q.  You were or were not aware of it?

19   A.  I was aware of that conversation.

20   Q.  And in that conversation it doesn't indicate that Ryan

21   Wedding was not involved in the deal?

22   A.  That's --

23               MR. GUTIERREZ:  Objection; lack of foundation.

24               THE COURT:  Well, the objection is sustained.  The

25   document itself is not evidence, but the witness has

1    indicated that the document refreshed his memory.  You may

2    now ask him how the document has refreshed his memory.

3              BY MR. DENIS:  Q.  And does the document indicate

4    that Ryan Wedding was not due a share?

5    A.  There was discussions about that, yes, not that he was

6    not part of the deal.

7    Q.  And in that transcript it indicated that Hassan Shirani

8    was due a share, correct?

9    A.  It said -- the conversation was that Hassan was due a

10   share and that -- something to the effect that Ryan was not

11   due a share but that he was just hired to work.  That's not

12   that he wasn't part of the deal.

13   Q.  Isn't it true based on what you recall from the

14   conversation that it indicates -- that the transcript

15   indicates that he is hired to work, hired to work, so to

16   speak, accompany, help, Hassan is the main person, Hassan is

17   the main person; isn't that true?

18             MR. GUTIERREZ:  Lack of foundation, hearsay as to

19   whether the transcript says that as opposed to refreshing

20   recollection.

21             THE COURT:  The objection is sustained.

22             MR. DENIS:  Your Honor, based on the fact that it

23   refreshed his recollection, I move to admit it since he

24   didn't have --

25             THE COURT:  Well, if a document is used to refresh

1    a witness's recollection, the party using the document cannot

2    introduce it as an exhibit; the opposing party can, however,

3    so if Mr. Gutierrez wishes to have it introduced as an

4    exhibit, he may move for that when he has the witness on

5    redirect.

6            BY MR. DENIS:   Q.   And, again, this was the

7    transcript that the conversation that you had transcribed

8    with the FBI, correct?   This was a portion of it?

9    A.   It was -- yes, it was.   The original was sent to our

10   linguists, yes.

11   Q.   And then it was further given to Ms. Johnson to

12   quality-check, correct?

13   A.   Yes.

14   Q.   And she testified here the other day, correct?

15   A.   Yes.   I was here.

16           MR. DENIS:   I'd like to move it in for impeachment

17   purposes.

18           MR. GUTIERREZ:   We'd object as lack of foundation

19   for purposes of impeachment, your Honor.

20           THE COURT:   The objection is sustained.

21           BY MR. DENIS:   Q.   So you don't recall the

22   conversation saying that Ryan Wedding is not due a share,

23   he's hired to work, hired to work, so to speak, accompany,

24   help, Hassan is the main person, Hassan is the main person,

25   after reading --

```
 1              MR. GUTIERREZ:  Objection --
 2              BY MR. DENIS:  Q.  -- the document?
 3              MR. GUTIERREZ:  -- lack of foundation, improper
 4    impeachment, hearsay.
 5              THE COURT:  The objection is overruled.  You may
 6    answer that question as to whether or not it refreshes your
 7    memory, sir, as to what you reviewed.
 8              THE WITNESS:  I remember that conversation, yes.
 9              BY MR. DENIS:  Q.  You remember that portion is
10    what I'm saying?
11              MR. GUTIERREZ:  Objection; hearsay as to the way
12    it's phrased now, your Honor.
13              THE COURT:  The objection is overruled.  You may
14    testify as to how your memory has been refreshed, sir.
15              THE WITNESS:  Yes, I remember that conversation.
16              BY MR. DENIS:  Q.  And you recall it saying that,
17    correct?
18    A.  I remember -- I remember that conversation.  If you're
19    asking me for the exact words --
20              MR. DENIS:  Your Honor, may I move for impeachment?
21              THE COURT:  Counsel, the document doesn't come in.
22    The document was used to refresh memory, so --
23              MR. DENIS:  But I --
24              THE COURT:  That's okay.  The objection is
25    sustained.  The best evidence is in the form of the testimony
```

1    that came in as to what the refreshed memory is.  Would you

2    please move on.

3              MR. DENIS:  Just for the record, he's making it

4    clear that he read the document --

5              THE COURT:  Counsel, the rules of evidence provide

6    that when a document has been used to refresh memory, it does

7    not come in.  The government may wish to admit it, but at

8    this point you're --

9              MR. DENIS:  For refreshment I understand.

10             THE COURT:  All right.  Please, counsel, just move

11   on with your --

12             MR. DENIS:  May we have a sidebar, your Honor,

13   brief sidebar?

14             THE COURT:  Let's not argue.  And please don't put

15   it back in your notebook.  Just leave it on the exhibit table

16   if you would because the government may want to have access

17   to it now it's been identified as a court exhibit.

18             BY MR. DENIS:  Q.  And in that same conversation,

19   Mr. Kalina, do you recall Michael Krapchan asking the

20   confidential source to use the confidential source's credit

21   card to reserve a room for him in San Diego?

22   A.  There was discussions about that, yes.

23   Q.  And the confidential source refused to give him his

24   credit card, correct?

25   A.  Yes.

1  Q.  And actually asked him why he wanted to use his credit

2  card for the room, correct?

3  A.  There was conversation about that, yes.

4  Q.  And he indicated it's kind of the rules of the game; do

5  you recall that?

6  A.  That's part of the conversation, yes.

7  Q.  Okay.  That they actually told him it's -- they told him

8  not to use his own credit card?

9          MR. GUTIERREZ:  Vague as to who they is, your

10 Honor, who made the statement.

11         THE COURT:  You're still referring to June 10 at

12 this point?

13         MR. DENIS:  Yes, your Honor.

14         THE COURT:  All right.  The objection is overruled.

15 You may answer.

16         THE WITNESS:  Can you repeat that, please.

17         BY MR. DENIS:  Q.  That he was told not to use it,

18 not to use his own credit card.

19 A.  Who was not told?

20 Q.  That Michael Krapchan was told not to use his own credit

21 card?

22         MR. GUTIERREZ:  Objection; lack of foundation,

23 hearsay as phrased.

24         THE COURT:  The objection is overruled.  You may --

25 if you recall what was said in that particular regard, sir,

1   you may testify.

2          THE WITNESS:  There was conversation about that,

3   yes.

4          BY MR. DENIS:  Q.  So Mr. Krapchan indicated he

5   didn't want to use his own credit card, correct?

6   A.  There was discussions about that, yes.

7          MR. DENIS:  Going to mark a three-page document --

8   well, let me mark it.

9          BY MR. DENIS:  Q.  And you further -- but

10  Mr. Krapchan eventually didn't use his credit card to reserve

11  the room, correct?

12  A.  He did use his -- a credit card in his wife's name to

13  reserve the hotel room in San Diego.  Yes, he did.

14  Q.  Was it his daughter's credit card?

15  A.  It was Ludmilla Krapchan; that was the name of the credit

16  card that was reserved for the room at the Hampton Inn.

17  Q.  Was that the daughter or the wife?

18  A.  That was the daughter.  I apologize.

19  Q.  Okay.  And you conducted a search warrant after the

20  arrest on June 13 regarding who rented the room, correct?

21  A.  We conducted a search of the hotel room --

22  Q.  Correct.

23  A.  -- yes.

24  Q.  And as part of that search warrant, you obtained some

25  Hampton Inn documents, correct, regarding the hotel room that

220

1    Krapchan was staying in?

2    A.   We seized multiple daily bills that he would receive from

3    the Hampton Inn as part of what we did, yes.

4    Q.   Let me show you -- I'm going to show you a document

5    regarding -- marked for identification purposes as -- Hampton

6    Inn document as Defense Exhibit Q?

7             THE COURT:   This is Exhibit Q?

8             MR. DENIS:   Q, your Honor.

9             THE COURT:   So you have others marked as --

10            MR. DENIS:   Yes.

11            THE COURT:   -- M, N, O, P?

12            MR. DENIS:   Yes, your Honor.

13            THE COURT:   Okay.

14            BY MR. DENIS:   Q.   Have you seen this document

15   before, Mr. Kalina?

16   A.   I have.

17   Q.   Okay.  And could you tell us what that document is.

18   A.   It's a bill from the Hampton Inn to Room 512 in the name

19   of Michael Krapchan.

20        (Exhibit No. Q identified.)

21   Q.   And was that the room that Michael Krapchan was staying

22   in?

23   A.   Yes.

24   Q.   And that document is obtained during the course of your

25   execution of the search warrant of his room?

221

1    A.   There were, again, multiple ones found at different

2    times, so I'd have to go back and take a look at my documents

3    as to which -- where exactly I would have gotten this.   But

4    there was multiple bills from Mr. Krapchan that we seized

5    throughout this investigation.

6    Q.   And this was one of the bills?

7    A.   Correct.

8    Q.   Okay.

9         MR. DENIS:   I'd like to move the exhibit in.

10        MR. GUTIERREZ:   No objection, your Honor.

11        THE COURT:   Exhibit Q is admitted.

12    (Exhibit No. Q admitted.)

13        BY MR. DENIS:   Q.   And, Mr. Kalina, you indicated

14    that -- and it indicated that Michael Krapchan used the

15    credit card with the last four digits of 4607, correct?

16    A.   That's what the bill states, yes.

17    Q.   And during the course of your investigation, you learned

18    that that was the credit card of his daughter, correct?

19    A.   That was what was found in his wallet, yes.

20    Q.   And the credit card was found in his wallet?

21    A.   That's correct.

22    Q.   And that was obtained as part of your search warrants,

23    correct, or your arrest of Michael Krapchan?

24    A.   That is correct, yes.   And just for clarification, I'm

25    not sure if that was obtained -- that particular obtained

1    from the search of the Hampton Inn or if it was obtained from

2    the search of the Comfort Inn.

3    Q.   And you indicated you obtained additional -- you

4    indicated you obtained additional receipts regarding the

5    Hampton Inn from -- strike that.  As part of your testimony,

6    you indicated that there were multiple receipts found

7    regarding the Hampton Inn, correct?

8    A.   That's correct.

9    Q.   Going to show you -- and do you recall the dates of those

10   the stays at the Hampton Inn?

11   A.   Well, he checked in on June 9 and was there through the

12   13th when he was arrested.

13   Q.   And at some point in time, he checked out of his hotel

14   correct?  Strike that.  Prior to the 13th he had checked out

15   of his hotel, correct?

16   A.   That is my understanding, yes.

17   Q.   And then he left to Los Angeles?

18   A.   But he did that twice.

19   Q.   Going to Los Angeles?

20   A.   Yes.

21   Q.   But he checked out of his hotel once, correct?

22   A.   It is my understanding that he checked out and rechecked

23   in on the 13th.

24   Q.   And when he had checked out, he was going back to meet

25   Hassan, correct?

1    A.   He was going back to Los Angeles to -- to meet Hassan and

2    Ryan.

3    Q.   And they were going to fly back to Canada, correct?

4    A.   That's not my understanding that they were going to fly

5    back to Canada, no.

6    Q.   I apologize.  I have a two-page document that was

7    previously marked as Exhibit R.  Have you seen these two

8    documents before?

9    A.   Yes.

10   Q.   And what are those documents?

11   A.   Those are bills from the Hampton Inn in the name of

12   Michael Krapchan for Room 512.

13        (Exhibit No. R identified.)

14   Q.   Is one of those documents from the date the 9th through

15   the 12th?

16   A.   The dates of the -- on Exhibit R, the check-in is the 9th

17   and then it goes through the 11th, whereas -- oh, they're --

18   I'm sorry.  So if this is page 1, that's the 9th through the

19   11th, and then page 2 would be 9th through the 10th.

20   Q.   Okay.  So they're two different --

21   A.   Two days.

22   Q.   And on one of those bills, does it indicate when Krapchan

23   checked out how did he pay for the room?

24   A.   No because it states -- like on the later bill, it shows

25   that the first two days, June 9 and June 10, were charged to

1    the credit card, and then for his bill for the 11th, he still

2    had an outstanding balance.

3    Q.   Okay.  So he was still checked in at the hotel through

4    the 9th through the 11th, correct?

5    A.   Based upon that, yes, he was.

6    Q.   And this was obtained as part of your search warrant,

7    correct?

8    A.   That was part of the search warrant at the Hampton Inn.

9    Q.   Correct.

10         MR. DENIS:  Your Honor, I'd like to move Exhibit R

11   into evidence.

12         MR. GUTIERREZ:  Your Honor, we'd have no objection

13   if there was a limiting instruction as to dominion -- for

14   dominion and control; we'd have objections to hearsay as to

15   any substance.

16         THE COURT:  Exhibit R is admitted.

17         MR. DENIS:  I apologize, your Honor.  I have

18   another exhibit.

19         THE COURT:  Where is Exhibit R at the present time?

20         MR. DENIS:  On the table.

21         THE COURT:  Thank you.

22       (Exhibit No. R admitted.)

23         BY MR. DENIS:  Q.  I apologize.  Mr. Kalina, there

24   was also an additional --

25         MR. DENIS:  I'm going to mark as Exhibit S another

1    Hampton Inn invoice dated -- arrival date the 9th, departure

2    date the 13th and identified as Defense Exhibit S.

3              BY MR. DENIS:   Q.   Mr. Kalina, have you seen that

4    document as part of the execution of the search warrant?

5    A.   Yes.

6         (Exhibit No. S identified.)

7    Q.   And on that document for the check-out, how is that room

8    paid for?

9    A.   Well, it reflects that the credit card was not charged,

10   and it was paid for in cash.

11   Q.   And how much was the cash?

12   A.   $800.

13   Q.   And was that, as far as your understanding, for the

14   entire stay of Mr. Krapchan?

15   A.   I do not know.   I did not have any involvement in that.

16   Q.   How much was the room per night at the Hampton Inn based

17   on the bill?

18   A.   $159 a night before -- room rate it says and then there

19   was taxes and assessments.

20   Q.   And Michael Krapchan paid for the room in cash?

21   A.   According to the bill, he paid for it in cash, and he had

22   a negative balance as of his check-out.

23   Q.   And the check-out was the 13th?

24   A.   The date of the bill is the 13th.

25   Q.   Okay.

1   A.   The last date for a charge was the 12th, so I don't know.

2   This doesn't say whether he checked out or not; it just would

3   have been that daily bill.

4   Q.   And when is the date that he paid the $800 in cash?

5   A.   That was paid on -- it reflects June 12 prior to his

6   charge for the 12th, prior to his bill for the 12th.

7   Q.   Okay.   So when he checked out on the 12th, he paid in

8   cash $800, correct, according to the bill?

9   A.   But the bill does not say he checked out.   The bill has a

10  charge for the 12th, but it does not say in here that he's

11  checked out.

12  Q.   Okay.   And according to Defense Exhibit R, does that

13  document indicate anywhere that he checked out on the 11th?

14  A.   It has a date of the bill and the dates for the charges,

15  but it does not say that anybody -- that he checked out on

16  any particular day.

17  Q.   Okay.   And it doesn't indicate there that the room was

18  paid for on that on Exhibit R, correct?

19  A.   No because it -- to me it states that, you know, if he

20  does not pay by any other means, they will charge it to the

21  credit card that he original put down, and that's how I read

22  that.

23  Q.   Okay.   But on Exhibit S --

24          MR. DENIS:   Your Honor, I'd like to move Exhibit S

25  into evidence if there isn't any objection.

1          MR. GUTIERREZ:  No objection, your Honor.

2          THE COURT:  Admitted.

3       (Exhibit No. S admitted.)

4          BY MR. DENIS:  Q.  So on Exhibit S it indicates

5    under entry, transaction number, or date, June 12, June 12,

6    transaction number -- reference No. 1023350, cash payment for

7    $800, correct?

8    A.  That's what that shows.

9    Q.  And there indicated a balance of $84.08, correct, as of

10   the 12th?

11   A.  Balance negative 84.08.

12   Q.  And when that means negative, is that a credit balance?

13   A.  I don't know.  I mean $800 is more than what four nights

14   would be, so I would just assume that's how they are

15   reflecting their bill, but I certainly don't know how they're

16   doing it; I just know that if you add up four nights, it's

17   less than $800.

18   Q.  Now, at some point in time on the 12th -- actually during

19   the course of the investigation on the 11th, there were

20   continuing recorded conversations between Hassan Shirani

21   and -- excuse me -- with Michael Krapchan and the

22   confidential source, correct?

23   A.  That is correct, yes.

24   Q.  And at some point in time, it was learned during your

25   investigation that Hassan Shirani wanted to take a look, was

1    asking to take a look, correct?

2    A.   That was part of the discussions during that week, yes.

3    Q.   Okay.  And the confidential source did not want to give

4    Hassan Shirani a look, correct, at any cocaine or drugs, or

5    whatever they were discussing, correct?

6    A.   Well, there was discussions about that, yes, that that

7    was not how the deal was planned, and so that was not what

8    they had arranged or previously arranged for, so there was

9    discussions about how they were going to do that.

10   Q.   And there was no agreement to -- to show Hassan Shirani

11   one of the -- one of the drugs apparently, correct?

12   A.   You mean as far as we -- coming to the -- the informant

13   and Mr. Shirani coming to a formal agreement as to how that

14   was going to happen?  There was not a final plan at that

15   time, no.

16   Q.   And because they weren't going to be allowed to take a

17   look, actually the confidential source told Michael Krapchan

18   to go home and come back in ten days, correct?

19   A.   Yeah, he actually told him to go home.

20   Q.   And Michael Krapchan checked out of his room and was

21   leaving, left San Diego, correct?

22   A.   Again, I don't know if he had checked out of his room at

23   that time.  I know that he then on the 12th got on a Amtrak

24   train and went up to Los Angeles to meet Ryan and -- Mr.

25   Wedding and Mr. Shirani.

1    Q.  And during the course of your investigation, the

2    confidential source actually called Hassan Shirani, correct,

3    one time?

4    A.  Yes.

5    Q.  And that was part of a recorded conversation?

6    A.  I think it was more than once; he may have reached a

7    recording as well.  One call of conversation, I believe so,

8    yes.

9    Q.  And the confidential source you indicated was calling a

10   number of times to Hassan Shirani?

11   A.  The exact number I do not know.  I'm just saying I

12   believe there was at least one call to -- you know, that

13   maybe didn't go through, so to say there was only one

14   attempt, I didn't want to mislead you.

15   Q.  So there was multiple attempts but there was one recorded

16   call?

17   A.  There was one call of substance.  How many, again, I'd

18   have to review.

19   Q.  And when the confidential source told Michael Krapchan to

20   go home, to come back in nine or ten days, Michael Krapchan

21   left back to LA, correct?

22            MR. GUTIERREZ:  Objection; asked and answered.

23            THE COURT:  Sustained.

24            BY MR. DENIS:  Q.  And the confidential source

25   then -- what was -- what was -- what were the instructions or

230

1    were there any instructions given to the confidential source

2    after he was -- after he was instructed to tell Michael

3    Krapchan to go home for ten days?

4    A.   Excuse me?  What instructions did I give the source?

5    Q.   Did you give the source instructions after -- strike

6    that.  Did you tell the confidential source to tell Michael

7    Krapchan to go home and to come back in ten days?

8    A.   We had that discussion, for him to tell him to return,

9    that we weren't prepared at that time to do it the way that

10   they wanted to do it, and so they could just go home.

11   Q.   And based on those -- you gave those instructions to the

12   confidential source, correct?

13   A.   Yes.

14   Q.   And the confidential source called Michael Krapchan and

15   told him to go home, correct?

16   A.   Exact timing of when that call was made, I'm not sure,

17   but that was -- that was in the instructions, yes.

18   Q.   Okay.  And did you instruct the confidential source to

19   call Michael Krapchan to come back?

20   A.   No.

21   Q.   Did the confidential source call Michael Krapchan to come

22   back?

23   A.   Mr. Krapchan had called on the morning of the 13th and

24   left many messages, and then the informant called

25   Mr. Krapchan back on the morning of the 13th, yes.

1    Q.   And did the confidential source -- but at that time

2    Michael Krapchan had left San Diego and was going back to Los

3    Angeles, correct?

4    A.   We did not know that until those calls had been made.

5    Q.   And when you made the calls, you learned that Michael

6    Krapchan had already left San Diego and was already in Los

7    Angeles, correct?

8    A.   Yes.  He said he was meeting them in Los Angeles.

9    Q.   And that he was going home?

10   A.   He did not say that.

11   Q.   And did the confidential source tell him to come back to

12   San Diego?

13   A.   Didn't tell him to come back to San Diego.  He said he

14   had -- that the cocaine was available if they still wanted to

15   do a transaction.

16   Q.   And when you say the cocaine was available, there was a

17   sample that was available?

18   A.   Again, I'd have to review the -- look at the exact -- I

19   think he just said that it was available because there was

20   still a concern that they wanted 24.

21   Q.   Part of the reason that the confidential source told

22   Michael Krapchan to leave was they kept changing the plans,

23   correct?

24            MR. GUTIERREZ:  Vague as to who they are, your

25   Honor.

1           THE COURT:  Overruled.  You may answer that, sir.

2           THE WITNESS:  He -- yes, he told him to go home.

3   Part of it was because they had kept changing the plans and

4   got conflicting reports from Krapchan.

5           BY MR. DENIS:  Q.  I'm going to show you what has

6   previously been marked as Defense Exhibit T.  It's a part of

7   the transcript from the June 13, 2008 call, No. 20 for

8   identification, pages 1 and 2.  Let me give you -- do you

9   recall -- do you recall that -- that there was a conversation

10  that Michael Krapchan was going to -- that the confidential

11  source asked Michael Krapchan to come back and pick a -- pick

12  up a sample for himself, for Michael Krapchan's self?

13  A.  Yes, there was that conversation.

14      (Exhibit No. Court's T identified.)

15  Q.  And the confidential source indicated that he had spent

16  half the night working on getting that source for Michael

17  Krapchan?

18          MR. GUTIERREZ:  Objection; lack of foundation,

19  hearsay.

20          THE COURT:  The objection is overruled.  You said

21  source.  You meant drugs?

22          MR. DENIS:  Yes.  Well, yes.

23          THE WITNESS:  So --

24          THE COURT:  Why don't you restate the question.

25          BY MR. DENIS:  Q.  Okay.  That the confidential

1  source had spent half the night working on getting Michael

2  Krapchan one kilo for himself; isn't that true?

3  A.   Yes.

4  Q.   All right.  And the confidential source indicated that he

5  had bought a large batch, that he had to mislead a bunch of

6  people to get that one sample for Krapchan, correct?

7  A.   Yes, I remember that conversation.

8  Q.   And he -- and he told Michael Krapchan to come back to

9  San Diego, correct?

10  A.   There were discussions about that.

11  Q.   And, again, on June 11, Michael Krapchan indicated that

12  Ryan Wedding wasn't any kind of torpedo, correct?

13  A.   There was a discussion about that, yes.

14  Q.   And, again, on the 13th the confidential source was --

15  was angry at Michael Krapchan and -- strike that.  On the

16  13th did Michael Krapchan -- or did the confidential source

17  ask who is the boss, is it you, Michael Krapchan, or Hassan

18  Shirani?  Do you recall that.

19  A.   I remember discussions about that.

20  Q.   And the confidential -- and Michael Krapchan said Hassan

21  is the boss?

22  A.   I remember that, yes.

23  Q.   Now, during the course of the investigation, there was

24  absolutely no surveillance done on Hassan Shirani or Ryan

25  Wedding after the June 10, '08 meeting at the airport,

1    correct?

2    A.   That's not true.

3    Q.   Oh.   When did -- when did surveillance resume?   Strike

4    that actually.   From LAX -- after they left the LAX on

5    June 10 of 2008 until June 12, 2008, there was no

6    surveillance, correct, of Ryan Wedding and Hassan Shirani?

7    A.   From the airport -- not just the airport.   It was from

8    when they were dropped off at the hotel till they got the

9    rental car.

10   Q.   Correct.

11   A.   And when they were out of sight at that point in time,

12   you're right, no, through the 12th there was no other

13   surveillance of Mr. Shirani and Mr. Wedding.

14   Q.   And when Hassan Shirani and Ryan Wedding were dropped off

15   at the hotel, that was a hotel near the airport, correct?

16   A.   Yes.

17   Q.   And during those conversations in the airport, there was

18   discussions about getting a car, correct, just needed a car

19   to go get money, correct?

20   A.   There was those discussions, yes.

21   Q.   Now, during the LAX conversation, you conducted -- you

22   indicated previously you conducted the surveillance, correct?

23   A.   I was one of the agents conducting surveillance, yes.

24   Q.   And you were walking around listening to snippets of

25   these conversations, correct?

1    A.   As best I could.

2    Q.   Okay.   And you reviewed the transcripts and the audios in

3    this -- in this -- in this case, correct?

4    A.   Yes.

5    Q.   And in particular the LAX call too, correct?

6    A.   I listened to all --

7    Q.   Okay.

8    A.   -- of them, yes.

9    Q.   And when Ryan Wedding and Hassan Shirani got off the

10   plane, they were introduced to the confidential source,

11   correct?

12   A.   They introduced each other.   They all introduced

13   themselves to --

14   Q.   Right.   And at some point in time during the introduction

15   or the during the meeting, Hassan Shirani indicated that the

16   money was not available, correct?

17   A.   Both Mr. Shirani and Mr. Wedding stated that.

18   Q.   What I'm asking is who was the first person -- as far as

19   you recall, who was the first person that said that the money

20   was not available?

21   A.   I believe it was Mr. Shirani, but I'd have to review the

22   records to make sure, but I believe it was him.

23   Q.   And Mr. Shirani indicated that the money was not

24   available and that he had to go get it or get it picked up,

25   correct?

1    A.   Things to that effect, yes.

2    Q.   And he indicated that he was waiting for a phone call

3    from his brother to pick up the money, correct?

4    A.   I think he said he had something different, to the effect

5    that he had called his brother and discussed -- and that was

6    part of the conversation with him.

7    Q.   And this was a discussion that -- in English going on

8    with the confidential source, correct?

9    A.   With all of them there, yes.

10   Q.   I'll play a clip for you of that conversation.

11        (The audio recording was played.)

12            BY MR. DENIS:  Q.  Do you know when he said we were

13   planning to --

14            THE COURT:  Before you proceed, you didn't identify

15   this by exhibit number.  What exhibit number is this, please?

16            MR. DENIS:  I apologize, your Honor.

17            THE COURT:  And it should have a clip reference as

18   well.

19            MR. DENIS:  Going to be Exhibit U, your Honor.

20            THE COURT:  All right.  Exhibit U will be the

21   transcript, a copy of a transcript that memorialized this

22   particular conversation.  It is admitted as a court exhibit

23   only.

24        (Exhibit No. Court's U identified.)

25            MR. DENIS:  Okay.

1              THE COURT:  Once again, ladies and gentlemen, the

2    evidence of this is the audio that you've heard.  The

3    transcript itself does not come in, but the audio is the

4    evidence of this conversation, and so you will -- you're

5    playing the entire conversation?

6              MR. DENIS:  Yes, your Honor.

7              THE COURT:  So it's not really a clip.  The court

8    exhibit will be a transcript of the entire conversation.

9              MR. DENIS:  Correct.  I just paused it.

10             THE COURT:  Okay.

11             BY MR. DENIS:  Q.  And, Agent Kalina, do you know

12   what Hassan Shirani indicated when he lowered his voice and

13   said we were trying to work it out in terms of the money?  Do

14   you have any idea what he was talking about?

15   A.  Are you asking me to interpret what they were saying?

16   Q.  Do you know through the course of your investigation what

17   Hassan Shirani meant?

18   A.  From that particular clip, right --

19   Q.  Yes.

20   A.  -- where it's highlighted?

21   Q.  Were you paying attention when it was playing?

22   A.  Yes.  There was a lot there, and yes, I was paying

23   attention.  What portion of it are you referring to?

24             THE COURT:  It may be hard to back it.  Mr. Denis,

25   just refer to the particular statement that may have been --

1              BY MR. DENIS:   Q.   The statement where Mr. Hassan

2     Shirani lowered his voice and said -- and he was talking to

3     the confidential source or Michael Krapchan, we were trying

4     to work it out to get the money.   Do you have any idea what

5     he meant by that?

6     A.   What do you --

7     Q.   If you do.   If you don't, that's fine.

8     A.   They were trying to get the money, trying to figure out

9     where to go to get the money.

10    Q.   But you don't know what Hassan meant, correct?

11    A.   Nothing other than the literal meaning of what he said,

12    no.

13         (The audio recording was played.)

14              BY MR. DENIS:   Q.   Now, during this part of the

15    conversation, was Ryan Wedding present while these

16    individuals were talking in English; do you recall?

17    A.   Well, some of it is in Russian there when Krapchan's

18    talking to the source and the informant is talking to

19    Krapchan.   I apologize for using "source" and "informant"

20    interchangeably, but --

21              THE COURT:   Sir, you have to keep your voice up.

22    The question was was Ryan Wedding present when this

23    conversation was taking place.

24              THE WITNESS:   Yes.

25              BY MR. DENIS:   Q.   Yes.   Okay.   Thank you.

1          (The audio recording was played.)

2              BY MR. DENIS:  Q.   And when Michael -- when Hassan

3    Shirani takes a call and goes off, Ryan Wedding makes a

4    couple statements, correct?

5    A.   He has a conversation with -- on the recording, yes.

6    Q.   And just it deals with picking up money, correct?

7    A.   Not only just picking up money.  He had conversation --

8    Q.   Okay.

9    A.   -- that was more than just talking about money.

10             MR. DENIS:  One moment, your Honor.

11             BY MR. DENIS:  Q.   Now, Agent Kalina, the

12   confidential source came to your office back in 2006,

13   correct?

14   A.   Yes.

15   Q.   And he was signed up as an informant, correct?

16   A.   Yes.

17   Q.   And part of the process of signing up an informant, there

18   are certain procedures that you have to follow, correct?

19   A.   Yes.

20   Q.   You have to check the background of the individual before

21   you use them?

