1                  United States District Court

2                 Southern District of California

3

4   UNITED STATES OF AMERICA,      )
                                   )
5                    Plaintiff,    )
                                   )
6       vs.                        ) Case No. 08-CR-2386 JM
                                   ) Jury Trial
7   RYAN WEDDING,                  ) Volume 4
                                   )
8                    Defendant.    ) Thursday, November 19, 2009
    _____)

9

10           Before the Honorable Jeffrey T. Miller
                 United States District Judge

11

12   Appearances:

13   For the Plaintiff:      Karen P. Hewitt
                             UNITED STATES ATTORNEY
14                           Orlando B. Gutierrez
                             ASSISTANT U.S. ATTORNEY
15                           880 Front Street, Suite 6293
                             San Diego, CA  92101
16
     For the Defendant:      David R. Denis, Esq.
17                           CENTER FOR EXTREME JUSTICE
                             707 Wilshire Boulevard, Suite 3600
18                           Los Angeles, CA  90017

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
22                            940 Front Street, Suite 5190
                              San Diego, CA  92101
23                            (619) 238-4538

24

25         Record produced by certified stenographic reporter

San Diego, California - Thursday, November 19, 2009

1

2          THE COURT:  Good morning, everyone.  Everyone is

3  present, and we are ready to resume with the direct

4  examination of Mr. Shirani.  Mr. Shirani, you've been

5  previously sworn, and you are still under oath.

6          THE WITNESS:  Yes.

7                    Direct Examination, cont'd

8          BY MR. GUTIERREZ:  Q.  Good morning, sir.

9  A.  Good morning.

10  Q.  Last night we had talked about two meetings you had had?

11  A.  Yes.

12  Q.  And during those two meetings, you came up with a plan?

13  A.  Yes.

14  Q.  After the second meeting what was the plan?

15  A.  The plan was to come down here and to make the purchase

16  for the 24 kilos and two at a time.

17  Q.  Two at a time?

18  A.  Two.

19  Q.  The two at a time, what does that mean?

20  A.  I had come up with the number because buying two kilos at

21  a time would take away the risk factor of someone just

22  walking away with all of the money.

23  Q.  Who would walk away from the money?  Could you explain

24  what it was you were trying to prevent?

25  A.  We were trying to prevent the seller from -- the seller

1    or Krapchan just walking away with all the money and being

2    left with none of the money.

3    Q.   Okay.  When you say that the plan was to come down here,

4    who was to come down?

5    A.   It was me and Mr. Wedding, and Mr. Krapchan had

6    previously come down.

7    Q.   What was Mr. Krapchan's role supposed to be?

8    A.   He was introducing us to the seller.

9    Q.   What was Mr. Wedding's role to be?

10   A.   He was the buyer.  He was --

11   Q.   You said he was --

12   A.   He was here just so he could -- he could be here for the

13   buy.

14   Q.   After this plan was instituted, how did you start to

15   implement it?

16   A.   We arrived at the airport, and the seller wanted to go to

17   San Diego right there and then --

18   Q.   Okay.  Let me stop you if I could.  When you say you

19   arrived at the airport, was that Los Angeles International

20   Airport?

21   A.   LAX, yes.

22   Q.   And from where did you fly?

23   A.   From Vancouver International Airport.

24   Q.   And did Mr. Wedding fly with you?

25   A.   Yes.

1  Q.  And regarding tickets, could you tell us how the tickets

2  were purchased, if you know.

3  A.  Mr. Wedding's friend came to my apartment and gave me a

4  thousand dollars to go buy the tickets.  I called the ticket

5  office, and the ticket lady had told me not to bring cash,

6  and Mr. Wedding informed me that he didn't have any room on

7  his credit card and neither did I, so I asked my brother to

8  purchase the tickets for us and then I would pay him cash.

9  Q.  Why were -- why was Mr. Wedding giving you money that you

10 would buy the tickets?

11 A.  Because he was in Las Vegas.

12 Q.  Is that why his friend had to give you the money instead

13 of him?

14 A.  Yes.

15 Q.  And roughly when did this occur that you got the money;

16 do you recall?

17 A.  Maybe two, three, four -- maybe a week before.  I can't

18 recall exactly.

19 Q.  Would it be fair to say it was after the second meeting?

20 A.  Yes.

21 Q.  But before the 10th when you left?

22 A.  Yes.

23 Q.  How long was Mr. Wedding back in Vancouver before you

24 guys left?

25 A.  I believe he arrived the night before we left.

1    Q.   This may seem like a silly question, but I want to ask:

2    Did you have any luggage?

3    A.   I had a carry-on.

4    Q.   Did you see whether or not Mr. Wedding had a carry-on or

5    luggage?

6    A.   He had luggage.

7    Q.   Did he have a carry-on?

8    A.   Not that I can remember.

9    Q.   When you flew into Los Angeles, had you already done

10   anything with regard to the money that was going to be used

11   to purchase the drugs?

12   A.   I had already given it to the establishment to be wired

13   down.

14   Q.   And where is that establishment?

15   A.   It's in Vancouver.

16   Q.   And was that the establishment that was part of the

17   havale?

18   A.   Yes.

19   Q.   And in addition to being able to transfer money to Iran,

20   they could do it to Los Angeles as well?

21   A.   Yes.

22   Q.   Mr. Shirani, why didn't you have it sent to a havale

23   perhaps in San Diego?

24   A.   I don't -- they didn't -- they didn't have the -- they

25   told me there was only the Los Angeles place to pick up.

1    Q.   Okay.  Were you given any instructions by the

2    establishment in Vancouver of how you would go about

3    identifying yourself as the person who was to collect the

4    money?

5    A.   The establishment had already told them that I was coming

6    and had given us a codeword to --

7    Q.   A codeword that you would use in Los Angeles?

8    A.   Yes.

9    Q.   Did you put anything into Mr. Wedding's luggage before

10   you flew from Vancouver?

11   A.   No.

12   Q.   Did you put anything in Mr. Wedding's luggage during your

13   flight from Vancouver?

14   A.   He had -- he checked his luggage in.

15   Q.   After you retrieved his luggage, did you put anything --

16   after his luggage was retrieved, did you put anything in it?

17   A.   No.

18   Q.   Was there any drug purchase money in those luggage,

19   Mr. Wedding's luggage?

20   A.   No.

21   Q.   Why didn't you just carry the luggage -- excuse me -- the

22   money yourself when you came from Vancouver?

23   A.   Crossing an international border, you're not supposed to

24   have more than $10,000 cash with you, and we didn't want to

25   take a risk on traveling with that sum of money.

1   Q.   Have you traveled to the United States before by

2   airplane?

3   A.   Yes.

4   Q.   And are Canadians required to go to Customs checkpoints?

5   A.   Yes.

6   Q.   So when you arrive at the airport, you have to speak with

7   an immigration officer?

8   A.   We actually did -- we actually go through Customs in

9   Vancouver.  They have a customs office -- U.S. has a customs

10  office in Vancouver International Airport.

11  Q.   And are there -- and is that where you usually receive a

12  stamp?

13  A.   Yes.

14  Q.   And are there times when you've traveled to the United

15  States and you don't receive a stamp?

16  A.   Not me.

17  Q.   Okay.  When you say not me, have you heard of other

18  people?

19  A.   Yeah.  Usually people -- well, what happens is because

20  I'm born in Iran, they put me through an extra screening, and

21  they stamp my passport, and then when I leave, I have to

22  check out with the -- one of their officers again.  So I

23  always get a stamp.  But other people normally don't really

24  even get a stamp from what I've seen.

25  Q.   Other Canadians?

1   A.   Yes.

2   Q.   So you didn't have to have your suitcases searched in Los

3   Angeles because it was already --

4   A.   No.

5   Q.   Okay.   After you arrived in Los Angeles, did you carry

6   your carry-on baggage off yourself?   Let me rephrase that.

7   You had your carry-on on the plane; is that correct?

8   A.   Yes.

9   Q.   And where was your passport?

10   A.   I believe in my carry-on.

11   Q.   Did you carry Mr. Ryan Wedding's passport with you as

12   well?

13   A.   I don't think so.

14   Q.   When you landed and you retrieved your luggage, who were

15   you intending to meet?

16   A.   When I landed, I called Mr. Krapchan, and Mr. Krapchan

17   had told me that he's meeting us at the airport with the

18   seller.

19   Q.   When you say the seller, do you mean the guy from San

20   Diego that you'd spoken of with Mr. Akhundov and Krapchan

21   earlier?

22   A.   Yes.

23   Q.   And after you made that phone call, what happened next?

24   A.   He said that he would meet us at the gate.

25   Q.   And did you go towards the gate?

1  A.  We came out of the gate and they were there.

2  Q.  And you had -- you recognized Mr. Krapchan?

3  A.  Yes.

4  Q.  And how is it -- is that based on your prior meetings

5  with him?

6  A.  Yes.

7  Q.  And did you see anybody with Mr. Krapchan?

8  A.  Yeah, he was with a larger gentleman.  He was --

9  Q.  And were you introduced to that gentleman?

10 A.  Yes.

11 Q.  And who was that gentleman?

12 A.  He was introduced as Yuri.

13 Q.  Was it your understanding that he was the seller?

14 A.  Yes.

15 Q.  Was that the first time you had ever had any dealings

16 with the seller?

17 A.  Yes.

18 Q.  Any face-to-face contact the first time?

19 A.  Yes.

20 Q.  Did you have any contact with the seller at all to you

21 personally while you were in Canada?

22 A.  No.

23 Q.  Did Mr. Wedding to your knowledge have any contact with

24 the seller before arriving in Los Angeles?

25 A.  No.

437

1    Q.   After you were introduced, what happened next?

2    A.   The seller wanted to go to San Diego and do the deal for

3    the cocaine right away, and we had told him that we had to go

4    pick up the money, and he was --

5    Q.   Well, let me -- did you explain to -- did you explain to

6    him or make efforts to explain to him what you needed to do?

7    A.   Yeah.  We tried to tell him that, you know, we can't

8    really cross international borders with that sum of money and

9    we needed some time to settle in and to go pick up the money.

10   Q.   And that wasn't just a story; that was true, wasn't it?

11   A.   Absolutely.

12   Q.   And after you told him that, how did he respond?

13   A.   He was upset because he -- he was under the impression

14   that we were getting off the plane and going straight to San

15   Diego.

16   Q.   When you saw he was upset, can you describe for the jury

17   what you mean by upset?  What did you observe?

18   A.   He seemed agitated.  He was -- he was speaking to

19   Mr. Krapchan in Russian.

20   Q.   When you say he was speaking to Mr. Krapchan, was he

21   speaking to Mr. Krapchan a lot?

22   A.   Yes.

23   Q.   Was Mr. Krapchan continuing to be a broker?

24   A.   Yes.

25   Q.   At that particular moment, what would you describe

1    Mr. Krapchan's role with regard to the drug deal?

2             MR. DENIS:  Objection; calls for a legal

3    conclusion.

4             THE COURT:  The objection is overruled.

5             THE WITNESS:  He was the broker.

6             BY MR. GUTIERREZ:  Q.  All right.  After you saw

7    this -- well, when you say -- actually did he flex his

8    muscles and wave his fists?

9    A.  No.

10   Q.  Did he draw a weapon and start threatening you?

11   A.  No.

12   Q.  Did you feel threatened at that point in time?

13   A.  No.

14   Q.  Did he do anything after becoming upset that could be

15   fairly characterized as threatening?

16   A.  No.  He just seemed agitated.  He just -- he was under

17   the impression that we were going to go straight from the

18   airport to San Diego.

19   Q.  And did he tell you what would happen if you didn't do it

20   that night?

21   A.  You know, most of the conversation was between

22   Mr. Krapchan and Yuri.  We didn't -- we didn't really get --

23   we just -- we were just trying to tell him that hey, we need

24   to go pick up this money and we need to settle in, we weren't

25   expecting to like come here and right away do this -- do this

1   deal.

2   Q.   So in speaking with Mister -- or Yuri, the CS, would it

3   be fair to say that you were trying to coordinate the deal,

4   the plan?

5   A.   Yeah.

6           MR. GUTIERREZ:   Your Honor, I'd like to play

7   Exhibit 26-A, clip 2, which purports to be a call on

8   6-10-2008.

9           BY MR. GUTIERREZ:   Q.   Mr. Shirani, I'm going to

10   play an audio clip, and there's going to be some text

11   following.   I would like you to look at the text and listen

12   to what's being said, and then I'm going to ask you some

13   questions after we play it all the way through.   Is that

14   okay?

15   A.   Yes.

16       (The audio recording was played.)

17           BY MR. GUTIERREZ:   Q.   We're going to put the text

18   back up for you.   Do you see, sir, where it says 58:12, HS:

19   Well, we have to grab the money.   We didn't bring the money

20   with us?

21   A.   Yes.

22   Q.   Did you hear the recording when the person said that?

23   A.   Yes.

24   Q.   And who was speaking when that was said?

25   A.   That was me.

440

1    Q.   That was you?

2    A.   Yes.

3    Q.   Is this part of the conversation you had with the

4    confidential source?

5    A.   Yes.

6    Q.   Do you recall where this conversation took place?

7    A.   At the airport.

8    Q.   And was Mr. Wedding nearby?

9    A.   I'm not sure because he had to go pick up his luggage.

10   Q.   I would like -- do you recognize --

11            MR. GUTIERREZ:  Could you put that call back up?

12            BY MR. GUTIERREZ:   Q.   Do you see where it says at

13   58:17, CS:  No, Misha, things aren't done this way?  Do you

14   recall hearing the voices?

15   A.   Yes.

16   Q.   Who was speaking besides you in the recording?

17   A.   It was Mr. Krapchan and Yuri.

18   Q.   Is that based on your familiarity with Mr. Krapchan?

19   A.   Yes.

20   Q.   And did you come to recognize the CS's voice as well?

21   A.   Well, I can hear Mr. Krapchan's voice, and then once I

22   don't hear his voice, I automatically assume that that's

23   Yuri's voice.

24   Q.   Okay.

25            MR. GUTIERREZ:  Could we have -- your Honor, I'd

1    like to play government's clip 36, clip 1.  Government's 36-A

2    is the transcript.  This is a call that was marked as defense

3    I believe FF, but it's been remarked Government's 36-A, clip

4    1.  It purports to be a call of a recorded conversation on

5    6-10-2008.

6              THE COURT:  Okay.

7              BY MR. GUTIERREZ:  Q.  Once again, I'm going to

8    play it all the way through, and then I'll ask questions

9    about it.

10        (The audio recording was played.)

11             BY MR. GUTIERREZ:  Q.  This clip, do you recognize

12   who's speaking in the first instance?

13   A.   Yes.

14   Q.   And who was that?

15   A.   That's me.

16   Q.   And you were referring to cars; is that correct?

17   A.   Yes.

18   Q.   Were you in -- did you fly to LA to buy cars?

19   A.   No.

20   Q.   What did you -- what did you come to LA to do?

21   A.   We came to LA to buy cocaine.

22   Q.   Well, why are you taking about cars then?

23   A.   A faint attempt to be inconspicuous.

24   Q.   What do you mean by that?

25   A.   Not to try to say obvious things on the phone.

442

```
 1   Q.  Were you concerned that somebody might be listening?
 2   A.  Yes.
 3               MR. GUTIERREZ:  Your Honor, I'd like to play
 4   Exhibit 26-A, clip 9, which is a recording that occurred on
 5   6-10-2008.  I'd like you to listen to this recording all the
 6   way through, and, please, we'll talk about it afterwards.
 7        (The audio recording was played.)
 8               BY MR. GUTIERREZ:  Q.  Did you get a chance to hear
 9   that voice?
10   A.  Yes.
11   Q.  Did you hear enough of the recording to determine who was
12   speaking?
13   A.  Yes.
14   Q.  Do you know who was speaking in this recording?
15   A.  Mr. Wedding.
16   Q.  And do you know -- is that based on you -- your
17   familiarity with Mr. Wedding?
18   A.  Yes.
19   Q.  Once he became agitated and you told him what you had to
20   do, what happened next?
21   A.  He was -- we asked him to drop us off at a car rental
22   place, and --
23   Q.  Why did you want to go to a car rental place?
24   A.  Because we wanted to part ways; they wanted to go back to
25   San Diego, and we wanted to stay in LA.
```

443

1    Q.   Why didn't you go to San Diego with them?

2    A.   Well, we wanted to go pick up the money and settle in.

3    Q.   Had you been to Los Angeles before?

4    A.   I believe I'd been once.

5    Q.   And where was the money?  Where were you told to go to

6    pick up the money?

7    A.   I was given a phone number, and I called the number, and

8    they told me that I have to go to the Valley area.

9    Q.   Before you went to get your rental car, did you make any

10   phone calls while you were meeting with the confidential

11   source and Mr. Krapchan?

12   A.   Yes.

13   Q.   And what was the -- who did you call?

14   A.   I called my brother.

15   Q.   Why did you call your brother?

16   A.   The money transfer guy had been not answering my calls,

17   and so I asked my brother to call him and find out what's

18   going on.

19   Q.   With the money transfer?

20   A.   Yes.

21   Q.   Is he familiar with the establishment that you used in

22   Vancouver?

23   A.   Yes.

24   Q.   To your knowledge has he used it before?

25   A.   Yes.

```
1   Q.  Has he used it before to transfer money to Iran?

2   A.  Yes.

3   Q.  Now, let me ask you this.  This is your brother by blood?

4   A.  From my mother's side.  Different father.

5   Q.  Okay.  But how would you describe your relationship with

6   him generally?

7   A.  Very good.

8   Q.  Very close?

9   A.  Yes.

10  Q.  Did he know why you were in Los Angeles?

11  A.  Yes.

12  Q.  Does he know what you do?

13  A.  Yes.

14  Q.  But does he do what you do?

15  A.  No.

16  Q.  Has he urged you to do something else or not do that sort

17  of thing in the past?

18  A.  He wants me to -- he wants me to work for him and with

19  him doing his own projects.  I don't think anyone's family

20  would want them to do what I did.

21  Q.  Now, when you called him, were you able to get ahold of

22  him?

23  A.  Yes.

24  Q.  And when you called him and you got ahold of him, what

25  language were you speaking?
```

1  A.   In Farsi.

2  Q.   And what did you guys talk about on that phone

3  conversation?

4  A.   He told me how much money was there, and -- and it wasn't

5  the full amount of money that was there, and I had asked him

6  to have -- I asked him to have one of the guys that we work

7  in Iran with that does money transfers, asked him to have him

8  call me to see if he could help me because there wasn't --

9  the whole sum of money wasn't there from what he told me.

10  Q.   And this was what he told you at the airport?

11  A.   Yes.

12  Q.   Did that cause you concern that you didn't have the whole

13  amount of money there?

14  A.   Yes.

15  Q.   Did that cause you any concern in relation to the

16  confidential source being agitated?

17  A.   No, the concern was -- I was -- when we had our second

18  meeting with Mr. Wedding, they had said -- Mr. Akhundov

19  proposed that if you guys don't have the money, you'll have

20  to pay $20,000 as a penalty, and if we don't have the

21  product, then we would pay $20,000 in penalties.  So I was --

22  and I was -- I was -- I was on the hook for both ends of

23  that.  If the money isn't there, then I have to pay 20,000,

24  and if the product isn't there, I still have to pay 20,000.

25  So I wasn't -- at that point I wasn't worried about the

1    product, but I was worried that the whole sum of money isn't

2    there and now I'm on the hook for the 20,000.

3    Q.   So if you didn't have the money, you would have to pay

4    Akhundov 20,000?

5    A.   Yes.

6    Q.   Why did you have to do that if you're saying Mr. Wedding

7    was the purchaser?

8    A.   Because I was to arrange for the money to be delivered.

9    Q.   That was your role in the plan?

10   A.   Yes.

11   Q.   And why would you be responsible if the drugs weren't

12   there?

13   A.   Because I was -- I was -- I was making -- I was making

14   the introduction between the buyer and the seller.

15   Q.   I thought that was Mr. Krapchan's role.

16   A.   Yeah, but if the -- let me see.  But I was -- I was also

17   there to -- to mediate, and if the drugs weren't there, then

18   I guess I wouldn't have to pay the 20,000, but Mr. Wedding

19   would be asking for the 20,000, so I would have to try to

20   collect the 20,000.

21   Q.   Did you have any knowledge of why Mr. Wedding didn't go

22   down by himself with Mr. Krapchan if he was the buyer?

23   A.   He didn't want to come at all.

24   Q.   What do you mean?

25   A.   He didn't -- he didn't want to come -- he didn't want --

1    he didn't want to come at all, he just wanted me to go, and I

2    didn't want to be responsible for all that money.  I wanted

3    him to come along, and I wanted him to meet the seller and

4    make a judgment on -- on whether he approves, doesn't

5    approve.  I didn't want to be responsible for this money.

6    Q.   Why is that?

7    A.   If I'm responsible for this money -- it's a lot of money,

8    and I can't pay it back.

9    Q.   At the time that Mr. Wedding and you had a discussion

10   with him about him coming down, you wanting him to come down,

11   did he understand what the plan was?  Did he know?

12   A.   Yes.

13   Q.   When you discussed the plan at the second meeting with

14   Mr. Akhundov and Mr. Krapchan, you said that Mr. Wedding was

15   there; do you remember that?

16   A.   Yes.

17   Q.   Was Mr. Wedding there participating in the planning?

18   A.   Yeah, he was -- he was present, I was there.  He was

19   there to be introduced to Mr. Krapchan and Mr. Akhundov.

20   Q.   After you called your brother and you found out the

21   amount wasn't all there, what did you do?

22   A.   I was trying to -- I got a phone call -- I had my brother

23   call the person that I know in Iran that does money transfers

24   as well, so I was trying to find out if he could maybe get

25   the rest of the money while we were here, and that's what I

 1  was trying to do.

 2  Q.  And you received a call in that regard?

 3  A.  Yes.

 4  Q.  And who called you?

 5  A.  A gentleman from Iran called me, and I had explained to

 6  him my situation, and he told me that he was going to work on

 7  it, and he -- he gave me a phone number to an associate of

 8  his in Los Angeles to call.

 9  Q.  And after that, what happened next?  What did you do?

10  A.  I don't remember if I called that gentleman right away or

11  not, but I eventually called him as well to find out if he

12  could provide us the rest of the funds.

13  Q.  All right.  So when you were going to the rental car

14  location, what was the plan at that point now?

15  A.  To go to the store in the Valley to count the money that

16  was there.

17  Q.  The portion that was there?

18  A.  Yes.

19  Q.  At this time at the airport when you were with -- were

20  you concerned about the agitation of the CI?  Were you -- did

21  you feel threatened?  Were you scared?

22  A.  I wasn't scared.  I didn't -- I didn't want to have to

23  deal with him directly.  I wanted really -- I wanted really

24  Krapchan to be doing all the dealings with him and to deal

25  with him because he didn't speak very good English, and so I

1   didn't -- I didn't really want to have too much to do with

2   him.

3   Q.   After the actual introduction and you were on your way to

4   the rental place, did you have a discussion about the CS with

5   Mr. Wedding?

6   A.   I believe we had a conversation in the -- in the car.   I

7   don't remember exactly, but I remember saying that this guy's

8   out of his mind if he thinks that we're going to fly here

9   with that sum of money in our pockets.

10   Q.   Did you use the term "crazy"?

11   A.   Yeah.

12   Q.   You called the CS crazy?

13   A.   Yes.

14   Q.   And what exactly were you referring to with using that

15   term?

16   A.   Well, I thought -- I thought he was -- I don't know.   I

17   just didn't think that he was rational thinking that we were

18   going to fly to the U.S. with that amount of money; I thought

19   that was insane.

20   Q.   And did Mr. Wedding make any statements about the CS?

21   A.   Yeah.   He thought he was crazy too.

22   Q.   And did he make any indication that if it got out of hand

23   or he had to do something, he had no problems doing something

24   to the CS?

25   A.   I told him that, you know -- we had this conversation

```
 1   later, and I had told him that, you know, this guy -- this
 2   guy's asking to see the money, all of the money, and that's
 3   concerning, I don't want -- I don't want to show him all the
 4   money, and I don't want to be ripped off or killed for the
 5   money or anything like that, and he's -- and Mr. Krapchan and
 6   Akhundov had told us that he is an ex-KGB officer, so -- and
 7   I told Mr. Wedding yeah, I don't know if I want to have
 8   anything to do with this guy.  And he goes -- he wasn't
 9   worried; he said he'd smash that old man, he said.
10   Q.   Smash that old man?
11   A.   Yes.
12   Q.   Did you ultimately arrive at the rental car location?
13   A.   Yes.
14   Q.   And what happened next?
15   A.   We went inside and we rented a car and went towards the
16   Valley.
17   Q.   When you say we rented a car, who actually rented the
18   car?
19   A.   Mr. Wedding.
20   Q.   And why did Mr. Wedding rent the car?
21   A.   I didn't want to have to pay for anything here because
22   this was -- this is his deal and in fact he should be paying
23   for everything.  I was -- do you understand what I'm saying?
24   Q.   You didn't feel that you should have to pay because it
25   was his deal; is that what you're --
```

1  A.  Yes.

2  Q.  And is that why it was your understanding why the car was

3  not paid for by you?

4  A.  Yes.

5  Q.  And did you have a conversation about that with Mr.

6  Wedding?

7  A.  Not to my recollection.  It was kind of perceived that

8  way; it was an understanding because he paid for the ticket

9  as well.

10 Q.  Did you put -- excuse me.  Did Mr. Ryan Wedding rent the

11 car because you didn't want to have it in your name if

12 anything were to happen?  Is that why?

13 A.  No.

14 Q.  Was the reason what you said earlier?

15 A.  Yes.

16 Q.  After you got the car, you said you drove towards the

17 Valley?

18 A.  Yes.

19 Q.  What happened next?

20 A.  We went to the establishment and we met the gentleman

21 there and spoke to him, and we went to the back room of the

22 establishment and counted the money that was available.

23 Q.  Physically touched the money?

24 A.  Yes.

25 Q.  And how much money was at the location at that time?

1   A.   There was $122,000.

2   Q.   Did you -- did you count it in the establishment -- in

3   the establishment?

4   A.   Yes.

5   Q.   Who was present when it was being counted?

6   A.   It was myself, Mr. Wedding, and the gentleman that owned

7   the store.

8   Q.   And who actually did the counting?

9   A.   We both did.

10  Q.   When you say we both, who do you mean?

11  A.   Mr. Wedding and I.

12  Q.   When you said that was cash, was that a fairly large

13  amount of cash?

14  A.   I would say --

15  Q.   I'm talking about size-wise.  I'm sorry.

16  A.   I don't know if it was large.  I'm pretty sure they were

17  all fifties and hundreds.

18  Q.   When you got to the store, did you have to use the

19  codeword?

20  A.   Yes.

21  Q.   And was the money just sitting out there in a showcase or

22  where did you go -- have to go?

23  A.   It was in a safe.

24  Q.   In the back room you say?

25  A.   We went to the back room.  There was -- there was --

1    there was -- there was drapes -- it's a small store in the

2    front, but the back end of it is bigger.  And we walked into

3    the front, and then we were directed into the back, and there

4    was drapes right there, so the owner of the store locked the

5    door of the store, locked the door so nobody would come in

6    like as a walk-in customer, and closed the drapes so we can

7    sit there privately.

8    Q.   Had you ever been there before?

9    A.   No.

10   Q.   Were you concerned at all with what might happen?

11   A.   No, because -- because this was the same place that Mr.

12   Wedding's friend had gone to pick up the money as well.

13   Q.   Oh, this was the location used for the earlier

14   transaction?

15   A.   Yes.

16   Q.   And once you closed the drapes, you say he went to a

17   safe?

18   A.   He went to a safe, yeah.

19   Q.   And he withdrew the money?

20   A.   Yes.

21   Q.   And is that when you counted it?

22   A.   We counted it, yes.

23   Q.   And after you counted that, the money, did you put it in

24   some kind of container or how did you take it?

25   A.   We didn't take it; we left it there.

1   Q.   You left the money there?

2   A.   Yes.

3   Q.   Why did you leave the money there?

4   A.   We -- I didn't want -- we didn't -- I didn't want the

5   money to be on me at all.

6   Q.   Why is that?

7   A.   Just concerns about, you know, maybe getting pulled over

8   with the money.  We didn't really know where we were going in

9   directions, we didn't really -- didn't know the city, so --

10  Q.   At that point in time when you decided to leave the money

11  there, what was the plan about purchasing drugs?

12  A.   I told Mr. Wedding that I was working on getting the rest

13  of the funds and that we would delay maybe a day or two to

14  get the rest of the funds so we can finish off the deal.

15  Q.   After you'd counted the money, what happened next?

16  A.   We left, and we -- I think we went and got something to

17  eat, and then we went and got a hotel room.

18  Q.   When you left the establishment, did you have a

19  discussion with the individual who owned the store about the

20  remainder of the money?

21  A.   Yeah.  He said he didn't know anything about that.  He

22  was just a guy that -- he was just a guy that you could pick

23  up the money from.

24  Q.   He wasn't responsible in doing whatever it is they do to

25  get the money there?

1    A.   Yes, he wasn't.

2    Q.   Now, you indicated that the CS was causing you some

3    concern as far as his agitation?

4    A.   Yes.

5    Q.   Was there any plan that you had if things didn't work out

6    with the CS?

7    A.   We had backup plans if we -- we couldn't get what we

8    wanted from the CS.

9    Q.   What were those backup plans?

10   A.   I -- I had set up a backup plan in case that it didn't

11   work out with the CS so we can purchase from some other

12   people.

13   Q.   Were those other people in San Diego also?

14   A.   I believe they were in Los Angeles.

15   Q.   Aside from that first backup plan, were there any others?

16   A.   Mr. Wedding had indicated that he had a plan as well.

17   Q.   What was Mr. Wedding's plan, backup plan?  Excuse me.

18   A.   Mr. Wedding indicated that he had received a text message

19   from his friend with a phone number that he could call as a

20   backup plan.

21   Q.   Would that be a backup plan to buy drugs?

22   A.   Yes.

23   Q.   Did he tell you who that friend was?

24   A.   I believe it was his friend Adrian is what he indicated

25   to me.

1        MR. GUTIERREZ:  Your Honor, the defense had marked

2   some reports of the phone exhibit.

3        BY MR. GUTIERREZ:  Q.  But you didn't actually see

4   that text message, did you?

5   A.  No.

6   Q.  And this phone number -- the backup plan that Mr. Wedding

7   had, what part of Southern California was that in, if you

8   know?

9   A.  I don't.

10  Q.  Why did you stay in Los Angeles if the drug deal with

11  Mr. Krapchan was to occur in San Diego?

12  A.  We wanted Mr. Krapchan to do the back-and-forth.  We

13  wanted to stay in Los Angeles.

14  Q.  Why is that?

15  A.  I had been informed that there's a checkpoint coming back

16  from San Diego that they check and search, and I didn't want

17  to be driving with drugs or money.

18  Q.  Did Mr. Krapchan agree to travel back and forth?

19  A.  Eventually he did.

20  Q.  Okay.  So after you counted the money and you went and

21  got some dinner I think, or food you said, what happened

22  next?

23  A.  We went to the hotel room I think, and then later on we

24  went out for dinner and waited around to get confirmation to

25  see when the money would arrive.

1    Q.   While you were waiting around for confirmation, were you

2    doing tourist-type things like going to Disneyland or going

3    to the Brea Mall?

4    A.   No.   I think we went to a mall right before we came to

5    San Diego.

6    Q.   What was the next thing that happened with regard to the

7    money and the drug purchase?

8    A.   We wanted to see a sample of the product.

9    Q.   Why is that?

10   A.   Just to make sure that the product was what we wanted.

11   Q.   Do you use cocaine?

12   A.   No.

13   Q.   How would you know if the drugs were of good quality or

14   not if you don't use cocaine?

15   A.   I'd been told what to look for.

16   Q.   Well, explain to the jury what it was you were told to

17   look for.

18   A.   I was -- I was told to -- to look for a white substance

19   that was shiny like a shell and that it didn't smell like

20   fish.

21   Q.   Is that what you talked about earlier regarding the

22   quality?

23   A.   Yes.

24   Q.   So even though you've transported narcotics before,

25   you've never actually seen it?

1   A.   I have, I have.   I had seen it.

2   Q.   Have you seen cocaine that was of good quality?

3   A.   Yes.

4   Q.   So you do have some experience in knowing what to look

5   for?

6   A.   Yes.

7   Q.   When you wanted to see a sample, did you have discussions

8   with Mr. Wedding about seeing a sample?

9   A.   Yes.

10  Q.   What did you tell Mr. Wedding or what did you two discuss

11  in that regard?

12  A.   I said I wanted to see a sample just for quality, and he

13  had said eventually -- because he wouldn't -- he didn't want

14  to show us a sample; he wanted to --

15  Q.   Who is he?

16  A.   The seller.   The seller didn't want to show us a sample.

17  He just wanted to do the deal.   And I told Mr. Krapchan that,

18  you know, we either see a sample or we don't do a deal at

19  all.

20  Q.   And you indicated that to Mr. Krapchan?

21  A.   Yes.

22  Q.   What did Mr. Wedding think about that, if anything?

23  A.   He agreed.

24  Q.   After you indicated to Mr. Krapchan that you would only

25  do the deal if you got a sample first, what happened next?

1    A.   Mr. Krapchan talked to Yuri, and then -- I -- I don't

2    remember exactly what happened, but I think there was --

3    there was like a back-and-forth, and then it took us a while

4    before we could get all the money together, and then I --

5    Q.   Let me interrupt you if I could just for a moment.   Did

6    you ultimately get all the money?

7    A.   We ended up getting all the money, yes.

8    Q.   And when you say all the money, is it more than the

9    122,000 that you talked about a moment ago?

10   A.   Yeah.   I got a -- I got a phone call from the

11   establishment in Vancouver saying that the rest of the money

12   was available, and then I received a phone call from the

13   gentleman in the store in LA that also had confirmed it to

14   me, but I actually didn't go there and physically see the

15   money.

16   Q.   Well, let's talk about the money.   After you left the

17   122,000 there --

18   A.   Yes.

19   Q.   -- on the day that you arrived, did you ever go back to

20   the store?

21   A.   Yeah, I believe we went back the next day and grabbed

22   20,000.

23   Q.   Why did you grab $20,000 the next day?

24   A.   We grabbed 20,000 for the sample because it was going to

25   be 17,000, so we had said that we want to pay for the sample

460

1   so we can look at it, and if we don't like it, we just give

2   it back.

3   Q.   And did it happen the same way?  You went into the store,

4   the gentleman locked it, and you went in the back?

5   A.   Yes.

6   Q.   And at that time was it still just the 122 there?

7   A.   Yes.

8   Q.   Was it from that 122 that you took the 20?

9   A.   Yes.

10  Q.   Now, after you took the 20, was there another occasion

11  that you came back to the store?

12  A.   I believe the next day I went back.

13  Q.   And you go -- went by yourself?

14  A.   Yes.

15  Q.   Why did you go to the store on that third occasion?

16  A.   Mr. Wedding wanted to take a shower I think, told me to

17  go grab 100,000 so if the sample was good, then we could

18  proceed.