22   A.   Yes.

23   Q.   You go through a period of trustworthiness or

24   suitability, correct?

25   A.   Yes.

1          MR. GUTIERREZ:  I'm going to object as beyond the

2    scope, your Honor.

3          THE COURT:  The objection is overruled.

4          BY MR. DENIS:  Q.  And when the confidential source

5    is employed by the FBI, he signs something called an OIA,

6    correct?

7    A.  First, he's not employed by the FBI.

8    Q.  Well, when he's working or assisting the FBI; is that the

9    appropriate wording?

10   A.  That would be more appropriate, yes.

11   Q.  Okay.  And while he's assisting, he also receives

12   compensation based on his assistance, correct?

13   A.  He can, yes.

14   Q.  And as part of the background of the informant, you

15   learned that the informant was not legally in this country,

16   correct?

17   A.  That he's not illegal.

18   Q.  That he was not legal in the country?

19   A.  No, he had legal status in the country.  He was not a

20   citizen.  Yes.

21   Q.  Okay.  And when you say legal status, he had applied for

22   political asylum from this country, correct?

23   A.  Yes.

24   Q.  And that application was filed in 2004?  Okay.  Strike

25   that.  Part of the investigation -- part of the your

241

1    background did you learn of the informant's status in the

2    United States?

3    A.   Yes.

4    Q.   Okay.  And did you just ask him or did you investigate

5    that?

6    A.   I talked to him about his status, yes.

7    Q.   And you heard that he filed for political asylum?

8    A.   He told me that, yes.

9    Q.   Did he tell you he won the lottery, the visa lottery, to

10   stay in this country legally?

11   A.   He did not; he did not tell me that, no.

12   Q.   So he told you that he applied for a political asylum,

13   correct?

14   A.   He told me that, yes.

15   Q.   Did he tell you that the political asylum was granted?

16   A.   He did not.

17   Q.   Did he tell you it was pending or denied?

18   A.   He told me it was still in the process.

19   Q.   And -- but he agreed to work for you or to assist you in

20   an investigation, correct?

21   A.   Yes.

22   Q.   And this was information that he brought to your office,

23   correct?

24   A.   Yes.  He came to us voluntarily.

25   Q.   Okay.  And he was working on some individuals in Canada

```
 1    for a little over two years, correct?
 2    A.   For us?
 3    Q.   Yes.
 4    A.   No.
 5    Q.   How long did he work for you?
 6    A.   Well, this investigation began in January of '07, and the
 7    arrest took place in June of '08.
 8    Q.   So about a year -- how long was that?
 9    A.   Year and a half.
10    Q.   Okay.  So during that year and a half, he made -- how
11    often did he meet you on a weekly or monthly -- strike that.
12    How often did he meet you on a weekly basis?
13    A.   That varied depending upon the activities.
14    Q.   When you say that varies, can you give us an average of
15    how often he met with you let's say on a monthly basis on
16    average?
17    A.   I would say on average at least once a week.
18    Q.   Once a week?
19    A.   I would say that would be about average.
20    Q.   And that was for about a year and a half?
21    A.   Yes.
22    Q.   And there were different times that he'd meet you more
23    than once a week, correct?
24    A.   Yes.
25    Q.   And were there times when he met with you almost every
```

1   day?

2   A.   Yes.   Towards the end of the investigation, yes.

3   Q.   And the confidential source was actually flown to

4   other -- other states, correct, than California?

5   A.   Yes.

6   Q.   He actually even went to Canada for the FBI, correct?

7   A.   That is not true.

8   Q.   Did he travel out of state for this case more than once?

9   A.   Twice.

10  Q.   Twice, okay.   And for this year and a half of working for

11  the FBI, how much money did he receive?   Not for expenses but

12  did he actually receive?

13  A.   His pay for the work that he'd done is $2,000.

14  Q.   So he worked for the -- and when he worked for you, was

15  he informing you of the -- updating you about the status of

16  his asylum case?

17  A.   I'm not sure if it occurred during that time period or

18  after, but we would discuss it if something maybe had come

19  up, but I don't specifically remember when those discussions

20  would --

21  Q.   And this was going on during the one and a half years

22  that he was working for the -- or assisting the FBI, correct?

23  A.   Yeah, I believe there would have been that conversation

24  during that time frame, but it would have been also a year

25  and a half since, so I had continuing contact with him.

244

1   Q.   Now, did he inform you that he was having problems with

2   his asylum application?

3   A.   During that time frame?

4   Q.   Yes.

5   A.   I don't believe so.

6   Q.   And you indicated for the year and a half that he

7   received $2,000 for himself, correct?

8   A.   For that year and a half, yes.

9   Q.   Do you know if he had an employment authorization to work

10  in the United States?

11  A.   He did.

12  Q.   He did.  And was that based on his asylum?

13  A.   I did not grant him that.

14  Q.   Did you actually ever see his -- his work authorization?

15  A.   I don't believe I ever saw his card.

16  Q.   And as far as you know, was his asylum prior to June 13,

17  2008?  Was his asylum application granted before June 13,

18  2008?

19  A.   I don't believe that it was.  I think I subsequently

20  learned that it was not granted, but I don't know during that

21  time frame, no.

22  Q.   So his asylum was denied, correct?

23  A.   I don't -- I've come to learn that, yes.

24  Q.   And -- and as far as you know, did he continue to have

25  work authorization?

245

 1   A.   Yes.

 2   Q.   Did you assist him in getting work authorization?

 3   A.   No, I did not.

 4   Q.   But you indicated you never saw the actual card, correct?

 5   A.   I don't believe I ever asked him to see his card, no.

 6   Q.   Did you ever check to see if he was legally working in

 7   the United States?

 8   A.   We would have done that at the outset, but I don't

 9   specifically remember.

10   Q.   And during your background check, did he -- did you check

11   to see if there was any warrants for Mr. Trofimov?

12   A.   Yes.

13   Q.   Were there any local warrants for Mr. Trofimov?

14   A.   No.

15   Q.   Did you ever conduct a background, like an international

16   background check, on Mr. Trofimov to see if there was any

17   international warrants for Mr. Trofimov?

18   A.   Yes.

19   Q.   And when did you first do that?

20   A.   It would have been the early part of 2007.

21   Q.   And did you learn that Mr. Trofimov was wanted by the

22   international police for --

23        MR. GUTIERREZ:   Objection; relevance, lack of

24   foundation.

25        THE COURT:   The objection is overruled at this

1    point.

2              THE WITNESS:  Yes.

3              BY MR. DENIS:  Q.  And the basis for the

4    international warrant was that --

5              MR. GUTIERREZ:  Objection; relevance, your Honor.

6              THE COURT:  The objection is overruled

7    provisionally.  You'll reserve a motion to strike at a later

8    time, Mr. Gutierrez.  Did you want to finish your question?

9              MR. DENIS:  Yes, your Honor.

10             BY MR. DENIS:  Q.  Did you learn that Mr.

11   Trofimov -- based on -- did you ever obtain a copy of the

12   warrant?

13   A.  No.  Not a copy of a warrant, no.

14   Q.  And in terms of your background check, did you -- you

15   conducted that in 2007, correct?

16   A.  Correct.

17   Q.  And it came up that Mr. Trofimov was wanted by Interpol,

18   correct?

19   A.  There was an Interpol report, correct.

20   Q.  Just for those of us that don't know what Interpol is,

21   what is Interpol?

22   A.  It's an international police organization.

23   Q.  And what's their -- what's their purpose, if you know?

24   A.  I wouldn't begin to be an expert on that area, so I

25   don't -- I wouldn't feel comfortable responding exactly what

1   they do.

2   Q.   Okay.  But they're an international police service?

3   A.   That's my understanding.

4   Q.   All right.  And they look for big criminals; is that your

5   understanding?

6           MR. GUTIERREZ:  Objection; improper impeachment,

7   lack of foundation.

8           THE COURT:  The objection is overruled.

9           THE WITNESS:  I don't -- again, don't know their

10  policies and procedures.  We don't deal with them on a

11  regular basis.

12          BY MR. DENIS:  Q.  Have you ever worked with

13  Interpol?

14  A.   I have not.

15  Q.   Have you ever had in your four or five year of working as

16  an agent had a person you were interested in flee before you

17  were able to press charges?

18  A.   Since that time, yes, I think I've had on a different

19  case, yes.

20  Q.   And when I say flee, leave the country.

21  A.   Yes.

22  Q.   And were these small investigations or rather large

23  investigations?

24  A.   In those cases they were small investigations.  It was --

25  the investigation wasn't necessarily small, but the

1    individuals that left weren't big, big players in that

2    investigation.

3    Q.   Okay.  So you were doing investigations for smaller --

4    smaller roles, correct, not the big players?

5    A.   Well, it's hard without going into that to particular

6    investigation, but the individuals that left were just

7    students that returned back to Russia.

8    Q.   As far as you're aware, has your office worked with

9    Interpol?

10   A.   The --

11   Q.   FBI.

12   A.   -- FBI?  I would assume, but I can't speak for anybody

13   else.

14   Q.   And when you say you assume, are you aware of or heard of

15   individual -- your office working with Interpol?

16   A.   I don't have any particular knowledge myself of anybody

17   working with Interpol.  Like, I said, I'm just assuming.

18   We're a large organization.

19           THE COURT:  We'll take our midmorning break at this

20   time, ladies and gentlemen; it's 10:30.  Please remember the

21   admonition not to discuss the case or make any decisions at

22   this time.  Thank you.

23       (The jury left the courtroom.)

24           THE COURT:  All right.  You may step down, yes.

25   We're outside the presence of jurors.  In terms of other

1     investigations, I don't think that's particularly germane.

2     Mr. Gutierrez, I know you didn't register an objection to

3     that, but I would have sustained it.  I think the general

4     subject of Interpol and whether or not it may have come up in

5     any of the conversations between the confidential source and

6     Agent Kalina would be relevant or whether the confidential

7     source had an expectation that the government might intercede

8     on his behalf vis-a-vis Interpol, but in terms of other

9     investigations or office policies or practice, that's not

10    particularly germane.  All right.  Let's take our recess.

11                MR. DENIS:  Thank you, your Honor.

12                MR. GUTIERREZ:  For ten minutes, your Honor?

13                THE COURT:  Well, the balance of 15 minutes, you

14    know; you got about 13.

15                MR. GUTIERREZ:  Thank you, your Honor.

16         (There was a break in the proceedings.)

17                THE COURT:  Okay.  We have everyone present.

18    Continuing on then.

19                MR. DENIS:  Thank you, your Honor.

20                BY MR. DENIS:  Q.  Did Yuri Trofimov ever tell you

21    that he had stolen 300,000 from an individual from

22    Kazakhstan, 300,000 U.S. dollars from an individual in

23    Kazakhstan?

24    A.  No, he did not.

25    Q.  And when you did your background investigation, you

1  learned of the Interpol warrant back in 2007?

2  A.  I learned of the report, yes.

3  Q.  And did you follow up on -- did you question Mr. Trofimov

4  about that in 2007?

5  A.  I did.

6  Q.  And what did he tell you about that?

7  A.  He had no knowledge of anything about that.

8  Q.  Did you contact Interpol yourself?

9  A.  I did not.

10  Q.  Did you investigate the claims made for the international

11  warrant?

12  A.  We talked with the source and reviewed it with counsel,

13  and that was it.

14  Q.  Was the warrant back in 2000 through 2008 -- excuse me.

15  Was the warrant -- from back in 2007, the latter of part of

16  2007 through June of 2008, was the warrant still valid as far

17  as you know?

18  A.  I'm not sure.

19  Q.  As far as you know, was the warrant ever recalled?

20  A.  Again, I don't know that it was a particular warrant.  I

21  know of the report that I received, but I've never seen an

22  actual warrant on that.

23  Q.  You never saw an actual warrant?

24  A.  Yes.  It's a want, not a warrant.

25  Q.  I'm going to show you a document which the defense has

1   marked -- previously marked as Defense Exhibit V, V as in

2   Victor.

3              THE COURT:  All right, counsel.  Let's proceed.

4              BY MR. DENIS:  Q.  Agent Kalina, take a look at

5   that document which has been marked for identification

6   purposes as Defense Exhibit V.

7   A.  You want me to look at every page?

8   Q.  Have you seen the document before?

9   A.  I have seen these documents, yes.

10  Q.  And it was also translated for your office?

11  A.  Yes.

12  Q.  Okay.  And you know the contents -- well, can you

13  describe the documents for us?  What are those documents?

14  A.  These were documents in regards to a claim by an

15  individual named Chokhani who claimed that Mister -- the

16  informant took $300,000.

17     (Exhibit No. V identified.)

18  Q.  And that was in Kazakhstan, correct?

19  A.  This paperwork is from there, yes.

20  Q.  And based on that, there was an international warrant

21  placed on Yuri Trofimov?

22  A.  I don't know that it was an international warrant placed

23  on Mr. Trofimov, no.

24  Q.  Did you do an Interpol inquiry at some point?

25  A.  Yes.  There's a report that -- from Interpol that says

1      they would like to talk to Mr. Trofimov.  That's different

2      from these documents.  That's a different report.

3      Q.   Okay.  That's what Interpol has, correct?

4      A.   That's -- yes.

5      Q.   And the documents you have before you are the claims made

6      that -- and the claims made by the victim was that Mr.

7      Trofimov stole 300,000 from him and fled to the United

8      States?

9             MR. GUTIERREZ:  Compound as phrased, asked and

10     answered.

11            THE COURT:  Would you resume the --

12            MR. DENIS:  Yes, your Honor.

13            THE COURT:  Okay.  The document hasn't been

14     admitted into evidence at this point; it's been generally

15     characterized, and until it's admitted into evidence, I don't

16     think it would be appropriate -- and I'm not suggesting that

17     it is admissible, but I don't think it would be appropriate

18     to refer to the contents or any of the details of the

19     contents.

20            MR. DENIS:  Okay.

21            BY MR. DENIS:  Q.  And as part of -- you actually

22     requested those documents based on the defense request,

23     correct?

24            MR. GUTIERREZ:  Objection, relevance.

25            THE COURT:  Sustained.

1          BY MR. DENIS:   Q.   Did you -- when you did your

2    background investigation in 2007, you indicated that there

3    was a want of Yuri Trofimov in Kazakhstan, correct, or --

4    excuse me -- that there was a want for Yuri Trofimov from the

5    international police, correct?

6    A.   There was an Interpol report, yes, that they wanted to

7    talk to Mr. Trofimov.

8    Q.   And when you saw that report, did you investigate with

9    Interpol regarding --

10          MR. GUTIERREZ:   Asked and answered, your Honor.

11          THE COURT:   Sustained.

12          BY MR. DENIS:   Q.   Is it the -- was this done

13    during your suitability period or -- excuse me.   Strike that.

14    Could you just describe when you have an informant, before

15    he's used, what's the procedure that's -- that's done.

16    A.   We --

17          THE COURT:   Counsel, this has already been asked

18    and answered; you've already gone through this, the steps.

19          MR. DENIS:   Right.   I just want --

20          THE COURT:   Let's keep --

21          MR. DENIS:   I'll ask a question.

22          BY MR. DENIS:   Q.   Is there a period of time that

23    the informant goes through a suitability period?

24    A.   Well, we're always looking at the informant during his

25    time as --

1   Q.   And you --

2   A.   -- they're assisting.

3   Q.   During this time you're trying to determine is he a

4   truthful individual?

5   A.   Yes.

6   Q.   And you received a report or a want that -- and on the

7   report or want, it indicated that -- based on your inquiry of

8   the want, it indicated on the Interpol that he had stolen

9   300,000 and left for America; is that correct?

10          MR. GUTIERREZ:   Objection; lack of foundation,

11   hearsay, compound as phrased.

12          THE COURT:   The objection is overruled.   And you

13   may -- you may ask whether based on any information, without

14   indicating what the information is, the agent took specific

15   action or declined to take action.   But let's not get into

16   any unsubstantiated materials that may be contained in a

17   multi-page report that would not be appropriate.

18          BY MR. DENIS:   Q.   You did an Interpol inquiry,

19   correct?

20   A.   We did a check, which resulted in finding out that

21   information, yes.

22   Q.   And as a part of your inquiry, you learned that Mr.

23   Trofimov had stolen $300,000 and fled the United States -- to

24   the United States?

25   A.   That's not true.

1   Q.   What did the Interpol inquiry say?

2   A.   It said --

3          THE COURT:   Counsel, I've already indicated that

4   it's not appropriate to get into any specific references in

5   that report.

6          BY MR. DENIS:   Q.   Mr. Kalina, when you do an

7   Interpol inquiry -- can you just describe what that is?

8   A.   I didn't say I did an Interpol inquiry itself.   We do a

9   very wide database check, which would result in something

10  coming back.   But I didn't do a specific Interpol inquiry.

11  Q.   And based on your review of the database, it comes back

12  with some limited information, correct?

13  A.   Yes.

14  Q.   And as part of that limited information -- that was a

15  database that the FBI had regarding Interpol warrants and

16  wants?

17  A.   I don't believe it's an FBI database.

18  Q.   Okay.   What database did you use?

19  A.   I would assume it's an all-encompassing -- ours,

20  Department of State, that type of thing.   Specifically where

21  this one popped up, I'm not sure at this point in time; I'd

22  have to go back and review.

23  Q.   It wasn't a -- you previously indicated it was an

24  Interpol warrant or want search that you did.

25  A.   It's not a specific -- I don't contact Interpol to do --

1    to find out information.  What I do is a general background,

2    and if information comes back to me, that's how that comes

3    back to me.  But I don't do a specific search at Interpol.

4    Q.  And when you did the -- when you did the inquiry, did you

5    receive information that Mr. Trofimov had stolen $300,000

6    from an individual and had left with his family to the United

7    States or fled to the United States?

8              MR. GUTIERREZ:  Objection; lack of foundation,

9    compound as phrased, and hearsay.

10             THE COURT:  Did you learn any such report, Agent?

11             THE WITNESS:  I learned of a report, but it didn't

12   say that exactly, no.

13             THE COURT:  Okay.

14             BY MR. DENIS:  Q.  What did the report say?

15   A.  It set that an individual named Chokhani made a claim

16   that the informant did this, not that --

17   Q.  Did what?

18   A.  That there was -- that he had taken some money.

19   Q.  How much?

20   A.  $300,000.

21   Q.  And what else did it say?

22   A.  They --

23             MR. GUTIERREZ:  Objection as to lack of foundation.

24             THE COURT:  The objection is in part sustained and

25   in part overruled.  It's sustained in terms of any of the

1    content of the report that was not the subject of a

2    conversation between this witness and the confidential

3    source; it is overruled as to any conversation that the

4    witness may have had with respect to any items in the report

5    with the confidential source.

6              BY MR. DENIS:  Q.  When you saw this -- this report

7    about the stolen 300,000, did you speak with Mr. Trofimov

8    about this?

9    A.  I did.

10   Q.  When was this?

11   A.  It would have been early 2007.

12   Q.  And did you go through the allegations that were made

13   against him and his family?

14   A.  I reviewed it with him, yes.

15   Q.  And in terms of fleeing to the United States, did you

16   discuss that with him with his family?

17   A.  I went over those allegations with him, yes.

18   Q.  And based on -- you also had the immigration applications

19   as well?

20   A.  That's not true.

21   Q.  Okay.  When you went over it with him did, he just deny

22   it?  Actually strike that.  What did you do after that?  Did

23   you just let it go?

24   A.  After what?

25   Q.  After having this discussion with him about this

1    international warrant.

2    A.   The information was placed in his file after reviewing it

3    with him, and that was it.

4    Q.   And when you say the information was placed in his file,

5    was that part of his OIA?

6    A.   No.

7    Q.   So the -- so you had learned that he had an international

8    warrant in 2007 regarding a possible stealing of a

9    substantial sum of money, correct?

10   A.   That's incorrect.  I did not know of a warrant.  The want

11   from Interpol on that's, what I knew at that time.

12   Q.   Did you assist him in resolving the want?

13   A.   I did not.

14   Q.   And based on his denials, you were satisfied with that

15   denial?

16   A.   Yes.

17   Q.   And his denial -- did he indicate that it just never

18   happened, it was made up?

19   A.   He had no idea who that individual was.

20   Q.   And you accepted his word, correct?

21           MR. GUTIERREZ:  Asked and answered, relevance.

22           THE COURT:  Sustained.  Well, sustained on the

23   first ground.

24           BY MR. DENIS:  Q.  Now -- and would the -- when you

25   got this information, did you monitor Mr. Trofimov more

1    closely or did you just treat him like a regular confidential

2    source?

3    A.   We treat -- I don't understand what you mean by treating

4    him.

5    Q.   During his suitability period, were you looking out to

6    see is he more -- is he truthful, is he dishonest?

7    A.   We're always watching out for credibility issues and

8    truthfulness, always.

9    Q.   And -- because that's an important aspect of a -- being a

10   confidential source, correct?

11   A.   Certainly.

12   Q.   They have to be truthful and honest with you and -- if

13   they have to testify, correct?

14   A.   Yes.

15   Q.   And as part of that assurance, you have them come in --

16   is it every month or three months? -- to sign an OIA

17   admonition, correct?

18   A.   That has nothing to do with his truthfulness.  No.

19   Q.   Why don't you describe for us what is an OIA.

20   A.   OIA is called Otherwise Illegal Activity.  So when we

21   have informants that are engaged in activities with targets

22   of investigation, we get approval through our chain,

23   including reviewing it with our higher-ups, that allows them

24   to participate in these types of activities without the

25   ramifications of prosecution, and which -- that way it's

1    monitored through us what they're doing, and we do that every

2    three months and review it with them.

3    Q.   And part of that admonition is that the OIA is only

4    allowed to conduct certain illegal activity that is being

5    supervised by the FBI, correct?

6    A.   Correct.  It has to be the -- what they do has got to go

7    through us.  They do not have blanket authority to commit any

8    type of criminal activity.  In fact, we tell them that every

9    three months as well, and there are certain things that we

10   can't even give authority for like acts of violence, that

11   type of thing.  It's only for particular criminal activity.

12   Q.   So let me ask you, if somebody were being instructed on

13   how to deceive the U.S. government to obtain their asylum

14   application, would that be an illegal activity?

15            MR. GUTIERREZ:  Objection, argumentative.

16            THE COURT:  Sustained.

17            BY MR. DENIS:  Q.   Would -- as far as you know, if

18   someone was lying or deceiving the United States government

19   for immigration papers, would that be illegal?

20   A.   You're asking if someone would commit perjury on

21   documents or in testimony?

22   Q.   Correct.

23   A.   That would be illegal, yes.

24   Q.   How about if they have an intention to deceive the United

25   States government to obtain asylum papers?

1          MR. GUTIERREZ:  Calls for speculation, lack of

2    foundation, your Honor.

3          BY MR. DENIS:  Q.  Would that be illegal?

4          THE COURT:  If it's a hypothetical circumstance,

5    it's an incomplete hypothetical.  And why don't you just ask

6    the witness whether they considered that and took any steps

7    to either verify there was no deception or confirm that there

8    was.

9          BY MR. DENIS:  Q.  Did you verify if there was any

10   deception in his immigration application?

11   A.  The immigration application did not even arise until in

12   preparation for this trial.  I did not review any asylum

13   application of Mr. Trofimov.  I did not promise him to help

14   him at any time with his asylum application.  That was

15   between him and his counsel at that time.

16   Q.  Okay.  And back in 2007 there was -- there was recordings

17   being initiated part of this case, correct?

18   A.  In 2007?

19   Q.  Yes.

20   A.  Yes.

21   Q.  And you made a number of CDs in this case, correct?

22   A.  There's a number of them, yes.

23   Q.  And do you recall CD No. 1, the very first recordings in

24   this case?

25   A.  I reviewed them all, yes.

1   Q.   And the confidential -- confidential source was given a

2   recording device, correct?

3   A.   He would have had a recording device, yes.

4   Q.   And early on in the investigation, Michael Krapchan back

5   in 2007 was supposed to come and meet the confidential

6   source, and he didn't.  He never came; isn't that true?

7   A.   Mr. Krapchan did come to San Diego in January of 2007.

8   Q.   He did come, correct?

9   A.   He did.

10  Q.   But was there an occasion early on in the investigation

11  that Michael Krapchan was scheduled to come and did not come?

12  A.   Yeah, I think there was a few of those throughout, yes.

13  Q.   Okay.  And on one of those occasions, Mr. Trofimov left

14  his recording device on and spoke with a immigration

15  consultant, correct?

16  A.   That's my understanding, yes.

17  Q.   And that -- and that recording device was actually still

18  on during that conversation, correct?

19  A.   Yes.

20  Q.   And you had that conversation listened to or you found

21  out about that conversation, correct?

22  A.   Yes.

23  Q.   And you learned of the content of that conversation,

24  correct?

25  A.   I'm sure we had that reviewed at that time; I don't know

1   if there was a transcript made of that though.

2   Q.  And did the -- but you were informed of the content,

3   correct?

4   A.  I believe so, yes.

5   Q.  Okay.  Now, when the -- when you sent the CD to get

6   recorded, you gave certain instructions regarding that first

7   CD, correct?  Well, strike that.  What -- do you recall that

8   first CD -- what was the information contained on that first

9   CD during the -- what was the conversation with the -- this

10  immigration assistant with Mr. Trofimov?

11          MR. GUTIERREZ:  Objection; relevance, hearsay.

12          THE COURT:  Sustained on the first basis.

13          BY MR. DENIS:  Q.  Did you -- did you obtain

14  information from that first recording that Mr. Trofimov was

15  being taught how to convince a judge about his political

16  asylum situation?

17          MR. GUTIERREZ:  Objection, relevance.

18          THE COURT:  Sustained.

19          BY MR. DENIS:  Q.  During -- during that

20  conversation did you instruct a translator not to record that

21  portion of the transcript?

22  A.  Well, I didn't ask her not to record it because --

23  Q.  Transcribe I'm saying.  Let me strike that.  At some

24  point did you give the recordings to an FBI transcriber to

25  write the content of that conversation?

264

1   A.   Yeah.  There were many calls that -- that I didn't have

2   fully translated.  There was summaries of some, there were --

3   but I didn't get them on each and every recording that was

4   made.

5   Q.   Did you specifically tell the translator not to translate

6   a portion -- strike that.  Isn't it true that you told a

7   translator specifically not to translate a section of the

8   recording?  And we're talking about CD No. 1.

9   A.   Yeah, it's possible.  I have to look at my records to see

10  what I requested the translator/transcriber to do at that

11  time.

12  Q.   And isn't it true that you actually told her not to

13  transcribe a section where Yuri was discussing how to cheat

14  the government; isn't that true?

15  A.   No, I didn't say that, please do not do that,

16  particularly use that kind of language, no.

17  Q.   And in that same portion, Mr. Trofimov was bragging about

18  having another lover, cheating on his wife; isn't that true?

19            MR. GUTIERREZ:  Objection; argumentative and

20  relevance, your Honor.

21            THE COURT:  It's sustained on the basis of

22  relevance.

23            BY MR. DENIS:  Q.  Now, Mr. Kalina, you did learn

24  of the content of that -- of that CD, correct?

25  A.   I would have been given a summary at that time.

1   Q.  And you just testified that you did not tell a translator

2   not to translate that specific section?  Didn't you just

3   testify to that?

4   A.  No, I did not say that.  I said I did not tell her not to

5   translate and use the specific words on how to deceive the

6   government.  I may have said don't translate anything

7   personal, but there was other portions of calls, whether it

8   be English calls, whether it be the recorder may have been

9   left on where I did not have the translator do that because

10  it wasn't between the targets of the investigation and the

11  informant.

12  Q.  If you had instructed a translator not to translate a

13  portion of the document, that would be inappropriate wouldn't

14  it?

15  A.  No.

16  Q.  So it's your discretion whether a portion of some CD is

17  appropriate for being transcribed or not being transcribed?

18  Is it your discretion?

19  A.  Well, it is in my discretion of certain calls, yes,

20  certain recordings.

21  Q.  But isn't it true that you -- you already testified.

22          MR. DENIS:  Your Honor, I'd like to mark for

23  defense exhibit?

24          THE COURT:  Counsel, perhaps I can save you some

25  time.  Unless you can establish through -- foundation through

1  testimony of the witness that this witness had or did not

2  have a -- well, that this witness had a certain

3  conversation --

4           MR. DENIS:  Okay.

5           THE COURT:  -- with the confidential source

6  relating to personal matters --

7           MR. DENIS:  Okay.  I got it.

8           THE COURT:  -- then this material would not be

9  relevant.  So if you want to proceed to see if you can lay a

10 foundation for that, you --

11          BY MR. DENIS:  Q.  Agent Kalina, when you got the

12 CD or the recording, you placed it onto a CD, correct?

13 A.  It was placed onto a CD, yes.

14 Q.  You were informed of the content of the CD, correct?

15 A.  Eventually, yes.

16 Q.  And you gave it to a FBI translation person to translate

17 the CD No. 1?

18 A.  I do a request for certain translations on each and every

19 disk.

20          MR. DENIS:  Okay.  I'd like to mark for

21 identification purposes Defense Exhibit R, which I'd like to

22 move in for impeachment.

23          MR. GUTIERREZ:  Your Honor, we object as a lack of

24 foundation.  I haven't seen this particular exhibit yet, and

25 we'd say it would be hearsay.

1          THE COURT:  The objections would be sustained on

2    each of the grounds stated, seeing as how the exhibit is

3    being offered at this time.  Exhibit R has already been

4    designated for another exhibit.

5          MR. DENIS:  Oh, W, your Honor.  I apologize.

6          THE COURT:  Okay.

7          BY MR. DENIS:  Q.  Agent Kalina, you saw the

8    transcript, and after you gave the investigator, you -- after

9    you gave the instructions to the translator, you received the

10   report back, correct, the translation that was done, correct?