19  Q.   So you went to the store to retrieve money?

20  A.   Yes.

21  Q.   And when you arrived at the store, was it the same thing

22  that happened before?

23  A.   Yes.

24  Q.   You walked in, he locked it, and he gave you $100,000?

25  A.   Yes.

461

1  Q.  Does that mean there was $2,000 left?

2  A.  Yes.

3  Q.  When you received that money, did you put it in any kind

4  of bag or anything?

5  A.  I believe the gentleman at the store helped me wrap it

6  around in -- in Farsi newspapers, and then we put it in a

7  plastic bag and I walked out.

8  Q.  And how far was your hotel from the location?

9  A.  It was like a block or two.

10  Q.  Did you feel it was safe to go from the store to the

11  hotel with that money?

12  A.  Yes.

13  Q.  And is that what you did?

14  A.  Yes.

15  Q.  And did you ultimately take the money back to the hotel?

16  A.  Yes.

17  Q.  What did you do once you got back to the hotel with the

18  money?

19  A.  I got to the hotel, and I told Mr. Wedding that I got the

20  hundred thousand.  And just -- I just left it.  And then we

21  were about to leave for dinner and I didn't want to take the

22  money with me, so I decided to hide the money under -- under

23  like the TV in a -- underneath a drawer.

24  Q.  Underneath a drawer?  Could you describe that a little

25  more to the jury.

1    A.   From what I remember, there was -- there's a TV, and

2    there was two drawers.  I took the bottom drawer out, and I

3    laid the money underneath -- on the ground underneath and

4    then put the drawer back in so if anybody opened the drawer,

5    it wouldn't be visible like if the maids or anything like

6    that would walk in.

7    Q.   And why did you do that again?

8    A.   Just in case the maids walked in and snooped around and

9    saw the money and grabbed it.

10   Q.   And was Mr. Wedding there when you put the money into the

11   cabinet?

12   A.   Yes.

13   Q.   And after you put the money in the cabinet, is that when

14   you left for dinner?

15   A.   Yes.

16           MR. GUTIERREZ:  State for the record that I showed

17   counsel Government's Exhibit 9, 11, 13, and 12 -- excuse

18   me -- and 14.

19           THE COURT:  Which are the exhibit numbers, please,

20   9, 11 --

21           MR. GUTIERREZ:  It's 9, 11, 12, 13, and 14.

22           THE COURT:  Okay.  Thank you.

23           BY MR. GUTIERREZ:  Q.   I'm placing before you

24   what's been previously marked as Government's Exhibit 9 for

25   identification; do you see that document?

1    A.   Yes.

2    Q.   Does that depict a certain location?

3    A.   I believe this is the hotel that we were staying at.

4    Q.   The one in Los Angeles?

5    A.   Yes.

6         (Exhibit No. 9 identified.)

7    Q.   Is it a fair and accurate representation of the hotel?

8    A.   Yes.

9    Q.   I'd like to show you picture Government's Exhibit 12 for

10   identification; do you recognize that?

11   A.   Yes.

12   Q.   What is depicted in Government's Exhibit 12?

13   A.   I believe that's the bag that the money was inside of.

14        (Exhibit No. 12 identified.)

15   Q.   Is that a fair and accurate representation of the bag

16   that the money was inside of?

17   A.   Yes.

18   Q.   I'd like to show you now what's been marked as

19   Government's Exhibit 13 for identification; do you recognize

20   that?

21   A.   Yes.

22   Q.   What is that?

23   A.   That's the money.

24   Q.   Is that a photograph of the money?

25   A.   Yes.

464

1      (Exhibit No. 13 identified.)

2  Q.  Is it a fair and accurate representation of the money as

3  you received it on the day that you took the hundred thousand

4  from the store?

5  A.  Yes.

6  Q.  Government's Exhibit 14 for identification, do you

7  recognize what that is?

8  A.  It's the money laid out on a newspaper.

9  Q.  The $100,000?

10  A.  I believe so.

11      (Exhibit No. 14 identified.)

12  Q.  And I notice there's some newspaper in Government's

13  Exhibit 14; do you see the newspaper?

14  A.  Yes.

15  Q.  What language is depicted on the newspaper, if you know?

16  A.  It's in Farsi.

17  Q.  Is that a fair and accurate representation of the money

18  in the newspaper that was given to you at the store that you

19  testified about a moment ago?

20  A.  Yes.

21  Q.  The $100,000?

22  A.  Yes.

23  Q.  And Government's Exhibit 11 for identification, do you

24  see that?

25  A.  Yes.

1   Q.   What is depicted in Government's Exhibit 11 for

2   identification?

3   A.   It's the bottom drawer of the TV stand.

4        (Exhibit No. 11 identified.)

5   Q.   Is that the bottom drawer under which you placed the

6   money when you were going to be going to dinner?

7   A.   Yes.

8   Q.   The place where you secreted the money so that -- I think

9   you said the maids wouldn't get it?

10  A.   Yes.

11  Q.   Is that a fair and accurate representation of where you

12  put the money?

13  A.   Yes.

14       MR. GUTIERREZ:  Your Honor, I would ask that

15  Government's Exhibits 9, 12, 13, 14, and 11 be admitted into

16  evidence.

17       THE COURT:  Those exhibits are admitted at this

18  time.

19       (Exhibit Nos. 9, 11, 12, 13, 14 admitted.)

20       MR. GUTIERREZ:  I'd ask for permission to publish.

21       THE COURT:  Okay.

22       BY MR. GUTIERREZ:  Q.  Government's Exhibit 12, you

23  recognize that, don't you?

24  A.   Yes.

25  Q.   It appears to be a white bag.  How is it that you're

1  familiar with that?

2  A.  I'm really familiar with the newspaper.

3  Q.  Well, let's put the next -- do you recognize what's

4  depicted in Government's Exhibit 13?

5  A.  Yes.

6  Q.  Is that the container which you received from the store

7  when you picked up the money?

8  A.  Yes.

9  Q.  Now, I notice that the newspaper in Government's 14 you

10  indicated was in Farsi; is that correct?

11  A.  That's correct.

12  Q.  Is that the same newspaper that the store owner gave you?

13  A.  Yes.

14  Q.  Was the store owner of Middle Eastern descent?

15  A.  Yes.

16  Q.  Is there anything significant about what is being said --

17  I mean is there any meaning with the Farsi there or is it

18  just a random sheet of newspaper?

19  A.  I think it's just an article, and I see some advertisings

20  on the bottom, bottom half of the page.

21  Q.  But as far as you know, does it have anything to do with

22  the fact that money's wrapped in it?

23  A.  No.

24  Q.  And just finally Government's 11, you had described

25  earlier that you put it underneath a shelf or a drawer; is

1   that correct?

2   A.  Yes.

3   Q.  You didn't put it in the drawer?

4   A.  No.

5   Q.  But you put it underneath?

6   A.  Yes.

7   Q.  Is that in the hotel room that you were staying with with

8   Mr. Wedding?

9   A.  Yes.

10  Q.  Was that -- the hotel room where this money was is the

11  hotel that's depicted in Government's Exhibit 9?

12  A.  Yes.

13  Q.  All right.  We can take them down.  Now, you received the

14  $100,000 on the third time.  Did you ever go back again to

15  that store?

16  A.  No.

17  Q.  No?

18  A.  No.

19  Q.  But you did receive phone calls about the rest of the

20  money, right?

21  A.  Yes.

22  Q.  And it was to be at the store?

23  A.  Yes.

24  Q.  But you just never saw it?

25  A.  No.

1   Q.  After you got the $100,000, what happened next with
2   regard to the planned deal?
3   A.  Plan was to have Mr. Krapchan deliver one kilo so we
4   could take a look at it.  We gave him -- we had given him the
5   money -- I think we traveled to Anaheim to give him money for
6   one kilo, and we waited around in Anaheim to -- for him to
7   bring the one kilo so we could take a look at it.
8   Q.  Why did you go to Anaheim as opposed to your hotel in the
9   Valley?
10  A.  We were trying to meet him halfway.  He was taking the --
11  the -- the public transportation, the train; he was taking
12  the train I think.
13  Q.  The train?
14  A.  Yeah.  We picked him up at the train station.
15  Q.  Was there a train station in Anaheim that you picked him
16  up?
17  A.  I think it was -- I think it was right beside the Anaheim
18  Angels baseball stadium.
19  Q.  Oh, do you remember seeing the stadium there?
20  A.  Yes.
21  Q.  Was there anything about the stadium that you remember or
22  any kind of --
23  A.  I just remember seeing the stadium.  I recognized it
24  because I watched a lot of sport -- a lot of sports, and
25  there was a lot of Anaheim Angels flags and whatnot.

1    Q.   And did you meet him there?

2    A.   Yes.

3    Q.   And what did you give him, if anything?

4    A.   Gave him the 17,000.

5    Q.   Would that be for the one kilogram sample?

6    A.   Yes.

7    Q.   And after you gave it to him, what happened next?

8    A.   He took the train back to San Diego.

9    Q.   When was he suppose to return with the kilogram of

10   cocaine, the sample?

11   A.   I think he was supposed to go -- go there and meet with

12   the seller and then -- and then return.

13   Q.   That same day?

14   A.   I believe so.

15   Q.   Did he return that same day?

16   A.   No.

17   Q.   Why not, if you know?

18   A.   He had -- he had called and informed -- informed me

19   that -- I think by this time he called and informed me that

20   the seller had sold his product and that he didn't have the

21   product anymore.

22   Q.   What happened next?

23   A.   Well, I was kind of happy.  I was -- because I didn't --

24   I was hesitant because he was -- he wanted the -- he asked to

25   see the money repeatedly to Mr. Krapchan, that --

470

1    Q.   When you say he, who do you mean?

2    A.   The seller had asked Mr. Krapchan that he wants to see

3    the money to see if we're serious or not, and I didn't -- I

4    didn't want to show him the money in case he was planning

5    to --

6    Q.   Planning to what?

7    A.   Planning to rip us off with the money or -- I was -- it's

8    a lot of money, and I didn't want to be like in a area that I

9    don't know very well and having to show this money to him and

10   God knows what he's -- his plans were.

11   Q.   Now, at some point in time, you had a conversation with

12   the CS yourself, right?

13   A.   Yes.

14   Q.   And you were explaining to him your concerns?

15   A.   Yeah, that we weren't from the town, we didn't know

16   anyone, and we want to take all the precautions that we

17   could.

18   Q.   And how did he seem to -- what did he do when you told

19   him about what you wanted to do?

20   A.   He had indicated that he understands, that it's the first

21   deal and that everyone's nervous, and that he would try to

22   work it out.

23   Q.   All right.  We played a portion of Government's 36-A,

24   clip 1 for you before.  We're going to play the entire

25   portion for you, and I'll ask you some questions afterwards.

 1    It is a call on 6-11 between you and the confidential source.

 2              THE COURT:  Once again, the exhibit number?

 3              MR. GUTIERREZ:  Is Government's Exhibit 36.   36-A

 4    will be the transcript.

 5              THE COURT:  The date of the conversation?

 6              MR. GUTIERREZ:  6-11, your Honor.

 7        (The audio recording was played.)

 8              BY MR. GUTIERREZ:  Q.   Who is -- who were

 9    participating -- who was it that was participating in this

10    conversation?

11    A.   It was myself, the seller, and Mr. Wedding.

12    Q.   Now, let me ask about when you said Mr. Wedding.  Do you

13    see where it says 8.06 in the background?

14    A.   Yes.

15    Q.   Do you recognize -- did you hear that portion where it

16    was in the background?

17    A.   Yes.

18    Q.   Would you like to hear it again?

19    A.   No.

20    Q.   Do you know who was speaking in the background?

21    A.   Yes.

22    Q.   Who was that?

23    A.   Mr. Wedding.

24    Q.   So once you found out that the deal was called off and

25    you said you were relieved, what happened next?  What did you

472

1   do?

2   A.   We were making plans to leave I think because we -- our

3   flight back was Saturday, so I think -- I think we were

4   making plans either to leave or to -- well, we had made plans

5   to arrange for another buyer, so I was going to try and -- I

6   can't remember exactly, but I think we were trying to make

7   plans to make the buy from another seller.

8   Q.   Did you ultimately make a buy from another seller?

9   A.   No.

10  Q.   Why not?

11  A.   After Mr. Krapchan had told us that he had sold his

12  product, we told him that that's fine, that if he could come

13  to LA and give us the money back, and he had agreed, and he

14  told us that he would be at the train station in downtown LA

15  at around ten o'clock.  And then when we went -- when we went

16  to pick him up, he informed us that the seller had gotten

17  ahold of more product, and we had decided to go down to San

18  Diego, drive down to San Diego and take a look at that

19  sample.

20  Q.   So your understanding was that the deal was called off?

21  A.   Yes.

22  Q.   But then there was contact reestablished?

23  A.   Yes.

24  Q.   Did you see the money again that you had previously given

25  Mr. Krapchan?

1    A.   Yes.

2    Q.   Did he show it to you there --

3    A.   Yes.

4    Q.   -- when he arrived back in LA?

5    A.   Yes.

6    Q.   Did you count it?

7    A.   I don't recall.

8    Q.   So all three of you traveled to San Diego?

9    A.   Yes.

10   Q.   How did you get there?

11   A.   We drove; we drove in the rental car.

12   Q.   Was that the rental car that Mr. Wedding had rented?

13   A.   Yes.

14   Q.   Were you not concerned about the checkpoint this time?

15   A.   We were planning to take a look at the sample and have

16   Mr. Krapchan transport it through the train.

17   Q.   At the time that you were driving back to San Diego to

18   buy the sample after the deal had been called off, what was

19   the plan overall?

20   A.   After the deal was called off, I had told Mr. Wedding,

21   and overall plan was to -- to eventually make a purchase

22   or -- I remember having a conversation with Mr. Krapchan

23   telling him that that's not a problem, that we would come

24   back in like two weeks and do the deal with him.

25   Q.   Okay.  But when you were driving down to San Diego, what

1   was the plan at that point in time?

2   A.   We were planning to take a look at the sample.

3   Q.   Just the sample?

4   A.   Yes.

5   Q.   And then come back later for the rest?

6   A.   We were planning to -- Mr. Wedding had suggested that it

7   was not feasible to do it two at a time, so he suggested to

8   give Mr. Krapchan the 100,000 and then let him bring that

9   back and then give him another 100,000 -- well, we didn't

10  really get into that part.

11  Q.   So instead of two at a time, the plan was to have larger

12  amounts at a time until it reached 24?

13  A.   Yes.

14  Q.   Did you have discussions with Mister -- with the

15  confidential source while you were traveling down?

16  A.   I personally didn't, no, but Mr. Krapchan was on the

17  phone with him.

18  Q.   And that was in the -- a phone call in the car where you

19  and Mr. Wedding were; is that correct?

20  A.   Yes.

21  Q.   Did you ultimately arrive in San Diego?

22  A.   Yes.

23  Q.   Where -- to where did you go?

24  A.   We went to a hotel that Mr. Krapchan had been staying at.

25  Q.   What happened next with regard to the plan?

1  A.  We went to the hotel room, and Mr. Krapchan asked if he

2  could -- if he could borrow the rental car to go and grab the

3  sample.

4  Q.  Was the plan to have Mr. Krapchan go by himself?

5  A.  Yes.

6  Q.  Why didn't you want to go?

7  A.  I didn't want to be involved in the purchase.

8  Q.  Why not?

9  A.  We were under the impression if we didn't -- we didn't --

10  if we weren't there and we didn't have any money on us,

11  then -- and we wouldn't be -- we wouldn't be -- we wouldn't

12  get in trouble with the law.

13  Q.  Are you aware now that that's not a true version of what

14  the law says?

15  A.  Yes.

16          MR. DENIS:  Objection, your Honor; calls for a

17  legal conclusion.  Move to strike.

18          THE COURT:  The objection is sustained.  The answer

19  is stricken; the jury is admonished to disregard it.

20          BY MR. GUTIERREZ:  Q.  Was Mr. Krapchan given

21  Mr. Wedding's rental car?

22  A.  Yes.

23  Q.  What was the purpose of giving it to him?

24  A.  He was to go and meet the seller to get the one kilo to

25  bring back to us so we can look at it as a sample.

476

1    Q.   So I imagine at some point in time he left?

2    A.   Yes.

3    Q.   And what did you and Mr. Wedding do after he left?

4    A.   We stayed at the hotel.

5    Q.   Waiting?

6    A.   Yes.

7    Q.   And how long did you wait until something else happened?

8    A.   We waited about I think 15 minutes, and Mr. Krapchan

9    called and said that he had the product and that he would be

10   at the hotel in five minutes.

11   Q.   What were you thinking at that point when you got the

12   call?

13   A.   We were thinking -- we were just -- we were just waiting

14   to see the sample.

15   Q.   And did Mr. Krapchan return after five minutes?

16   A.   No.

17   Q.   How long did you wait?

18   A.   We waited about an hour, maybe hour and a half.

19   Q.   And when he didn't return, what were you thinking?

20   A.   I didn't -- I didn't really know what to think.

21   Q.   Did you stay in the hotel room?

22   A.   After about an hour and a half, we decided to leave so we

23   can get something to eat, and I had a headache, so I wanted

24   to buy some pain killers to get rid of the headache.

25   Q.   So you left the room?

477

1    A.   Yes.

2    Q.   And was it shortly after leaving the room that you were

3    taken into custody?

4    A.   Yes.

5              MR. GUTIERREZ:   If I may have a brief moment, your

6    Honor.

7              BY MR. GUTIERREZ:   Q.   Mr. Krapchan -- excuse me --

8    Mr. Shirani, you were charged with a crime in this case; is

9    that correct?

10   A.   Yes.

11   Q.   And did you plead guilty?

12   A.   Yes.

13   Q.   What did you plead guilty to?

14             MR. DENIS:   Objection, your Honor.

15             THE COURT:   Ground?

16             MR. DENIS:   Withdrawn.

17             THE COURT:   Okay.   You may answer.

18             THE WITNESS:   I believe we were charged with

19   conspiracy to possess and distribute 24 kilos of cocaine.

20             BY MR. GUTIERREZ:   Q.   Is that what you pled guilty

21   to?

22   A.   I believe I pleaded guilty to seven kilos of cocaine, or

23   six.

24             MR. DENIS:   Objection, speculation.

25             THE COURT:   The objection is overruled.   Ladies and

1  gentlemen of the jury, you may not consider this witness's

2  plea of guilty to any charge of conspiracy to possess or to

3  distribute cocaine as evidence against Mr. Wedding.  It is,

4  however, admissible on the question of the witness's

5  credibility, and you will be further instructed on that at a

6  later time, but do not consider this witness's plea of guilty

7  as evidence against Mr. Wedding in this case.

8           BY MR. GUTIERREZ:  Q.  Having pled guilty, did you

9  agree to cooperate with the government?

10 A.  Yes.

11          MR. GUTIERREZ:  Thank you, Mr. Shirani.  At this

12 time the government has no further questions.

13          THE COURT:  Cross-examination?

14          MR. DENIS:  Your Honor, it's approximately 10:15.

15 Could we have a break now so we can set up clips and

16 everything so we can expedite Mr. Shirani's

17 cross-examination?

18          THE COURT:  Okay.  We'll take our midmorning recess

19 at this time, ladies and gentlemen, and resume in 15 minutes.

20 Please remember the admonition.  Thank you.

21     (There was a break in the proceedings.)

22          THE COURT:  All right.  Cross-examination?

23          MR. DENIS:  Thank you, your Honor.

24                    Cross-Examination

25          BY MR. DENIS:  Q.  Mr. Shirani, you indicated that

1   you pled guilty to the charges against you, correct?

2   A.   Yes.

3   Q.   And in exchange you also signed a cooperation agreement;

4   is that true?

5   A.   Yes.

6   Q.   And the cooperation agreement indicates that you will get

7   less time if you provide substantial assistance to the

8   government, correct?

9   A.   I was told if I --

10  Q.   Just answer my question.  If you give substantial

11  assistance to the government, you're going to get a reduction

12  in your sentence; isn't that true?

13  A.   They told me they may recommend less time.

14  Q.   And for that cooperation agreement, you came and met with

15  the government, correct?

16  A.   Yes.

17  Q.   And you were there with your attorney?

18  A.   Yes.

19  Q.   Agent Kalina was there?

20  A.   Yes.

21  Q.   Mr. Gutierrez was there?

22  A.   Yes.

23  Q.   Natalie Lambert was there?

24  A.   Yes.

25  Q.   Some police officers from Canada were there --

480

1   A.   Yes.

2   Q.   -- correct?  And in these proffer sessions, you recounted

3   the events that happened, correct?

4   A.   Yes.

5   Q.   And you were asked a number of questions?

6   A.   Yes.

7   Q.   And when the government asked you questions about certain

8   individuals, you would respond about different individuals'

9   roles, correct?

10  A.   Yes.

11  Q.   In fact, on your first proffer session, you actually

12  withheld names of certain individuals that were involved in

13  drug dealing, correct?

14  A.   Yes.

15  Q.   So basically you lied to the government the first time

16  you were there; isn't that true?

17          MR. GUTIERREZ:  Objection, argumentative.

18          THE COURT:  The objection is overruled.  You may

19  answer, sir.

20          THE WITNESS:  No.

21          BY MR. DENIS:  Q.  You were trying to protect some

22  individuals?

23  A.   Yes.

24  Q.   So you didn't want to tell them the truth at that time,

25  correct?

481

1    A.   I believe there was one individual, and --

2    Q.   What was that individual's name?

3              MR. GUTIERREZ:  Relevance.

4              THE COURT:  The objection is overruled.  You may

5    answer, sir.

6              THE WITNESS:  Mr. Manavie (phonetic).

7              BY MR. DENIS:  Q.  Manavie?

8    A.   Yes.

9    Q.   Is that your drug partner?

10   A.   He's my friend, yes.

11   Q.   And you guys deal in drugs together?

12   A.   In transporting, yes.

13   Q.   Purchasing and selling as well?

14   A.   No.

15   Q.   So all you do is you transport drugs; is that what you're

16   saying here today?

17   A.   Well, purchasing for other individuals, yes, but the

18   selling part doesn't have anything to do with us.

19   Q.   But you take drugs from -- where do you bring drugs from?

20   A.   Generally the United States.

21   Q.   And you bring them into Canada?

22   A.   Yes.

23   Q.   And Manavie's a person that helps you in this endeavor?

24   A.   Yes.

25   Q.   Is Manavie the same guy as Maziar?

1   A.   Yes.

2   Q.   And you basically told the government of other drug

3   activity that you were involved in, correct?

4   A.   Yes.

5   Q.   And you indicated -- and there was RCMP, which is -- the

6   Canadian police were there as well, true?

7   A.   Yes.

8   Q.   So you could be possibly facing charges in Canada if you

9   were returned to Canada; is that true?

10          MR. GUTIERREZ:   Calls for speculation, legal

11   conclusion.

12          THE COURT:   The objection is overruled.   You may

13   answer if you are able to, sir.

14          THE WITNESS:   I don't know.

15          BY MR. DENIS:   Q.   And when you were telling your

16   other drug activity in Canada -- well, strike that.   When the

17   RCMP was there -- were you telling them about other drug

18   activity that you did in Canada in front of the RCMP?

19   A.   I don't remember.

20   Q.   So you didn't -- you don't remember what you told at the

21   proffer session in front of the RCMP?

22   A.   I don't recollect exactly everything.

23   Q.   Were you being -- did -- were you being honest and

24   truthful at that time about your -- your activity in drugs up

25   in Canada?

1   A.   Yes.

2   Q.   And did you tell them you were dealing drugs in Canada?

3            MR. GUTIERREZ:  Objection; asked and answered.

4            THE COURT:  Overruled.  You may answer.

5            THE WITNESS:  Can you repeat the question, please.

6            BY MR. DENIS:  Q.  Did you tell them -- did you

7   tell the RCMP that you were dealing drugs in Canada?

8   A.   I don't remember what I --

9   Q.   Did you tell the RCMP that Manavie was dealing drugs with

10  you in Canada?

11  A.   I think we said -- I think I said that we were

12  transporting it and he was involved in the transportation.

13  Q.   Didn't you just indicate that you protected him and

14  didn't bring up his name?

15  A.   They didn't initially ask me what he does, and I had said

16  nothing.

17  Q.   You indicated he was not involved, correct?

18  A.   Yes.

19  Q.   So you lied right away in the first proffer session,

20  correct?

21  A.   Well, I -- I didn't think --

22  Q.   Is that correct?

23  A.   I didn't -- I don't think -- I don't feel like I lied

24  because I think the next day I did say that he was involved

25  as well.

484

1   Q.   You indicated that -- that you told them the next day?

2   A.   Either the next day or in that same session.   I don't --

3   can't say that I remember everything.

4   Q.   But at some later proffer, they confronted you with

5   knowledge that they had that Maziar was involved in drug

6   dealing with you in Canada, correct?

7   A.   I believe I told them that he was my partner and he

8   introduced me to the driver.

9   Q.   And during this time -- do you recall the date that you

10  first went to the proffer session?

11  A.   No.

12  Q.   Was it a day or two before you testified in front of a

13  grand jury?

14  A.   Yes.

15  Q.   So was it approximately -- do you recall the date you

16  testified at the grand jury?

17  A.   No.

18  Q.   So on the 17th -- well -- and at that time on the 18th

19  when you testified to the grand jury, you had already met

20  with the government one time, correct?

21  A.   Yes.

22  Q.   And you didn't tell them about Manavie at that time?

23  Well, strike that.   You told them that he was not involved in

24  this business, correct?

25  A.   I think in -- I -- from what I remember, I believe in

1    that same meeting on that day, I had told them that he was

2    involved.  I don't remember exactly.

3              MR. DENIS:  One moment, your Honor.

4              BY MR. DENIS:  Q.  And when you were giving a

5    proffer with these individuals, you had not disclosed the

6    fact that you had been charged for fraud in 1997, correct --

7    A.  With --

8    Q.  -- in Canada?

9    A.  -- fraud?  I don't think I had.

10   Q.  Do you recall being charged in Canada for fraud?

11   A.  For fraud?  I believe I was charged with -- from what I

12   remember, I believe I was charged with possessing credit

13   cards.

14   Q.  And were these credit cards that did not belong to you?

15   A.  They were not found on my person, and the charges were

16   dropped.

17   Q.  And in 2001 you were also charged with credit card fraud?

18   A.  I think it was just that once.

19   Q.  You don't recall being charged a second time for fraud --

20   A.  I think --

21   Q.  -- in 2001?

22   A.  I remember it being just once.

23   Q.  Was that in '97 or 2001?

24   A.  I remember -- I can't tell you exactly.  I can remember

25   that I was charged once, but it was dropped.  And it was

1    never found on me.

2    Q.  But somehow you were linked to these stolen credit cards?

3    A.  I was with the person that had them on him.

4    Q.  And in 2001 you were aware of an individual that was

5    murdered in -- in 1997 as well, correct?

6    A.  Yes.

7    Q.  What was that person's name who was murdered?

8    A.  I believe his name was Mr. Mirhadi.

9    Q.  And you knew the individual that did the murder of Mr.

10   Mirhadi?

11   A.  I knew both individuals.

12   Q.  Did you know Mirhadi?

13   A.  Yes.

14   Q.  Did you used to fight with him in the gym?

15   A.  I went to high school with Mr. Mirhadi.

16   Q.  And did you guys have martial arts class together as

17   well?

18   A.  No.

19   Q.  And who was the individual that was charged with

20   murdering Mr. Mirhadi?

21           MR. GUTIERREZ:  Objection; relevance, 403.

22           THE COURT:  Sustained.

23           BY MR. DENIS:  Q.  You were also arrested driving

24   Mr. Mirhadi's motorcycle or the individual that was charged

25   for the murder of Mr. Mirhadi, correct?

```
 1              MR. GUTIERREZ:  Objection; relevance, 403.

 2              THE COURT:  Sustained.

 3              BY MR. DENIS:  Q.  As part of your plea agreement,

 4    did you believe that you would be -- strike that.  As far as

 5    you know, is that investigation still ongoing?

 6    A.  Which one?

 7    Q.  The murder of Mr. Mirhadi.

 8    A.  I don't think it's still ongoing.

 9    Q.  But at some point in time, you were arrested for -- as an

10    accessory to Mr. Mirhadi's --

11              MR. GUTIERREZ:  Objection; 403, relevance.

12              THE COURT:  The objection is sustained.

13              BY MR. DENIS:  Q.  And after your arrest and you

14    met the government, you indicated to the government that

15    you -- that you were seeking Mr. Akhundov for Mr. Wedding,

16    correct?

17    A.  Yes.

18    Q.  And you were looking to purchase drugs for Mr. Wedding,

19    correct?

20    A.  Yes.

21    Q.  And did you know of a Mr. Akhundov?

22              MR. GUTIERREZ:  Vague as to time, your Honor.

23              THE COURT:  The objection is sustained, if you can

24    narrow that down --

25              MR. DENIS:  Yes, your Honor.
```

488

1          THE COURT:  -- Mr. Denis.

2          BY MR. DENIS:  Q.  At some point in time before

3   June 10, 2008, you indicated you were looking to purchase

4   drugs for Mr. Wedding, correct?

5   A.  Yes.

6   Q.  And at that time when you were looking to purchase drugs,

7   did you know a Mr. Elmar Akhundov?

8   A.  I knew him just as we went to the same gym together.  I

9   knew him through my friend, and he's the one that eventually

10  introduced me to Mr. Akhundov.

11  Q.  And who was your friend?

12  A.  His name is Dimitri.

13  Q.  Does Dimitri go to the same gym or martial arts school

14  that you did?

15  A.  Yes.

16  Q.  And Akhundov goes to that same gym or martial arts school

17  that you go to, right?

18  A.  Yes.

19  Q.  How long have you been going to that martial arts school?

20  A.  At the time roughly around six months.  Can't remember

21  exactly how much time.

22  Q.  And Dimitri is the one that introduced you to Mr.

23  Akhundov?

24  A.  Yes.

25  Q.  And you indicated that prior to that meeting, or prior to

1    being introduced, you had wired money for Mr. Wedding,

2    correct, for 300?

3    A.   Yes.

4    Q.   And that was for $250,000?

5    A.   Yes.

6    Q.   Or was it $300,000?

7    A.   It was -- it was close to 300,000 Canadian, which ended

8    up being 250 U.S. with the exchange rate and the fee.

9    Q.   And what was the -- if it was 250,000 U.S., what would be

10   the exchange percentage?

11   A.   Whatever the exchange rate was for U.S. to Canadian plus

12   the fee.

13   Q.   And was it always 15 percent or was it a different

14   percent?

15   A.   Believe the last time was 15 percent.  It was -- I do

16   remember it being different sometimes.

17   Q.   What was the date that you did that first exchange for

18   Mr. Wedding?

19   A.   I can't remember that.

20   Q.   Give me an approximation.  Before the -- before the June

21   10, 2008 travel, how much -- how far back was that?

22   A.   Maybe four or five months.  I can't remember exactly.

23   Q.   And you indicated that you transfered -- did you pick up

24   300,000 Canadian from Mr. Wedding, then have that transported

25   down to the United States?

1  A.  Yes.

2  Q.  You indicated that it got stolen, correct?

3  A.  He indicated to me that the person that was supposed to

4  purchase drugs for him had ran off with the money.

5  Q.  And did you travel to the United States for that

6  exchange?

7  A.  No.

8  Q.  So you just got the money and gave it to the money

9  exchange?

10  A.  Yes.

11  Q.  Did you use Salamet?

12  A.  Yes.

13  Q.  And did Salamet send it down to Mister -- to the rug

14  store down in the United States?

15  A.  I believe so.

16  Q.  And had you picked up money from the drug (sic) store on

17  a previous occasion?

18  A.  No.

19  Q.  So you were never involved in wiring money down to Los

20  Angeles prior to this incident?

21  A.  I had been, but I had never picked up the money.

22  Q.  So your involvement would be just to take money from

23  someone and take it to a money exchange?

24  A.  Yes.

25  Q.  And that person would arrange it down at the bottom -- in

491

1    the United -- in California?

2    A.    Yes.

3    Q.    Is that the only connection that you had at that time?

4    A.    I believe that was the only reliable connection.

5    Q.    And that's what you used, correct?

6    A.    Yes.

7    Q.    Are you -- did you have a situation where you had took

8    money and wired it, and your money or product was lost or

9    stolen in California?

10    A.    No.    I didn't have the substantial amount of money that

11    was needed to make a purchase.

12    Q.    So you never did that yourself, correct?

13    A.    No.

14    Q.    You never told anyone that you did that or had that

15    happen to you; isn't that true?

16    A.    I may have told people that I had done that.

17    Q.    So you may have told people that you had transfered money

18    and someone stole the money or the drugs from you in

19    California?

20    A.    No.    I may have said to people that I had bought drugs

21    for myself or sent money for myself, but I had never told

22    anyone that I had lost money.

23    Q.    I'm going to play you a clip -- we'll get back to that

24    clip.    Going to show you what --

25              MR. DENIS:    Your Honor, I have -- we don't have the

1    clip on Sanctions, but we have the portion of the clip --

2              THE COURT:  Well, counsel, once again, if you're

3    going to -- if you're intending on showing something or

4    introducing something, I suggest you talk to counsel to see

5    if there's any objection.

6              BY MR. DENIS:  Q.  So, Mr. Hassan, you indicated

7    that you never told -- did you ever tell Michael Krapchan

8    that you had -- that you had merchandise that disappeared or

9    ran away and that you had paid back investors or returned

10   their money?

11   A.  I don't think so.

12             MR. DENIS:  Your Honor, I'd like to play a

13   statement or transcript of a statement.

14             MR. GUTIERREZ:  Lack of foundation, improper

15   impeachment, your Honor.

16             THE COURT:  At this point I'll sustain the

17   objections -- just on the first ground.

18             MR. DENIS:  But, your Honor, this is a transcript

19   that Ms. Johnson -- okay.  All right.

20             BY MR. DENIS:  Q.  Now, you indicated here -- you

21   testified that -- that you -- you sought out Mr. Akhundov,

22   correct?

23   A.  I didn't know at the time who the person was.  I just had

24   asked my friend if he had anyone that could buy drugs, that I

25   could buy drugs, which eventually led to the meeting with Mr.

1   Akhundov.

2           MR. DENIS:  I apologize, your Honor.

3           THE COURT:  Well, let's move the questioning along.

4   Why don't you continue on with your questioning.

5           BY MR. DENIS:  Q.  All right.  And you indicated

6   here, Mr. Shirani, that you were not involved in this deal

7   other than transportation, correct?

8   A.  My involvement was to provide for the money to be here

9   and to do the transportation and to introduce -- to make an

10  introduction of the buyer and the seller.

11  Q.  So you had the source here in the United States, correct?

12  A.  Yes.

13  Q.  And you had the ability to transport the money from

14  California to Canada, correct?

15  A.  Yes.

16  Q.  And you came down to negotiate this deal, correct?

17  A.  Yes.

18  Q.  And you were supposed to make $400 for each kilo that was

19  transported, correct?

20  A.  Yes.

21  Q.  So if there was 24 kilos supposed to be transported, how

22  much would you have made?

23  A.  I think about $9,600.

24  Q.  $9,600?

25  A.  I think, if my math is correct.

1   Q.   And you also indicated that you took the money to the --

2   you took about -- how much money did you take to the

3   exchange?