11   A.  For a particular request that I made?

12   Q.  Yes.

13   A.  Yes.

14   Q.  And on one of those requests, the translator indicated

15   that the point of contact, Special Agent Brett Kalina,

16   instructed the translator not to translate a portion of the

17   CD, correct?

18   A.  I'm sure that's correct.

19   Q.  And because it's true that you instructed the translator

20   not to transcribe a portion of this CD, correct?

21   A.  Yes.

22   Q.  And that portion of the CD contained information that Mr.

23   Trofimov was learning how to deceive the U.S. government to

24   get his asylum application, correct?

25   A.  I did not know that, no.

1    Q.  And you also -- but you learned of the information on the

2    CD, correct?

3    A.  I learned of the information on the CD, yes.

4    Q.  And you asked the translator not to translate that

5    portion, correct?

6    A.  Yes.

7    Q.  You also learned that -- that in the CD Mr. Trofimov is

8    bragging about his other lovers, correct?

9         MR. GUTIERREZ:  Objection; relevance, lack of

10   foundation, asked and answered.

11        THE COURT:  The objection is overruled.

12        THE WITNESS:  No.

13        BY MR. DENIS:  Q.  But you instructed the

14   translator not to translate that portion as well; isn't that

15   true?

16   A.  But that's not why I instructed them not to translate it.

17   Q.  Why did you instruct them not to translate it?

18   A.  Because that was not a conversation between the informant

19   and the targets of the investigation.

20   Q.  So you weren't trying to cover up or hide that the -- Mr.

21   Trofimov was trying to deceive the U.S. government to get

22   immigration papers back in --

23        MR. GUTIERREZ:  Argumentative.

24        BY MR. DENIS:  Q.  -- back in January 20 of 2007

25   when he had just started working for you?

1          MR. GUTIERREZ:  Argumentative as phrased and

2    compound, your Honor.

3          THE COURT:  Would you restate the question, please,

4    counsel.

5          MR. DENIS:  Yes.

6          BY MR. DENIS:  Q.  Wasn't it true you were trying

7    to conceal the fact that Mr. Trofimov was trying to illegally

8    obtain immigration status in this country?

9    A.  No, that's not true.

10   Q.  Weren't you trying to conceal the fact that Mr. Trofimov

11   was cheating on his wife?

12   A.  That is not true.

13   Q.  And the only reason you had instructed the translator not

14   to translate those portions was because it didn't deal with

15   the source of the target of the investigation?

16   A.  There are many calls that I -- or recordings that I did

17   not have them transcribed.  Specifically I would -- each disk

18   would have a preamble where I would say who I was and that I

19   was handing over a recording device and this is the name of

20   the investigation; I did not ask them to do that.  It was not

21   a call or recording between the targets of the investigation

22   and the informant.

23   Q.  Ms. Johnson indicated it would be inappropriate for

24   someone to tell her what she should translate and what she

25   should not translate.  You were here when she said that;

1    isn't that true?

2    A.   No, it's --

3    Q.   Were you here --

4    A.   During her testimony, yes.

5    Q.   And I asked her was it inappropriate for someone to tell

6    her what she should or shouldn't translate.

7    A.   And that's how to translate it and how to put it words on

8    a paper.  That's different from actually doing a translation.

9    Q.   So is it your testimony that there are other

10   conversations that you instructed other interpreters not to

11   interpret that might be damaging to your case?

12           MR. GUTIERREZ:  Compound as phrased, your Honor.

13           THE COURT:  Overruled on that objection.

14           MR. GUTIERREZ:  Lack of foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  I don't believe there would have

17   been.  Numerous times where on very lengthy ones, I would ask

18   for a summary instead of a direct translation or, if it was

19   not involving the -- again, the informant and the targets of

20   the investigation, then it would not be translated --

21           BY MR. DENIS:  Q.  But there were certain --

22   A.   -- and I would not do a request for it.

23   Q.   But there are certain portions of transcript where there

24   are summaries of conversations; is that true?

25   A.   Yeah, and those summaries are between the informant and

1    the targets of the investigation.

2    Q.   And they're summarized; they're not verbatim

3    translations.

4    A.   There's some of them, yes.

5    Q.   Okay.  And if that were the case --

6    A.   There's some on June 10 when they're at the airport that

7    was done that way as well.

8    Q.   So that was your decision, correct?

9    A.   Generally that was my decision I believe, yeah.

10   Q.   And you were telling the translators how they should

11   translate the documents.

12   A.   I'm not --

13   Q.   Isn't that true?

14   A.   No, that's not true.

15   Q.   So you're not the one that told them to summarize this

16   portion?

17   A.   I would tell them what portions I would like translated,

18   I would tell what portions I would like summarized, but I did

19   not tell them how to do their job; I just told them what

20   portions I would like to have done.

21   Q.   And then there's some incidences where you actually

22   instruct the -- the interpreter not to translate something;

23   isn't that true?

24   A.   And, again, I've said this --

25   Q.   Isn't that true?

1    A.   Yes.

2    Q.   And in this particular -- okay.  Never mind.  Now, Agent

3    Kalina, were you given transcripts of some of my prior trials

4    to review?

5    A.   I was not.

6    Q.   Are you aware of the government having prior trials

7    transcribed in preparation for this trial?

8    A.   I am not.

9    Q.   Now, Mr. Kalina, after -- there is a cooperating witness

10   in this case, correct, or a cooperating co-defendant in this

11   case, correct?

12   A.   Yes.

13   Q.   And that's Hassan Shirani, correct?

14   A.   Correct.

15   Q.   Actually, I apologize.  I didn't finish one subject.  I

16   withdraw the question.  Mr. Kalina, during the

17   investigation -- no, that's it.  There's a co-defendant in

18   this case that's cooperating, that's going to cooperate in

19   this case, correct?

20   A.   Yes.

21   Q.   And that's Hassan Shirani, correct?

22   A.   Yes.

23   Q.   As part of your investigation, you obtained his passport,

24   correct?

25   A.   It was seized in -- during the search of the Comfort Inn.

1   Q.   And you also obtained the passport of Mr. Wedding,

2   correct?

3   A.   That's correct.

4   Q.   And where was Mr. Wedding's passport when it was seized?

5   A.   Both passports were in a duffel bag.

6   Q.   And did you learn that the duffel bag was owned by

7   Mr. Shirani?

8   A.   Well, Mr. Shirani was the one that came off the airplane

9   with the duffel bag.

10  Q.   And that was noted in your report, that the passports

11  were found in his passport -- I'm sorry -- in his duffel bag?

12  A.   I may have phrased it that way, but we were aware that he

13  was the one with the duffel bag.

14  Q.   And in your -- in your training and experience -- well,

15  did you review the passport?

16  A.   I have looked at the passport, yes.

17  Q.   Did you see the countries that were traveled in that

18  passport?

19  A.   Are you talking about Mr. Shirani or Mr. Wedding's?

20  Q.   Mr. Shirani's.

21  A.   Yes, I've looked at it.  I have, yes.

22  Q.   And you're aware -- are you aware in your training and

23  experience -- well, did you see stamps to Dubai?

24            MR. GUTIERREZ:  Relevance.

25            THE COURT:  Overruled.

1              THE WITNESS:  Yes.

2              BY MR. DENIS:  Q.  And there were a number of

3    stamps actually to Dubai, correct?

4    A.  In Mr. Shiran's?

5    Q.  In Mr. Shirani's passport.

6    A.  Yes.  I'd have -- again, I believe there were multiple

7    ones.  How many I'm not sure.

8    Q.  And those were over the course of the last five to ten

9    years?

10   A.  I'm not sure exactly how far back they went, but it was

11   many years.

12   Q.  I've marked a photocopy of Hassan Shirani's passport for

13   identification as Defense Exhibit X.  Have you seen that

14   exhibit or what is represented -- you've seen Mr. Shirani's

15   passport, correct?

16   A.  Yes.

17   Q.  Could you look at that document and see if you recognize

18   it.

19   A.  Yeah, it appears -- I don't know if this is -- the

20   numbering is just off, but it appears that that looks like

21   it, his passport, yes.

22       (Exhibit No. X identified.)

23   Q.  Okay.  And are you aware of Iranian individuals flying to

24   Dubai and from Dubai to Iran in your training and experience?

25   A.  That people fly to Iran from the Dubai?

1    Q.   Yes.

2    A.   I'm sure it happens.  I don't -- I don't work with

3    anybody in that area, so I'm not -- I'm assuming that people

4    fly through Dubai to get to other parts of that -- of the

5    world there.

6    Q.   And are you -- just during the course of any of your five

7    years of investigating, have you heard -- did you track

8    Iranian individuals at all?

9    A.   No.

10   Q.   Okay.  So you're not familiar how they go to Iran?

11   A.   No, I'm not.

12   Q.   Okay.  And just as far as your training and experience,

13   when individuals are arriving back from Iran, does it raise

14   any red flags in the United States?

15            MR. GUTIERREZ:  Relevance.

16            THE COURT:  Sustained.

17            MR. DENIS:  Your Honor, I'd like to admit Defense

18   Exhibit X; self-authenticating, gave notice to the

19   government.

20            THE COURT:  Do you have any objection?

21            MR. GUTIERREZ:  No, your Honor.

22            THE COURT:  Are you sure?

23            MR. GUTIERREZ:  Well, we do have --

24            THE COURT:  Let me know if you have an objection,

25   that's all.  I want to keep things moving here.

1            MR. GUTIERREZ:  No objection to the original.  We

2    have an objection to the copy.  It's not the best evidence,

3    it's hearsay, and there's lack of foundation.

4            THE COURT:  Well, as long as -- we'll substitute

5    the original if you're agreeing that the original can come

6    in.

7            MR. GUTIERREZ:  I have the original.

8            THE COURT:  That's fine.  We'll do that at a later

9    time; we'll make the switch.  The original will be admitted.

10            MR. DENIS:  Thank you, your Honor.

11        (Exhibit No. X admitted.)

12            BY MR. DENIS:  Q.  And, Agent Kalina, part of the

13    search warrant, you obtained a number of documents from

14    Mr. Shirani's person, correct?

15    A.  Not pursuant to a search warrant, no.

16    Q.  Okay.  After you arrested him.

17    A.  Yes.

18    Q.  And did you find a credit card on his person?

19    A.  There was at least one.  I don't know how many without

20    taking a look at the documents.

21    Q.  Okay.  Let me show you a number of documents that were

22    obtained pursuant to arrest or search warrant.  Take an

23    opportunity to look at those documents, Mr. Kalina.

24    A.  Okay.

25    Q.  You recognize those documents?

1    A.   Yes.   Those are the documents we --

2    Q.   That you what?

3    A.   -- photocopied for you.

4    Q.   And we will go through each page of the exhibit.  What is

5    the first page of the exhibit?

6              THE COURT:  First of all, what is the exhibit?

7    What is it marked?

8              MR. DENIS:  It's marked as Defense Exhibit Y, your

9    Honor.

10             THE COURT:  All right.  Are they different

11   documents or all the same document?

12             MR. DENIS:  Different documents.

13             THE COURT:  Well, I suggest you mark them --

14             MR. DENIS:  Y-1?

15             THE COURT:  They should be marked with some kind of

16   an individual designation.  Do you have any objection, Mr.

17   Gutierrez, to any of these?

18             MR. GUTIERREZ:  No, your Honor.

19             THE COURT:  Are you sure?

20             MR. GUTIERREZ:  Yes, your Honor.

21             THE COURT:  All right.  Fine.  Then they'll be

22   marked as Exhibit Y, but they'll be designated Y-1, et cetera

23   for the various pages.

24             MR. DENIS:  Thank you.  Let me just --

25             THE COURT:  So why don't you do that real quickly

1   now if you can, Mr. Denis.  Just put those number references

2   on each of the pages and then you can ask your questions.

3           BY MR. DENIS:  Q.  Agent Kalina, can you describe

4   what each page of the document which is marked as Y-1 through

5   Y-9?

6   A.  Y-1 is the front of a Visa credit card.

7       (Exhibit No. Y-1 identified.)

8   Q.  Is that in the name of Hassan Shirani?

9   A.  Yes.  Y-2 is the back of that credit card.  Y-3 is the

10  front of a business card of -- looks like a realtor.  And the

11  front of a Comfort Inn key.

12      (Exhibit No. Y-2, Y-3, Y-4 identified.)

13  Q.  Let me just ask you, the Comfort Inn key, do you recall

14  where that was found?

15  A.  All of these documents were I believe when we did that

16  day in the wallet of Mr. Shirani.

17          BY MR. DENIS:  Q.  Just hold on for the Comfort Inn

18  key.  Do you recall if that document was -- or that key was

19  found in the -- the Prius that was rented?

20  A.  No.

21  Q.  When you -- when you do a inventory search, you prepare a

22  report, correct?

23  A.  Correct.

24  Q.  And in that report you indicate what are the items that

25  you find, correct?

1   A.   Correct.

2   Q.   And you place that on a report?

3   A.   Yes.

4   Q.   Going to show you what we've marked as Defense Exhibit Z,

5   which is -- which is a -- why don't you tell us what this

6   document is.

7   A.   It's an FD-597 of the items from the Toyota Prius that

8   Mr. Krapchan was arrested in --

9   Q.   And --

10  A.   -- or he came in and then was getting into.   I apologize.

11        (Exhibit No. Z identified.)

12  Q.   And then did you sign that document?

13  A.   I did.

14  Q.   So did you prepare that document?

15  A.   I did.

16  Q.   And looking at No. 4 in that document, what do you see

17  there?

18  A.   Hotel key, Comfort Inn.

19  Q.   Is that the key that's in this exhibit?

20  A.   No, sir.

21  Q.   So this was found on Mr. Shirani?

22  A.   This would have been in the documentation, so there

23  should be one of these for the documents that were taken off

24  Mr. Shirani, which would show these documents.

25  Q.   Okay.   So there is another -- another key?

1   A.   Yes.

2   Q.   All right.   And did you produce that to the defense, a

3   copy of it?

4   A.   You would have -- you get this.   You have a copy of what

5   we took from the Toyota Prius.

6   Q.   Okay.   So there was -- there was a key, a Comfort Inn

7   key.   Where's the key from again -- I apologize -- the

8   Comfort Inn.

9   A.   Which one?

10   Q.   I apologize.   Looking at Defense Exhibit Z, what is item

11   No. 4?

12   A.   Hotel key, Comfort Inn.

13   Q.   Comfort Inn.   And the Comfort Inn, was that the hotel

14   that was in Los Angeles?

15   A.   Yeah.   I mean it's -- it looks like this --

16   Q.   Correct.

17   A.   -- and, again, I have to pull it out, but it's a similar

18   key like this.

19   Q.   Okay.

20   A.   But I didn't use that key to get into the room, so -- do

21   you understand?   I just wrote down what it was just like

22   this.

23   Q.   Okay.   On June 13 in San Diego, Michael Krapchan was

24   staying at the Hampton Inn, correct?

25   A.   That is correct.

1  Q.   Okay.  And the key that you found in the Prius was for

2  the Comfort Inn, correct?

3  A.   That is correct.

4  Q.   And the Comfort Inn is the hotel that was in Los

5  Angeles --

6  A.   That is correct.

7  Q.   -- correct?  Okay.  So this was a key to the hotel in Los

8  Angeles, correct?

9  A.   I don't --

10  Q.   The Comfort Inn.

11  A.   It says hotel key, Comfort Inn.  As to -- as you can see

12  from the key itself, it says Comfort Inn, but it doesn't say

13  Comfort Inn for this hotel in Los Angeles.  All I know it's a

14  Comfort Inn key, and they had that on their possession at

15  that time.

16  Q.   Okay.  Do you recall if that was in his wallet or that

17  was somewhere else?

18  A.   Again --

19       MR. GUTIERREZ:  Objection; vague as to what that

20  refers to, your Honor.

21       THE COURT:  Well, you're talking about "them,"

22  you're talking about "his," you're talking about -- the

23  record is very, very unclear as to what counsel is referring

24  to.

25       MR. DENIS:  I know.

282

1          THE COURT:  And you're not even referring to

2     exhibit numbers any longer at this point, whether it's the

3     key that's depicted as Exhibit Y-3 or a key that's somehow

4     mentioned in Exhibit Z.  So the record is very unclear.

5          MR. DENIS:  Thank you, your Honor.

6          BY MR. DENIS:  Q.  Looking at Y-3, do you recall

7     specifically where you obtained that key?

8     A.  I believe that was from Mr. Shirani.

9     Q.  All right.  And let's look at Y-4.

10    A.  Y-4 is blank because I believe it would have been the

11    back page of these two things, which maybe they didn't have

12    anything, but we the front and back for you.

13    Q.  Correct.

14    A.  There's what I'm saying, Y-4 would have been the back of

15    Y-3.

16    Q.  Okay.

17    A.  It's blank.

18    Q.  That would be substituted --

19         MR. GUTIERREZ:  I'm sorry.  I can't hear counsel.

20         THE COURT:  Yes.  You're not conducting a private

21    conversation there, and --

22         MR. DENIS:  Correct, your Honor.

23         THE COURT:  -- that's why I'm going to ask -- do

24    you need to be here, Mister --

25         MR. DENIS:  Yeah, I --

1          THE COURT:  Then speak up if you would, and if you

2   would stand to the side so that you're not blocking the views

3   of any jurors, please.

4          MR. DENIS:  Yes, your Honor.

5          THE COURT:  Okay.  Why don't you continue on.

6          MR. DENIS:  Thank you, your Honor.

7          BY MR. DENIS:  Q.  And Y-5?

8   A.  Y-5 is -- looks like one, two, three, four, five business

9   cards.

10      (Exhibit No. Y-5 identified.)

11  Q.  Is one of them from a jewelry store?

12  A.  Yes, Trio Diamond and Gold Jewelry, Incorporated.

13  Q.  And is that in Canada?

14  A.  The address is North Vancouver, British Columbia.

15  Q.  Okay.  And that was found on Shirani's person, correct?

16  A.  Yes.

17  Q.  Okay.  What's Y-6?

18  A.  Y-6 is a Cinemark U.S.A. employment application.

19      (Exhibit No. Y-6 identified.)

20  Q.  Okay.  And that was found -- where was that found?

21  A.  That was folded up in the wallet.

22  Q.  Okay.  Go ahead.  What's -- Y-7 is?

23  A.  It looks like page 2.

24      (Exhibit No. Y-7 identified.)

25  Q.  Okay.  Y-8?

1    A.   It's a handwritten note.

2         (Exhibit No. Y-8 identified.)

3    Q.   And it's an address -- where does it purport to be?

4    A.   I don't know.

5    Q.   You don't know?  Okay.  It has the words Tehran on it?

6    A.   The word Tehran is on it, yes.

7    Q.   Are you familiar with addresses in Iran?

8    A.   I am not.

9    Q.   Okay.  Next page, do you know what that document is?

10   A.   It's a copy of a receipt, and the receipt is not very

11   clear, so I can't read that.  And the other one appears to be

12   a receipt that says damage deposit.

13        (Exhibit No. Y-9 identified.)

14   Q.   Okay.  And are you familiar with that through the course

15   of your investigation, the address for this receipt?

16   A.   I am not.

17   Q.   Okay.  Is it a rental receipt?

18   A.   I do not know.

19   Q.   Okay.

20        MR. DENIS:  And I'd like to move that into

21   evidence, your Honor.

22        THE COURT:  It's already in.

23        MR. DENIS:  Oh.

24     (Exhibits Y-1 through Y-9 admitted.)

25        MR. DENIS:  I'd like to move Exhibit Z into

1     evidence.

2               THE COURT:  Any objection?

3               MR. GUTIERREZ:  No objection, your Honor.

4               THE COURT:  All right.  Z is admitted.

5          (Exhibit No. Z admitted.)

6               BY MR. DENIS:  Q.  Now, Agent Kalina, we were

7     looking at -- do you have the Interpol documents in front of

8     you?

9     A.  No.

10    Q.  Are they there on your desk?

11    A.  No.

12              MR. DENIS:  Apologize, your Honor.  Interpol

13    documents were exhibit --

14              BY MR. DENIS:  Q.  It's not there, Mr. Kalina?

15    A.  I think you're referring to a different document.  These

16    aren't Interpol documents.

17    Q.  Oh.  But document -- Exhibit V, you obtained those

18    documents, correct?

19    A.  Yes.

20    Q.  And those were official documents from Kazakhstan?

21    A.  To the best of my knowledge, yes.

22    Q.  And -- okay.

23              MR. DENIS:  Your Honor, I'd like to move V into

24    evidence.

25              MR. GUTIERREZ:  Your Honor, that exhibit has things

1    and translations and discovery from --

2              THE COURT:  Are you objecting?

3              MR. GUTIERREZ:  Yes, your Honor, we'd object.

4              THE COURT:  On what grounds, please?

5              MR. GUTIERREZ:  Lack of foundation,

6    misidentification of what the documents are, and hearsay.

7              THE COURT:  All right.  I'm going to sustain the

8    objection, lack of foundation, also on 403 grounds; and we'll

9    deal with that at a later time if you wish to make a record

10   on that.  Just move to another area of examination if you

11   have anything further, Mr. Denis.

12             MR. DENIS:  Okay.

13             BY MR. DENIS:  Q.  Now, Agent Kalina, the

14   confidential source made a number of calls in this case,

15   correct?

16   A.  Many.

17             MR. DENIS:  Your Honor, and after Z, how would the

18   Court --

19             THE COURT:  Double A.

20             BY MR. DENIS:  Q.  Let me show you an exhibit

21   that's been previously marked as AA.  Are you familiar with

22   what's been previously marked as Exhibit AA?

23   A.  Yep, I am familiar with -- I don't know if this is a

24   complete one or not, but I'm familiar with what that is.

25   Q.  And what is the document?

287

1   A.   It's a printout from our records regarding phone -- some

2   phone records that are in our records.

3   Q.   Okay.   And the phone records that are printed there, were

4   these the phone calls that were made by the confidential

5   source during the course of the investigation?

6   A.   This appears to be a list of calls between the subjects

7   of the investigation and the informant, but I don't know that

8   it's a list of every call that he made.

9        (Exhibit No. AA identified.)

10  Q.   What is the -- okay.   What is the date on the document

11  then?   Where does the call log begin and what date does it

12  end?

13  A.   Call log begins January 27 of '07, ends June 13 of 2008.

14  Q.   Okay.   And just for the record, how many pages is that

15  document, Exhibit AA?

16  A.   Four pages.

17  Q.   Okay.   And when you indicate the targets of the

18  investigation, the targets when you initiated the

19  conversation were Michael Krapchan, correct?

20  A.   Initially it was Michael Krapchan or Elmar Akhundov, and

21  there might have been some other individuals in that time as

22  well.

23  Q.   And have you reviewed that document which has been placed

24  before you, Exhibit AA, in the past?

25  A.   In the past.   It's been a long time since I would have

1    looked at this document.

2    Q.   Okay.   And is there -- on the call log is there a number

3    that was called or was there a number that was associated to

4    Hassan Shirani in the call log?

5    A.   It doesn't have names; it just has telephone numbers.

6    Q.   Okay.   But during the course of your investigation, did

7    you learn the phone number of Hassan Shirani?

8    A.   We eventually learned of a couple different numbers of

9    Mr. Shirani, but without looking at those records from those

10   phones that we seized, I wouldn't be able to tell you if

11   these numbers match those numbers.

12   Q.   All right.   Just based on your recollection of the case,

13   was there some calls made by the confidential source to

14   Hassan Shirani?

15   A.   Well, I know there were --

16   Q.   Okay.

17   A.   -- yes.

18   Q.   And those calls would be reflected on that call log?

19   A.   Possibly.   I'm not -- I'm not a hundred percent sure that

20   each and every one would be in here; I don't know that.   This

21   information would have been added, and you'll see that

22   there's a large gap between a certain time in '07 and '08,

23   and when we seized the phones, we were able to take

24   information off of those phones.

25   Q.   When you say seize the phones, is this of the

1    confidential source's phone?

2    A.   No, this -- this is the phones that were seized from the

3    defendants.

4    Q.   Which ones -- you're talking about this call log?

5    A.   Well, portions of this call log, yes.  So what I'm

6    telling you is that when it starts here in May of '08, these

7    would reflect that those are the calls that we would have

8    seen based upon the phones that we seized from those

9    individuals.

10   Q.   The numbers you're talking about, correct?

11   A.   So --

12   Q.   Actually let me lay some foundation.  The call log that

13   you have in front of you, are these the call logs from the

14   confidential source's phone as far as you recall?

15   A.   Not exclusively, no.

16   Q.   Okay.  What was the phone number -- can I see the

17   document for a moment.  Can you tell me the file number on

18   the phone number?

19   A.   Well, the file number doesn't relate to the phone number,

20   but I'll read you that file number.  That's is my file

21   number.

22   Q.   Oh, okay.  Just read it for the record.

23   A.   It's 69151.

24   Q.   I'm looking at a 604 area code, 725?

25   A.   That's the phone number that was run to generate this

 1    report.

 2    Q.  And whose phone number was that?

 3    A.  Michael Krapchan.

 4    Q.  Oh, that was Michael Krapchan's phone?

 5    A.  Yes.

 6    Q.  So you never produced to the defense the phone of the --

 7    the call log of the confidential source?

 8    A.  We didn't --

 9            MR. GUTIERREZ:  Objection; relevance, 403, lack of

10    foundation.

11            THE COURT:  Well, the way the question is put, this

12    witness may or may not know what was produced.  Would you

13    resume the lectern, please, counsel.

14            MR. DENIS:  Yes, your Honor.

15            THE COURT:  So the question in its present form is

16    argumentative.  If you wish to rephrase the question, you

17    may.

18            BY MR. DENIS:  Q.  Okay.  Was there a call log

19    generated of what numbers the confidential source called?

20    A.  No.

21    Q.  Well, during the course of your investigation, you are

22    aware of the confidential source calling Michael Krapchan,

23    correct?

24    A.  Yes.

25    Q.  You're aware of the confidential source calling Hassan

1  Shirani, correct?

2  A.  Yes.

3  Q.  And you're also aware that there are no calls from the

4  confidential source to Ryan Wedding's phone, correct?

5  A.  I do not believe there were any, no.

6  Q.  And you also seized Ryan Wedding's phone, correct?

7  A.  One or two.  I'm trying to remember how many each of them

8  had, so at least one, yes.

9  Q.  Well, Hassan Shirani had two phones, correct?

10  A.  Yes.

11  Q.  Michael Krapchan had one phone?

12  A.  I believe he had two phones.

13  Q.  Okay.  He had two phones?

14  A.  I believe.

15  Q.  And Ryan Wedding had one phone, correct?

16  A.  I believe so.

17  Q.  And you also executed a search warrant on Ryan's phone,

18  correct?

19  A.  Yes.

20  Q.  And you retrieved text messages from Mr. Wedding's phone,

21  correct?

22  A.  I did.

23  Q.  And there was no reference to any drug transaction on his

24  text messages, correct?

25  A.  If you're saying using those words?

1  Q.   Yes.

2  A.   No, he didn't use those words.

3  Q.   Okay.  And was there okay -- you also did a further --

4  well, actually why don't you describe what -- what did you --

5  what process did you use to extract information from Ryan

6  Wedding's phone?  Let's just start with that.

7  A.   From Mr. Wedding's phone we used two different methods;

8  one was an electronic method where we hook up a machine that

9  connects to the phone and it electronically downloads some of

10  the information that's on the phone or that may be on a SIMM

11  card that's attached to the phone.  Sometimes the electronic

12  machine is not able to get all of the information off the

13  phone, and then what information we did not get off

14  electronically we manually go through the phone and document

15  what we find on the phone.

16  Q.   So that was a two-step process, correct?

17  A.   Correct.

18  Q.   And the first process, you just got the memory from the

19  text messages, correct?

20  A.   I'd have to look at the report and see exactly what we

21  took off electronically versus what we took off manually.

22  There was, again, many phones, so I'd have to take a look at

23  my report on that to see what the order was on that.

24  Q.   As far as your memory, does anything stand out that there

25  were any -- reference any drug dealing on Mr. Wedding's phone

1    in terms of text messages, first of all?

2    A.  The only one that I noted was that he said he was in --

3    he was there to work.

4    Q.  And you also did a sampling of the memory found in the --

5    you did a sampling -- well, what was the second procedure,

6    the second step that you did?

7    A.  We would review the information that we got off the phone

8    electronically because there would be a report that would

9    print out and tell us what it retrieved or what it was unable

10   to retrieve off of the phone, and then we would go through

11   the phones, if there was additional information that we could

12   see and view on the phone manually that didn't go

13   electronically, we would document it that way.

14   Q.  So what would happen is you would get a -- it would go

15   extend further -- I mean was this more of a forensic-type

16   analysis that you did off the phone --

17   A.  Yes.

18   Q.  -- where they deleted messages that you were able to

19   retrieve?

20   A.  Sometimes the electronic version will take messages off a

21   phone that have been deleted because they're on the SIMM card

22   whereas you would not be able to manually see those messages.

23   But we wouldn't take anything off manually obviously that we

24   couldn't see that was on the phone.

25   Q.  Okay.  And you did that analysis, correct?

1   A.   Yes.

2   Q.   And you pulled all those deleted messages as well,

3   correct?

4   A.   If the report says I had -- I found or the machine found

5   deleted messages off of Mr. Wedding's phone, then I'd have to

6   rely on my report on that.

7   Q.   Okay.

8   A.   I know it was an extensive report.

9   Q.   And you did a review of his phone, correct, of the text

10  messages?

11  A.   Have I read them?

12  Q.   No, you've done -- you did a report on them --

13  A.   Yes.

14  Q.   -- correct?

15  A.   Yes.

16  Q.   And you placed those items that you found into your

17  report, correct?

18  A.   Yes.

19  Q.   Okay.  And as far as the -- I apologize.  I'm going to

20  get those phone records.  You also did a phone analysis

21  for -- and text analysis for Hassan Shirani's phone, correct?

22  A.   That's correct.

23  Q.   And you retrieved the text messages correct?

24  A.   That's correct.

25  Q.   You retrieved the -- the -- the -- the contacts on the

1    phone, correct?