4   A.   I think it was roughly around 390,000 roughly, maybe 400.

5   I can't remember exactly.

6   Q.   And you indicate here that you took about 390 or 400,000.

7   Back in July 17 when you met with the government, they asked

8   you how much money did you take to the money exchange; do you

9   remember that?

10  A.   No, not exactly.

11  Q.   Do you recall them asking you about the money?

12  A.   Yes.

13  Q.   Do you recall what you told them?

14  A.   I believe I do.

15  Q.   And what did you tell them?

16  A.   I believe that I told them that I had picked up the money

17  and dropped it off to -- the currency to be wired down to LA.

18  Q.   And how much money did you need to get wired down to LA?

19  A.   It was roughly around -- I think it was around 390,000,

20  400,000, it was roughly around what I needed.

21  Q.   How much money did you need in LA?

22  A.   Three-forty.

23  Q.   And you didn't tell the government that you picked up

24  $340,000 from Canada?

25  A.   I told them that I picked up around 400 -- 390, 400 I

1    think.

2    Q.   That's what you told the government, correct?

3    A.   I think.  I don't remember exactly.

4    Q.   Well, at that time you were being truthful with them,

5    correct?

6    A.   Yes.

7    Q.   You also indicated that you were -- you were not part of

8    the actual cocaine transaction or the deal involving the

9    cocaine, correct?

10   A.   I was here for that reason, to make the transaction go

11   through.

12   Q.   But you didn't have any ownership in the actual kilos of

13   the cocaine, correct?

14   A.   I did not.

15   Q.   And you were not the -- I'm going to play the clip of

16   June 11, which we heard a portion of.

17              THE COURT:  Well, which exhibit number is it and

18   clip number, please?  You say it's already been played?

19              MR. DENIS:  It's been played, your Honor.

20              THE COURT:  Which exhibit and clip number?  Why

21   don't you confer with Mr. Gutierrez.  Perhaps he can assist

22   you.

23              MR. GUTIERREZ:  We have no objection, your Honor.

24   We understand it's a call in English.

25              THE COURT:  Do you have a designation for it?  It

1    is something you've already played, Mr. Gutierrez?  We're

2    looking just for a little help here by way of exhibit number

3    and clip number, counsel.  Do you -- we need to mark it for

4    identification --

5              MR. DENIS:  Right.

6              THE COURT:  -- so that we have a record of what

7    evidence is put before the jury.

8              MR. GUTIERREZ:  The clip we played, your Honor,

9    will be of no assistance to counsel because it was a small

10   portion.  If he wants to play more, I think he'd have to come

11   up with the number.

12             MR. DENIS:  And I do recall and I apologize.  I

13   think we have the audio portion; we didn't have the actual --

14   oh, we do.

15             THE COURT:  Tell you what, Mr. Denis.  If you can

16   continue on with another -- if you have any more

17   questioning --

18             MR. DENIS:  We have the clip, your Honor.  I

19   apologize.

20             THE COURT:  All right.  What is it?

21             MR. DENIS:  It's going to be a new clip, which we

22   will mark as --

23             THE COURT:  What exhibit number then?  Has it

24   previously been marked as an exhibit or is it --

25             MR. DENIS:  No, it's not.  This was --

1          THE COURT:  All right.  Would you like to --

2          MR. DENIS:  It's the June 11, 2008 clip.

3          THE COURT:  Would you like to mark this KK?

4          MR. DENIS:  KK, your Honor.

5          THE COURT:  So KK will be a transcript then of this

6    particular clip.  We'll call this clip 1.  You're aware of

7    what's about to be played now, Mr. Gutierrez?

8          MR. GUTIERREZ:  Yes, your Honor.

9          THE COURT:  Okay.  This is a conversation of what

10   date, sir?

11         MR. DENIS:  This is June 11, your Honor.

12         THE COURT:  Okay.  Let's proceed.

13      (Exhibit No. KK-1 identified.)

14      (The audio recording was played.)

15         BY MR. DENIS:  Q.  So, Mr. Shirani, in this

16   recorded conversation it indicates that you are -- that two

17   of the kilos are your money?

18   A.   Yes.

19   Q.   Correct?

20   A.   No.

21   Q.   That's what you said on the recording.

22   A.   I understand.

23   Q.   Okay.  And you indicated that you were not involved in

24   planning this deal, correct?  You were just transporting the

25   money; is that true?

1   A.   Transporting the money --

2   Q.   Or just bringing the money and then transporting the

3   drugs, correct?

4   A.   And making the introduction for --

5   Q.   And making the introduction.  Okay.  I'm going to play a

6   second clip, which we will -- hold on.  It's the June 11

7   call.

8               THE COURT:  Is this part of the same conversation?

9               MR. DENIS:  Part of the same conversation but it's

10  going to be a separate clip, your Honor.  So we'll have it

11  June -- it will be Exhibit LL --

12              THE COURT:  No, it's Exhibit KK, clip 2.  That's

13  fine.

14              MR. DENIS:  Okay.  KK-2?

15              THE COURT:  Yes.

16      (Exhibit No. KK-2 identified.)

17      (The audio recording was played.)

18              BY MR. DENIS:  Q.  So you were going to do two,

19  two, two, correct?

20  A.   Yes.

21  Q.   And that two of them, according to your statement, was

22  your money and the rest were other people's money, correct?

23              MR. GUTIERREZ:  Compound as phrased, your Honor.

24              THE COURT:  Overruled.  You may answer that, sir.

25              THE WITNESS:  I said two at a time because I had

499

1    enough money to cover two.

2              BY MR. DENIS:  Q.  So you -- on the recording it

3    said two was your money, correct?

4    A.  Yes, but the reason I say --

5    Q.  No pending question.  And during the proffer you

6    indicated that the money in a drug deal, they usually don't

7    travel, correct?

8    A.  On the plane, yes.

9    Q.  Well, they don't -- if there's going to be a drug

10   transaction, the money person usually stays in Canada; isn't

11   that true?

12   A.  Yes.

13   Q.  Your brother was supposed to come down to Los Angeles,

14   correct?

15   A.  Yes.

16   Q.  And that was on a previous -- and your brother was

17   supposed to be flying down with you guys when you came to LA,

18   correct?

19   A.  That's correct.

20   Q.  But he never did come and fly down to California,

21   correct?

22   A.  Yes.

23   Q.  Was your brother due a share in this deal?

24   A.  No.

25   Q.  Michael Krapchan was due a share in this deal, correct?

1    A.  Yes.

2    Q.  You indicated he was the broker in this deal, correct?

3    A.  Yes.

4    Q.  And you met with them -- you met with him and Akhundov on

5    at least a couple of occasions, correct?

6    A.  Yes.

7    Q.  And he was familiar with the deal that was happening?

8    A.  Yes.

9           MR. DENIS:  Your Honor, this is a call from June 8,

10   which we will mark as LL.

11          THE COURT:  Well, would you like to show it to

12   counsel?

13          MR. DENIS:  Yes.

14          MR. GUTIERREZ:  Objection, your Honor; lack of

15   foundation, hearsay.

16          THE COURT:  The objection is sustained on the first

17   ground at this time.

18          BY MR. DENIS:  Q.  Play another clip which we will

19   mark as Defense Exhibit LL.  This is a portion of a call

20   that's been previously admitted.

21          THE COURT:  Counsel, please move along.  It's three

22   to four minutes and we've just been sitting here without

23   anything happening.

24          MR. DENIS:  Apologize.

25          MR. GUTIERREZ:  Your Honor, I was informed that

1    this is a call from June 10, 2009 (sic).  That transcript is

2    in the record, so we have no objection.

3              THE COURT:  Has it been previously marked as an

4    exhibit?

5         (The audio recording was started.)

6              THE COURT:  Stop the recording, please.  Stop the

7    recording.  Has it been previously marked as an exhibit?

8    Counsel, a little help from any --

9              MR. GUTIERREZ:  Yes, your Honor.

10             THE COURT:  -- voice here.  Okay.  What is the

11   exhibit number, please?

12             MR. DENIS:  The transcript was admitted, your

13   Honor, but we're going to play a clip, and we --

14             THE COURT:  I understand that.  Can you help us out

15   with an exhibit number, if you know?

16             MR. GUTIERREZ:  Exhibit 26, your Honor.

17             THE COURT:  Exhibit 26.  And what clip was it?

18             MR. DENIS:  There's going to be a new clip, your

19   Honor.

20             MR. GUTIERREZ:  It will be a new defense clip.

21             THE COURT:  Okay.  Exhibit LL --

22             MR. DENIS:  Right.

23             THE COURT:  -- clip 1.

24             MR. DENIS:  June 10.

25             THE COURT:  June 10.  Thank you.

502

1              (Exhibit No. LL-1 identified.)

2              (The audio recording was played.)

3                    BY MR. DENIS:  Q.  Were you able to see that clip?

4   A.   Yes.

5   Q.   And Mr. Krapchan indicated that you were supposed to have

6   five kilos of cocaine?

7   A.   It says his are four kilograms, four, five kilograms.

8   Q.   So yours was supposed to be four or five kilograms

9   correct?

10  A.   Yes.

11  Q.   And is that different than the two kilograms that you

12  said?

13                    MR. GUTIERREZ:  Objection, argumentative.

14                    THE COURT:  The objection is overruled.  You may

15  answer if you are able to.

16                    THE WITNESS:  Can you repeat the question, please.

17                    BY MR. DENIS:  Q.  Four or five kilos is different

18  than the two kilograms that you said, correct?

19  A.   Yes.

20  Q.   And it's different than just saying you're supposed to

21  receive $400 per kilo for transportation, correct?

22  A.   Yes.

23  Q.   And Mr. Krapchan at that time didn't enter into a plea

24  agreement with the government; isn't that true?

25  A.   From what I know, yes.

1   Q.  And you indicated that your brother was not involved in

2   this deal, correct?

3   A.  Yes.

4   Q.  He wasn't due a share, correct?

5   A.  That's correct.

6   Q.  And he didn't provide any of the money for this

7   transaction, correct?

8   A.  That's correct.

9   Q.  It was all Ryan Wedding's money, correct?

10  A.  That's correct.

11          MR. DENIS:  From the same clip, your Honor.  We'll

12  call it Defense Exhibit LL-2.

13          THE COURT:  Okay.  It's the same exhibit number,

14  this will be clip 2; is that what you're saying?

15          MR. GUTIERREZ:  Your Honor, if I could see that

16  clip before it's played.

17          THE COURT:  All right.  Please show counsel.  Have

18  you marked the transcript clip 2?

19          MR. DENIS:  Yes, your Honor, LL-2.

20          THE COURT:  All right.  Please mark it so that we

21  can preserve it.  Thank you.

22      (Exhibit No. LL-2 identified.)

23      (The audio recording was played.)

24          BY MR. DENIS:  Q.  So Mr. Krapchan indicates that

25  Mr. Krapchan was supposed to receive five kilograms, or four,

1    and then a fifth for the informant, and then you were

2    supposed to receive four or five kilograms, and the rest were

3    your brother's; that's what that indicates, correct?

4    A.   Yes.

5    Q.   And you met with Mr. Krapchan regarding this deal

6    previous to coming down on June 10, 2008, correct?

7    A.   Yes.

8    Q.   And, Mr. Hassan, you indicated that you were like

9    minimally involved in this drug deal or just for the money

10   part, correct?

11          MR. GUTIERREZ:   Objection; states facts not in

12   evidence.

13          THE COURT:   Well, there are two questions there.

14          MR. DENIS:   I think, your Honor --

15          THE COURT:   The first is a mischaracterization of

16   the testimony.  The second part of it is a fair question.

17   You may answer whether you were involved just for the money,

18   sir.

19          THE WITNESS:   No, I -- my part was transporting the

20   money down, delivering the cocaine back, and making the

21   introduction.  I never said I had a small part.  I just said

22   I had no stake in the cocaine.

23          BY MR. DENIS:   Q.   Were you the main person in this

24   deal?

25   A.   I was the main facilitator in the deal.

1   Q.  If you were to have -- if it was a 24-kilo deal and you

2   were supposed to have five kilos and your brother was

3   supposed to have 15 kilos, that would be about 20 kilos,

4   correct?

5   A.  That was never the case.

6   Q.  But if that were the case, that would be -- you would

7   have a big -- you would be the main person in this?

8        MR. GUTIERREZ:  Calls for speculation,

9   argumentative.

10       THE COURT:  Well, it is argumentative.  I'll

11  sustain it on that ground.

12       MR. DENIS:  Okay.

13       BY MR. DENIS:  Q.  Were you the main person in

14  this --

15       MR. GUTIERREZ:  Asked and answered.

16       THE COURT:  The objection is sustained.  Do you

17  have anything further, Mr. Denis?

18       MR. DENIS:  Yes, your Honor.

19       THE COURT:  Please ask your next question.

20       MR. DENIS:  Okay.

21       BY MR. DENIS:  Q.  Now, Mr. Shirani, when you came

22  from Canada to Los Angeles, did you meet Mr. Ryan Wedding at

23  the airport?

24  A.  Yes.

25  Q.  Did you try to meet with Mr. Wedding before coming to the

506

1    airport?

2    A.   He had just arrived from Vegas the night before.

3    Q.   So did you have an opportunity to meet with him?

4    A.   No, I don't think so.

5    Q.   Did you try to meet with him?

6    A.   I don't think I did.

7    Q.   And how long was Mr. Wedding in Las Vegas?

8    A.   I think it was three days, four days.

9    Q.   Do you recall what date that was if he arrived on the

10   9th?

11   A.   No.

12   Q.   So would it be -- three days or four days would be the

13   5th or the 6th that he left to Las Vegas?

14          MR. GUTIERREZ:  Objection; lack of foundation,

15   calls for speculation.

16          THE COURT:  Sustained on the second ground.

17          BY MR. DENIS:  Q.  But he had been in Las Vegas,

18   correct?

19          MR. GUTIERREZ:  Asked and answered, your Honor.

20          BY MR. DENIS:  Q.  And do you --

21          THE COURT:  It has been asked and answered.

22          BY MR. DENIS:  Q.  Do you know why Mr. Wedding was

23   in Las Vegas?

24   A.   He told me that he was there for a stag party.

25   Q.   And do you know what a stag party is?

1             MR. GUTIERREZ:  Objection; relevance, 403.

2             THE COURT:  Overruled.  You may answer.

3             THE WITNESS:  For someone that's getting married.

4             BY MR. DENIS:  Q.  And is that like a bachelor

5   party?

6   A.  I guess.

7   Q.  And did you -- at some -- when did you pick up the money?

8   A.  I don't recall exactly.

9   Q.  You don't recall when you picked up three, almost

10  $400,000 Canadian money?

11  A.  Maybe roughly like a week to ten days before we came

12  down.  I don't recall exactly.

13  Q.  You indicated in your proffer session that Mr. Wedding --

14  he was broke, correct?

15  A.  I don't remember.

16  Q.  And that he had just lost $300,000 on a -- on a bad deal?

17  A.  Yes.

18  Q.  And then he came up with $400,000 after you indicated he

19  was broke; do you recall that?

20  A.  I think so.

21  Q.  So Mr. Wedding was broke, but he had 400,000 -- almost

22  400,000 Canadian dollars to give to you?

23            MR. GUTIERREZ:  Objection; argumentative, compound

24  as phrased.

25            THE COURT:  The objection is overruled.  You may

```
 1   answer.
 2            THE WITNESS:  I believe Mr. Wedding told me that he
 3   had invested in a deal, which that's -- that's the -- that's
 4   all the money that he got from that deal, that he had
 5   invested like -- can't remember -- like four, five, three
 6   months before into a deal, and that was what he got back.
 7            BY MR. DENIS:  Q.  So Mr. Wedding wasn't broke?
 8   A.  Well, before he had received that money, he had been
 9   complaining that he doesn't have any money, and when he
10   received that money, he wanted to go ahead and arrange for
11   the deal.
12   Q.  So this was before you picked up the money?
13   A.  I can't remember.
14   Q.  Okay.  And you were going to have to pay 15 percent to
15   the money exchange, correct?
16   A.  That's correct.
17   Q.  And that was about $50,000?
18   A.  I think so.
19   Q.  And do you recall what the exchange rate was at that
20   time?
21   A.  No.
22   Q.  Did you ever count the money?
23   A.  Not personally, no.
24   Q.  So you just gave it to the -- do you recall exactly how
25   much you gave to the exchange rate, (sic) or just brought
```

1    them a box of money?

2    A.   It was box.   It was like a -- it was a box similar to

3    that one, maybe bigger.

4    Q.   Which box?

5    A.   The box underneath that table.   It was like maybe a third

6    bigger, and it had stacks of money in it.   I just counted the

7    stacks, not the individual money.

8    Q.   And you picked it up from Mr. Wedding?

9    A.   I picked it up at his house, yes.

10   Q.   And when did you pick it up?

11   A.   I can't exactly remember.   It was -- I think it was about

12   a week, ten days before we -- we were coming down.

13   Q.   And did you hang on to that money in your house?

14   A.   No.

15   Q.   You took it straight to the exchange?

16   A.   Yes.

17   Q.   And didn't you indicate that the exchange took -- you can

18   get money down to where you needed it in like 12 to 24 hours?

19   A.   It's when the money is going to Iran or coming back to

20   Vancouver.   This is a little bit more difficult because it's

21   dealing in cash only, so it takes a little bit more time from

22   what I had been told.

23   Q.   Well, didn't you just previously testify yesterday that

24   the money exchange takes 12 to 24 hours to do?

25   A.   That's for a regular -- that's for like -- that's for a

1  regular wire.  This kind of wire usually takes a week to ten

2  days.

3  Q.  And did you give the money to the exchange rate (sic) a

4  week to ten days before?

5  A.  I believe so, yes.

6  Q.  And the money wasn't ready when you got down there?

7  A.  Yes.

8  Q.  Were you trying to save the $50,000 for yourself?

9  A.  No.

10  Q.  Did you intend to put the money in Mr. Wedding's bag?

11  A.  No.

12  Q.  Did you ever tell Michael Krapchan you were going to put

13  the money in Mr. Wedding's bag?

14  A.  No.

15  Q.  Did you tell anyone you were going to put the money in

16  Mr. Wedding's bag?

17  A.  What money?  This 50,000 is coming from where?

18  Q.  No, the close to 400,000 or 340,000.

19  A.  That -- that I told Mr. Krapchan that I was putting the

20  money in Mr. Wedding's bag?

21  Q.  Yes.

22  A.  I never said anything like that.

23  Q.  At the airport did you ever tell Mr. Krapchan you thought

24  that -- did Mr. Krapchan ever ask you what happened to the

25  money at the airport?

1    A.   I don't -- I don't remember.

2              MR. DENIS:   Going to mark MM --

3              THE COURT:   I think this has already been played

4    for the jury, but just to facilitate things, the witness

5    indicated he doesn't remember.  If you have a transcript or

6    any other piece of paper that might refresh his memory, why

7    don't you show it to him if you wish to --

8              MR. DENIS:   It's just a small clip.

9              THE COURT:   That's fine.  If it's already been

10   played, then just make sure that Mr. Gutierrez is on board

11   with what it is, and then we can move along.

12             MR. GUTIERREZ:   We'd have no objection, your Honor.

13   It's from the translated call of 6-10, which I believe is

14   Government's Exhibit 26.

15             THE COURT:   Is it a clip that's already been

16   played?

17             MR. GUTIERREZ:   It's not a clip that's already been

18   played that I'm aware of, your Honor.

19             THE COURT:   Okay.  Then --

20             MR. DENIS:   Then we'll mark it as Defense MM.

21             THE COURT:   Then it's MM.  This will be -- a

22   transcript of this will be Exhibit MM, clip 1.  The audio

23   will be played.  The transcript will be marked as a court

24   exhibit.  And this is a 6-10 recording; is that correct,

25   counsel?

1            MR. DENIS:  Yes, your Honor.

2            THE COURT:  Okay.  Thank you.

3        (Exhibit No. MM-1 identified.)

4        (The audio recording was played.)

5            BY MR. DENIS:  Q.  Mr. Shirani, it indicates

6    Krapchan overlapping.  He's doing -- he's doing something.

7    He said that's okay.  The confidential source says talk to

8    him.

9            When the confidential source asked to talk to him,

10   did Mr. Krapchan talk to you about what happened with the

11   money or why -- where was the money?

12   A.  I don't think so.

13   Q.  And then when Mr. Krapchan says he said that the money

14   was supposed to be in the bag but there were some kind of

15   unforeseen events, you didn't tell him that?

16   A.  No.

17   Q.  When you made this deal, was the deal supposed to happen

18   on that same day when you arrived?

19   A.  I wasn't under that impression, no.

20   Q.  Did you expect that when you came down, it was going to

21   take several days to get the money from the havale, what you

22   set up?

23   A.  I was expecting the money to be ready, and when it wasn't

24   ready, that's when we had the problems that we had.

25   Q.  You indicated that you would have to pay -- you were --

1    as part of the money exchange with the exchange rate (sic),

2    you'd give them 14 percent of the money exchanged and you'd

3    keep 1 percent, correct?

4    A.   That's correct.

5    Q.   On July 17, 2008 when you had your proffer session, you

6    never said that you get a percent for the money exchange,

7    correct?

8    A.   I guess not.

9    Q.   So the first time you brought that up was here in court,

10   correct?

11   A.   I believe I've brought it up before.

12   Q.   And when you say you brought it up before, was that

13   recently?

14   A.   I don't remember if it was recently or not.

15   Q.   And it was basically to show that you had some -- so at

16   least you get a percentage of doing this money transfer,

17   correct?

18              MR. GUTIERREZ:   Argumentative as phrased, your

19   Honor.

20              THE COURT:   The objection is overruled.

21              THE WITNESS:   Can you repeat the question, please.

22              BY MR. DENIS:   Q.   It was to show that you at least

23   get a percentage of this money transfer, correct?

24   A.   That's correct.

25   Q.   And that was 1 percent, correct?

1   A.   That's correct.

2   Q.   And the 15 percent of the $340,000, that's roughly almost

3   $50,000?

4   A.   Okay.

5   Q.   So if you're able to put that in Mr. Wedding's bag, let's

6   just say, you could have kept that, correct?

7           MR. GUTIERREZ:  Calls for speculation,

8   argumentative.

9           THE COURT:  The objection is sustained on the

10  second ground.

11          BY MR. DENIS:  Q.  If you didn't take the money to

12  the exchange, you wouldn't have to pay the 14 percent,

13  correct?

14  A.   That's correct.

15  Q.   If you found a different way to do it, you could have

16  saved that money for yourself, correct?

17  A.   That's correct.  But anyone who's going to do a deal like

18  that, they're going to charge a fee.

19          MR. DENIS:  Your Honor, this was an exhibit that

20  was previously played.  I must apologize.  It's defense

21  exhibit --

22          THE COURT:  Well, rather than having duplicate

23  exhibit numbers for the same clip, if that's what you're

24  going to do, just --

25          MR. DENIS:  It's a different -- yeah.

515

1                THE COURT:  It's a clip that's already been played?

2                MR. DENIS:  Yes, your Honor.

3                THE COURT:  Okay.  Well, just indicate -- well, do

4     you have the government exhibit number so it can just be

5     replayed at this time?

6                MR. DENIS:  The government exhibit number?  I

7     don't, your Honor.

8                MR. GUTIERREZ:  I believe it was played by the

9     defense, your Honor, and he's trying to call it something

10    that he's already played, so I don't know what he's directly

11    referring to.

12               THE COURT:  Okay.  Then if you've already played

13    it, just give us the exhibit number and clip number then so

14    we have a record of it.

15               MR. DENIS:  Your Honor, it's Defense Exhibit EE.

16               THE COURT:  Okay.  And it's a clip?

17               MR. DENIS:  Yes.

18               THE COURT:  Okay.  You've already played it, so

19    you'd like to play it again?

20               MR. DENIS:  Yes, your Honor.

21               THE COURT:  All right.  Very good.  Thank you.

22               MR. DENIS:  Actually, your Honor, could we -- it's

23    a smaller version of that clip.

24               THE COURT:  Well, just play what you'd like from

25    that.

1          MR. DENIS:  Okay.  Thank you, your Honor.

2          THE COURT:  Okay.

3       (The audio recording was played.)

4          BY MR. DENIS:  Q.  So when Mr. Krapchan again

5    indicates that -- at first he said that the money should be

6    in the bag, something probably didn't work out well at the

7    end, you never told him that the money was going to be in

8    Mr. Wedding's bag, correct?

9          MR. GUTIERREZ:  It's been asked and answered, your

10   Honor.

11         THE COURT:  Sustained.

12         BY MR. DENIS:  Q.  And, Mr. Shirani, did you tell

13   Mr. Wedding that you were coming here to do a car deal for

14   your brother?

15   A.  No.

16   Q.  Does your brother have a car business in Iran?

17   A.  No.

18   Q.  Does your brother do any kind of dealing with cars in

19   Iran?

20   A.  No.

21   Q.  Did your brother ever want to purchase a motorcycle from

22   Mr. Wedding?

23   A.  Not that I know of.

24   Q.  Did your brother ever tell Mr. Wedding that your brother

25   was involved in some kind of car dealing in Iran?

1   A.   I don't know.

2   Q.   Did you tell your family that you were coming down to Los

3   Angeles for a car deal?

4   A.   I hadn't told anyone why I was coming down except for my

5   brother.

6   Q.   So your brother knew why you were coming down, correct?

7   A.   Yes.

8   Q.   So he had knowledge you were going to participate in a

9   drug deal, correct?

10  A.   That's correct.

11  Q.   And he was originally supposed to come down to Los

12  Angeles, correct?

13  A.   Yes.

14  Q.   And then he didn't?

15  A.   That's correct.

16  Q.   Now, you indicated when you met the confidential source

17  and -- at the airport, did you ever make reference to him

18  later on that this was the crazy guy?

19  A.   I did.

20  Q.   And you indicated that he was agitated, correct?

21  A.   That's correct.

22  Q.   Was he very upset that the deal didn't take place that

23  day?

24  A.   He was fairly agitated.

25  Q.   Did he ever -- or during that conversation there at the

1    airport, did anybody ever discuss drugs or say the word

2    "cocaine"?

3    A.   No.

4    Q.   And you indicated that when you first came down, there

5    was a discussion about the money not being available, was Mr.

6    Wedding next to you when you indicated that the money wasn't

7    available?

8    A.   I'm not sure.

9    Q.   And at that time at the airport, did you indicate that

10   you were waiting from a call from your brother?

11   A.   Yes.

12   Q.   And it was in reference to the money, correct?

13   A.   That's correct.

14   Q.   Did your money take -- did your brother take the money to

15   the money exchange?

16   A.   No.

17   Q.   You personally did, correct?

18   A.   That's correct.

19   Q.   And your brother was supposed to call you back about

20   what's going on with the money?

21          MR. GUTIERREZ:  Asked and answered, your Honor.

22          THE COURT:  Sustained.

23          BY MR. DENIS:  Q.   And when you were waiting for a

24   call from your brother, did your brother call you when you

25   were at LA?

1          MR. GUTIERREZ:  That's been asked and answered,

2    your Honor.

3          THE COURT:  Ladies and gentlemen, we're going to

4    take a brief recess at this time, just five minutes.  Please

5    remember the admonition not to discuss the case or make any

6    decisions at this time.  Thank you.

7        (The jury left the courtroom.)

8          THE COURT:  Sir, would you step in the back behind

9    the railing.  Let me see counsel at the side of the bench.

10   Would you please secure Mr. Wedding at this point, Marshal.

11       (Following is a sidebar conference.)

12         THE COURT:  I've been advised -- we're at the side

13   of the bench here.  I've been advised that there's

14   communication going on between Mr. Wedding and his entourage

15   still.  You're aware of this I assume.

16         MR. DENIS:  No, I'm not, your Honor.

17         THE COURT:  Okay.

18         MR. DENIS:  Definitely not done in my presence.

19         THE COURT:  It's not done in your presence, but I

20   can see notes being passed back and forth between --

21         MR. DENIS:  Who?

22         THE COURT:  -- between Wedding and this individual

23   you have sitting at the computer, and he's not -- all he is

24   is a technician.

25         MR. DENIS:  Correct.

1        THE COURT:  It's clear to me that there are notes

2   being passed --

3        MR. DENIS:  Perhaps about clips on some --

4        THE COURT:  No, I don't think it's about clips.

5   You want to bring that note up?

6        MR. DENIS:  Yeah.

7        THE COURT:  Why don't you bring the note up and you

8   can let me know what it's about.  Counsel, it's right there

9   by the computer.  No, no.  There was something else.  Okay.

10  He should be communicating with you --

11       MR. DENIS:  I know.

12       THE COURT:  -- rather than this individual.  You

13  know, I've tried to extend the courtesy to you --

14       MR. DENIS:  Very much so and I appreciate it, and I

15  apologize.

16       THE COURT:  This is --

17       MR. DENIS:  And just for the record, I have to

18  apologize.  It's the clips that are killing us here.

19       THE COURT:  Well, this guy is not -- he's not a

20  paralegal, he's not an attorney, I don't even think he's

21  employed in your office; as I understand, he's just a friend.

22       MR. DENIS:  No, he's a -- he's an independent

23  contractor for this -- for this machine and then --

24       THE COURT:  Did you --

25       MR. DENIS:  -- I chose him because he speaks

521

1  Russian, and --

2  THE COURT:  Okay.  Well --

3  MR. DENIS:  -- it was --

4  THE COURT:  -- let me tell you what my concern is.

5  The marshals have come to me again, came to me this morning,

6  they came to the Court this morning saying there's still

7  unauthorized communication going on between your client and

8  his sister.  Now, I don't want to bar his sister or any of

9  his friends from the courtroom, but you need to know that

10  he's making it difficult for the marshals.  Now, I thought --

11  MR. DENIS:  I did see him -- just for the record,

12  your Honor, I did see him turn around, smile, and say hi --

13  THE COURT:  I'm not talking about --

14  MR. DENIS:  That's all that happened in the

15  beginning.  That's all I saw.

16  THE COURT:  I'm not talking about that.  The

17  marshals are talking about more communication than that.  You

18  need to let him know at the noon recess he can't be

19  communicating or attempting to communicate with friends back

20  there through notes or -- as he did yesterday, or in any

21  other manner because the marshals are just kind of hinky

22  about this case in any event.  Just tell him to knock it off.

23  MR. DENIS:  I did.  We were good yesterday, and I

24  said I want to maintain that.

25  THE COURT:  All right.  That's good.  That's good.

1    But, you know, it really -- it just creates the wrong

2    impression.  These two are whispering at one another, they're

3    looking up at me, and then once in a while, my eye will catch

4    them, and it looks like they've been caught.  And I don't

5    know what's going on.  All I know is we've had a problem with

6    unauthorized communication, and I just don't want to see any

7    more of this.  This is fine.  I don't have a --

8              MR. DENIS:  I'm sure that's all.  I'm struggling

9    with the clips, your Honor.  I think they're trying to help

10   with the clips.

11             THE COURT:  That's fine.

12             MR. DENIS:  And, your Honor, I do have to inquire

13   to see -- partially the problem that we're having with the

14   other clips is we have a number of transcripts that are up

15   there.  I assumed they were all the calls, and when I was

16   meeting with my staff about that, they indicated almost all

17   the calls those days that we want are there.  So the clips

18   then I'm showing and to present, then he's telling me they're

19   not up there.  And, again, I wish -- I mean --

20             THE COURT:  This is really -- we've had a

21   circumstance here where it's two to three minutes are going

22   by --

23             MR. DENIS:  Correct.

24             THE COURT:  -- where you're not doing anything,

25   you're just standing at the lectern.  I don't say anything

1    until we have that kind of time going by, and then I try to

2    nudge you gently just to keep the questioning moving because,

3    frankly --

4              MR. DENIS:  Correct.

5              THE COURT:  -- because frankly the jury is just

6    moving around in their chairs --

7              MR. DENIS:  Sure.

8              THE COURT:  -- and they're becoming impatient,

9    that's clear.  I know that you must be aware of that.  So we

10   just need to keep things moving.  I know when we get back to

11   the clips that -- you know, the government offered to

12   stipulate to the authenticity of everything that they've had,

13   including what you're showing now.  I mean the real

14   unfortunate part of this is that everything you've played has

15   been provided to you by the government, and you could have

16   easily avoided all of this just by entering into the

17   stipulation the government suggested on the authenticity and

18   accuracy of the tapes.  That would have eliminated the need

19   to bring in Ms. Johnson, the translator, and establish that

20   whole chain of authentication, but --

21             MR. DENIS:  I did do that.

22             THE COURT:  Well --

23             MR. DENIS:  The translations, I did do that.

24             THE COURT:  Well, the problem is though you've

25   reached no stipulation here, and that's why you need to show

1  any kind of a clip that you're going to be showing to Mr.

2  Gutierrez so he can tell you whether he's got an objection to

3  it, if it's already been played as a part of the government's

4  case and you're just replaying it so we have a prior --

5  designation of exhibit identification and anything else that

6  can make things go a little more smoothly.

7           On the immediate problem, we're going to get the

8  jury back in here and we're going to go for about another 15

9  to 20 minutes.  So call the jury back in -- well, hold on.

10  We need to bring Mr. Wedding in and then we'll get the jury.

11           THE CLERK:  Right.

12           THE COURT:  Tell Wedding it's fine for him to write

13  notes as long as the notes are --

14           MR. DENIS:  Legal in nature.

15           THE COURT:  -- as long as they have to do with

16  evidence in --

17           MR. DENIS:  Sure.

18           THE COURT:  -- his communicating with the

19  technician.

20           MR. DENIS:  He's been told this.  He knows.  We

21  want to keep you happy and keep everything --

22           THE COURT:  I know you've done your best.  I know

23  you've done your best.  But he really needs to understand

24  that.

25           MR. DENIS:  Let the Court be assured he's been told

 1   and he's going to honor what the Court, and --

 2              THE COURT:   Okay.

 3              MR. DENIS:   -- he knows, and he's not doing

 4   anything.   I'm -- that's why I was certain -- without even

 5   knowing what the note is, I knew what the note would be

 6   about --

 7              THE COURT:   That's fine.

 8              MR. DENIS:   -- to his defense.   We have had this

 9   discussion.

10              THE COURT:   Okay.   Bring the jury in, please.

11   About how much longer?   Can you finish by noon?

12              MR. DENIS:   No, I'm going to go a little bit after

13   noon.   I have to get organized here -- I apologize -- to see

14   what clips --

15              THE COURT:   You've got to move it along.

16              MR. DENIS:   I know.   I know.   I know.   I won't be

17   long after lunch, that's for sure.

18              THE COURT:   How much longer do you think you'll be?

19   I may take you into the noon hour 10 or 15 minutes if you

20   think you can --

21              MR. DENIS:   I would beg the Court to break at noon

22   so I can get further organized.   I'm blown off with the

23   clips, and I'm a bit rattled, and I apologize.

24              THE COURT:   That's all right.

25              MR. DENIS:   I had my outline, can't find my

1    outline, so it's --

2              THE COURT:  That's what this guy should be helping

3    you with, just getting your stuff together.