2    A.   Yes.

3    Q.   You obtained -- and these were -- you obtained the emails

4    from the phone, correct?

5    A.   Well, only one of his phones I believe had email

6    capability, so it would have been different than his other

7    phone, so I may have taken off emails off one but not all of

8    them --

9    Q.   Okay.  And the emails you took them off were the

10   Blackberry phone?

11   A.   Yes.

12   Q.   Then he had another phone, correct?

13   A.   Yes.

14   Q.   And what was the name of the individual -- well, that

15   what name strike that.

16        THE COURT:  I think we'll break at this time,

17   ladies and gentlemen, and resume at 1:30 this afternoon.

18   Please remember the admonition.  Thank you.

19      (There was a break in the proceedings.)

20        THE COURT:  Everyone is present.  Counsel?

21        MR. DENIS:  Thank you, your Honor.

22        BY MR. DENIS:  Q.  Agent Kalina, you still have Y-1

23   through -9 in front of you?

24   A.   I do not.

25   Q.   You indicated that the Comfort Inn key, that was obtained

1    in the -- on the person of Hassan Shirani, correct?

2    A.   I believe I stated that earlier, and reviewing my

3    records, I do not believe that that's the case.  I think that

4    document got mixed in with Mr. Shirani's documents.  There

5    were three keys found, and one was not on Mr. Shirani.

6    Q.   Okay.  You reviewed your -- what is it, the 597?  What

7    was it?

8    A.   We document it twice; it's on a 597 and a 302, so I don't

9    know which one you're looking at.  But on my 597 there's

10   documentation that that was Wedding was found on a clip

11   that --  that Comfort Inn hotel key was found in a clip found

12   on Mr. Wedding.

13   Q.   Okay.  So Mr. Wedding had the Comfort Inn key on his

14   person, correct?

15   A.   He had one of them, yes.

16   Q.   And on Hassan Shirani's person, there was no key found on

17   him, correct?

18   A.   No Comfort Inn key.

19   Q.   Correct.

20   A.   Again, I'd have to look at the entire documentation of

21   what was found as well.  I do know there was a lot of things,

22   but I don't believe that -- there was not a hotel key, a

23   Comfort Inn hotel key.

24   Q.   I'm going to give you what has been marked as Exhibit DD

25   for identification purposes.  Are you familiar with this

1    document, Agent Kalina?   It's DD.

2    A.   Yes.

3    Q.   And there was no hotel key found on Mr. Shirani, correct?

4    A.   No hotel key on Mr. Shirani.

5    Q.   And the document that we're referring to is your 597,

6    correct?

7    A.   That is not my 597, and this is not my 302; this was

8    authored by Agent Lambert, not myself.

9    Q.   Oh, Agent Lambert did the inventory of the person of

10   Hassan Shirani, correct?

11   A.   Correct.   She provided -- she did this document.   It

12   would be based on a 597, so I'd have to take at look at the

13   FD-597 to see who signed of on -- who took possession of the

14   items taken from Mr. Shirani when he was arrested.   This is a

15   302, which documents that he was arrested, things were

16   seized, and then we attach the 597 and sometimes a list that

17   documents it if it's short enough.

18   Q.   Okay.   So a 302 is a police report, correct?

19   A.   It's a report that we do, yes.

20        (Exhibit No. DD identified.)

21   Q.   Or FBI report.   Forgive me.   And on that 302, it

22   indicates what was found on Mr. Shirani, correct?

23   A.   When he was arrested, yes.

24   Q.   And there was no Comfort Inn key on his person?

25   A.   Correct.

1    Q.   And there was no Hampton key on his person?

2    A.   Correct.

3    Q.   Okay.  And the Comfort Inn, just so we're sure, is the

4    hotel in Los Angeles, correct?

5    A.   In the Valley.

6    Q.   In the Valley?

7    A.   It was in the Valley.

8    Q.   And the Hampton Inn is the hotel here in San Diego,

9    correct?

10   A.   That's correct.

11   Q.   Okay.  On the previous 597 there was a Comfort Inn key

12   found in the car, in the Prius, correct?

13   A.   There was one found in the Prius, correct.

14   Q.   And do you recall where that was found?

15   A.   I'd have to take a look at the documentation and/or --

16   and/or the photographs that were taken to -- to specifically

17   say where in the car it was found.

18   Q.   Okay.  Was it -- do you recall if it was in the dashboard

19   or you don't recall?

20   A.   I don't want to say without taking a look at my records

21   because I don't recall exactly where I found it.

22   Q.   But it was found somewhere in the Prius car, correct?

23   A.   That's correct.

24   Q.   All right.  Agent Kalina, you were also part of the

25   search warrant found what has been previously marked as

1   Defense Exhibit C -- CC; do you recall this document?

2   A.   I recall making a photocopy for you of these documents,

3   yes.

4   Q.   Okay.  And that's a receipt from Planet Funk?

5   A.   That's what that appears to be, yes; there's two of them.

6        (Exhibit No. CC identified.)

7   Q.   And that -- okay.  That was in Anaheim, California?

8   A.   In Brea.

9   Q.   Brea.  And that was -- the purchase was approximately

10  1 p.m.?

11  A.   One was at 1:02, and it appears that one is a receipt

12  maybe of the store and one could be like a credit card

13  receipt, so it appears that it's from one purchase.

14  Q.   And what was the mall?  Was there a mall on there?

15  A.   It has an address 1065 Brea Mall 1103, Brea, California.

16  Q.   Okay.  And that document -- that document was obtained

17  pursuant to one of your search warrants, correct?

18  A.   I remember, but I'd have to look at 597 to see exactly

19  where it was found.

20  Q.   Okay.  But you provided a copy of that to me, correct?

21  A.   Correct.

22  Q.   Okay.

23        MR. DENIS:  Your Honor, I'd like to move Defense

24  Exhibit CC into evidence.

25        MR. GUTIERREZ:  No objection, your Honor.

300

1          THE COURT:  Admitted.

2      (Exhibit No. CC admitted.)

3          BY MR. DENIS:  Q.  Agent Kalina, I'm going to take

4  you back to the LAX surveillance and recordings.  We

5  previously heard one conversation at the LAX where the

6  confidential source with Michael Krapchan were speaking with

7  Hassan Shirani, correct, about money?

8  A.  Yes.

9  Q.  And there was a subsequent conversation on the same day

10  within a matter of minutes where they discussed money and

11  planning something, correct?

12  A.  That conversation was throughout the time that they were

13  in the parking garage and to the hotel.

14  Q.  Okay.

15          THE COURT:  How long is this clip, counsel?  Before

16  we go --

17          MR. DENIS:  Four minutes.

18          THE COURT:  And is there a separate clip for it?

19          MR. DENIS:  We will -- yes.

20          THE COURT:  Have you done the clip on the -- do you

21  have a separate transcript for the first recording that was

22  played?

23          MR. DENIS:  We'll get that, your Honor.

24          THE COURT:  You do have that?

25          MR. DENIS:  Yes, we will have it.

1          THE COURT:  Okay.  And you're going to get one for

2    this one?

3          MR. DENIS:  Yes.

4          THE COURT:  Okay.  So how do you want to designate

5    this?

6          MR. DENIS:  This will be --

7          THE COURT:  What exhibit number is it?

8          MR. DENIS:  DD.

9          THE COURT:  I thought you had a DD.

10         MR. DENIS:  I'm sorry, EE.

11         THE COURT:  Well, wait a minute now.  Was the form

12   597 prepared by Lambert double Delta or double Bravo?  I

13   thought it was double Delta the way I heard it.

14         MR. DENIS:  That was double Delta.

15         THE COURT:  All right.  So this is --

16         MR. DENIS:  EE.

17         THE COURT:  So this is EE?  Okay.  And this is

18   going to be a -- this is going to be a court exhibit; it's a

19   transcript of what's being played at this point.  I assume

20   you have no objection to this.

21         MR. GUTIERREZ:  No objection, your Honor.

22         THE COURT:  All right.  This can be clip 2.

23         MR. DENIS:  Correct.

24      (Court's Exhibit No. EE identified and admitted.)

25      (The audio recording was played.)

1          THE COURT:  Is that the end of the clip?

2          MR. DENIS:  Yes, your Honor.

3          THE COURT:  Okay.  Thank you.  Counsel?

4          BY MR. DENIS:  Q.  Agent Kalina, during the course

5    of the investigation, the confidential source, you indicated

6    he received $2,000 for his compensation, correct?

7    A.  That's --

8          MR. GUTIERREZ:  That's been asked and answered,

9    your Honor.

10          THE COURT:  Sustained.

11          BY MR. DENIS:  Q.  He was paid additional funds for

12    his expenses, correct?

13          MR. GUTIERREZ:  Asked and answered, your Honor.

14          THE COURT:  Sustained.

15          BY MR. DENIS:  Q.  Did you prepare a summary of the

16    payments that -- that the confidential source received?

17    A.  I did not prepare a written summary, no.

18    Q.  Did someone from the FBI prepare a written summary of the

19    compensation received by the confidential source?

20    A.  There would maybe be a printout of what the individual

21    had been paid for certain things, but I didn't -- I didn't

22    prepare it myself.

23    Q.  I'm just going to show you a document, see if you

24    recognize it, which for identification purposes is Defense

25    Exhibit BB as in Bravo Bravo.  Are you familiar with that

1   document?

2   A.   I'm familiar with the contents but I did not prepare that

3   document.

4        (Exhibit No. BB identified.)

5   Q.   Okay.  And as part of the -- part of Mr. Trofimov's

6   assistance to the FBI, you indicated he traveled out of

7   state, correct?

8   A.   Twice, yes.

9   Q.   And on one of those occasions he met with Elmar Akhundov?

10  A.   Yes.

11  Q.   And it was -- and the confidential source met Elmar

12  Akhundov and Michael Krapchan, correct?

13  A.   The second trip to Seattle, yes.

14  Q.   And during those trips you also debriefed the informant,

15  the confidential source, correct --

16  A.   Yes.

17  Q.   -- on each of those.  And you prepared a report?

18  A.   If there is a report that's prepared, I --

19  Q.   And on one of those debriefs, the confidential source

20  indicated to you that Elmar Akhundov was using Michael

21  Krapchan to cover his tracks?  Do you recall that debrief?

22  A.   There was some conversations.  Yes, I remember that.

23  Q.   And the confidential source thought that Elmar Akhundov

24  was the boss of Michael Krapchan, correct?

25             MR. GUTIERREZ:  Objection; hearsay, lack of

1  foundation.

2         THE COURT:  The objection is sustained.  It calls

3  for speculation or an opinion.

4         BY MR. DENIS:  Q.  So just so we're clear, Elmar

5  Akhundov was using Michael Krapchan to cover his tracks; that

6  was what was -- the information given to you by the

7  confidential source, correct?

8         MR. GUTIERREZ:  Objection; hearsay, lack of

9  foundation.

10        THE COURT:  It's been asked and answered.

11        BY MR. DENIS:  Q.  And you put that into a report,

12 correct?

13        MR. GUTIERREZ:  Objection; lack of foundation.

14        THE COURT:  You may answer that.  The objection is

15 overruled if you put that in a report.

16        THE WITNESS:  Yes.

17        BY MR. DENIS:  Q.  And through the course of your

18 investigation, you learned that Elmar Akhundov knew Hassan

19 Shirani, correct?

20 A.  Based upon the recorded conversations, you could deduce

21 that from the recordings from Mr. Akhundov and Mr. Krapchan.

22 Q.  So Elmar Akhundov knew Hassan Shirani, correct?

23 A.  I don't know personally if he did; he didn't say that on

24 the recording.  You can -- so I -- I can only say I can

25 deduce that from what I listened to in the recordings.

1    Q.   Okay.   And as far as you know, Hassan Shirani brought

2    Ryan Wedding to Los Angeles, correct?

3    A.   I don't know that I would classify that Hassan brought

4    Ryan to San Diego, no.

5    Q.   But Hassan and Ryan came to California, correct?

6    A.   Yes.

7    Q.   Okay.   And the information that you had was there was

8    communication with Michael Krapchan and Hassan, correct?   His

9    name was brought up before, Hassan's name.

10   A.   Before --

11   Q.   Before they arrived to -- to Los Angeles, to -- yes, to

12   Los Angeles?

13   A.   Yes.

14   Q.   The name "Ryan Wedding" was never used in any recording

15   prior to Mr. Wedding arriving at Los Angeles, correct?

16   A.   I don't believe so, no.

17   Q.   And you indicated that there were conversations where the

18   confidential source spoke to Hassan Shirani, correct?

19   A.   Yes.

20   Q.   And it was a recorded conversation?

21   A.   Yes.

22   Q.   And it was in English, correct?

23   A.   Yes.

24   Q.   This will be Court -- Defense Exhibit FF, a transcript, a

25   court copy.

1          THE COURT:  Have you shown it to -- are you

2   familiar with it, Mr. Gutierrez?

3          MR. GUTIERREZ:  Yes, your Honor.  No objection.

4          THE COURT:  And this is FF?

5          MR. DENIS:  FF, your Honor.  It's --

6          THE COURT:  It's going to be, once again, a clip of

7   it, a clip of the transcript will be placed in the record as

8   a court exhibit.  And this is -- what is it purported to be

9   now?

10          MR. DENIS:  It's a conversation between the

11   confidential source and Hassan Shirani.

12          THE COURT:  What date?

13          MR. DENIS:  The 11th, your Honor.

14          THE COURT:  Thank you.  What's the length of this?

15          MR. DENIS:  I believe it's a short clip.  My

16   technician thinks it's five minutes, your Honor.

17          THE COURT:  Five minutes or less?

18          MR. DENIS:  Yes.

19      (Court's Exhibit No. FF identified and admitted.)

20      (The audio recording was played.)

21          THE COURT:  All right.  There was no rolling as the

22   transcript on the screen.  You didn't use Sanctions?

23          MR. DENIS:  Correct.  We just --

24          THE COURT:  I want to make sure there's a

25   transcript of that, that you have a separate and discrete

1  transcript, one side or the other.  If that could be placed

2  in the court file.

3          MR. GUTIERREZ:  I'd be happy to provide that, your

4  Honor.

5          THE COURT:  Just make sure that it gets done.

6  Thank you.

7          BY MR. DENIS:  Q.  And, Agent Kalina, on the 10th,

8  after the LAX, there was a two-hour conversation between the

9  confidential source and Michael Krapchan, correct, on the

10  way -- on the drive to San Diego?

11  A.  Correct, that's about right.

12  Q.  And as we previously discussed, in that transcript Ryan

13  Wedding wasn't due a share, according to the transcript,

14  correct?

15          MR. GUTIERREZ:  That's been asked and answered,

16  your Honor.

17          THE COURT:  Sustained.

18          BY MR. DENIS:  Q.  And part of that, which has been

19  previously marked as Exhibit L, the breakdown of who was due

20  a share was discussed in that conversation, correct?

21  A.  Yes.

22  Q.  I'm referring to Exhibit L, page 1, beginning at line 20.

23  Could you read from that page, line 20.  You can look at me;

24  you don't have to look at Mr. Gutierrez.  Line 20 --

25          THE COURT:  Exhibit L is not in evidence.

1          MR. DENIS:  No, it's not.

2          THE COURT:  So it would not be appropriate for the

3    witness to read from it unless there's -- unless you're

4    offering it and there's no objection.

5          MR. GUTIERREZ:  Can I see it?  What day is this?

6          MR. DENIS:  The 10th.

7          MR. GUTIERREZ:  We have no objection, your Honor.

8          MR. DENIS:  I'll have Exhibit L into evidence.

9          THE COURT:  L is admitted.  That's two pages?

10         MR. DENIS:  Two pages, your Honor.

11         THE COURT:  All right.  Actually we don't have

12   transcript material in evidence.  Are you going to play the

13   audio corresponding to the two pages of transcript material?

14   The transcript themselves don't come into evidence.

15         MR. DENIS:  Yeah, we do have that.

16         THE COURT:  If you want to display it on the Elmo,

17   you can do that, counsel.  I don't want to take undue time

18   here.  If you want to display it just to -- for the purpose

19   of expediency here, you can do that.

20         MR. DENIS:  Okay.

21      (Exhibit No. Court's L admitted.)

22         BY MR. DENIS:  Q.  So, Agent Kalina, starting --

23   this was the -- this is the conversation where Michael

24   Krapchan indicated that he was here to accompany or help

25   Hassan, that Hassan was the main person, and then the

1    confidential source asked how much has Hassan contribute, and

2    the -- Michael Krapchan indicates Hassan contributed, his are

3    four kilograms, Hassan's four or five kilograms, and the

4    confidential source indicates five kilos are Hassan's, the

5    rest is yours, right?  And Michael Krapchan indicates --

6              MR. GUTIERREZ:  Your Honor, I would object as no

7    question pending.

8              THE COURT:  Well, go ahead with your --

9              MR. DENIS:  Thank you.

10             BY MR. DENIS:  Q.  And Michael Krapchan indicates

11   no, four are ours.  And the confidential source says plus own

12   five, correct?  Do you see that, Mr. Kalina?

13   A.  I see that.

14   Q.  Was the confidential source supposed to get one kilo of

15   cocaine as well?  Was that part of the deal?

16   A.  Early on in the calls when they first started discussing

17   bringing the cocaine -- transporting the cocaine back to

18   Canada, they're like hey, if you want to get in on the deal

19   and make some profit, we'll transport a kilo for you and sell

20   it up in Vancouver because we make a large profit, and then

21   give you the profit.  So they had always optioned that for

22   the plan of sorts to be that way.

23   Q.  So the confidential was supposed to receive a kilo of

24   cocaine, correct?

25   A.  He was not.  He never said that he would do that, but

1    that was discussed.

2    Q.   And when the confidential source -- when Krapchan

3    indicates no, four are ours, and the confidential source says

4    plus own, five, that's not the confidential source's own

5    kilo; is that your testimony?

6    A.   Right.   It was -- the source did not have --

7    Q.   Okay.   And then Krapchan indicates plus own, five, that's

8    ten, a half only.   Hassan -- and this is Krapchan speaking --

9    yours, and ours is only half.   And Michael Krapchan indicates

10   and the rest is his brother's.   And the confidential source

11   says Hassan's.   And Mr. Krapchan says Hassan's.   Is that what

12   the transcript says, Agent Kalina?

13   A.   Yes.

14   Q.   Is that what the transcript says?

15   A.   I said yes.   Sorry.

16             MR. DENIS:   Nothing further, your Honor.

17             THE COURT:   Mr. Gutierrez?

18             MR. GUTIERREZ:   Thank you, your Honor.

19                      Redirect Examination

20             BY MR. GUTIERREZ:   Q.   Good afternoon, Agent.

21   A.   Good afternoon.

22   Q.   You were asked some questions on cross-examination about

23   the confidential informant having paid for things for

24   Mr. Krapchan; is that correct?

25   A.   Correct.

1   Q.   Were there circumstances when you instructed the

2   confidential informant to pay for Mr. Krapchan's expenses in

3   any way?

4   A.   There was one time, yes.

5   Q.   And when was that?

6   A.   In January of 2007 when Mr. Krapchan came to San Diego.

7            THE COURT:   Sir, would you please keep your voice

8   up -- and you may need to move a little closer to the

9   microphone -- because I want to make sure everyone hears your

10  testimony, including Dr. Riste, who's situated all the way at

11  the end of the jury box there.   Thank you.

12           BY MR. GUTIERREZ:   Q.   And what were the

13  circumstances behind that instruction?

14  A.   At that time Mr. Krapchan had asked for assistance in his

15  travels to come to San Diego, and so he flew into LA, and we

16  provided some -- the flight through the source for

17  Mr. Krapchan.

18  Q.   Was the source ever reimbursed by Mr. Krapchan?

19  A.   No.

20  Q.   Did that provide any operational benefits having them

21  Mr. Krapchan -- the CI pay for the flight?

22  A.   We were able to get Mr. Krapchan here where we could

23  conduct some surveillance while they were having some

24  meetings.

25  Q.   But to be clear, during the operation from 6-9 to 6-13 of

1   2008, did the CI pay for any of the expenses of Mr. Shirani?

2   A.   No, sir.

3   Q.   Pay for any of the expenses of Mr. Wedding?

4   A.   No, sir.

5   Q.   Of Mr. Krapchan?

6   A.   Not that I remember.  He may have paid for like a drink

7   that night on June 9 when they went out to dinner together,

8   so he may have paid for a drink or a meal, but --

9   Q.   No hotel room?

10  A.   No, sir.

11  Q.   No plane tickets?

12  A.   No, sir.

13  Q.   You were asked on cross-examination about a recording

14  dealing with a bag, is that correct --

15  A.   Yes.

16  Q.   -- at the international airport?

17  A.   Yes.

18  Q.   You were asked about if that bag was a suitcase of Mr.

19  Wedding's or some other item; do you remember those

20  questions?

21  A.   Yes.

22  Q.   Was there a discussion by Mr. Krapchan and the CS

23  regarding a bag at any time previous to the meeting at the

24  airport?

25  A.   Yes.

1  Q.  And did that discussion with relation to the bag deal

2  with money?

3  A.  Yes.

4  Q.  And what was the nature of what Mr. Krapchan told the CS

5  about how a bag would be used in relation to money at the

6  international airport?

7  A.  Mr. Krapchan told our informant that -- that they would

8  be arranging for a courier to bring a bag to the airport

9  which had the money in it.

10 Q.  Was that your understanding of the recording as well?

11 A.  Yes.

12 Q.  You were asked on cross-examination if there was any

13 surveillance of Mr. Shirani and Mr. Wedding when they were in

14 Los Angeles at the time the CI was returning; do you remember

15 those questions?

16 A.  Yes.

17 Q.  Why was there no surveillance made of Mr. Shirani and Mr.

18 Wedding while they were in Los Angeles?

19 A.  Well, we were anticipating that -- the four of them to

20 travel back down to San Diego to complete the transaction,

21 and when they separated, my obligation and the surveillance's

22 obligation was on the source and protecting his safety, and

23 we did not have the manpower to conduct surveillance on both.

24 Q.  You were asked some questions about who -- what name or

25 what credit card was used to pay for Mr. Krapchan's room here

1  at the Hampton Inn in San Diego; do you remember those

2  questions?

3  A.  Yes, sir.

4  Q.  And you indicated first that it was the wife but then I

5  think you were corrected and said the daughter?

6  A.  Yes, my understanding is that that's the daughter.

7  Q.  What is the daughter's name?

8  A.  Ludmilla Krapchan.

9  Q.  And is Ludmilla Krapchan, is that the name that appears

10  in relation to that account?

11  A.  On the credit card that was found on Mr. Krapchan, that

12  with the credit card that was on the bill.

13  Q.  Okay.  You were asked questions regarding the Interpol

14  want.  What is the difference between a want and a warrant?

15  A.  Well, the Interpol is just -- that report that was

16  referenced was a report that the authorities there would want

17  to talk to Mr. Krapchan -- I mean -- I'm sorry -- the

18  informant.

19  Q.  And how is that different than a warrant?

20  A.  A warrant would be placed out on someone for their

21  arrest, which would give authority to different jurisdictions

22  to execute that warrant.

23  Q.  Based on a foreign charging document?

24  A.  Correct.

25  Q.  But as you indicated, I believe there was no arrest

1   warrant issued by Interpol?

2   A.   There was nothing that would give me that indication, no.

3   Q.   But you did have a conversation with the CI nevertheless?

4   A.   Certainly.

5   Q.   And what did he say regarding that want?

6   A.   That he had no idea of who that individual was, he had no

7   idea of any of the circumstances and why that would be there.

8   Q.   Did you ask the CI to think of what sort of circumstances

9   to lead to such an accusation?

10  A.   I did.

11  Q.   Did he have an explanation?

12  A.   Yes.  He said that other individuals that did his line of

13  work, which was basically --

14       MR. DENIS:  Objection, your Honor; hearsay.

15       THE COURT:  The objection is overruled.  Ladies and

16  gentlemen, this is not -- any comment attributed to the

17  confidential informant or confidential source, as those terms

18  are used interchangeably, is not being received for the truth

19  of matter; it would just be received for the limited purpose

20  of information received by this particular witness upon which

21  he took action or decided not to take any action, explanatory

22  of this witness's response, if any.

23       BY MR. GUTIERREZ:  Q.  You indicated on

24  cross-examination that you were constantly looking at the CI

25  to check and making sure that he's being credible and

1    truthful; is that correct?

2    A.   Yes.

3    Q.   So when you made this inquiry, was it pursuant to your

4    ongoing diligence to make sure he was doing that?

5    A.   Certainly I would look into it, yes.

6    Q.   And this explanation that he gave you, did his

7    explanation about what he could possibly do, is that

8    something you took into consideration when you decided to

9    continue to use him as a confidential informant?

10   A.   Yes.

11   Q.   And what was it that he said in that limited regard?

12   A.   He worked as a type of Secret Service for the country of

13   Kazakhstan, which included protecting dignitaries, including

14   the president and the vice-president of the country, and once

15   he would leave that when he came -- when he left the country,

16   that other individuals had that similar problem because they

17   thought they might be going to different countries to give up

18   information.

19   Q.   And when he left the country, did he indicate that he

20   left a house in Kazakhstan?

21   A.   Yes.

22   Q.   Did you take this information into consideration when you

23   decided to keep working with him?

24   A.   Yes.

25   Q.   And how would it affect your decision to keep working

1   with him?

2   A.   I believed that what he was telling me was credible.

3   Q.   I'd like to show you Defense Exhibit Q.

4           MR. GUTIERREZ:   State for the record I'm showing

5   counsel its own exhibit.

6           BY MR. GUTIERREZ:   Q.   Do you recognize Defense

7   Exhibit Q?

8   A.   Yes.

9   Q.   It's a bill for the Hampton Inn; isn't that correct?

10  A.   It's the first bill from the Hampton Inn that I --

11  Q.   All right.

12  A.   Just for that one first date.

13  Q.   Did you talk about that on cross-examination with

14  counsel?

15  A.   Yes, I did.

16  Q.   And is it in anybody's particular name?

17  A.   Michael Krapchan.

18  Q.   And you were shown other bills that were relative to

19  Mr. Krapchan's room at the Hampton Inn, right?

20  A.   Yes.

21  Q.   But where was this particular bill found, what city?

22  A.   This was found in the Comfort Inn in -- off of Ventura

23  Boulevard up in the LA area.

24  Q.   And was that in the room that was rented out by Mr.

25  Wedding?

1  A.   Yes.   This was found in his room, yes.

2  Q.   Do you know how it is a bill from Mr. Krapchan's room

3  wound up in the room of Mr. Wedding?

4          MR. DENIS:   Objection; calls for speculation.

5          THE COURT:   Sustained.

6          BY MR. GUTIERREZ:   Q.   That bill, was it found in

7  any particular location within the room?

8  A.   It was found in --

9          MR. DENIS:   Objection; lacks -- oh, withdrawn.

10          THE WITNESS:   It was found in a pants pocket in the

11  hotel.

12          BY MR. GUTIERREZ:   Q.   And those pants were seized

13  pursuant to the search warrant?

14  A.   Yes.

15  Q.   You were asked on cross-examination about the

16  confidential informant telling Mr. Krapchan to go home; do

17  you recall that questioning?

18  A.   Yes, sir.

19  Q.   Did you instruct the confidential informant shortly

20  before the 13th to tell Mr. Krapchan to go home?

21  A.   Yes.

22  Q.   Could you please explain to the jury why it is you told

23  the confidential informant to tell that to Mr. Krapchan

24  specifically to go home?

25  A.   Well, we told him -- because he showed up on the

1  Thursday, which was the 12th, at the Hampton Inn, requested a

2  meeting with the source, at which time he requested to

3  purchase a kilo from the source.  He said he had the money,

4  but he didn't have the full amount of money.  And we told him

5  -- the source told him that he would not get a kilo for less

6  than what the agreement was.  He --

7  Q.   What was the agreement for?

8  A.   For 17,000 --

9  Q.   And --

10  A.   -- at that time.

11  Q.   -- how much did he have?

12  A.   Fifteen thousand.

13  Q.   And did you instruct the confidential informant to accept

14  15,000?

15  A.   I told him in advance no, yes.

16  Q.   Okay.  And after Mr. Krapchan was told that he couldn't

17  buy one kilogram of cocaine for $15,000, what happened next?

18  Well, let me ask you, was there surveillance at this time?

19  A.   There was surveillance at --

20  Q.   This was a recorded meeting between Mr. Krapchan and CS?

21  A.   It was recorded, yes.

22  Q.   And were there a number of agents, including yourself,

23  conducting surveillance of this meeting.

24  A.   Yes.  I mean throughout that time frame, yes --

25  Q.   Okay.

1    A.   -- there was surveillance.

2    Q.   And after he declined to sell Mr. Krapchan one kilogram

3    of cocaine for 15, what happened next?

4    A.   He asked if he could buy a half kilogram.

5    Q.   And what did the -- what did the CS say in that regard?

6    A.   Said no.

7    Q.   And then what happened next?

8    A.   He left that meeting, told him to go -- go home, maybe we

9    can rearrange this and do some type of deal that's better

10   planned, better organized a different time, and I think he

11   said nine to ten days.

12   Q.   Why did the fact that Mr. Krapchan only showed up with 15

13   out of the 17 for the key sample, why did that compel you to

14   sell the CS to say go home?  What was it about him showing up

15   with less money that made you say -- tell the CS to tell him

16   to go home?

17   A.   It was just part of the whole organizing plan that we

18   weren't going to change our plans just for Mr. Krapchan.  And

19   we had told the source specific instructions that if he was

20   going to do this, these are the specific ways in which it

21   needed to be done, and if it wasn't that say, if they tried

22   to deviate from the plan in any way, for his safety we always

23   told him just to say no.