4              MR. DENIS:  Yeah.  Well, generally I would have my

5    secretary there or -- who works in my office, and she assists

6    me with marking the exhibits and having them ready --

7              THE COURT:  Is your secretary here?

8              MR. DENIS:  She's here.  And the marshals will not

9    let her -- they've been really strict with us and that's why

10   I'm running to exhibits and I'm trying to pull out -- she's

11   got the stuff down, memorized.  That's why it's the delay.

12   And if the Court could let the marshal know -- and she won't

13   do anything but help me.  She has everything marked, what

14   exhibits, what everything is, and she can get them for me.

15             THE COURT:  All right.  She can sit at a chair in

16   front of the railing, not at counsel table, but if you'd like

17   her a little closer to you, she can sit -- you can just let

18   her know that when you go back there.  Which one is she?

19             MR. DENIS:  She's the one in the front row right

20   there.  Her head is turned.

21             THE COURT:  Okay.  You know, she can sit behind

22   you, behind your chair in the front row, anything to help

23   you --

24             MR. DENIS:  Yeah.

25             THE COURT:  -- move this thing along so we can

527

1    finish on time.

2              MR. DENIS:  Thank you, your Honor.

3         (There was a break in the proceedings.)

4              THE COURT:  Okay, ladies and gentlemen.  We are

5    going to continue.  Thank you for your patience.  We needed

6    to discuss a couple of matters outside your presence.  Okay.

7    Mr. Denis?

8              MR. DENIS:  Thank you, your Honor.

9              THE COURT:  Please.

10             BY MR. DENIS:  Q.  Mr. Hassan, you indicated at the

11   proffer session in July 17, 2008 that your brother didn't

12   know what business you were in, correct?

13   A.   I don't think so.

14   Q.   So you told them that your brother did know?

15   A.   I don't -- I don't remember any questions --

16   Q.   Regarding your brother's knowledge?

17   A.   I don't -- no, I don't think I ever said that he didn't

18   know.

19   Q.   Did you tell your mother that or -- your brother knew why

20   you were coming down, correct?

21   A.   Yes.

22   Q.   Did you tell your mother you were coming down for a drug

23   deal?

24   A.   No.

25   Q.   Did you tell your mother you were coming down for a car

1   deal?

2   A.   No.

3   Q.   Was your mother -- okay.  You did not tell your mother

4   that you were coming down for a car deal, correct?

5              MR. GUTIERREZ:  Objection; asked and answered.

6              THE COURT:  Sustained.

7              BY MR. DENIS:  Q.  Did you tell anyone that you

8   were coming down for a car deal?

9   A.   Not that I can remember.

10             THE COURT:  Keep your voice up, sir.

11             THE WITNESS:  I apologize.

12             BY MR. DENIS:  Q.  Now, you indicated that you

13   train in martial arts, correct?

14   A.   I have.

15   Q.   And how long have you been doing that?

16   A.   I did that for about nine months.

17   Q.   Nine months.  When you met the confidential source, was

18   he a big man?

19   A.   Yes.

20   Q.   Were you afraid of him?

21   A.   I was afraid of his reputation that he was an ex-KGB

22   officer.

23   Q.   And are you the one -- you indicated that -- strike that.

24   If the confidential source was to attack you, could you beat

25   him up?

```
 1   A.   I didn't think I could.

 2   Q.   You did not think you could?

 3   A.   No.

 4   Q.   You think he could have beat you up?

 5   A.   I think I -- yes.

 6   Q.   Could you describe the confidential source.

 7   A.   From what I remember, he was probably about

 8   Mr. Krapchan's height, and --

 9   Q.   How tall is Mr. Krapchan; do you recall?

10   A.   I don't recall.

11   Q.   How tall are you?

12   A.   I'm about 6 feet.

13   Q.   Is he shorter than you?

14   A.   I think he was a little bit shorter, yes.

15   Q.   Okay.  And was the confidential source -- how much do you

16   think he weighed approximately?

17   A.   I think he was about -- he was a larger man.  I couldn't

18   tell you exactly, but he was a larger man.

19   Q.   Was he an older guy?

20   A.   He was an older guy.

21   Q.   Can you approximate his age?

22   A.   I would approximate it probably around Mr. Krapchan's

23   age.

24   Q.   Approximately how old is Mr. Krapchan?

25   A.   I think he's in his late 40s.  I think the confidential
```

1  source -- I think he was probably in his mid 40s from what I

2  could tell.

3  Q.  And you indicated that the confidential source could

4  probably have beaten you up?

5          MR. GUTIERREZ:  Objection; asked and answered, your

6  Honor.

7          THE COURT:  Sustained.

8          MR. DENIS:  I didn't hear the response.  I

9  apologize.

10         THE COURT:  Okay.  You may answer again, sir.

11         THE WITNESS:  I think he could, yes.

12         BY MR. DENIS:  Q.  Beat you up?

13  A.  Yes.

14  Q.  So you were afraid of him?

15         MR. GUTIERREZ:  Objection; asked and answered.

16         THE COURT:  Sustained.

17         BY MR. DENIS:  Q.  Now, you indicated that you

18  brought Mr. Wedding down, who you indicated is the money

19  person, correct?

20  A.  That's right.

21  Q.  So this was unusual that the money person actually

22  traveled to where the drug transaction happened, right?

23  A.  That's correct.

24  Q.  You previously indicated that the money person doesn't

25  come down?

531

```
 1            MR. GUTIERREZ:  Objection; asked and answered.
 2            THE COURT:  Counsel, it was asked and answered.
 3            MR. DENIS:  Okay.
 4            BY MR. DENIS:  Q.  And when you told the
 5   confidential source that the money was not available, did he
 6   get upset?
 7   A.  He got agitated.  He was agitated.
 8   Q.  Did you tell him you were waiting for a phone call from
 9   your brother?
10            MR. GUTIERREZ:  Asked and answered, your Honor.
11            MR. DENIS:  Okay.
12            BY MR. DENIS:  Q.  At a point in time -- I withdraw
13   the question.  At a point in time you received a phone call
14   from someone, correct?
15   A.  That's correct.
16   Q.  Was that from Mr. Sabouri (phonetic)?
17   A.  I believe so.
18   Q.  And had you dealt with Mr. Sabouri in the past?
19   A.  Not personally, no.
20   Q.  Had your brother dealt with Mr. Sabouri in the past?
21   A.  I don't think so.
22   Q.  And when you took the call, did you indicate that you
23   were Hassan, Mr. Mohti's -- strike that.  Who is Mohti
24   (phonetic)?
25   A.  That's my brother.
```

532

1   Q.  Did you indicate to Mr. Sabouri that you were Mohti's

2   brother?

3   A.  I don't think so.

4   Q.  Did you ever tell someone on the phone that you were

5   Mohti's brother?

6   A.  I may have because I received a call from Iran as well.

7   Q.  But the first call that you got, was it from your

8   brother?

9           MR. GUTIERREZ:  Been asked and answered, your

10  Honor.

11          BY MR. DENIS:  Q.  What --

12          THE COURT:  Why don't you ask another question.

13          BY MR. DENIS:  Q.  Okay.  What did you -- what did

14  you tell your brother when he called you?

15  A.  I can't remember.

16  Q.  Were you trying to have him get the money to you?

17  A.  I don't remember the details of the conversation.  I just

18  remember that he told me that he had been told that the money

19  was short and that the guy was working on getting the rest of

20  the money.

21  Q.  This was your brother, correct?

22  A.  That's what he told me, yes.

23  Q.  So he was assisting you in getting the money down to

24  California?

25  A.  Well, I wasn't getting a response from Salamet because he

1  wasn't answering my phone calls, so before I flew down, I
2  told my brother to call him and find out what's going on with
3  the money.
4  Q.  So you indicated you weren't getting a response from
5  Salamet, correct?
6  A.  That's right.
7  Q.  Were you calling Salamet when you arrived in Los Angeles?
8  A.  No.
9  Q.  Did you indicate to the confidential source that you were
10 waiting -- you were -- you didn't need to make a call, you
11 were waiting for a call from your brother?
12 A.  I can't remember those conversations.
13 Q.  And you indicated that you went to the -- you were taken
14 to -- well, when you arrived in -- at LAX, were you
15 anticipating that there would be a car waiting for you at
16 LAX?
17 A.  I was expecting to probably rent a car from LAX and
18 leave, but I think Mr. Krapchan said that he would pick us
19 up, so we were expecting to get picked up.
20 Q.  Did you expect to see the confidential source when you
21 arrived or -- strike that.  Did you expect to see Yuri when
22 you arrived?
23 A.  I had been told I think that he was going to be there,
24 yes.
25 Q.  So you expected him there?

1    A.   I -- I don't remember.   Vaguely I think he was -- I think

2    Mr. Krapchan told me that he was with him.

3    Q.   So when you arrived at LAX, did you call Michael

4    Krapchan?

5    A.   I think I did, yes.

6    Q.   And you indicated that you went to the -- you rented a

7    car, correct?

8    A.   Yes, we went to the car rental place.

9    Q.   And you asked Mr. Wedding to rent the car?

10   A.   That's correct.

11   Q.   And you indicated that you did that because it was his

12   deal, correct?

13   A.   That's correct.

14   Q.   And you didn't want to spend any money on that, correct?

15   A.   That's correct.

16   Q.   Previously you also testified that you went -- you picked

17   up money from one of the Ryan's -- strike that.   Did you

18   purchase the two tickets from Canada to Los Angeles?

19   A.   I had my brother purchase them, and I paid him in cash.

20   Q.   So your brother purchased the tickets from Canada to LAX,

21   correct?

22   A.   That's correct.

23   Q.   And did he purchase the ticket with using cash?

24   A.   No.   We didn't have enough room in our credit cards, and

25   I had asked him if he could do it, and he said that he could.

```
 1   Q.  So the brother used his credit card to purchase the
 2   tickets?
 3   A.  I believe so.
 4   Q.  And when you came to LAX, you indicated that you didn't
 5   have room on your credit card to rent a car, correct?
 6   A.  Yes.
 7   Q.  You maxed out your credit card; is that right?
 8   A.  That's correct.
 9   Q.  And did you indicate that Mr. Wedding had maxed out his
10   credit card?
11   A.  He had told me that there wasn't a lot of room in his
12   credit card.
13   Q.  There was not?
14   A.  That's what he had indicated to me.
15   Q.  But he used his credit card to get the car?
16   A.  That's correct.
17   Q.  And when you rented the car, were you added as a second
18   driver?
19   A.  I believe so.
20   Q.  Did you drive the car?
21   A.  I believe so.
22   Q.  And you drove it to a hotel, correct?
23   A.  That's correct.  No, we --
24   Q.  You went into one hotel?
25   A.  We drove down to -- we drove down straight to the store
```

536

1   and waited for the gentleman to show up at his store.

2   Q.  So did you contact Sabouri or Salamet going to the store?

3   A.  I had called the gentleman at the store, but he told me

4   he was going to be there like shortly from what I remember.

5   Q.  So you had all your luggage and everything in the car?

6   A.  I believe so.

7   Q.  Did you guys go eat dinner first?

8   A.  I believe we went and ate lunch at the restaurant next

9   door to the store.

10  Q.  So you didn't check into the hotel yet?

11  A.  I don't think so.

12  Q.  When did you check into the hotel?  Which hotel did you

13  check into?

14  A.  I don't remember the name.  There was two hotels; there

15  was the one that -- that there was pictures of, and then

16  there was one that was -- we had stayed at previously.

17  Q.  Did you pick the hotel to stay at?

18  A.  The gentleman at the store had recommended the hotel.

19  Q.  And you indicated that Mr. Wedding went with you to the

20  store?

21  A.  That's correct.

22  Q.  And had you met -- well, what was name of the individual

23  at the store?

24  A.  I believe it was Mr. Sabouri.

25  Q.  And did you meet Mr. Sabouri?

1   A.   That's correct.

2   Q.   And you indicated that you went into the store.  Was that

3   by yourself?

4   A.   Mr. Wedding and I went into the store.

5   Q.   So you and Mr. Wedding went into the store, correct?

6   A.   That's correct.

7   Q.   This was a Persian rug store?

8   A.   That's correct.

9   Q.   And you are Persian?

10  A.   That's correct.

11  Q.   Had Mr. Sabouri met you previously?

12  A.   No.

13  Q.   Had he had met Mr. Wedding previously?

14  A.   No.

15  Q.   Was he scared that you and Mr. Wedding there were?

16          MR. GUTIERREZ:   Calls for speculation.

17          THE COURT:   Sustained.

18          BY MR. DENIS:   Q.   Based on what you observed, did

19  he appear nervous that you and Mr. Wedding were there?

20  A.   I don't recall.

21  Q.   Was he expecting you and another individual to show up at

22  his store?

23  A.   I believe so.

24  Q.   And Mr. Sabouri, he's in this business of the havale

25  exchange?

1   A.  Not from what I know, no.

2   Q.  He's not part of the exchange?

3   A.  His -- what I -- what he had told me that he didn't know

4   on -- what's going on.  His job was just to transfer the

5   money to the person that was picking it up.

6   Q.  Does your brother know Mr. Sabouri?

7   A.  I don't think so.

8   Q.  Is Mr. Sabouri your brother's friend?

9   A.  Not that I know of.

10  Q.  And you indicated you walked in there with Mr. Wedding,

11  correct?

12  A.  That's correct.

13  Q.  And Mr. Sabouri took you into a private room?

14  A.  There's a little like a showcase room in the front, and

15  then there's a larger area in the back.

16  Q.  And did Mr. Sabouri take the money out from a -- well,

17  where did Mr. Sabouri take the money out from?

18  A.  I believe it was a little safe that he had in his store.

19  Q.  Did you see him take it out of the safe?

20  A.  I think so.

21  Q.  And then he took it to the room?

22  A.  I think so.

23  Q.  And then did he leave you and Mr. Wedding in the room by

24  yourselves?

25  A.  It's a -- it's like -- it's like the front of the store

1   and then the back of the store, and then there's a little

2   door that's -- that has drapes.  So we stayed at the back of

3   the store, he went to the front and then came back with the

4   money.

5   Q.  And was there a table?

6   A.  Yes.

7   Q.  And so did you count the money by yourself?

8   A.  No, Mr. Wedding and I, we both counted the money.

9   Q.  And you indicated that there were hundreds and fifties in

10  a stack?

11  A.  I believe so.

12  Q.  How much did you see there?

13  A.  I believe we counted 122,000.

14  Q.  So after you sat there and counted the 122,000, how long

15  did that take?

16  A.  I can't remember.

17  Q.  You can't remember how long?  Was it ten minutes, an

18  hour, two hours?  How long did it take you to count that

19  money?

20  A.  I don't see -- probably maybe half an hour.

21  Q.  Do you recall that or you're guessing?  I don't want you

22  to guess.

23  A.  I'm guessing.

24  Q.  So you counted the money, and you counted 122,000,

25  correct?

540

1   A.   That's correct.

2   Q.   And so now you've counted it.   What was the reason you

3   were counting it?

4   A.   To make sure how much there was.

5   Q.   Did Mr. Sabouri tell you how much it was?

6   A.   Yes.

7   Q.   And then you gave him -- did you take any portion of that

8   money out?

9   A.   No.

10  Q.   So then what did you do?

11  A.   We just left.   I had asked for Mr. Salamet's number again

12  from Mr. Sabouri.

13  Q.   You didn't have Mr. Salamet's number?

14  A.   The one that I had he wasn't answering.   So he had given

15  me a different number, and I got ahold of him.

16  Q.   Did you learn why after you gave the money seven to ten

17  days prior that the money wasn't available when you arrived?

18  A.   He didn't give me a reason.   He just told me that -- just

19  reassured me that it would be there soon and that he's

20  working on it.

21  Q.   Why didn't you take the 122,000?

22  A.   I didn't want to have anything on my person.

23  Q.   So you then gave back the money you had just counted to

24  Mr. Sabouri, correct?

25  A.   That's correct.

1    Q.   And then did you leave the rug store?

2    A.   That's right.

3    Q.   Did you go eat after that?

4    A.   I believe we ate before that.

5    Q.   And then did you ask Mr. Sabouri which hotel you should

6    check into?

7    A.   He told us to go to a hotel up the street on Ventura.

8    Q.   And was that the Comfort Inn?

9    A.   We stayed at two hotels, one that was further away from

10   the store --

11   Q.   Is that what Mr. Sabouri recommended you go to?

12   A.   That's the one he recommended, yes.

13   Q.   The further away one?

14   A.   That's correct.

15   Q.   And then when you went to the hotel room, did you check

16   into the hotel?

17   A.   Mr. Wedding checked in.

18   Q.   Did you ask Mr. Wedding to get the room?

19   A.   Yes.

20   Q.   Had you made reservations for the room?

21   A.   No.

22   Q.   Okay.

23   A.   We just walked in.

24   Q.   And did you ask Mr. Wedding to use his credit card?

25   A.   I didn't ask him.  It was -- I was -- I was let's get a

1    room, and he used his credit card.

2    Q.   And when Mr. Wedding was at the rug store, did Mr.

3    Sabouri actually see Mr. Wedding?

4    A.   Yes, he did.

5    Q.   And did he see Mr. Wedding count the money?

6    A.   Yes.

7    Q.   And after you checked into the hotel, what did you do?

8    And this is the 10th, correct?

9    A.   I think we went out for food later.  Not sure if we did

10   anything else.

11   Q.   Do you recall that day?  I mean what did you do after?

12   A.   I think we went out for dinner.

13   Q.   Do you remember what restaurant?

14   A.   No.

15   Q.   Okay.

16   A.   But they were mostly on the same street that we were

17   staying on.

18   Q.   Was it a Persian restaurant?

19   A.   We went to a few different Persian restaurants.

20   Q.   Did Mr. Wedding pay for the dinner?

21   A.   I paid for the dinner.

22   Q.   Oh, okay.  Did you pay that in cash?

23   A.   Yes.

24   Q.   And then after dinner what did you do?

25   A.   Then we went back to the room and went to sleep.

543

1    Q.   Approximately what time did you go back to the room on

2    the 10th?

3    A.   I can't remember exactly.

4    Q.   And the next day was the 11th, correct?

5    A.   Yes.

6    Q.   What did you do on that day?

7    A.   We went -- I believe we went back to the store, and --

8    Q.   Did you take Mr. Wedding with you to the store?

9    A.   The second time I believe, yes.

10   Q.   So you took him the first time, correct?

11   A.   Yes.

12   Q.   You took him the second time, correct?

13   A.   I believe so.

14   Q.   I mean do you recall taking him to the store the second

15   time?

16   A.   I can't be positive, but I think we went together the

17   second time.

18   Q.   And when you took Mr. Wedding with you to the store the

19   second time, what did you do at the store?  Strike that.

20   What time did you get up that day on the 11th; do you recall?

21   A.   I think it was around noon.

22   Q.   Noon?

23   A.   I think so.

24   Q.   You got up at noon?

25   A.   I think so.

544

1    Q.  And what time did you leave the hotel to go to the rug

2    store?

3    A.  I think Mr. Wedding wanted to take a shower from what I

4    remember.  Then we left pretty shortly after that to get

5    something to eat as well.

6    Q.  Where did you go eat?

7    A.  I can't remember.

8            THE COURT:  All right.  We'll stop now, ladies and

9    gentlemen.  I wanted to go into the noon hour just about ten

10   minutes to pick up the time we lost here at the side of the

11   bench.  So we'll break at this time and then resume at 1:30

12   this afternoon.  Please remember the admonition not to

13   discuss the case or make any decisions at this time.  Thank

14   you.

15       (There was a break in the proceedings.)

16           THE COURT:  Okay.  We have everyone present once

17   again.  Counsel?

18           MR. DENIS:  Thank you, your Honor.

19           BY MR. DENIS:  Q.  Mr. Shirani, you indicated that

20   your brother purchased the plane ticket in cash -- I mean by

21   credit card, correct?

22   A.  Yes.

23   Q.  I'm going to show you what's been previously marked as

24   Government's Exhibit 33 and 34.  I apologize.  And that was

25   both your plane ticket and Mr. Wedding's plane ticket,

1  correct?

2  A.  That's correct.

3  Q.  Okay.  I'm going to show you -- see this document?  Have

4  you seen these documents before?

5  A.  I think those are tickets stubs or --

6  Q.  It's an itinerary?

7  A.  Itinerary, yes.

8  Q.  I'm going to show you -- so you're familiar with this

9  document?

10  A.  I believe so.

11          MR. DENIS:  Your Honor, may I publish?

12          BY MR. DENIS:  Q.  And, Mr. Shirani --

13          THE COURT:  Why don't you just zoom out a little

14  bit.

15          BY MR. DENIS:  Q.  You know where it says --

16          THE COURT:  You want to zoom out?

17          MR. DENIS:  Yes.

18          THE COURT:  If you're not going to move it around,

19  you don't have to --

20          MR. DENIS:  No, no.

21          THE COURT:  That's fine then.

22          MR. DENIS:  Hold on for just one moment.

23          BY MR. DENIS:  Q.  It indicates Ryan Wedding,

24  correct?

25  A.  Yes.

1   Q.  And this would be the itinerary that you had recognized

2   seeing.  And it indicates on form of payment -- do you see

3   that?

4   A.  Yes.

5   Q.  What does it say?

6   A.  Cash.

7   Q.  Okay.  I'm going to show you a passenger.  Who's the name

8   of -- is this you?

9   A.  Yes.

10  Q.  When it comes to form of payment, what does it say?

11  A.  Cash.

12  Q.  Doesn't say credit card, correct?

13  A.  That's correct.

14  Q.  But your brother purchased the tickets, correct?

15         MR. GUTIERREZ:  Asked and answered, your Honor.

16         THE COURT:  The objection is sustained.

17         BY MR. DENIS:  Q.  Now, Mr. Shirani, you indicated

18  that for -- for doing the transportation and brokering the

19  deal or -- excuse me -- introducing the source of the drugs,

20  providing the transportation to Canada, and arranging this

21  deal, you were to receive $9,600, correct?

22  A.  Yeah, I would receive -- plus the transfer of money, the

23  1 percent.

24  Q.  Okay.  So for 400 -- do you know what the number 400

25  times let's say the 24 kilos --

```
 1              THE COURT:  We already did this, counsel.
 2              MR. DENIS:  We did, your Honor?
 3              THE COURT:  Yes.
 4              BY MR. DENIS:  Q.  Now, Mr. Shirani, back in June
 5    of 2008, the arrangement was to purchase the 24 -- or the
 6    kilos of cocaine for how much?
 7    A.  Seventeen thousand.
 8    Q.  And when you would have transported up to Canada, how
 9    much was the value of the cocaine in Canada?
10    A.  I wasn't really aware of that.  I can assume it was
11    substantially more.
12    Q.  When you stay substantially more, what's the basis for
13    that?
14    A.  I assume --
15    Q.  Do you know the value in Canada is greater than it is in
16    the United States?
17    A.  Yes.
18    Q.  Do you -- do you recall what cocaine was selling for in
19    Canada?
20    A.  No.
21    Q.  No?
22    A.  No.
23    Q.  Now, you indicated that on the 11th you got up and you
24    went to the -- to the money exchange, correct?
25    A.  When we were here?
```

548

1    Q.  Yes.  I'm sorry.  I'm going to bring you back to June 11,

2    2008.  You arrived on the 10th, you got up the next day at

3    noon --

4    A.  Went to the rug store.

5    Q.  You went to the rug store again.  And what did you do at

6    the drug (sic) store on the 11th?

7                MR. GUTIERREZ:  Believe it's been asked and

8    answered, your Honor.

9                THE COURT:  It has been.  Sustained.

10               MR. DENIS:  Your Honor, I apologize.  I did not --

11   don't recall the answer.  I apologize.

12               THE COURT:  All right.  Why don't you respond for

13   the benefit of counsel, Mr. Shirani.

14               MR. DENIS:  Thank you.

15               THE WITNESS:  Why we went to the store?

16               BY MR. DENIS:  Q.  Yes.

17   A.  To grab the 20,000.

18   Q.  So you grabbed $20,000, correct?

19   A.  I believe so.

20   Q.  And what did you do after that?  Oh.  And Mr. Wedding was

21   with you, correct?

22   A.  Second time I believe so.

23   Q.  And what did you do after you had the 20,000 on the 11th?

24   A.  We waited around for Mr. Krapchan I believe to call and

25   find out if he would -- I think we went down -- I can't

1    remember.  I'm sorry about my memory.  But I think we drove

2    down to Anaheim and gave Mr. Krapchan the 17,000 to get a

3    sample and bring it back.

4    Q.  That was on the 11th?

5    A.  I believe so.

6    Q.  And you went to Anaheim on the 11th?

7    A.  I believe so.

8    Q.  And on the 11th did you give the 17,000 to Mr. Krapchan?

9    A.  Yes.

10   Q.  Was Mr. Wedding present --

11   A.  Yes.

12   Q.  -- when you actually gave Mr. Krapchan the money?

13   A.  Yes.

14   Q.  Did you go on the 11th to the mall?

15   A.  Yes.

16   Q.  Did you drop off Mr. Wedding at the mall?

17   A.  We were together.

18   Q.  And when did you see Mr. Krapchan?

19   A.  I believe the next day.  He told me on the phone that he

20   couldn't get through or -- I don't recollect exactly, but it

21   came down to he told us to go back and he would call us

22   because we were waiting in Anaheim for him.

23   Q.  So you drove down to Anaheim to meet Mr. Krapchan on the

24   11th, correct?

25   A.  I believe so.

550

1    Q.  And did you go straight to the train station?

2    A.  Yes.

3    Q.  Approximately what time was that?

4    A.  It was early afternoon-ish I think.

5    Q.  That you drove down to the train station?

6    A.  I believe so.

7    Q.  So you got up at 12:00 on the 11th, you drove to the rug

8    store --

9            THE COURT:  Counsel, you've asked these questions.

10   You're just going over this now for the third or fourth time,

11   so would you continue on with the chronology, what you

12   intended to do.

13           MR. DENIS:  Okay.

14           BY MR. DENIS:  Q.  And you got there -- how long

15   did it take you to drive to Anaheim?

16   A.  I think it might have been like an hour and a half, two

17   hours.  I'm not sure.

18   Q.  All right.  So it's safe to say that you arrived at the

19   train station after three o'clock?

20   A.  I don't remember exact time.

21   Q.  Well, it had to be after you went to the drug store,

22   correct, or rug store?

23   A.  That's correct.

24   Q.  And then you took about an hour to drive to Anaheim,

25   correct?

1    A.   I believe so.

2    Q.   So did you arrive to the -- would it be safe to say

3    around after two o'clock?

4    A.   I can't tell you indefinitely (sic) around what time we

5    arrived.

6    Q.   Okay.  And you testified that you took Mr. Wedding with

7    you to the train station, correct?

8    A.   That's correct.

9    Q.   You didn't go to the mall?

10   A.   We went to the mall afterwards.

11   Q.   So after you gave the money to Mr. Krapchan, you went to

12   the mall?

13   A.   That's correct.

14   Q.   And what did you do at the mall?

15   A.   We walked around, we ate something, Mr. Wedding bought

16   some clothes.

17   Q.   Did you go to Planet Funk?

18   A.   I can't remember exactly what stores we went to.

19   Q.   But you went to a store and bought some clothes, correct?

20   A.   That's correct.

21   Q.   Did you go back to Anaheim on the 12th?

22   A.   I think on the 12th we picked up Mr. Krapchan at the

23   train station in Los Angeles --

24   Q.   Okay.

25   A.   -- or I might be off by a day.

1   Q.   All right.   Do you recall what you did on the 11th, the

2   next day after you arrived?   Do you recall?   Did you meet

3   anyone that day besides Mr. Krapchan?

4   A.   We met a friend of mine the next day that was from

5   Vancouver that lived here.

6   Q.   Who is he?

7   A.   His name is Boback (phonetic).

8   Q.   And what did you do with Mr. Boback?   Or where did you go

9   with Mr. Boback?

10  A.   We just met him and we went to his store that he was

11  opening on Ventura, hung out, we went out for dinner I think.

12  Q.   Was this after meeting with Mr. Krapchan or was this a

13  different day?

14  A.   I can't -- I don't remember exactly, but it might have

15  been on a different day.

16  Q.   And when you met Boback -- I'm sorry -- you indicated you

17  went to a -- you went to a store?

18  A.   Yes.

19  Q.   And you went shopping with Mr. Boback?

20  A.   Yeah.   Eventually we went to Hollywood and we went to

21  Mr. Wedding's friend's store, picked up some clothing.

22  Q.   Was that the next day after the 10th or was that on the

23  12th?

24  A.   I can't -- I can't remember exactly which day that was.

25  Q.   But one day you didn't go down to Anaheim, correct?

1    A.  We went down to Anaheim one day, and then we went down

2    to -- we went -- we went downtown LA and picked up

3    Mr. Krapchan another day and drove down to San Diego.

4    Q.  Was that the day of your arrest?

5    A.  That's correct.

6    Q.  If you were arrested on the 13th, would that be the day

7    that you did that?

8    A.  That's the day we picked up Mr. Krapchan at the train

9    station in downtown LA.

10   Q.  That would be the 13th, correct?

11   A.  That's correct.

12   Q.  And what I'm trying to focus is what did you do on the

13   11th?  Is that when you saw Boback?

14   A.  We saw Boback.  I think we went to Hollywood and did some

15   shopping.

16   Q.  Did he show you around Los Angeles?

17   A.  We went -- we went around like Hollywood area a little

18   bit.

19   Q.  And did you eat breakfast that day?

20   A.  Think when we woke up, it was lunchtime.

21   Q.  Okay.  And did you go to lunch?

22   A.  I believe so.

23   Q.  Did you pay for lunch?

24   A.  I paid for lunch, yes.

25   Q.  And then when you met up with Boback and you went to

1    Hollywood, did you guys have dinner?

2    A.   Yes.

3    Q.   Did you pay for dinner?

4    A.   I can't remember.

5    Q.   Did Boback pay for dinner?

6    A.   No.   I paid for most of the meals.

7    Q.   Did you pay that in cash?

8    A.   Yes.

9    Q.   Did you use some of the $20,000 that you picked up?

10   A.   No.

11   Q.   You had other money?

12   A.   I had $2200 with me that I brought.

13   Q.   Twenty-two hundred?

14   A.   That's correct.

15   Q.   And how long were you planning to stay in Los Angeles?

16   A.   We were planning to leave Saturday; that was our flight

17   back.

18   Q.   So on the day that you met with Boback, did you spend the

19   entire day with him?

20   A.   No.   We spent a little bit of time, and then we met up

21   with him again later on that night.

22   Q.   Did you guys have dinner together?

23           MR. GUTIERREZ:   Objection; asked and answered.

24           BY MR. DENIS:   Q.   After dinner what did you do?

25           THE COURT:   If there's an objection, counsel, I'll

555

 1   rule on it unless you want to withdraw the question --

 2             MR. DENIS:  I'll withdraw the question.

 3             THE COURT:  -- that's always fine.

 4             MR. DENIS:  Apologize, your Honor.

 5             THE COURT:  All right.

 6             BY MR. DENIS:  Q.  After dinner where did you --

 7   did you go with Boback somewhere after dinner?

 8   A.  We went to Westwood to this cafe called Gypsy Cafe.

 9   Q.  Is that a hookah lounge?

10   A.  That's correct.

11   Q.  Is that where a lot of Persian people congregate?

12   A.  I believe so.

13   Q.  And you took Mr. Wedding with you there?

14   A.  Yes.

15   Q.  And how long did you stay there?

16   A.  Couple hours.

17   Q.  And then did you do anything after that?

18   A.  We just went back to the room.

19   Q.  And did you go to sleep?

20   A.  Yes.

21   Q.  At that time was the $100,000 already in the room?

22   A.  I can't remember.

23   Q.  Okay.  And I'm just trying to figure out, the day you

24   went to Anaheim, was that after you met Boback?

25   A.  I can't indefinitely (sic) say yes or no.  I can't

1   remember exactly.

2   Q.   When you were in Anaheim, did you pick up Mr. Krapchan in

3   the morning or in the evening -- at Anaheim?

4   A.   I think we saw him early afternoon.

5   Q.   Early afternoon?

6   A.   Yes.

7   Q.   What would be your best estimate as to the time?

8   A.   I can't remember.  When we went to Anaheim to meet

9   Mr. Krapchan, it was early afternoon I think.

10  Q.   When you say early afternoon, what does that mean to you?

11  A.   Anywhere from like one to like four o'clock I guess.

12  Q.   So between 1:00 and 4:00 you went to the train station,

13  correct?

14  A.   I believe so, yes.

15  Q.   And you went to the train station first, correct?

16  A.   I believe so.

17  Q.   Okay.  And then after the train station, you went to the

18  mall?

19          MR. GUTIERREZ:  Asked and answered, your Honor.

20          THE COURT:  Sustained.

21          BY MR. DENIS:  Q.  And that was after -- between

22  1:00 and 4:00, correct?

23  A.   I believe so.

24  Q.   And that's where Mr. Wedding did the shopping?

25  A.   I believe so.

1    Q.  All right.  And you indicated you -- Wedding was with you

2    the entire time going to the train station and -- strike --

3    yeah, Mr. Wedding went with you to the train station,

4    correct?

5    A.  That's correct.

6    Q.  Did Mr. Krapchan -- did you go and meet Mr. Krapchan in

7    the train station?

8    A.  We drove to the train station, and then when he walked

9    out, he got into our car.

10   Q.  And did you have the $20,000 on you?

11   A.  I believe so.

12   Q.  Okay.  And you paid Mr. Krapchan how much money?

13   A.  Seventeen thousand.

14   Q.  Okay.  And then did you drive -- okay.  Then in the mall

15   did you have lunch or dinner?

16   A.  I think we had lunch or -- afternoon food.

17   Q.  But you didn't meet Mr. Wedding at the mall, correct?

18   You brought him with you to the mall?

19   A.  That's correct.

20   Q.  And when you were in the mall, did you do shopping first

21   and then eat or did you eat and then do some shopping?

22            MR. GUTIERREZ:  Objection; relevance, 403.

23            THE COURT:  Sustained.

24            MR. DENIS:  Your Honor, it's cross and it has some

25   relevance and --

1          THE COURT:  Unless you make an offer of proof --

2          MR. DENIS:  Okay.

3          THE COURT:  -- at this point, and we'll deal with

4    that later, but at this point in terms of testing memory,

5    you've had an adequate opportunity to do that.  These issues

6    are just -- under 403 just unduly consuming time with

7    probative value being pretty minimal, so I'm --

8          MR. DENIS:  Your Honor, I'm just --

9          THE COURT:  -- sustaining the objection not only to

10   that question but to any others of a similar nature.

11         MR. DENIS:  I have a receipt from the Brea Mall and

12   it's -- there's -- it's time-stamped.

13         THE COURT:  Okay.

14         MR. DENIS:  Can I proceed?  It's highly relevant.

15         THE COURT:  Well, you can always ask your next

16   question and we'll see if an objection comes.  Hopefully it

17   will be probative.

18         BY MR. DENIS:  Q.  After you -- after you ate in

19   the mall, did you -- what did you do after that?

20         MR. GUTIERREZ:  It's been asked and answered, your

21   Honor.

22         THE COURT:  Sustained.

23         BY MR. DENIS:  Q.  Did you return to Los Angeles?

24   A.  After the mall?

25   Q.  Yes.

559

1  A.  I believe so.

2  Q.  And did you stop at a sushi restaurant after that?

3  A.  I believe so.

4  Q.  What was the circumstances for that?

5  A.  I think we went to see Boback, my friend, again, and he

6  had told us about this sushi restaurant that was really good

7  and he had given us the directions.