24   Q.   And he did say no at this time?

25   A.   He did.

```
1    Q.   And in your mind after he made that statement to the CS,

2    was -- were you still planning on doing a cocaine deal with

3    the people who traveled from Canada that day?

4    A.   It was at that time we actually believed that we wouldn't

5    be doing any transfer after that time frame.

6    Q.   But after that time frame, after you told him and you

7    thought he was going home, what happened, if anything, with

8    regard to Mr. Krapchan and the two other, Mr. Wedding and

9    Mr. Shirani in LA, if anything?

10   A.   There was contact on Friday morning --

11   Q.   When you say contact, who initiated it and who received

12   it?

13   A.   There was multiple calls back and forth between the

14   source and Mr. Krapchan.

15   Q.   Who made the first call to who?

16   A.   I'd have to review the records --

17   Q.   Okay.

18   A.   -- to see, but I think there was reference that

19   Mr. Krapchan had left a message.

20              MR. DENIS:   Objection; calls for speculation.

21              THE COURT:   The objection is overruled.

22              THE WITNESS:   On the recording they discussed that

23   Krapchan had left a message to the informant, and the

24   informant said hey, I been working, I've been doing some

25   other things to get this thing arranged.
```

1          BY MR. GUTIERREZ:  Q.  As an explanation as to why

2   he didn't return the message?

3   A.   Correct.

4   Q.   And what happened after he said that?

5   A.   Krapchan explained that he was going up to Los Angeles to

6   meet them, and the source told him at that time that he was

7   able to arrange to get cocaine available if they needed it.

8   Q.   If they needed it.  How did Mr. Krapchan respond once he

9   said that the cocaine was available if they needed it?

10  A.   He was excited, said that he's going to meet with them,

11  talk to them, and that they would discuss coming back down to

12  do a transaction.

13  Q.   And how long was this conversation?  How long after was

14  the "you go home" statement; in other words, you go home and

15  then you have the deal back on again?

16  A.   Approximately 12 hours, maybe a little more.

17  Q.   And after they said that the cocaine was available if you

18  still need it, did they indicate -- did somebody indicated

19  that they needed it?

20  A.   They said that they would be coming down together --

21  Q.   Who said this?

22  A.   Krapchan.

23  Q.   To whom?

24  A.   To the informant.

25  Q.   And what did he tell the informant regarding their need

1    to get the cocaine?

2    A.   That they met with them and they would be coming down.

3    Q.   And were they coming down for the full 24 or some

4    quantity thereafter?

5    A.   That was the understanding at that time, that it was for

6    the full amount.

7    Q.   And after this conversation, did Mr. Shirani, Mr.

8    Wedding, and Mr. Krapchan arrive at the Hampton Inn?

9    A.   Yes.

10   Q.   About how long after them saying that they wanted to --

11   if it was available they would want it, was it that they

12   arrived in San Diego?

13             MR. DENIS:   Your Honor, objection; beyond the

14   scope.

15             THE COURT:   The objection is overruled.

16             THE WITNESS:   They arrived at the Hampton Inn --

17             BY MR. GUTIERREZ:   Q.   Approximately.

18   A.   -- shortly after 3 p.m. on that -- on the 13th.

19   Q.   So how many hours from the time that they said if it's

20   available, they want it and they indicated they wanted it

21   till the time they arrived in San Diego?

22   A.   Three and a half, around that time frame.

23   Q.   And did they -- was there surveillance at the Hampton Inn

24   upon their arrival?

25   A.   Yes.

1    Q.  And were all three, Mr. Shirani, Mr. Wedding, and

2    Mr. Krapchan, in a car?

3    A.  Yes.

4    Q.  Was it the car that was rented out to Mr. Wedding?

5    A.  Yes.

6    Q.  If you told them to go home and that you weren't going to

7    initiate or participate in a sale any more using the CS --

8          MR. DENIS:  Objection, your Honor; incomplete

9    hypothetical.

10         THE COURT:  The objection is overruled.

11         BY MR. GUTIERREZ:  Q.  -- what changed your mind

12   operationally to reinitiate that which you said you didn't

13   think was going to occur?  Why did you decide to do that?

14   A.  Well, that was a decision we made operationally, that we

15   wanted to attempt to at least be able to conduct a

16   transaction even if it was only with Michael Krapchan at that

17   time so that we could at least complete that part of the

18   operation.

19   Q.  Thank you.  I'd like to draw your attention now to the

20   payments received by the CI.  You indicated that he did

21   receive money from the FBI, right?

22   A.  Yes.

23   Q.  And what are the two -- you've worked CIs in the past; is

24   that correct?

25   A.  Still am, yes.

1  Q.  Are there -- what are the different ways that a CI can

2  get money from the FBI?

3  A.  We can either reimburse them or we can pay them for their

4  assistance.

5  Q.  When you say reimburse, is that like if they buy a

6  sandwich, you would reimburse them for their expenses as long

7  as it was pursuant to the investigation?

8  A.  If it was pursuant to what we have them doing, then yes,

9  we would reimburse them.

10  Q.  So would it be fair to say that the CI was reimbursed on

11  a number of occasions?

12  A.  Yes.

13  Q.  Was that for expenses incurred during his cooperating

14  with the FBI?

15  A.  That's correct.

16  Q.  Gas money and things like that?

17  A.  Gas money, meal money, those types of things, yes.

18  Q.  Okay.  But there were also occasions when he was paid not

19  as reimbursement; is that right?

20  A.  That's correct.

21  Q.  How many occasions?

22  A.  Two times.

23  Q.  Over a period of a year and a half, only two times?

24  A.  Yes, only twice.

25  Q.  What were those two occasions?

1  A.   Once was in the middle of 2007, and we had just done a
2  trip to Seattle, so I had asked the source to come up to
3  Seattle to meet with who we thought was going to be Krapchan
4  and Akhundov, but the first time it was only Mr. Krapchan.
5  So he took off work for a few days and flew up to Seattle, so
6  we reimbursed -- well, we paid him for his assistance for
7  that.
8  Q.   But that was in relation to some work he did for the FBI
9  in Seattle?
10  A.   That's correct.
11  Q.   And the second time, what were the circumstances for the
12  second payment?
13  A.   I believe that was in December of '07, and he had done so
14  much work for us, whether it was a second meeting in Seattle,
15  all the numerous recordings and debriefings that we had
16  throughout the case that I put in for what we call an award
17  for him, a payment for him.
18  Q.   When you say meetings, would those be the meetings that
19  you talked about earlier that he would record a conversation
20  and he would meet with you?
21  A.   Yes.
22  Q.   At any point in time, did you tell him if you get us this
23  type of information, we'll pay you a certain amount, but if
24  you get us a different kind of information, we'll pay you a
25  different amount?

1  A.  No.

2  Q.  Did you ever equate information to money?

3  A.  Never.

4  Q.  Did you ever equate charges to money?

5  A.  No.

6  Q.  How is it that somebody could work for the FBI for a year

7  and a half and only get paid $2,000 plus expenses?

8  A.  He volunteered his time, and he told me that it was

9  important to him.

10  Q.  Now, some cooperating informants that the FBI uses, would

11  it be fair to say that they have different motivations?

12  A.  Yes.

13  Q.  Are some of the motivations that people are trying to

14  work off charges?

15  A.  Yes.

16  Q.  Work off a sentence?

17  A.  Yes.

18  Q.  Or just purely to earn money?

19  A.  Some of them, yes.

20  Q.  Are you aware of the term "citizen informant"?

21  A.  Yes.

22  Q.  What is a citizen informant?

23  A.  Someone who voluntarily will give up information.

24  Q.  For no money?

25  A.  That's correct.

1   Q.   When you met with the CI for the first time, was it

2   because FBI reached out for them, for the informant, or the

3   informant reached out to the FBI?

4   A.   He contacted us.

5   Q.   But for the CI contacting you back in early late 2007 or

6   early 2007, but for that, would you have been able to

7   investigate what you did in this case?

8   A.   No.

9   Q.   So if it wasn't for him, you wouldn't be able to?

10  A.   No.

11  Q.   Did he ever ask for money?

12  A.   Never.

13  Q.   Like the people you indicated you've worked with that

14  have a conviction and they're trying to work it off, does he

15  have any prior convictions that you considered as his

16  motivation for coming to you?

17  A.   No.

18  Q.   Does he have sentences or time he's trying to work down?

19  A.   No.

20  Q.   What did he state to you was his motivation when you

21  decided to use him as a CI?

22  A.   His biggest motivation was that he -- he had two children

23  and he was worried about drugs and he was really afraid of

24  drugs.

25  Q.   But to be fair, he was talking to them about money

1    laundering, right?

2    A.   As well, right.

3    Q.   And he didn't feel the need to come to the FBI for money

4    laundering; is that fair to say?

5    A.   Well, he came to -- he came to us with both, but when I

6    asked what his -- what really was his motivation at that

7    time, it was the drugs.

8    Q.   And even if he had a criminal record, the FBI uses people

9    as confidential informants who have records, right?

10   A.   Yes.

11   Q.   Why would the FBI use a confidential informant if a

12   confidential informant has a record or is involved in crime?

13   A.   Well, those are the ones that know the individuals that

14   we're targeting; they have access, they're familiar with the

15   terminology, they're familiar with how things work, they have

16   connections in that area, and so they can be very good

17   informants.

18   Q.   When deciding to use the CI in this investigation, did

19   you take into consideration whether or not he had a

20   relationship preexisting with the people who were being

21   investigated?

22   A.   Certainly.

23   Q.   And did he?

24   A.   He did.

25   Q.   Is that a reason why you chose to continue to use him to

1    aid your investigation?

2    A.   One of the reasons, yes.

3    Q.   Now, this is an investigation that had aspects over in

4    Canada, right?

5    A.   That's correct.

6    Q.   But there was also a Southern District of California

7    aspect too, wasn't there?

8    A.   Yes.

9    Q.   And is that something the government created or was that

10   something that the people investigated were interested in

11   doing?

12   A.   Well, when they first contact us about moving money down

13   on the money laundering side thing, they said they needed to

14   move the money into Southern California because that's where

15   the drugs were coming from, and so that was what was

16   important to us.  When we initially started the

17   investigation, it was looking into who locally was providing

18   those things.  We were not even initially focusing on those

19   individuals in Canada.

20   Q.   But the people that you initially focused on were Elmar

21   Akhundov and Michael Krapchan; is that correct?

22   A.   That's correct.

23   Q.   Now, there was some cross-examination and direct about

24   you having heard the name Hassan Shirani or seeing their

25   faces and Mr. Ryan Wedding for the first time at LAX.

1   A.   Correct.

2   Q.   And on cross-examination you indicated that you had heard

3   the name Hassan though spoken in the days previous to; is

4   that correct?

5   A.   Yes.

6   Q.   And you indicated that you had some indication that Mr.

7   Wedding or another person was coming; is that right?

8   A.   That another person was coming, yes.

9   Q.   Okay.  What was said about this other person that was

10  coming with Mr. Hassan?

11  A.   They said that there was --

12          MR. DENIS:   Objection, your Honor; hearsay, lack of

13  foundation.

14          THE COURT:   I'll sustain the objection on the basis

15  of foundation.  I think it's necessary to state who the

16  participants were to this conversation that was overheard by

17  the witness.

18          MR. GUTIERREZ:   Thank you, your Honor.

19          BY MR. GUTIERREZ:   Q.   On June 9, 2008 did the

20  confidential informant have a recorded conversation with

21  Michael Krapchan?

22  A.   Yes.

23  Q.   Was that a conversation about who was going to be coming

24  to Southern District of California?

25  A.   That was one of the things that they talked about, yes.

1   Q.   And did the confidential informant ask questions about

2   who would be accompanying Mr. Krapchan?

3   A.   Yes.

4   Q.   And was he given any instructions about -- from you

5   regarding these other people who were coming with

6   Mr. Krapchan?

7   A.   Yeah, we had specifically instructed the informant to try

8   to find out as much information as he could about these

9   individuals because we didn't know anything about them.

10          MR. GUTIERREZ:   Your Honor, I'd state for the

11   record that are about to play Exhibit 25-A, which is an

12   excerpt we provided to the Court, which is based on an

13   exhibit -- the transcript that's already in -- at least

14   marked for evidence, and it will be Exhibit 25-A, clip 2.

15          MR. DENIS:   Your Honor, I don't think there was any

16   foundation on 25-A.   I know there was a 26-A, but I don't

17   recall any 25-A.

18          MR. GUTIERREZ:   Your Honor, I'd be happy to outline

19   the foundation I did lay.

20          THE COURT:   That's okay.   I thought that there was

21   some agreement on the foundation now for these later clips,

22   sees as how Mr. Denis -- you were agreeing to Mr. Denis

23   showing some transcripts and playing audios, audio clips of

24   conversations.   Am I incorrect then, there's been no

25   agreement --

1           MR. DENIS:  No, your Honor, no agreement.  It's

2    just --

3           THE COURT:  Okay.  That's something that cuts both

4    ways, counsel.  So if you can lay the foundation, you may do

5    so.

6           MR. GUTIERREZ:  Your Honor, if I could, I would

7    state for the Court that --

8           THE COURT:  No, no.  Just go ahead with the

9    foundation, that's fine, whatever foundational evidence you

10   want to elicit.

11          MR. GUTIERREZ:  All right.

12          BY MR. GUTIERREZ:  Q.  I'm placing before you

13   Government's Exhibit 25 and the Government's Exhibit 16.  Do

14   you see those two items?

15   A.  Yes.

16          MR. DENIS:  Your Honor, I haven't seen it.  Show

17   them to counsel.

18          THE COURT:  I'm sure you have seen them, but maybe

19   not with those exhibit tags.  Counsel, if you would show Mr.

20   Denis, please.

21          MR. DENIS:  Still make an objection as to

22   foundation.

23          THE COURT:  Well, he's trying to lay the foundation

24   at this point.  He's just showing you the exhibits, that's

25   all.

1           MR. DENIS:  All right.

2           BY MR. GUTIERREZ:  Q.  With regard to Government's

3    Exhibit 16, do you recognize that CD?

4    A.  Yes.

5    Q.  How is it that you recognize Government's Exhibit 16?

6    A.  I initialed it.

7    Q.  Why did you initial it?

8    A.  Because I reviewed all of the recorded calls on the CD.

9    Q.  And is that the recorded calls that you received from the

10   confidential informant with regard to recordings he made

11   during the course of the investigation?

12   A.  It's a portion of it, yes.

13   Q.  It's a portion of a large volume of calls; is that right?

14   A.  Yes.

15   Q.  And were you asked to review those in preparation for

16   trial?

17   A.  Yes.

18   Q.  And after you did, is that why you put your initials?

19   A.  Yes.

20   Q.  Let me ask you with regard to Government's Exhibit 25, do

21   you see Government's Exhibit 25.

22   A.  Yes.

23   Q.  Were you in the courtroom when Ms. Johnson testified

24   regarding Exhibit 25?

25   A.  Yes.

1  Q.  What is Government's Exhibit 25?

2  A.  It is a transcript of a recorded call that --

3  Q.  That's good enough, sir.

4        MR. DENIS:  Your Honor, I still object as to

5  foundation as to the date of the transcript.

6        THE COURT:  Well, I think that's going to be

7  established at this point, and it hasn't been offered yet.

8        BY MR. GUTIERREZ:  Q.  With regard to the

9  investigation, was there a conversation recorded on June 9,

10  2008?

11  A.  Yes.

12  Q.  Was that conversation included on Government's

13  Exhibit 16?

14  A.  Yes.

15  Q.  Was that the conversation that's documented in

16  Government's Exhibit 25?

17  A.  It's at least one of those recordings from that date,

18  yes.  That was the one that's attached to that transcript.

19        MR. GUTIERREZ:  For the purpose of the record, your

20  Honor, it may be that 16 and 25 aren't in for the limited

21  purpose of making the report complete, but we would for that

22  limited purpose ask that 25 be received.  We do have an audio

23  recording clip which we would like to offer into evidence at

24  this point in time.

25        THE COURT:  This is of the June 8 conversation.

1    And the participants are --

2              MR. GUTIERREZ:  It's a June 9 conversation between

3    the confidential informant and Mr. Krapchan.  I'll have the

4    agent identify the voices once it's played.

5              THE COURT:  All right.

6              MR. DENIS:  I do object.  Basically the statements

7    are being offered against Mr. Wedding.  There's no foundation

8    as to those statements, there hasn't been.  There are certain

9    elements that must be proved first, and those have not been

10   established at this time.

11             THE COURT:  The objections are overruled.  The

12   audio may be played.

13             BY MR. GUTIERREZ:  Q.  Agent, what I'm going to do

14   is play the entire clip, which is about six lines -- it's a

15   clip from a bigger transcript -- and then I'm going to ask

16   questions about it afterwards.  If you could please listen to

17   it all the way through.

18        (The audio recording was played.)

19             BY MR. GUTIERREZ:  Q.  Now, on cross-examination

20   you indicated that they referred to somebody who was coming

21   who was an athlete; do you remember that?

22   A.  Yes.

23   Q.  Was this the call that you were referencing on

24   cross-examination with regard to somebody -- the second

25   person being an athlete?

1  A.  Yeah, I believe there was two times where that was

2  mentioned in recordings.

3  Q.  Now, the first person that spoke on this clip was marked

4  CS when it said Hassan, whatever, only one Hassan, is that

5  the big guy Hassan?  Who was that who said that?

6  A.  I recognize that the informant's voice.

7  Q.  The first person talking?

8  A.  Yes.

9  Q.  And down toward the bottom, the last person to speak says

10 this Canadian, is that what you said, who was that?

11 A.  That's the source.

12 Q.  And other person in this conversation, was there only one

13 other person?

14 A.  Mr. Krapchan?

15 Q.  Was that Mr. Krapchan?

16 A.  Yes.

17 Q.  I'm sorry.  And who said and the one, an athlete, is he

18 Azerbaijani?

19 A.  The source.

20 Q.  And was it Krapchan who said the athlete, Canadian?

21 A.  Yes.

22 Q.  So you knew that there was going to be Hassan Shirani

23 coming; is that fair to say?

24 A.  Yes.

25 Q.  And was Hassan Shirani the one they labeled the athlete?

338

1   A.   No.

2   Q.   That was the other person?

3   A.   Yes.

4   Q.   Are you aware of whether or not Mr. Shirani is an

5   accomplished athlete?

6   A.   Not to my knowledge.

7   Q.   Have you heard that Mr. Wedding is an athlete?

8   A.   I have.

9   Q.   What's the sport that you're aware that he participates

10  in?

11  A.   Snowboarding.

12          MR. GUTIERREZ:   I'd state for the record, 25-A,

13  clip 3, I'd like to play the audio.   It is a conversation

14  purportedly between the confidential source and Mr. Krapchan.

15          BY MR. GUTIERREZ:   Q.   Agent, I'd like you to

16  listen to this call through, and I'll ask you questions

17  specifically about it.

18          MR. DENIS:   Is this June 9?

19          MR. GUTIERREZ:   It's the same exact conversation

20  but just a different clip, your Honor, 6-9.

21          THE COURT:   Clip 3 did you say?

22          MR. GUTIERREZ:   Yes, your Honor.

23      (The audio recording was played.)

24          BY MR. GUTIERREZ:   Q.   Did you hear that

25  conversation?

1   A.   Yes.

2   Q.   Did you recognize the voices?

3   A.   Yes.

4   Q.   Who is speaking?

5   A.   That was Michael Krapchan and the informant.

6   Q.   The first person to speak who starts, Listen, this is --

7   this Hassan, does he shake hands or give you a hug like

8   Iranians, who was talking?

9   A.   That's the informant.

10  Q.   And when somebody says there at 63:15, Krapchan, the

11  second one's Canadian and as Canadian, you know Americans --

12          MR. DENIS:   Objection, your Honor, reading, not

13  been admitted.

14          THE COURT:   It's admitted.   The audio's admitted.

15  I think you were reading from an earlier transcript, counsel.

16          MR. DENIS:   That was admitted, your Honor.

17          THE COURT:   Well, this is admitted.   Go ahead, sir.

18          BY MR. GUTIERREZ:   Q.   He's working guy, he's a

19  reliable working guy whose principles, as that of all of us,

20  as long as it makes money, it means that there's no telltale,

21  who is speaking there?

22  A.   That was Mr. Krapchan.

23  Q.   Was he speaking about Hassan Shirani that you could

24  deduce?

25  A.   No.

1    Q.   So before 6-10 you knew that Mister -- who was coming?

2    A.   Well, Mr. Krapchan was already there.

3    Q.   Okay.

4    A.   And as of the 9th when we instructed the source to try

5    and find out who else was coming, we learned that there was

6    two other individuals, an Iranian and a Canadian who was an

7    athlete.

8    Q.   And then finally from 25 --

9              MR. GUTIERREZ:   Excuse me, your Honor.

10             BY MR. GUTIERREZ:   Q.   Let me switch gears if I

11   could now and draw your attention to the hotel keys that were

12   talked about in cross-examination.   During the aftermath of

13   the arrests that were made, were some search warrants

14   conducted?

15   A.   Yes.

16   Q.   Was a search warrant applied for and received for the

17   Hampton Inn of San Diego room of Mr. Krapchan?

18   A.   Yes.

19   Q.   Was a search warrant applied for and received for the

20   room at the Comfort Inn?

21   A.   Yes.

22   Q.   And were hotel keys for the Comfort Inn seized by the

23   FBI?

24   A.   Yes.

25   Q.   How many?

1  A.   Three of them.

2  Q.   Three of them?  Where were the three keys that were

3  seized for the Comfort Inn room located?

4  A.   There was one on Mr. Wedding when we arrested him, there

5  was one in the Toyota Prius in which they arrived to San

6  Diego in, and then there was one on the floor of the Comfort

7  Inn.

8  Q.   You were asked a question on cross-examination if you

9  were trying to conceal information with regard to you

10 choosing summaries versus draft versus QC translations; do

11 you remember those questions?

12 A.   Yes.

13 Q.   Let me start by asking, have you deliberately or directly

14 tried to conceal anything in this case?

15 A.   No, sir.

16 Q.   Let me ask you, with regard to choosing which calls to

17 summarize, draft, or QC that you testified, why would you

18 have to make that decision?

19 A.   Because there were hundreds of recordings that were done,

20 some were done in English, some were done in Russian, and so

21 some of those we would not request to have transcribed.  Also

22 if there was no call -- if there was no recording that was

23 between a target of the investigation and the informant, we

24 would not have that transcribed as well.  There was volumes

25 and volumes of information, and we just --

342

1   Q.  Well, if you have the option available to get a QC, a

2   quality controlled copy produced of a call and a summary, why

3   would you ever choose a summary over a quality controlled

4   copy?

5   A.  A lot of times that was discussed between myself and a

6   translator; if there was a -- you know, there were times when

7   you actually have meetings, there might be a four- or

8   five-hour recording, and in order to do that in any decent

9   amount of time for us to get that information back, we would

10  ask them maybe if there isn't any information that the

11  subjects are discussing something related to the

12  investigation that we would have them summarize that.  There

13  was times they talked about cars, they talked about their

14  family, they talked about things that were not related to the

15  investigation, so we would sometimes have them summarize that

16  versus do an actual transcript.

17  Q.  Were there sometimes be operational need to have a

18  summary quickly so you can ascertain your next move?

19  A.  Certainly.

20  Q.  And based on your experience in this case, how long does

21  it take to get a Russian translation QC'd if you were to

22  request it approximately?

23  A.  Well, the -- just the process of getting the draft was a

24  lengthy process, and then I have it QC'd, which is similar to

25  what Ms. Johnson did, that's a whole second process of having

1    it reviewed.  And in some instances when we first started

2    doing these and I did the requests, which had to leave our

3    office to get done, as long as six months at times to get

4    them back in the format of a draft.

5    Q.  And that was translation that the FBI -- that's their

6    process in doing it?

7    A.  Correct.

8    Q.  The FBI doesn't deal directly with Ms. Johnson; is that

9    correct.

10   A.  No, not at all.

11   Q.  Did the request from Ms. Johnson come from the FBI or the

12   U.S. Attorney's Office?

13   A.  It did not come from me.

14   Q.  If it did, would you --

15          MR. GUTIERREZ:  I'll withdraw that, your Honor.

16          BY MR. GUTIERREZ:  Q.  Well, even though during the

17   course of the investigation you chose to have certain

18   recordings summarized, draft transcribed, or quality control

19   transcribed, did you ever make any direction to anybody at

20   the FBI or otherwise regarding including the recordings or

21   not putting recordings on the disk?

22   A.  No, every recording is on the disk.

23   Q.  So every audio recording, whether or not you asked to

24   have them transcribed, was memorialized on a CD --

25   A.  That's correct.

1   Q.   -- for anybody, including the defense, to look at; is

2   that correct?

3   A.   That's correct.

4   Q.   And maybe listen to?

5   A.   Yes.

6   Q.   And if they would like, anybody could have made their own

7   transcription from an audio recording that they were

8   provided; is that correct?

9   A.   Yes.

10  Q.   At the Hampton Inn did you locate passports for anybody?

11  A.   Not.

12  Q.   Excuse me.   The Comfort Inn.

13  A.   At the Comfort Inn, yes.

14  Q.   And is that the room rented by Mr. Wedding?

15  A.   Yes.

16          MR. GUTIERREZ:   I'll state for the record I'm

17  showing counsel Government's Exhibit 30 and 31.   I apologize,

18  your Honor, Government's 31 and 32.

19          BY MR. GUTIERREZ:   Q.   I'm placing before you first

20  Government's Exhibit 31 and Government's Exhibit 32.   Do you

21  recognize Government's Exhibit 31?

22  A.   Yes.

23  Q.   What is Government's Exhibit 31?

24  A.   It's Hassan Shirani's passport.

25          (Exhibit No. 31 identified.)

1    Q.   Is that a passport that you found at the Comfort Inn?

2    A.   Yes.

3    Q.   Would you please open up the package and look through it.

4    I don't recall the defense exhibit because I don't see it on

5    the table, but -- Defense Exhibit X, do you remember talking

6    about that on cross-examination?

7    A.   Yes, sir.

8    Q.   Defense Exhibit X was a photocopy of a passport; is that

9    correct?

10   A.   Correct.

11   Q.   And that is the original?

12   A.   This is the original.

13   Q.   And there are stampings for Dubai; is that correct?

14   A.   Multiple.

15   Q.   And what does that stamping indicate?  Are you familiar

16   with that at all?

17   A.   Well --

18   Q.   When you testified on cross-examination, you said that

19   there were stampings; what did you mean by that?

20   A.   When you enter a country, that country can, when you go

21   through customs, can stamp your passport.

22   Q.   Does somebody always get a -- excuse me.  I'll withdraw

23   that.  Could you please look at Government's Exhibit 32 now.

24   A.   Yes.

25   Q.   Could you please open the packet.  What is Government's

1    Exhibit 32?

2    A.   This is Mr. Wedding's passport.

3         (Exhibit No. 32 identified.)

4    Q.   Where was that located?

5    A.   The same, in the Comfort Inn, same place as Mr. Shirani's

6    passport.

7    Q.   Now, is there anything facially wrong or suspicious or

8    something unusual about Mr. Shirani having Dubai stampings,

9    anything facially that you're aware of?

10        MR. DENIS:   Objection, your Honor; calls for

11   speculation.

12        THE COURT:   The objection is overruled.   You may

13   answer that.

14        THE WITNESS:   No.   There's stampings as well for

15   United Arab Emirates.

16        BY MR. GUTIERREZ:   Q.   And Mr. Wedding has also

17   stampings for UAE?

18   A.   Yes.

19   Q.   Is that where Dubai is?

20   A.   Yes.

21   Q.   So both Mr. Wedding and Mr. Shirani have UAE stampings?

22   A.   Yes.

23   Q.   Now, is there a stamping for the entry into the United

24   States on June 10, 2008 for both of the individuals?

25   A.   In my view, there's a stamp for Mr. Shirani on June 10 of

1   2008, but there is not a stamp for Mr. Wedding on June 10,

2   2008 that I see in his passport.

3   Q.  But during the course of surveillance, you personally saw

4   them, Mr. Wedding and Mr. Shirani, leave the Customs area; is

5   that correct?

6   A.  Yes.  They exited out the Customs gate, yes.

7   Q.  And is that a gate where people from the airport can

8   freely pass into Customs going the reverse way?

9   A.  No.  It's just like all airport security buildings, you

10  can't go in there.

11          MR. GUTIERREZ:  Your Honor, may I please have 31

12  and 32 received into evidence?

13          THE COURT:  Exhibits 31 and 32 are admitted.

14      (Exhibit Nos. 31, 32 admitted.)

15          BY MR. GUTIERREZ:  Q.  By the way, what's the

16  birthday listed for Mr. Shirani on 31?

17  A.  February 2, 1978.

18  Q.  '78.  What's the birthday for Mr. Wedding?

19  A.  September 14, 1981.

20  Q.  Wait a minute.  I thought there was big age difference

21  between the two.  How much of an age difference is there

22  between two individuals?

23  A.  A little over three years.

24  Q.  If I may have a brief moment.  You were shown some

25  documents -- excuse me.  You seized a lot of physical

1   evidence at the Comfort Inn; is that correct?

2   A.   We seized evidence, yes.

3   Q.   Some of it you were shown copies of?

4   A.   Yes.

5   Q.   And some of it was the passports that you have right now?

6   A.   Yes.

7   Q.   Now, did you also find flight itineraries?

8   A.   Yes.

9   Q.   What's a flight itinerary in the term the way you're

10   using it that say that you found it?

11   A.   It was a printout of the flight itinerary for Mr. Wedding

12   and Mr. Shirani.

13   Q.   In the name of Mr. Wedding and Mr. Shirani?

14   A.   Yes.

15   Q.   Did it indicate their arrival date?

16   A.   Yes.

17   Q.   And when was it according to the itinerary that they were

18   arriving in Los Angeles?