8  Q.  Did you eat at the restaurant?

9  A.  Yes.

10  Q.  Do you like sushi?

11  A.  I don't eat seafood, but I ordered vegetarian food.

12  Q.  Was that a dinner or was that a second lunch?

13  A.  I believe it was in the afternoon.  I can't be -- I

14  can't -- I can't tell you exactly the timings of these

15  things.  I can tell you it was light outside, but like

16  definitely about the time of the day --

17  Q.  Okay.  Do you recall where the sushi restaurant was, what

18  city?

19  A.  I believe we were still in the Valley.

20  Q.  Okay.  And did you meet with Boback after that --

21  A.  After the --

22  Q.  Sushi.

23  A.  I think so.

24  Q.  Okay.  And what did you do with Mr. Boback after that?

25  A.  I believe we went to -- we went to the Hollywood area,

1   and I believe we went to the store that Mr. Wedding's friend

2   owns.

3   Q.   That was on the 12th?

4   A.   I don't remember.

5   Q.   Okay.

6   A.   I apologize.

7   Q.   So did you meet Boback on one -- only on one day or two

8   days?

9   A.   I think we met him on one or -- on two days.

10   Q.   Did you have dinner with Boback?

11   A.   Yes.

12   Q.   And after the dinner where did you go?

13   A.   Back to the room I think.

14   Q.   Did you go to any other hookah lounge or any club or

15   anything like that?

16   A.   I think we had dinner at the hookah lounge.

17   Q.   The same one you went to the previous night?

18   A.   There is one on this side and then there's one on the

19   other side of the street.   I think we went to the one on the

20   other side of the street.

21   Q.   When you say that, did you go to the hookah lounge in

22   Westwood on one day?

23   A.   That's correct.

24   Q.   And when you say on this side, was this in the Valley?

25   A.   No, it was still in Westwood.   It's like the street's

561

 1  like this and then there's one hookah lounge here and then

 2  one here on the same street, different ends of the street.

 3  Q.  Did you go with Boback to the hookah lounge?

 4  A.  Yes, he was there.

 5  Q.  Was that both nights or just one of the nights?

 6  A.  One of the nights I believe he was with us.

 7  Q.  And then on the 13th -- now, during this time were you in

 8  contact with Mr. Krapchan?

 9  A.  Yes.

10  Q.  Were you talking to Mr. Krapchan?

11  A.  Yes.

12  Q.  Okay.  And on the 11th did you speak with the

13  confidential source or with Yuri?

14  A.  I believe so.

15  Q.  Okay.  And when you were speaking, was that in the room?

16  A.  In the hotel room?

17  Q.  Yes.

18  A.  I can't remember.

19  Q.  But you remember having a conversation with the -- with

20  Yuri, correct?

21  A.  That's correct.

22  Q.  When you were having that conversation, did Mr. Wedding

23  enter the room while you were talking?

24  A.  I believe he was -- I believe he was there.

25  Q.  Did he go anywhere before you received that call?

1   A.   I don't think so.

2   Q.   Did you -- when Mr. Wedding was there, did you change

3   basically talking about cars instead of anything else?

4   A.   When -- that's -- I spoke like that on the phone.

5   Q.   About cars, correct?

6   A.   That's correct.

7   Q.   And you indicated that you were going to do -- get two

8   cars at a time; that was your deal, correct?

9   A.   That's correct.

10  Q.   Now, during this time did Mr. Wedding ever speak with

11  Michael Krapchan on the phone?

12  A.   I don't think so.

13  Q.   Did -- did Ryan Wedding ever speak with Yuri on the

14  phone?

15  A.   I don't think so.

16  Q.   Did Mr. Wedding ever speak to your brother on the phone?

17  A.   I don't think so.

18  Q.   Did Mr. Wedding ever speak with Akhundov, Elmar Akhundov,

19  on the phone?

20  A.   No.

21  Q.   Now, you indicated that people that were in the deal were

22  Michael Krapchan, correct?

23  A.   Yes.

24  Q.   Elmar Akhundov?

25  A.   Yes.

1    Q.   And Mr. Wedding?

2    A.   Yes.

3    Q.   And yourself?

4    A.   That's correct.

5    Q.   There were four people, correct?

6    A.   There was four people, yes.

7    Q.   And what was your understanding of -- well, strike that.

8    You indicated that -- did you ever pick up any money for

9    Michael Krapchan or Akhundov in Canada for the drug

10   transaction?

11   A.   No.   I -- I actually offered them -- I told them that do

12   you guys want me to wire the money down for you, and he --

13   Mr. Krapchan told me that he was going to pay Yuri with a

14   check; that's what he told me.

15   Q.   Was that in one of your meetings with Michael Krapchan

16   and Akhundov?

17   A.   That's right.

18   Q.   And you indicated that you only met with them two times,

19   correct?

20   A.   Yes.

21   Q.   Now, on the 13th Mr. Krapchan was coming back to Los

22   Angeles, correct?

23   A.   That's correct.

24   Q.   And you had spoken with Mr. Krapchan that the deal wasn't

25   going to go forward.   You told him to come back, correct?

1   A.   That's correct.

2   Q.   You instructed him to do that, correct?

3   A.   That's correct.

4   Q.   And to return the money to you?

5   A.   That's correct.

6   Q.   And you discussed that over the telephone, correct?

7   A.   That's correct.

8   Q.   And were you planning to go back to Canada?

9   A.   That's correct, the next day.

10  Q.   The next day on the -- what day was that?

11  A.   I believe --

12  Q.   The 14th?

13  A.   -- Saturday, yeah, our plane tickets was.

14  Q.   Now, you indicated that you had some backup plans in case

15  it didn't work out with Yuri, correct?

16  A.   That's correct.

17  Q.   During the time that you were here in Los Angeles, you

18  were text messaging on your phone; is that true?

19  A.   The BlackBerry.

20  Q.   The BlackBerry.  And you had two phones, correct?

21  A.   That's correct.

22  Q.   One, the BlackBerry, was that in your name?

23  A.   No.

24  Q.   And you had another phone?

25  A.   That's correct.

1   Q.  What was the other phone?  Was it a throwaway phone?

2   What kind of phone?

3   A.  That's correct.  It was a throwaway phone.

4   Q.  And was that in your name?

5   A.  No.

6   Q.  So neither of the phones were in your name, correct?

7   A.  That's correct.

8   Q.  Let me show you what has been previously marked as

9   Defense Exhibit HH.  I want you to take a look at the right

10  side, some text messages.  Take a moment to look it over.

11  Have you seen -- take a few minutes if you need to.

12          THE COURT:  All right.  Let's move this on.  HH is

13  not in evidence, and so if you have any question concerning a

14  phone, the matter of a phone --

15          MR. DENIS:  Correct.  It was identified, your

16  Honor, and I'm going to move it when he lays the foundation.

17          THE COURT:  I doubt he can lay a foundation for it.

18          MR. DENIS:  I laid the foundation with Mr. Kalina

19  previously.  I didn't -- I didn't ask to have it admitted at

20  this time, but I'm going to ask --

21          THE COURT:  Why don't you proceed with --

22          MR. DENIS:  Okay.

23          THE COURT:  -- any question you have at this point

24  so we can keep this moving.

25          MR. DENIS:  Thank you, your Honor.

1        BY MR. DENIS:   Q.   On the 11th, Mr. Shirani, you

2   sent a text message to Blondyy, correct?

3   A.   That's correct.

4   Q.   And that was the day after you had arrived in Los

5   Angeles, correct?

6   A.   That's correct.

7   Q.   And what did you -- what did you text to Blondyy?

8   A.   Do you want me to read it?

9   Q.   Yes.

10       MR. GUTIERREZ:   Actually we object, your Honor, as

11   to reading.

12       THE COURT:   The exhibit is not in evidence.

13   There's been no foundation established for it, so it would

14   not be appropriate for him to read anything yet.   The

15   objection is sustained.

16       MR. DENIS:   Your Honor, I laid the foundation

17   yesterday.   I was going to ask to admit it today --

18       THE COURT:   Well --

19       MR. DENIS:   -- now.

20       THE COURT:   -- if you're offering to admit it at

21   this point based on anything that happened yesterday, Mr.

22   Gutierrez, do you have any objection?

23       MR. GUTIERREZ:   The objection is to hearsay, lack

24   of foundation, your Honor.

25       THE COURT:   And it's sustained as to lack of

1    foundation.

2              MR. DENIS:  Okay.  Your Honor, on this issue can I

3    please have a sidebar?  I did lay the foundation yesterday.

4              THE COURT:  Not at this time.  The record is what

5    it is.

6              BY MR. DENIS:  Q.  Now, Mr. Shirani, you

7    indicated -- on the text message you indicated that Blondyy

8    had 20 --

9              MR. GUTIERREZ:  Objection as to form, lack of

10   foundation.

11             THE COURT:  Don't ask the witness to read anything

12   from the exhibit; it's not in evidence.  Move to another area

13   of questioning, please.

14             MR. DENIS:  Okay.

15             BY MR. DENIS:  Q.  On the 11th you had 20 kilos

16   already available for you from Blondyy, correct?

17   A.  I believe he had told me that he could get them.

18   Q.  The 11th is on the first page.

19             MR. GUTIERREZ:  Lack of foundation for refreshing

20   recollection, your Honor.

21             THE COURT:  He hasn't approached it from that

22   point.  Counsel, are you asking the witness to read from the

23   exhibit?

24             BY MR. DENIS:  Q.  Well, Mr. Hassan, I mean --

25   excuse me -- Mr. Shirani, do you recall sending a text

568

1    message to Blondyy on the 11th?

2    A.   I remember sending text messages to this person, yes.

3    Q.   And if I show you the document which has been previously

4    identified as Defense Exhibit EE --

5             MR. DENIS:  Is it EE, your Honor?  I apologize.

6             THE COURT:  I don't know what exhibit you have

7    reference to.

8             BY MR. DENIS:  Q.  Mr. Shirani, could you look at

9    the back of that page and tell me what's the --

10   A.   Says HH.

11            MR. DENIS:  HH.  Okay.  Apologize.  HH.

12            BY MR. DENIS:  Q.  Would looking at the document

13   refresh your recollection as to what text message you sent to

14   Blondyy?

15            MR. GUTIERREZ:  Lack of foundation.

16            THE COURT:  The objection is overruled.  He's

17   merely asking at this point -- I don't know that it's been

18   established that he has a lack of memory as to what that text

19   message was.  I think you can ask him the question, and then

20   if he needs to have his memory refreshed, you can proceed

21   from there.

22            BY MR. DENIS:  Q.  Mr. Shirani, do you recall that

23   Blondyy had --

24   A.   I believe he confirmed to me that he could get them for

25   me if I needed them.

1   Q.   Okay.   And when you say -- when you indicated -- did you

2   text him that your guy that has the 20 for us to do the TP,

3   is that what that meant to you?

4   A.   No.   Later on he says -- he says --

5            THE COURT:   Excuse me.   Mr. Shirani, turn that

6   exhibit over.   Just close it down at this point.   Counsel,

7   ask the witness if he has any memory of what you'd like to

8   ask him about.

9            MR. DENIS:   Okay.

10            THE COURT:   And then if he doesn't, then you can

11   ask him if reviewing this exhibit refreshes his recollection

12   independently.

13            BY MR. DENIS:   Q.   Do you recall text messaging

14   Blondyy on June 11 approximately 1:57?

15   A.   I remember texting him because we were having problems

16   with Yuri, so we wanted to establish a backup plan.

17   Q.   And so you contacted -- was Blondyy in Los Angeles?

18   A.   He's in Vancouver.

19   Q.   He was in Vancouver.   And he was a friend of yours?

20   A.   That's correct.

21   Q.   And was he part of the transportation of the cocaine?

22   A.   No.   I would -- I would arrange for transportation for

23   him when he needed to bring cocaine back up to Vancouver.

24   Q.   Was he a source of cocaine?

25   A.   Yes.

```
1    Q.   Okay.  So he could get you a substantial amount of
2    cocaine if you needed it, correct?
3    A.   That's correct.
4    Q.   And you could have that transported to Canada, correct?
5    A.   That's correct.
6    Q.   And was he already bringing 20 kilos for you based on
7    that text message?
8    A.   Not for me.  It was for himself.
9    Q.   When you say -- and if you -- if the text message says
10   your guy that has the 20 for us to do the TP --
11            MR. GUTIERREZ:  Objection as to form, your Honor;
12   reading.
13            THE COURT:  Sustained.
14            MR. DENIS:  All right.
15            BY MR. DENIS:  Q.  Now, on the 11th at about 1:58
16   Blondyy sent you back a text, correct?
17   A.   I can't remember exactly the time.
18   Q.   Would looking at the document refresh your recollection?
19   A.   Sure.
20   Q.   Okay.  Take a look at the first page, the second text.
21   A.   Yes.
22   Q.   Did you read the three lines?
23   A.   The second?
24   Q.   Yeah, the three lines.  That's all I'm asking right now.
25   A.   Yes.
```

1    Q.  And he indicated he's going to find out if he can find

2    you some cocaine, correct?

3    A.  That's correct.

4    Q.  And previously you had indicated that him -- that you

5    thought the deal was sketchy because they wanted to see all

6    the money, correct?

7    A.  That's correct.

8              MR. GUTIERREZ:  Objection; vague as to who they

9    are.

10             THE COURT:  Well, you know, counsel, the last two

11   questions were objectionable, once again, reading from this

12   exhibit.  You didn't object and I'm going to overrule the

13   objection.  It comes late in any event as to the second

14   question.

15             BY MR. DENIS:  Q.  Go ahead, Mr. Shirani.

16   A.  Could you repeat the question, please.

17   Q.  You texted Blondyy that you were seeking extra kilos of

18   cocaine because the source or the deal that you were coming

19   to purchase it wanted to see all the money, correct?

20   A.  I believe so, yes.

21   Q.  And you felt that they were -- it was sketchy, correct?

22   A.  Yes.

23   Q.  So you're looking -- you were going to your other source

24   to get cocaine, correct?

25   A.  That's correct.

1    Q.  And this is not with Yuri and Mr. Krapchan, correct?  It

2    was one of your sources?

3              MR. GUTIERREZ:  Asked and answered, your Honor.

4              THE COURT:  Sustained.

5              BY MR. DENIS:  Q.  And Blondyy -- what did Blondyy

6    indicate to you in a text message?

7              MR. GUTIERREZ:  Vague as to which text message,

8    your Honor.

9              THE COURT:  Overruled on that ground.  Go ahead and

10   answer the question, sir.

11             THE WITNESS:  He had -- he mentioned that he could

12   get them.

13             BY MR. DENIS:  Q.  Okay.  So he was going to let

14   you know that he can get additional cocaine for you, correct?

15   A.  I had asked him if he could get some, and he had let me

16   know that he can get some.

17   Q.  And -- okay.  And did you believe that when a person that

18   wants to see all the money -- is that the way a normal

19   transaction occurs in a drug transaction?

20   A.  I didn't think so.

21   Q.  You thought it was unusual, correct?

22   A.  I did.

23   Q.  And you have experience in dealing with drugs?

24   A.  I have -- I had -- I don't have extensive experience, but

25   we're in a foreign city and it's a large sum of money and we

1  don't know anyone and we're sitting in a hotel room.  Doesn't

2  make sense to invite someone that's selling cocaine to come

3  and see all the money and perhaps stick you up and take all

4  the money.

5  Q.   Now -- now, when you were talking about the

6  transportation, how did that generally work?

7  A.   I don't really understand.  What do you mean how did that

8  work?

9  Q.   How did you transport the cocaine from California to

10  Canada?

11  A.   How -- how we did it was through a truck driver that

12  would go back and forth from California to Vancouver.

13  Q.   And was the truck driver on his way down to Los Angeles?

14  A.   I believe so.

15  Q.   And were you in contact with the truck driver?

16  A.   I eventually got in contact with him, yes.

17  Q.   And you indicated that -- when you say -- was the -- on

18  the 11th -- what day was that, do you recall, when you

19  arrived?  What day did you arrive on the 10th?

20  A.   I believe it was a Thursday.  I'm just thinking.  It was

21  Saturday when we were leaving, it was Wednesday when we

22  arrived, so 11th would be a Thursday.

23  Q.   Thursday would be the 11th?

24  A.   I believe.

25  Q.   Was the 13th a Friday that you were arrested?

1   A.   Yes.

2   Q.   So would that make the -- would that make the 12th a

3   Thursday?

4   A.   Wednesday, Thursday, Friday, yeah, the 11th would be the

5   Thursday.

6   Q.   The 11th -- well, if you were arrested on the 13th, on a

7   Friday, and --

8   A.   Oh, the 11th would be a Wednesday.

9   Q.   Okay.  So you arrived on Tuesday?

10  A.   I guess so, yes.

11  Q.   And on Tuesday you indicated that your transportation --

12  well, you had gotten in contact with your transportation,

13  correct?

14  A.   I hadn't been ahold of him yet, no.  I had got ahold of

15  him like the next -- the next night I believe.

16  Q.   Was that on the 11th or the 12th?

17  A.   I think on the 11th at night.

18  Q.   Okay.  And you sent a text message to Blondyy, correct?

19  A.   I sent a lot of text messages to Blondyy.

20  Q.   Okay.  And did you tell Blondyy that your ride would be

21  there in two days?

22  A.   It was -- I was under the expression that he was supposed

23  to be there because I had met with the driver before I came

24  to Los Angeles, but it ended up being that he had some issues

25  with some tickets, and he was held over in Seattle somewhere.

1   Q.   And on the 11th did you indicate that you had your cash

2   there as well in a text message?

3   A.   I can't remember.

4   Q.   Okay.  Would looking at the text message refresh your

5   recollection?

6   A.   Do you know what page?

7   Q.   The first page on the bottom, June 11, 1417 to Blondyy.

8   A.   Yes.

9   Q.   It says --

10              MR. GUTIERREZ:  Objection.

11              THE COURT:  You know, there have been too many --

12   too many instances of the contents of this particular exhibit

13   coming in without objection, so at this point a good part of

14   it is in in bits and pieces.  You can refer to the exhibit

15   and read what you were about to read.

16              MR. DENIS:  Thank you, your Honor.

17              THE WITNESS:  It says that --

18              BY MR. DENIS:  Q.  What does it say verbatim?

19   A.   Says I got my ride here too in two days, and I have my

20   cash here as well.

21   Q.   And the next line?

22   A.   You want me to read it?

23   Q.   Yes.

24   A.   Can the bullshit story I have to see all the money.  I'm

25   kind of stressed out.  See what you can do for me, bro'.

1   Q.   And this was to Blondyy, correct?

2   A.   Yes.

3   Q.   And did Blondyy respond back to you?

4   A.   Yes.

5   Q.   And what did he respond to you?

6   A.   You want me to read it?

7   Q.   Yes.

8   A.   My other guy I just talked to said he won't know till

9   Saturday if he has them for sure, bro'.  That's kind of weird

10  with the sample thing.  They should show sample and then you

11  can show paper before you grab them.  Sounds a bit fishy,

12  bro'.

13  Q.   And did you respond back to Blondyy on the 11th?

14  A.   Do you want me to read it?

15  Q.   Yes.

16  A.   What about the guy that we're supposed to do the TP thing

17  for.  Then he say he has extra ones.

18  Q.   And this is what you're texting, correct?

19  A.   I believe so.

20  Q.   And then continue with your text.

21  A.   You know who I'm talking about, the heat bad guy that's

22  from the same place as me originally.

23  Q.   This was another Iranian?

24  A.   That's correct.

25  Q.   Okay.  And then on the 11th did Blondyy respond back to

577

1    you?

2    A.   You want me to keep reading?

3    Q.   Yes.  Let's just do it one at a time so we have a record.

4    So on June 11 at 1425, which is 2:25, you text Blondyy again,

5    correct?

6    A.   Yes.  I know that's who he said -- that's who said Sat,

7    he was supposed to have them tomorrow.

8    Q.   So when you say Sat, is that Saturday?

9    A.   Yes.

10   Q.   Was that the 14th?  If Friday -- you were arrested on the

11   13th, Friday, was -- Saturday was the 14th?

12   A.   I believe so.

13   Q.   And when it indicates he was supposed to have them

14   tomorrow, what did that refer to, drugs?

15   A.   That's correct.  I believe that was me.

16   Q.   When it says 1425 from Blondyy, that was to you or from

17   you?

18   A.   I don't know.

19   Q.   Okay.  Then on June 11 at 1425 to Blondyy, did you text

20   message Blondyy?

21   A.   1425?

22   Q.   Yeah.  It says so Saturday or tomorrow?

23   A.   Yeah.

24   Q.   What did that mean?

25   A.   I was trying to ask if it was Saturday that the guy would

1   have them or tomorrow.

2   Q.   And what did Blondyy respond?

3   A.   Saturday, bro'.  I'm trying my other guy too.

4   Q.   So Blondyy was trying another source of cocaine for you,

5   correct?

6   A.   That's correct.

7   Q.   To make this deal happen, correct?

8   A.   Yes.

9   Q.   And this is another deal, different than with Yuri and

10  Michael Krapchan, correct?

11  A.   These were all in case the Michael Krapchan deal didn't

12  work out.

13  Q.   Okay.  This was a backup plan?

14  A.   That's right.

15  Q.   Okay.  And, again, we're using your source for cocaine,

16  correct?

17  A.   That's right.

18  Q.   Then on June 11 at 1427, Blondyy sent you a text message,

19  correct?

20  A.   I think I sent that.

21  Q.   Oh, you sent it.  I apologize.  And what did you say?

22  A.   Said thank you, bro', you're too kind.

23  Q.   And you heard no news on the 11th about the cocaine,

24  correct?  You inquired to see if there was any news?

25  A.   I believe it's the 13th that he says that he can get

1    some.

2    Q.   That was Blondyy?

3    A.   That's correct.

4    Q.   Let me just take you to the 12th.  Let's stay actually at

5    the last -- on page 2 of the document you have in front of

6    you, the last page, and that's on June 11, 1913.  That's in

7    the evening, correct?

8    A.   Yes.

9    Q.   And you indicate to him chilling, nothing, 17,000 will

10   work but not sure yet, can you keep the guy on ice?

11   A.   I see that.

12   Q.   You see that?

13   A.   I do see it.

14   Q.   And so did Blondyy have another source for you for the

15   cocaine?

16   A.   He was trying to come up with the sources, trying to

17   figure out who can get them.

18   Q.   And then on the 12th at 1537 -- well, you -- strike that.

19   You indicated to keep the guy on ice; what did that mean?

20   A.   I'm not quite sure.

21   Q.   Did you write that text message?

22   A.   I believe so.

23   Q.   And you didn't know what -- can you keep the guy on ice,

24   you didn't know what that meant?  If you don't remember what

25   you meant by that, that's fine.

580

1   A.   I don't think I do.

2   Q.   Okay.  So why don't we take a look at the 12th at 3:37

3   from Blondyy.  Can you -- what did that text message say?

4   A.   Says yes, I think if you can get them T 17 we can make a

5   lot of money from my pal who needs a hundred.

6   Q.   So Blondyy had a friend who needs a hundred.  What did

7   that refer to?

8   A.   A hundred kilos.

9   Q.   Okay.  And he was looking to get it from your source,

10  correct?

11  A.   He said if you can get them at 17, his friend needs a

12  hundred.

13  Q.   That's a hundred what?

14  A.   Kilos.

15  Q.   Of what?

16  A.   Cocaine.

17  Q.   Okay.  And did you respond to Blondyy?

18  A.   I said 'K, bro'.

19  Q.   And on the 12th at 1605, what did Blondyy write to you on

20  the 12th?

21  A.   Says my other pal just called me and said he can get

22  too-- he can get them too.

23  Q.   And this was more kilos of cocaine, correct?

24  A.   That's correct.

25  Q.   So both his sources were able to get kilos of cocaine for

1   you?

2   A.   That's correct.

3   Q.   Okay.   Did you ask him for how much?

4   A.   I did.   I said how much.

5   Q.   And how much -- how much could he get it for?

6   A.   He just told me 20, and I said are you crazy to him.

7   Q.   And how many did his source have?

8   A.   That he has 80 of them.

9   Q.   And that's 80 what?

10  A.   Kilos.

11  Q.   Of cocaine?

12  A.   That's correct.

13  Q.   So Blondyy was able to get 80 kilos of cocaine, correct?

14  A.   That's correct.

15  Q.   At 20,000?

16  A.   That's what he's saying.

17  Q.   Okay.   And what do you write to -- what did you write on

18  the 12th to Blondyy?

19  A.   Says wow, bro', that's insane.   That's funny.   Is that

20  the guy that lost that hundred to you, Hairpiece?   You know

21  who I'm talking about?   He also told me 20.

22  Q.   And then on the 12th on 1610 where it starts with I know?

23  A.   Yes.

24  Q.   Well, I'll just stay in chronology.   I apologize.   Why

25  don't we look at 1609.   Then Blondyy wrote to you, correct?

1   A.   Yes.

2   Q.   What did he say?

3   A.   Weird, eh?  Maybe prices are up there.  I don't know.  It

4   sounds too good to be true that your pal can get them for 17.

5   Q.   And then what did you respond back to Blondyy on the

6   12th?

7   A.   I know.  We will see.  If it works, we are rocking, bro'.

8   Keep your fingers crossed.

9   Q.   So when you say you're rocking, bro', that's because you

10  can get cocaine for Ryan Wedding at 17,000 or is that for you

11  and your pals?

12  A.   He had indicated that he could get his friend to buy a

13  hundred in an earlier message if he could get them -- if I

14  could get them to him at 17, so --

15  Q.   Had you moved large amounts of kilos of cocaine in the

16  past?

17  A.   I transported.

18  Q.   How many kilos have you transported?

19  A.   Think the most I transported was 40, 40 something.

20  Q.   At one time?

21  A.   Yes.

22  Q.   And it happened multiple, multiple times?

23  A.   I think the one time it was 40 something.

24  Q.   Is that the only other time you ever transported cocaine?

25  A.   No, there were more times.

1    Q.   And you never got in trouble for that, correct?

2    A.   That's correct.

3    Q.   This is the first time you got in trouble for

4    distributing cocaine, correct?

5    A.   That's correct.

6    Q.   Then Blondyy texted you back, correct?

7    A.   Yes.

8    Q.   What did he say?

9    A.   I hear you.

10   Q.   Now, there's a different individual -- well, who was

11   Blondyy?  Well, strike that.  That was a friend of yours

12   correct?

13   A.   That's correct.

14   Q.   Now, there's another individual.  What was his name?  On

15   the 12th at 1819.

16   A.   You want me to read what's here?

17   Q.   What's the -- what's the name of the person?  Who is

18   Anally Retentive?

19   A.   His name is Maziar.

20   Q.   Is that your drug partner?

21   A.   He's the guy that we did the transport through.

22   Q.   Okay.  And is he letting you know what time the

23   transportation is coming in?

24   A.   I believe so.

25   Q.   And what does he say?

1   A.   He's getting in around 2 a.m.

2   Q.   And then that came from Maziar, correct?

3   A.   That's correct.

4   Q.   Which you have here as Anally Retentive?

5   A.   That's correct.

6   Q.   And on the 12th what did -- what did -- what did you text

7   to Anally Retentive?

8   A.   He's getting in tonight, question mark.

9   Q.   And what did Anally Retentive text you back?

10  A.   He says yes.

11  Q.   And on the 12th at 1820, what did you text to Anally

12  Retentive?

13  A.   I said did you tell the old man to get him ready to come

14  right back down.

15  Q.   What did that mean?

16  A.   The driver has a roommate, and I told my friend to get

17  the old man -- that's his roommate -- to get him ready to

18  come back down because he was -- he had supposed to be -- he

19  had supposed to be down already, but he had a problem with

20  a -- some tickets that he had gotten, so they sent him back

21  to clarify the tickets, from what I can remember.

22  Q.   When you say tickets, was he driving his truck down to

23  LA?

24  A.   That's correct.

25  Q.   And were you able to get on to that transportation?

1   Well, let's read the next text message from Anally Retentive.

2   What happened there?

3   A.   Most likely they head back on Monday.  I told them right

4   now, and he's looking for a load as we speak.

5   Q.   So was the transportation already there in Los Angeles?

6   A.   No.  He had gotten turned -- turned around.

7   Q.   Oh, he had -- coming down or leaving?

8   A.   Coming down.

9   Q.   Okay.  And he was going to be in on Monday?

10  A.   He was going to -- he was going to take off from

11  Vancouver on Monday I believe.

12  Q.   And if he was leaving on Monday, that would have been the

13  16th, correct?

14  A.   I believe so.

15  Q.   And how long does it generally take a transport to come

16  down to Los Angeles?

17  A.   Thirty-six hours.

18  Q.   So if he was leaving on Monday, how many days would that

19  be?

20  A.   A day and a half.

21  Q.   So he would have came in on when, Tuesday or Wednesday?

22  A.   Tuesday afternoon.

23  Q.   And Tuesday -- if Monday was the 16th, what would Tuesday

24  be?

25  A.   The 17th?

1    Q.   And this was the transportation that was going to take

2    the drugs from Los Angeles to Canada, correct?

3    A.   That's correct.

4    Q.   Okay.   And you indicated he was looking for a load as we

5    speak.   What did that mean?

6    A.   For a load to bring down to Los Angeles, like --

7    Q.   Was that marijuana or cocaine?

8    A.   No, just a regular shipping load.

9    Q.   Okay.   So he would bring a regular shipment down to the

10   United States -- to California or the United States and then

11   he would pick up drugs and take it up to Canada?

12   A.   He would take a regular shipment down and then take a

13   regular shipment back every week.

14   Q.   And then you would just put cocaine inside that?

15   A.   If we could find some, if we could kind anyone that

16   wanted to bring some back, yes.

17   Q.   And then on the 12th at 1627, what did you text to Anally

18   Retentive?

19   A.   It says you know, that's fucked up.   That means I have to

20   sit here with these bitches with my thumb in my ass.   Tell

21   them to get on top of it because I'm coming back Saturday.

22   Tell them to really get their shit together because I'm not

23   sitting here waiting for their bullshit.

24   Q.   When you say with these bitches, who are -- who are you

25   referring to?

1   A.   The cocaine.

2   Q.   So you were sitting with cocaine?  Or were you talking

3   about Ryan Wedding and Michael Krapchan?

4   A.   I think what I meant was eventually once I got the deal

5   through that I didn't want to sit there with the cocaine,

6   just wanted to give it to the driver.

7   Q.   So do you call -- is cocaine a slang word for bitches --

8   A.   I don't know.

9   Q.   -- a codeword?

10  A.   I guess so.  No, I don't know.  I guess in this instance

11  that's how it came out.

12  Q.   Did you -- you texted these text messages, correct?

13  A.   That's correct.

14  Q.   And what you were sending these text messages -- okay.

15  Have you ever referred to cocaine as "girls"?

16  A.   I believe so.

17  Q.   All right.  And on the 12th at 2105, you texted to Anally

18  Retentive, correct?

19  A.   Yes.

20  Q.   And what did you text?

21  A.   I texted can you find out what units are going for right

22  now.

23  Q.   This was to Anally Retentive, correct?

24  A.   That's correct.

25  Q.   And what did Anally Retentive -- and Anally Retentive, is

1   he in Canada?

2   A.   Yes.

3   Q.   And what did Anally Retentive say units were going for?

4   A.   About 30K.

5   Q.   So they were selling for 30,000, correct?

6   A.   That's correct?

7   Q.   And that's what your friend Anally Retentive told you?

8   A.   That's what he told me.

9   Q.   And Anally Retentive was your business partner Maziar,

10  correct?

11  A.   He's the guy that we went through for transport.

12  Q.   So the difference between 30 and 17 -- excuse me -- yeah.

13  Forgive me.   Withdrawn.   So the difference between 30,000 and

14  17,000 is how much per kilo?

15  A.   Thirteen thousand.

16  Q.   Thirteen thousand times 24 -- well, what's 13,000 times

17  ten?

18  A.   A hundred thirty.

19  Q.   Thousand?

20  A.   Yes.

21  Q.   And if it's for 20, that would be double that, correct?

22  A.   That's correct.

23  Q.   That would be $260,000?

24  A.   That's correct.

25  Q.   And four more kilos?

1    A.   Fifty-two.

2    Q.   Forty-nine?

3    A.   Fifty-two I think.

4    Q.   Fifty-two.  So that would be approximately -- the

5    difference between that would be about 300 -- my brain is --

6    $312,000 correct?

7    A.   I believe so.

8    Q.   For 24 kilos of cocaine, correct?

9            THE COURT:  Move on, counsel.  You've done the

10   math.

11           MR. DENIS:  Thank you, your Honor.

12           BY MR. DENIS:  Q.  Now, you had the -- you had the

13   connection for the drugs in the United States, correct?

14           MR. GUTIERREZ:  Asked and answered, your Honor.

15           THE COURT:  Sustained.

16           MR. DENIS:  I think -- okay.

17           BY MR. DENIS:  Q.  Now, on the -- on the -- when

18   Anally Retentive returned your text saying that it was around

19   30,000, that was on the 13th, correct?

20           MR. GUTIERREZ:  403, your Honor.

21           THE COURT:  Sustained.

22           BY MR. DENIS:  Q.  Then to Blondyy what did you

23   write?

24           MR. GUTIERREZ:  403, your Honor.

25           THE COURT:  Sustained.  At this point any probative

590

1    value of this further line of questioning is outweighed by

2    the consumption of time, so just move to another area if you

3    would, counsel.

4            MR. DENIS:  Okay.

5            BY MR. DENIS:  Q.  Now, you were trying to --

6    Mr. Krapchan, on the 13th, he was leaving -- he was coming

7    back to Los Angeles so that you guys would go back home to

8    Vancouver on the 14th, correct?

9    A.   That's correct.

10   Q.   Now, at the time were you still keeping tabs on your

11   transportation?

12   A.   I can't remember.

13   Q.   Would looking at the document -- and I'll give you the

14   area.  Take a look at the June 13 text at 1334.  On the lower

15   right-hand corner it says 2163, Bates stamp number.

16   A.   Yes.

17   Q.   Does that help refresh your recollection?

18           MR. GUTIERREZ:  Object as to 403, your Honor.

19           THE COURT:  Sustained.

20           BY MR. DENIS:  Q.  Your transportation was supposed

21   to come in at what -- what date?