19   A.   June 10, 2008.

20   Q.   And did it also indicate when it was that they would be

21   leaving the Southern District of California or Southern

22   California area?

23   A.   June 14, 2008.

24   Q.   They would be leaving June 14 --

25   A.   Yes.

349

1  Q.  -- 2008?  And where was their flight originating from on

2  June 14, 2008 according to the itinerary?

3  A.  I'd have to look at the exact return, but I believe it

4  was Los Angeles coming in from --

5  Q.  Do you have a recollection as to where they were going to

6  flying to according to the itinerary?

7  A.  Vancouver.

8  Q.  Vancouver, Canada?

9  A.  Correct.

10 Q.  And was there a flight itinerary indicating a flight to

11 Vancouver, Canada, for both Mr. Shirani and Mr. Wedding?

12 A.  Yes.

13       MR. DENIS:  Your Honor, I'd make a late objection

14 for hearsay; no document introduced.

15       THE COURT:  Well, the objection does come late, as

16 you noted.

17       MR. GUTIERREZ:  Your Honor, I would like to play

18 for the jury the audio portion of what has come in during the

19 defense case where they just played audio and no

20 transcription.  I have a transcription of that exact same

21 call, and I would like to play that for the jury.

22       THE COURT:  All right.  Tell you what.  We'll take

23 our midafternoon recess.  You can get that all cued up if

24 you'd like, and we'll resume with that in 15 minutes.

25 Remember the admonition, ladies and gentlemen.  Thank you.

1       (There was a break in the proceedings.)

2              THE COURT:  Okay.  We have everyone present.  Mr.

3   Gutierrez?

4              MR. GUTIERREZ:  Your Honor, at this time we would

5   play -- if I could start off, your Honor, with having marked

6   Government's 33 and 34, which are two envelopes containing

7   documents.  If I may approach.

8              THE COURT:  Certainly.

9              BY MR. GUTIERREZ:  Q.  Agent Kalina, I'm putting

10  before you an envelope marked Government's 33 and an envelope

11  marked 34; do you see those envelopes?

12  A.  Yes.

13  Q.  Do those envelopes contain documents?

14  A.  Yes.

15  Q.  Starting with Government's 33, what is contained in

16  Government's 33?

17  A.  Government's 33 is a E-ticket receipt for Ryan James

18  Wedding.

19      (Exhibit No. 33 identified.)

20  Q.  Was that found in the Comfort Inn hotel room in Los

21  Angeles?

22  A.  Yes.

23  Q.  And when was the departure date?

24  A.  June 10, 2008.

25  Q.  I'm sorry.  Departure back to Vancouver.

1   A.  Oh, I'm sorry.  June 14, 2008.

2   Q.  And what's the airport of origination?

3   A.  Vancouver, British Columbia, Canada.

4   Q.  I'm sorry.  Maybe I'm using terminology.  That itinerary

5   shows how they arrived in Los Angeles and how they intended

6   to leave Los Angeles; is that right?

7           MR. DENIS:  Objection, leading.

8           THE COURT:  The objection sustained.

9           BY MR. GUTIERREZ:  Q.  Okay.  This itinerary, does

10  it show at all how they arrived in Los Angeles?

11  A.  It has the confirmation of the departure and the arrival

12  time for that flight, yes.

13  Q.  And does it also have any indication of how they intended

14  to leave Los Angeles?

15  A.  Yes, it's got a departure from Los Angeles to Vancouver.

16  Q.  And that flight from Los Angeles to Vancouver, according

17  to that itinerary in the name of Ryan Wedding, when was that

18  flight supposed to occur?

19  A.  June 14, 2008.

20  Q.  Now, the government's next exhibit, I believe it's 34,

21  what's contained in that envelope?

22  A.  It is the -- basically a similar E-ticket receipt in the

23  name of Hassan Shirani.

24      (Exhibit No. 34 identified.)

25  Q.  And does that document any particular flight?

1    A.  The exact same flights that Mr. Wedding were on, the June

2    10, 2008 arriving to Los Angeles from Vancouver and departing

3    from Los Angeles to Vancouver on June 14, 2008.

4    Q.  Is it fair to say that when you get a ticket or you check

5    in, they give you a little envelope?

6    A.  Yes.

7    Q.  And there's a baggage claim may be attached to that?

8    A.  Yes.

9    Q.  And was there one also in Government's Exhibit 33?

10   A.  Yes.

11   Q.  And was that found in the hotel room?

12   A.  Yes.

13   Q.  And in that little envelope, is there any kind of other

14   little coupon or piece of a coupon?

15   A.  There's the -- there's two things; there's the jacket

16   that you would get from the airline, which is -- looks like

17   a --

18           MR. DENIS:  I would object as to foundation.

19           THE COURT:  The objection is sustained as to the

20   additional pieces of paper.

21           BY MR. GUTIERREZ:  Q.  Well, those pieces of paper

22   were found in the hotel whom; is that right?

23   A.  Yes.

24           MR. GUTIERREZ:  Your Honor, we'd ask to have these

25   two exhibits received into evidence.

1          THE COURT:  Exhibits 33 and 34 are admitted.

2       (Exhibit Nos. 33, 34 admitted.)

3          MR. DENIS:  Your Honor, just for clarification,

4   including the pieces of paper that Mr. Kalina was talking

5   about?

6          THE COURT:  No, 33 and 34, the documents were

7   identified as E-tickets, E-ticket receipts.

8          BY MR. GUTIERREZ:  Q.  Do you recall on

9   cross-examination that you were asked to listen to something

10   on the Sanctions program.

11   A.  Yes.

12   Q.  Previously when the government on direct examination

13   showed you Sanctions, there was a transcript scrolling with

14   audio; is that correct?

15   A.  Yes.

16   Q.  I'd like to draw your attention to the audio played by

17   the defense without a transcript; do you remember that

18   occasion?

19   A.  Yes.

20   Q.  And do you remember that call?

21   A.  Yes.

22   Q.  Okay.  I'd like to play for you what was marked as

23   Defense Exhibit FF, but we would like to have, if necessary,

24   the recording marked as Government's 36-A, which we'll

25   provide a transcript of for the Court.  But here is the audio

354

1  portion of that call that you heard during cross-examination.

2  I'll play it in its entirety and then ask you questions about

3  it.  This is an excerpt.

4          (Court's Exhibit No. 36-A identified.)

5          (The audio recording was played.)

6          BY MR. GUTIERREZ:  Q.  Do you see where it says "in

7  the background"?

8  A.  Yes.

9  Q.  Were you able to discern any words in the background?

10 A.  Yes.

11 Q.  Would you like to hear it again or were you able to --

12 A.  I was able to hear that, yes.

13         MR. DENIS:  Your Honor, I'm going to -- I'm going

14 to object as to -- well, I'll wait.

15         THE COURT:  All right.  The objection is withdrawn?

16 If you want to -- are you playing that again; is that what

17 you'd --

18         MR. GUTIERREZ:  We would ask to play it again.

19       (The audio recording was played.)

20         BY MR. GUTIERREZ:  Q.  Were you able to make out

21 some of the words?

22 A.  Yes.

23 Q.  Do you feel that you heard enough of the words to

24 identify who was speaking?

25 A.  Yes.

1   Q.  Based on you having been familiar with the voices in the

2   investigation, who was speaking?

3               MR. DENIS:  Your Honor, I'm going to object; it's

4   hearsay, calls for I would assume speculation.  Everybody

5   else heard it --

6               THE COURT:  The objection is overruled.  And if you

7   wish to cross-examine at a later time, you may do so.

8               BY MR. GUTIERREZ:  Q.  Could you tell what the

9   first few words were of that -- where it says -- I forget how

10  it was termed.  If we could just start it and stop it.

11              THE COURT:  Well, wait a minute.  If you just

12  scroll up without playing the audio or is it all integrated?

13              MR. GUTIERREZ:  It won't let us just scroll up.

14              THE COURT:  Okay.

15              MR. GUTIERREZ:  So if you could just scroll up --

16  and if we could mute the sound so it doesn't emphasize that

17  first portion.

18         (The audio recording was played.)

19              BY MR. GUTIERREZ:  Q.  Based on what you heard,

20  were you able to tell what language was being spoken --

21  A.  Yes.

22  Q.  -- by the person who was in the background?

23  A.  Yes.

24  Q.  And what language is that?

25  A.  English.

1    Q.   Now, that voice that you heard, that was somebody in the

2    background either on the CS's side or Mr. Shirani's side of

3    the call; is that fair to say?

4    A.   Well, I was present when that call was made, so --

5    Q.   I'm asking, it's either those two options; is that fair

6    to say?

7    A.   Yes.

8    Q.   Were you present when this CS was speaking to Mr. Shirani

9    during this call?

10   A.   Yes, I was.

11   Q.   Did you or anybody on your side of the conversation say

12   anything in the background like that?

13   A.   No.

14   Q.   Did that sound like Mr. Krapchan's voice to you?

15   A.   No, sir.

16   Q.   But that was during a time when they, all three of them,

17   were in Los Angeles?

18   A.   At that time I do not believe that Mr. Krapchan was in

19   Los Angeles.

20   Q.   Okay.

21            MR. GUTIERREZ:  At this time, your Honor, we're

22   going to play clip 25 -- excuse me -- 25-A, clip 1.

23        (The audio recording was played.)

24            THE COURT:  Before you play this --

25            MR. DENIS:  Objection, foundation.

1          THE COURT:  -- would you please just for the

2    benefit of the jury and everyone else indicate what the date

3    that that --

4          MR. GUTIERREZ:  I apologize, your Honor.

5          THE COURT:  -- conversation purportedly took place

6    and who the participants are.

7          BY MR. GUTIERREZ:  Q.  Agent Kalina, I'm going to

8    play for you clip 25-A -- excuse me -- Exhibit 25-A, clip 1.

9    It's a conversation that occurred on 6-9 purportedly between

10   CS-1 and Krapchan.  It is approximately 12 to 15 lines.  I'd

11   ask you to listen through it all the way, and I'll ask you

12   questions about this particular call.  25-A, clip 1.

13      (The audio recording was played.)

14         BY MR. GUTIERREZ:  Q.  Do you see that

15   conversation?  Can you start from the beginning?

16   A.  Yes.

17   Q.  Did you recognize the voices of who was speaking?

18   A.  Yes, I did.

19   Q.  And who was speaking in this conversation?

20   A.  Mr. Krapchan and the informant.

21   Q.  And the first line at 20:14 where it's indicated

22   Krapchan, do you know spoke that line?

23         MR. DENIS:  Your Honor, I'd make the same

24   objection.  It's a translation.  It's being offered.

25         THE COURT:  The objection is overruled.  The

 1   foundation has been established.

 2            BY MR. GUTIERREZ:   Q.   Do you see where Mr.

 3   Krapchan is saying one is a big guy like you, a guy two

 4   meters tall, period, one is Iranian.   Do you see that?

 5   A.   Yes.

 6   Q.   Was this call made in reference to who would be coming to

 7   Los Angeles?

 8   A.   Yes.

 9   Q.   One of the two people, who was either the Iranian or a

10   Canadian athlete?

11   A.   Yes.

12   Q.   And as far as size, is there a big size difference

13   between Mr. Shirani and Mr. Wedding?

14   A.   A few; there's I would say three, four inches'

15   difference.

16   Q.   Who would be the bigger and who would be the smaller?

17   A.   Mr. Wedding.

18   Q.   Would be the bigger?

19   A.   Yes.

20   Q.   Okay.   Agent, from this same recording, 25-A, on 6-9, I'd

21   like to play 25-A, what we will mark as clip No. 2.   Could

22   you please listen to this entire conversation in its entirety

23   then we will ask you questions about it after that.

24            MR. GUTIERREZ:   I apologize, your Honor.   Call

25   occurring on 6-9, 25-A, the same recording but clip 4, clip

1   4.

2         (The audio recording was played.)

3             BY MR. GUTIERREZ:   Q.   Do you recognize the people

4   speaking in this conversation?

5   A.   Yes.

6   Q.   Was that -- who were they?

7   A.   Michael Krapchan.

8   Q.   And who else?

9   A.   And the source, the informant.   I apologize.

10            MR. GUTIERREZ:   At this time, your Honor, the

11  government has no further questions?

12            THE COURT:   Okay.   Cross-examination?   Any further

13  cross-examination on the limited areas that counsel delved

14  into on redirect, Mr. Denis?

15            MR. DENIS:   Yes, your Honor.

16            THE COURT:   Okay.

17                    Recross-Examination

18            BY MR. DENIS:   Q.   Agent Kalina, you've

19  indicated -- you were played a number of clips just recently

20  here on June 9, 2008, correct?

21  A.   Yes.

22  Q.   And this was when Michael Krapchan had arrived from

23  Canada to Los Angeles -- to San Diego, correct?

24  A.   Yes, he flew into San Diego.

25  Q.   And after he arrived -- arrove (sic) from San Diego, he

1    met up with the confidential source, correct --

2    A.   Yes.

3    Q.   -- on the 9th?

4    A.   The informant picked him up at the airport.

5    Q.   And at that time did Michael Krapchan indicate to the

6    confidential source in a recorded conversation on the 9th

7    that Michael Krapchan got drunk in the plane?

8    A.   I remember him discussing that he had drinks on the

9    plane.

10   Q.   And he was sweating; is that correct?

11   A.   Yeah.

12   Q.   And there was arrangements to go have dinner after

13   Mr. Krapchan arrived from Canada to San Diego -- to San

14   Diego, correct?

15   A.   That's correct.

16   Q.   And they meet immediately went to dinner shortly

17   thereafter?

18   A.   Shortly after arriving in San Diego?

19   Q.   Yes.

20   A.   It wasn't shortly after they arrived.  There was some

21   time in between when he was picked up at the airport and when

22   they actually went out to dinner.

23   Q.   So shortly -- at some time -- do you recall approximately

24   how much time had elapsed?

25   A.   It was approximately three plus hours from the time he

1  was picked up maybe and that they actually went to dinner.

2  Q.  Okay.  So when Michael Krapchan came off the plane, he

3  indicated to the confidential source that he got drunk on the

4  plane?

5  A.  There was a discussion about that, that's right.

6  Q.  There was or was not?

7  A.  There was a discussion about that.

8  Q.  Okay.  And you indicated three hours later the

9  confidential source and Michael Krapchan went to diner,

10  correct?

11  A.  Yeah.  The exact time of when they did -- because they

12  drove around for a while, then he asked to be dropped off at

13  his hotel, where he spent some time, and then I met with the

14  source, and then he went and picked him up.  So I'd have to

15  look at the reports to see the exact time of all those

16  occurrences.

17  Q.  Okay.  But you estimate approximately two to three hours

18  would be accurate?

19  A.  Three plus hours.

20  Q.  Three plus, okay.  And you need to look at your report to

21  be sure how much time had elapsed, correct?

22  A.  From the time he picked him up at the airport until they

23  went out to dinner, yes, it would be in the reports, that's

24  correct.

25  Q.  So you wrote a 302 report, correct?

1  A.  Well, I wouldn't have done all the 302 reports because we

2  had different surveillance groups on them at that time, so --

3  it wasn't me doing the surveillance all the time that day, so

4  there were other reports, but I believe these have been

5  provided to you.

6  Q.  Okay.  And three hours later they went to an Italian

7  restaurant in San Diego, correct?

8  A.  That is correct.

9  Q.  And that conversation was recorded, correct?

10  A.  That is correct.

11  Q.  And how long was that dinner, do you recall, the

12  recording?

13  A.  You know, without looking -- I wasn't conducting the

14  surveillance at that time, so I don't know how long it was.

15  More than, you know, 30 minutes, but if it was an hour, hour

16  and a half, I'm just not sure.

17  Q.  Okay.  And during that dinner the confidential source

18  was -- did you listen to the recording and read the

19  transcripts?

20  A.  I listened to the recording and then eventually read the

21  transcripts, yes.

22  Q.  And that would be the entire recording and transcripts of

23  the dinner, correct?

24  A.  Yes.

25  Q.  And during that time -- do you recall how many drinks the

1   confidential source was pouring for Michael Krapchan?

2   A.   I was not there.

3   Q.   Okay.  Could you decipher that from listening to the

4   recordings?

5   A.   Could I decipher?

6   Q.   Well, let me ask you this.  Did they finish a bottle of

7   wine between them during that dinner?

8   A.   I don't know if they finished it.  I know they ordered

9   one.

10  Q.   And did they order a second one?  Do you recall that?

11  A.   You know, offhand I don't remember if it was whole

12  'nother bottle or if they ordered another glass, I do not

13  know, but I know that there was -- well, that was part of it.

14  I'd just have to review that.

15  Q.   There was a -- but you do recall there were a number of

16  drinks being drank (sic)?

17  A.   Certainly.

18  Q.   Two Russian guys got together and were drinking, correct?

19  A.   I know based upon what I heard from the source about what

20  he drank, so -- I don't know -- I can't say about the

21  source -- I mean about Mr. Krapchan.

22  Q.   I'm -- okay.  Maybe I missed what you said.  You don't

23  what?

24  A.   I obviously instructed the source when he was dealing

25  with them that he was not to have too much; he, Krapchan,

1    could have as much as he wanted, but the source was

2    instructed not to drink too much.

3    Q.  So the source didn't drink too much, but he was pouring a

4    lot of drinks for Michael Krapchan?

5    A.  He may have been, yes.

6    Q.  And that -- I'm talking about based on you recall in the

7    record; that's what I'm talking about.

8    A.  I understand, but if you're asking me if I could deduce

9    that the source was pouring wine in his glass, I can't say

10   that.  I'm sure he drank, but I wasn't there to observe how

11   much either of them drank.

12   Q.  And do you recall they finished one bottle and ordered a

13   second?

14          MR. GUTIERREZ:  That's been asked and answered,

15   compound.

16          THE COURT:  Sustained.

17          BY MR. DENIS:  Q.  And when Michael Krapchan was --

18   made these statements, this was after they had practically

19   finished the entire bottle, correct?

20          MR. GUTIERREZ:  Vague as to what these statements

21   refer to, your Honor.

22          MR. DENIS:  And I'm referring to the clips that

23   were played for you, Mr. Kalina.

24          THE WITNESS:  I don't see the time frame from when

25   they started until the end, so if you could show me where

1    that started and where those clips were at the end -- I

2    couldn't tell you how much they had had in that time frame.

3    Q.  So these clip are just kind of taken out of context and

4    just thrown on the screen, correct?

5                MR. GUTIERREZ:  Compound as phrased, your Honor.

6                THE COURT:  The objection is overruled on that

7    ground.  You can answer, sir.

8                THE WITNESS:  Those are portions of the entire

9    recorded conversation, yes.

10               BY MR. DENIS:  Q.  And do you -- could you decipher

11   from listening to the transcript if Michael Krapchan was

12   drunk when he was talking, when he made those statements?

13   A.  I could not, no.

14   Q.  But you indicate -- but you indicated that three hours or

15   so prior, Michael Krapchan was already drunk off the plane?

16   A.  No, I did not say that.  I did not say he was drunk;

17   you --

18   Q.  You did not but Michael Krapchan told the confidential

19   source he was drunk from coming off the plane, correct?

20   A.  There was a conversation about that.  As to what his

21   exact words, again, I'd have to rely on the transcript.  I

22   can't sit here and say that I heard those exact words on the

23   recording.

24   Q.  Okay.  Then three hours later Michael Krapchan made

25   additional statements after he was drinking, correct?  These

1    were statements he made after he was drinking with Yuri

2    Trofimov, correct?

3              MR. GUTIERREZ:  Objection; asked and answered, your

4    Honor.

5              THE COURT:  Sustained.

6              BY MR. DENIS:  Q.  Okay.  Agent Kalina, you

7    indicated that you did a database search regarding the

8    informant, Yuri Trofimov, correct?

9    A.   Yes.

10   Q.   And you indicated that you found that there were, quote,

11   unquote, a want for him, correct?

12   A.   That there was a document provided by Interpol.

13   Q.   Going to show you what's been previously marked -- I

14   believe we're at GG.  Do you recognize this document, sir?

15   A.   I do.

16   Q.   What is that document?

17   A.   This is the report that I got back.

18   Q.   From Interpol, correct?

19   A.   Interpol, yes.

20        (Exhibit No. GG identified.)

21   Q.   And you personally got that document back from Interpol,

22   correct?  You requested it and they --

23   A.   I didn't -- again, I didn't do a general or a specific

24   request to Interpol.  It would be within a wide range of

25   databases, and then this was returned to me, so --

1   Q.   This is the document that you got back, correct?

2   A.   Yes.

3             MR. DENIS:  Your Honor, I'd like to move Defense

4   Exhibit GG into evidence.

5             MR. GUTIERREZ:  We'd object as to hearsay, your

6   Honor.

7             THE COURT:  Sir, is this the report that you

8   reviewed that you mentioned previously in determining that

9   there was no difficulty retaining the confidential source?

10            THE WITNESS:  Yes.

11            THE COURT:  The objection is overruled.  GG is

12  admitted.

13      (Exhibit No. GG admitted.)

14            MR. DENIS:  Thank you, your Honor.

15            THE WITNESS:  Your Honor, I have a request based

16  upon that document taking a look at that document.

17            THE COURT:  Well --

18            THE WITNESS:  There's information on that

19  document --

20            THE COURT:  It hasn't been redacted?

21            THE WITNESS:  Yes.

22            THE COURT:  Counsel, if you need a minute to confer

23  with Mr. Gutierrez, why don't you do that.  Mr. Gutierrez,

24  why don't you come up here and confer with your client, your

25  agent, on this.  Just move that microphone a little bit.  I

1   don't know what the concern is here.

2           BY MR. DENIS:  Q.  Agent Kalina, this you indicated

3   was the printout that you received from Interpol, correct?

4   And it was dated -- can you tell us what the date of that

5   document is.

6   A.  February 27, 2006.

7   Q.  And at that time you received information that the

8   subject -- and the subject in this case was Mr. Trofimov,

9   correct?

10  A.  Yes.

11  Q.  And it indicates subject wanted, Kazakh national,

12  Trofimov, F.N. -- is that full name -- or first name,

13  correct?  As far as you're aware, is that first name?

14  A.  That's my understanding.

15  Q.  And S.O., is that the surname?

16  A.  I do not know.

17  Q.  Okay.  But there's Yuri Trofimov, correct, and it has

18  some identifying information like his date of birth?

19  A.  Yes.

20  Q.  And it gives his region, Russia, passport number, and

21  there are I guess some -- a date.  Is that the issuance of

22  his passport?

23  A.  Do not know.  I did not see that.

24  Q.  And there's a second paragraph here on the Interpol; it

25  says please be informed that the person, the subject, is

1    wanted for aggravated fraud, correct?

2    A.   That's what it says.

3    Q.   Search case, and there is a case number, 765; there's a

4    date, January, or could be October, of 2005, criminal case

5    No. 047573020017, I believe September 25 of 2004, correct?

6    A.   That's what it says.

7    Q.   And there's a third paragraph:   On January 9, 2004

8    Trofimov got 300,000 US dollars from an Indian national.   And

9    there's a name there, S. Chokhani, as a loan and failed to

10   return the money.   After commitment of the crime, he escaped.

11   According to the police, information subject -- according to

12   the police information, subject together with members with

13   his family, left USA, correct?

14   A.   Left to USA.

15   Q.   And there is wife information, her date of birth; there's

16   a son's information, which indicates that he was studying at

17   Santa Monica College, Los Angeles, correct?

18   A.   Yes.

19   Q.   You are requested to take all necessary measures in order

20   to establish subject's whereabouts, correct?

21   A.   That's what it says.

22   Q.   Photo of this subject is attached.   Thank you for your

23   cooperation.   Best regards.   Correct?

24   A.   That's what it says, yes.

25   Q.   And this was the document that you obtained regarding

1    Yuri Trofimov in February 27, 2006, correct?

2    A.   No.

3    Q.   Okay.  You got it in 2007?

4    A.   Yes.

5    Q.   Okay.  And it indicated on this report that Mr. Trofimov

6    fled in January 9?

7            THE COURT:  Counsel, the report speaks for itself,

8    and you've read it.  In the interest of moving on --

9            MR. DENIS:  Okay.

10            THE COURT:  -- if you have a further question --

11            MR. DENIS:  Okay.

12            THE COURT:  -- please pursue that.

13            BY MR. DENIS:  Q.  Mr. Trofimov filed for asylum in

14    approximately 2004; isn't that true?

15    A.   I don't know the exact date when he filed for asylum.

16    Q.   When you interviewed him, did you request that

17    information?

18    A.   It was probably discussed with him, yes.

19    Q.   Did you inquire or did you tell headquarters of the FBI

20    that a individual that came to want to work for you was

21    wanted by international police for aggravated fraud?  Did you

22    tell headquarters that?

23    A.   No.

24    Q.   Were you supposed to tell headquarters that?

25    A.   No.

1   Q.  So you made an executive decision back in 2007 to have

2   this individual work as a confidential source for you?

3               MR. GUTIERREZ:  Objection; argumentative as

4   phrased.

5               THE COURT:  The objection is overruled.  You may

6   answer that if you're able to, sir.

7               THE WITNESS:  I did not make an executive decision

8   to do anything with him.  Everything was run through the

9   proper channels.

10              BY MR. DENIS:  Q.  Did you -- when you went through

11  the proper channels, did you disclose through the proper

12  channels that Mr. Trofimov was an international fugitive?

13              MR. GUTIERREZ:  Objection, argumentative.

14              THE COURT:  Sustained.

15              BY MR. DENIS:  Q.  Did you -- did you indicate to

16  the channels that you had to go to that Mr. Trofimov was

17  wanted by the Interpol, the international police?

18  A.  Again, this was a want for whereabouts; it's not a

19  warrant for him.

20  Q.  It indicated he's wanted, correct?

21  A.  That's what that says, yes.

22  Q.  And there's a criminal case pending; they gave a criminal

23  case number and a date of when it was filed.  Isn't it that

24  true?

25  A.  They put dates on there and a criminal case, yes.

1    Q.  And it indicated on your Interpol that he fled with his

2    family to the United States, correct?

3                MR. GUTIERREZ:  Objection; asked and answered.

4                THE COURT:  Well, it's true it's asked and

5    answered, but the question that wasn't answered that was

6    asked was whether or not this witness communicated to other

7    people within the agency the content of this report, all

8    right, so that is the pending question before counsel got

9    sidetracked on --

10               MR. DENIS:  Thank you, your Honor.

11               THE COURT:  -- what the content of the report is.

12               THE WITNESS:  Yes, I did review that.

13               THE COURT:  Okay.  Very good.  Let's ask the next

14   question.

15               BY MR. DENIS:  Q.  Okay.  You did inform that to

16   your supervisors?

17   A.  Yes.

18   Q.  And they okayed the use of the confidential source?

19   A.  Yes.

20   Q.  Would that be contained in Mr. Trofimov's file?

21   A.  What would?

22   Q.  The approval process of Mr. Trofimov.

23   A.  No, it would not be in his file.

24   Q.  Where would that be contained?  Is that in a 302?

25   A.  No.

1    Q.  Would that be documented anywhere?

2    A.  You mean document an opening communication regarding that

3    informant?

4    Q.  Yes.

5    A.  We do that, yes.

6    Q.  And would there be information regarding this warrant for

7    his -- for this want of this individual for a criminal case?

8    Would that be in Mr. Trofimov's file?

9    A.  It would.

10   Q.  Was this document there?

11   A.  Yes.

12   Q.  So you were aware of this when you were using him as a

13   confidential source, correct?

14   A.  Well-aware, yes.

15   Q.  And when you questioned him, he just simply denied it,

16   correct?

17   A.  He didn't just simply deny it.  We discussed this, we

18   went over it with him, and he explained what might have been

19   the reason for it.

20   Q.  Now, you indicated -- but you don't recall when he filed

21   for asylum; is that your understanding?

22           MR. GUTIERREZ:  Asked and answered, your Honor.

23           THE COURT:  Sustained.

24           BY MR. DENIS:  Q.  Are you familiar with an I-589?

25   A.  No, sir.

1    Q.   Sorry?

2    A.   No, sir.

3    Q.   In the course of your investigation, there was a request

4    for Mr. Trofimov's immigration file, correct?

5            MR. GUTIERREZ:  Objection; relevance, 403.

6            THE COURT:  The objection is sustained on both

7    grounds.

8            BY MR. DENIS:  Q.  Would you be surprised that Mr.

9    Trofimov filed or do you know that -- actually let me --

10           THE COURT:  Counsel, the form of the question is

11   objectionable.  And the immigration status is, based on prior

12   rulings of the Court, not germane.  Under 403 I would sustain

13   the objection.  Move on to another area of examination if you

14   would, please.

15           MR. DENIS:  Your Honor, I just want to establish

16   the date between when he fled and there was a criminal case

17   and when he filed for asylum; that's all I' trying to

18   establish.

19           THE COURT:  Well, you're not going to get it

20   through this witness because he doesn't know the date of the

21   application.

22           MR. DENIS:  I have the application.

23           THE COURT:  Well, counsel, move on.

24           MR. DENIS:  Okay.

25           BY MR. DENIS:  Q.  Agent Kalina, I have a document

1    which is the asylum application -- well, first of all, are

2    you familiar with the confidential source's signature?

3                MR. GUTIERREZ:  Relevance, 403, your Honor.

4                THE COURT:  Sustained.

5                MR. DENIS:  I have the asylum --

6                MR. GUTIERREZ:  Relevance, 403, your Honor --

7                THE COURT:  Sustained.  We'll take up --

8                MR. DENIS:  -- application, your Honor.  I think --

9                THE COURT:  -- this matter at another time.

10               MR. DENIS:  All right, your Honor.

11               BY MR. DENIS:  Q.  Now, Mister, you indicated that

12   Mr. Trofimov, he came to the FBI to assist the FBI because he

13   was concerned about drugs for his family, correct?

14   A.  That was one of his concerns, yes.

15   Q.  So this investigation was, according to what Mr.

16   Trofimov, he wanted nothing really in return, he was just

17   doing this out of the goodness of his heart, correct?

18   A.  He never asked for anything.

19   Q.  Okay.  So he was just doing this from the goodness of his

20   heart, not asking anything, correct?