22   A.   From what I remember here, Maziar told me he's leaving

23   Monday, so I was assuming Tuesday afternoon.

24   Q.   And Tuesday afternoon is the 17th?

25           MR. GUTIERREZ:  Asked and answered, your Honor.

```
1              THE COURT:  Sustained.
2              BY MR. DENIS:  Q.  So this would have been the
3    transportation that would have taken the drugs from Canada to
4    the United States, correct?
5    A.   That's correct.
6    Q.   So you had Mr. Wedding in the car, correct, when you went
7    to pick up Michael Krapchan on the 13th?  I'm sorry.
8    A.   Yeah.  We didn't -- he was -- we were both in the car and
9    he just jumped in the car when he got out of the door.
10   Q.   And you were picking up to take him back to the Valley?
11   A.   We picked him up, and then he informed us that Yuri had
12   found some more product.
13   Q.   And what time was this that you went and picked up
14   Michael Krapchan?
15   A.   It was in the morning.
16   Q.   And Ryan Wedding got up in the morning and went with you?
17   A.   Yes.
18   Q.   He didn't sleep in?
19   A.   No.
20   Q.   You indicated you guys were waking up at 12 o'clock every
21   day; was that because Ryan Wedding was sleeping?
22   A.   I believe we were both sleeping in.
23   Q.   So on Friday you got up early?
24   A.   Because Mr. Krapchan wanted us to pick him up early.
25   Q.   And you didn't go by yourself?
```

592

1   A.  No.

2   Q.  So you had Mr. Wedding with you, correct?

3   A.  Yes.

4   Q.  And then did you go to -- when Mr. Krapchan came in the

5   car with you, what happened?

6   A.  We had a lengthy discussion about Yuri.  Mr. Krapchan

7   said that Yuri was a very reputable person in San Diego, that

8   he had a very good reputation, and that he had gotten ahold

9   of some more product and that we should go down and take a

10   look at one.

11   Q.  Did he -- did you discuss it with him outside of the car

12   or in the car?

13   A.  We were all in the car.  We never left the car.

14   Q.  And then where was the money at this time?

15   A.  The money was -- 17,000 was with Mr. Krapchan, 3,000 was

16   with Mr. Wedding, there was 100,000 in the hotel room, and

17   the rest of it was at the rug store.

18   Q.  Now, when you -- did you go back to the room to pick up

19   the money?

20   A.  No.

21   Q.  Did you have Mr. Wedding go and guard the money in the

22   room?

23   A.  No.

24   Q.  Did you feel comfortable leaving $100,000 sitting in a

25   room?

593

1  A.   No, but Mr. Wedding said that, you know, if the maids

2  walk in, they're not going to go and open drawers out of

3  sockets and look underneath, so you don't have to worry about

4  it.

5  Q.   When you said you weren't comfortable, was that because

6  it was your money?

7  A.   No, because I was responsible for the money.

8  Q.   You were responsible for these other people, correct?

9  You said other people -- it was other people's money,

10  correct?

11  A.   I was responsible for Mr. Wedding's money.

12  Q.   You were responsible for Mr. Wedding's money when Mr.

13  Wedding was with you?

14  A.   No, but if we had left that money in the hotel room and

15  somebody had come and grabbed it, I would be responsible for

16  that money.

17  Q.   Why would you be responsible?

18  A.   Because I went and got it.

19  Q.   So when you discussed the plan with Michael Krapchan,

20  what was the plan on the 13th?

21  A.   To go back and take a look at one to see if the product

22  was good.

23  Q.   Okay.  And when you went down to -- you drove to San

24  Diego?

25  A.   That's correct.

1   Q.   Did you drive?

2   A.   From what I remember, yes.

3   Q.   So you drive down to San Diego.  And do you recall

4   approximately what time you got to San Diego?

5   A.   No.

6   Q.   No?

7   A.   No, I don't.  We stopped in the middle and had breakfast

8   at Denny's.

9   Q.   Did you pay for that meal?

10  A.   I can't remember that.

11  Q.   You wouldn't -- okay.  Did you pay cash or -- do you

12  recall who paid?

13  A.   I don't.

14  Q.   So on the 13th -- well, you went down to San Diego, and

15  you only had -- Mr. Krapchan is the one that had the 17,000,

16  correct?

17  A.   That's correct.

18  Q.   And you drove him to San Diego; is that right?

19  A.   That's correct.

20  Q.   Why didn't you send Michael Krapchan back by train?

21  A.   Because we wanted to come here, take a look at the

22  sample, and then go back to Los Angeles.

23  Q.   So you could recognize good quality of cocaine or bad

24  quality of cocaine, correct?

25  A.   Yes.

1  Q.  And you indicated you were going to take it back to Los

2  Angeles?

3  A.  Mr. Krapchan would be bringing it back to Los Angeles.

4  Q.  How, by train?

5  A.  That was the agreement.

6  Q.  So when you went down to San Diego, you drove the car,

7  correct?

8  A.  From what I remember, yes.

9  Q.  Okay.  And at this time you were staying at the Comfort

10  Inn; is that right?

11  A.  In LA?

12  Q.  In LA, correct.

13  A.  I believe so.

14  Q.  That's where the money was, correct?

15  A.  The same room that the money was, we were staying.

16  Q.  That's where you were staying?  And when you drove down

17  to San Diego, where did you drive to?

18  A.  We drove to the hotel that Mr. Krapchan had been staying

19  at.

20  Q.  Was that the Hampton Inn?

21  A.  I can't tell you.

22  Q.  Okay.

23  A.  I -- we went to a hotel right by the water.

24  Q.  And did you go park the car?

25  A.  I parked the car in the underground.

1  Q.  Did you have the key?

2  A.  Yes.

3  Q.  Okay.  And did you go and meet with Mr. Krapchan in his

4  room?

5  A.  We -- he went and checked back into the hotel and then

6  came in the car and then we went and parked the car and went

7  up to the hotel room.

8  Q.  Okay.  Then did you give him the key to go buy drugs?

9  A.  Yes.

10 Q.  Now, when you were there, you were going to pick up -- at

11 that time -- do you recall approximately what time you

12 arrived in San Diego?

13 A.  No.

14 Q.  Did you have a backup plan if this -- did you have some

15 backup plan at three o'clock on that day, on the 13th, to

16 pick up more drugs?

17 A.  Nothing that I can remember.

18 Q.  Now, at the time that you were -- on the 13th were you

19 still text messaging back to Anally Retentive?

20 A.  I don't know if I remember.  I don't think I remember.

21 Q.  I'm sorry?

22 A.  I don't think I remember.

23 Q.  Would looking at your text messages refresh your

24 recollection?

25 A.  Do you want me to do that?

1   Q.   Yes.   Please look at 2164 on the lower right-hand corner,

2   and look at the time stamp, 1715, from Blondyy.

3   A.   Okay.

4   Q.   And were you supposed to get 40 kilos of coke?

5           MR. GUTIERREZ:   Objection; 403, lack of foundation.

6           THE COURT:   Well, I'm going to sustain that at this

7   point under 403, counsel, and I'll state why in just a few

8   minutes.   Just move on to another subject other than a backup

9   plan at that late point in time, please.

10          BY MR. DENIS:   Q.   Okay.   So on the 13th were you

11  under a bit of stress that day?

12  A.   I had a headache from what I remember.

13  Q.   Okay.   And was your transportation on schedule?

14  A.   Not on the original schedule.

15  Q.   So was it delayed further?

16  A.   From what I remember, he was supposed to come Monday and

17  arrive Tuesday afternoon.   From what I remember.

18  Q.   You weren't able to contact him?   You ran out of minutes

19  or something?

20  A.   I didn't have his phone number in Vancouver.

21  Q.   So someone else, your partner, was contacting him,

22  correct?

23  A.   I believe so.

24  Q.   And when Michael Krapchan went to -- to pick up drugs --

25  okay.   You gave him the keys and he went to pick up the

1    sample, correct?

2              MR. GUTIERREZ:  Asked and answered, your Honor.

3              THE COURT:  Sustained.

4              BY MR. DENIS:  Q.  And you indicated you got a

5    headache, correct?

6              MR. GUTIERREZ:  Been asked and answered, your

7    Honor.

8              THE COURT:  Sustained.

9              BY MR. DENIS:  Q.  Is this because you were -- do

10   you frequently get headaches or was there a lot of pressure

11   on you at that time?

12             MR. GUTIERREZ:  Asked and answered, your Honor.

13             THE COURT:  Overruled.

14             THE WITNESS:  It happens once in a while.

15             BY MR. DENIS:  Q.  Okay.  And when you -- when you

16   were there on the 13th and you gave Mr. Krapchan your --

17   your -- the car keys, was your hotel key in the car?

18   A.  I -- I don't remember that.

19   Q.  When you gave Mr. Krapchan the car on the 13th, you knew

20   that the money was still in the Comfort Inn, correct?

21   A.  That's correct.

22   Q.  You didn't have any document on your person to show that

23   you stayed even at the Comfort Inn, correct?

24   A.  I don't think I did.  I'm not -- I'm not really sure.

25   Q.  Do you recall if you had the key on you, if you recall?

1   A.   I don't.

2   Q.   Now, when Michael Krapchan went there, it was -- you knew

3   he was there to pick up drug -- a drug sample, correct, one

4   kilo?

5   A.   That's correct.

6   Q.   And he was going to bring it back for you to take a look

7   at it, correct?

8   A.   Yes.

9   Q.   And you would give the okay or no-go; is that right?

10  A.   That's correct.

11  Q.   Because you're familiar with what cocaine is supposed to

12  look like, correct?

13  A.   I had seen and I had been told what it's supposed to look

14  like.

15  Q.   And it's from your experience of transporting hundreds

16  and hundreds of kilos of cocaine, correct?

17          MR. GUTIERREZ:   Been asked and answered, your

18  Honor, 403.

19          THE COURT:   The basis has been asked and answered.

20          BY MR. DENIS:   Q.   Now, when 15 minutes had passed,

21  Michael Krapchan had called you back, correct?

22  A.   That's correct.

23  Q.   It was your telephone, correct?

24  A.   It was a phone that we both used, Mr. Wedding and I.   He

25  paid for the phone.

1    Q.   Oh, Mr. Wedding paid for the phone?

2    A.   That's correct.  He gave me $1,000, plane tickets were

3    400 each, phone was around $180 with the line.

4    Q.   I'm sorry.  The plane tickets were 400 each --

5    A.   That's correct.

6    Q.   -- and the cell phone was what?

7    A.   It was $180 for unlimited usage for a month.

8    Q.   And if he paid for the phone, why didn't he take the

9    phone?  Why didn't he use -- strike that.  Who was in

10   possession of the phone?

11   A.   I was.

12   Q.   Why didn't Mr. Wedding have possession of the phone?  He

13   paid for it.

14   A.   He was not there when I picked up the phone.

15   Q.   But you eventually met with him, correct?

16   A.   That's right.

17   Q.   And you didn't give him the phone that he paid for?

18   A.   He used the phone whenever he needed to.

19   Q.   When you say he -- did your phone have cheaper minutes?

20   Was it -- strike that.  Was that a local phone?

21   A.   I picked up the phone in Vancouver, and it was meant to

22   be used in the States.

23   Q.   And that was a phone that wasn't in your name, correct?

24   A.   That's correct.

25   Q.   Do you recall the person whose name it was under?

1   A.  No.

2   Q.  Did you know the person?

3   A.  No.

4   Q.  So this was a -- you were using the phone on someone

5   else's name without their knowledge, correct?

6   A.  I had picked up the phone from a cell phone store.  I

7   didn't know it was under someone else's name.

8   Q.  Is that something called identity theft?

9   A.  I picked up the phone from another cell phone store.  I

10  told them that I needed a phone to use in the United States,

11  and he had provided me with that phone.

12  Q.  As far as you know, is that called identity theft?

13          MR. GUTIERREZ:  Lack of foundation, calls for a

14  legal conclusion.

15          THE COURT:  Sustained.

16          BY MR. DENIS:  Q.  Now, when you were waiting for

17  Michael Krapchan, you had waited in the room for about an

18  hour, correct?

19  A.  I believe so.

20  Q.  What did you and Mr. Wedding talk about during that hour?

21  A.  He was sleeping.

22  Q.  He was sleeping?

23  A.  He was sleeping.

24  Q.  He wasn't worried about anything, was he?

25          MR. GUTIERREZ:  Calls for speculation, lack of

602

1    foundation.

2            THE COURT:  Sustained.

3            BY MR. DENIS:  Q.  You were up worrying; is that

4    right?

5    A.  I was waiting.

6    Q.  And you got a headache, correct?

7            MR. GUTIERREZ:  Been asked and answered, your

8    Honor.

9            THE COURT:  Sustained.

10           BY MR. DENIS:  Q.  Did you wake up Mr. Wedding or

11   did he wake up on his own?

12   A.  I believe I eventually woke him up.

13   Q.  And you wanted to go eat lunch?

14   A.  Yeah.

15   Q.  So you guys went to eat lunch?

16   A.  Well, we stepped out of the hotel, and we got arrested.

17   Q.  Was this out of the hotel room or out of the lobby and

18   out in the front of the hotel?

19   A.  In front of the hotel.

20   Q.  And what happened?

21   A.  There was five, six cars with FBI agents putting us under

22   arrest.

23   Q.  Now, Mr. Shirani, when you were cooperating or you signed

24   a cooperation agreement with the government, you were

25   expecting to get something back for your cooperation,

1   correct?

2   A.   I was informed that if I told the truth, they may

3   recommend less time for me.

4   Q.   Did you understand -- and you had an attorney during this

5   process, correct?

6   A.   That's correct.

7   Q.   And he explained to you -- strike that.  You were made

8   aware what substantial assistance is?

9   A.   Yes, I guess.  I don't really know the answer to that

10  question.

11  Q.   Okay.  But you came and met with the government, correct?

12  A.   That's correct.

13  Q.   And you told them whatever you knew about drugs, correct?

14  A.   That's correct.

15  Q.   You were not truthful with them at the first or you

16  withheld certain information from the government at the first

17  meeting, correct?

18           MR. GUTIERREZ:  That's been asked and answered,

19  your Honor.

20           THE COURT:  Sustained.

21           BY MR. DENIS:  Q.  And you -- the day after that

22  you were asked to testify at a grand jury, correct?

23           MR. GUTIERREZ:  That's been asked and answered,

24  your Honor.

25           THE COURT:  Sustained.

1          BY MR. DENIS:  Q.  And when you --

2          THE COURT:  Do you have any further questions --

3          MR. DENIS:  I do, your Honor.

4          THE COURT:  -- to ask that you haven't already

5    asked?  Then you certainly may proceed, but please cease from

6    asking questions that have already been asked by you on

7    cross-examination.

8          MR. DENIS:  Yes, your Honor.

9          BY MR. DENIS:  Q.  When you testified at the grand

10   jury, did you expect to get some reduction in your sentence?

11   A.  I had been explained that if I tell the truth, they may

12   recommend less time.

13   Q.  And at the grand jury, you told them that you were just

14   going to receive $400 per kilo for transporting the drugs to

15   Canada; is that right?

16   A.  That's right.

17   Q.  You told them at the grand jury and -- that -- and the

18   grand jury had a number of witnesses -- excuse me.  Strike

19   that.  Had a number of the grand jury -- strike that.  At the

20   grand jury there were a number of jurors, similar to here but

21   more of them, correct?

22   A.  That's correct.

23   Q.  And you told those individuals that you were going to

24   receive $400 for transporting the cocaine to Canada, correct?

25   A.  That's correct.

1   Q.   And you told them that this was Ryan's money, correct?

2   A.   That's correct.

3   Q.   And that you were not -- you weren't responsible or --

4   there -- you were not -- none of the kilos were your kilos of

5   cocaine, correct?

6   A.   That's correct.

7   Q.   You never told them that your brother was involved in

8   drug dealing, correct, at the grand jury?  You never told

9   them that?

10  A.   No.

11  Q.   You said that it was Ryan Wedding's money?

12  A.   That's correct.

13  Q.   And after you testified for the grand jury, did you get

14  depressed?

15  A.   I was nervous.

16  Q.   When it was done?

17  A.   Yes.

18  Q.   Did you speak with your family from jail after the grand

19  jury?

20            MR. GUTIERREZ:  Objection; relevance, 403.

21            THE COURT:  The objection is overruled.

22            THE WITNESS:  I can't recall.

23            BY MR. DENIS:  Q.  When I say your family, who do

24  you speak with -- strike that.  You have conversations with

25  your brother from jail, correct?

1   A.   That's correct.

2   Q.   You also have conversations with your mom in jail,

3   correct?

4   A.   That's correct.

5   Q.   And you've also had some conversations with Maziar from

6   jail; is that true?

7   A.   That's correct.

8   Q.   And prior to you testifying at the grand jury, you were

9   still drug dealing from the jail; isn't that right?

10  A.   I was trying to arrange for some transportation.

11  Q.   Okay.   And you were trying to collect some money; is that

12  right?

13  A.   I had some money that was owed to me; I was trying to get

14  that collected.

15  Q.   Did you ask your brother to help you collect money that

16  was owed to you?

17  A.   I asked my brother to go see a friend of mine that had

18  owed me money so he could collect that money.

19  Q.   Was that a car wash guy?

20  A.   That's correct.

21  Q.   And your brother went to see him and collect money for

22  you?

23  A.   That's correct.

24  Q.   Were these from drug proceeds?

25  A.   For the transportation, yes.

1    Q.   During conversations with Maziar or -- do you recall

2    discussing girls, referring to drugs?

3    A.   Not -- not to the best of my knowledge.

4    Q.   Did you reference girls to mean cocaine while you were

5    using the jail phone calls?

6             MR. GUTIERREZ:   Objection; it's irrelevant for

7    post-arrest conduct, your Honor.

8             THE COURT:   The objection is overruled.   You may

9    answer.

10            THE WITNESS:   I can't recall any of that.

11            BY MR. DENIS:   Q.   You can't recall?

12   A.   No.

13   Q.   So is your answer no, you did not use girls to reference

14   cocaine?

15   A.   I can't -- I can't remember a conversation from a year

16   and a half ago that I had on the phone.

17   Q.   Now, at the proffer session you were being asked

18   questions about what happened, correct?

19            THE COURT:   I think we'll take our midafternoon

20   recess at this time --

21            MR. DENIS:   Thank you, your Honor.

22            THE COURT:   -- ladies and gentlemen, 15 minutes.

23   Please remember the admonition not to discuss the case or

24   make any decisions at this time.   Thank you.   Counsel, may I

25   see you for a moment, please, just on scheduling.

1          (Following is a sidebar conference.)

2          THE COURT:  Okay.  You're both ordered to be here

3    at 8:45 tomorrow morning.  We're going to spend as much

4    time -- you two are going to spend as much time as necessary

5    working with the exhibits and getting transcripts from all of

6    these things together.  It's very important that at the very

7    slow pace of the proceedings, we're going to be looking for

8    as much time as we can find to take care of these kinds of

9    things and still get the case to the jury by the time we

10   should get it to the jury, what I've represented.  So you'll

11   need to take as much time as necessary on the exhibits

12   tomorrow, and then I'd like you to begin working on jury

13   instructions to see where you are on jury instructions.

14   Anything that you can agree on -- well, in terms of the

15   substantive instructions, work on those, and if there are

16   issues, we'll deal with that as soon as we can.

17          MR. GUTIERREZ:  Your Honor, and I'm -- to prepare

18   for the forthcoming days, has the Court had a chance to

19   consider the government's motion regarding the expert?

20          THE COURT:  Yeah, I have.  I'm not going to take

21   any more time during this recess; I want to give you the

22   benefit of a little time off here.  But consider that all day

23   tomorrow will be a working day here, even though I have a

24   calendar and I'm not going to be working with you except to

25   put things on the record as necessary relative to exhibits.

609

1     And keep Saturday open as well.

2               MR. DENIS:  Okay.

3               THE COURT:  And so we'll see how far you get.

4               MR. DENIS:  Thank you, your Honor.

5          (There was a break in the proceedings.)

6               THE COURT:  Okay.  We have everyone ready once

7     again.

8               MR. DENIS:  Thank you, your Honor.

9               BY MR. DENIS:  Q.  Mr. Shirani, you met with the

10    government on July 17, 2009 -- excuse me -- 2000 -- July 17,

11    2008, correct?

12    A.  I believe -- I think so.

13    Q.  And you told the government about what happened -- well,

14    strike that.  You told the government that you went and

15    picked up the money from Ryan Wedding's house, correct?

16    A.  That's correct.

17    Q.  And you were asked if there was any way to corroborate

18    that fact; isn't that true?

19    A.  That's correct.

20    Q.  And you answered no, correct?

21    A.  That's correct.

22    Q.  And you told the government that you were -- you knew

23    about a lie detector test, correct?

24    A.  That's correct.

25    Q.  Did you ever take a lie detector test?

1    A.   No.

2    Q.   Other than your testimony here today, the events that

3    happened -- strike that.   About you picking up the money from

4    Ryan Wedding house, that can only be proved by -- from your

5    testimony, correct?

6              MR. GUTIERREZ:   Objection; argumentative as

7    phrased.

8              THE COURT:   It's argumentative; it's sustained on

9    that ground.

10             BY MR. DENIS:   Q.   Your -- do you know a Hamid?

11   A.   Yes.

12   Q.   Who is he?

13             MR. GUTIERREZ:   Relevance, your Honor.

14             MR. DENIS:   Very relevant, your Honor.   Cross.

15   Very relevant.

16             THE COURT:   I'll allow a couple of questions to see

17   if you can quickly relate it --

18             MR. DENIS:   Quickly.

19             THE COURT:   -- to a relevant subject.

20             MR. DENIS:   Very good.

21             THE WITNESS:   I know a few Hamids.

22             BY MR. DENIS:   Q.   Didn't you and your brother

23   recruit Hamid to testify in this case that he went with you

24   to pick up the money from Ryan Wedding?

25   A.   No.

611

1    Q.  You didn't make those arrangements with your brother?

2    A.  No.

3    Q.  Did your brother make those arrangements as far as you

4    know?

5              MR. GUTIERREZ:  Objection; relevance, 403 at this

6    point, your Honor.

7              THE COURT:  The objection is overruled

8    provisionally at this time.  You may answer if you understand

9    the question, Mr. Shirani.

10             THE WITNESS:  Can you --

11             BY MR. DENIS:  Q.  Did your brother arrange for --

12   as far as you know, did your brother arrange for Hamid to

13   come and testify that he went with you to Ryan Wedding's

14   house to pick up a box of money?

15   A.  No.

16   Q.  Is -- did you in the jail also set up other phone

17   accounts that you can use?

18   A.  Yes.

19   Q.  And you got in trouble for that, correct?

20   A.  That's correct.

21   Q.  And it was so that you could have conversations not on

22   your account, correct?

23   A.  That's correct.

24   Q.  Is Hamid staying rent-free at your brother's -- or back

25   in -- between -- sometime between June 13, 2008 through

1    October 2008, did your brother have Hamid staying at his home

2    or an apartment of his rent-free?

3                MR. GUTIERREZ:  Objection; relevance, 403.

4                THE COURT:  It's sustained on both grounds.

5                BY MR. DENIS:  Q.  You indicated you were not aware

6    of Hamid being recruited to testify in this case that he went

7    with you to pick up the --

8                MR. GUTIERREZ:  Objection; asked and answered.

9                THE COURT:  That was the testimony, counsel.  It's

10   been asked and answered.

11               MR. DENIS:  Thank you, your Honor.

12               BY MR. DENIS:  Q.  And you testified at the grand

13   jury similar as you testified here today that you were not

14   promised any specific points for your assistance to the

15   government, correct?

16   A.  That's correct.

17   Q.  You didn't discuss points with your brother or mother

18   over the telephone; is that true?

19               MR. GUTIERREZ:  Objection; relevance, 403.

20               THE COURT:  The objection is sustained.

21               BY MR. DENIS:  Q.  Your cooperation with the

22   government is simply to get a reduction in your time,

23   correct?

24               MR. GUTIERREZ:  Objection; asked and answered.

25               THE COURT:  The objection is sustained.  Well, I'm

1   going to reverse that decision.  Do you understand the

2   question?

3              THE WITNESS:  Yes.

4              THE COURT:  Okay.  You may answer the question.

5              THE WITNESS:  Can you rephrase the question,

6   please.

7              MR. DENIS:  Your Honor, can it be read back?  I'm a

8   little tired.

9              THE COURT:  No, just rephrase the question.

10  Restate it.

11             MR. DENIS:  I don't remember which question I

12  asked.  Can it be read back?

13             THE COURT:  Okay.

14             MR. DENIS:  I had a number of questions in my head,

15  and --

16             THE COURT:  That's fine.  Read back the last

17  question.

18             MR. DENIS:  Thank you, your Honor.

19             THE REPORTER:  "Question:  Your cooperation with

20  the government is simply to get a reduction in your time,

21  correct?"

22             THE WITNESS:  My cooperation with the government --

23  I just wanted to come clean and cut away from this kind of

24  business.

25             BY MR. DENIS:  Q.  Is it your understanding --

1   well, you cooperate -- you've met with the government on a
2   number of occasions, correct?
3              MR. GUTIERREZ:  Asked and answered, your Honor.
4              THE COURT:  Well, overruled.  You may answer that
5   question, sir.
6              THE WITNESS:  That's correct.
7              BY MR. DENIS:  Q.  Approximately how many times
8   have you met with the government?
9   A.  I think around ten times.
10  Q.  And prior to your testifying here today, you met with Mr.
11  Gutierrez, correct?
12  A.  I believe I did, yes.
13  Q.  And your lawyer wasn't present with you, correct?
14  A.  This last time, no.
15  Q.  So you were alone with the government and Mr. Kalina?
16  A.  And Mr. Kalina's partner.
17  Q.  And Mr. Kalina's partner.  And your lawyer wasn't present
18  with you, correct?
19  A.  That's correct.
20  Q.  And they went through the questions and answers without a
21  lawyer present, correct --
22  A.  Well --
23  Q.  -- without your lawyer present?
24  A.  They informed me that the trial was going through, and
25  they had me read some phone conversations that I have had --

1    that I had had.

2    Q.   And they went over questions and answers with you without

3    your lawyer present, correct?

4    A.   No, I didn't go over any questions or answers that day.

5    Q.   And how long were you with the government with you, Mr.

6    Gutierrez, and Agent Kalina, and his partner?  Was that a

7    female?

8    A.   Yes.

9    Q.   Is that Natalie Lambert?

10   A.   Yes.

11   Q.   How long were you with them reviewing these calls?

12   A.   I think Mr. Gutierrez left about -- after about half an

13   hour, and I was there probably for about an hour.

14   Q.   And that was just with the case agent, Kalina, and

15   Natalie?

16   A.   That's correct.

17   Q.   And they were going over calls with you?

18   A.   That's correct.

19   Q.   And how late was this?

20   A.   How late?

21   Q.   Yeah.  What time was it?

22   A.   I think it was in the morning, but I'm not sure.

23   Q.   On a previous occasion did you go over the questions and

24   answers for your testimony here today with Mr. Gutierrez?

25   A.   I had gone over the grand jury -- the testimony that I

1    had given in the grand jury and my plea agreement and my

2    agreement with the government; I'd gone through those type of

3    things.

4    Q.   Did you go over questions and answers with someone other

5    than Mr. Gutierrez from the United States Attorney's Office?

6    A.   No.

7    Q.   Is it your understanding if you are able to convince the

8    jury and get a conviction against Mr. Wedding that you would

9    basically walk out of jail?  Is that your understanding?

10   A.   No.

11   Q.   You indicated you met with the government ten times,

12   correct?

13            MR. GUTIERREZ:  That's been asked and answered,

14   your Honor.

15            THE COURT:  Sustained.

16            BY MR. DENIS:  Q.   And you've testified in a trial

17   against Mr. Wedding, correct?

18   A.   Yes.

19   Q.   And you -- have you learned that doing these things has

20   been a substantial -- has the government reminded you that

21   this has been of substantial assistance to the government?

22   A.   I've discussed this with my own lawyer.

23   Q.   And it was in your best interest to testify and cooperate

24   with the government, correct?

25   A.   I did this to come clean, like I said earlier.

617

1    Q.  You're doing this just out of the kindness of your heart,

2    correct?

3              MR. GUTIERREZ:  Objection, argumentative.

4              THE COURT:  Sustained.

5              BY MR. DENIS:  Q.  Now, just briefly, Mr. Hassan,

6    you own a -- right at your arrest you owned a -- an apartment

7    or a home, correct?

8              MR. GUTIERREZ:  Objection; relevance, 403.

9              THE COURT:  It is sustained on both grounds.

10             BY MR. DENIS:  Q.  You also had a apartment in

11   downtown, in Vancouver or Richmond?

12             MR. GUTIERREZ:  Objection; relevance, 403.

13             THE COURT:  Sustained.  Any testimony relating to

14   the personal property or assets of the defendant in my view

15   at this point would be of minimal probative value, if at all,

16   and outweighed by the undue consumption of time.

17             MR. DENIS:  Okay, your Honor.

18             BY MR. DENIS:  Q.  And you're aware that your

19   brother made a million dollars off of selling one piece --

20             MR. GUTIERREZ:  Objection; relevance and 403, your

21   Honor.

22             MR. DENIS:  Let me finish the question.  You're

23   aware that your brother made a million dollars off of selling

24   one piece of property; is that true?

25             MR. GUTIERREZ:  Objection; relevance, 403.

1          THE COURT:   Sustained.   You know, ladies and

2     gentlemen of the jury, this is a perfect example of that

3     earlier instruction I gave you at the beginning of the trial

4     that when an objection is sustained by the Court, that means

5     you are to disregard any implication in the question

6     regardless of how suggestive the question might have been.

7     Simply because counsel mentions it -- counsel can mention

8     anything in a question, but if it's not adopted by a witness

9     or if the objection is sustained, you are to completely

10    disregard the asking of the question; it has no evidentiary

11    value.

12          BY MR. DENIS:   Q.   You transfered your property to

13    your --

14          THE COURT:   Counsel, just move on --

15          MR. DENIS:   All right.

16          THE COURT:   -- with the questioning and let go of

17    the property questions at this point.

18          MR. DENIS:   Okay.

19          BY MR. DENIS:   Q.   You referred to Michael Krapchan

20    in your phone records and in conversations as a Jew, correct?

21          MR. GUTIERREZ:   Objection; relevance, 403.

22          THE COURT:   Sustained.

23          BY MR. DENIS:   Q.   And, again, you testified that

24    you only knew Ryan Wedding as an acquaintance, correct?

25    A.   That's correct.

619

1            MR. DENIS:  And we have one last clip, which we'll

2    mark as defense exhibit -- your Honor, I apologize.  What is

3    the next in order?  Is it LL or MM?  NN I believe.

4            THE COURT:  It would be MM I believe.

5            MR. DENIS:  M as in Mary or Nancy?

6            THE COURT:  Show counsel before it's projected.

7            MR. DENIS:  We're going to show it right now.

8            MR. GUTIERREZ:  We have no objection, your Honor.

9            THE COURT:  Okay.  This is one clip?

10           MR. DENIS:  One clip, your Honor.

11        (The audio recording was played.)

12           BY MR. DENIS:  Q.  So Mr. Hassan -- Mr. Shirani --

13   A.  Yes.

14   Q.  -- it indicates -- you're aware of the confidential --

15   Yuri and Michael Krapchan, correct?

16   A.  That's correct.

17   Q.  And there's the part from line number 106 -- excuse me --

18   starting from -- let me find the last -- 106.

19           Krapchan:  Only with this one -- no, I'm sorry, the

20   line above it.

21           Confidential source:  Hassan deals only with this,

22   right?

23           Krapchan:  Only with this.  Only with this.

24           Confidential source:  He contact -- he contact

25   Elmar on his own or not?  Or did Elmar find him?

1          Krapchan:  Elmar was looking for him.  Then I

2    joined him.  He -- we've been looking for him for how long?

3    Two years?  You remembered when we started, two years?  Yeah.

4          So you testified that Elmar found -- you were

5    looking for Elmar, correct?

6    A.   I didn't know who he was.

7    Q.   Okay.

8    A.   I was introduced by my friend.

9          MR. DENIS:  Nothing further.

10          THE COURT:  Mr. Gutierrez?

11          MR. GUTIERREZ:  Could you please put that clip back

12    up.

13                    Redirect Examination

14          BY MR. GUTIERREZ:  Q.  I believe this is Defense

15    Exhibit NN.  Do you see that?

16    A.   Yes.

17      (Exhibit No. NN-1 identified.)

18    Q.   And you were asked a question about that, right?

19    A.   That's right.

20    Q.   And did you have an explanation as to what that could

21    possibly mean?

22    A.   No.

23    Q.   You were asked a lot of questions about what Mr. Krapchan

24    said to the CS; is that --

25    A.   That's correct.

621

1   Q.   Do you -- are you able to read Mr. Krapchan's mind?

2   A.   Not at all.

3   Q.   Do you know whether or not he had your best interests at

4   heart throughout the entire plan?

5   A.   I don't know.  I don't know what he was doing.

6   Q.   How much did he tell you he was charging per kilogram of

7   cocaine?

8   A.   He said he was charging 17,000.

9   Q.   And have you learned during the course of this case how

10  much the CS was charging Mr. Krapchan?

11  A.   No.

12  Q.   But Mr. Krapchan told you 17,000 a kilogram; is that

13  right?

14  A.   Yeah, he said that was his price.

15  Q.   Were you aware that he was charging -- the CS was

16  charging Mr. Krapchan only 15,000?

17          MR. DENIS:   Objection; calls for speculation.   He

18  testified he didn't know.

19          THE COURT:   The objection is sustained.

20          BY MR. GUTIERREZ:   Q.   You were asked some

21  questions about meeting with us at the government on ten

22  separate occasions; is that right?

23  A.   That's correct.

24  Q.   During any of those meetings, were you told what to say?

25  A.   No.

1   Q.   During any of those meetings, were you told to say

2   something other than what you remembered to be the truth?

3   A.   No.

4   Q.   Were you ever told to say anything that made you feel it

5   was inappropriate?

6   A.   No.

7   Q.   There was an occasion when you were there in the

8   government's office without your attorney; is that right?

9   A.   That's correct.

10  Q.   Were you informed that your attorney was aware of it?

11  A.   Yes.

12  Q.   Were you also informed that if you wanted to speak to

13  your attorney at any time that his office would be called?

14  A.   Yes.

15  Q.   And did you feel comfortable going forward at that time?

16  A.   I did.

17  Q.   And when you went forward at that time, the last time I

18  believe you testified that you were on cross-examination

19  going over calls; is that what happened?

20  A.   No.

21  Q.   What happened during the last meeting when your attorney

22  wasn't there?

23  A.   There was -- I was told that the trial was probably going

24  through and that I would be on call for it, and there was

25  some phone calls that I had made from the prison that were

1  translated that the agents had made me read, from what I

2  remember.

3  Q.  And on cross-examination counsel said that you went over

4  the calls with the government.  Did the government sit down

5  and tell you what the meaning of the calls were or were you

6  just simply allowed to read what they were?

7  A.  I just read them.

8  Q.  Did anybody tell you how to interpret what you said on an

9  earlier day?

10 A.  No.

11 Q.  When you testified today, were you testifying based on

12 your memory of the events that occurred?

13 A.  Yes.

14 Q.  You were asked about your cooperation agreement.  What

15 was your understanding of the agreement with the government?

16 A.  I was told repeatedly that there could be no time off or

17 some time off; it would be relevant to if I came forward and

18 told the truth and that you would recommend -- that you may

19 recommend less time.

20 Q.  So when you said less time or no time, is that your

21 understanding --

22 A.  Yes.

23 Q.  -- that you could get nothing off conceivably?

24 A.  That's correct.

25 Q.  What's your understanding of who makes that choice?

1    A.   The judge.

2    Q.   Counsel indicated on cross-examination that there was

3    perhaps some money that you were going to keep for yourself

4    after you received it from Mr. Wedding before you sent it to

5    the United States; do you remember those questions?