21               MR. GUTIERREZ:  It's been asked and answered, your

22   Honor.

23               THE COURT:  Sustained.

24               BY MR. DENIS:  Q.  And do you know approximately

25   how many hours he spent in this investigation over that year

1    and a half?

2    A.  It would be hundreds of hours.

3    Q.  Would it be several hundreds of hours?

4    A.  Yes.

5    Q.  Okay.  And was Mr. Trofimov working during this time,

6    making income aside from his undercover capacity?

7    A.  He was not in undercover.

8    Q.  I'm sorry.  When he was a confidential source.

9    A.  Yes.

10   Q.  Was this a regular 9:00-to-5:00 job?

11   A.  It was a regular job for him, yes.

12   Q.  So he was a -- was he a regular working guy?

13            MR. GUTIERREZ:  Relevance, vague as to what working

14   guy refers to, your Honor.

15            THE COURT:  Sustained.  Well, it's ambiguous.  It

16   may not be irrelevant, but it's ambiguous.  You want to

17   define it, counsel?

18            MR. DENIS:  I'm sorry.  Work?

19            THE COURT:  What you mean by regular working guy.

20            MR. DENIS:  Okay.

21            BY MR. DENIS:  Q.  He had a -- he worked, correct?

22   A.  Yes, he did.

23   Q.  Do you know, was it a 9:00-to-5:00 job?

24   A.  Well, he didn't clock in if that's what you're asking.

25   Q.  Okay.  But he'd be considered a regular working guy?

1    A.  He worked, yes.

2    Q.  And in the clips that were indicated -- that were played

3    for the jury, it indicated that Mr. Wedding was a regular

4    working guy, didn't it?  Didn't it?

5    A.  I don't know, again, if that's the exact words that were

6    used.

7    Q.  It indicated he's a working guy, that he was there to

8    work.

9    A.  That's different than him being a working guy.

10   Q.  Okay.  But you're a special agent, correct, for the FBI?

11   A.  That's my title, yes.

12   Q.  Okay.  During the recorded conversations, you -- there

13   was -- there was discussion that Mr. Wedding had just come

14   from Las Vegas, isn't that true, on June 10, 2008?

15   A.  There were some discussions about him traveling to Vegas,

16   yes.

17   Q.  That he had just came back from Vegas, correct?

18   A.  Again, you're asking me to quote exactly, and without

19   looking at the exact quotes, there was discussions about

20   that, yes.

21   Q.  About him coming from a stag party or a bachelor party,

22   correct?

23   A.  Again, there was conversations about that.

24   Q.  Okay.  Now, you have an agent that works with you, and

25   he's -- Scott Peterson; he speaks Russian, correct?

378

1    A.   Yes.

2    Q.   And he listened to the recordings?

3    A.   He has, yes.

4    Q.   And he tells you what's on the recordings?

5    A.   When we ask him to review them, he can do that for us,

6    yes.

7    Q.   So you knew what was on disk 1 when you gave it to the

8    FBI translators, correct?

9    A.   Do I -- I know there were recordings on disk 1 when I

10   gave it to the translators, yes.

11   Q.   And you knew what the content of those recordings were

12   when you gave them to the translator, correct?

13   A.   Not the full contents, no, I did not.

14   Q.   Did Scott Peterson listen to those recordings and tell

15   you what was on them?

16   A.   I believe he may have reviewed them, but I -- I'd have to

17   talk to him to --

18   Q.   But you specifically told -- you specifically told the

19   translator, Melissa Waters, not to translate a certain

20   portion of the transcript, correct?  You told her not to do

21   it?

22              MR. GUTIERREZ:  Been asked and answered, beyond the

23   scope.

24              THE COURT:  Sustained.  This whole area has been

25   explored thoroughly on your initial examination, counsel.

379

1          MR. DENIS:  I want to impeach Mr. Kalina with

2    his -- with his testimony.

3          MR. GUTIERREZ:  We'd object to a speaking

4    objection.

5          THE COURT:  No speaking objections.  The objection

6    is sustained.

7          MR. DENIS:  Your Honor, I'm trying to get it in

8    under --

9          THE COURT:  It's been asked and answered, counsel.

10          MR. DENIS:  Okay.  I'm just trying to get it in

11    under --

12          THE COURT:  For whatever purpose, it's already been

13    asked and answered.

14          MR. DENIS:  Okay.  Under Rule 806, attacking in

15    supporting the credibility of the declarant.

16          THE COURT:  I'm familiar with the Federal Rules of

17    Evidence.  It's been asked and answered.

18          MR. DENIS:  And, your Honor, I'm trying to impeach

19    Mr. Kalina with the documents that --

20          MR. GUTIERREZ:  Your Honor, we'd object to any

21    speaking objections in front of --

22          THE COURT:  Counsel, ask another question, please.

23          MR. DENIS:  All right.  Thank you, your Honor.

24          BY MR. DENIS:  Q.  Now, Agent Kalina, you were

25    shown two passports, one of Ryan Wedding and one of Hassan

1    Shirani, correct?

2    A.   Correct.

3    Q.   And Hassan Shirani's passport was -- there was a -- there

4    was a -- he was actually seen by US Customs, correct, and

5    received an entry stamp from the United States?

6    A.   Based upon his -- that stamp, yes, but I was not there

7    when he went through the Customs.

8    Q.   Are you familiar with special registration?

9    A.   I am not.

10   Q.   Okay.  Do you know if Mr. Shirani was inspected by

11   Immigration because he was Iranian?

12   A.   I do not know that.

13   Q.   Do you know if Canadians are generally given stamps on

14   their passports?

15   A.   I have no idea.

16   Q.   But Ryan Wedding didn't have a stamp on his passport,

17   correct?

18   A.   He had many stamps on his passport.

19   Q.   But he didn't have the entry into the United States on

20   the 10th, correct?

21   A.   Correct.

22   Q.   Okay.  But Hassan did?

23   A.   Correct.

24   Q.   Okay.  And you indicated that there were a number of

25   stamps from the UAE on Shirani's passport, correct?

1   A.   Correct.

2   Q.   And you indicated there was one stamp from the UAE on Mr.

3   Wedding's passport, correct?

4   A.   I don't remember how many I said there were.   I'd have to

5   take a look at the passport.

6            MR. DENIS:   And I'm showing for the witness the two

7   passports of Shirani, I believe, Plaintiff's Exhibit --

8   Government's Exhibit.

9            THE COURT:   It's 32 and 33.

10            MR. DENIS:   No, 31 and 32, your Honor.

11            BY MR. DENIS:   Q.   Do you have that in front of

12   you?

13   A.   I have these two passports in front of me, yes.

14   Q.   And the dates in the UAE, Hassan Shirani and Mr. Wedding

15   didn't go to the UAE together?

16   A.   Would you like me to review them to --

17   Q.   Sure, please.

18   A.   There is two stamps to the UAE on Mr. Wedding's; one was

19   May 24, 2007 and one is May 29, 2007.   And the UAE stamps for

20   Mr. Shirani are March 11, 2005, March 7, 2005, January 15,

21   2005, January 30, 2005, July 9, 2004, June 26, 2004, June 7,

22   2004, June 3, 2004, August 28, 2004, August 22, 2004,

23   August 29, 2005, August 31, 2005, multiple were in 2005.   No,

24   they do not have the same stamps for the same dates for UAE.

25   Q.   Okay.   The last one you saw was sometime in 2005, and Mr.

1    Wedding was for 2007, correct, sometime in 2007?

2    A.   I believe I read off one from Shirani's in 2006 if not

3    more.

4    Q.   Okay.  And you were asked on redirect by Mr. Gutierrez,

5    by the government, whether you conducted search warrants,

6    correct?

7    A.   I did.

8    Q.   And as part of those search warrants, you did -- and you

9    testified to this -- the search warrant on Mr. Wedding's

10   phone, correct?

11   A.   Correct.

12   Q.   And you also did the search warrant -- the search warrant

13   on Mr. Shirani's phone, correct?

14   A.   I did it on two of them I believe.

15   Q.   On both of his phones, correct?  Let me show you --

16          THE COURT:  Counsel, would you please mark your

17   exhibits so that we can move on.

18          MR. DENIS:  Apologize, your Honor.

19          BY MR. DENIS:  Q.  Let me show you the report --

20   going to show you three sets of documents which have been

21   previously marked as Defense Exhibit HH, which are documents

22   that purported to be from Ryan Wedding's telephone; II, which

23   are documents referring to Mr. Shirani -- one of

24   Mr. Shirani's phones; and JJ, which come from another

25   telephone held by Mr. Shirani.  Are you familiar with those,

1   with the content of that information?

2   A.   Yes.   However, JJ is missing my -- the SIMM examination

3   report that the other two have.

4   Q.   So there was a SIMMs report as well?   It's not in there?

5   A.   It's not.

6   Q.   Could you explain for us what that SIMM --

7           THE COURT:   Why don't you wait until you're above

8   the level of the lectern there before you ask your questions,

9   Mr. Denis.   Let's try to keep it moving.

10          MR. DENIS:   Okay.   Apologize.

11          MR. GUTIERREZ:   We object as to relevance and 403

12  at this point, your Honor.

13          THE COURT:   Well, I'm just concerned.   You did go

14  into these phone records and what they showed and what they

15  didn't show with respect to communications with your client

16  on the initial go-around of cross-examination.   I hope this

17  is not repetitive.

18          MR. DENIS:   No, your Honor.   I'm --

19          THE COURT:   Then let's move along.   Let's ask some

20  questions.

21          BY MR. DENIS:   Q.   Okay.   And looking at the phone,

22  No. (207)208-9484, do you see that report?

23  A.   Yes.

24          MR. GUTIERREZ:   What exhibit is that?

25          THE WITNESS:   II.

1    BY MR. DENIS:   Q.   Does that contain the SIMM

2  reports in that phone towards the back?

3  A.   This one does, yes.

4  Q.   And you also have a report regarding phone

5  No. (778)987-2005?

6  A.   Yes.   That is the one that is missing the report.

7  Q.   And you prepared -- basically you took the information

8  from the telephone and you prepared it in a report, correct?

9  A.   Again, there was -- there's two different ways I took

10  information off the phone; that's why there's a SIMM report,

11  which incorporates the things that were taken off the phone

12  electronically, and then my 302 report, which is on top,

13  which is the stuff that we took off manually.

14  Q.   So there's a SIMM report that goes with your -- with

15  the -- with the 778 area code phone number, correct?   What

16  exhibit is that, sir?

17  A.   JJ.

18  Q.   And looking Ryan Wedding's phone number under telephone

19  number (604)729-1325, is that a complete report with the

20  SIMM, with the contact information, text messages, everything

21  from the SIMM card -- everything from Mr. Wedding's phone,

22  correct?

23  A.   It appears it's both, yes.

24  Q.   And you prepared or supervised -- well, you prepared

25  these reports, correct?

1  A.   I did, yes.

2  Q.   And that's all three, correct?

3  A.   Yes.

4          MR. DENIS:  Nothing further of this witness, your

5  Honor.

6          THE COURT:  May this witness be excused at this

7  time, Mr. Gutierrez?

8          MR. GUTIERREZ:  No further questions, your Honor.

9          THE COURT:  All right.  Thank you, sir.  You may

10  step down.

11          MR. DENIS:  Your Honor --

12          THE COURT:  The government may call its next

13  witness.

14          MR. GUTIERREZ:  We call Hassan Shirani, your Honor,

15  Mr. Warwick is present, your Honor.

16          THE COURT:  Yes, I know that.

17          THE CLERK:  Please raise your right hand to be

18  sworn.  Do you solemnly swear or affirm that the evidence you

19  shall give in the cause now before the Court shall be the

20  truth, the whole truth, and nothing but the truth?

21          THE WITNESS:  Yes.

22                    Hassan Shirani

23  was called by the government and testified as follows:

24          THE CLERK:  Please state and spell your name for

25  the record.

1          THE WITNESS:   Hassan Shirani, H-a-s-s-a-n,

2     S-h-i-r-a-n-i.

3                     Direct Examination

4          BY MR. GUTIERREZ:   Q.   Good afternoon.

5     A.   Good afternoon.

6     Q.   I'd like to talk to you about some activities that

7     occurred first on June 6 -- excuse me -- June 10, 2008.

8     A.   Okay.

9     Q.   But before we get to those questions, I'd like to ask

10    you, do you know an individual by the name of Ryan Wedding?

11    A.   Yes.

12    Q.   How well -- how well do you know Mr. Ryan Wedding, if at

13    all?

14    A.   I know him probably for like six to nine months before we

15    came down here.

16    Q.   How would you describe the nature of your relationship

17    with him or acquaintance with him?

18    A.   We were just working, working relationship.

19    Q.   Do you see Mr. Ryan Wedding in the courtroom right now?

20    A.   Yes.

21    Q.   Using your hand in this fashion, could you please

22    indicate towards him and describe an article of clothing he

23    may be wearing.

24    A.   He's wearing a vest with a tie.

25          MR. GUTIERREZ:   Your Honor, I'd ask the record

1    reflect that this witness has indicated towards and

2    identified the defendant.

3              THE COURT:  The record will reflect the

4    identification of Mr. Wedding.

5              BY MR. GUTIERREZ:  Q.  When you came to Los Angeles

6    on June 10, 2008, generally at first what was the purpose of

7    your trip?

8    A.  It was to buy 24 kilos of cocaine.

9    Q.  Were those kilograms of cocaine going to be purchased by

10   you and you alone or were there other people involved?

11   A.  It was -- it was supposed to be Mr. Krapchan, Mr.

12   Wedding, and I, and Elmar in Vancouver.

13   Q.  And who were you going to be purchasing this cocaine

14   from?

15   A.  A fellow by the name of Yuri I believe.

16   Q.  Let me ask you, did this trip that happened on June 10,

17   2008, was there a certain amount of planning that occurred

18   before you traveled here?

19   A.  We had two meetings prior to coming.  We discussed --

20   Q.  If I could interrupt you.  When you say we had two

21   meetings, who do you mean?

22   A.  I initially had a meeting with Mr. Krapchan and Elmar,

23   and then the second meeting, it was -- Mr. Wedding was there

24   as well.

25   Q.  So the first meeting was you, Krapchan, and Elmar?

1   A.   Yes.

2   Q.   And the second was Mr. Wedding, Krapchan, you, and Elmar?

3   A.   Yes.

4   Q.   Okay.  What was the purpose of the first meeting?  What

5   happened at that meeting?

6   A.   The purpose of the first meeting is -- was that -- to

7   find out who could supply cocaine down in California.

8   Q.   How was it that you knew to have a conversation with

9   Mr. Krapchan and Mr. Elmar Akhundov about cocaine; how did

10  that happen?

11  A.   I had asked -- I had asked a friend of mine if he knew

12  anyone to purchase cocaine from in Los Angeles area, and he

13  told me that yeah, and the guy's out of the country, but when

14  he gets in, we would have a meeting.

15  Q.   And who was it that that person referred you to?

16  A.   Come again?

17  Q.   The friend that you asked --

18  A.   Yes.

19  Q.   -- who did that friend told you to go to to ask about

20  cocaine that could be purchased in Southern California?

21  A.   It was with Elmar.  We had a meeting when Elmar came back

22  and with Elmar and Krapchan.

23  Q.   Why at that point in time were you looking to buy

24  cocaine?

25  A.   Mr. Wedding was looking, and he had asked me if I could

1    find someone.

2    Q.   Why would Mr. Wedding come to you to ask about cocaine?

3    A.   I had wired money down to Los Angeles for him before, and

4    I had asked him why he needed to wire the money down, and he

5    told me -- and I told him that I could also provide

6    transportation for him.

7    Q.   You had prior discussions about transportation with Mr.

8    Wedding?  Let me withdraw that.  Would it be fair to say that

9    Mr. Wedding knew that you had the ability to transport

10   narcotics from Southern California to Canada?  Is that right?

11   A.   I told him this, yes.

12   Q.   And would that be one of the reasons why he came to you?

13   A.   Yeah, I guess.

14   Q.   And when you transfered that money earlier, was it by use

15   of any kind of special mechanism or company?  I mean did you

16   just go like to Federal Express and send Mr. Ryan Wedding's

17   money to Southern California or did you do it another way?

18           MR. DENIS:  Objection; compound, vague.

19           THE COURT:  It is compound.  Will you break it

20   down.

21           BY MR. GUTIERREZ:  Q.  Mr. Ryan Wedding had come to

22   you before your first meeting with Krapchan, Elmar

23   Akhundov --

24           MR. DENIS:  Objection, leading.

25           THE COURT:  Well, let's allow the question to be

1    asked, and if it's leading, then go ahead and make the

2    objection, please.

3            BY MR. GUTIERREZ:   Q.   You testified a while ago

4    that you talked to Krapchan and Elmar about cocaine --

5    A.   Yes.

6    Q.   -- and I had asked you about how Mr. Wedding knew to come

7    to you?

8    A.   Yes.

9    Q.   And I believe you testified that he had asked you to do

10   something in the past, right?

11   A.   Yes.

12   Q.   What was it that he asked you to do?

13   A.   To wire money down to LA.

14   Q.   Okay.   Are you in the money wiring business?

15   A.   Not formally.

16   Q.   When you say not formally, what do you mean?

17   A.   When it's large quantities of cash, you have to know

18   certain people to be able to wire that money.

19   Q.   Okay.   And was this a service that you would provide

20   informally to people?

21   A.   Yes.

22   Q.   To people other than Mr. Wedding?

23   A.   Yes.

24   Q.   Would it be fair to say that you may have had a

25   reputation with regard to if you need to wire money to the

1    United States, you can go to Mr. Shirani?

2    A.   Yes.

3    Q.   Now, why would somebody use your services and wire money

4    to the United States and not just go to Federal Express, for

5    example?

6    A.   Well, the sums of money were fairly large and in cash.

7    Q.   And how much money had Mr. Ryan Wedding -- previous to

8    your first meeting with Mr. Krapchan and Mr. Akhundov, how

9    much money did he ask you to wire?

10             MR. DENIS:   Objection; foundation, vague as to

11   time.

12             THE COURT:   The objection is sustained as to the

13   second ground; it is vague as to time.

14             BY MR. GUTIERREZ:   Q.   You indicated that you

15   transfered money for Mr. Wedding on one prior occasion before

16   meeting with Mr. Krapchan and Elmar Akhundov; is that right?

17   A.   Yes.

18   Q.   I would like to know how much money was transfered by you

19   for Mr. Wedding.

20   A.   It was --

21             MR. DENIS:   Same objection, your Honor.

22             THE COURT:   It's a different question now.   The

23   objection is overruled.   You may answer.

24             THE WITNESS:   It was roughly around 300,000

25   Canadian.

1          BY MR. GUTIERREZ:   Q.   Do you have a rough

2    estimation of how much that was in U.S. dollars at the time?

3    A.   Well, it worked out to 250 U.S. because there was a

4    15 percent surcharge.

5    Q.   Okay.   And, Mr. Shirani, perhaps I'm not clear.   Why

6    would somebody use your services as opposed to shipping it

7    via FedEx or using the banking system?

8    A.   I believe if you walk into the bank with more than

9    $10,000 cash, they call the police.

10   Q.   Your understanding that there might be some reporting

11   obligations on the bank?

12   A.   Yes.

13   Q.   And your services -- when you would move money to

14   Southern California, would you report to authorities that

15   somebody came with a large amount of cash?

16   A.   No.

17   Q.   Did you -- were you aware that you were perhaps violating

18   Canadian or United States laws --

19   A.   Yes.

20   Q.   -- by not reporting?

21   A.   Yes.

22          MR. DENIS:   Objection; calls for speculation.

23          THE COURT:   The objection is overruled.   That was

24   the witness's understanding.   It's not a conclusion as to the

25   law.

393

1          BY MR. GUTIERREZ:   Q.   And did you charge a fee for

2     transporting money?

3     A.   Yes.

4     Q.   And was that fee, if you know, higher than what it would

5     cost you if you went to a bank?

6     A.   Yes.

7     Q.   And why was it more?

8     A.   Because it was illegal.

9     Q.   And was it after doing this transaction for Mr. Wedding

10    that he came to you to ask about cocaine, per your testimony?

11    A.   Yes.

12    Q.   And how was it that he approached you?   Were you already

13    friends at this point or business partners or how -- what was

14    the circumstances of him coming to you?

15          MR. DENIS:   Objection; leading, compound.

16          THE COURT:   The objection is overruled.   You may

17    answer the question, sir.

18          THE WITNESS:   We were like acquaintances, friends.

19          BY MR. GUTIERREZ:   Q.   And when he came to you to

20    ask about cocaine, did he come with a specific amount in mind

21    or just generally or how did he ask you?

22          MR. DENIS:   Objection; vague as to time.

23          THE COURT:   Well, it's -- I'm going to sustain the

24    objection, but you had two or three questions in there as

25    well.   If you can break it down and also pinpoint it as to

394

1    time, counsel.

2            BY MR. GUTIERREZ:   Q.   After you shipped him his

3    money to Southern California but before your first meeting

4    with Mr. Krapchan and Mr. Akhundov, what did he say when he

5    said he wanted you -- in relation to cocaine and him, what

6    did he say?

7            MR. DENIS:   Objection, your Honor; compound, vague.

8            THE COURT:   The objection is overruled.   You may

9    answer, sir.

10            THE WITNESS:   He had mentioned to me that the money

11    that he had sent down was ripped off by the guy that was

12    supposed to purchase cocaine for him.

13            BY MR. GUTIERREZ:   Q.   So how did that relate to

14    cocaine that he was asking you now about?

15    A.   Well, his money was gone, and he was asking me if I had

16    anyone to buy cocaine.

17    Q.   And what did you tell him?

18    A.   I said I would ask.

19    Q.   And is that when you asked your friend that you testified

20    about earlier?

21    A.   Yes.

22    Q.   And that friend turned you on to I believe Mr. Krapchan

23    and Akhundov?

24    A.   Yes.

25    Q.   Okay.   This first meeting that you had with Mr. Krapchan

1  and Akhundov where Mr. Wedding wasn't present, where did that

2  occur?

3  A.   In Vancouver.

4  Q.   Did you know Mr. Krapchan and Mr. Akhundov before meeting

5  with them?

6  A.   I knew Mr. Akhundov vaguely, and I didn't know

7  Mr. Krapchan at all.

8  Q.   Well, how was it that you were able to approach them and

9  ask them about cocaine if you didn't know them very well?

10 A.   A friend of mine was there introducing us.

11 Q.   The same friend who told you about Mr. Akhundov?

12 A.   Yes.

13 Q.   And at this first meeting relative to cocaine, what was

14 discussed?

15 A.   Quantity, quality, and price.

16 Q.   Did you indicate towards them that you were looking to

17 purchase?

18 A.   Yes.

19 Q.   And did they indicate anything to help you in your

20 request?  What did they specifically say?

21 A.   They said that yeah, that they had a guy and they've

22 always had -- they never did anything with the guy because

23 they never had transportation.

24 Q.   And by them not having transportation -- well, this guy

25 they talked about, did they say where he was located?

396

1    A.   In San Diego.

2    Q.   Did you ultimately find out who that guy was?

3    A.   Yeah.

4    Q.   Who was that guy?

5    A.   I believe his name is Yuri.

6    Q.   Was he the person who met you on June 10, 2008 at the

7    airport?

8    A.   Yes.

9    Q.   And they said about transportation, they never did

10   anything with the guy because they didn't have

11   transportation, how did that -- did that have any special

12   significance to you, that statement that they made?

13   A.   I told them that I could arrange for the transportation.

14   Q.   And how was it that you were able to arrange for

15   transportation?  Well, first of all, when I say

16   transportation, when you were talking about transportation

17   with Akhundov and Krapchan, transportation of what?

18   A.   Cocaine.

19   Q.   You had prior experience before that meeting in

20   transporting cocaine from Southern District of California --

21   Southern California --

22   A.   Yes.

23   Q.   -- to Canada?

24   A.   Yes.

25   Q.   And after they'd told you that they hadn't done anything

1    with the guy because of lack of transportation, did you offer

2    them anything?

3    A.   Yeah, I told them that I could -- I could arrange for

4    transportation for them.

5    Q.   After you told them that, what was the next thing that

6    was discussed, if anything?

7    A.   The next -- the next thing I said was that we should have

8    another meeting with everyone, and then I believe that's when

9    the next time we had a meeting.

10   Q.   Now, when you say everyone, who did you mean?

11   A.   Well, I was there, Mr. Akhundov was there, and

12   Mr. Krapchan was there, and Mr. Wedding was there.

13   Q.   And this would be the second meeting that you talked

14   about earlier?

15   A.   Yes.

16   Q.   Where did this second meeting occur?

17   A.   Same -- same location, Vancouver.

18   Q.   After you got the news from the first meeting that they

19   had a contact in San Diego, did you go back and tell anybody?

20   A.   I told Mr. Wedding.

21   Q.   And where was it?  Was that also in Canada where you told

22   him?

23   A.   Yes.

24   Q.   And generally how did he respond?

25   A.   He was excited.

1   Q.  And he wanted to go forward with the plan?

2   A.  Yes.

3   Q.  After you told him, was the next part of the plan to have

4   the second meeting?

5   A.  We were waiting for his money to be ready because he had

6   lost that original 300,000, and then once that was ready, we

7   were going to have the next meeting.

8   Q.  You transported 300,000 Canadian previously, which you

9   indicated was lost?

10  A.  Yes.

11  Q.  How much -- did you discuss quantity in the first

12  meeting?

13  A.  No, we didn't.  I don't believe we discussed quantity.

14  I'm not sure.  I don't remember it that well.

15  Q.  Well, if you were waiting for money before the second

16  meeting --

17  A.  Yes.

18  Q.  And it was whose money?

19  A.  Mr. Wedding's money.

20  Q.  How much money were you waiting for?

21  A.  At that point I didn't know how much money was coming.

22  Q.  What was discussed at the second meeting?

23  A.  At the second meeting it was -- the price was discussed,

24  the quality, and the quantity was discussed.

25  Q.  What were the discussions about price?  What was said by

1    Mr. Krapchan, Mr. Akhundov, or Mr. Wedding about price?  How

2    much were you going to have to pay?

3    A.   Originally Mr. Akhundov and Krapchan told us or told me

4    that the price would be 15,000 per kilogram, and then on the

5    second meeting, they told us that it would be 17,000 a

6    kilogram.

7    Q.   What was the agreed-upon price when you ultimately flew

8    down on June 10?

9    A.   Seventeen thousand.

10   Q.   Was that 17,000 Canadian or 17,000 U.S. dollars?

11   A.   U.S. dollars.

12   Q.   Now, you mentioned a moment ago that you always talked

13   about quality?

14   A.   Yes.

15   Q.   What sort of quality were you discussing?

16   A.   Well, we were discussing to get pure quality and not to

17   get fish dope, which is called.

18   Q.   When you say fish dope, what do you mean?

19   A.   Cocaine that smells like fish.

20   Q.   Cocaine that smells like fish?  What does that mean?

21   A.   Well --

22           MR. DENIS:  Objection; foundation, lack of

23   specialty.

24           THE COURT:  The objection is overruled on each

25   ground.  You may answer, sir.

1            THE WITNESS:  Fish dope.  I had been told that

2    people that use it would throw up.

3            BY MR. GUTIERREZ:  Q.  Is that a reference to

4    quality of cocaine?

5    A.  Yes.

6    Q.  Is it your testimony that if it was fish dope, it would

7    be of inferior quality?

8    A.  Yes.

9    Q.  Okay.  Now, at the time of the second meeting, you

10   indicated that you had some experience in transporting?

11   A.  Yes.

12   Q.  And you had a mechanism for that which we'll talk about,

13   but let me ask you, were you a seller of cocaine or

14   participated in distribution by transporting?

15   A.  Transporting.

16           MR. DENIS:  Objection, compound.

17           THE COURT:  I'm sorry?

18           MR. DENIS:  Compound.

19           THE COURT:  Overruled.  You may answer.

20           THE WITNESS:  I was in charge of the transporting.

21           BY MR. GUTIERREZ:  Q.  And when we're talking

22   transporting, we're not talking -- let me withdraw that.

23   What were the types of quantities that you were transporting?

24   A.  Anywhere from 10 kilos to 40 kilos.

25   Q.  Okay.  You indicated at the meeting you talked about

1    price, quality.  What was the quantity talked about that you

2    would purchase from the guy in San Diego with Mr. Krapchan

3    and Mr. Akhundov?

4    A.   Twenty-four kilos.

5    Q.   Now, with four people involved with these discussions,

6    was there any discussion about who would get what cut or what

7    proportion of the drugs or who would have to pay what amount?

8    Were there any discussions regarding who would pay a certain

9    amount?

10   A.   It was -- it was agreed that Mr. Wedding would get 20,

11   Mr. Krapchan would get two, and Mr. Akhundov would get two.

12   Q.   What was Mr. Shirani -- what were you getting out of

13   this?  If 20 were going for Mr. Wedding, two were going to

14   Krapchan, and two were Akhundov, what were you getting out of

15   this?

16   A.   I was making money on the transportation, and I was

17   making money on wiring the money.

18   Q.   How much money were you going to have to wire

19   approximately for this plan that you had that you came up

20   with during the second meeting?

21   A.   Well, Mr. Krapchan and Mr. Akhundov said that they

22   would -- they would pay Yuri themselves with a check when

23   they got down here for their share of the cocaine, and it was

24   going to be 340,000 for the 20 that was left over for Mr.

25   Wedding.

1   Q.  So were you asked to transport $340,000 from Vancouver to

2   Southern California?

3   A.  Yes.

4   Q.  And was that using the same mechanism that you described

5   generally earlier?

6   A.  Yes.

7   Q.  And you would get a portion of that 300 -- was that

8   340,000 U.S. dollars?

9   A.  It was -- yeah.  Well, it was in Canadian, but we needed

10  340,000 U.S. cash in the United States.