6    A.   Yes.

7    Q.   And I believe you testified that there was -- $340,000

8    was given to you, was what needed to be had?

9    A.   There needed to be around 390 in Canadian; that was what

10   needed to be had.

11   Q.   So that would -- and how much did you receive from Mr.

12   Wedding?

13   A.   Approximately 390 to 400,000 I believe.

14   Q.   And would that 390 include the 15 percent fee that it was

15   going to cost to send the money to the United States?

16   A.   It included that cost and the exchange rate.

17   Q.   On cross-examination you indicated that if the deal

18   went -- if the money was gone, you would be dead and that you

19   were in for two, two were yours.  What did you mean by that?

20   A.   The reason I said two was I could cover two.  The

21   original plan was to do two at a time.  That's the amount of

22   money that I could cover in case anybody walked away with the

23   money or got arrested with the money or anything like that; I

24   wouldn't be indebted to Mr. Wedding.

25   Q.   Well, you thought you were being charged 17 a kilogram,

1    right?

2    A.   Yes.

3    Q.   So 17 plus 17 I believe is $34,000.

4    A.   That's correct.

5    Q.   So you're saying you were able to cover $34,000?

6    A.   I would be capable of covering that much money.

7    Q.   But you testified you'd had about 2,000 or $2200 on you.

8    How could you cover that much money with only 2200 on you?

9    A.   I would cover it back in Vancouver.

10   Q.   Is that how much cash you had available to you?

11   A.   I had a little bit more money than that.

12   Q.   A little bit more?

13   A.   Yeah.

14   Q.   How much more, roughly?

15   A.   I had roughly around 40 something thousand dollars.

16   Q.   Okay.  You indicated on cross-examination that your

17   brother purchased the tickets for you, the tickets to Los

18   Angeles; is that right?

19   A.   That's correct.

20   Q.   But if -- but he was reimbursed by you, right?

21   A.   Yes.

22   Q.   In cash?

23   A.   That's right.

24   Q.   And you saw that the receipts, they said cash was the

25   payment.

626

1   A.   That's correct.

2   Q.   But you testified that you thought it was credit card?

3   A.   That's what my brother had told me.

4   Q.   That was your understanding?

5   A.   That's correct.

6   Q.   But you weren't there to actually purchase the tickets,

7   were you?

8   A.   No.

9   Q.   And do you remember which one of Mr. Wedding's friends

10  came to you to give you the cash before you asked your

11  brother to buy the tickets?

12  A.   Yes.

13  Q.   Which friend was it?

14  A.   Adrian.

15  Q.   You indicated that your brother was supposed to come down

16  too; is that correct?

17  A.   That's correct.

18  Q.   Was your brother part of the plan to purchase drugs?

19  A.   No.

20  Q.   Why was your brother supposed to come down?

21  A.   He's recently moved back to Canada.  He has some friends

22  in Orange County and Hollywood and Westwood.  He wanted to

23  come and see them.  And I had told him after I had finished

24  doing this, we could maybe extend our visit.

25  Q.   But he -- do you know why he decided not to come down?

1    A.   He actually couldn't find his passport.   He was -- he was

2    ready to come.

3    Q.   You were asked a lot of questions about text messages to

4    other sources; do you recall those questions?

5    A.   Yes.

6    Q.   And to summarize those, that would -- those constituted

7    your backup plan; is that right?

8    A.   That's correct.

9    Q.   You had people who were able to supply cocaine as a

10   backup?

11   A.   That's correct.

12   Q.   And I believe -- did Mr. Wedding have a plan as well or

13   sources?

14   A.   He had received a phone call and received a text message

15   with a phone number where his friend had told him that you

16   can call this person for the supply of cocaine.

17   Q.   So there were options available through the two of you to

18   get drugs if the deal with Mr. Krapchan and the CS didn't

19   work out; is that right?

20   A.   That's right.

21   Q.   But let me ask you, were those additional deals in

22   addition to what you had planned with Mr. Krapchan or were

23   those deals that were going to be in case you didn't have

24   Mr. Krapchan's deal work out?

25   A.   That was in case if Mr. Krapchan didn't work out.

628

1    Q.   So when counsel was asking you about multiple kilos,

2    those were a backup or backup kilos; is that fair?

3    A.   That's correct.

4    Q.   If you had all these other plans that friends were

5    setting up for you and Mr. Wedding had friends who would do

6    it, why did you ultimately go with Mr. Krapchan and the CS, a

7    CS who you'd never met before and you thought was crazy?

8    A.   His price was far less than everybody else's.

9    Q.   When you say far less, how much less was it?

10   A.   Everything that I had heard was around 20,000 or roughly

11   around that.

12   Q.   For a kilogram?

13   A.   Yes.   And Mr. Krapchan's source was 17,000.

14   Q.   So there would be -- you could make more profit with

15   Mr. Krapchan's connection's cocaine than the other ones?

16   A.   Mr. Wedding would be able to make more profit.

17   Q.   You were asked on cross-examination about a text message

18   that Anally Retentive -- where you said to him can you find

19   out what units are going for right now.   Do you remember

20   that?

21   A.   Yes.

22   Q.   Now, when you said units, were you asking about anything

23   in particular?

24   A.   I was asking him about the price of cocaine that was

25   going for in Vancouver.

1    Q.   And he gave you 30,000?

2    A.   That's correct.

3    Q.   When Mr. Krapchan came back after you were told the deal

4    was off --

5    A.   Yes.

6    Q.   -- on cross-examination you indicated that you had a

7    lengthy discussion about Yuri?

8    A.   Yes.

9    Q.   Do you remember that lengthy discussion?

10   A.   Mr. Krapchan told me that he had gone -- he had gone

11   around town with Yuri and he was a very reputable person, he

12   had a very good reputation, he was very wealthy, that the

13   case wasn't like he wanted to rip us off, he was just nervous

14   as well as we were, things of that nature.

15   Q.   And this conversation was about the plan?

16   A.   That's correct.

17   Q.   And when you were talking to Mr. Krapchan about what you

18   just said, where was Mr. Wedding?

19   A.   He was sitting in the car.

20   Q.   In the Toyota Prius?

21   A.   That's correct.

22   Q.   You were asked on cross-examination about not telling the

23   whole truth about a particular individual; is that right?

24   A.   That's correct.

25   Q.   And who was that individual?

630

1    A.   Maziar Manavie.

2    Q.   But you did wind up telling the government ultimately

3    about that individual; is that fair to say?

4    A.   Yes.

5    Q.   Why did you ultimately change?

6    A.   I just didn't want to -- I just didn't want to lie.

7    Q.   Had you lied before or had you just withheld information?

8    A.   He's a very close friend of mine.  I didn't want to

9    give -- I didn't want to give his name.

10   Q.   Have you ever been convicted of a crime in Canada?

11   A.   No.

12   Q.   You were asked some questions about some alleged fraud;

13   do you recall those questions --

14   A.   Yes.

15   Q.   -- about some credit cards that were found on a friend of

16   yours?

17   A.   That's correct.

18   Q.   And although you were charged, were you ever convicted?

19   A.   No.

20   Q.   Were the charges ultimately dropped?

21   A.   Yes.

22   Q.   And with regard to this murder investigation, how long

23   ago did that murder occur approximately?

24   A.   I think it happened in 1995.

25   Q.   And did you -- you knew the people -- you knew the person

631

1   who was murdered; is that right?

2   A.   Yes.

3   Q.   And were you ever charged in that murder investigation?

4   A.   No.

5   Q.   Have you ever been convicted of committing murder in any

6   fashion?

7   A.   No.

8   Q.   You were asked on cross-examination about using other

9   phone accounts in custody.

10  A.   That's correct.

11  Q.   Why did you do that?

12  A.   The building's policy is you only get 300 minutes every

13  month.   I wanted to speak to my mom and my brother and my

14  girlfriend, so I asked someone to get his PIN number so I

15  could use his PIN number because he wasn't using it.

16  Q.   As far as you know, were you the only person in custody

17  doing that?

18  A.   No.  Well, yeah.  Well, no, I wasn't the only person.  A

19  lot of people do it.

20  Q.   And is it just to get more minutes to speak with people?

21  A.   That's why I was doing it.

22  Q.   But it is against the jail rules; is that fair to say?

23  A.   That's correct.  I got taken -- my phone was taken for

24  like two or three months.

25  Q.   So you were punished for it?

1    A.   Because of it, yes.

2              MR. GUTIERREZ:   If I may have just a brief moment,

3    your Honor, I should be able to finish.

4              BY MR. GUTIERREZ:   Q.   Did your brother supply any

5    money to this plan?

6    A.   No.

7              MR. GUTIERREZ:   Your Honor, I have no further

8    questions.

9              THE COURT:   Any further cross-examination on any of

10   the areas just inquired into?

11             MR. DENIS:   Yes, your Honor.

12                      Recross-Examination

13             BY MR. DENIS:   Q.   Mister -- Mr. Hassan, you

14   indicated that Adrian gave your brother a thousand dollars?

15   A.   Gave me a thousand dollars.

16   Q.   Gave you a thousand dollars?

17   A.   Yes.

18   Q.   And in your proffer you indicated that -- this is the

19   first proffer on July 17, 2008 -- you indicated that you

20   picked up the money personally from Ryan Wedding, correct?

21   A.   That's correct.

22   Q.   And that Adrian was there but Ryan specifically told you

23   that it was no one else's money but his own, correct?

24   A.   That's correct.

25   Q.   And here in your proffer sessions, you never told that

1  Adrian paid a thousand dollars for the ticket; isn't that

2  true?

3  A.  I told them not that I know of.

4  Q.  Okay.  And you indicated that your brother was going to

5  come down -- you were going to extend your visit when you

6  were here in Los Angeles and your brother was going to come

7  down, correct?

8  A.  He told -- he was going to come down with us.  He was

9  going to go see his friends about business opportunities that

10 he had, and I told him that if I were to be finished, we

11 could extend our visit and maybe hang out out here for a

12 while.

13 Q.  And that's in Los Angeles, correct?

14 A.  That's correct.

15 Q.  Because Ryan Wedding had a ticket to return on the 14th,

16 correct?

17 A.  I did too as well.

18 Q.  But you were going to extend your visit in Los Angeles,

19 correct, to see your brother?

20 A.  That was the plan --

21 Q.  Okay.

22 A.  -- but he never ended up coming.

23 Q.  Because you got arrested?

24 A.  He never ended up even initially coming.

25 Q.  Okay.

634

1   A.   He eventually came --

2   Q.   Okay.   There's no question pending.   Mr. Gutierrez

3   indicated that you were talk -- there were backup plans to

4   purchase and move a large number of drugs in your text

5   message, correct?

6   A.   There was --

7   Q.   One for 40 kilos, 30 kilos?

8   A.   There were backup plans for Mr. Wedding's purchase.

9   Q.   Okay.   And that was for you, your friend Blondyy or

10  Anally Retentive, and to -- to purchase and transport drugs,

11  correct?

12  A.   There was -- there was a backup plan for Mr. Wedding.

13  That's why I had initially reached out to Blondyy.

14  Q.   Has the -- okay.   Are you finished?

15  A.   The -- Mr. Manavie was trying to get the drivers to come

16  down here, so -- as soon as possible.

17  Q.   You were never charged for that -- setting up that drug

18  transaction; isn't that true?

19  A.   I was never --

20  Q.   -- charged for another conspiracy to set up another drug

21  transaction --

22  A.   No.

23  Q.   -- correct, for 40 kilos or 30 kilos, correct?

24  A.   No.

25  Q.   Is it your understanding based on your cooperation that

1    the government won't charge you for this other conspiracy of

2    trying to set up another 40-plus kilos that you were setting

3    up?

4    A.   It was my understanding that whatever I said couldn't be

5    held or used against me as long as I came and told the truth.

6    Q.   So as long as you came and cooperated with the

7    government, they wouldn't charge you with additional kilos or

8    conspiracies for additional kilos of cocaine, correct?

9         MR. GUTIERREZ:  Calls for a legal conclusion, your

10   Honor, 403.

11        THE COURT:  Well, the objection is overruled.  The

12   witness can testify as to what his understanding or

13   expectation was based on any conversation he had.

14        THE WITNESS:  My -- we read the cooperation with my

15   lawyer, and my conclusion was that if I were to lie, then

16   they could turn around and use everything that I had said

17   against me.

18        BY MR. DENIS:  Q.  And you haven't lied one time in

19   your testimony here today, correct?

20   A.   That's correct.

21   Q.   If Mr. Wedding were to indicate that you told him that

22   you were doing a car deal for your brother, is Mister --

23   would Mr. Wedding be lying?

24        MR. GUTIERREZ:  Calls for speculation.

25        THE COURT:  That's an improper question, counsel.

636

1             BY MR. DENIS:  Q.  Is Mr. Wedding a liar?

2             MR. GUTIERREZ:  Objection as to form,

3  argumentative.

4             THE COURT:  The objection is sustained on both

5  grounds.

6             BY MR. DENIS:  Q.  Is Mr. Wedding untruthful?

7             MR. GUTIERREZ:  Same objection, your Honor.

8             THE COURT:  Sustained.

9             BY MR. DENIS:  Q.  Do you have an opinion of Mr.

10  Wedding telling the truth?

11            MR. GUTIERREZ:  Relevance, 403, your Honor.

12            THE COURT:  Counsel, this is inappropriate,

13  improper cross-examination.  Move on to another area if you

14  wish to do so.

15            MR. DENIS:  Your Honor, I would like the witness

16  to --

17            THE COURT:  Counsel, the objection was sustained.

18  Move on to another area of questioning, please.

19            BY MR. DENIS:  Q.  Mr. Shirani, do you know what

20  High-Five is, High-Five?

21            MR. GUTIERREZ:  Beyond the scope, your Honor.

22            THE COURT:  I don't know if it is or not.  I'll

23  allow a preliminary question or two and see if it can be

24  connected up shortly.

25            THE WITNESS:  No.

1          BY MR. DENIS:  Q.  Is it -- do you have a web page

2     or a social network called High-Five?

3     A.   I may have had one like a long time ago.

4     Q.   Okay.  And you indicated -- you testified if something --

5     if something had happened to you with this money, you would

6     die, correct?

7     A.   That's correct.

8     Q.   And are your friends and associates dangerous people?

9     A.   No.

10    Q.   Okay.  Going to show you -- this has been previously

11    marked as an exhibit which has been previously marked as

12    Exhibit OO.

13         MR. GUTIERREZ:  We'll have an objection to this

14    packet, your Honor.

15         THE COURT:  You know, he's marked it; that's all

16    that's happened at this point, and we'll see how it's used.

17         BY MR. DENIS:  Q.  Are you able to read the -- see

18    the picture?  If not, I have a color copy.

19    A.   I am.

20    Q.   Are you familiar -- are you familiar with the -- what is

21    that document in front of you?

22         MR. GUTIERREZ:  Your Honor, the document is a

23    multiple-page document, and we have objections --

24         THE COURT:  The document is not admitted into

25    evidence.  For him to describe it at this point would not be

638

1    appropriate.

2              BY MR. DENIS:  Q.  You have a -- you have a

3    High-Five web page, correct?

4              MR. GUTIERREZ:  Same objection, your Honor.

5              THE COURT:  Well, the question has been asked and

6    answered.

7              BY MR. DENIS:  Q.  And do you recognize the photo

8    of the gentleman sitting on the toilet?

9              MR. GUTIERREZ:  Relevance, 403, your Honor.

10             THE COURT:  I'm going to sustain the objection at

11   this time.

12             MR. DENIS:  Your Honor, could there be just a

13   little bit of leeway, just a little bit?

14             THE COURT:  Not at this point.

15             BY MR. DENIS:  Q.  Is one of your friends Soroush

16   Ansari?

17             MR. GUTIERREZ:  Relevance, 403.  Your Honor, if I

18   may request the Court to review the packet; I think it's

19   facially inappropriate.

20             THE COURT:  Well, I'm not going to review it at

21   this point just based on the way the questioning has evolved.

22   I'm going to sustain the objection.  It would appear any

23   probative value of this is outweighed by the undue

24   consumption of time.

25             BY MR. DENIS:  Q.  But the individuals that you

639

1   associate with are very dangerous, correct?

2           MR. GUTIERREZ:  It's been asked and answered, your

3   Honor.

4           THE COURT:  Sustained.

5           BY MR. DENIS:  Q.  You've known Mr. Wedding for --

6   for approximately six months as an acquaintance, correct?

7           MR. GUTIERREZ:  That's been asked and answered as

8   well, your Honor.

9           THE COURT:  Sustained.

10          BY MR. DENIS:  Q.  And during that time he's been

11  untruthful with you?

12          MR. GUTIERREZ:  Objection; 403, relevance.

13          THE COURT:  The objection is sustained.

14          MR. DENIS:  Your Honor, I do need to establish

15  this.

16          THE COURT:  Counsel, move to another area of

17  questioning.  This is only -- this kind of evidence is only

18  admissible after a predicate condition has occurred; I think

19  you know that or should know that, so move on --

20          MR. DENIS:  I'm trying to establish that predicate

21  condition.

22          THE COURT:  No, you're not.  We're not talking

23  about the same condition.

24          MR. DENIS:  Okay.

25          BY MR. DENIS:  Q.  You didn't have any proof that

640

1   you had assisted Mr. Wedding in transfering on a previous

2   occasion $250,000 to Los Angeles on a previous wire transfer,

3   correct?

4           MR. GUTIERREZ:  Objection; argumentative, beyond

5   the scope.

6           THE COURT:  It's sustained.

7           BY MR. DENIS:  Q.  Were there any records -- well,

8   strike that.  Did you give the document -- strike that.  When

9   you did this alleged first transfer for Mr. Wedding, did you

10  use the -- did you use the money exchange from a business?

11          MR. GUTIERREZ:  That's been asked and answered,

12  beyond the scope.

13          THE COURT:  It's beyond the scope of redirect

14  examination.  Sustained on both grounds actually.

15          BY MR. DENIS:  Q.  Sabouri saw Mr. Wedding,

16  correct?

17          MR. GUTIERREZ:  Beyond the scope, calls for

18  speculation.

19          THE COURT:  Sustained.

20          MR. DENIS:  Okay.  Nothing further.

21          THE COURT:  May this witness be excused?

22          MR. DENIS:  Yes, your Honor.

23          THE COURT:  Mr. Gutierrez?

24          MR. GUTIERREZ:  Yes, your Honor, please.

25          THE COURT:  All right.  Thank you, Mr. Shirani.

1              THE WITNESS:  Thank you, sir.

2              THE COURT:  Do you have another witness waiting?

3              MR. GUTIERREZ:  Yes, your Honor.  It's Officer

4     McGill.

5              THE CLERK:  Would you raise your right hand to be

6     sworn, please.  Do you solemnly swear or affirm that the

7     evidence you shall give in the cause now before the Court

8     shall be the truth, the whole truth, and nothing but the

9     truth?

10              THE WITNESS:  I do.

11                        John McGill

12     was called by the government and testified as follows:

13              THE CLERK:  Please state your name for the record

14     and spell your full name.

15              THE WITNESS:  John McGill, J-o-h-n  M-c-G-i-l-l.

16                     Direct Examination

17              BY MR. GUTIERREZ:  Q.  Sir, what is your

18     occupation?

19     A.  I'm a detective with the San Diego Police Department

20     currently assigned --

21     Q.  Sorry.

22     A.  Currently assigned to the San Diego Narcotics Task Force.

23     Q.  How long have you been a San Diego police officer?

24     A.  Twenty-four years.

25     Q.  And how long have you been assigned to -- I believe you

1    said a task force?

2    A.   I've been assigned to the task force for approximately

3    ten years.

4    Q.   And what is the task force that you're assigned to

5    currently?

6    A.   The task force is a multi-jurisdictional group of

7    individuals, detectives, narcotics detectives, throughout the

8    county, who work in conjunction with the DEA.  We work

9    county-wide on certain investigations, narcotic

10   investigations.

11   Q.   You mentioned narcotics investigations.  Are you familiar

12   with how to conduct a narcotics investigation?

13   A.   Yes.  Prior to being on the narcotics task force, I was

14   assigned to the San Diego Police Department narcotics section

15   for two and a half years as well.

16   Q.   And pursuant to your duties and assignments past and

17   present, have you had the opportunity to conduct undercover

18   operations?

19   A.   Yes.

20   Q.   And during the course of these undercover operations, has

21   it become necessary to -- for you to understand or learn what

22   a distributable amount of cocaine is?

23   A.   Yes.

24   Q.   Could you please explain to the jury the sort of things

25   that you have been trained to look to to determine whether a

1  substance is a an amount of cocaine sufficient for

2  distribution or for personal use.

3  A.   It varies on several different factors.  You have to

4  first think of what is a usable amount of cocaine for an

5  individual, casual user; it's approximately a tenth of a

6  gram.  And if I can put that in perspective, a tenth of a

7  gram -- a sugar packet you see at Denny's or whatever is a

8  gram, so you divide that by ten, and a tenth of that is a

9  usable amount.  And for prices, prices fluctuate throughout

10  the years and on several different factors.

11  Q.   So if a tenth of a gram is a usable -- a usable amount,

12  amount for personal use, do you have an opinion based on your

13  training and experience whether or not a kilogram is for

14  personal use or for the purpose of distribution?

15  A.   It's for distribution.

16  Q.   What is the basis of that opinion?

17  A.   The weight alone.

18  Q.   Can you please explain how the weight alone makes you

19  believe that a kilogram is an amount possessed for

20  distribution.

21  A.   Again, the casual user uses approximately a tenth of a

22  gram for a dosage unit.  A heavy user of cocaine will

23  probably use a gram a day.  There's a thousand grams in a

24  kilogram.  So you times that by ten, you have 10,000 dosage

25  units of cocaine.  Now, an individual, in my training and

644

1    experience, who uses cocaine as a casual basis will purchase

2    cocaine just the amount to get high or a little bit more, for

3    maybe a day or two more, one, for the main factor is that

4    they don't want to get caught by the police with a the

5    narcotics on them.

6    Q.   Is there a difference between how usable amounts of

7    cocaine are packaged and how cocaine possessed with the

8    intent to distribute is packaged?

9    A.   Usable amount is packaged -- usually packaged, if we're

10   talking about cocaine, usually in small one inch by one inch

11   little bindles.  Larger amounts will usually be in a Ziploc

12   bag or in a kilo-size or even wrapped in duct tape or some

13   type of a masking agent over it.

14        MR. GUTIERREZ:  I'd state for the record I'm

15   showing counsel what's been previously marked as Government's

16   Exhibit 30.

17        BY MR. GUTIERREZ:  Q.  Sir, I'm placing before you

18   what has been marked as Government's Exhibit 30 for

19   identification.  Do you see that?

20   A.   Yes, I do.

21   Q.   I would like you to hypothetically assume that that

22   contains cocaine.  If that were to contain cocaine on the

23   inside, I'd like you to pay attention to the packaging that

24   exists on Government's Exhibit 30.  Can you see the

25   packaging?

1    A.   Yes.

2         (Exhibit No. 30 identified.)

3    Q.   Can you see the shape of the packaging?

4    A.   Yes.

5    Q.   Is that packaging consistent with an amount of cocaine

6    used for distribution or personal use if that were to contain

7    cocaine inside?

8    A.   Distribution.

9    Q.   This may seem silly, but let me ask you:  If one kilogram

10   is possessed for the purpose of distribution, would you have

11   an opinion as to whether 24 kilograms would be possessed for

12   the purpose of distribution?

13   A.   Again, it would be for distribution.

14   Q.   For the same reasons you stated earlier?

15   A.   Yes.

16   Q.   Thank you.

17            MR. GUTIERREZ:  Your Honor, at this time I have no

18   further questions.

19            THE COURT:  Any cross-examination?

20            MR. DENIS:  No, your Honor.

21            THE COURT:  All right.  Thank you, sir.  You are

22   excused.

23            THE WITNESS:  Thank you, your Honor.

24            THE COURT:  Do you have another witness we can get

25   started with?

1        MR. GUTIERREZ:  DEA Chemist Skinner, your Honor,

2   Chemist Skinner.

3        THE CLERK:  Would you raise your right hand to be

4   sworn, please.  Do you solemnly swear or affirm that the

5   evidence you shall give in the cause now before the Court

6   shall be the truth, the whole truth, and nothing but the

7   truth?

8        THE WITNESS:  I do.

9                    Harry F. Skinner

10  was called by the government and testified as follows:

11       THE CLERK:  Please state your name for the record

12  and spell your full name.

13       THE WITNESS:  Harry F. Skinner, S-k-i-n-n-e-r.

14                   Direct Examination

15       BY MR. GUTIERREZ:  Q.  Good afternoon, sir.

16  A.  Good afternoon.

17  Q.  What is your occupation?

18  A.  I'm a forensic chemist employed by the United States

19  Department of Justice Drug Enforcement Administration, and

20  currently assigned to the Southwest Laboratory in Vista,

21  California.

22  Q.  What is a forensic chemist?

23  A.  A forensic chemist is a chemist that analyzes material

24  for the Department of Justice.  We determine the identity of

25  the substance; we quantitate a controlled substance that's

647

1  present; we further identify any other materials that may be

2  present as necessary in the sample; we prepare reports to our

3  findings and testify in court if necessary.  We also assist

4  agents in any other type of chemical investigation in our job

5  duties.

6  Q.  Do you have a certain amount of formalized and on-the-job

7  training to hold that position?

8  A.  Yes, I do.

9  Q.  Could you please briefly describe that to the jury.

10  A.  I have a bachelor's of science degree and a master's of

11  science degree, both in chemistry, from San Diego State

12  University, and once I was employed by the Drug Enforcement

13  Administration, I received six months on-the-job training

14  specifically in the analysis of controlled substances.

15  Q.  I'm placing before you what has been marked as

16  Government's Exhibit 30 for identification.  Do you recognize

17  Government's Exhibit 30?

18  A.  Yes, I do.

19  Q.  Have you seen Government's Exhibit 30 before?

20  A.  Yes, I have.

21  Q.  Where was it that you saw Government's Exhibit 30 before?

22  A.  This morning.  It was in our reverse undercover stockpile

23  in our laboratory located in Vista, California.

24  Q.  And was that kilogram previously provided to the FBI

25  pursuant to an FBI formal request for a kilogram of cocaine?

1    A.   Yes, it was.

2    Q.   And did you have the opportunity to test that coke --

3    that package in there; did you have an opportunity to test it

4    to see if it contained actual cocaine?

5    A.   Yes, I did.   I tested it this morning, and the kilo was

6    identified as cocaine hydrochloride.

7    Q.   Now, when you tested it, did you use a method generally

8    accepted in the scientific community as an accurate way of

9    determining whether a substance is cocaine?

10   A.   Yes, I did.

11   Q.   And did you use that test that is accepted on this

12   particular exhibit?

13   A.   Yes, I did.

14   Q.   And what were the results of that test?

15   A.   That the sample was cocaine hydrochloride.

16   Q.   Is that a Schedule II controlled substance?

17   A.   Yes, it is.

18           MR. GUTIERREZ:   Your Honor, I'd ask that the

19   government's exhibit be provisionally received for the sake

20   of deliberation and the record, however, to be kept in the

21   custody of the FBI agent.

22           THE COURT:   In the absence of objection, Exhibit 30

23   is --

24           MR. DENIS:   Well, there would be an objection; 403,

25   your Honor.

1          THE COURT:  Overruled on the basis of 403.  It will

2     not go in with the jury -- that's understood -- but the jury

3     may have an opportunity to observe it, to view it.

4          MR. GUTIERREZ:  No further questions, your Honor.

5          THE COURT:  Any cross-examination?

6          MR. DENIS:  Briefly, your Honor.

7                        Cross-Examination

8          BY MR. DENIS:  Q.  Mr. Skinner, so you tested the

9     substance that was presented in front of you?

10    A.   Yes, I did.

11    Q.   Was that here in San Diego or in your lab?

12    A.   In our lab in Vista, California.

13    Q.   And what test did you perform?

14    A.   I did a infrared spectrophotometer examination of the

15    substance.

16    Q.   And you indicated you took a sample from your stockpile?

17    A.   The kilogram package is sample from our stock, reverse

18    undercover stockpile.

19    Q.   So you just randomly took one -- one -- one kilo from

20    your stockpile and just tested it?

21    A.   No, I did not.

22    Q.   Well, how did you pick that one?

23    A.   This particular kilo was one that we identified that was

24    used in this FBI operation.

25    Q.   And was there -- were you able to obtain that information

650

1    because of the chain of custody?

2    A.   The chain of custody and the physical characteristics of

3    this particular kilo was the one that we provided to the FBI.

4    Q.   What's the physical characteristics of this kilo?

5    A.   In this particular case, we were using the weight of the

6    particular kilo as well as the packaging materials.

7    Q.   Did you actually retrieve the kilo yourself or someone

8    else did it?

9    A.   You mean today?

10   Q.   Yes.

11   A.   Yes, myself and another co-worker in the reverse

12   undercover stockpile.

13   Q.   And was there a number assigned to that kilo that somehow

14   transpired to the kilo that you provided the government

15   previously?

16   A.   The particular kilo in this operation, we tracked it

17   essentially by the gross weight of the package.

18   Q.   So you just simply went by the gross weight, no other

19   form of information, correct?

20   A.   The gross weight, and also in this particular package, we

21   had a photograph provided by the FBI, and we were able to

22   utilize the tape markings on this particular kilo to

23   specifically identify it as the one that was utilized.

24   Q.   In your stockpile do you have similar kilos that look

25   like this?

1   A.   Yes, we do.

2   Q.   Are they in similar weight?

3   A.   The weights of the stockpile are such that the weights

4   are not similar; they're not the same.

5   Q.   How many kilos in your stockpile?

6   A.   We currently have readily available, including this one

7   this morning that we went through, was 104 kilograms of

8   cocaine.

9   Q.   Okay.  And this was a kilo that you presented to the

10  government, correct, in this operation a few years ago?

11  A.   Yes, sir.

12  Q.   Okay.  And you did that based on a photograph and some

13  weight measurements, correct?

14  A.   That's correct.

15  Q.   And as far as you know, were all of the other kilos

16  different weight?

17  A.   Yes, they are.

18  Q.   And you are aware of that personally, correct?

19  A.   Yes, sir.

20  Q.   Okay.

21           MR. DENIS:  Nothing further.

22           MR. GUTIERREZ:  Nothing further, your Honor.

23           THE COURT:  All right.  Thank you, sir.  You are

24  excused.

25           MR. GUTIERREZ:  Final witness would be FBI agent

1      Natalie Lambert, your Honor.

2                     THE COURT:  I'm sorry?

3                     MR. GUTIERREZ:  FBI Agent Natalie Lambert would be

4      our final witness.

5                     THE COURT:  Okay.  I assume she'll be more than ten

6      minutes.

7                     MR. GUTIERREZ:  I imagine she would be about five

8      minutes, your Honor; it would be very quick.

9                     MR. DENIS:  I have an issue regarding my doctor

10     that --

11                    THE COURT:  Well, unfortunately that's not going to

12     work out.  Let's call her.

13                    MR. DENIS:  Could I have request to have a witness

14     taken out of order, your Honor?

15                    THE COURT:  Not at this time.  Let's see how

16     expeditiously we can take this witness.  On the scheduling of

17     another witness, let me see counsel here at the side of the

18     bench.

19          (Following is a sidebar conference.)

20                    THE COURT:  You say five minutes?

21                    MR. GUTIERREZ:  Well, she's going to talk about

22     discovery of the money and enter the money actually and

23     identification of the suitcase, and that should be it.  I

24     don't know about how cross-examination is going to go.

25                    MR. DENIS:  I'm not sure, your Honor.  She's local;

653

1    she's a local witness.  I have a witness that, you know, a

2    professional dentist in the case that flew in from Canada

3    with a very busy practice and personal obligations next week.

4    I did raise the issue with the Court, and we do have about

5    ten, maybe 15 minutes.  I think we could get through that

6    witness --

7              THE COURT:  I'm not going to do that.  You've

8    wasted more time today, Mr. Denis, in arguing with the Court

9    and all the rest of it.  You can bring him down during your

10   case-in-chief.  If we were to finish up this next witness in

11   a few minutes, I'd consider --

12             MR. DENIS:  Thank you so much.

13             THE COURT:  -- calling him but only if he's going

14   to be literally a few minutes.  This is your last witness?

15             MR. GUTIERREZ:  Yes, your Honor.

16             THE COURT:  Okay.  We've got to finish with her

17   direct and cross-examination, and then if your witness is

18   still here -- how long do you anticipate your witness is

19   going to be?

20             MR. DENIS:  Ten minutes.

21             THE COURT:  Total?

22             MR. DENIS:  Total, maybe 15.

23             THE COURT:  I'll hold you to it.

24             MR. DENIS:  Yeah, that's fine.  I'm mean I'm

25   talking about direct and cross-examination, assuming --

1          MR. GUTIERREZ:  This is -- never mind, your Honor.

2          THE COURT:  Is this your last witness?

3          MR. GUTIERREZ:  My last witness.  We offered to

4   stipulate to the dentist, but that's water under the bridge.

5   Could we not rest until tomorrow after I have an

6   opportunity -- after this witness could we not officially

7   rest until tomorrow after we've had the opportunity provided

8   to us to look at all the exhibits and to make sure that

9   everything's in that I need?

10         THE COURT:  That's fine.

11         MR. DENIS:  I don't object to that.

12         THE COURT:  As long as we're here at the side of

13  the bench, I want to mention something to you, and that is

14  the reaction you demonstrated last objection that I sustained

15  on you on your recross-examination of Shirani attempting to

16  get his character for truthfulness; I told you there was a

17  predicate condition, and under the Federal Rules, the

18  predicate condition is that the defendant has to take the

19  stand and testify.

20         MR. DENIS:  Before -- before you can then

21  rehabilitate?

22         THE COURT:  Yes.  I know there's a good chance that

23  your defendant, your client, is not going to testify in this

24  case, and for you to in essence ask me to comment on that

25  predicate condition in front of the jury, saying that that

1    kind of evidence is conditioned only upon the defendant

2    testifying --

3              MR. DENIS:  I misunderstood the rule.

4              THE COURT:  -- really, really put this Court and

5    your client in a bit of jeopardy -- I didn't want to say that

6    in front of the jury -- and then all of a sudden they're

7    deducing from that that this kind of evidence, character

8    evidence, evidence of truthfulness is relevant only if

9    someone testifies is, as I say, really put the Court and your

10   client in a place we shouldn't have been.  So I hope you

11   understand that was the basis of the ruling.

12             MR. DENIS:  I appreciate the clarification.

13             THE COURT:  That would have been in a sense a

14   negative inference that I'm drawing should the defendant

15   decide not to testify.

16             MR. GUTIERREZ:  Your Honor, may I add one thing is

17   that the reason the government called the cocaine expert and

18   for sales --

19             MR. DENIS:  We agreed.  We agreed.

20             MR. GUTIERREZ:  -- is counsel indicated to me that

21   he wanted --

22             MR. DENIS:  Motions in limine.

23             MR. GUTIERREZ:  Counsel indicated to me that he

24   wanted to be able to cross-examine them because it would be

25   very relevant.  I produced them for his benefit, and then

1    didn't cross-examine much at all.