11  Q.  Okay.  So of the $340,000 U.S. cash, what was your

12  payment going to be from your cut in transporting it?

13  A.  The fee for transporting the money was 15 percent.

14  Q.  One-five?

15  A.  One-five.  And my fee was included in the 15 percent, was

16  1 percent.

17  Q.  Let's talk about how you would transport money.  Is there

18  a term -- are you familiar with the term "havale"?

19  A.  Havale.

20  Q.  Havale.  Would you be able to spell that for the

21  reporter?

22  A.  H-a-v-a-l-a -- l-e.

23         BY MR. GUTIERREZ:  Q.  What is a havale?

24  A.  It's a traditional -- it's like traditional banking

25  that's often used in the Middle East for transferring money

403

1    from different places.

2    Q.   Could you give us an example of how that works.

3    A.   For example, if I needed to wire money to my mom and she

4    lived in Iran, I would go to one of these establishments and

5    pay them whatever sum that I wanted her to have, and they

6    would give her her money within 12 to 24 hours.

7    Q.   In Iran?

8    A.   In Iran.

9    Q.   And you say that's something somehow prevalent in your

10   culture in the Middle East?

11   A.   Yes, this is -- this is what most people use for sending

12   money to Iran or the Middle East.

13   Q.   Why is this system used as opposed to sending money in

14   any other way?

15   A.   Well, if you send money any other way, it takes a lot

16   longer time.  And if you wire money to Iran, the banks don't

17   guarantee your money arriving there.

18   Q.   So are you saying that it is less risky to use the havale

19   system when transporting money to Iran?

20   A.   Well, I wouldn't say less risky.  I think -- I mean

21   what's happening is the bank -- the banking system in Iran

22   and the banking system everywhere else don't have good

23   rapport, so when you wire money from, for example, Canada to

24   Iran through your bank, they don't guarantee -- I personally

25   have done it just, but -- the money always arrives, but they

1   don't guarantee it, so people get scared so that they rather

2   use the havale system because it always gets there.

3   Q.  The havale system, is that used by people who are --

4   that's the system you use when you transported money to

5   Southern California?

6   A.  That's the same system we use, yes.

7   Q.  Now, you indicated it's pretty prevalent in the culture.

8   I want to ask you is it pretty prevalent in your culture for

9   people who are of Middle Eastern descent who are criminals to

10  use or do people who are not criminals per se like a drug

11  dealer use the system as well just to send money home to

12  Iran?

13  A.  Everybody --

14          MR. DENIS:  Objection; calls for speculation.

15          THE COURT:  The objection is overruled.  You may

16  answer.

17          THE WITNESS:  Everyone uses the system.  Like when

18  I was in Iran, I would use it to send money from my mom or

19  vice versa.

20          BY MR. GUTIERREZ:  Q.  Do you have family in

21  Vancouver?

22  A.  Yes.

23  Q.  Do you have family in Iran?

24  A.  Yes.

25  Q.  So if everybody uses it -- well, not everybody.  If it's

405

1  used by people who are not involved directly in crime, to

2  your knowledge is it still illegal in Canada to do the

3  havale?

4          MR. DENIS:  Objection; calls for speculation.

5          THE COURT:  The objection is overruled.  You can

6  testify as to what your understanding is.

7          THE WITNESS:  The havale system is -- I don't think

8  it's illegal because there is -- there is many different

9  businesses operating and they advertise that they do this, so

10 I don't think it's illegal.

11         BY MR. GUTIERREZ:  Q.  Okay.  So when you sent

12 money that time for Mr. Wedding before the first meeting, you

13 said you used the havale system?

14 A.  Yes.

15 Q.  But you charged 15 percent?

16 A.  Yes.

17 Q.  Because you said that you knew that that was illegal?

18 A.  Yes.

19 Q.  So why is it any more or less illegal to send money to

20 the United States, if you know, that you could charge

21 15 percent?

22 A.  Well, I don't really understand that question.

23 Q.  Well, you said you charge 15 percent to send money to the

24 United States.

25 A.  Well, that wasn't my charge.  That -- the charge is by

1     the person that sends it, the store providing the service.   I

2     would just add a percent for myself.

3     Q.    Okay.  So you weren't actually in charge of the havale.

4     A.    No.

5     Q.    You weren't carrying money on your back; would that be

6     fair to say?

7     A.    Yeah, I wouldn't.

8     Q.    Would it be fair to say you were brokering --

9     A.    Yes.

10    Q.    -- and taking a percent?

11    A.    Yes, absolutely.

12    Q.    That the mechanism didn't belong to you but to somebody

13    else?

14    A.    It belonged to somebody else.

15    Q.    So the first time that you transfered money, the time

16    before the first meeting, that was somebody else's store that

17    you went to?

18    A.    Yes.

19    Q.    Did that money ultimately arrive into Southern

20    California?

21    A.    Yes.

22    Q.    And was that the same mechanism that you intended to use

23    after the second meeting when Mr. Wedding asked you to

24    transport the money?

25    A.    Yes.

1   Q.   So although you charged Mr. Wedding 15 percent, you

2   yourself were getting a different amount; is that fair to

3   say?

4   A.   Yeah.   I was getting 1 percent.

5   Q.   Was anybody else getting a cut of that transportation fee

6   for the money?

7   A.   The establishment that was doing it was getting the

8   14 percent.

9   Q.   But Mr. Krapchan, was he getting anything from that?

10   A.   No.

11   Q.   Mr. Akhundov?

12   A.   No.

13   Q.   It was just you?

14   A.   Yes.

15   Q.   You also indicated that you were going to get some money

16   from the transportation back north --

17   A.   Yes.

18   Q.   -- is that correct?

19   A.   Yes.

20   Q.   What -- what sort of compensation would you get for

21   coordinating the transportation back north?

22   A.   The charge for every kilo was $1,800, and my cut would be

23   $400 per kilo.

24   Q.   So of the -- was the intended price $17,000?

25   A.   Yes.

1  Q.  And from that you would be charging Mr. Wedding and Mr.

2  Akhundov and Mr. Krapchan a fee to get it back up here?

3  A.  Yes.

4  Q.  And that fee was $1,800 per kilogram?

5  A.  Yes.

6  Q.  But you didn't get $1,800 personally --

7  A.  No.

8  Q.  -- did you?

9  A.  No.

10 Q.  You got 400?

11          MR. DENIS:  Objection, leading.

12          THE COURT:  Well, the last few questions --

13          MR. DENIS:  Motion to strike.

14          THE COURT:  -- have been leading.  Well, I'll grant

15 the motion with respect to the last question, which was the

16 second time that the witness testified he was to get $400 of

17 the 1800.  Counsel --

18          MR. GUTIERREZ:  I can move on, your Honor.

19          THE COURT:  Well, are you at a convenient time to

20 break?

21          MR. GUTIERREZ:  We could stop here, your Honor.

22 Thank you.

23          THE COURT:  Very good.  Ladies and gentlemen, let

24 me just chat with counsel here at the side of the bench.

25 We're going to stop for today, but I want you to just remain

1    with us for another minute or two.  I'm going to ask counsel

2    about scheduling.  We'll be with you shortly.  Thank you.

3         (There was a sidebar out of the presence of the court

4    reporter.  The court reporter was summoned to sidebar.)

5              THE COURT:  With respect to scheduling -- I was

6    just feeling out counsel for a moment before the court

7    reporter arrived -- you've indicated, Mr. Gutierrez, that

8    your case-in-chief -- the government's case-in-chief will be

9    finished tomorrow morning is what you're anticipating, give

10   or approximately.

11             MR. GUTIERREZ:  Yes.

12             THE COURT:  You have a few more witnesses after

13   this witness.  How long do you anticipate your

14   cross-examination will go of this witness?

15             MR. DENIS:  It's an important witness.  I would

16   say -- I hate to limit myself, but --

17             THE COURT:  I'm not going to limit you.

18             MR. DENIS:  Okay.  Two, three hours, two hours

19   maybe.

20             THE COURT:  Let me make one observation with

21   respect to your cross-examination of the case agent.  It was

22   brutally slow in some areas.  There was so much wasted time

23   between questions, oftentimes -- the record didn't reflect

24   this -- easily a couple of minutes going by between questions

25   where we just had dead time, and then there was time taken

1   with exhibits.  You've got to tighten it up, button it up.

2   I'm not limiting you in terms of time, your total running

3   time, but you've got to be more efficient with your time.

4              MR. DENIS:  Okay.

5              THE COURT:  And your witness -- I'm not going to

6   call the dentist out of order.  We've got to finish -- we've

7   got to finish the government's case-in-chief before we go

8   with this dentist that you're talking about, keeping in mind

9   that we're not in session in this case on Friday.

10             MR. DENIS:  Right.

11             THE COURT:  Based on your preliminary

12  indications -- because we've received some questions from

13  jurors -- I'm going to tell them it looks like the evidence

14  is going to be concluded Monday or Tuesday, Tuesday at the

15  latest.  Are you --

16             MR. DENIS:  Yes.

17             THE COURT:  -- on board with that?

18             MR. DENIS:  Yes.

19             THE COURT:  Which means that they're going to have

20  the case by Wednesday to begin their deliberations.  That

21  means that they're going to --

22             MR. DENIS:  I know.

23             THE COURT:  -- need to come back after Thanksgiving

24  to conclude their deliberations; I'm assuming they will not

25  finish before then.  Your initial estimates to me as we were

1    getting started with the case was that we would be finished

2    with the evidence by Monday, and that's what I represented to

3    the jury when we were doing jury selection.  So I'm going to

4    modify that a little bit with them now based on the estimates

5    you've given me, and we'll go from there.

6              MR. DENIS:  Your Honor, one issue that I --

7              THE COURT:  I'm not -- I'm going to let the jury

8    go.

9              MR. DENIS:  Okay.

10        (Sidebar conference concludes.)

11             THE COURT:  Ladies and gentlemen, I was discussing

12   scheduling with counsel.  I know that next week we have

13   Thanksgiving, and of course we'll be out on Thursday and

14   Friday, Thursday being Thanksgiving, and the court is closed

15   on Friday.

16             Based on my conversations with counsel, it looks

17   like the evidence will be concluded in this case by Monday or

18   by Tuesday at the latest, which means that in all probability

19   the case will ultimately be given to you by Wednesday at the

20   latest.  Now, that is going to trigger the likelihood, a

21   pretty fair chance of deliberations extending beyond the

22   Thanksgiving weekend and then resuming as necessary sometime

23   next week.  I know that one or more of you may have some

24   questions about scheduling and may be concerned about the

25   general subject of scheduling.  That's the best estimate I

1    can give you at this time.  I'm assuming that each and every

2    one of you will be available to resume the case if necessary,

3    resume with your deliberations if necessary next -- the

4    following week, on Monday of the following week after

5    Thanksgiving, but if that is an issue for anyone, if it's a

6    problem for anyone, I'm going to ask that you remain behind

7    so that I can discuss that with you privately and

8    individually.  So that's pretty much where we are at this

9    point.

10            Any questions before we break at this time?  Any

11   questions about scheduling or anything -- anything else that

12   you need to discuss of an administrative or housekeeping

13   matter?  Okay.  Apparently not.  Okay then.  We're going to

14   resume and keep moving forward with the case, ladies and

15   gentlemen.  We're going to continue tomorrow morning at

16   9 a.m. sharp.  So please remember the admonition not to

17   discuss the case or make any decisions at this time.  We'll

18   continue on with the testimony of the present witness,

19   Mr. Shirani, and then devote the entire day tomorrow to the

20   evidence as well.  Okay.  All right.

21            Mr. Garcia, did you raise your hand?  Did you have

22   a question?  All right.  Very good.  Thank you.  Have a very

23   good evening.  We'll see you tomorrow morning at 9 a.m.

24        (The jury left the courtroom.)

25            THE COURT:  The record should reflect that

1    Mr. Shirani's attorney, Thomas Warwick, was here the entire

2    duration of Mr. Shirani's initial testimony.  I assume you'll

3    be here tomorrow, Mr. Warwick.

4            MR. WARWICK:  Your Honor, I have an 8:30 appearance

5    in state court that I will move with alacrity to get here by

6    9:00.

7            THE COURT:  Okay.

8            MR. WARWICK:  Could I inquire?  I think I've been

9    told that you're going to be engaged in other matters on

10   Friday, so I have Friday free?

11           THE COURT:  True.

12           MR. WARWICK:  I have a prelim that is scheduled on

13   Monday.  It's actually going to start on Friday and continue

14   to Monday, and they're flying witnesses in.  Are we going to

15   finish with Mr. Shirani?  If not, I would like to notify the

16   prosecution not to bring their witnesses in for Monday.

17           THE COURT:  No, we're going to finish with

18   Mr. Shirani given the estimates of counsel.  We're going to

19   start with Mr. Shirani tomorrow.  Mr. Denis has indicated his

20   cross-examination may be somewhat lengthy, but even with

21   his -- even with his estimate, I'm confident we'll finish

22   with him tomorrow.

23           MR. WARWICK:  I appreciate that, your Honor.

24           THE COURT:  Very good.  Now, are you asking that we

25   not start until you --

1          MR. WARWICK:  No, your Honor.  If I am delayed --

2    I've already spoken with my client; you can start the

3    questioning without me present if I am late.  I hope I won't

4    be, but thank you, your Honor.

5          THE COURT:  Thank you.  Appreciate it.

6          MR. DENIS:  Your Honor, I'm just bringing up one

7    issue that we had addressed previously regarding any Brady,

8    Jencks, or Giglio material regarding Mr. Shirani.  I know the

9    government was in possession of a number of documents,

10   transcripts, and other types of documents that are available

11   to them, that they had actually in their possession that they

12   have not turned over, and there was the issue of whether or

13   not Mr. Shirani was even going to testify if the government

14   could not turn those documents over.  They called Mr. Shirani

15   before I recalled the issue, but if the Court could address

16   that.

17         THE COURT:  I don't need to address it.  I've

18   addressed it by order, which is the only real proper way to

19   do it.  I have probably issued more orders relative to

20   discovery or discovery requests in this case than probably

21   all the other cases I've have had in the last five years.  I

22   based those orders on the representations of counsel, what's

23   set forth in the declarations, what the government indicates

24   it has provided.  The government is aware of its obligations,

25   as I've mentioned time after time in the orders.

1          I have reviewed in-camera materials that the

2   government had some question about, including the materials

3   that you were given relative to your cross-examination of the

4   case agent in this case.  The government I think in good

5   faith gave me the Interpol documents.  They had some question

6   as to whether or not those documents should go over.  I felt

7   they should go over, and they were ordered to be provided to

8   you.  So the government has been providing documents for

9   in-camera inspection.  And, once again, I will confirm that

10  my view of things is the government is aware of its

11  obligations under Brady, Giglio, Henthorn, and controlling

12  case law, Ninth Circuit law.

13         I'm not going to serve as a discovery master at

14  this time.  I know the government has provided voluminous

15  documentation, discovery material to you.  Mr. Gutierrez has

16  indicated that you've gotten all of the tapes, all of the

17  conversations that have been captured and are being used by

18  the government or are of any Brady value.

19         MR. DENIS:  I was just specifically mentioning

20  there were transcripts of interviews of Mr. Shirani where he

21  was basically lying to the agent, and --

22         THE COURT:  Well, I'm not going to accept that

23  proposition.  You load up your question with that kind of

24  a -- with that kind of a prefatory remark, and I just don't

25  think it serves you well to do that.

1          MR. DENIS:  That's my understanding of the

2   transcript, your Honor.  I've spoken to --

3          THE COURT:  Well, that may be your understanding.

4   Well, you're talking about transcripts involving

5   conversations between Mr. Shirani and another person?

6          MR. DENIS:  The police, correct.

7          THE COURT:  Okay.  The police.  So you've

8   received --

9          MR. DENIS:  I have never received those or made

10  aware of them.  I haven't received any of the in-camera

11  records that the Court may have decided on on these issues.

12  I just --

13         THE COURT:  Well, the order is for the material to

14  be turned over.

15         MR. DENIS:  To be turned over?

16         THE COURT:  Yeah, in-camera materials that were

17  provided to the Court for inspection, which I felt --

18  although the government may have felt fell in the gray zone

19  but I felt should be provided were in fact provided to you.

20  Now, they may be very limited --

21         MR. DENIS:  Could the Court just clarify what the

22  Court ordered should be provided so that I could be aware

23  that I've received --

24         THE COURT:  No.  You've been provided with those

25  materials.  I'm not going to make reference to any other

1    materials, but you've been provided with the materials

2    that -- and there were -- they were limited, the limited

3    materials the government provided to me for an in-camera

4    inspection.

5              MR. DENIS:  Okay.  The second issue, your Honor,

6    was just the --

7              THE COURT:  I thought we were dealing with one

8    issue.

9              MR. DENIS:  I just recalled one other that I

10   asked -- I addressed your clerk about it.  There was these

11   exhibits that Ms. Johnson testified to regarding transcripts

12   that she quality-checked, I don't recall the exact numbers,

13   16 through Exhibit 27, and the defense never received a copy.

14   And you know they were introducing certain conversations.  I

15   know there's a number of transcripts there, but we never

16   received the copy that was introduced by the Court.  I

17   don't -- I don't recall if it was admitted, it may have, but

18   we never received -- obviously we have the calls, but these

19   particular transcripts that were admitted, and if we'd had

20   them, we could have perhaps used them and we did not.

21             THE COURT:  Well, Mr. Gutierrez has indicated that

22   all the conversations in recorded form went over to you, plus

23   the transcripts; is that correct, Mr. Gutierrez?

24             MR. GUTIERREZ:  Yes, your Honor.

25             THE COURT:  All right.  So you better check with

1    your office.  But in any event, you've had the source

2    materials -- the conversations, the oral conversations -- in

3    CD form forever, for at least a year.  And of course you're

4    able to -- you were able to create your own transcripts if

5    you wished to do so.  The government created its transcripts

6    and had those transcripts verified by a court-certified

7    specialist, Russian-speaking court-certified specialist who

8    has testified in federal courts and state courts as a

9    translator for years in major cases, both state and federal.

10   So the government did what it needed to do.

11         If there are -- I wouldn't at this point even ask

12   Mr. Gutierrez to supply you with additional copies of what

13   he's already reportedly given to you.  If he wishes to do

14   that, then that's his decision to make, but so far you have

15   not been able to reach a stipulation --

16         MR. DENIS:  Correct.

17         THE COURT:  -- with respect to the accuracy and

18   authenticity of these materials.  So Mr. Gutierrez has gone

19   through all of the steps A to Z, whatever was necessary,

20   including bringing in the translator.  As I've mentioned on

21   the record before, it's the first case I've ever dealt

22   with -- and I've dealt with many cases where there were

23   translations necessary, recordings both in English and

24   foreign languages, including many trials involving Russian

25   and Ukrainian languages being utilized -- where the

1    government has been put to this test.  But the government has

2    met the test in this case, and if they wish to provide those

3    transcripts to you in written form, they may certainly do so,

4    but I'm not going to order it, once again.

5              MR. DENIS:  Okay.  And these were the quality-check

6    ones, correct, your Honor?

7              THE COURT:  Those were the ones that have been used

8    in connection with the Sanctions program.

9              MR. DENIS:  Okay.

10             THE COURT:  I know that there are going to be

11   separate transcripts created for each one of those clips

12   because as those conversations are rolling and the script is

13   being highlighted on the Sanction program for the jury as

14   those conversations are being projected on the screen, the

15   court reporter is not taking those down, and that is why I've

16   asked the government and why I'm asking you for the clips

17   you've played for the written memorialization of each of

18   those conversations that have been played for the jury so

19   that any reviewing court, if necessary, would have access to

20   that material.  So that's still something that needs to be

21   done, but it's an important part of all of this, and I'm

22   going to ask both sides to complete those clips.

23             MR. GUTIERREZ:  I think we have complied, your

24   Honor, and I will double check today whether those have --

25             THE COURT:  Okay.  You know, I know that there's

1    been an awful lot of tension and lack of any positive working

2    relationship between counsel here, but, once again, to the

3    extent that you're capable of cooperating and making it a

4    little bit easier on one another during this process, I would

5    urge you to do so to the extent that you, Mr. Gutierrez,

6    might have these clips in transcript format, separate clip

7    transcripts of conversations played by Mr. Denis, that

8    might -- that might assist him.

9              MR. GUTIERREZ:  I gave counsel all my clips,

10   referenced all my clips.  So they have forewarning.

11             THE COURT:  How about his clips, the ones he's

12   played?

13             MR. GUTIERREZ:  He has given me a portion saying

14   that he wants to hold onto some so that he may maintain his

15   element of surprise.

16             THE COURT:  You know, that's his privilege; he can

17   do that.

18             MR. DENIS:  Thank you, your Honor.

19             THE COURT:  Okay.

20             MR. GUTIERREZ:  Your Honor, ultimately if I could

21   just raise two problems I can foresee coming is that

22   Mr. Shirani has not been convicted, and I'm afraid that

23   counsel might venture in his impeachment to bring up charges

24   because he indicated that he wanted to bring Mister --

25   Sergeant Marks, who is closely related to --

1          THE COURT:  Who is Sergeant Marks?

2          MR. GUTIERREZ:  Sergeant Marks is the RCMP sergeant

3   who interviewed Mr. Shirani in the interview that the Court

4   ruled was not discoverable.  I know that they were

5   endeavoring to subpoena him.  So it's my understanding that

6   they may intend to, for lack of a better term, bomb that

7   information in anyway.  So I'm concerned that on a

8   cross-examination of Mr. Shirani, Mr. Denis will seek to

9   impeach him with things that aren't convictions or anything

10  under the code that would be allowed for conviction -- I mean

11  for impeachment, and I just want to bring that to the Court's

12  attention because I'm going to do my best to be vigilant,

13  but -- I don't know if there's a need to have a hearing, but

14  it's my understanding he was not convicted of any crimes, and

15  the RCMP said that he has no criminal record.  So for him to

16  be impeached with that I think would be bringing up a

17  collateral matter.

18          THE COURT:  You care to respond?

19          MR. DENIS:  Your Honor, I will comply obviously

20  with the Federal Rules of Evidence.

21          THE COURT:  Okay.  You know, you can certainly

22  approach it that way.  You're not in any -- under any

23  obligation to divulge any of this.  The risk you run,

24  however, is calling someone and essentially not having that

25  person testify, having that person walk into the courtroom

1    and out of the courtroom, and that never looks too good for

2    the defense.  So you've got to weigh in your mind whether or

3    not you want to assume that risk.

4         By the same token, Mr. Gutierrez, you're just

5    assuming that it's only a conviction that can be brought up,

6    and when you're dealing with someone who's cooperating with

7    the government, who's pled guilty in the instant offense and

8    has a working relationship with the government, there's a

9    strong argument to be made that impeachment may not be

10   limited to merely convictions, that the scope, the full scope

11   of cooperation, either real or anticipated, may be delved

12   into.  So don't -- don't be -- don't make the assumption that

13   it's only convictions on the part of -- suffered by Mr.

14   Shirani that may be referred to in any impeachment.

15        MR. GUTIERREZ:  Oh, and my concern is for extrinsic

16   evidence, for a number of witnesses to come to have a

17   minitrial to prove up a thing denied by Mr. Shirani by

18   extrinsic evidence.  But I mean I've raised the issue, and --

19        THE COURT:  No, we're not going to do minitrials.

20   We're not here to try other -- to try other matters.  But,

21   for example -- just to give you one example, and this is

22   not -- why don't you move over a little bit, just a little

23   bit so Mr. Warwick -- I know Mr. Warwick is interested in

24   this and he can at least see all of the participants here.

25        Regardless of the merits or lack of merits as to

1   any pending charge or any investigation that may be ongoing

2   into particular circumstances involving Mr. Shirani, if

3   Mr. Shirani has an expectation, reasonable or otherwise, that

4   the government might step in and help him with other charges,

5   that he's aware, that the government is aware that there are

6   other matters that are pending, then an argument may be made

7   that those matters can be delved into on cross-examination of

8   Mr. Shirani.  But if Mr. Shirani -- and this is -- now I make

9   this comment to you, Mr. Denis -- if Mr. Shirani denies any

10  wrongdoing with respect to some other event, then this is not

11  the forum for bringing in witnesses relative to whatever that

12  other circumstance may be; we don't try cases within cases.

13  But the circumstances surrounding any expectations Mr.

14  Shirani has that he will receive favorable treatment or that

15  the government may be there to assist him in other matters I

16  think is fair game for you.

17        Now, if you want to make a proffer, you can

18  certainly make a proffer, and there are ways to do that; that

19  may be something you might want to consider.  Otherwise, you

20  call witnesses as they may relate to other activities on the

21  part of Shirani, as I say, with the risk that they may not be

22  able testify.

23        So I hope those remarks are of some value to both

24  sides in going forward with what may be anticipated by way of

25  impeachment material of Mr. Shirani and how the government

1    may want to respond to that.

2            MR. GUTIERREZ:  I know the Court is being very

3    generous with its time.  The last issue is there is a pending

4    motion to exclude the expert witness.  Your Honor, I still

5    have not received noticed under the code, written notice as

6    to exactly what would be said.  I was given notice which I

7    referenced in the papers I believed to be insufficient.

8    Counsel indicated that he would not tell me what the opinions

9    were until --

10           THE COURT:  This is the dentist?

11           MR. GUTIERREZ:  No, this is on Mr. Wedick, the

12   former FBI agent.  And I did on the day before -- probably

13   the Thursday afternoon before trial or the Friday, I was

14   given a lengthy report by Mr. Wedick.  I think it was the --

15           THE COURT:  I don't think I've seen that.

16           MR. GUTIERREZ:  I did file a motion to challenge

17   Mr. Wedick, and I could bring it to court when --

18           THE COURT:  Was that motion filed within the last

19   couple of days?

20           MR. GUTIERREZ:  No, that was filed I believe weeks

21   ago, your Honor.  I'll make sure it was officially received

22   in the ECF.  But I did receive a report, and the conclusions

23   are I think something that the Court should consider whether

24   or not they're appropriate for their intended purpose.  And I

25   just say generally because --

1          THE COURT:  Why don't you bring a copy of your

2    motion tomorrow morning if you could.

3          MR. GUTIERREZ:  As an attachment could I also

4    attach the defendant's or witness's reports so the Court

5    could also consider --

6          THE COURT:  Yes, definitely.  I'll need that.

7          MR. GUTIERREZ:  Because the motion preceded the

8    report on the --

9          THE COURT:  Well, let me ask you.  Mr. Denis, is

10   this a moot point?  Are you even considering calling this

11   individual, whoever it might be?

12         MR. DENIS:  I am considering, your Honor, and I

13   think the Court does have the report.  It was submitted

14   in-camera to support a certain issue, and it was in the last

15   submission.  The Court does have it there.

16         THE COURT:  Okay.  Let me just get -- so Mr.

17   Gutierrez has everything; is that correct?

18         MR. DENIS:  Yes.

19         THE COURT:  Okay.  Why don't you just get a copy of

20   the last thing you filed, Mr. Gutierrez, which will be an

21   integration of all the material that exists on this point,

22   and I'll have a chance to address that before the defense

23   would consider calling this individual.

24         MR. GUTIERREZ:  Thank you very much, your Honor.

25         THE COURT:  All right.  And if there's nothing

1    else, you all have a very good evening.  We'll see you

2    tomorrow morning.

3              MR. GUTIERREZ:  Thank you, your Honor.

4         (There was a break in the proceedings for the evening

5    recess.)

<u>I n d e x</u>

Witnesses                                              <u>Page</u>

**Brett Kalina  (Government)**
Cross-Examination, cont'd by Mr. Denis            197
Redirect Examination by Mr. Gutierrez            310
Recross-Examination by Mr. Denis                 359
**Hassan Shirani**
Direct Examination by Mr. Gutierrez              386


<u>E x h i b i t s</u>

| Exhibits | Description | For ID | In Evd |
|---|---|---|---|
| Court's K | Transcript excerpt | 202 | |
| Court's L | Transcript excerpt | 213 | 308 |
| Q | Hotel bill | 220 | 221 |
| R | Hotel bills | 223 | 224 |
| S | Hotel bill | 225 | 227 |
| Court's T | Transcript excerpt | 232 | |
| Court's U | Transcript excerpt | 236 | |
| V | Interpol documents | 251 | |
| X | Passport, copy (Shirani) | 274 | 276 |
| Y-1 | Copy, credit card | 278 | 284 |
| Y-2 | Copy, back of Y-1 | 278 | 284 |
| Y-3 | Copy, business card | 278 | 284 |
| Y-4 | Copy, hotel key | 278 | 284 |
| Z | FD-597 | 279 | 285 |
| Y-5 | Copy, business cards | 283 | 284 |
| Y-6 | Copy, employment app. | 283 | 284 |
| Y-7 | Copy, back of Y-6 | 283 | 284 |
| Y-8 | Note | 284 | 284 |
| Y-9 | Receipt | 284 | 284 |
| AA | Call log | 287 | |
| DD | FBI 302 (Lambert) | 297 | |
| CC | Receipt | 299 | 300 |
| Court's EE | Transcript excerpt | 301 | 301 |
| BB | FBI document | 303 | |
| Court's FF | Transcript excerpt | 306 | 306 |
| 31 | Passport (Shirani) | 344 | 347 |
| 32 | Passport (Wedding) | 346 | 347 |
| 33 | Ticket receipt (Wedding) | 350 | 353 |
| 34 | Ticket receipt (Shirani) | 351 | 353 |
| Court's 36-A | Transcript excerpt (FF) | 354 | |
| GG | Interpol document | 366 | 367 |
| HH | Phone documents (Wedding) | 383 | |
| II | Phone documents (Shirani) | 383 | |
| JJ | Phone documents (Shirani) | 383 | |

<u>Certificate of Reporter</u>

I hereby certify that I am a duly appointed, qualified, and acting Official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.

Dated _____ at San Diego, California.

_____
/s/ Debra M. Henson  (electronic)
Debra M. Henson
Official Court Reporter