2          THE COURT:  What stipulation are you willing to

3    enter into with respect to the dentist?

4          MR. GUTIERREZ:  I would not want to stipulate in a

5    vacuum.  He would like one line.  There are four additional

6    lines regarding the treatment that he received.  If you want,

7    I can tell you.  He wanted to say that defendant had a

8    surgical appointment on a particular day; it wasn't for

9    surgery per se, but he also had two prior appointments that

10   he blew off, that he didn't make.

11         THE COURT:  Counsel, realize where we are in this

12   case.  Do you really think this jury is going to determine

13   the question of Mr. Wedding is guilty or not guilty based on

14   a dental appointment?

15         MR. GUTIERREZ:  I agreed to stipulate, your Honor.

16         THE COURT:  Who or how that appointment is

17   characterized in a book, there's no issue.  He was down here,

18   he was with -- he was with Shirani, and the recordings are

19   what they are and the evidence will be what it is.  But that

20   seems to be the kind of thing that you can easily enter into

21   a stipulation over.

22         MR. DENIS:  Your Honor, I did fly the witness in.

23   Mr. Gutierrez, you know, did have -- you know, I think should

24   have the opportunity to cross-examine the dentist on those

25   issues rather than --

1        THE COURT:  You understand the larger point I'm

2   trying to make here, Mr. Denis?

3        MR. DENIS:  I do.  I do.

4        THE COURT:  So the chemist wasn't really necessary

5   in light of the stipulation that could have been entered

6   into, and apparently this dentist has flown down, and we have

7   to question whether that was really necessary.  All right.

8   We'll take Lambert first, and you've got to finish her up,

9   both sides, in ten minutes and then you can call your

10  dentist.

11       MR. DENIS:  Thank you.

12     (Sidebar conference concludes.)

13       THE CLERK:  Would you raise your right hand to be

14  sworn, please.  Do you solemnly swear or affirm that the

15  evidence you shall give in the cause now before the Court

16  shall be the truth, the whole truth, and nothing but the

17  truth?

18       THE WITNESS:  I do.

19                  Natalie Lambert

20  was called by the government and testified as follows:

21       THE CLERK:  Please state your name for the record

22  and spell your full name.

23       THE WITNESS:  Natalie Lambert, N-a-t-a-l-i-e

24  L-a-m-b-e-r-t.

25       THE COURT:  Ladies and gentlemen of the jury, we're

1    going to -- I understand that the testimony of this witness

2    should be very short on both sides, and we may go a little

3    bit beyond 4:30, and then there may be another witness that

4    we can call and complete in another ten minutes beyond that,

5    which would probably take us to about 4:45.  If we went that

6    late, is that going the inconvenience anyone?  If so, have no

7    hesitation to raise your hand.  Okay.  Some people have

8    pretty tight transportation schedules, and I see no hands.

9    Okay.  Well, I'm going to hopefully enlist the cooperation of

10   counsel so that we can finish both of these witnesses in an

11   expedited but reasonable period of time.

12           MR. GUTIERREZ:  Your Honor, I'd like to request the

13   production of Defense Exhibit AA.

14           THE COURT:  Well, it should be -- all exhibits

15   should be on the exhibit table.

16           MR. GUTIERREZ:  I've checked, your Honor.  That and

17   several others aren't currently present, but I would request

18   AA if I could.

19                      Direct Examination

20           BY MR. GUTIERREZ:  Q.  Good afternoon.

21   A.  Good afternoon.

22   Q.  What is your occupation?

23   A.  I'm a special agent with the Federal Bureau of

24   Investigation.

25   Q.  And how long have you been employed in that capacity?

1    A.   Approximately four and a half years.

2    Q.   And what is your current assignment?

3    A.   I'm assigned to the Major Mexican Drug Traffickers squad.

4    Q.   And during the course of that assignment or any prior

5    assignment, have you had the opportunity to participate in

6    the investigation of an individual by the name of Michael

7    Krapchan?

8    A.   Yes, I have.

9    Q.   Did that investigation that you participated in also

10   include an investigation of Ryan Wedding?

11   A.   Yes.

12   Q.   During the course of that investigation, did you have the

13   opportunity to conduct a search warrant at a Comfort Inn

14   hotel in the Los Angeles area?

15   A.   Yes.

16   Q.   Specifically the San Fernando Valley?

17   A.   Yes.

18         MR. GUTIERREZ:   I'll state for the record I'm

19   showing counsel what's been previously marked as Government's

20   Exhibit 6, 7, 8, 10, and 15.

21         THE COURT:   These are photographs?

22         MR. GUTIERREZ:   These are photographs, your Honor.

23         THE COURT:   All right.

24         BY MR. GUTIERREZ:   Q.   I'm placing before you what

25   has been previously marked as Exhibit 15 for identification.

1    Do you recognize Government's Exhibit 15?

2    A.   I do.

3    Q.   What is Government's Exhibit 15 generally?

4    A.   It is a bundle of bulk currency, the top bill being $100

5    denomination.

6         (Exhibit No. 15 identified.)

7    Q.   Have you see that bundle of bills on a prior occasion?

8    A.   I have.

9    Q.   Where have you seen that bundle of bills on a prior

10   occasion?

11   A.   It was retrieved during the search warrant of the Comfort

12   Inn.

13   Q.   Is that a fair and accurate representation of the bundle

14   as it existed during the course of your search warrant?

15   A.   Yes.

16   Q.   I'd like to now place before you what's been previously

17   marked as Government's Exhibit 10 for identification.  Do you

18   see that?

19   A.   I do.

20   Q.   It's a photograph; is that correct?

21   A.   That is correct.

22   Q.   What is that photograph of?

23   A.   It is photograph of a bag containing the bulk currency

24   within a piece of hotel furniture.

25        (Exhibit No. 10 identified.)

1    Q.  Is that fair and accurate representation of the bulk cash

2    in a bag in the piece of furniture that you found on the day

3    of the search warrant?

4    A.  Yes, it is.

5    Q.  I'd like to now show you what's been previously marked as

6    Government's Exhibit 7 for identification.  Do you recognize

7    that document?

8    A.  The photograph, yes, I do.

9    Q.  And what is that photograph of generally?

10   A.  A suitcase with an ID tag.

11       (Exhibit No. 7 identified.)

12   Q.  And is that a suitcase that you found pursuant to the

13   search warrant of the Comfort Inn that you mentioned earlier?

14   A.  Yes, it is.

15   Q.  Is that a fair and accurate representation of the

16   suitcase that was found at the location?

17   A.  Yes.

18   Q.  I'd like now place before you what's been previously

19   marked as Government's Exhibit 6 for identification.  Do you

20   recognize that document?

21   A.  I do.

22   Q.  Is it a photograph?

23   A.  Yes, it is.

24       (Exhibit No. 6 identified.)

25   Q.  What is it a photograph of?

1   A.   It's an LAX tag in the name of Ryan Wedding.

2   Q.   Have you seen those tags before?

3   A.   I have.

4   Q.   Where have you seen those tags?

5   A.   On the suitcase.

6   Q.   Is it a fair and accurate representation of the tags that

7   exist on the suitcase as it is displayed in Government's

8   Exhibit 7?

9   A.   Yes, it is.

10  Q.   And, finally, I'd like show you what's been previously

11  marked as Government's Exhibit 8 for identification.

12  A.   Yes.

13  Q.   That's a photograph, is it not?

14  A.   It is.

15       (Exhibit No. 8 identified.)

16  Q.   What is Government's Exhibit 8 a photograph of?

17  A.   It's a closeup of the tag from photograph evidence item

18  7, a handwritten tag in the name of Ryan Wedding with a home

19  address.

20  Q.   Was that attached to the suitcase pictured in

21  Government's Exhibit 7?

22  A.   Yes.

23  Q.   Is it a fair and accurate representation of the tag as it

24  existed the day of the seizure?

25  A.   Yes.

1          MR. GUTIERREZ:  Your Honor, at this time I would

2     ask that Government's Exhibit 10, 15, 8, 6, and 7 be received

3     into evidence.

4          THE COURT:  In the absence of objection, they are

5     admitted.

6          (Exhibit Nos. 6, 7, 8, 10, 15 admitted.)

7          MR. GUTIERREZ:  Could we please request to have

8     some of these exhibits published, your Honor?

9          THE COURT:  Yes.

10         BY MR. GUTIERREZ:  Q.  I'm showing you -- I'm

11    publishing Government's Exhibit 11 for identification.  Do

12    you see that?

13    A.  Yes.

14    Q.  Is that the same item of furniture that you identified in

15    Government's Exhibit 10?

16    A.  Yes, it is.

17         (Exhibit No. 11 identified.)

18    Q.  Now, did you participate in the execution of the search

19    warrant at the Comfort Inn?

20    A.  Yes.

21    Q.  Did you personally locate a quantity of money?

22    A.  Yes, I did.

23    Q.  Where was it that you located it?

24    A.  It was contained in that bag beneath the bottom drawer

25    of -- it was a TV console and dresser.

664

1    Q.   And if somebody were to walk in the room, would they be

2    able to see the money in the bag?

3    A.   No, they would not.

4    Q.   Would it be fair to say that it was hidden underneath the

5    drawer?

6    A.   Yes.  You physically had to pull the drawer out to be

7    able to see the money.

8    Q.   Now, Government's Exhibit 15 -- can you play that -- you

9    identified a moment ago as a bundle of money that was found;

10   is that correct.

11   A.   That is correct.

12   Q.   There was more than one bundle; is that correct?

13   A.   Yes, there were two bundles.

14   Q.   Was that -- were both bundles almost identical to that

15   displayed in Government's Exhibit 15?

16   A.   Yes.

17   Q.   Now, I'd like to put before you Government's Exhibit 5.

18   This is a photograph that was previously admitted before you

19   testified, but I'd like to ask do you recognize what is

20   depicted in Government's Exhibit 5?

21   A.   Yes, I do.

22   Q.   What is Government's Exhibit 5?

23   A.   It is the black hard-back suitcase with the LAX tag.

24   Q.   Is this a suitcase that was found in the room when you

25   executed the search warrant?

1  A.  Yes, it was.

2  Q.  And did this -- please play No. 8 -- the suitcase also

3  had a tag; is that correct?

4  A.  Yes, it did.

5  Q.  And is that tag depicted in Government's Exhibit 8?

6  A.  Yes, it is.

7  Q.  And was there a name on that tag?

8  A.  Yes, Ryan Wedding.

9  Q.  Ryan Wedding?

10  A.  Yes.

11  Q.  Was Ryan Wedding the subject of your investigation?

12  A.  He was, yes, ultimately became a subject of the

13  investigation.

14          MR. GUTIERREZ:  Your Honor, this was once marked as

15  Defense Exhibit A, but I notice there's no tag on it.  I

16  would like to have it marked government's next in order,

17  which I believe is 37.  State for the record I'm showing

18  counsel Government's 37.

19          BY MR. GUTIERREZ:  Q.  I place before you

20  Government's Exhibit 37 for identification.  Do you see that

21  document?

22  A.  I do.

23  Q.  Have you seen that document before?

24  A.  Yes, I have.

25  Q.  Are you familiar with the cooperating source used in this

1    investigation?

2    A.   I am.

3    Q.   Is that a Mr. Yuri, as he's been called?

4    A.   Yes.

5    Q.   And let me ask you, at the outset of his becoming a

6    confidential informant, were any efforts made to verify that

7    he was telling you the truth about what he was doing in the

8    investigation?

9    A.   Yes.

10   Q.   Were one of those efforts that you conducted having

11   anything to do with his telephones?

12   A.   Yes.

13   Q.   Could you please explain to the jury how it was you used

14   telephone records to determine if Mr. Trofimov -- excuse

15   me -- the confidential source was telling you the truth.

16   A.   Yes.  We received a Court order for a pen register, which

17   monitored the call activity, the incoming/outgoing calls on

18   that phone that the source was using.  And during that time,

19   we monitored the contact that he had with the initial target

20   of the investigation, who was Michael Krapchan.  So in

21   monitoring the call data, we were able to determine every

22   time that the source had telephonic contact with Michael

23   Krapchan, and that effort was made to -- the source was

24   recording phone calls with Michael Krapchan, so every time we

25   would get a recording from the source, we were able to verify

1    that yes, there had been phone contact, and also in an effort

2    to make sure that there weren't additional phone calls that

3    we were not aware of.

4    Q.   And did those documents in Government's Exhibit 37 verify

5    the information that the CS was giving you?

6    A.   Yes.

7    Q.   Now, I notice that a lot of the records indicated in

8    government Exhibit 37 pertain to 2007.

9    A.   Correct.

10   Q.   Did you make efforts to verify his credibility for a

11   certain amount of time?

12   A.   We had the -- the pen order on the phone.  I don't

13   remember the exact time period, but yes, during that initial

14   time period of 2007.

15   Q.   Now, I notice there's some entries in 2008 towards the

16   end of the document; is that correct?

17   A.   Correct.

18   Q.   Why are those entries in 2008 there if you'd already

19   established that you were getting consistent information from

20   the CS?

21   A.   The call data at the end of this report is not actually

22   retrieved from the CS phone, it was retrieved from Michael

23   Krapchan's phone following the search warrant of that phone.

24   Q.   So you did your initial comparison to make sure that all

25   the calls from Mr. Krapchan were matching the recordings that

668

1    you were getting?

2    A.   Correct.

3    Q.   But when you received Mr. Krapchan's phone after his

4    arrest, when you dumped those into the computer, that wound

5    up on the same printout?

6    A.   Correct.

7             MR. GUTIERREZ:   I have no further questions at this

8    time, your Honor.

9             THE COURT:   Any cross-examination?

10             MR. DENIS:   Your Honor, I'm going to recall Ms.

11    Lambert in my case-in-chief, so I will forego

12    cross-examination at this time.

13             THE COURT:   Any cross-examination on these subjects

14    though?

15             MR. DENIS:   Very briefly.

16                        Cross-Examination

17             BY MR. DENIS:   Q.   Ms. Lambert -- Ms. Lambert, did

18    you -- you looked at this stack of money that was found in

19    the room, correct?

20    A.   Correct.

21    Q.   And when you entered the room, you did a search of the

22    room, correct?

23    A.   Correct.

24    Q.   And you didn't know the money was there?

25    A.   Correct.

1  Q.   So you just, as part of your FBI training and background,

2  you know how to search a room?

3  A.   Correct.

4  Q.   Did you immediately find the money?

5  A.   Not immediately.

6  Q.   Just some time?

7  A.   Yes.

8  Q.   Okay.  After you'd conducted a thorough search of the

9  entire room, correct?

10 A.   Correct.

11 Q.   You indicated in order to see the money, you had to pull

12 the actual drawer out of the dresser, correct?

13 A.   Correct.

14 Q.   Now, when you looked at the money, just looking at the

15 money or when you actually saw it physically, were they in

16 stacks of 10,000?

17 A.   I do not recall what each stack was in, so when you look

18 at this large stack, five smaller stacks are actually

19 contained within each of the larger bundles.  I do not recall

20 if they were actually in stacks of 10,000.

21 Q.   Did actually open the money and go through the money?

22 A.   Ultimately.  Not at the time.

23 Q.   Did you eventually find out they were all in hundreds?

24 A.   Yes.

25 Q.   There was no 50s, correct?

1   A.   Not in that money.

2              MR. DENIS:  Nothing further?

3              THE COURT:  Anything further, Mr. Gutierrez?

4              MR. GUTIERREZ:  No, your Honor.  Thank you.

5              THE COURT:  All right.  Thank you.  You may step

6   down.  Ladies and gentlemen, as I understand, the government

7   has completed -- has called all its witnesses at this time

8   but is not formally resting until a little bit later, and

9   there will be the matter of exhibits to be reviewed.  So as I

10  understand it, the Government's case-in-chief is essentially

11  concluded at this time subject to what I've just indicated.

12  So what we're going to do is try to accommodate the defense

13  by allowing them to call this second witness whose testimony

14  I have been told will be very short indeed.  So you may

15  proceed with that.

16             MR. DENIS:  The defense calls Dr. Hill, your Honor.

17             THE COURT:  First name?

18             MR. DENIS:  Let me get the file right now.  Steve

19  Hill.

20             THE COURT:  Thank you.

21             MR. DENIS:  Thank you, your Honor.

22             THE CLERK:  Would you raise your right hand to be

23  sworn, please.  Do you solemnly swear or affirm that the

24  evidence you shall give in the cause now before the Court

25  shall be the truth, the whole truth, and nothing but the

1   truth?

2          THE WITNESS:  I do.

3                       Steven Hill

4   was called by the defense and testified as follows:

5          THE CLERK:  Please state your name for the record

6   and spell your full name.

7          THE WITNESS:  My name is Steven Hill, S-t-e-v-e-n

8   H-i-l-l.

9                    Direct Examination

10          BY MR. DENIS:  Q.  Mr. Hill, what's your

11   occupation?

12   A.  I'm a dentist.

13   Q.  And where do you have your practice?

14   A.  Vancouver, Canada.

15   Q.  And how long have you been in dentistry?

16   A.  Twenty-five years.

17   Q.  And what type of dentistry do you do?

18   A.  General and cosmetic procedures.

19   Q.  And is -- in June of 2008 was Mr. Wedding your patient?

20   A.  Correct.

21   Q.  And prior to June of 2008, did you perform any procedures

22   on Mr. Wedding's teeth?

23   A.  We had completed his upper teeth, and we were scheduled

24   to have him back to complete his lower teeth.

25   Q.  When you say his upper teeth, what did you have to do for

1    Mr. Wedding's upper teeth?

2    A.   We had placed 12 crowns on 12 of his teeth.

3    Q.   And when you say you had to place 12 crowns, did you --

4    what did you do?  Did you have to shave his teeth?

5    A.   Yes.

6    Q.   And you had to place crowns?

7    A.   Correct.

8    Q.   Did he have some deformity in his mouth with teeth?

9    A.   He has -- he had excessive wear to his teeth.

10   Q.   And approximately -- I'm going to show you a document

11   which we have previously marked as defense Exhibit PP.  Are

12   you familiar with the medical -- have you see that document,

13   those documents, before?

14   A.   Yes.

15   Q.   Are those part of Mr. Wedding's file?

16   A.   Correct.

17   Q.   Can you look -- and you've reviewed those previously,

18   correct?

19   A.   Yes.

20   Q.   Okay.  When did you do Mr. Wedding's upper teeth?

21   A.   We had Mr. Wedding in on July 6, 2007.  We placed

22   provisional restorations/temporary restorations on his lower

23   teeth, and then we began the preparation and recordtaking for

24   his upper teeth on that same -- on that same appointment.

25   Q.   Okay.  And just -- and did Mr. Wedding have a

1    subsequent -- well, you indicated --

2    A.   He had a number of subsequent appointments.   The issue

3    with Mr. Wedding was to increase the dimension of his

4    occlusal height, and so we had to make sure that we didn't

5    overdo it and cause him any pain, so I had him wear the

6    provisional restorations for a couple of weeks before we

7    proceeded on.

8    Q.   Was that on the upper teeth or the lower teeth?

9    A.   At this point he was in both provisionals, upper and

10   lower.   He actually fractured two of the provisionals, which

11   is a good indication that I hadn't got the balance right, so

12   I fixed that, we waited another couple weeks, and then we

13   proceeded.

14   Q.   When did you fix the provisionals?

15   A.   July 16.   I had to redo a couple of the temporaries.

16   Q.   Was that on the upper or lower or both?

17   A.   That was two uppers.

18   Q.   Okay.   Did you complete the -- did you eventually put in

19   the permanent uppers?

20   A.   On July 19 we cemented the permanent uppers, and we

21   booked him back a couple of months later to begin the process

22   on the lower teeth.

23   Q.   And that was in July 19 of 2007?

24   A.   Correct.

25   Q.   And did Mr. Wedding come back to begin the process of the

1  lower teeth?

2  A.   On October 3.

3  Q.   And that was in 2007?

4  A.   Correct.

5  Q.   And he did the -- you did the lower teeth at that time?

6  A.   Yes.

7  Q.   And just briefly, can you just summarize briefly what --

8  is this a major procedure that Mr. Wedding was having done or

9  was this something --

10  A.   Yes.

11  Q.   And just briefly, what did it involve again?

12  A.   Preparation of the teeth, means essentially removing the

13  enamel from the teeth that -- so that we can then reestablish

14  the relationship to his upper teeth then with the provisional

15  -- with the porcelain restorations.

16  Q.   Okay.  So he was having porcelain restorations for his

17  teeth.  And you indicated that you completed the uppers on

18  October 30, 2007, correct?

19  A.   No, I completed the uppers on July 19, '07, and then we

20  began the process of making the lower ones on October 3.

21  Q.   October 30?

22  A.   October 3.

23  Q.   The 3rd.  I'm sorry.  And did Mr. Wedding have that

24  completed on October 3?

25  A.   That is the initial preparation.  We require at least two

1   to four weeks to get the restorations made in a commercial

2   laboratory, so he was appointed back on November 6.

3   Q.   And that was 2007?

4   A.   Correct.

5   Q.   And that -- did he -- were his -- did he have temporaries

6   put on his lower teeth already?

7   A.   Yes.

8   Q.   When did he have those put in?

9   A.   They were placed originally -- the initial ones were

10  placed on July 6, 2007, but they were replaced in October.

11  Q.   The lower ones?

12  A.   Correct.

13  Q.   And how long do these temporaries usually -- in Mister --

14  how long do these temporaries last?

15  A.   Well, the way that we do them, we attempt to get about

16  three to six months' use out of them.

17  Q.   Was Mr. Wedding scheduled for a subsequent appointment;

18  to complete the lowers?

19  A.   After Christmas I realized that we still had the lab work

20  in our lab at the office, and so we attempted to get hold of

21  him, but it wasn't until -- we couldn't confirm an

22  appointment until June 16 of 2008.

23  Q.   June 16, 2008?

24  A.   Correct.

25  Q.   And at that time how long had the temporaries been in Mr.

1    Wedding's mouth?

2    A.   Since the beginning of October, so about eight months.

3    Q.   And you indicated the temporaries last between six and

4    nine months?

5    A.   About three and six months.  It's unusual for them to

6    last longer than six.

7    Q.   And what generally happens?  Do they --

8              THE COURT:  Counsel, I think we're at the point

9    where the jury needs to get going.

10             MR. DENIS:  Okay, your Honor.

11             THE COURT:  If there's one entry that you need to

12   emphasize with this witness, I suggest that you get right to

13   it.

14             BY MR. DENIS:  Q.  You indicated that Mr. Wedding

15   was scheduled to come in on June 16, 2008?

16   A.   Correct.

17   Q.   And that's after he had his temporaries for six --

18   A.   Eight months.

19   Q.   Eight months.  As far as you recall, if that schedule --

20   if that appointment was missed, when could Mr. Wedding have

21   scheduled a subsequent appointment?

22   A.   We require three or four hours; it's either a morning or

23   an afternoon, and typically that would take three to four

24   weeks to schedule, to find a room in my schedule for it.

25   Q.   And when the --

1        MR. GUTIERREZ:  Last question, your Honor.

2        BY MR. DENIS:  Q.  When the temporaries begin to

3   deteriorate, what is underneath the temporaries?

4   A.  Generally the bacteria that cause cavities get underneath

5   and cause massive decay to the teeth.

6   Q.  Is there nerves, correct, nerves?

7   A.  Nerve exposure typically happens, root canals at the very

8   least, and sometimes we have to extract the teeth.

9   Q.  Now, when these temporaries begin to decay, is there a

10  lot of pain associated --

11  A.  Exquisite amount of pain.

12        MR. DENIS:  Okay.  Nothing further.

13        THE COURT:  Any cross-examination?

14        MR. GUTIERREZ:  Yes, your Honor.

15                    Cross-Examination

16        BY MR. GUTIERREZ:  Q.  What was the date that he

17  had his bottom teeth finished or prepped ready to go?

18  A.  On October 3, 2007.

19  Q.  And he had an appointment after that?

20  A.  In November.

21  Q.  And was the appointment missed by him?

22  A.  It was.

23  Q.  Did your staff try to contact him?

24  A.  I imagine so.

25  Q.  Are there any indications in the record that they did?

```
 1   A.   No.

 2   Q.   And was there another appointment made?

 3   A.   We made the next appointment for June 16.

 4   Q.   Okay.

 5   A.   And that would have been confirmed the week before or

 6   something.

 7   Q.   Now, you said the only thing that needed to be done was

 8   that these cosmetic porcelains had to be installed in his

 9   mouth; is that correct?

10   A.   They're more restorative than cosmetic, but they do look

11   nice.

12   Q.   But you are a cosmetic -- primarily a cosmetic

13   practitioner, right?

14   A.   Correct.

15   Q.   Now, let me ask you, is the application of these

16   prosthetic or cosmetic replacements so technical that no

17   other certified dentist in the United States might not be

18   able to accomplish?

19   A.   Certainly.

20   Q.   Any dentist could do it; is that correct?

21   A.   Any prosthodontist could do it, any specialist dentist.

22   Q.   But there's no reason why were you only person in the

23   world who could have put that in; is that right?

24   A.   Correct.

25   Q.   And if he would have made the appointment that was
```

1  originally made, tooth decay wouldn't be a problem, would it?

2  A.  Of course.

3  Q.  And let me ask you, was there anything about this

4  procedure and treatment that you did when replacing his

5  bottom teeth that has anything to do with 24 kilograms of

6  cocaine in San Diego?

7  A.  I can't imagine.

8       THE COURT:  That's argumentative.

9       MR. GUTIERREZ:  Nothing further, your Honor.

10      THE COURT:  Thank you, Doctor.  You are excused.

11      MR. DENIS:  Just very briefly, your Honor.

12                    Redirect Examination

13      BY MR. DENIS:  Q.  Mr. Hill, you had the lower

14  teeth in your office, correct?

15  A.  I still --

16  Q.  You were the individual that Mr. Wedding had to come to

17  to have that --

18  A.  Correct.

19  Q.  -- procedure done, correct?

20  A.  Correct.

21  Q.  Thank you.

22      THE COURT:  Thank you for your patience, Doctor.  I

23  know you've been waiting awhile.  Have a safe trip back.

24  Thank you, sir.

25            Okay.  Ladies and gentlemen, we're going to break

1    and resume Monday at nine o'clock.  Of course next week is

2    Thanksgiving, and is there anyone who has travel plans,

3    flights scheduled Wednesday afternoon.  I see a couple of

4    hands raised.  What time are your flights.  Ms. Gaynes, how

5    about you?

6              JUROR GAYNES:  I have a flight -- actually I'm

7    supposed to be driving to Arizona at three o'clock.

8              THE COURT:  Three o'clock, okay.  Could you plan a

9    little bit ahead so that you'd be -- what's the latest you

10   need to be out of the courthouse?  Let me ask you that.

11             JUROR GAYNES:  By 4:00.

12             THE COURT:  By 4:00?  Well, you say --

13             JUROR GAYNES:  If I want to drive as a group.  I

14   could just drive by myself and --

15             THE COURT:  No, I don't want you to alter your

16   plans.  I was wondering if we kept going until about 2:30 or

17   so, would that --

18             JUROR GAYNES:  That would be fine for me.

19             THE COURT:  Ms. Munoz, how about you?

20             JUROR MUNOZ:  That would be fine.

21             THE COURT:  Okay.  We'll see how things go.  I

22   thank you for the information; I'm glad to be aware of that,

23   so we'll certainly try to work within your plans.  And thank

24   you very much for your patience.  You're going to be away --

25   remember now, we're not in session tomorrow on this case for

1    your purposes.  So you're going to be away from the case for

2    three days.  Please do not discuss the case amongst

3    yourselves or with anyone else or allow yourselves to form or

4    express any opinions until the case has been submitted to

5    you.  You can leave the notebooks right there on the seats,

6    they'll be fine there, and we'll see you Monday.

7              (The jury left the courtroom.)

8              THE COURT:  Couldn't resist, Mr. Gutierrez?

9              MR. GUTIERREZ:  My apologies, your Honor.

10             THE COURT:  I guess I can't resist asking you or

11   confirming that you couldn't resist.  That was pretty

12   unfortunate.

13             Okay.  With respect to the issue of FBI Agent

14   Wedick, you can have him ready to be called, but I'm aware

15   that there are several subjects here, some of which may be

16   appropriate, some of which may not be, but in terms of the

17   notice part of that, I don't -- I don't see that that's going

18   to be a hindrance here, Mr. Denis.

19             MR. DENIS:  Thank you, your Honor.

20             THE COURT:  And on the limited areas where he may

21   be able to testify, I don't think a Daubert hearing is going

22   to be necessary.  It's typically my practice -- first of all,

23   you take the position that Daubert is not necessary for

24   nonscientific testimony.  It certainly is appropriate, that

25   approach is testimony for nonscientific testimony, but it's

1   not my practice to hold a separate Daubert hearing,

2   especially when we're starting out with someone with this

3   kind of experience, 35 years of experience.  However, that's

4   not to say that the foundation can be automatically

5   established.  And, Mr. Gutierrez, in the limited areas where

6   you may go forward, certainly can take a witness on voir dire

7   at any time and question a witness as to foundation.  So in a

8   sense, that may take the place of a Daubert hearing, and it's

9   usually done right in front of the jury, so there's no need

10   to break and do that in a separate proceeding.

11           MR. DENIS:  Thank you, your Honor.

12           THE COURT:  So you can have him ready to go, and

13   then we'll give the identified topics a further thought.  I

14   set this out as a guideline.  Hopefully it will be helpful.

15   As oftentimes I see in many cases, criminal cases, the

16   strategy is to somehow put the investigation on trial for

17   some kind of malpractice or claimed malpractice, to argue

18   that the investigation fell below the standard of care what

19   might be policy, which completely deflects the case, in my

20   view, away from the issues in the case.  If there's something

21   about policy or protocol that was not done in this case and

22   will be buttressed by the testimony of Wedick such that it

23   might be reasonably related to have a nexus with a

24   significant part of the undercover operation in this case

25   such that a reasonable trier of fact would conclude that if

1    they believe Wedick, that because something didn't happen

2    according to Hoyle that the underlying operation was somehow

3    defective, then I think that you can explore that.  That was

4    opened up I think on the examination of Agent Kalina where he

5    did get into standard operating procedure in some ways.  So

6    hopefully that can be a guide for you at this point.

7           There are -- some of the topic areas that you

8    discussed I think are, from my initial view of this, are just

9    too attenuated from the issues in this case to be explored by

10   your witness.  It seems that the undue consumption of time

11   would easily outweigh any probative value.  So that's pretty

12   much my initial take on former or retired FBI Agent Wedick.

13          The only other thing I would have to offer to you

14   at this point, Mr. Denis, is take a look at Rule 608 of the

15   Federal Rules of evidence that presupposes that a witness --

16   in other words, someone who has testified -- may have his or

17   her credibility buttressed by a character witness touching on

18   the question of truthfulness.  Then and only then, and 608

19   (a) is pretty clear on that.

20          Okay.  Well, counsel, I'll meet with you tomorrow

21   at 8:45.  All of -- you'll be collecting all of the exhibits

22   and working on creating transcripts for each of the clips

23   that were played and otherwise getting all of the exhibits in

24   order.  I have a feeling -- I hope the exhibits are currently

25   at counsel table and I hope not in briefcases and the like.

1    But you've got to pull all of that material together --

2              MR. DENIS:  Yes, your Honor.

3              THE COURT:  -- so that it can be organized.  Okay.

4    We'll see you at 8:45.  Thank you.

5              MR. DENIS:  Thank you.

6              MR. GUTIERREZ:  Your Honor, will there be any other

7    hearing regarding the expert or are we going to have to be

8    able to judge the appropriateness of what's coming in as it's

9    coming in?

10             THE COURT:  There's not going to be -- in terms of

11   the Daubert hearing?  There wouldn't be a Daubert hearing, a

12   separate preliminary hearing on that.

13             MR. GUTIERREZ:  Well, as far as --

14             THE COURT:  I'm not going to extend this

15   unnecessarily.  It seems -- you know, this has occurred so

16   many times in these cases, and a Daubert hearing is rarely

17   necessary or a separate hearing is rarely necessary, so --

18             MR. GUTIERREZ:  Would you like me to be more

19   specific?  The arguments that were put forth in the report

20   that were attenuated, would the Court be willing to let the

21   government know what those were so we can prepare?

22             THE COURT:  Yeah, I will.

23             MR. GUTIERREZ:  Okay.  Thank you, your Honor.

24             THE COURT:  I was just trying -- basically what I'm

25   doing at this point is trying to explain to Mr. Denis that if

1  he wishes to have this witness ready to be called, he can do

2  so.  We'll have a further discussion on which topics may be

3  explored, but you were attempting to preclude him from

4  testifying at all because of the notice issue, and I'm saying

5  no, I think the notice -- I think notice has been given,

6  sufficient notice has been given.  Then we'll get into the

7  areas where he can go with his testimony, and I've tried to

8  give just a general guideline for the types of areas that can

9  be explored.

10            MR. GUTIERREZ:  Thank you, your Honor.

11            THE COURT:  Okay.

12            MR. DENIS:  Thank you, your Honor.

13            THE COURT:  All right.

14            MR. DENIS:  Your Honor, at 8:45 can we --

15            THE COURT:  I'd like to see counsel at 8:45, and

16  you're going to be working in the jury room --

17            MR. DENIS:  Got it.

18            THE COURT:  -- after that.

19       (There was a break in the proceedings for the weekend

20  recess.)

21

22

23

24

25

1                                I n d e x

2    Witnesses                                              Page

3    **Hassan Shirani  (Government)**
     Direct Examination, cont'd by Mr. Gutierrez            429
4    Cross-Examination by Mr. Denis                         478
     Redirect Examination by Mr. Gutierrez                  620
5    Recross-Examination by Mr. Denis                       632

6    **John McGill  (Government)**
     Direct Examination by Mr. Gutierrez                    641
7
     **Harry F. Skinner  (Government)**
8    Direct Examination by Mr. Gutierrez                    646
     Cross-Examination by Mr. Denis                         649
9
     **Natalie Lambert  (Government)**
10   Direct Examination by Mr. Gutierrez                    658
     Cross-Examination by Mr. Denis                         668
11
     **Steven Hill  (Defense)**
12   Direct Examination by Mr. Denis                        671
     Cross-Examination by Mr. Gutierrez                     677
13   Redirect Examination by Mr. Denis                      679

14                             E x h i b i t s

15   Exhibits          Description            For ID   In Evd
     9                 Photo                   463      465
16   12                Photo                   463      465
     13                Photo                   464      465
17   14                Photo                   464      465
     11                Photo                   465      465
18   KK-1              Audio recording         497
     KK-2              Audio recording         498
19   LL-1              Audio recording         502
     LL-2              Audio recording         503
20   MM-1              Audio recording         512
     NN-1              Audio recording         620
21   30                Package                 645
     15                Photo                   660      663
22   10                Photo                   660      663
     7                 Photo                   661      663
23   6                 Photo                   661      663
     8                 Photo                   662      663
24   11                Photo                   663

25

<u>Certificate of Reporter</u>

I hereby certify that I am a duly appointed, qualified, and acting Official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.


Dated _____ at San Diego, California.


                              _____
                              /s/ Debra M. Henson  (electronic)
                              Debra M. Henson
                              Official Court Reporter