1                    United States District Court

2                  Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                      Plaintiff,     )
                                      )
6        vs.                          ) Case No. 08-CR-2386 JM
                                      ) Jury Trial
7    RYAN WEDDING,                    ) Volume 5
                                      )
8                      Defendant.     ) Monday, November 23, 2009
     _____ )

9

10             Before the Honorable Jeffrey T. Miller
                    United States District Judge

11

12   Appearances:

13   For the Plaintiff:        Karen P. Hewitt
                               UNITED STATES ATTORNEY
14                             Orlando B. Gutierrez
                               ASSISTANT U.S. ATTORNEY
15                             880 Front Street, Suite 6293
                               San Diego, CA  92101
16
     For the Defendant:        David R. Denis, Esq.
17                             CENTER FOR EXTREME JUSTICE
                               707 Wilshire Boulevard, Suite 3600
18                             Los Angeles, CA  90017

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                               U.S. Courthouse
22                             940 Front Street, Suite 5190
                               San Diego, CA  92101
23                             (619) 238-4538

24

25           Record produced by certified stenographic reporter

1          San Diego, California - Monday, November 23, 2009

2               THE COURT:  Good morning, everyone.  We are outside

3      the presence of the jury at this time.  I understand counsel

4      worked on Friday and got the exhibits in order.  Mr.

5      Gutierrez, did you wish to rest at this time?

6               MR. GUTIERREZ:  At this point in time, your Honor,

7      the government does rest.

8               THE COURT:  Okay.  Mr. Denis?

9               MR. DENIS:  Yes, your Honor.  I would like to make

10     a Rule 29 motion, and it would be based on that the

11     government has not proven agreement between Mr. Wedding and

12     the other co-conspirators, and they have not proven any act

13     by Mr. Wedding in furtherance of that conspiracy.

14              THE COURT:  Mr. Gutierrez?

15              MR. GUTIERREZ:  Your Honor, the government has

16     produced sufficient evidence that a reasonable jury could

17     find that Mr. Wedding was part of the conspiracy.  According

18     to the testimony so far that has been uncontradicted, it was

19     his money, he came down with Mr. Shirani, participated in the

20     coordination, rented the room, rented the car, all -- even

21     though not required, all acts in furtherance of the

22     conspiracy.  And we'd submit it.

23              THE COURT:  The Rule 29 motion is denied.  Are you

24     ready to call your next witness?  We're going to get the jury

25     in here in just a moment.

1           MR. DENIS:  Yes, your Honor, we're ready.

2           THE COURT:  Okay.  Fine.  Let's get our jury,

3    please.  Thank you.

4        (The jury entered the courtroom.)

5           THE COURT:  Good morning, ladies and gentlemen.  I

6    trust you all had a nice weekend.  We are ready to continue

7    on now.  And the defense will be calling its first witness.

8    The government has rested at this time, ladies and gentlemen.

9    Mr. Denis?

10          MR. DENIS:  Thank you, your Honor.  The defense

11   calls the Government's translator -- I don't recall her first

12   name -- Ms. Johnson or recalls her.

13          THE COURT:  For what purpose, counsel?

14          MR. DENIS:  Your Honor, just to reestablish the

15   fact that she originally did the original draft, the original

16   quality checking, and then we have our translator, who's

17   going to testify that she --

18          THE COURT:  Let me see counsel at the side of the

19   bench, please.

20       (Following is a sidebar conference.)

21          THE COURT:  We can continue this on right here.  I

22   didn't want you to make a statement in front of the jury.  Go

23   ahead.

24          MR. DENIS:  Basically I was going to have Ms.

25   Johnson testify she actually did a quality check of the

1  transcripts, of the entire transcripts of certain dates, and

2  then I have my translator take clips of that and then quality

3  check, those, and she's going to testify about those clips

4  and those clips --

5          THE COURT:  Who's your translator.

6          MR. DENIS:  Her name is -- Natasha is it?

7          THE COURT:  Is she a court-certified --

8          MR. DENIS:  I don't think she's a court-certified,

9  but she's very extensive experience in translations and has

10 substituted --

11         THE COURT:  You're not calling anyone from

12 Interpretive Services here, you're just going to be -- you're

13 going to have --

14         MR. DENIS:  Additional clips that were outside the

15 different -- some additional clips that the government did

16 not -- well, did not introduce for Ms. Johnson the previous

17 time.

18         THE COURT:  Have they been translated for you --

19         MR. DENIS:  Yes.

20         THE COURT:  -- by the government?

21         MR. DENIS:  They were translated by the government,

22 and then we quality checked them; that's what my translator

23 will lay the foundation as to those clips.

24         THE COURT:  Well, why wasn't this -- you say these

25 are different clips that were not gone into --

```
 1              MR. DENIS:  Correct.

 2              THE COURT:  -- on direct?  Are you aware which

 3    clips we're talking about, Mr. Gutierrez?

 4              MR. GUTIERREZ:  Counsel has chosen not to share

 5    that with me, your Honor.

 6              THE COURT:  Okay.  Counsel --

 7              MR. DENIS:  I'll give him -- I'll give you the

 8    whole clips; I have a set.

 9              THE COURT:  Just make sure you don't engage in any

10    repetitive testimony --

11              MR. DENIS:  Right, correct, right, absolutely.

12              THE COURT:  -- from the first time around, and --

13              MR. DENIS:  Okay, your Honor, and just one issue.

14    I did ask Mr. Gutierrez to have Mr. Shirani available.  Did

15    you -- were you able to do that or have him available today

16    just for the voices?

17              MR. GUTIERREZ:  Your Honor, Mr. Denis called me on

18    Friday afternoon for Mr. Krapchan, and I informed him that

19    I'm not the Bureau of Prisons, he's not in my custody --

20              MR. DENIS:  No, I'm withdrawing --

21              MR. GUTIERREZ:  -- and neither is Mr. Shirani.

22              MR. DENIS:  -- Mr. Krapchan.  I have discussed this

23    with Mr. Pancer, and we're not --

24              THE COURT:  Well, that doesn't surprise me at all.

25    But you can proceed with Ms. Johnson, keeping in mind that
```

1   you've already had an opportunity to cross-examine her and

2   that you won't be asking questions --

3           MR. DENIS:  No.

4           THE COURT:  -- that have been asked and answered --

5           MR. DENIS:  No, no, no.

6           THE COURT:  -- in your cross-examination already.

7   Okay.

8           MR. DENIS:  Thank you, your Honor.

9        (Sidebar conference concludes.)

10          THE COURT:  Ms. Johnson, if you would come forward,

11  please.  You have been previously sworn, and you are still

12  under oath.  If you would please resume the stand at this

13  time.  Thank you.

14                     Oleksandra Johnson

15  was previously sworn, recalled by the defense, and testified

16  as follows:

17                     Direct Examination

18          BY MR. DENIS:  Q.  Good morning, Ms. Johnson.

19  A.  Good morning.

20  Q.  Thank you for coming back.  I just have a brief

21  follow-up.  Previously you testified that you had looked at

22  and quality checked certain exhibits, 17 through 26, correct?

23  A.  I believe it was 17 through 27, but I could be mistaken.

24  Q.  Okay.  Prior to quality checking Exhibit 17 through 26 or

25  27, the government had given you a number of transcripts to

1    quality check, correct?

2    A.   Yes.

3    Q.   And -- and those dates range sometime from early June

4    until June 13, 2008, correct?

5    A.   Correct.

6    Q.   And -- and you were requested to quality check those

7    transcripts as well; is that true?

8    A.   Correct.

9    Q.   And you did that in anticipation of a trial which was

10   anticipated in -- at some previous point, correct?

11   A.   Yes.

12   Q.   Okay.  And as -- and you did quality check those?

13   A.   Yes.

14   Q.   You were given a CD with those transcripts placed by the

15   government, correct?

16   A.   I was given both CDs, multiple CDs, as well as paper

17   copies.

18   Q.   And at some point in time, all of the quality checking

19   that you did, you were presented with one CD to make sure

20   that was your work in that CD, correct?

21   A.   I was presented with -- for this particular court

22   appearance, I was presented with a CD that contained Exhibits

23   17 through 27.

24   Q.   But previous to anticipation of this trial, you were

25   given a CD with all the calls that you quality checked,

1    correct?

2    A.  I don't recall that.  I don't think so.

3    Q.  You were never given a CD with all your quality-checked

4    translations?

5    A.  I was -- on the day before this trial, I was given a CD

6    with the entire call log, all the records, the eve before

7    this trial, the Friday before this trial, but --

8    Q.  And that --

9    A.  -- that's not something that I went through.

10   Q.  Okay.  But you were given that, and that was all of the

11   translations that you did for this project, correct?

12   A.  I was given two CDs; one contained all of the text, and

13   the other CD contained all of the recordings.

14   Q.  Okay.  I'm going to present to you a CD, which has been

15   previously marked as Defense SSS.

16              THE COURT:  Did you say Triple S as in Sam?

17              MR. DENIS:  S as in Sam, your Honor.

18              THE COURT:  All right.  Do you have an R?  Do you

19   have something marked Exhibit RR?

20              MR. DENIS:  Yes.

21              THE COURT:  This is Double S or --

22              MR. DENIS:  Triple S.

23              THE COURT:  Triple S.

24       (Exhibit No. SSS identified.)

25              MR. GUTIERREZ:  Mr. Denis, do you mind if I see

1    that?

2             BY MR. DENIS:   Q.   Do you recognize that, Ms.

3    Johnson?

4    A.   No.

5    Q.   Okay.   The CD that you'd given, did it have any

6    identifying marks on it?

7    A.   The CD that I was given, which I still have with me in my

8    purse now, had marks saying "all text" and "all audio" I

9    believe.

10   Q.   Can I see that CD?

11   A.   There's two CDs.   These are the CDs I was given.

12   Q.   Can I take these from you for a moment?

13   A.   Sure.

14   Q.   And were these the CDs that had all of the calls that you

15   had quality checked through this project?

16   A.   I don't know.

17   Q.   But at some point you did quality check calls from early

18   June through June 13, 2008, correct?

19   A.   That's correct.

20   Q.   And the quality check that you did you provided to the

21   government, correct?

22   A.   That's correct.

23   Q.   And that represented all of the work that you had done in

24   terms of quality checking all the calls, correct?

25   A.   Yes and no.   I then did the quality check of the select

1  exhibits that we talked about --

2  Q.  Okay.

3  A.  -- earlier.

4  Q.  That was after you had already quality checked all of the

5  calls, correct?

6  A.  That's correct.

7  Q.  And then the government gave you a select number of calls

8  and asked you to requality check those --

9  A.  Exactly.

10  Q.  -- in anticipation for trial, correct?

11  A.  Yes.

12  Q.  Okay.

13          MR. DENIS:  Nothing further.

14          THE COURT:  Mr. Gutierrez, any examination?

15          MR. GUTIERREZ:  No, your Honor.  Thank you.

16          THE COURT:  All right.

17          MR. GUTIERREZ:  If counsel wasn't going to mark

18  those exhibits that he took from Ms. Johnson, we'd ask that

19  they be returned for her.  She's still working on those.

20          THE COURT:  All right.  You can return those to the

21  witness; they'll be held by her, Mr. Denis.

22          MR. DENIS:  Thank you, your Honor.

23          THE COURT:  Thank you, Ms. Johnson.  You are

24  excused.

25          MR. DENIS:  Your Honor, the defense calls

1    Ms. Nataliya Sidorova.

2              THE CLERK:  Would you raise your right hand to be

3    sworn, please.  Do you solemnly swear or affirm that the

4    evidence you shall give in the cause now before the Court

5    shall be the truth, the whole truth, and nothing but the

6    truth?

7              THE WITNESS:  Yes.

8                        Nataliya Sidorova

9    was called by the defense and testified as follows:

10             THE CLERK:  Please state your name for the record

11   and spell your full name.

12             THE WITNESS:  My name is Nataliya Sidorova,

13   N-a-t-a-l-i-y-a  S-i-d-o-r-o-v-a.

14                      Direct Examination

15             BY MR. DENIS:  Q.  Ms. Sidorova, as part of your --

16   are you a translator?

17   A.  Yes.

18   Q.  And what languages do you translate from?

19   A.  From Russian to English and from English to Russian.

20   Q.  And how long have you been translating?

21   A.  Around two years.

22   Q.  And is that professionally?

23   A.  Yes.

24   Q.  And did you also go to law school here in the United

25   States?

1    A.   I was a -- I was a visiting scholar in law school twice.

2    Q.   And did you take the California Bar exam?

3    A.   Yes.

4    Q.   Okay.  And can you -- do you have a Ph.D in Russia?

5    A.   Yes, I have Ph.D in law in Russia.

6    Q.   And do you have any -- can you give us a little bit of

7    your experience in Russia.

8    A.   I was a corporate lawyer, and at the same time I'm a

9    associate professor at law school right now in Russia; I'm

10   working online.  And here I have also some legal-related

11   experience; I was a legal assistant at Silver, Oppenheim, and

12   Linder office, and also I was a visiting scholar at Harvard

13   University and at Arizona State University all together one

14   year.

15   Q.   And how long have you been speaking English?

16   A.   I think since my high school.

17   Q.   Okay.  And for two years you've been translating English

18   into Russian and Russian into English?

19   A.   Yes, professionally, but before, my work also was related

20   to English/Russian translation, but it was basically legal

21   translation.

22   Q.   Okay.  And you were given a CD with clips, correct?

23   A.   Yes.

24   Q.   Is that the CD that's in front of you?

25   A.   Yes.

1  Q.  And did you listen to those CDs and quality check the

2  clips that are on that CD?

3  A.  Yes.

4  Q.  And the sheets --

5          MR. DENIS:  I'm going to mark as Defense Exhibit

6  TTT, the CD.

7          BY MR. DENIS:  Q.  And you also had a transcript of

8  those clips, correct?

9  A.  Yes.

10     (Exhibit No. TTT identified.)

11  Q.  Is that the sheet of paper -- the number of sheet of

12  papers that are in front of you?

13  A.  Yes.

14  Q.  And you quality checked those CDs, those clips, correct?

15  A.  Yes.

16  Q.  And were they found to be an accurate translation from

17  Russian into English?

18  A.  Yes.

19          MR. DENIS:  I would like to mark those clips

20  collectively as exhibit -- Defense Exhibit UUU.  Okay.

21  Nothing further.  Thank you, Ms. Sidorova.

22     (Court's Exhibit No. UUU identified.)

23          THE COURT:  Mr. Gutierrez?

24          MR. GUTIERREZ:  May I briefly approach, your Honor?

25          THE COURT:  I'm sorry?

1          MR. GUTIERREZ:  May I approach the witness?

2          THE COURT:  Oh, certainly.

3                        Cross-Examination

4          BY MR. GUTIERREZ:  Q.  Good morning, Ms. Sidorova.

5    How are you?

6    A.  I'm good.  How are you?

7    Q.  Would you mind -- this CD that you testified about -- I

8    believe you said it was TTT, the one that I'm holding in my

9    hand, did you have possession of this actual disk?

10   A.  Yes.

11   Q.  And did you give it back to counsel at some point?

12   A.  Yes.

13   Q.  And did he give it back to you when you walked into court

14   this morning?

15   A.  Yes.

16   Q.  Did you put some kind of mark or number on this disk so

17   you could say that this was in fact the actual disk that you

18   looked at or are you taking for granted that this man, the

19   defense attorney, gave you the same disk?

20   A.  I believe he gave me same disk because I gave him this

21   disk like for a couple of minutes before I came here.

22   Q.  But did you put a marking on this disk so we know for

23   sure?

24   A.  I didn't put my marks.

25   Q.  So you don't know for sure that this is the same disk but

701

1   you suspect it is?

2   A.   Yes, but I can listen and I can verify that it's same

3   disk.

4   Q.   Now, did you produce these --

5   A.   Yes.

6   Q.   -- transcripts?

7   A.   I didn't produce them but I checked them.

8   Q.   Were they accurate?

9   A.   Yes.

10  Q.   Were there any errors?

11  A.   There was not any mistakes.

12  Q.   When did you complete your review of these?

13  A.   My last interview was today in the morning before the

14  court.

15  Q.   Okay.  Did you put any markings on this so that we know

16  that these are the ones you actually looked at?

17  A.   Yes, I put my signature.

18  Q.   On each page?

19  A.   Not on each page but on some.

20  Q.   I see that there was some staples removed here; did you

21  do that --

22  A.   No.

23  Q.   -- or did somebody do that?

24  A.   I don't know.

25  Q.   Do you know how many clips it was that you read over?

 1    A.   I verified four clips.

 2    Q.   Four?

 3    A.   Yes.

 4    Q.   All right.  Thank you very much.

 5         MR. GUTIERREZ:  Your Honor, I have no further

 6    questions.

 7         THE COURT:  Anything further, Mr. Denis?

 8         MR. DENIS:  No, your Honor.

 9         THE COURT:  All right.  Before the witness goes, I

10    just don't want -- I want to eliminate the need for having to

11    call back Ms. Sidorova.  Mr. Gutierrez, would you please hand

12    Ms. Sidorova the four pages, if that --

13         RIGHT1:  Certainly, your Honor.

14         THE COURT:  -- is what constitutes Exhibit UUU.

15    Ms. Sidorova, will you please look at these four pages and at

16    least make sure that these four pages were transcripts that

17    you personally reviewed for accuracy.

18         THE WITNESS:  Everything is accurate.

19         THE COURT:  Anything further?

20         MR. GUTIERREZ:  No, your Honor.  Thank you.

21         THE COURT:  Mr. Denis, why don't you take the -- if

22    you could take the pages and place them back on the exhibit

23    table.  Did you have any further examination?

24         MR. DENIS:  Just briefly.

25                    Redirect Examination

1           BY MR. DENIS:   Q.   So the four clips that you

2    quality checked, could you identify what page they're from

3    and which ones you actually did.

4    A.   Yes.   This is page No. 2, Exhibit D; page No. 5, Exhibit

5    XX; page No. 10, Exhibit N, Nancy; and page No. 10, Exhibit

6    P.

7    Q.   Okay.   And those are the four clips that you quality

8    checked, correct?

9    A.   Yes.

10   Q.   Okay.

11          MR. DENIS:   Nothing further.   Thank you.

12          THE COURT:   Ms. Sidorova, if you would please

13   repeat.   I've got page 2 of Exhibit D; page 5 of Exhibit XX;

14   page -- the next one was page what now?

15          THE WITNESS:   Ten.

16          THE COURT:   Page 10 of --

17          THE WITNESS:   Exhibit N.

18          THE COURT:   Exhibit M.

19          THE WITNESS:   N, Nancy.

20          THE COURT:   I'm sorry?

21          THE WITNESS:   N, Nancy.

22          THE COURT:   N.   Thank you.   And then another

23   page 10 --

24          THE WITNESS:   Yes.

25          THE COURT:   -- from Exhibit P.

 1              THE WITNESS:  Yes.

 2              THE COURT:  Thank you very much.

 3              MR. DENIS:  Your Honor, I do apologize.  There is

 4   one extra.

 5              BY MR. DENIS:  Q.  Ms. Sidorova, I do -- I recall

 6   one other CD.  You were given a project to do over the

 7   weekend, correct?

 8   A.  Yes.

 9   Q.  And that was to translate a CD marked as CD No. 1?

10   A.  Yes.

11   Q.  And was that for -- let me show you what has been marked

12   Defense Exhibit VVV.  Ms. Sidorova, do you recognize this

13   document?

14   A.  Yes.

15   Q.  Can you describe that document.

16   A.  I'm sorry?

17   Q.  Can you describe that document.

18   A.  This is a conversation between two people.  Basically one

19   of them is looking for legal advice about --

20              MR. GUTIERREZ:  Object as hearsay at this point.

21              THE COURT:  The objection is sustained.  I believe

22   counsel may be just asking you whether or not this is

23   something that purports to be a transcript.

24              BY MR. DENIS:  Q.  Is this a transcript that you

25   did over the weekend?

1    A.   Yes.

2         (Court's Exhibit No. VVV identified.)

3    Q.   And what is the -- was the date January 20, 2007 CD?

4    A.   Yes.

5    Q.   Was it marked as CD No. 1?

6    A.   Yes.

7    Q.   Okay.  And you received that CD, correct?

8    A.   Yes.

9    Q.   And you were asked to translate a portion of that CD?

10   A.   Yes.

11   Q.   And did you do that?

12   A.   Yes.

13   Q.   And did -- you translated that from Russian into English?

14   A.   Yes.

15   Q.   Okay.  And this was from -- could you describe what was

16   marked on the CD.  I mean was that CD No. 1, January 20,

17   2007?

18   A.   Yes.

19   Q.   Okay.  And you listened to this CD, and then you

20   translated it from Russian into English, correct?

21   A.   Yes.

22   Q.   Okay.  And is that an accurate -- the transcript there,

23   is that an accurate transcription from Russian into English?

24   A.   Yes.

25   Q.   Okay.

```
 1              MR. DENIS:  Nothing further.

 2              THE COURT:  Anything further, Mr. Gutierrez?

 3              MR. GUTIERREZ:  No, your Honor.

 4              THE COURT:  All right.  Thank you, Ms. Sidorova.

 5   You are excused.

 6              MR. DENIS:  Can you bring those exhibits, Ms.

 7   Sidorova?  The defense calls Ms. Natalie Lambert to the

 8   stand.

 9              THE COURT:  Counsel, would you put the exhibits on

10   the exhibit table.

11              MR. GUTIERREZ:  Ms. Lambert should be right down

12   the hall.  We'll get her.

13              THE COURT:  Okay.  Thank you.

14              MR. DENIS:  Your Honor, I like to move into

15   evidence the CD clips and the -- well, you know, I apologize.

16   I withdraw that.

17              THE COURT:  Okay.  You did say Ms. Lambert was

18   right outside, Mr. Gutierrez?

19              MR. GUTIERREZ:  I've been informed she's in my

20   office in the conference room right outside, which is down

21   the hall across the bridge.  Somebody is going to get her

22   right now.  She had phone issues, so we couldn't just call

23   her.  We are running to get her right now, your Honor.  I

24   apologize.

25              THE COURT:  Okay.  Well --
```

1          MR. GUTIERREZ:  I'll make sure that there are no

2     witnesses in my office; they'll be in the hall.

3          THE COURT:  Well, I tell you what.  Let's just take

4     advantage of this time here.  There was something I wanted to

5     address with counsel, so if I can see counsel at the side of

6     the bench for just a moment.  Ladies and gentlemen, please

7     just feel free to relax right where you are in the jury box

8     there and chat amongst yourselves as long as you don't

9     discuss the case.  Thank you.

10         (Following is a sidebar conference.)

11         THE COURT:  This is Ms. Lambert?

12         MR. GUTIERREZ:  Yes, your Honor.

13         THE COURT:  We've received word from one of the

14    jurors that the juror only gets paid for five days' jury

15    duty, and there was I think a gentle suggestion on the part

16    of the juror that things get speeded up.  I know that I told

17    the jury at the beginning of the trial that your joint

18    estimate was five days for the trial of the case, and what

19    I'm going to do is just have a discreet word with the juror

20    at some point that -- not to be concerned about that

21    circumstance, and if there is any issue with respect to

22    limited pay for jury duty, I'd be happy to intervene on that

23    juror's behalf with the employer if the juror wishes me to do

24    so at the end of the case.  I just wanted to let you know

25    that I was going to make that contact with the juror at some

1    appropriate time.  And I think that's about it.

2              MR. DENIS:  Thank you, your Honor.

3              THE COURT:  Okay.  We're ready to go with Ms.

4    Lambert then.

5         (Sidebar conference concludes.)

6              THE COURT:  Ms. Lambert, if you would come forward,

7    please.  You have been previously sworn, and you are still

8    under oath.

9              THE WITNESS:  Okay.

10                        Natalie Lambert

11   was previously sworn, called by the defense and testified as

12   follows:

13                     Direct Examination

14             BY MR. DENIS:  Q.  Morning, Ms. Lambert.

15   A.  Good morning.

16   Q.  Ms. Lambert, you participated in this investigation,

17   correct?

18   A.  Correct.

19   Q.  And you were assisted by Special Agent Brett Kalina; is

20   that true?

21   A.  Correct.

22   Q.  And you and he were partners in this case, in this

23   investigation, correct?

24   A.  That is correct.

25             MR. GUTIERREZ:  I'd object as to leading, your

1    Honor?

2              THE COURT:  The objection is overruled.

3              BY MR. DENIS:  Q.  And, Ms. Lambert, you

4    participated in the proffer sessions of Mr. Shirani, correct?

5    A.  That is correct.

6    Q.  And can you just describe what a proffer session is.

7    A.  Following Mr. Shirani signing a plea agreement, we

8    participated in conversations with him.

9    Q.  And in that plea agreement, he was to be honest and

10   truthful with the government, correct?

11   A.  That is correct.

12   Q.  And he was to assist -- to assist the government, and for

13   that assistance, he would get a reduction in his sentence,

14   correct?

15             MR. GUTIERREZ:  Objection; compound as phrased,

16   leading.

17             THE COURT:  The objection is sustained on the basis

18   that the question is compound.

19             MR. DENIS:  Okay.

20             THE COURT:  I think counsel may proceed with

21   leading questions of this witness if he wishes to do so.

22             MR. DENIS:  Thank you, your Honor.

23             BY MR. DENIS:  Q.  And at that time, at the proffer

24   session, Ms. Lambert, Mr. Shirani's informed that he has to

25   be truthful with the government, correct?

1   A.   That is correct.

2   Q.   Okay.  And if he's found not truthful, he could lose all

3   his points, correct?

4   A.   As the investigator I do not make the decisions as far as

5   what that will be.

6   Q.   That would be with the government, correct?

7   A.   That is correct.

8   Q.   They're the ones that present any motion for a downward

9   departure to the Court; isn't that true?

10  A.   Correct.  And ultimately the decision is made by the

11  judge.

12  Q.   But without the government's motion, the judge doesn't

13  have any discretion, correct, as far as you know?

14  A.   That is my understanding of it.

15  Q.   Okay.  And, in addition, the individual who's cooperating

16  has to be of substantial assistance to the government before

17  any kind of a motion for downward departure is made, correct?

18         MR. GUTIERREZ:  Objection; relevance, calls for

19  speculation, lack of foundation for this witness, your Honor.

20         THE COURT:  The objection is sustained on the basis

21  of lack of foundation.  If you wish to lay the foundation, if

22  you can, you may do so, counsel.

23         BY MR. DENIS:  Q.  All right.  Ms. Lambert, you've

24  participated in proffer sessions before, correct?

25  A.   Yes.

1    Q.  And these proffer sessions is to get information that may

2    or may not benefit the government, correct?

3    A.  It is to get the statements of the defendant so we have a

4    better understanding of the investigation as a whole.

5    Q.  And when the defendant makes those statements, if there

6    is a benefit to the government from those statements, the

7    government can recommend for a downward departure, correct?

8    A.  We can make recommendations.

9    Q.  And that could be just on statements, correct?

10            MR. GUTIERREZ:  Calls for speculation, lack of

11   foundation, your Honor.

12            THE COURT:  The objection is sustained.  It's

13   calling for speculation, but it's also vague.

14            BY MR. DENIS:  Q.  Okay.  If the defendant gives

15   information helpful to the government, that could be a basis

16   for a downward departure, correct?

17            MR. GUTIERREZ:  Asked and answered, your Honor.

18            THE COURT:  Sustained.

19            BY MR. DENIS:  Q.  In addition to helpful

20   statements by the defendant, the defendant can give

21   information that would lead to arrests, correct, to get a

22   downward departure?

23            MR. GUTIERREZ:  Compound as phrased, your Honor.

24            THE COURT:  Overruled.  You may answer that.

25            THE WITNESS:  I'm sorry.  Did you say that the

1    information can lead to arrests?

2              BY MR. DENIS:  Q.  Yes.  And that could be the

3    basis for a downward departure?

4    A.  Yes.

5    Q.  The defendant could agree to testify at a grand jury and

6    receive -- and receive a downward departure, correct?

7    A.  Yes.

8    Q.  The defendant can testify at a trial such as this one and

9    receive additional points for a downward departure; isn't

10   that true?

11   A.  Again, this is all information -- as the investigator I

12   do not make these recommendations, but that is my

13   understanding.

14   Q.  Okay.  And the number of times that a defendant is called

15   and interviewed giving information could lead to additional

16   points for downward departure; isn't that true?

17             MR. GUTIERREZ:  Calls for speculation, lack of

18   foundation.

19             THE COURT:  Well, the question does call for a bit

20   of speculation, but as a general proposition, if that's your

21   understanding, Ms. Lambert, you may testify as to what your

22   understanding is.  Would you like the question repeated?

23             THE WITNESS:  No, I understand.  It is not based on

24   the number of interviews conducted, no.

25             BY MR. DENIS:  Q.  Okay.  So can someone get the

1    same amount of points if he comes and proffers one time and

2    gives a whole bunch of information versus someone who comes

3    in 10 or 15 times and gives more?  Would the same people get

4    the same amount of points?

5              MR. GUTIERREZ:  Relevance, lack of foundation for

6    hypothetical, your Honor.

7              THE COURT:  Sustained on all grounds.

8              BY MR. DENIS:  Q.  But your understanding if a

9    defendant comes and testifies -- meets on proffers multiple

10   times, would that individual, if it's found to be reliable,

11   get additional points?

12             MR. GUTIERREZ:  Been asked and answered, your

13   Honor.

14             THE COURT:  Well, that hasn't been asked and

15   answered exactly in that form.  But, counsel, the question is

16   of a hypothetical nature where the circumstances are so

17   vague.  I'm going to sustain the --

18             MR. DENIS:  Okay.

19             BY MR. DENIS:  Q.  Mister --

20             THE COURT:  -- objection on that basis.

21             BY MR. DENIS:  Q.  -- Shirani, he met with the

22   government on a number of occasions, correct?

23   A.  Yes.

24   Q.  Do you have an approximation how many times Mr. Shirani

25   met with the government?

1    A.   I do not.   I would have to review the reports to refresh

2    my recollection.

3    Q.   Just based on your estimates or your memory, would it be

4    approximately ten times or more?

5    A.   Again, I would have to review the reports.

6    Q.   Okay.   And based on your memory though, was it multiple

7    times?

8    A.   Yes, it was.

9    Q.   Okay.

10           MR. DENIS:   And I have the report, and I will use

11   it to refresh her recollection.

12           BY MR. DENIS:   Q.   Ms. Lambert, Mr. Shirani

13   indicated in the proffer session that he had met with Ryan

14   Wedding and Elmar and Michael Krapchan on at least four or

15   five times; isn't that true?

16           MR. GUTIERREZ:   Hearsay, lack of foundation.

17           THE COURT:   The objection is sustained.   And,

18   counsel, if you'd refrain from testifying yourself, I think

19   that might be helpful.

20           MR. DENIS:   All right.

21           BY MR. DENIS:   Q.   Ms. Lambert, during the proffer

22   sessions, Mr. Shirani was asked how many times he met with

23   Mr. Akhundov, Michael Krapchan, himself, and Ryan Wedding,

24   correct?

25   A.   Yes.

1    Q.   And what did he say?

2              MR. GUTIERREZ:  Objection, hearsay, lack of

3    foundation, not inconsistent, your Honor.

4              THE COURT:  The objection is overruled, ladies and

5    gentlemen, insofar as -- well, you may -- you may answer that

6    question at this point.

7              THE WITNESS:  Okay.  I would have to review the

8    report of what Mr. Shirani stated.

9              BY MR. DENIS:  Q.  Okay.  Going to hand you a

10   multi-page document, which we'll just mark for identification

11   I believe.

12             MR. DENIS:  I withdraw that identification.

13             BY MR. DENIS:  Q.  Going to hand you a report --

14             MR. GUTIERREZ:  Mr. Denis, may I see what you're

15   going to show the witness?

16             MR. DENIS:  Sure.

17             BY MR. DENIS:  Q.  Are you familiar with that

18   document?

19   A.   Yes, I am.

20   Q.   Could you take a moment and just take a look through the

21   document.

22   A.   Okay.  This particular document or the entire stack of

23   documents?

24   Q.   The entire stack.

25             THE COURT:  What did you mark the document as, what

    1    exhibit number?

    2              MR. DENIS:  I withdrew it, your Honor.  I need that

    3    document.  I can't --

    4              THE COURT:  Well, if you've shown it to the

    5    witness --

    6              MR. DENIS:  Mark it?

    7              THE COURT:  -- we need to have it marked.

    8              MR. DENIS:  Okay.

    9              THE COURT:  We'll mark it WWW.  Go ahead and mark

   10    it now before we lose track of it, please.

   11              MR. DENIS:  Thank you, your Honor.

   12              THE WITNESS:  Did you want me to review in

   13    particular the last question or to review the entire stack of

   14    documents?

   15              BY MR. DENIS:  Q.  What I wanted you -- based on

   16    your memory, did Mr. Shirani indicate in the first proffer

   17    session how many times he met with Michael Krapchan, Elmar

   18    Akhundov, and Ryan Wedding?

   19    A.  Okay.

   20    Q.  Do you recall that from memory?

   21    A.  I do not.

   22       (Exhibit No. WWW identified.)

   23              THE COURT:  Next question, counsel.

   24              BY MR. DENIS:  Q.  Ms. Lambert, do you recall if

   25    Mr. Hassan -- Mr. Shirani indicated that -- well, would

1  looking at the document refresh your recollection?

2  A.  Yes.

3  Q.  Okay.  Why don't you take a look at the document.

4  A.  Okay.

5  Q.  Do you recall?

6  A.  Yes, according to this proffer session that we conducted

7  with Mr. Shirani.

8  Q.  What was the date of that proffer session?

9  A.  July 17, 2008.

10  Q.  Okay.  And on July 17, 2008 what did Mr. Shirani -- how

11  many times did Mr. Shirani indicate that he met with Ryan

12  Wedding, Michael Krapchan, and Elmar Akhundov?

13  A.  On one occasion.

14  Q.  And in that same proffer --

15          THE COURT:  Excuse me, counsel.  Ladies and

16  gentlemen, you may not consider Mr. Shirani's statement to

17  any investigator as evidence against Mr. Wedding.  You may

18  only consider that statement for a limited purpose; that

19  purpose would be on the question of the credibility of

20  Mr. Shirani.

21          MR. DENIS:  Thank you, your Honor.

22          BY MR. DENIS:  Q.  And how many times did

23  Mr. Shirani indicate that he himself met with Elmar Akhundov

24  and Michael Krapchan and himself?

25  A.  Let me review again.

1   Q.   Okay.

2   A.   After reviewing the report, I don't see that he mentioned

3   how many times that he met with Mr. Krapchan and Mr.

4   Akhundov.

5   Q.   Would it be close to -- could you look at the area where

6   he indicated that he met with Mr. Wedding and then one

7   time -- and also based on your memory, do you recall that

8   there was a CD made of that proffer?  Do you recall that?

9   A.   Yes, there was.

10  Q.   Okay.

11  A.   It does not say in this report the number of times that

12  he met with those individuals.

13  Q.   Okay.  It just -- it's not contained on the July 17 part

14  of the report, correct?

15  A.   That is correct.

16  Q.   And as you indicated, just looking at the report, can you

17  give the dates that you had the proffer sessions with

18  Mr. Shirani.

19  A.   For all of the dates?

20  Q.   Yes, based on those reports.

21  A.   The initial proffer was on July 17, 2008.  There was one

22  conducted on August 12, 2008 --

23  Q.   And I apologize.  Just before we get past the August 12,

24  2008, on the 17th of 2008, did that session break up into

25  three proffer sessions?

1   A.   No.

2   Q.   How many proffer sessions were there?

3   A.   It was one session.

4   Q.   And how was that session broken up?  Was there a break

5   for lunch and part 2 was done --

6   A.   Yes.

7   Q.   -- and then after an hour or so, there was a part 3 of

8   that session, based on the report, in the afternoon at 2:30?

9   A.   Following a break?

10   Q.   Yes.

11   A.   Yeah.  I wouldn't say that it was three parts, but there

12   was an interview, a lunch break, and then another interview.

13   Q.   Okay.  And they're on that date.  Okay.  That's fine.

14   And then there was a second date, August 12 of '08, correct?

15   A.   Correct.

16   Q.   And after August 12 of '08, when was the next one?

17   A.   August 19, 2008, February 5, 2009, looks like this one

18   was out of order, so October 14, 2008 --

19   Q.   October 14?

20   A.   Yes.  This was a duplicate on February 5, 2009.

21   Q.   Okay.

22   A.   And that's it.

23   Q.   All right.  And just before we pass on that, in -- in

24   October 14, 2008 -- looking at the last paragraph -- did

25   Mr. Shirani indicate how many times he met with Elmar

1    Akhundov, Ryan Wedding, and Michael Krapchan?

2              MR. GUTIERREZ:  Your Honor, we'd object as to

3    defense counsel asking the witness to read from a report.

4              THE COURT:  The objection is sustained.

5              BY MR. DENIS:  Q.  Okay.  Do you recall on August

6    14 of '08 -- strike that.  Well, do you recall how many times

7    Shirani indicated on October -- strike that.  During the

8    proffer session on October 4 of '08, did Mr. Shirani

9    indicate -- give a statement as to how many times he met with

10   Elmar Akhundov, Michael Krapchan, and Ryan Wedding?

11   A.  I would have to review the report.  I do not remember.

12   Q.  Okay.  Would reviewing -- you have the report there.

13   Would that refresh your recollection?

14   A.  Yes, it would.

15   Q.  Okay.  Go ahead.  Tell me when your memory has been

16   refreshed.

17   A.  According to this report Shirani indicated that he and

18   Mr. Wedding had met with Mr. Krapchan --

19             MR. GUTIERREZ:  Your Honor, we'd object as to the

20   witness reading from her report.

21             THE COURT:  The objection is sustained.

22             BY MR. DENIS:  Q.  And what is your recollection

23   based on refreshing your memory of how many times Mr. Shirani

24   indicated he met with Elmar Akhundov, Michael Krapchan, and

25   Ryan Wedding?

1    A.   During this proffer session Mr. Shirani indicated that he

2    had met approximately four or five times.

3    Q.   That's different than one time, correct?

4              MR. GUTIERREZ:   Argumentative.

5              THE COURT:   The objection is sustained.   Ladies and

6    gentlemen, once again, you may consider this evidence only on

7    the issue of Shirani's credibility and not as evidence

8    against Mr. Wedding.   Counsel, would you put -- unless you're

9    going to use the report, put it back on the --

10             MR. DENIS:   I'm going to be using it, your Honor --

11             THE COURT:   Okay.

12             MR. DENIS:   -- extensively.

13             BY MR. DENIS:   Q.   Ms. Lambert, during the proffer

14   sessions Mr. Shirani never indicated that he would get a

15   percentage, 1 percent, from the money transfer; isn't that

16   true?

17   A.   Could you repeat the question, please.

18   Q.   During the first proffer session on -- well, on July --

19   July 17, 2008, Mister -- Mr. Shirani did not indicate that he

20   would make a 1 percent from the 15 percent money transfer,

21   correct?

22   A.   That is correct.

23   Q.   Okay.   And in the proffer session, when Mr. Shirani was

24   asked how much money he transported to -- or that he gave to

25   the money exchange, do you recall what he said in the first

1   proffer session?

2   A.  He indicated that he had taken $340,000 plus 15 points.

3   Q.  And that was 15 percent, correct?

4   A.  Correct.

5   Q.  And at that time he didn't recall how much money he gave

6   to the money exchange, correct?

7   A.  That is correct.

8   Q.  He just kept referring it to, if you add it up to

9   15 percent, that's the number that I gave.  Correct?

10  A.  He did not say it that way, no.

11  Q.  How did he say it?

12  A.  He said that he had taken $340,000 plus 15 points.

13  Q.  Okay.  And he didn't know the amount, correct, that he

14  gave to the money exchange.  Correct?

15  A.  As I indicated, he said $340,000 plus 15 points.

16  Q.  But when asked how much was that total that he gave to

17  the money exchange, he did not know that total, correct?

18  A.  He did not have a dollar figure, no.

19  Q.  And at that proffer session or any other proffer session,

20  Mr. Shirani didn't indicate that he would make a one

21  percentage point off of that money transfer, correct?

22          MR. GUTIERREZ:  That's been asked and answered,

23  your Honor.

24          THE COURT:  The objection is overruled.  You may

25  answer that.  I believe the question now relates to all

1      proffer sessions, not just the first one.

2              THE WITNESS:  No, he indicated that he was

3      receiving $400 per kilogram upon delivery.

4              BY MR. DENIS:  Q.  Okay.  But he never indicated a

5      1 percent from the 15 percent money transfer, correct --

6      A.  That is correct.

7      Q.  -- in any of the proffer sessions as well, correct?

8      A.  That is correct.

9      Q.  All right.  And during your proffer sessions, you went

10     through the events that happened from June 10 through June

11     13, 2008 with Mr. Shirani, correct?

12     A.  We covered a greater time period than that, but yes, we

13     did cover the June 10 to June 13 time period as well.

14     Q.  And during any of those proffer sessions, did Mr. Shirani

15     indicate that Mr. Wedding would -- would in any way harm the

16     confidential source?

17             MR. GUTIERREZ:  Your Honor, that calls for

18     hearsay --

19             THE COURT:  Sustained.

20             MR. GUTIERREZ:  -- improper impeachment.

21             THE COURT:  Sustained.

22             BY MR. DENIS:  Q.  During the proffer sessions did

23     Shirani indicate any statement made by Mr. Wedding that he

24     would harm the confidential source?

25             MR. GUTIERREZ:  Same objection, your Honor; vague

1    as to who he is.

2            THE COURT:  Yes, the objection is sustained.  It is

3    vague as to who he is.

4            MR. DENIS:  Okay.

5            BY MR. DENIS:  Q.  During the proffer sessions

6    did -- did Mr. Shirani tell the government in any of the

7    proffer sessions that Mr. Wedding was going to somehow harm

8    the confidential source?

9            MR. GUTIERREZ:  Hearsay, your Honor.

10           THE COURT:  The objection is sustained.

11           BY MR. DENIS:  Q.  Okay.  During any of the proffer

12   sessions, did Mr. Shirani tell the government that Mr.

13   Wedding would smash the old man?

14           MR. GUTIERREZ:  Hearsay, your Honor.

15           THE COURT:  The objection is sustained.

16           MR. DENIS:  Your Honor, as to credibility?

17           THE COURT:  The objection sustained.

18           BY MR. DENIS:  Q.  Isn't it true, Ms. Lambert, that

19   Shirani never told the government that -- that Mr. Wedding

20   would do anything to harm the confidential source?

21           MR. GUTIERREZ:  Objection; hearsay, your Honor.

22           THE COURT:  The objection is sustained.  As to the

23   previous question that was asked, the ruling on that is that

24   that particular question may be asked as to whether -- that

25   question may be asked, the question relating to whether Mr.

1    Wedding told Shirani -- excuse me -- whether Shirani told the

2    agents during the proffer session that Wedding indicated he

3    would smash the old man.  Why don't you repeat that question

4    if you would to the witness.

5            Ladies and gentlemen, once again, if this answer

6    comes in, it only may be used for the purpose of credibility

7    on the part of Shirani, not on the question -- not directly

8    related to the question of Mr. Wedding's involvement in this.

9            MR. DENIS:  Thank you.  Thank you.  Thank you, your

10   Honor.

11           BY MR. DENIS:  Q.  Ms. Lambert, during any of the

12   proffer sessions that have been documented, Mr. Shirani never

13   told the government that Mr. Wedding would smash the old man;

14   isn't that true?

15   A.  That is not true.

16   Q.  There was a proffer session that Mr. Shirani told the

17   government that Mr. Wedding said he would smash the old man?

18   A.  We did have a conversation that was not during -- it was

19   part of an aside conversation, and during that time -- I

20   don't remember the specific words that he used, but to my

21   memory, he did indicate that Mr. Wedding had said that he

22   would I believe smash his elbow into the old man's face.

23           THE COURT:  All right.  Once again, ladies and

24   gentlemen, that evidence, that answer, may not used as

25   evidence against Mr. Wedding; you may only consider it on the

 1    credibility of Mr. Shirani.

 2              BY MR. DENIS:  Q.  Was that a proffer session that

 3    occurred on the morning that Mr. Shirani testified here in

 4    court?  Was that the first time you had heard that statement?

 5    A.  No, no.

 6    Q.  But that statement, as far as you recall, was never

 7    documented in any of the proffer sessions, correct?

 8    A.  No, it was not.

 9    Q.  And you indicated it was a side statement that was made?

10    A.  It was not during a formal documentation period, but yes,

11    Mr. Shirani did make that statement to me.

12    Q.  And you indicated it wasn't a formal documentary period;

13    when was that approximately?  When was that statement made

14    approximately?

15    A.  I do not remember the exact date.

16    Q.  And did he make that statement only to you?

17    A.  No.  I was never in the room with Mr. Shirani alone.

18    Q.  So were you told about that statement or you actually

19    heard that statement from Mr. Shirani?

20    A.  I heard that statement from Mr. Shirani.

21    Q.  And no one put that in any formal report, correct?

22    A.  That is correct.

23    Q.  And just based on your training and experience, material

24    facts, are most -- are all put into your report to refresh

25    your recollection at a later time, correct?

1          MR. GUTIERREZ:  Compound as phrased, your Honor.

2          THE COURT:  Overruled.  You may answer that.

3          THE WITNESS:  There are times that things may not

4   get documented in reports simply because at the time that the

5   report is written, it may not be recalled.  But in your

6   asking me that question, I did recall that statement that

7   Mr. Shirani made.

8          BY MR. DENIS:  Q.  Now, also on July 17, 2008,

9   Mr. Shirani was asked about other individuals involved in

10  drug dealing, correct?

11         MR. GUTIERREZ:  Objection; relevance, hearsay.

12         THE COURT:  The objection is overruled.

13         THE WITNESS:  Yes, he was.

14         BY MR. DENIS:  Q.  And did he -- did he mention

15  that Manavie was not involved in drug dealing, or Maziar?

16  A.  What is the full name of the individual?

17  Q.  Almozet (phonetic) Maz Manavie.

18  A.  And could you repeat the question, please.

19  Q.  Did he on August -- I'm sorry -- strike that.  On

20  July 17, 2008 did he tell the government that Almozet Maz

21  Manavie was not involved in drug dealing?

22  A.  He indicated that he was no longer involved in drug

23  dealing.

24  Q.  And then that was on July 17, 2008, correct?

25  A.  That is correct.

 1  Q.  And then on August 19, 2008, did he recant that

 2  statement?

 3          MR. GUTIERREZ:  Argumentative as phrased, your

 4  Honor.

 5          THE COURT:  The objection is overruled.  You may

 6  answer that.

 7          THE WITNESS:  Upon further questioning by Agent

 8  Kalina and myself, he did indicate that Maz Manavie was

 9  involved in drug trafficking.

10          BY MR. DENIS:  Q.  And that was a month later,

11  correct?

12  A.  Based upon the date of that report, yes.

13  Q.  And you indicated that Mr. Shirani proffered on July 17

14  of '08, correct?

15  A.  The initial one, yes.

16  Q.  A then there was a second one on August 12 of 2008?

17          THE COURT:  Counsel, we've been through these,

18  please, all of these dates.  If you could move on.

19          BY MR. DENIS:  Q.  Okay.  And then on the 19th, on

20  the third proffer session, upon further questioning he

21  admitted that his business partner, Almozet Maz Manavie, was

22  involved in drugs --

23          MR. GUTIERREZ:  Asked and answered, your Honor.

24          BY MR. DENIS:  Q.  -- was involved in drug dealing,

25  correct.

1          THE COURT:  The objection is sustained.

2          BY MR. DENIS:  Q.  So that was after the third

3   proffer session, correct?

4          MR. GUTIERREZ:  Asked and answered, your Honor.

5          THE COURT:  Sustained.

6          BY MR. DENIS:  Q.  Now, Mr. Shirani also

7   testified -- or strike that.  On the first proffer session,

8   Mr. Shirani indicated that there was no way for him to

9   corroborate the version -- his version of events, correct?

10  Do you recall that?

11  A.  To corroborate his version of the events?

12  Q.  Correct.  Let me strike that.  I'll break it down.

13  Mister -- Mr. Shirani indicated to you at the proffer session

14  that he had picked up $340,000 from Ryan Wedding's house,

15  correct?

16  A.  Correct.

17  Q.  And that he received that from Ryan Wedding, correct?

18  A.  Not that he received the money directly from Ryan Wedding

19  but that he received the money at the home of Ryan Wedding.

20  Q.  And you're testifying that he did not testify or he did

21  not in the proffer session say that he picked it up directly

22  from Mr. Wedding?

23  A.  I would have to review the report.

24  Q.  Okay.  Would reviewing the report refresh your

25  recollection?

730

1    A.   Yes, it would.   Could you repeat the date of that proffer

2    session.

3    Q.   The July 17 '08 proffer session.

4    A.   Okay.   I have reviewed the report.

5    Q.   Did that refresh your recollection?

6    A.   Yes, it did.

7    Q.   Did it indicate that he had picked up the money from Ryan

8    Wedding's home?

9    A.   From Ryan Wedding's home and from Ryan Wedding, okay.

10   Q.   Okay.   And --

11                THE COURT:   Once again, ladies and gentlemen, even

12   though counsel -- it is defense counsel eliciting these

13   statements consisting of what Shirani said during a proffer

14   session concerning money he picked up from Mr. Wedding, you

15   may not consider that evidence against Mr. Wedding.   I know

16   it may be counterintuitive because it's Mr. Wedding's own

17   attorney who's eliciting these statements, but you may

18   consider any statements made by Shirani concerning Mr.

19   Wedding only on the issue of Mr. Shirani's credibility, not

20   as evidence against Mr. Wedding.

21                MR. DENIS:   Thank you, your Honor.

22                BY MR. DENIS:   Q.   So it indicated that he picked

23   up 340,000, correct?

24   A.   Well, 340,000 plus the 15 percentage points.

25   Q.   In your recollection did he indicate that that was the

731

1  amount that he picked up from Mr. Wedding or he had just

2  picked up 340,000 from Mr. Wedding's house?

3  A.  That it was $340,000 plus the 15 percent percentage

4  points.

5  Q.  Okay.  And also when the government had asked Mr. Shirani

6  if there was any way he could corroborate this picking up of

7  this 340,000 and, according to you, plus the 15 percent from

8  Mr. Wedding's house, he was asked if he was able to

9  corroborate that, and he indicated he could not; isn't that

10  true?

11  A.  With the exception of another individual being at Mr.

12  Wedding's home.

13  Q.  Correct.

14  A.  But he did not believe that that individual would

15  corroborate his information.

16  Q.  But he never made that statement in the first proffer

17  session, correct?

18  A.  He indicated, yes, that Mr. Wedding's friend Adrian was

19  at the home, but he did not believe that that individual

20  would corroborate his statements due to being Mr. Wedding's

21  friend.

22  Q.  Was that a statement that he said or was that what you

23  deduced from that proffer session?

24  A.  He indicated that.

25  Q.  And he indicated that at the proffer session that was

1    recorded?

2    A.  I do not recall honestly if it was during that session.

3    Q.  If I showed you the report, would that refresh your

4    recollection as to what -- Mr. Shirani making that statement?

5    A.  I have reviewed that report, and that statement in and of

6    itself is not contained in the report.

7    Q.  Okay.  So that statement was not contained in the report,

8    and that statement was not contained in -- on July 17, 2008's

9    proffer session, correct?

10   A.  It does state that Ryan's friend Adrian was at the home

11   at the time that Mr. Shirani picked up the money.

12   Q.  Correct.  That's what Mr. Shirani stated, correct?

13   A.  Correct.

14   Q.  But he never stated that he, Mister -- that Adrian would

15   or would not corroborate that, correct, at that time?

16   A.  That is correct.

17   Q.  Okay.  And at some later time, Mr. Shirani came for

18   another proffer session after the July 17, 2008 proffer,

19   correct?

20          THE COURT:  Counsel, this has already been

21   established.

22          MR. DENIS:  Correct.

23          THE COURT:  The dates have been given now two or

24   three times, so --

25          MR. DENIS:  Okay, your Honor.

1              BY MR. DENIS:   Q.   And at the -- at the later

2    proffer session, Mr. Shirani indicated that he wire

3    transfered $250,000 for Mr. Wedding, correct?

4    A.   That it was conducted through wire transfer?

5    Q.   Or using some means to move money.

6    A.   He never indicated that it was through wire transfer.

7    Q.   How did he indicate he was moving money for Mr. Wedding?

8    A.   Through the same way that he conducted the money

9    transfer -- the transaction for this deal; it was a Middle

10   Eastern money exchange.

11   Q.   And what they would do is they would give the money to

12   this exchange in one location and they could pick up the

13   money in another location, correct, for a fee?

14   A.   That is correct.

15   Q.   And Mr. Shirani indicated that the money that he was

16   moving for Mr. Wedding was for 250,000; is that true?

17   A.   On a prior occasion?

18   Q.   Yes.

19   A.   May I review the report to refresh my memory?

20   Q.   Yes, if that would assist you in refreshing recollection.

21   A.   Okay.  I have reviewed the report.

22   Q.   And do you recall Mr. Shirani indicating that he had

23   moved $250,000 for Mr. Wedding?

24   A.   Mr. Shirani indicated that it was $300,000 during the

25   July 17 proffer.

1          THE COURT:  Once again, ladies and gentlemen, this

2    testimony relates to a supposed transaction, prior

3    transaction, and any statement made by Mr. Shirani to any of

4    the agents in this case may be considered by you only as to

5    Shirani's credibility and may not be considered by you as

6    evidence against Mr. Wedding.

7          BY MR. DENIS:  Q.  And, Ms. Lambert, can you show

8    me where in the report it indicated 300,000 on the first

9    proffer session.

10   A.  Yes.  It's during the first paragraph.

11   Q.  Okay.  And that was for 300,000, correct?

12   A.  That is correct.

13   Q.  And on August 7, 2008, Mr. Shirani indicated that he did

14   a wire transfer -- that the wire transfer that he did

15   previously was for $250,000; isn't that true?

16   A.  Again, there was no wire transfer.

17   Q.  During this money exchange that he had done for Mr.

18   Wedding, allegedly done for Mr. Wedding.

19   A.  Yes.  At that time he said $250,000.

20   Q.  So he had changed the number; isn't that true?

21          MR. GUTIERREZ:  Argumentative.

22          THE COURT:  The objection is overruled.

23          BY MR. DENIS:  Q.  Go ahead, Ms. Lambert.  He had

24   changed the number from 300 to 250,000, correct?

25   A.  The number was different, but it was unclear if it was

1   some confusion based on the percentage point transfer again

2   or if it was simply a change in number.

3   Q.  But you also noted that discrepancy, correct?

4   A.  Yes, we did.

5   Q.  And you had questioned Mr. Shirani why did that figure

6   change a month later, correct?

7   A.  Yes, we did.

8   Q.  And he explained it was the 15 percentage point from in

9   there, correct?

10  A.  No.  According to the report he indicated he did not know

11  why his memory was different based upon the two proffer

12  sessions.

13  Q.  Did he try to explain it away, that it had to deal with

14  the percentage points?

15  A.  I do not recall that.  I can simply state that it was

16  $300,000 during the July 17 session, and on a subsequent

17  session it was $250,000.

18  Q.  And you noted that discrepancy, correct?

19  A.  Yes, we did.

20  Q.  And at that time on the 17th is when Mr. Shirani 'fessed

21  up that -- that Manavie was involved in drug dealing,

22  correct?

23  A.  Yes, it was during that same session.

24  Q.  So at that time he had 'fessed up that Manavie was

25  involved in drug dealing?

736

1           THE COURT:  Counsel, you've asked this question.

2    Let's move on to another question, please.

3           MR. DENIS:  All right.

4           BY MR. DENIS:  Q.  And during the course of this

5    investigation, you had subpoenaed a number of jail calls,

6    correct, between June 13, 2008 and October of 2008, correct,

7    Ms. Lambert?

8    A.  That is correct.

9    Q.  And you had personally subpoenaed them from a federal

10   institution, namely MCC; is that true?

11   A.  A subpoena was completed on my behalf, yes.

12   Q.  Okay.  And you received telephone calls from the jail,

13   correct, in response to that subpoena?

14   A.  Yes, a disk of telephone calls.

15   Q.  Okay.  And also you requested the mail of the

16   individuals, correct?

17   A.  Correct.

18   Q.  Okay.  And during the course of your investigation, you

19   later learned that -- you independently verified that on --

20   that Manavie was conducting a drug transaction with

21   Mr. Shirani over the telephone, correct?

22   A.  As a result of the jail calls?

23   Q.  Yes.

24   A.  No.

25   Q.  Did you ask Mr. Shirani about who the carwash guy was?

1   A.   Yes, we did.

2   Q.   And was that reference made in the jail calls?

3   A.   Yes.

4   Q.   Okay.  And did Mr. Shirani indicate that that individual

5   was assisting him in collecting -- or his brother was

6   assisting in collecting drug proceeds from the carwash guy?

7              MR. GUTIERREZ:  Vague as to what the name is, your

8   Honor.

9              THE COURT:  Overruled.  You may answer.

10             THE WITNESS:  Could you repeat the question,

11  please.

12             BY MR. DENIS:  Q.   During the course of your

13  investigation, you had learned about the identity or -- of a

14  person named the carwash guy, correct?

15  A.   Correct.

16  Q.   And Mr. Shirani was requesting the assistance -- do you

17  recall from who? -- to get drug proceeds for him?  Was it the

18  brother or was it Manavie?

19  A.   Based upon the calls I do not specifically remember if he

20  told anybody to go collect drug proceeds.  I do recall that

21  he was asking his brother to have Maz get the money that

22  somebody owed him, but I do not think that he specifically

23  said get the drug proceeds that he owes me.

24  Q.   Okay.  Did you have those calls translated from Farsi to

25  English to review or this was just based on questions from

1    Mr. Shirani?

2    A.  The calls were not translated, but they were listened to

3    by a translator and summarized.

4    Q.  I'm sorry?

5    A.  Summaries were provided.

6    Q.  And you questioned Mr. Shirani about those activities,

7    correct?

8    A.  Yes.

9    Q.  And he admitted that they were collecting drug money,

10   correct?

11   A.  Again, I would have -- if that is contained in the

12   report, I would have to review the report to refresh my

13   recollection.  I do recall that he said they owed him money.

14   Q.  During the course of your investigation, you learned that

15   Mister -- that Mr. Shirani's brother was assisting him in

16   collecting drug money for Mr. Shirani, correct?

17            MR. GUTIERREZ:  Been asked and answered, your

18   Honor.

19            THE COURT:  Overruled.  You may answer.

20            THE WITNESS:  Again, I do not recall that he said

21   drug money, but that his brother was collecting the money for

22   his bail.

23            BY MR. DENIS:  Q.  And he was to go and see the

24   carwash guy, correct?

25   A.  To go see him or to contact him, yes.

1   Q.  And it was learned that the carwash guy was involved in

2   owing drug money to Mr. Shirani, correct?

3         MR. GUTIERREZ:  Been asked and answered, your

4   Honor.

5         THE COURT:  Sustained.

6         BY MR. DENIS:  Q.  Now, Miss, during the proffer

7   session you also learned that Shirani used another

8   person's -- well, do you recall how many phones Mr. Shirani

9   brought to Los Angeles while he was here between June 10 and

10   June 13, 2008?

11   A.  He had a personal BlackBerry and then there was one other

12   cell phone.

13   Q.  And the other cell phone was not in his name, correct?

14   A.  That is correct.

15   Q.  And the BlackBerry also wasn't in his name; isn't that

16   true?

17   A.  That I do not know.

18   Q.  You don't recall that in the proffer session of July 17,

19   2008?

20   A.  No, I do not recall that.

21   Q.  Okay.

22         THE COURT:  Ladies and gentlemen, I think now is an

23   appropriate time to take our midmorning recess, 15 minutes.

24   Please remember the admonition.  Thank you.

25         MR. DENIS:  Thank you, your Honor.

 1            THE COURT:  Counsel?

 2        (Following is a sidebar conference.)

 3            THE COURT:  Let's keep this moving.

 4            MR. DENIS:  I have a transcript.  I apologize.  I

 5    don't have that.

 6            THE COURT:  Let's just keep it moving.  All

 7    questions are being asked and answered several times now.

 8    Keep it moving.

 9            MR. DENIS:  Yes.

10            THE COURT:  We have to keep this moving.

11            MR. DENIS:  Yes.

12            THE COURT:  You're losing the jury.  The jury is

13    kind of -- they look like, I don't know, looks like a

14    cornfield that a hurricane's come through.

15            MR. GUTIERREZ:  The only problem I have, your

16    Honor, is that a lot of these statements are coming out,

17    they're not inconsistent with what Shirani said.

18            THE COURT:  I know, I know.  It's just -- just get

19    through the examination.  And what's your -- when do you

20    think you'll be done with your witnesses?  I'm trying to plan

21    here for going over jury instructions and argument.

22            MR. DENIS:  I should be done tomorrow.

23            THE COURT:  Okay.

24            MR. DENIS:  I can give you a lineup of what I have

25    today.  I can give you that right after the lunch break.

1    I'll verify who's here and --

2              THE COURT:  What time tomorrow?

3              MR. DENIS:  Hopefully before the lunch break, by

4    lunch.

5              THE COURT:  Okay.  If I can just suggest something.

6    If you'd just keep -- if you can refrain from asking and

7    answering questions two and three times --

8              MR. DENIS:  Right.

9              THE COURT:  -- that will really help the

10   examination and just getting through our witnesses so you can

11   keep the case moving.

12             MR. DENIS:  Okay.

13             THE COURT:  All right.

14             MR. DENIS:  Apologize.

15        (Sidebar conference concludes.)

16        (There was a break in the proceedings.)

17        (The jury entered the courtroom.)

18        (Following is a sidebar conference.)

19             MR. DENIS:  Your Honor, there is an issue that came

20   up.  I need to have Shirani made available, and I informed

21   the government, the government informed me just to let him

22   know, and I did that.  Now he's telling me I should go

23   subpoena Shirani here.  He would be my next witness in terms

24   of authenticating his voice.  I know we didn't have him do

25   that when he was here, but he was going for quite some time,

 1    and Mr. Shirani basically --

 2          MR. GUTIERREZ:  That's entirely inaccurate.  I

 3    never told him to rely on me.  I talk to him.  I'm sure if he

 4    would have asked me, I'd be more than happy to --

 5          THE COURT:  I'm sure that's the case.  You know, if

 6    you -- with the history of this case, Mr. Denis -- and

 7    certainly you're privileged to play your hand so close to

 8    your vest that nobody can be of assistance to you in getting

 9    witnesses for you and all -- this is your issue.  If you're

10    asking Mr. Gutierrez to assist you at this point coming --

11    having Shirani recalled, then just ask him.

12          MR. DENIS:  I have.  Could the Court assist me in

13    having Mr. Shirani made available?

14          THE COURT:  Mr. Gutierrez?

15          MR. GUTIERREZ:  Your Honor, the problem is the

16    soonest we can get him here -- well, I'm sure if the Court

17    ordered it, I'm sure they would bring him over; he's at MCC.

18    But we have to do it before twelve o'clock the day before.

19    Anticipating this, your Honor, and attempting whatever I can

20    to be helpful, I've already asked my assistant to make the

21    request for tomorrow.

22          MR. DENIS:  For tomorrow?

23          THE COURT:  Yes.

24          MR. GUTIERREZ:  If you want him today, it would

25    require a court order, and I can't request that; it would

743

1    have to be from the judge.

2            THE COURT:  Okay.  You're going to finish with

3    Lambert?

4            MR. DENIS:  Yes.

5            THE COURT:  You probably won't be much longer with

6    her I'm assuming.

7            MR. DENIS:  Well, I have clips, so there's going to

8    be a bunch of clips coming in through Ms. Lambert.

9            THE COURT:  Have you shown counsel which ones they

10   are?

11           MR. DENIS:  I've given him all the clips that we

12   have.

13           MR. GUTIERREZ:  I don't think there's a

14   foundation -- if any of them are in Russian, your Honor, I

15   would have an objection to the foundation.

16           MR. DENIS:  They're -- the majority of the clips

17   have already been introduced by the government in terms of

18   the transcripts, and the clips -- the additional clips are

19   the four clips that Ms. Sidorova.

20           THE COURT:  She never laid a foundation for those.

21   All she did was say that they're Russian clips and she

22   checked what was on the CD with what is in the transcripts,

23   and what is in the transcripts would be an accurate

24   interpretation or translation of what she listened to on the

25   clips.  But for all I know it's a Russian interpretation or a

1    Russian broadcast of the Chargers game on Sunday.  I mean

2    there's nothing in there tying the contents of those exhibits

3    to this case.

4         MR. DENIS:  She actually verified the CDs that

5    contained the clips in Russian, and that is the English which

6    is going to be projected.

7         THE COURT:  You're not understanding what I'm

8    saying.  There's nothing on the CD or the translation that

9    relates to this case.  You have to have a witness to do that

10   unless Mr. Gutierrez wants to stipulate.  Do you understand

11   what I'm saying?

12        MR. DENIS:  I asked Ms. Johnson.  She produced the

13   CD that has all the calls that she quality checked, and then

14   what we did is we took those calls from that CD which she

15   quality checked, and then Ms. Sidorova took excerpts from

16   them that we requested, which we put on Sanctions, and she

17   listened to those to just square --

18        THE COURT:  I don't doubt what you're telling me.

19   I don't doubt what you're telling me.  But the government is

20   going to be putting you in a position where you have to

21   establish the foundation for that, the causal -- or the

22   foundational links, just as you had them go through all of

23   that exercise without any stipulations.  So I cannot help

24   you.  I cannot -- I cannot order the government to stipulate

25   to the authenticity of what you have here.  Now, look, I

1    don't like sidebars, and I don't like issues that come at the

2    last minute.  Continue on with your examination of --

3              MR. DENIS:  But, your Honor, that's -- that CD was

4    in the discovery.

5              THE COURT:  That's fine, but you have to lay a

6    foundation.  Let's continue on with the examination.

7              MR. DENIS:  Okay.

8         (Sidebar conference concludes.)

9              THE COURT:  Thank you, ladies and gentlemen.  Mr.

10   Denis, please.

11             MR. DENIS:  Thank you, your Honor.

12             BY MR. DENIS:  Q.  Ms. Lambert, you indicated there

13   was a CD recording, correct, of the -- of the July 17, 2008

14   proffer session, correct?

15   A.  Correct.

16   Q.  And that proffer session was in the English language,

17   correct?

18   A.  Correct.

19   Q.  Going to show you what has been marked Defense Exhibit

20   XXX.  XXX is a certified transcript --

21             THE COURT:  Have you seen that, Mr. Gutierrez?

22             MR. GUTIERREZ:  No, I haven't, your Honor.

23             THE COURT:  Well, rather than saying what it is,

24   counsel, just provide it to the witness and see if she

25   recognizes it, please.

1    BY MR. DENIS:   Q.   Ms. Lambert, have you had an

2    opportunity to look through the words in the transcript and

3    see if you recall the statements or conversations made in the

4    proffer session?

5         MR. GUTIERREZ:   Object as to Rule 403 with regard

6    to the question as phrased.

7         THE COURT:   I think counsel is asking the witness

8    if she recognizes the document, if she's seen it before.   Is

9    that correct, Mr. Denis?

10        MR. DENIS:   No, your Honor.

11        THE COURT:   Okay.   Well, I'll sustain the

12   objection.

13        BY MR. DENIS:   Q.   Okay.   Could you look at the

14   document and see if the transcript is what occurred at the

15   proffer session based on the CD recording -- strike that.

16   For your testimony here today did you listen to the CD

17   proffer session with Mr. Shirani and the government,

18   including yourself?

19   A.   No, I did not.

20   Q.   Okay.   But you recall that proffer session CD being made,

21   correct?

22   A.   Yes.

23   Q.   And that CD was -- do you recall it was made in two

24   parts?

25   A.   That the CD was made in two parts?

1    Q.   Strike that.   There was a recording made at the proffer

2    session, correct?

3    A.   Yes.

4    Q.   And I've handed you a transcript.   And looking at that

5    transcript, does it remind you of the proffer session that

6    was contained in the CD?

7              MR. GUTIERREZ:   Relevance as to whether it reminds

8    her of it, your Honor.

9              THE COURT:   The objection is sustained.

10             BY MR. DENIS:   Q.   Would the transcript of the

11   proffer session refresh your recollection as to whether or

12   not Mr. Shirani -- if he in fact made the statement --

13   discussed the BlackBerry not being in his name?

14   A.   If it is contained in the transcript, it would refresh my

15   memory.

16   Q.   Okay.   Let me direct you to page 44 of the transcript.

17   And, again, you were at that proffer session, correct?

18   A.   Yes, I was.

19   Q.   And you asked questions of Mr. Shirani, correct?

20   A.   Yes.

21   Q.   Okay.

22   A.   Can I remove this binder?

23   Q.   Huh?

24   A.   Can I remove this?

25   Q.   Yes.

1   A.  Is there anything in particular on page 44?

2   Q.  Yes, looking at lines 5 through 13.

3         THE COURT:  Ms. Lambert, there is no question

4   pending.  Counsel has just asked you to look at something,

5   look at some lines on a piece of paper.  The piece of paper

6   hasn't even be identified yet as part of a transcript.

7   Counsel, do you have another question?

8         MR. DENIS:  Yes.

9         BY MR. DENIS:  Q.  Do you -- does reviewing at that

10   transcript refresh your recollection as to the BlackBerry not

11   being in Mr. Shirani's name?

12   A.  It does.

13   Q.  Okay.  And the BlackBerry was not in Mr. Shirani's name,

14   correct?

15   A.  According to this transcript, Mr. Shirani stated --

16         THE COURT:  Ms. Lambert, that is not a transcript,

17   it has not been identified as a transcript, and if -- the

18   question is whether it refreshes your memory, not what that

19   piece of paper says.  Does that refresh your memory as to

20   what was said by Shirani regarding the ownership of a

21   BlackBerry.  If it does, then you can testify as to what your

22   refreshed memory is; if it doesn't, then you may indicate it

23   does not.

24         THE WITNESS:  I do not recall Mr. Shirani making

25   that statement.

1          BY MR. DENIS:   Q.   And reading the transcript does

2    it refresh your recollection whether he said that the

3    BlackBerry was not in his name?

4    A.   Reading --

5    Q.   Just looking at the transcript.

6          MR. GUTIERREZ:   Relevance, hearsay, just looking at

7    the transcript, your Honor.

8          THE COURT:   The objection is sustained.

9          BY MR. DENIS:   Q.   If I were to play the portion of

10   the CD of the proffer, would that refresh your recollection?

11         MR. GUTIERREZ:   Calls for speculation, lack of

12   foundation at this point, relevance.

13         THE COURT:   The objection is sustained on it

14   calling for speculation and lack of foundation with respect

15   to any CD that would be played at this time.

16         BY MR. DENIS:   Q.   Ms. Lambert, looking at page 44

17   and reading from page 43 through the middle of 44, does that

18   refresh your recollection as to statements made at the

19   proffer session?

20         MR. GUTIERREZ:   Lack of foundation for refreshing

21   recollection.

22         THE COURT:   The objection is overruled.   The

23   witness is merely being asked if looking at certain lines on

24   a typewritten piece of paper refreshes her memory.

25         BY MR. DENIS:   Q.   Could you -- does it refresh

1    your recollection as to what was said at the proffer session?

2    A.  It refreshes my recollection about some of the

3    statements, yes.

4    Q.  And did Mr. Shirani indicate that the BlackBerry was not

5    in his name as well?

6    A.  As I stated before, I do not recall Mr. Shirani making

7    that statement.

8    Q.  Going to ask you to look at the first page of the

9    document.  What does the document purport to say on the first

10   page?  Do you see --

11   A.  Yes.

12          MR. GUTIERREZ:  Objection; hearsay and relevance.

13          THE COURT:  The objection is sustained.

14          BY MR. DENIS:  Q.  Do you recall asking Mr. Shirani

15   the question which is on line 5, which phone, the one that

16   you brought down, not in your name or in the BlackBerry?  Do

17   you remember asking that question of Mr. Shirani about

18   placing calls on his phone?

19   A.  Prior to reading this I did not recall asking him that

20   question.

21   Q.  And after reading the transcript, does it refresh your

22   recollection of you asking that question of Mr. Shirani?

23   A.  Again, I do not remember asking Mr. Shirani that

24   question, nor do I remember his answer to that question.

25   Q.  And reading the transcript, did it not refresh your

1    recollection as to the question that --

2              THE COURT:  Counsel, she's --

3              MR. GUTIERREZ:  Objection.

4              THE COURT:  It's been asked and answered.  Just

5    move on to another area, please.

6              MR. DENIS:  Okay.

7              BY MR. DENIS:  Q.  Ms. Lambert, during the course

8    of your investigation, did you check whose name the

9    BlackBerry was under?

10   A.  Honestly, I do not remember that.  The BlackBerry is a

11   Canadian phone, and to my recollection we cannot subpoena

12   Canadian phones.

13   Q.  Okay.  And would the issue have come up whether or not

14   the BlackBerry was Mister -- in fact, Mister -- in Mr.

15   Shirani's name.  Doing your investigation would that issue

16   have come up?

17             MR. GUTIERREZ:  Relevance and vague as to what come

18   up means, your Honor.

19             THE COURT:  The objection is sustained on the

20   second ground.

21             MR. DENIS:  I'm sorry.  What was the second ground,

22   Mr. Gutierrez.

23             MR. GUTIERREZ:  Your Honor, my objection was vague

24   as to what come up means.

25             THE COURT:  Yes.

1          BY MR. DENIS:   Q.   Would the -- would the ownership

2    of phones used in a purported drug transaction been a real

3    issue for you to investigate, Ms. Lambert?

4    A.   Yes, it would.

5    Q.   And as part of your investigation, you would have

6    obtained whether or not that phone was in fact owned or

7    registered to Mr. Shirani; isn't that true?

8    A.   As I stated, it was a Canadian phone, and we cannot

9    subpoena Canadian companies; but we were aware that it was

10   being used by Mr. Shirani.

11   Q.   And you also had a number of proffer sessions with

12   Mr. Shirani where he was answering your questions, correct?

13   A.   Could you -- where he was answering my questions?

14   Q.   Yes, at a proffer, at proffer sessions?

15          THE COURT:   We've established that there were a

16   number of proffer sessions for Mr. Shirani.

17          BY MR. DENIS:   Q.   And during those proffers you

18   would have asked Mr. Shirani the ownership of the BlackBerry;

19   isn't that true?

20   A.   As I stated, Mr. Denis, I do not recall asking

21   Mr. Shirani that question, nor what his response was.

22   Q.   Okay.   And would anything refresh your recollection as to

23   what took place in the proffer session?

24   A.   That is -- that is honestly just something I do not

25   recall.

1    Q.   If I were to play the CD with the actual proffer session

2    where Mr. Shirani is actually informing you of the ownership

3    of the call, would that refresh your recollection --

4    ownership of the phone, would that refresh your recollection?

5    A.   I'm not really -- I'm not really sure about that.

6    Q.   So if I played the call that you were physically present

7    where Mr. Shirani tells you that the phone is not in his

8    name, that would not refresh your recollection, Ms. Lambert?

9    A.   Yes, I would say that it happened, but I can't sit here

10   right now and say yes, I would remember specifically that

11   moment that it happened.

12   Q.   But if I played it and it said that, you wouldn't doubt

13   the accuracy of what that recording said, correct?

14   A.   That's correct.

15   Q.   Okay.  And, Ms. Lambert, you're not trying to be

16   difficult here today, correct?

17   A.   No, absolutely not.  I'm trying to answer your questions

18   to the best of my ability.

19   Q.   Thank you, Ms. Lambert.  And do you recall in the proffer

20   sessions that Mister -- Mr. Shirani indicated that he himself

21   went to pick up the hundred thousand dollars and brought it

22   to the room, correct?

23   A.   Yes.

24   Q.   And he did that when Mr. Wedding was taking a shower,

25   correct?

1   A.   Yes, that Mr. Wedding was in the room but Mr. Shirani

2   went to pick up the money.

3   Q.   And that was by himself, correct?

4   A.   Correct.

5   Q.   And that he placed it himself under the dresser and hid

6   it, correct?

7   A.   Yes, in the presence of Mr. Wedding.

8   Q.   But he indicated he himself placed the money in the

9   dresser and hid it, correct?

10          MR. GUTIERREZ:  Been asked and answered, your

11   Honor.

12          MR. DENIS:  He himself.

13          THE COURT:  The objection is sustained.  Once

14   again, ladies and gentlemen, the statement from Shirani to

15   the agents in the proffer session that Mr. Wedding was

16   present at the time the money was placed under the dresser or

17   the piece of furniture cannot be used as evidence against Mr.

18   Wedding; you may consider that only on the credibility of

19   Mr. Shirani.

20          MR. DENIS:  Thank you.

21          BY MR. DENIS:  Q.  But he specifically told you in

22   the proffer session that he himself went to the store and

23   picked up the hundred thousand dollars by himself, correct?

24          MR. GUTIERREZ:  Been asked and answered, your

25   Honor.

1            THE COURT:  Sustained.

2            BY MR. DENIS:  Q.  Correct?

3            MR. GUTIERREZ:  It's been asked and answered, your

4   Honor.

5            THE COURT:  Counsel, if the question is sustained,

6   you don't need to --

7            MR. DENIS:  Yes, your Honor.

8            THE COURT:  -- ask it again.

9            MR. DENIS:  I apologize.

10           THE COURT:  You have already asked it once,

11   actually twice, and you've gotten your answers.

12           BY MR. DENIS:  Q.  Now, Ryan Wedding's phone that

13   was in Ryan Wedding's name, correct, based on your

14   investigation?

15   A.  I would have to look at the report to refresh my memory

16   on that.  I do not recall if that telephone was in Ryan's

17   name or not.

18   Q.  And which report would you -- would you need to refresh

19   your recollection?  Do you recall which report you would

20   need?  Do you have any of the reports in the investigation

21   with you personally?

22   A.  No, I do not.

23   Q.  I'll get it.  I'll get it.  I'm going to show you what's

24   been previously marked as Defense Exhibit HH.

25   A.  Okay.  I've reviewed the report.

1   Q.  And the phone belonging to Mr. Wedding was in fact in Mr.

2   Wedding's name, correct?

3           MR. GUTIERREZ:  Your Honor, we object as to

4   hearsay, lack of foundation, how this agent would have --

5           THE COURT:  Well, you had about three or four

6   grounds there.  First of all, HH is not in evidence, and so

7   it's not appropriate, Mr. Denis, to ask what is on HH.  But

8   if your question, once again --

9           MR. DENIS:  Refreshes --

10          THE COURT:  -- is whether HH refreshes her memory

11  as to the ownership of the phone, you may --

12          MR. DENIS:  Thank you, your Honor.

13          THE COURT:  -- ask that question.

14          MR. GUTIERREZ:  Well, we would object as to lack of

15  foundation as to how that knowledge would have come to the

16  agent in the first place being that it would be based on

17  hearsay.

18          MR. DENIS:  No, it's --

19          THE COURT:  The objection is overruled.  If it is

20  the case the investigation disclosed that, this witness can

21  answer that.

22          MR. DENIS:  Thank you, your Honor.

23          BY MR. DENIS:  Q.  Go ahead, Ms. Lambert.  Does

24  reviewing Defense Exhibit HH refresh your recollection as to

25  the ownership of Mr. Wedding's phone?

1  A.  It does not to the ownership.  This was the phone that

2  was taken from Mr. Wedding at the time of his arrest, which

3  was in his possession, but as far as the actual subscriber

4  information, it is not contained here.

5  Q.  And you did not investigate to see if in fact Mr. Wedding

6  owned that phone?

7  A.  Again, that is the same circumstance as Mr. Shirani's

8  BlackBerry, that it's a Canadian phone and we cannot subpoena

9  Canadian companies.

10 Q.  But you have no information that Mr. Wedding -- that this

11 phone did not belong to Mr. Wedding, correct?

12 A.  That it did not belong?  No.  Like I said, at the time of

13 his arrest, it was in his possession.

14 Q.  Okay.  And, Ms. Lambert, if in fact Shirani's phones were

15 in different people's names, that would be considered

16 identity theft here in the United States, correct?

17          MR. GUTIERREZ:  Calls for speculation, legal

18 conclusion.

19          THE COURT:  Sustained.

20          BY MR. DENIS:  Q.  Have you investigated identity

21 theft during your term in the FBI?

22          MR. GUTIERREZ:  Relevance, 403.

23          THE COURT:  The objection is sustained on each of

24 those grounds.

25          BY MR. DENIS:  Q.  Now, Ms. Lambert, you were --

1   there were a number of recordings in this investigation,

2   correct?

3   A.   That is correct.

4   Q.   And these were consensual recordings by the confidential

5   source, Yuri Trofimov, correct?

6   A.   Correct.

7   Q.   And you had an opportunity -- as the co-case agent, you

8   had reviewed those recordings, correct?

9   A.   I reviewed the transcript of the recordings.

10  Q.   Okay.  And those were transcripts that were prepared by

11  Ms. Johnson?

12  A.   Throughout the course of the investigation, there were

13  the initial draft transcripts; I reviewed those as well as

14  the Sanction transcripts by Ms. Johnson.

15  Q.   Okay.  Going to share with you a clip -- and you were on

16  the investigation on June 3 of '08, correct?

17  A.   Yes.

18         MR. GUTIERREZ:  Your Honor, if I could see this

19  before it's shown to the jury.

20         THE COURT:  Well, I think counsel understands that

21  before anything is shown to the jury for evidentiary purposes

22  or even to refresh memory, to see if it refreshes memory, it

23  must be shown to you, Mr. Gutierrez.

24         MR. DENIS:  This was previously identified as

25  Defense Exhibit A.

```
 1            THE COURT:  All right, counsel.  If you don't have
 2   a transcript to show Mr. Gutierrez, then deal with it at a
 3   later time.  I don't want to take any more time here creating
 4   more down time with the jury present.  Just move on to the
 5   next line of questioning if you can and have your
 6   assistant --
 7            MR. DENIS:  We'll give Mr. Gutierrez the clips so
 8   he can have the actual clip and it corresponds to his
 9   exhibit.
10            THE COURT:  Mr. Denis, would you please ask another
11   question, sir.  We've had three or four minutes go by now.
12            MR. DENIS:  Yes, your Honor.
13            THE COURT:  All right.
14            BY MR. DENIS:  Q.  I'm going to play the clip
15   for --
16            MR. DENIS:  Your Honor, can we play this, and if
17   Mr. Gutierrez objects we'll deal with it at a --
18            THE COURT:  No, that's not the way it works.
19            MR. DENIS:  Okay.
20            MR. GUTIERREZ:  Your Honor, this is the first time
21   we're seeing this.  If I could just have a moment to check
22   and see --
23            THE COURT:  Mr. Denis, what I suggest is just move
24   to another area and give Mr. Gutierrez --
25            MR. DENIS:  I will.
```

1          THE COURT:  -- and his people there an opportunity

2    to look at it and check it for accuracy, and let's keep

3    moving.

4          MR. DENIS:  I'll do that.  I apologize, your Honor.

5          THE COURT:  Thank you.

6          BY MR. DENIS:  Q.  Ms. Lambert, you also -- and in

7    the recordings there was -- there was discussion that the

8    people that were in this business had been in this business

9    for -- who were coming down to -- to California had been in

10   this business for more than ten years, correct?

11         MR. GUTIERREZ:  Object as to hearsay, your Honor,

12   as phrased.

13         THE COURT:  The objection is sustained.  Ladies and

14   gentlemen, please disregard any implication in that question

15   whatsoever that Mr. Wedding was involved in this business,

16   whatever this business refers to, for a period of ten years.

17         BY MR. DENIS:  Q.  In the recordings there was

18   discussions with Michael Krapchan and the confidential source

19   as to individuals that were coming down to California,

20   correct, Ms. Lambert?

21         MR. GUTIERREZ:  Your Honor, we'd object to "in the

22   recordings" is essentially having this witness testify about

23   what the recordings say.

24         THE COURT:  The objection is sustained.

25         BY MR. DENIS:  Q.  And these statements were

1    made -- do you recall the statements of individuals that were

2    coming down to California had been in the business for more

3    than ten years?  Do you recall those statements?

4              MR. GUTIERREZ:  Same objection, your Honor.

5              THE COURT:  Well, the objection is overruled.  Is

6    your question whether this witness recalls Shirani making a

7    statement that certain individuals --

8              MR. DENIS:  Michael Krapchan making a statement to

9    the confidential source.

10             THE COURT:  -- making a -- the objection is

11   sustained insofar as it relates to any statement made by

12   Mr. Krapchan.

13             MR. DENIS:  As a co-conspirator statement, your

14   Honor?

15             THE COURT:  No, this is made during investigation.

16   A co-conspirator statement is admissible only if it's made in

17   the course of and in furtherance of a conspiracy.  That

18   cannot be the case if you're eliciting a statement made by

19   Mr. Krapchan to this investigator after the investigation.

20             MR. DENIS:  No.

21             THE COURT:  The objection is sustained.  Move to

22   another question, please.

23             MR. DENIS:  Okay.

24             BY MR. DENIS:  Q.  Ms. Lambert, do you recall the

25   statement that was made to -- by Michael Krapchan to the

1   confidential source about individuals that were coming to

2   California to do this business have been in the business for

3   more than ten years?

4   A.   I do not recall that specific statement.

5   Q.   If I were to show you the clip, would that refresh your

6   recollection?

7   A.   Yes, it would.

8   Q.   Okay.

9           MR. GUTIERREZ:  Your Honor, to refresh recollection

10   would require it being shown to the witness.

11           THE COURT:  Yes, you can't just put that on the

12   screen in front of the jury, Mr. Denis.  But if you have --

13   if you have something you'd like to show the witness on a

14   piece of paper to see if that refreshes her memory --

15           MR. DENIS:  Your Honor, this is a clip -- this is a

16   portion of the conversation that has been already identified

17   and by the government --

18           THE COURT:  Has it been admitted?

19           MR. DENIS:  -- a transcript.

20           THE COURT:  Has it been admitted?

21           MR. DENIS:  I don't believe the transcript has been

22   admitted, but the clips that the government had relied on --

23           THE COURT:  The objection is sustained.  Unless the

24   clip has previously been shown to the jury, the objection is

25   sustained.

1          MR. DENIS:  Your Honor, again, these were clips

2     from the transcripts that the government has identified as --

3     quality checked transcripts that have been identified.  The

4     government has played portions --

5          THE COURT:  Unless it's in evidence, Mr. Denis, the

6     objection is sustained.

7          MR. DENIS:  Then I believe it is in evidence, your

8     Honor.  I'm playing it from the clip that the government had

9     introduced in their exhibit.

10          THE COURT:  All right.  Don't argue further on this

11     point.  You can -- Mr. Gutierrez will have an opportunity to

12     verify that.  Have you shown him --

13          MR. DENIS:  Yes, he has all the clips.

14          THE COURT:  No, no.  Have you shown him this

15     particular clip --

16          MR. DENIS:  Yes.

17          THE COURT:  -- or a page of transcript material on

18     this particular material --

19          MR. DENIS:  Yes, your Honor.

20          THE COURT:  -- the ten-year issue.

21          MR. DENIS:  He has the -- he has all of the clips.

22     It's Exhibit B.

23          THE COURT:  All right.  Continue on.  I'm going to

24     sustain the objection.

25          MR. DENIS:  Your Honor, I guess we'd -- could I

1    have a brief sidebar?

2              THE COURT:  Not at this point.

3              MR. DENIS:  Your Honor, could I --

4              THE COURT:  Not at this point.  Just continue on.

5    Go on to another subject, and then we'll address the other

6    matter at a later time.

7              MR. DENIS:  Okay.

8              BY MR. DENIS:  Q.  Ms. Lambert, do you recall

9    during the course of your investigation that on June 6 that

10   Michael Krapchan asked the confidential source to buy his

11   plane ticket and that he would pay him back when he arrived

12   in the United States?

13   A.  Yes, I do recall that.

14   Q.  And do you recall, Ms. Lambert, that on June 6, 2008,

15   call No. 8, that Mr. Krapchan was going to fly in on Monday

16   and leave Tuesday evening at 6:30 in the evening, correct?

17   A.  That is correct.

18   Q.  And that clip refers to defense exhibit -- which has been

19   previously identified Defense Exhibit D about leaving.  And

20   the -- Michael Krapchan's statement asking the confidential

21   source to pay the ticket, that has been previously identified

22   as Defend Exhibit C for June 6 of '08, call No. 7.

23             MR. GUTIERREZ:  Your Honor, we'd object as to the

24   form of the question for eliciting hearsay and lack of

25   foundation.

1          THE COURT:  Well, the objection is sustained on the

2     second ground, lack of foundation.  And unless the -- unless

3     that particular exhibit is in evidence, then please don't

4     indicate what the content of that, any particular clip or

5     transcript may be.

6          MR. DENIS:  Okay.

7          BY MR. DENIS:  Q.  And, Ms. Lambert, do you recall

8     on June 6, 2008, call 12, which has been previously

9     identified as Defense Exhibit E, there was a transcript where

10    the confidential source and Michael Krapchan were discussing

11    who was in the deal, and it indicated that the Iranian is in

12    the deal?  Is that correct?

13    A.  That is correct.

14         MR. GUTIERREZ:  Your Honor, we're going to object

15    as to -- the transcripts are not in evidence, the recording's

16    in evidence, and we'd object as to form and lack of

17    foundation.

18         THE COURT:  The objection is sustained.  Counsel, I

19    think you can ask the question without making any reference

20    to particular exhibit numbers, especially if the exhibit

21    number has not been received into evidence.  If your question

22    is whether the witness overheard that statement being made or

23    whether her investigation indicated the statement was made, I

24    think that's fair; you can do that.

25         MR. DENIS:  And, your Honor, just for the record

 1    these are recordings -- these are state clips from the

 2    recordings already admitted by the government.

 3            THE COURT:  If they're admitted, then you can

 4    indicate to Mr. Gutierrez what exhibit number it is and show

 5    him that it's been admitted.

 6            MR. DENIS:  Okay.

 7            THE COURT:  While you're doing that -- go ahead and

 8    do that, Mr. Denis, right now, please.  Ladies and gentlemen,

 9    I know we've had so many stops and starts, and the Court has

10    had to interject a few times on the questioning and hopefully

11    gently reminding counsel that certain questions have been

12    asked and answered.  It is a valid objection to be made, and

13    the Court does have the responsibility of seeing that the

14    examination of all witnesses moves along and that we don't

15    have the kinds of delays and interruptions and down time that

16    we've been experiencing.  Please do not let any objections

17    made by counsel nor the Court reminding counsel from time to

18    time that questions have been asked and answered influence

19    you in any way in your determination of the facts.  I mean

20    you cannot draw any negative inferences with respect to Mr.

21    Wedding as a result of the objections made by the government

22    or my having to remind counsel to move along or try to do his

23    best to eliminate these periods of time between questions.

24    It's very important that you not consider that when

25    considering Mr. Wedding's circumstances in this case.  And so

1   be patient and we'll just continue to move on as

2   expeditiously as we are able to.  And I do very much

3   appreciate your willingness to abide by that instruction.

4   How are we doing, counsel?

5           MR. DENIS:  We're doing fine.  The government has

6   confirmed Exhibit A, so we will play the clip for Exhibit A.

7           THE COURT:  Okay.  Is that what you're doing right

8   now or are you --

9           MR. DENIS:  Yes, your Honor.

10          THE COURT:  Okay.  Exhibit A relates to what clip

11  the governed played.

12          MR. GUTIERREZ:  Exhibit 19, your Honor.

13          THE COURT:  Exhibit 19, clip what?

14          MR. GUTIERREZ:  Your Honor, it doesn't pertain to a

15  government clip; it pertains to --

16          MR. DENIS:  Transcript.

17          MR. GUTIERREZ:  A transcript of the recording that

18  was laid for foundation.  The government only played a

19  portion of that --

20          THE COURT:  Okay.

21          MR. GUTIERREZ:  -- recording.

22          THE COURT:  All right.  So Exhibit A -- you have no

23  objection to Exhibit A --

24          MR. GUTIERREZ:  Coming in as --

25          THE COURT:  -- played at this time in audio form.

1          MR. GUTIERREZ:  If they could identify the clip for

2    the record.

3          MR. DENIS:  This will be Defense Exhibit Clip A or

4    Exhibit A, which is our clip.

5          THE COURT:  Clip 1?  Are there any other clips to

6    be played from Exhibit A; do you know?

7          MR. DENIS:  Not from our Exhibit A, no, your Honor.

8          THE COURT:  Okay.  And do you have a transcript of

9    that?

10         MR. DENIS:  Yes, your Honor.

11         THE COURT:  Okay.

12         MR. DENIS:  And it's been provided to the

13   government.

14         THE COURT:  Thank you.

15         MR. DENIS:  Thank you, your Honor.

16      (Exhibit No. A identified.)

17      (The audio recording was played.)

18         THE COURT:  Is that a conversation of June 6?

19         MR. DENIS:  That is a conversation of June 3, your

20   Honor, 2008.

21         THE COURT:  Thank you.

22         BY MR. DENIS:  Q.  Ms. Lambert, do you recall that

23   conversation by looking at the clip or looking at the clip?

24   A.  I recall reviewing that transcript.

25   Q.  And on June 3 the confidential source is -- Michael

1    Krapchan indicates that he's flying in alone or you --

2              MR. DENIS:  Can you put the clip up, the first

3    part?

4              THE WITNESS:  Mr. Denis, do you have a copy that I

5    can look at?

6              MR. DENIS:  Yes.

7              THE COURT:  And you might as well keep the sound

8    down on it because no one can understand the Russian that is

9    spoken; it might be a little distracting when the volume is

10   up that high.

11             THE WITNESS:  Thank you.

12             BY MR. DENIS:  Q.  And on June 3 -- I'm looking at

13   the first part -- the confidential source says flying in

14   alone, correct?  You fly in with the person who is going to

15   pick it up?

16   A.  Well, it's actually a broken statement; it says you are

17   not flying alone, correct?

18   Q.  Okay.  And he indicates -- and he indicates that

19   Mr. Krapchan is flying with the person who is going to pick

20   up the money.  Correct?

21   A.  It's not clear if he's staying pick up the money or pick

22   up the drugs.

23   Q.  So then he -- he indicates that he's flying in with

24   someone who's going to pick it up, correct?

25   A.  I believe that the source is asking him if he's going to

1   fly in --

2   Q.   -- alone?

3   A.   Yes.

4   Q.   Or is he flying in with someone who's going to pick it

5   up?

6   A.   Correct.

7   Q.   Okay.  And that's on June 3, 2008, correct?

8   A.   Correct.

9   Q.   I'm going to -- which government has already seen -- clip

10  E for June 6, 2008, call 12.

11          (The audio recording was begun.)

12          THE COURT:  Well, hold on now.  What's being

13  played?

14          MR. DENIS:  It is clip E, first --

15          THE COURT:  You mean Exhibit E?

16          MR. DENIS:  Exhibit E, correct.  I apologize, your

17  Honor.

18          THE COURT:  Okay.  Does it have a clip designation

19  or --

20          MR. DENIS:  As Exhibit E.

21          THE COURT:  Okay.

22          MR. GUTIERREZ:  For the record it corresponds to

23  the transcript that's in for the record of Exhibit 23.

24          THE COURT:  Okay.  And just as a foundation, you

25  want to give the jury a head's up, what date are we talking

1    about?

2            MR. DENIS:  We're talking about June 6, 2008, call

3    No. 12.  The Iranian is in the deal, gives the money.

4        (The audio recording was played.)

5            MR. DENIS:  Okay.  Is that the right one?  I

6    apologize.  Technical issues, your Honor.  Once we resolve

7    that --

8            BY MR. DENIS:  Q.  And, Ms. Lambert -- and on

9    June 6, 2008, call 5, there was conversations that by June 6,

10   2008, the tickets were bought for the individuals that were

11   coming down to California, correct?

12   A.  I do not recall that.

13   Q.  Okay.  Play for you which has been previously marked as

14   Exhibit G, which the government had already indicated that we

15   have --

16           MR. GUTIERREZ:  Your Honor, G corresponds with

17   Government's Exhibit 24 for the record.

18           THE COURT:  Thank you.  Date of the conversation,

19   please.

20           MR. DENIS:  June 6, 2008, call 15.

21       (The audio recording was played.)

22           BY MR. DENIS:  Q.  Ms. Lambert, it indicates at the

23   bottom of the clip -- do you see there it says did you

24   already buy all -- all that?  And Mr. Krapchan says huh?  The

25   confidential source:  Did they at least buy the tickets or

1    not?  And, the last line, the last two lines, the tickets are

2    bought, yeah, the tickets are bought.

3               So on June 7, 2008 the tickets had been bought for

4    the individuals that were coming down, correct, according to

5    Mr. Krapchan?

6    A.  I'm sorry.  Did you say this call was on the 6th or the

7    7th?

8    Q.  On the 7th.  I apologize.

9    A.  Okay.  So according to the statements of Mr. Krapchan,

10   the individuals who were flying down had purchased their

11   tickets.

12   Q.  Or that the tickets had been purchased for the

13   individuals, correct?

14   A.  I don't -- I don't see that it says they'd been purchased

15   for them.  I think it said that they have their tickets.

16   Q.  And at the last line, the tickets are bought, yeah, the

17   tickets are bought, they at least -- did they at least buy

18   the tickets or not?  The tickets are bought, yeah, the

19   tickets are bought.  That's what it says on the clip,

20   correct?

21   A.  I guess that's what it said.

22   Q.  I'm going to play for you a clip which has been

23   previously marked as Defense Exhibit L, which is in evidence.

24   That is an excerpt from June 10, 2008 after the individuals

25   arrived at LAX.  Mister -- the confidential source and

1  Mr. Krapchan had left to San Diego, correct?

2  A.   That is correct.

3       (Exhibit No. L identified.)

4  Q.   And at that time the confidential source asked

5  Mr. Krapchan who was involved in the deal, correct?

6  A.   Correct.

7  Q.   And who was due a share, correct?

8  A.   Correct.

9  Q.   And let's play that.

10          MR. GUTIERREZ:   Your Honor, for the record that

11  clip on June 10, 2008 corresponding to Government's Exhibit

12  26.  I believe it will be labeled Defense Exhibit L.

13          THE COURT:   It's already been admitted as Exhibit

14  L?

15          MR. DENIS:   Yes, your Honor.  We're going to play

16  the clip.

17       (The audio recording was played.)

18          BY MR. DENIS:   Q.   Stop it, please.  So Miss --

19  during the conversation they -- the subject comes up as to

20  Rick, Rick or Brian, Brian.  Do you recall that clip?  Was it

21  on Exhibit L where Mister -- the -- Mister -- the

22  confidential source asks about the second one, what's his

23  name, Rick, or Ruck, and Mr. Krapchan Bri or Brian,

24  confidential source, Brian?

25  A.   Yes, I recall that.  I recall that clip.

1   Q.  And at that conversation they're discussing about Brian

2   or Ryan, whatever the second individual was with Mr. Shirani,

3   correct?

4   A.  That is what I would assume.

5   Q.  Okay.

6        (The audio recording was played.)

7            BY MR. DENIS:  Q.  Stop there.  So it indicates the

8   confidential source, ask this guy Bri or Brian from

9   Mr. Krapchan, if he's due a share.  Do you recall that

10  portion of the transcript?

11  A.  I do recall reading that.

12  Q.  And Mr. Krapchan indicates he's not due a share, he's --

13  let's continue the clip --

14       (The audio recording was played.)

15           BY MR. DENIS:  Q.  He's hired to work, so to speak,

16  accompany, help.  Stop there.  And that Hassan is the main

17  person, Hassan is the main person, correct?  Is that what the

18  clip says so far?

19  A.  Yes, it does say that Brian or Ryan is hired to help and

20  that Mr. Krapchan's understanding is that Hassan was the main

21  person.

22  Q.  But the actual transcript says he's hired to work, hired

23  to work, so to speak.  And it indicates -- and you have the

24  transcript in front of you -- accompany or help, that Hassan

25  is the main person.  That is what the clip indicates,

1    correct?

2    A.   Yes.  As I said, that he was hired to work or --

3    Q.   What is the whole -- according to what you have there,

4    what does it say?

5    A.   You gave me a whole stack.  Which one is it?

6    Q.   It is Exhibit L on -- page 2 of Exhibit L.

7    A.   Yes.  As I stated, Mr. Krapchan stated that he's -- and I

8    guess that they are referring to Brian or Ryan -- is hired to

9    work, so to speak, accompany, help.

10   Q.   Okay.

11   A.   Hassan is the main person.

12   Q.   That Hassan was the main person.  And --

13        (The audio recording was played.)

14        BY MR. DENIS:  Q.  Stop it there.  And Hassan -- it

15   indicates Hassan, his share was four or five kilograms of

16   cocaine?

17   A.   Yes, that is what Mr. Krapchan stated.

18   Q.   And Mr. Krapchan also stated what their share --

19   Mr. Krapchan's share was with the confidential source and

20   Elmar, correct, as five?

21   A.   I don't believe it says with the confidential source.  I

22   think he says ours are, meaning himself and Mr. Akhundov.

23   Q.   As far as your investigation, was there some discussion

24   that the confidential source was going to get one kilo of

25   cocaine as well?

1    A.   No.

2    Q.   You don't recall that?

3    A.   No, I do not recall that.

4    Q.   If Mr. Kalina indicated that, is he wrong or --

5              MR. GUTIERREZ:  Calls for speculation, your Honor.

6              THE COURT:  Sustained.  Counsel, would you use the

7    microphone, please.

8              MR. DENIS:  Yes, your Honor.  I have difficulty

9    seeing.  I forgot to bring my glasses.  Would you please

10   continue with that clip.

11        (The audio recording was played.)

12            BY MR. DENIS:  Q.  Stop there.  So -- so Hassan's

13   and Michael Krapchan portion with his group, that represented

14   half of the number of kilograms, correct?

15   A.   I'm sorry.  Could you repeat the question.

16   Q.   The five kilograms for Mr. Shirani or for Hassan and the

17   other four or five to Mr. Krapchan, that represented half,

18   correct, according to the transcript?

19   A.   According to this transcript.

20   Q.   And the confidential source then asked that was about

21   ten, and the -- and he goes that represents half and -- go

22   ahead.

23        (The audio recording was played.)

24            BY MR. DENIS:  Q.  And the rest was his brother's.

25   Play the rest of the clip.

1        (The audio recording was played.)

2            BY MR. DENIS:  Q.  It indicated the remaining half

3    belonged to Hassan's brother, correct?

4    A.   According to Krapchan's statements.

5    Q.   Okay.  After -- during the course of your investigation,

6    after this June 10 transcript, had that position in any of

7    the other conversations, did that every change?  Strike that.

8    Were there any recorded calls subsequent to this on June 10,

9    2008 that Mr. Wedding was due a share in this drug

10   transaction that took place?

11   A.   There was a call that indicated that, yes.

12   Q.   That indicated what?

13   A.   That Mr. Wedding was not simply a helper but that he was

14   more than that.

15   Q.   When you refer to a call -- now, let me ask the question

16   this way.  After the June 10, 2008 statement made there,

17   correct -- and you recall this was made when the confidential

18   source and Michael Krapchan were driving back to San Diego,

19   correct?

20   A.   Correct.

21   Q.   From June 10 through June 13, there was no call that

22   indicated that Michael -- that Ryan Wedding was due any share

23   in the drug proceeds, correct?

24   A.   That is not correct.  As I stated earlier, Mr. Krapchan

25   did have a call with the confidential source that Mr. Wedding

```
 1  was not just a helper.
 2  Q.  Was that a phone call that was recorded?
 3  A.  Yes.
 4  Q.  Do you recall the date of that phone call?
 5  A.  I do not recall the date.
 6  Q.  And according to your memory of what that phone call was,
 7  how much was Mr. Wedding due?  What was his share in the drug
 8  transaction?
 9  A.  It did not state a specific amount of a share that he was
10  due.  As I stated, Mr. Krapchan just indicated that he was
11  more than a helper.
12  Q.  And you indicated you don't recall the date of that
13  transcript, correct?
14  A.  Off the top of my head, I do not recall it, but if I had
15  the transcripts, I'm sure I could refresh my memory.
16  Q.  Do you recall the date that transcript was made?
17          MR. GUTIERREZ:  Asked and answered, your Honor.
18          THE COURT:  Sustained as to just the last question.
19          BY MR. DENIS:  Q.  Are you indicating that -- now,
20  during that same conversation on the 10th, there was an issue
21  where Michael Krapchan asked the confidential source to use
22  his credit card, correct, to check into the hotel?
23  A.  During that call that we just reviewed?
24  Q.  Yes.  Not the one we just reviewed, but during the ride
25  from LAX to San Diego, there was a discussion where Michael
```

1      Krapchan asked the -- Yuri to use his credit card to check

2      into the room and use the credit card to rent a rental car.

3      Do you recall that conversation?

4      A.   Mr. Krapchan had already checked into his room on the

5      10th.  He checked in on the 9th.

6      Q.   And what I'm saying is on the drive to -- to San Diego --

7      A.   Again, you're speaking of the drive on the 10th?

8      Mr. Krapchan had already checked into his hotel --

9      Q.   Okay.  I'm going to play --

10     A.   -- using his -- using a credit card in his possession.

11     Q.   I'm going to play a clip of this from the 10th on the

12     same Exhibit No. 26.

13               THE COURT:  This is a separate clip, counsel?

14               MR. DENIS:  Yes, your Honor.

15               THE COURT:  The first one was clip 1, correct?

16               MR. DENIS:  I'm sorry, your Honor?

17               THE COURT:  First one would be clip 1 then?

18               MR. DENIS:  This is a different clip from the same

19     conversation.

20               THE COURT:  So shall we call this clip 2?

21               MR. DENIS:  No, this will be called clip -- what

22     we've previously identified as BBB.

23               THE COURT:  Before we play it, what is it now?  Is

24     it -- is this a second clip from the same --

25               MR. DENIS:  Yeah, from the same -- from Exhibit 26,

1   your Honor.

2           THE COURT:  Same recording?

3           MR. GUTIERREZ:  If I may ask, does it reference

4   what has been marked and provided to the government as

5   Exhibit M?

6           MR. DENIS:  It relates to --

7           THE COURT:  Has it been --

8           MR. GUTIERREZ:  Your Honor --

9           THE COURT:  Why don't you do that.  Why don't you

10  just check to see.

11          MR. DENIS:  Correct.  There's a long list.  Exhibit

12  M, but it's a longer -- yes.

13          THE COURT:  I'm informed we don't have an Exhibit

14  M, anything that's been marked as Exhibit M.  Do you have a

15  transcript there that you'd like to mark as Exhibit M?

16          MR. DENIS:  There's a clip.  We've marked the clip

17  as exhibit -- well, it's not going to be Exhibit M, your

18  Honor.  I'm going to play Exhibit BBB, which is --

19          THE COURT:  Is that what this is, BBB?

20          MR. DENIS:  Correct.

21          THE COURT:  Okay.  Why don't you mark it so that at

22  least there's an -- if you can mark whatever is going to be

23  shown right now with an exhibit number, so that'll become a

24  court exhibit should there be any need for --

25          MR. DENIS:  Correct.  All these exhibits have

 1    been -- part 2 -- yeah, we have all the clips for the Court,

 2    your Honor.

 3              THE COURT:  Okay.  So this has already been marked

 4    as Exhibit BBB?

 5              MR. DENIS:  BBB.

 6              THE COURT:  BBB?

 7              MR. DENIS:  BBB.  Thank you, your Honor.

 8         (Exhibit No. Court's BBB identified.)

 9         (The audio recording was played.)

10              BY MR. DENIS:  Q.  Ms. Lambert, do you recall that

11    clip?

12    A.  I do recall that.

13    Q.  And Michael Krapchan indicated to the confidential

14    source, Krapchan says question.  And the confidential source

15    says what.  Krapchan, if I need, unintelligible, would it be

16    all right if I returned the money to you as cash and you'll

17    give your credit card number, it's -- and the confidential

18    source then interjects for the hotel.  And Krapchan indicates

19    no, not for the hotel.  Confidential source asks for what.

20    Krapchan says the hotel, the car, that's fine, for rebooking

21    tickets, a hundred bucks.  Then the source asks a hundred

22    bucks, is yours empty.  And Krapchan says the credit card?

23    My credit card, the one I use is in my daughter's name, the

24    one I have here with me.  The confidential source then says

25    oh.  Krapchan, everything else is all right, but the credit

782

1  card, make a call, I'm using someone else's, the tickets,

2  schematics are all right, I'm saying the rules of the game,

3  that's what they told me, not to use my own credit card so

4  I'm not using it.

5          Mr. Krapchan was asking -- asked the confidential

6  source to use his credit card for the hotel, for tickets, for

7  renting a car.  Do you recall that conversation?

8  A.   That's not correct.  That's not what he's saying.  He's

9  saying that the hotel and the car that's fine.  He needed the

10 money to rebook the flight because, as you stated earlier,

11 the original plan was for him to depart on Tuesday evening,

12 but because the plans had changed and he was going to have to

13 leave later, he needed to rebook his flight, so he wanted to

14 use the source's credit card, according to this conversation,

15 to rebook that flight, which was going to cost $100.

16 Q.   Okay.

17 A.   Because the credit card that he had brought with him was

18 in his daughter's name.  And we did get that credit card at

19 the time of arrest of Mr. Krapchan.

20 Q.   So when -- when the confidential source -- and this is

21 your interpretation of what the transcript says, correct?

22 A.   That is correct because I was not a party to this

23 conversation.

24 Q.   All right.  And the statement that I'm interested in, if

25 you can just focus on there, just says -- confidential source

1    asks, after Mr. Krapchan asks him for his credit card, he

2    says is it for the hotel?

3                MR. GUTIERREZ:  Asked and answered, your Honor.

4                THE COURT:  Sustained.  Counsel, you're just

5    repeating what's already been shown now to the jury twice in

6    the form of rolling script as a part of the audio being

7    played.  So the conversation is what it is.  It's been played

8    twice now for the jury.

9                MR. DENIS:  Okay, your Honor.

10               BY MR. DENIS:  Q.  Now, Mr. Krapchan, on June 11,

11   call No. 1, indicated to the confidential source that -- this

12   is -- this has been previously identified as Defense Exhibit

13   N as in Nancy.

14               MR. GUTIERREZ:  Your Honor, does that correspond to

15   with a government exhibit?

16               THE COURT:  Well, counsel, I have no idea.

17   Perhaps -- we'll do this.  Ladies and gentlemen, we're really

18   close to noon, and in the hopes that counsel can get together

19   and look at the last of these conversations and we can go a

20   little more smoothly, we'll break a little early, a few

21   minutes early.  We'll resume at two o'clock this afternoon.

22   Please remember the admonition not to discuss the case or

23   make any decisions at this time.  Thank you for your patience

24   so far.  We'll see you back here at two o'clock.

25         (The jury left the courtroom.)

1          THE COURT:  We're outside the presence of all

2    jurors.  Counsel, Mr. Denis, I assume you want to avoid

3    what's been happening here.

4          MR. DENIS:  Absolutely, your Honor.

5          THE COURT:  Well, there's one way to do that, and

6    that's to show Mr. Gutierrez what conversations are upcoming

7    and have him go through his material so that this can all be

8    coordinated and we can move more smoothly.

9          MR. GUTIERREZ:  If it matches, your Honor, I'll be

10   happy to stipulate.  I just need to know what it is and --

11         THE COURT:  Well, for some reason Mr. Denis is very

12   reluctant to give you his designations ahead of time, and so

13   the pace of what we're doing at this point is really, really

14   slow and is just wasting a lot of time frankly.

15         MR. DENIS:  I apologize.  I've given the defense --

16   I mean the government -- the clips, your Honor.  We'll go

17   through them right now.  I believe there's just three or four

18   that were not part of the government's introduced

19   transcripts.

20         THE COURT:  Well, what you need to do -- you know,

21   Mr. Gutierrez is not going to agree with you on that as he

22   didn't when we were at the side of the bench discussing how

23   we can better move this along, but what you have right now

24   the terms of your remaining clips I suggest you show him so

25   that -- I mean look, it's a matter of record.  Both sides

1   have this information.  Both sides have these clips.  We're

2   not talking about State secrets here.

3                 MR. DENIS:  The government has the clips, your

4   Honor.  I've given the government --

5                 THE COURT:  Show him what you're next --

6                 MR. DENIS:  Yes.

7                 THE COURT:  -- going to play so that he can verify

8   that and we can just keep this ball rolling.

9                 MR. DENIS:  Thank you, your Honor.

10                THE COURT:  All right.  Very good.

11                MR. DENIS:  We'll remain in the courtroom just for

12  a few minutes?

13                THE COURT:  For a few minutes.  You're going to

14  have to take that up with the CRD.

15                MR. DENIS:  Okay, your Honor.

16          (There was a break in the proceedings.)

17                THE COURT:  All right.  Good afternoon, everyone.

18  We have everyone present.  We are ready to proceed with the

19  examination of Agent Lambert.  Mr. Denis?

20                MR. DENIS:  Thank you, your Honor.  I apologize.  I

21  need one more minute just to get the -- thank you, your

22  Honor.

23                BY MR. DENIS:  Q.  Ms. Lambert, you indicated that

24  the proffer session, that was recorded, correct, between

25  Mr. Shirani and the government on July 19 -- July 19, 2008,

1    correct?

2    A.   I believe it was on July 17.

3    Q.   July 17.   I apologize.

4    A.   Yes.

5    Q.   You indicated that was recorded, correct?

6            MR. GUTIERREZ:   Asked and answered.

7            THE COURT:   Sustained.

8            BY MR. DENIS:   Q.   Going to show you a CD that was

9    prepared by the FBI.

10           MR. GUTIERREZ:   We'd object as to counsel

11   testifying as to what the item is.

12           THE COURT:   Right.   At this point, ladies and

13   gentlemen, just disregard any statement by counsel that this

14   is something prepared by the FBI.   I think counsel has just

15   given this item to the witness at this point, and it's

16   marked --

17           MR. DENIS:   As defense exhibit --

18           THE COURT:   Is this XXX?   No, this is a CD.   Okay.

19           MR. DENIS:   This is YYY, your Honor.

20           THE COURT:   Okay.   Very good.

21       (Exhibit No. YYY identified.)

22           BY MR. DENIS:   Q.   And you recall the CD being made

23   of that proffer session, correct?

24   A.   There was a CD made of that proffer session, yes.

25   Q.   And through the course of discovery, were you made aware

1    that that CD was provided to the defense counsel?

2              MR. GUTIERREZ:  Lack of foundation.

3              THE COURT:  Sustained.

4              BY MR. DENIS:  Q.  Are you aware that the CD was

5    provided to the defense?

6              MR. GUTIERREZ:  Same objection for the same

7    question.

8              THE COURT:  It's the same question, counsel.

9              BY MR. DENIS:  Q.  If I play a portion of the -- as

10   I indicated, if you were to hear a portion of the proffer

11   session, would it have refreshed your recollection as to the

12   BlackBerry belonging to Shirani?

13   A.  As I stated, it would refresh my memory that that

14   question did take place, yes.

15   Q.  Okay.

16             MR. GUTIERREZ:  Your Honor, we would object to --

17             THE COURT:  Don't play anything at this point in

18   front of the jury if it's not in evidence.  Do you have a

19   transcript, Mr. Denis, of --

20             MR. DENIS:  Yes, your Honor.

21             THE COURT:  -- what purports to be some kind of a

22   recording of that session?

23             MR. DENIS:  Correct.  And that was the transcript I

24   provided to the agent.

25             THE COURT:  All right.  Do you have it with you?

1          MR. DENIS:  Yes.

2          THE COURT:  All right.  Is there a -- now, let's

3    just talk about the written transcript.  Is a there a portion

4    of a written transcript you'd like to show this witness at

5    the witness stand to see if any part of that transcript is

6    going to refresh her memory?

7          MR. DENIS:  Your Honor, that is the transcript that

8    I had provided to Ms. Lambert previously.

9          THE COURT:  Okay.  Well, it should be either with

10   Ms. Lambert or on the exhibit table.  Has it been previously

11   marked --

12         MR. DENIS:  Yes.

13         THE COURT:  -- as XXX?

14         MR. DENIS:  As XXX, your Honor.

15         THE COURT:  All right.  Now, if you'd like to show

16   her the transcript and direct her attention to any particular

17   part of what purports to be a transcript and ask her if it

18   refreshes her memory, you can do that.

19         MR. GUTIERREZ:  Your Honor, to our recollection

20   this was already done, but --

21         THE COURT:  Well, you're right.  It's in my notes.

22   Yes, I'll sustain the objection.  Sir, that was already done.

23   It was done earlier.

24         MR. DENIS:  That was done.

25         THE COURT:  It was, yes.  You covered that.

1           MR. DENIS:  And Ms. Lambert indicated that the

2   audio -- she didn't recall, and she indicated the audio

3   portion would refresh her recollection, so I would request --

4           THE COURT:  Well, not at this point, not in front

5   of the jury.  Just delay that until a time when we can

6   discuss it.  If you need to break at this point with this

7   witness and call another witness, we can do that.

8           MR. DENIS:  Okay.  No, I'll continue with Ms.

9   Lambert.

10          THE COURT:  Okay.

11          MR. DENIS:  Thank you.

12          BY MR. DENIS:  Q.  Now, Ms. Lambert, after June 10,

13  2008, after the arrival at LAX, there was no surveillance

14  done on Mr. Wedding and Mr. Shirani, correct?

15  A.  There was surveillance at the airport and for a period of

16  time after the airport.

17  Q.  And that surveillance ended after Mr. Wedding and

18  Mr. Shirani were dropped off at a hotel, correct?

19  A.  They were dropped off out in front of a hotel and

20  subsequently got into a taxi.

21  Q.  Okay.  And no surveillance was conducted after that,

22  correct?

23  A.  That is correct.

24  Q.  And Mister -- the confidential source and Mr. Krapchan

25  drove back to San Diego, correct?

1   A.   That is correct.

2   Q.   And there was surveillance done on that vehicle?

3   A.   Yes.

4   Q.   Okay.  And the only -- and there were phone calls between

5   the confidential source and Michael Krapchan that were

6   recorded, correct?

7   A.   During the course of the investigation?

8   Q.   Yes, during the -- after the 10th through the 13th.

9   A.   Yes.

10   Q.   And during that time, during the 10th through the 13th,

11   at some point the agreement had broken down regarding this

12   drug transaction or this alleged transaction, correct?

13   A.   By broken down --

14   Q.   For example, Mr. Krapchan wanted to see a sample,

15   correct?

16   A.   That is correct.

17   Q.   The sample was not provided, correct?

18   A.   At the time on a specific date?

19   Q.   During the 10th through the 12th.

20   A.   That is correct.

21   Q.   And at some point in time, the confidential source told

22   Michael Krapchan that the deal is off, come back in seven to

23   ten days, correct?

24   A.   I don't recall that it was the source that told

25   Mr. Krapchan that.

1    Q.   So did Mr. Krapchan call off the deal?

2    A.   I believe there was a recording where Mr. Krapchan tells

3    the source that they want to come back in seven to ten days.

4    Q.   And at that time Mr. Krapchan had gotten back on a train

5    and was headed back to Los Angeles, correct?

6    A.   At what particular time are you referring?

7    Q.   On the 13th.

8    A.   Yes, on the 13th Mr. Krapchan traveled from San Diego via

9    train to LA.

10   Q.   And again, from -- after the LAX on the 10th through July

11   12, 2008, there was no surveillance done on either Ryan

12   Wedding or Mr. Shirani, correct?

13   A.   That is correct.

14   Q.   And was there surveillance -- there was surveillance on

15   Michael Krapchan's room; is that right?

16   A.   There was surveillance on the door of Mr. Krapchan's room

17   as well as surveillance of Mr. Krapchan at various times as

18   he left the hotel.

19   Q.   And at one of the occasions between the 11th and 12th,

20   Mr. Krapchan went to -- took a train and went to Anaheim,

21   correct?

22   A.   At the time that he left, we did not know the

23   destination.  We had recordings that he had taken a train to

24   go see them.

25   Q.   And there was no surveillance done at that time

1   between --

2   A.   That is --

3   Q.   -- the 10th and 12th while he took the train to Anaheim,

4   correct?

5   A.   That is correct.

6   Q.   And on the 13th when Mr. Krapchan left San Diego and went

7   to Los Angeles on the 13th, there was no surveillance done on

8   Mr. Krapchan leaving from San Diego to Los Angeles; isn't

9   that true?

10  A.   That is correct.

11  Q.   Now, during the 13th the deal had been called off, and

12  Mr. Krapchan was leaving San Diego to come back in seven to

13  ten days, correct?

14  A.   That is not correct.

15  Q.   Okay.  Was Michael Krapchan on the 13th in the morning --

16  do you know why he left -- why he checked out of his hotel

17  room in San Diego and was leaving to Los Angeles?

18  A.   Based upon the call that he made to the source later that

19  day, he believed that -- because he was unable to get in

20  contact with the source on Thursday night and Friday morning

21  because we had had the source discontinue communication with

22  him until we were able to make some decisions, Mr. Krapchan

23  at that time believed that the source was not going to

24  provide him the sample; so yes, he indicated to the source

25  that he was traveling with the money back to LA.

1    Q.  Isn't it true that the confidential source had indicated

2    to Mr. Krapchan that there was some negatism (sic) on the

3    part of Mr. Krapchan's side, and he instructed him to leave

4    and come back within seven to ten days?

5              MR. GUTIERREZ:  Compound as phrased, your Honor.

6              THE COURT:  Overruled.  You may answer that if

7    you're able to.

8              THE WITNESS:  Could you repeat the question again.

9              MR. DENIS:  Yes.

10             BY MR. DENIS:  Q.  Isn't it true that the

11   confidential source indicated to Mr. Krapchan that because of

12   some negatism (sic) -- negatism (sic) on the part of Michael

13   Krapchan and his group that he asked him to leave for seven

14   to ten days and come back and regroup?

15   A.  Again, I remember that statement of seven to ten days,

16   but I would have to read that transcript to refresh my memory

17   as far as who told whom.

18   Q.  Okay.  Going to show you a portion of a transcript which

19   has been previously identified as Defense Exhibit O --

20             MR. GUTIERREZ:  Counsel, could I see that?

21             MR. DENIS:  Sorry.  June 12, 2008.

22             THE COURT:  You say this is already marked as

23   Exhibit O?

24             MR. DENIS:  Yes, your Honor.

25             THE COURT:  Okay.

1           MR. GUTIERREZ:  Thank you.

2       (Exhibit No. Court's O identified.)

3           BY MR. DENIS:  Q.  And once you read the

4   transcript, let me know when your memory has been refreshed.

5   A.   Yes, I remember.

6   Q.   And -- and the confidential source on the 12th indicated

7   that because of some negatism (sic) coming from

8   Mr. Krapchan's side, there's these constant changing of the

9   plans, he called off the deal; isn't that true?

10  A.   That is not correct.

11  Q.   When did -- when did Michael Krapchan or Yuri call off

12  the deal?

13  A.   The deal was never called off.

14  Q.   When did the -- when did the confidential source tell

15  Mr. Krapchan to leave and come back in seven to ten days?

16  A.   Again, I told you I remember that time period being

17  mentioned; I don't remember if it was Mr. Krapchan that said

18  at the direction of them, meaning Mr. Wedding and Shirani,

19  that he was going to come back in seven to ten days, or if

20  the source had instructed him that.

21  Q.   But when Mr. Krapchan had left San Diego and was leaving

22  to Los Angeles, had the deal been called off at that time on

23  the 13th?

24  A.   The deal had not been called off.

25  Q.   Do you know why Michael Krapchan had left San Diego and

795

1   went to Los Angeles, based on the recorded conversations?

2   A.   Based on the recorded conversation to the source?

3   Q.   Yes.

4   A.   Mr. Krapchan believed that because he could not get ahold

5   of the source on Thursday night or Friday morning that the

6   source was not going to provide the sample to him, so he was

7   traveling back to LA to return the money.

8   Q.   And at some point in time, did the confidential source

9   get in touch with Michael Krapchan?

10  A.   Yes.

11  Q.   And did he tell Michael Krapchan to come back and get a

12  sample?

13  A.   He wanted to know why he had left, and he said why didn't

14  you call me, if you had called me, we could have worked this

15  out.  The source -- I mean Mr. Krapchan said I had tried to

16  get ahold of you but I was not able to.  And at that time the

17  source indicated that he did have the sample for

18  Mr. Krapchan.

19  Q.   But when -- on the 13th Michael Krapchan was instructed

20  to come back and he was going to purchase a sample, correct,

21  one --

22              MR. GUTIERREZ:  Compound as phrased, your Honor.

23              THE COURT:  Sustained.

24              BY MR. DENIS:  Q.  When Mister -- when the

25  confidential source called Michael Krapchan, he instructed

796

1    him to return to San Diego; isn't that true?

2    A.   I would have to review that transcript.  I do not

3    remember if he told him to return, but he did tell him that

4    he had a sample available.

5    Q.   And based on your memory, you don't recall if Mister --

6    if the confidential source asked Michael Krapchan to return

7    back to San Diego?

8    A.   I do not recall that.

9    Q.   During the phone conversation -- was it your

10   understanding through the recorded transcripts that

11   Mr. Krapchan was going to return and purchase one kilo for

12   $17,000?

13   A.   He wanted one-kilo sample for $17,000.

14   Q.   During that conversation there was no mention of Ryan

15   Wedding; isn't that true?

16   A.   That is correct.

17   Q.   And during those conversations or conversations leading

18   up to the 13th, it indicated that Mister -- that Mr. Shirani

19   wanted to take a look at one; isn't that true?

20   A.   That Mr. Shirani wanted to look at one?

21   Q.   Yes.

22   A.   Yes, but then when they were coming back down, he said we

23   are all coming.

24   Q.   So when he said we are all coming, it indicated that it

25   was Hassan or whoever else was coming down to San Diego,

1    correct?

2    A.   Yes.

3    Q.   At any time on the 13th, did he say that they're all in

4    the deal?  Strike that.  During -- on the 13th when they were

5    coming down to San Diego, there was never any mention that

6    everybody was part of the deal; isn't that true?

7    A.   He said that we are all coming.

8    Q.   Down to San Diego?

9    A.   Yes.

10   Q.   Okay.  Now, during the course of your investigation

11   leading up to the -- the LAX call, there was discussion

12   that -- I'm taking you back to the 4th -- well, strike that.

13   There -- the -- the transcript that I showed you about the

14   negatism (sic) occurring from Michael Krapchan's side, do you

15   recall that conversation or the transcript that we just

16   showed you?

17   A.   Yes, I recall you showing me that.

18   Q.   And that refreshed your recollection, correct?

19   A.   Yes.

20   Q.   And part of this negatism (sic) was because the plans and

21   the people kept changing, correct?

22   A.   That there were a lot of changes.

23   Q.   Okay.  And on June 4 of 2008, Michael Krapchan indicated

24   that he was positively flying down to San Diego, correct?

25   A.   What was the date of that call again?

1   Q.   On June 4.

2   A.   Yes, on June 4 Mr. Krapchan indicated that he was flying

3   to San Diego.

4   Q.   Okay.  And he indicated that Elmar was 50/50?

5   A.   I don't remember that exact statement from Mr. Krapchan,

6   but Mr. Akhundov's attendance did seem to go back and forth

7   during the course of negotiations.

8   Q.   Going to show you -- would a portion of the transcript

9   refresh your recollection?

10  A.   Yes.

11  Q.   Showing you a portion which has been previously marked as

12  defense --

13          THE COURT:  Why don't you show that to Mr.

14  Gutierrez.

15          MR. DENIS:  -- Exhibit SS for identification, your

16  Honor.

17          THE COURT:  What has it been marked?

18          MR. DENIS:  SS as in Sam, Sam Sam.

19          THE COURT:  It's already been marked as --

20          MR. GUTIERREZ:  Your Honor, if it is marked, could

21  we have counsel use the marked exhibits and not copies of the

22  marked exhibits?  I know that O is still -- well, we just

23  object as to this not being S, and we'd have no objection

24  otherwise.

25          THE COURT:  Have you marked another --

799

1           MR. DENIS:  No, this is --

2           THE COURT:  -- document S?

3           MR. DENIS:  No, your Honor.  These are the clips

4     that are --

5           THE COURT:  Well, Mr. Gutierrez, is suggesting S

6     has been utilized for some other document.  Put an S sticker

7     on it then if you would just so the record is clear.

8           MR. DENIS:  It's SS, your Honor.

9           THE COURT:  It's double S?

10          MR. DENIS:  Double S.  These are clips.

11          THE COURT:  Well, don't -- you don't have to --

12    this is just being used to see if it refreshes the witness's

13    memory.  You don't have to characterize it.

14          MR. DENIS:  Correct.

15          THE COURT:  Put it on the page that you'd like her

16    to see, please.

17       (Exhibit No. Court's SS identified.)

18          BY MR. DENIS:  Q.  Let me know when your memory has

19    been refreshed.

20    A.  Yes, I remember this call.

21    Q.  Okay.  And in that call Michael Krapchan was positively

22    flying down to San Diego, correct?

23    A.  That is correct.

24    Q.  And do you recall what the date Michael Krapchan was

25    supposed to fly down to San Diego back then on June 4, 2008?

1   A.   I believe the plan was always for him to fly in on the

2   9th.

3   Q.   There was never a previous time where he indicated he was

4   going to arrive sooner or the next day?

5   A.   There may have been.   I don't recall that.

6   Q.   And Michael Krapchan also indicated that Elmar was 50/50

7   of coming down to San Diego?

8   A.   Yes.

9   Q.   And he indicated that he was going to be bringing down

10  the boss, the boss will fly in as well.   Do you recall that?

11  A.   I do remember that, but based upon my recollection of

12  that, I'm not -- I don't know who he was referring to in that

13  conversation.

14  Q.   Okay.   But in that conversation on the 4th, he indicated

15  he was bringing down the boss, correct?

16  A.   That is correct.

17  Q.   And that was in addition to Elmar, correct?

18  A.   I don't know that it was in addition to, and I believe in

19  that call he also said that he was going to bring Sam.

20  Q.   Correct.

21  A.   So we had a lot of conversations as far as who possibly

22  Sam could be.

23  Q.   And during the calls from -- between the 10th and 13,

24  Mr. Krapchan indicated that -- that Hassan was higher, higher

25  than Elmar; isn't that true?   Do you recall that

1    conversation?

2    A.   There were a number of conversations.  As an example, in

3    that call that you just showed, me he refers to Sam and says

4    that he is an inferior person, then there were additional

5    calls where he references people that are the boss.  So I am

6    not sure as far as the hierarchy and what Krapchan's

7    understanding of the hierarchy of the organization was.

8    Q.   Okay.  But during the 10th and the 13th there was a call,

9    if you recall, where Michael Krapchan indicates that -- that

10   Hassan was higher, higher than Elmar; isn't that true?

11   A.   Higher than Elmar?

12   Q.   Yes.

13   A.   I do not recall that conversation.

14   Q.   Okay.  Would looking at that transcript refresh your

15   recollection?

16   A.   It would refresh my recollection of the transcript.

17            THE COURT:  Would you continue on, Mr. Denis --

18            MR. DENIS:  Yes.

19            THE COURT:  -- with your questioning, please.  Mr.

20   Denis, please --

21            MR. DENIS:  Yes, your Honor.  I apologize.

22            THE COURT:  -- proceed.  Let's go.

23            BY MR. DENIS:  Q.  And, Ms. Lambert, do you recall

24   the conversation where Mr. Krapchan indicated that the money

25   was a mixed stew on July -- on June 4, 2008?

1    A.   I'm sorry.  Can you repeat the question.

2    Q.   Do you recall there was a conversation on June 4, 2008

3    where Michael Krapchan indicated that the money was a mixed

4    stew?

5    A.   I don't remember that specific term.

6    Q.   Would looking at that transcript refresh your

7    recollection?

8    A.   I do not remember that term, as I stated.

9    Q.   Okay.  I'm going to show you what has been previously

10   marked as Defense Exhibit UU.

11   A.   Which call is it?

12   Q.   It is the June 4 call.  Does it refresh your recollection

13   as to the call that took place on June 4?

14   A.   I don't specifically remember that conversation, no, but

15   I do remember being aware of the fact that multiple people

16   were going to, you know, be receiving narcotics from this

17   transaction.

18        (Exhibit No. Court's UU identified.)

19   Q.   And based on your review, or your recollection, the

20   individuals were Michael Krapchan, Elmar, and the boss; isn't

21   that true?

22   A.   Based upon that call, that is what the translation is.

23   Q.   Okay.  And at that time on the 4th, we didn't know who

24   the boss was, correct?

25             MR. GUTIERREZ:  Asked and answered, your Honor.

1          THE COURT:  The objection is sustained.

2          MR. GUTIERREZ:  Your Honor, it's my understanding

3    that, although counsel said UU was previously marked, I don't

4    think it was marked on the record.  We'd ask that a sticker

5    be affixed so we can preserve for the record what was shown

6    to the witness.

7          THE COURT:  Well, I think -- you put a sticker on

8    that, didn't you, Mr. Denis?

9          MR. DENIS:  Yes, your Honor.  And just for the

10   record these are the excerpts --

11         THE COURT:  You don't need to say what they are at

12   this point.  They were just being used to refresh memory.

13         MR. DENIS:  Okay.

14         THE COURT:  All right.  Continuing on, please.

15         MR. DENIS:  Thank you, your Honor.

16         BY MR. DENIS:  Q.  And then on June 6, call No. 9,

17   there was some discussion as to -- there was some discussion

18   as to who was flying in to either San Diego or Los Angeles,

19   correct?

20   A.  That is correct.

21   Q.  And one of the individuals was supposed to be -- Sam was

22   one of them, correct?

23   A.  That is correct.

24   Q.  And it first indicated that Mr. Krapchan would be in on

25   Monday and that Sam would be there on Tuesday; isn't that

1   correct?

2   A.   That is correct.

3   Q.   Okay.   And on June 6, the same day, on call 12, there was

4   indication that the Iranian will be in the deal, correct?

5   A.   That is correct.

6   Q.   And that was on the 6th, correct?

7           MR. GUTIERREZ:   Your Honor, we'd object as to lack

8   of foundation who the declarants are.

9           THE COURT:   Well, the exhibit is not in.

10          MR. GUTIERREZ:   Well, then to the form of the

11  question, your Honor.

12          THE COURT:   The objection is overruled.

13          BY MR. DENIS:   Q.   Do you recall that?

14  A.   Yes, I recall that.

15  Q.   Okay.   We're going to play which has been part of the

16  Government's Exhibit 23, a clip.   Well, you recall -- okay.

17          MR. DENIS:   Why don't we play that, which we have

18  previously marked or will mark --

19          THE COURT:   You don't need to mark it if it's

20  already marked.   Has it already been played is the question.

21          MR. DENIS:   It has not been played, your Honor.

22  This is --

23          THE COURT:   All right.   Well, you'd better show Mr.

24  Gutierrez what it is you're thinking about displaying to the

25  jury at this time.

1            MR. DENIS:  Okay, your Honor.

2            BY MR. DENIS:  Q.  This was on June 6, 2008,

3    correct?

4            THE COURT:  There's no question pending.

5            MR. DENIS:  I apologize.

6            THE COURT:  Before anything is played, would you

7    indicate what it is that is going to be played apparently

8    without objection.

9            MR. DENIS:  Correct, your Honor.  This is a phone

10   call which --

11           THE COURT:  What's it marked?

12           MR. DENIS:  Marked as WW.

13           THE COURT:  And it's clip 1?

14           MR. DENIS:  It is just -- we'll call it Exhibit WW.

15   It's the clip.

16           THE COURT:  All right.  Do you have a sticker on

17   it?

18           MR. DENIS:  Yes, your Honor.

19           THE COURT:  Okay.  And which -- do you have it

20   highlighted what's going to be played?  Do you have it

21   highlighted in some fashion so that we have a --

22           MR. DENIS:  Just two lines.

23           THE COURT:  -- record of it?

24           MR. DENIS:  Yes.

25           THE COURT:  Just two lines?  Do you have those

1   lines highlighted?

2           MR. DENIS:  This --

3           THE COURT:  No, no.  We've got to put it in as a

4   court exhibit, so will you highlight those two lines.

5           MR. DENIS:  There's just two lines on the actual --

6           THE COURT:  Thank you.

7           MR. DENIS:  Thank you, your Honor.

8       (Exhibit No. Court's WW identified.)

9           MR. GUTIERREZ:  Your Honor, it corresponds to

10  Government's Exhibit 23.

11      (The audio recording was played.)

12          MR. DENIS:  You can leave it there.

13          BY MR. DENIS:  Q.  Now, on the -- on the -- on the

14  6th there, the Iranian was in the deal, correct?  He was in

15  the deal?

16  A.  Correct.

17  Q.  Okay.

18          THE COURT:  That was the prior testimony of this

19  witness.  You do recall that?

20          MR. DENIS:  Yes, your Honor.

21          THE COURT:  Okay.

22          BY MR. DENIS:  Q.  And, Ms. Lambert, on that same

23  day on the 6th, call No. 16, the brother -- there was a

24  brother that was supposed to be traveling or was planning to

25  travel to Los Angeles, correct?

1    A.   According to the statements that Krapchan made to the

2    source, yes.

3    Q.   And that was on the 6th, correct?

4    A.   I believe so.

5    Q.   Okay.  Now, after -- prior to picking up Hassan from the

6    airport, there was some discussion as to who was going to sit

7    in the front seat; isn't that true?

8    A.   The front seat of what?

9    Q.   Do you recall that conversation where they were

10   discussing either Hassan or Hussein was going to sit in the

11   front seat?

12   A.   I'm sorry, Mr. Denis.  I don't understand the question I

13   don't know who --

14   Q.   Sorry.

15   A.   -- you're referring to or --

16   Q.   I apologize.  On June 10 when the confidential source and

17   Mr. Krapchan were headed to LAX to pick up Hassan and whoever

18   was with him, there was some conversation about who was going

19   to sit in the front seat; do you recall that?

20   A.   I do not recall that off the top of my head.

21   Q.   If I showed you the portion of the transcript, would that

22   refresh your recollection?

23   A.   Yes.

24   Q.   Okay.  Going to show you what's been previously marked as

25   Defense Exhibit ZZ, which corresponds to Government

 1   Exhibit 26, and when I give you that, I'm going to also play

 2   that.

 3         MR. GUTIERREZ:  We'd object as to lack of

 4   foundation and hearsay for playing it, your Honor.

 5         THE COURT:  Well, the objection is sustained

 6   insofar as playing it for the jury, but if you wish to show

 7   the witness what you have there to see if it refreshes her

 8   memory --

 9         MR. DENIS:  I'm withdrawing it as a -- to refresh

10   her recollection, but I'm going to play it as a -- well, this

11   exhibit has already been admitted; it's going to be admitted

12   as a co-conspirator statement.

13         THE COURT:  Apparently it hasn't been played.

14         MR. GUTIERREZ:  Your Honor, we'd have no objection

15   to this clip being -- part of Government's Exhibit 26 being

16   played before the jury as a co-conspirator statement.

17         THE COURT:  All right.  Does it come in as ZZ, clip

18   1?

19         MR. GUTIERREZ:  If it can be so marked, your Honor,

20   we'd have no objection.

21         THE COURT:  Do you have a copy of that that we can

22   memorialize for the record?

23         MR. DENIS:  We have the court copy.

24         THE COURT:  Where --

25         MR. DENIS:  It's been provided to the Court.

1           THE COURT:  As ZZ?

2           MR. DENIS:  Yes.

3           THE COURT:  It's in your hand right now.

4           MR. DENIS:  Yes, your Honor, but all of these clips

5    are with the Court --

6           THE COURT:  Okay.

7           MR. DENIS:  -- and they've been marked ZZ and --

8    everything is marked, your Honor.

9           THE COURT:  Thank you.

10          MR. DENIS:  Thank you.

11          THE COURT:  Apparently we don't have it.

12   Apparently we don't have it yet.  Why don't you just come

13   forward with that and -- why don't you submit what you have

14   in your hand to the courtroom deputy, that will make it easy,

15   and then you can project it on the screen.

16          MR. DENIS:  There's just the court copy that I

17   believe we provided, but I --

18          THE COURT:  Well, the courtroom deputy says we

19   haven't received any of those exhibits.

20          THE CLERK:  This is WW.  You said ZZ.

21          THE COURT:  Just highlight what you're going to

22   play so that we have a record of it.

23       (Exhibit No. Court's ZZ identified.)

24       (The audio recording was played.)

25          BY MR. DENIS:  Q.  Put it back up.  Ms. Lambert, do

1   you recall -- you have the actual -- you have the Court's

2   exhibit, don't you?

3   A.   This is the one you handed me.  I don't know what exhibit

4   number it is.

5            MR. DENIS:  I apologize, your Honor.

6            THE COURT:  I tell you what.  Why don't you compare

7   what you have with what you've given the witness.  Ladies and

8   gentlemen of the jury, it may seem overly technical, but it

9   isn't.  The Court has to maintain an absolutely accurate

10  record of anything that's played to you and that you see on

11  the screen in written form; that completes the record, and

12  keeping a record is very important.  The attorneys had to

13  work all day on Friday, this past Friday, just to try to

14  catch up to the exhibits that had been previously identified

15  or marked but were not in the court file, so I'm trying to

16  avoid that at this point, and I appreciate your patience in

17  that regard.

18           Do you have a separate piece of paper marked ZZ in

19  which what was just played is highlighted?

20           MR. DENIS:  Yes, your Honor.

21           THE COURT:  All right.  Would you please bring that

22  forward.

23           MR. DENIS:  I've provided it to the -- to the court

24  deputy.

25           THE COURT:  Well, we need it at this point.

1              MR. DENIS:  I'm sorry, your Honor?

2              THE COURT:  We need it at this point.  It has to be

3    made a part of the record.  It's been played, so we need to

4    have it.  Just take what you've already marked because it's

5    highlighted; you've already highlighted that particular piece

6    of paper.

7              MR. DENIS:  Your Honor, these are -- this is my

8    copy that I've -- there is --

9              THE COURT:  Well, if you're marking as a court

10   exhibit your copy, it becomes a court exhibit.

11             MR. DENIS:  I will provide it to the Court, your

12   Honor.  Is that okay?  I've discussed it with the court

13   deputy.  I will provide the copy to the court deputy, one

14   that's been marked.

15             THE COURT:  Is there one that's been marked?

16             MR. DENIS:  Yes.  I will provide it.  Thank you,

17   your Honor.  I will provide it.

18             BY MR. DENIS:  Q.  So, Ms. Lambert, there was a

19   conversation on June 10 where there was discussion as to who

20   was going to sit in the front seat, correct?

21   A.  Correct.

22   Q.  There was some discussion that Hussein was going to sit

23   in the front seat, correct?

24   A.  That is correct.

25   Q.  And during the course of your investigation -- and have

1   you learned -- what's the name -- what's Hassan's brother's

2   name?

3   A.   Hossein.

4   Q.   And at that time there was some discussion that a Hossein

5   was going to arrive, and he was going to sit in the front

6   seat, correct?

7   A.   According to this, that individual name is Hussein, Mr.

8   Shirani's brother is Hossein, and there was some obvious --

9   some confusion even on Hassan's name as well.  As you

10  indicated earlier in the conversations, Krapchan believed his

11  name was Sam.

12  Q.   So Krapchan believed that Hussein's name was Sam?

13  A.   The individual arriving, initially Mr. Krapchan stated

14  that his name was Sam.  There were some follow-up

15  conversations between Mr. Akhundov and the source.  When the

16  source asked Mr. Akhundov about Sam, Mr. Akhundov did not

17  know who was -- a Sam was, and --

18  Q.   And at that time -- I'm sorry.  And at that time when

19  they were discussing Sam, they were discussing the boss,

20  correct, the main person?

21  A.   Again, that went back and forth.  You handed me one

22  transcript where Mr. Krapchan indicated that Sam was an

23  inferior person.  There were subsequent conversations where

24  there was conversation of a boss.  After the conversation

25  between the source and Mr. Akhundov, then, as we can see, the

1  name -- I don't know if it is because the individual's

2  primary language is Russian, if it was just difficult to

3  understand, but the name was not always consistent.

4  Q.  But in that transcript the name doesn't appear as Hassan

5  as it did in a previous transcript, it appeared as Hussein?

6  A.  As Hussein.

7  Q.  Okay.  And you've indicated that you have learned the

8  name of Mr. Shirani's brother, correct?

9          MR. GUTIERREZ:  Been asked and answered, your

10 Honor.

11         THE COURT:  Sustained.

12         BY MR. DENIS:  Q.  And during the course of your

13 investigation, have you heard of the voice of Hussein,

14 Shirani's brother?

15 A.  Of Hossein?

16         MR. GUTIERREZ:  Objection; misstates the evidence,

17 your Honor.

18         THE COURT:  The objection -- well, I think the

19 witness clarified it.  The question did misstate the name,

20 and I think the witness clarified it as Hossein.

21         BY MR. DENIS:  Q.  Hossein, correct?

22 A.  Correct.

23 Q.  You also listened to jail calls of Mr. Hossein, Shirani's

24 brother, correct?

25 A.  Yes, I did.

814

1    Q.  And you're familiar with that voice, correct?

2    A.  Yes, I am.

3    Q.  And you also listened to the calls where Hassan was

4    speaking with his mother, correct?

5    A.  I listened to parts of the conversations, but those

6    conversations were predominantly in Farsi, so I was not able

7    to listen to those conversations.

8    Q.  But you did hear the voice of who allegedly -- or

9    purportedly to be Hassan's mother, correct?

10   A.  Correct.

11   Q.  Okay.  And you were familiar with that voice, correct?

12   A.  Yes.

13   Q.  Okay.  And during the course of your investigation, you

14   also heard the voices of Maziar with Mr. Shirani, correct?

15   A.  On one call.

16   Q.  On one call; is that right?

17   A.  Yes.

18   Q.  And you're familiar with that voice of one call of

19   Maziar, correct?

20   A.  That voice would obviously be harder for me to identify.

21   Q.  Okay.  But there was one call that had Maziar on the jail

22   call, correct?

23   A.  Yes.

24   Q.  You did listen to that call, correct?

25   A.  I did listen to it, but again, I can't remember if that

815

1    call was in Farsi or English.

2    Q.   Okay.  And the calls that you listened to, the

3    individuals that were on the call, predominantly they were to

4    his brother, correct, Hussein, the jail calls?

5    A.   Calls that I listened to?

6    Q.   Yes.

7    A.   No.

8    Q.   Which -- okay.  But there were a number of calls that

9    Hassan was speaking with Hussein, his brother, correct, on

10   the jail calls?

11   A.   With Hossein, his brother?

12   Q.   Yes.

13   A.   Again, most of the conversations with his brother were

14   not in English, so I was not able to listen to those calls.

15   Q.   But when you did listen to them, you recognized the

16   voice, that that was his brother, correct?

17            MR. GUTIERREZ:  Objection as to asked and answered.

18            THE COURT:  Sustained.

19            BY MR. DENIS:  Q.  Okay.  And during the course of

20   your investigation, there was reference that the confidential

21   source, that he was in the business of selling cars, correct?

22   A.   That's correct.

23   Q.   And on -- actually on the 10th leading up to the LAX

24   call, there was a discussion with Yuri regarding selling cars

25   in Bulgaria; isn't that true?

1   A.   I don't remember that specific conversation, but I am

2   familiar with the source selling cars.

3   Q.   Okay.  And do you recall the -- I'm going to play the

4   exhibit which has been previously marked as Defense Exhibit

5   AAA, which is part of the Government's Exhibit 26.

6          MR. GUTIERREZ:  We'd have no objection, your Honor.

7          THE COURT:  Does it have a subnumber under 26?

8          MR. DENIS:  Your Honor, it is Exhibit AAA by the

9   defense clip list, which will be provided to the Court.

10          THE COURT:  Do you have it marked as an exhibit?

11          MR. DENIS:  Yes, your Honor, as Exhibit AAA.

12          THE COURT:  Do you have it highlighted, that

13   portion that will be played now?

14          MR. DENIS:  The only portion that will be played is

15   on the clip, that portion which is going to be played.  It's

16   about 20 lines.

17          THE COURT:  Okay.  It's the entirety of the

18   conversation?

19          MR. DENIS:  Of the clip, correct.

20          THE COURT:  Do you have the clip highlighted?

21          MR. DENIS:  Yes, your Honor.  It's -- it is.

22          THE COURT:  Okay.

23      (Exhibit No. Court's AAA identified.)

24      (The audio recording was played.)

25          BY MR. DENIS:  Q.  And what you have in front of

1   you, which has been previously marked as Defense Exhibit AA

2   (sic), did you see that conversation?

3   A.  Exhibit AA?

4   Q.  Defense Exhibit AA, correct.

5           MR. GUTIERREZ:  AAA?

6           BY MR. DENIS:  Q.  AAA, I'm sorry, on June 10,

7   2008.

8   A.  Yes.

9   Q.  Do you recall that conversation?

10  A.  As I stated earlier, I am familiar that the source does

11  deal in exporting cars.

12  Q.  And did you discuss this particular conversation with the

13  source regarding getting stolen cars and taking them to

14  Bulgaria and having them worked on?

15          MR. GUTIERREZ:  Object as to form; attorney

16  testifying.

17          THE COURT:  The objection is sustained.

18          BY MR. DENIS:  Q.  Do you recall discussing this --

19  this conversation with the confidential source?

20  A.  That they were stolen?

21  Q.  Yes, that they drove them to a garage to Bulgaria, they

22  have Bulgarian -- well --

23          MR. GUTIERREZ:  Objection; there's no question

24  pending, your Honor.

25          BY MR. DENIS:  Q.  Do you recall -- do you recall

1    having the conversation with the source regarding this --

2    this clip, which reads --

3              THE COURT:  That's already been played for the

4    jury.

5              MR. DENIS:  Yes, your Honor.  Just for the

6    record --

7              THE COURT:  It's already a part of the record.

8    Would you just ask the next question.

9              BY MR. DENIS:  Q.  Did you -- when you read the

10   clip or you heard the clip where Mister -- the confidential

11   source says they drive the cars to Bulgaria and they have the

12   Bulgarians working for them, and they check and see the --

13   and they work on the cars and clear customs.  Did you have a

14   conversation with the CS regarding that -- that discussion?

15   A.  No, I didn't because that is not my interpretation of the

16   call, that he was referring to stolen cars.

17   Q.  And when I -- when we say cars, this was actually done

18   while they were together, the confidential source and Michael

19   Krapchan, on their way to LAX, correct?

20             MR. GUTIERREZ:  Your Honor, we'd object as to

21   hearsay, lack of proper foundation.

22             THE COURT:  The objection is sustained as to the

23   form of the question.  Counsel, ask another question, please.

24             MR. DENIS:  Okay.

25             BY MR. DENIS:  Q.  But you indicated that -- did

1   you have a discussion with the source regarding this call?

2                 MR. GUTIERREZ:  Been asked and answered, your

3   Honor.

4                 THE COURT:  The objection is overruled.  Your

5   answer was --

6                 THE WITNESS:  Not this call, no.

7                 THE COURT:  I think in the interest of moving on,

8   Agent Lambert, I think counsel is trying to ask whether you

9   had a conversation with the confidential source about his

10  selling automobiles.

11                MR. DENIS:  In Bulgaria.

12                THE WITNESS:  Yes, because the source, his job is

13  to purchase cars and he exports them to foreign countries.

14                BY MR. DENIS:  Q.  And he was discussing that with

15  Michael Krapchan, correct?

16  A.  It appears that he was, yes.

17  Q.  Now, also on June 13 there was a conversation where

18  the -- the confidential source actually ordered Michael

19  Krapchan to get Hassan and bring him back to San Diego; do

20  you recall that?

21  A.  What was the date?

22  Q.  It's on June 13.  If it would refresh your recollection,

23  the transcript's on Exhibit CCC on page 22.

24  A.  Yes, this is in reference to the call that I had

25  mentioned earlier that Krapchan believed that he had lost

 1   communication with the source because he was unable to talk

 2   to him on Thursday night and Friday morning, so he traveled

 3   back to LA when they made contact.  The source had indicated

 4   to Krapchan that he hadn't lost contact with him and he was

 5   getting very frustrated at all of the changes in the plan,

 6   and the source had told Mr. Krapchan if you still have the

 7   money, then get Hassan and come down.

 8   Q.  So the confidential source specifically instructed to --

 9   if the -- if they had the money, to get Hassan and come to

10   San Diego, correct, with Michael Krapchan?

11   A.  As part of the deal, Mr. Krapchan wanted to see a

12   sample --

13   Q.  Ms. Lambert, I'm asking you a very specific question.

14   Based on the transcript that you read that refreshed your

15   recollection, the confidential source asked Michael Krapchan

16   if they had the money to bring Hassan with him and come down

17   to San Diego; isn't that true?

18          MR. GUTIERREZ:  Objection as to form; asking the

19   witness to read essentially what came off the document that's

20   in front of her.

21          THE COURT:  The objection was sustained.  I don't

22   think there was any indication from the witness that she

23   needed to refresh her memory on that particular call.

24          Ladies and gentlemen, we'll take our midafternoon

25   recess at this time, 15 minutes.  Please remember the

821

1    admonition not to discuss the case or make any decisions at

2    this time.  Thank you.

3         (There was a break in the proceedings.)

4              THE COURT:  All right.  We have everyone present.

5              MR. DENIS:  Thank you.

6              THE COURT:  Counsel?

7              MR. DENIS:  Yes, your Honor.

8              BY MR. DENIS:  Q.  Ms. Lambert, you were shown a

9    transcript of the proffer session, correct, and that did not

10   refresh your recollection as to what happened at the proffer

11   session regarding the BlackBerry phone, correct?

12   A.  I don't think it was a transcript that you showed me, not

13   a certified transcript.  It was words, as you stated,

14   contained within the proffer.

15   Q.  Do you know what a certified transcript is?

16   A.  No, I do not, but I believe you stated that -- or the

17   judge stated that it was not a certified transcript.

18   Q.  I'm going to show you an exhibit which has been

19   identified as Defense Exhibit XXX.  Can you look at the last

20   page.

21   A.  Yes, I can.

22   Q.  Is that a certificate -- a transcript that's been

23   transcribed by a court-certified transcriber and certified?

24              MR. GUTIERREZ:  Objection; calls for speculation,

25   hearsay.

1           THE WITNESS:  Yes.

2           THE COURT:  It's sustained on the basis of

3    foundation.  I think you just wanted to ask if it refreshed

4    her memory with respect to the BlackBerry.  Maybe we can

5    pursue that question.

6           MR. DENIS:  Thank you, your Honor.

7           MR. GUTIERREZ:  Unfortunately, your Honor, I think

8    that's been asked and answered.

9           MR. DENIS:  Ms. Lambert --

10          THE COURT:  Well, perhaps you looked at it.  I

11   don't know at this point, sir.

12          BY MR. DENIS:  Q.  Looking at page 44 of the

13   proffer, do you recall being told that the BlackBerry owned

14   by Mr. Shirani was not in his name?

15   A.  I do not recall that.

16   Q.  Looking at the transcript it doesn't refresh your

17   recollection?

18   A.  I do not remember during that proffer session asking

19   Mr. Shirani about the ownership of his BlackBerry or any

20   answer to that question.

21   Q.  If I were to play you the portion from the proffer

22   session --

23          THE COURT:  Counsel, that has been asked and

24   answered; it was asked and answered some time ago; it's been

25   asked and answered again.  The witness has no memory of that.

823

1    Please move to another area.

2              MR. DENIS:  Your Honor, it will just be brief.  We

3    have it cued up --

4              THE COURT:  No, we're not going to play it because

5    it will not refresh the witness's memory.

6              MR. DENIS:  Perhaps it would, your Honor.

7              THE COURT:  Counsel, ask another question, please.

8              BY MR. DENIS:  Q.  If you heard Mr. Shirani tell

9    you and you acknowledge that in the proffer session, would

10   that refresh your recollection of --

11             MR. GUTIERREZ:  Objection, your Honor.

12             BY MR. DENIS:  Q.  -- about what was said?

13             THE COURT:  The objection is sustained.

14             BY MR. DENIS:  Q.  Okay.  Ms. Lambert, you

15   indicated that you subpoenaed phone records from MCC, the

16   jail, correct?

17   A.  I subpoenaed the calls?

18   Q.  Correct.  You subpoenaed the calls and you received a

19   disk, a CD, that contained the calls from the jail, correct?

20   A.  Correct, for all three defendants.

21   Q.  And -- and you testified that you listened to the jail

22   calls of Mr. Shirani and recognized the voice of his brother

23   Hussein, correct?

24   A.  Most of the calls that I listened to were the English

25   calls, which were not with his brother; however, there were a

1   couple of calls to my recollection with his brother Hossein.

2   Q.   And you recognized his voice, correct, as the brother's

3   voice?

4   A.   At that time I could recognize the voice.

5   Q.   Correct.  And you also recognized the voice of Hassan's

6   mother, correct?  You testified earlier that you had heard

7   the calls.

8   A.   Correct.

9   Q.   Is that yes?

10   A.   Yes.

11   Q.   Okay.  And you indicated that you also heard the call or

12   one call that was of Maziar, correct, that you heard?

13   A.   Correct.

14   Q.   Okay.

15        MR. DENIS:  Your Honor, we have stipulated to

16   foundation of the calls.  What I'd like to do is play just

17   for identifying the voices -- I'm going to play a clip with

18   the voice and ask if you recognize that voice.  May I do

19   that, your Honor, just purely for identifying?

20        THE COURT:  If you're --

21        MR. DENIS:  We have stipulated --

22        THE COURT:  Counsel, you don't need my permission

23   for anything.  If counsel has an objection to what you're

24   doing, he'll object and I will rule on the objection.

25        MR. GUTIERREZ:  Your Honor, we're going to object.

1   There were some conditions precedent to that stipulation that

2   have not been met, so we will object.

3              THE COURT:  On foundation?  All right.  Sustained.

4              MR. DENIS:  Your Honor, Mr. Gutierrez indicated

5   that he would stipulate to the foundation of the CDs.

6              THE COURT:  Apparently there's no stipulation at

7   this point.  We can take that matter up at a later time when

8   we're outside the presence of the jury.

9              BY MR. DENIS:  Q.  Ms. Lambert, you received some

10  calls from MCC you indicated.

11             MR. GUTIERREZ:  Been asked and answered, your

12  Honor.

13             THE COURT:  Sustained.

14             BY MR. DENIS:  Q.  And I'm showing you what has

15  been -- which will be marked as Defense Exhibit YYY and ZZZ.

16  Do you see these?

17             MR. DENIS:  I'm going to -- and the hard case will

18  be YYY and the soft case will be ZZZ.  The government has

19  stipulated these were the CDs provided to defense counsel.

20             MR. GUTIERREZ:  Objection; attorney testifying,

21  your Honor.

22             THE COURT:  The objection is sustained.  Ladies and

23  gentlemen, please disregard the statement of counsel as to

24  what these exhibits consist of.

25             BY MR. DENIS:  Q.  Can you look at the document,

1    the CDs?

2    A.   Yes.

3    Q.   Are you familiar with the CDs?

4    A.   I'm not familiar with these CDs.

5    Q.   But you received two CDs for the jail calls from the

6    jail, correct?

7    A.   I received multiple CDs.

8    Q.   And pursuant to your subpoena, did you receive -- you

9    issued multiple subpoenas, correct?

10   A.   Correct.

11   Q.   And on July 17 of '08, you received the first batch of

12   calls; isn't that true?

13   A.   I don't recall which date I received the batch of calls.

14   Q.   Okay.  But do you recall subpoena -- subpoenaing the

15   calls from MCC?

16   A.   I did subpoena the calls.

17   Q.   And looking at the CDs, does it refresh your recollection

18   as to the time period that you subpoenaed the calls?

19   A.   The only problem with these is that this is -- I know

20   this is not the handwriting that I originally received the

21   disks from nor is it my handwriting, so I can't -- I can't

22   vouch for the authenticity of these CDs.

23   Q.   If the government had stipulated I believe to the

24   foundation of these CDs --

25            MR. DENIS:  Do we have a stipulation as to the --

1          THE COURT:  Counsel, don't confer like that in

2    front of the jury, please.  Is there a stipulation as to

3    foundation for these?

4          MR. GUTIERREZ:  Your Honor, may I please request a

5    brief sidebar?

6          THE COURT:  No, no.  Just indicate --

7          MR. GUTIERREZ:  I'm going to object, your Honor,

8    until the condition precedent's been satisfied.

9          THE COURT:  All right.  Well, there's no foundation

10   set at this point, counsel.  So like I suggested last time,

11   we'll pick it up outside the presence of the jury in a while,

12   so if you can proceed with another line of questioning, that

13   would be appreciated.

14         MR. DENIS:  Your Honor, I apologize.  I'm just

15   trying to expedite this procedure as best I can.

16         BY MR. DENIS:  Q.  Now --

17         MR. DENIS:  Your Honor, may I play just for this

18   the purpose of this witness to identify the voices, just with

19   the voices at this time?

20         THE COURT:  Any objection?

21         MR. GUTIERREZ:  There would be lack of foundation.

22   She's only heard one call with regard to one person and few

23   of the others.  I don't know if that will be sufficient for

24   her to render that opinion.  I don't think she's been asked.

25         THE COURT:  Let me ask you this, Mr. Gutierrez.

1    Are you objecting?

2                MR. GUTIERREZ:  For foundational reasons, your

3    Honor, if I could just verify those --

4                THE COURT:  Are you objecting on any basis?

5    Counsel has suggested that he play one of these CDs to see if

6    the witness recognizes the voice.

7                MR. GUTIERREZ:  Well, only if she can recognize it,

8    your Honor.  We'd be happy to have it played.

9                MR. DENIS:  Thank you, your Honor.

10               THE COURT:  Now, what's being played?

11               MR. DENIS:  Your Honor --

12               THE COURT:  What is this, YYY or ZZZ?

13               MR. DENIS:  This is a portion of the CD --

14               THE COURT:  Do you have a separate transcript for

15   it --

16               MR. DENIS:  Yes, your Honor.

17               THE COURT:  -- just so the record is clear.

18               MR. DENIS:  I do.

19               THE COURT:  Bring it forward, please, so it will be

20   marked.

21               MR. DENIS:  Your Honor, we have a set --

22               THE COURT:  What is going to be played now?

23               MR. DENIS:  It's going to be EEE, which will be

24   marked as Defense Exhibit EEE, and that is a June 29 call.

25               THE COURT:  Do you have a transcript of that --

1           MR. DENIS:  Yes, your Honor.

2           THE COURT:  -- a separate one?  And you've just

3    given it to the CRD?

4           MR. DENIS:  Yes.

5           THE COURT:  All right.  Mark it EEE and just

6    highlight what is going to be played at this time, please.

7           MR. DENIS:  Just the voices, your Honor, or just --

8    the entire transcript?  Okay.

9           THE COURT:  Well, what are you going to do, just

10   play a portion --

11          MR. DENIS:  The voice at this time, correct.  Can I

12   have that back at this time?

13          THE COURT:  Okay.

14      (Exhibit No. Court's EEE identified.)

15      (The audio recording was played.)

16          BY MR. DENIS:  Q.  Ms. Lambert, hearing the voice

17   of the -- of the gentleman, do you recognize that voice to be

18   Hassan Shirani?

19   A.  I do recognize that voice as Mr. Shirani.

20   Q.  And the female voice on the CD, do you recognize that

21   voice to be Mr. Shirani's mother?

22   A.  I could not verify that voice.

23   Q.  As far as the recordings that you heard, there was a

24   Farsi lady speaking on all of the calls, correct?

25   A.  There was a foreign-language female speaking I do not

830

1    know what language.

2    Q.   And then there is also another female who speaks English,

3    correct?

4    A.   On the jail calls?

5    Q.   Yes.

6    A.   There are calls with an English-speaking female.

7    Q.   Is that purported to be Mr. Shirani's girlfriend?

8    A.   Yes.

9    Q.   And you're familiar with that voice, correct?

10   A.   At the time that I was listening to them, I was.

11   Q.   And the Farsi calls of the older lady or the woman who

12   was speaking in Farsi, has that been the same voice

13   throughout all of the jail calls?

14   A.   That I do not recall.

15   Q.   As far as you recall, were there other women that were

16   speaking Farsi to Mr. Shirani in Farsi?

17   A.   I do not remember.  There are -- each inmate is allowed

18   to put a number of phone calls on their account, so I do not

19   remember how many individuals Mr. Shirani had on his account.

20   Q.   But on the calls you recall that Mr. Shirani was speaking

21   with his mother, correct?

22   A.   I do know that the phone number of his mother was listed

23   as one of the numbers on his account.

24   Q.   Okay.  And was there any other number where there's a

25   female other than his girlfriend that he speaks to as far as

1   you could recall?

2   A.  I do not recall that.

3   Q.  Okay.  So there was just the one -- the one call to his

4   mother or the individual that he talked to is his mother,

5   correct?

6   A.  Again, I cannot corroborate that.  I do not recall how

7   many individuals Mr. Shirani spoke to.

8   Q.  I'm going to play a second CD or second call, which we

9   have will marked as Defense Exhibit GGG, and we're going to

10   play just the audio portion and see if you recognize that

11   voice, Ms. Lambert.

12      (Exhibit No. Court's GGG identified.)

13      (The audio recording was played.)

14      BY MR. DENIS:  Q.  Ms. Lambert, do you recognize

15   the two individuals speaking on that CD as one being

16   Mr. Hassan Shirani?

17   A.  I can depict the voice of Hassan Shirani, but I don't

18   know the identity of the other individual.

19   Q.  When the other individual calls -- what was Hassan

20   Shirani's brother's name?

21      MR. GUTIERREZ:  That's been asked and answered,

22   your Honor.

23      THE COURT:  Sustained.  It's Hossein.

24      BY MR. DENIS:  Q.  And was that the name that was

25   called by Mr. Shirani?

1   A.   I hear the name Hossein in that conversation, but because

2   I don't speak the language that they are speaking, I don't

3   know if they are referencing an individual by the name

4   Hossein or if he is using that as the person's name that he

5   is talking to.

6   Q.   But on a number of occasions, you listened to a number of

7   CDs between -- or heard CDs between Hassan and his brother

8   Hussein, correct?

9   A.   Again, I don't speak the foreign language that they

10   speak, so I did not listen to those calls.   Another

11   translator listened to those calls.

12   Q.   And other than his brother, is there any other calls in

13   the Farsi language to another male?

14   A.   I do not recall.

15   Q.   And besides the one call that was to Maziar, was there

16   any other call to any other male?

17          MR. GUTIERREZ:   Object as to form, lack of

18   foundation as to whether there was one call.

19          THE COURT:   Well, I'll sustain the objection.   The

20   witness has already been asked this question; she indicated

21   that she cannot recall.

22          BY MR. DENIS:   Q.   But if -- is there's another

23   individual on Mr. Shirani's phone list that goes by the name

24   of Hussein --

25   A.   The names of individuals are not contained on the phone

1    list, so I am not -- I am not sure about that.

2    Q.  But listening to what you've known about this

3    conversation, Hussein is the brother of Shirani, correct?

4              MR. GUTIERREZ:  That's been asked and answered,

5    your Honor.

6              THE COURT:  Sustained.

7              BY MR. DENIS:  Q.  Going to play a -- the last clip

8    was actually from July 7 of 2008.  I'm going to play a clip

9    from July 8, 2008 and see if you recognize this voice.

10             THE COURT:  What's it marked?

11             MR. DENIS:  It's marked as Defense Exhibit HHH,

12   clip 1.

13             THE COURT:  All right.  Do you have that designated

14   on that?

15             MR. DENIS:  Yes, your Honor.

16             THE COURT:  All right.  It's already highlighted?

17             MR. DENIS:  Everything.

18             THE COURT:  Very good.  Thank you.

19        (Exhibit No. Court's HHH identified.)

20        (The audio recording was played.)

21             THE COURT:  Counsel, that's a sufficient exemplar.

22             MR. DENIS:  Thank you, your Honor.

23             BY MR. DENIS:  Q.  Ms. Lambert, the one clip that

24   you heard of Maziar, that's the clip that you heard, correct,

25   the sound?

1          MR. GUTIERREZ:  Objection; leading as phrased.

2          THE COURT:  The objection is overruled.  You may

3    answer that if you're able to.

4          THE WITNESS:  I'm not able to answer that.

5          BY MR. DENIS:  Q.  Okay.  During the course of your

6    investigation, you did not listen to Maziar's voice?

7    A.  As I stated earlier, I believe there was one call on the

8    jail calls, and that was based upon the phone number; but as

9    far as recognizing the voice, I do not recognize the voice.

10   Q.  And the phone number -- going to show you -- do you

11   recall what the phone number was?

12   A.  No, I do not.

13   Q.  Do you have the phone number from -- I'm going to show

14   you -- do you recall the phone numbers just during the course

15   of your investigation of the mother, of the brother, and of

16   Maziar?

17   A.  Off the top of my head, I don't recall.

18   Q.  If I showed you the clips that are associated with the

19   phone numbers, would that assist you in refreshing your

20   recollection?

21   A.  As far as putting the voices with the phone numbers?

22   Q.  Or you indicated that there were phone numbers associated

23   with the phone -- with the phone calls, correct?

24   A.  I still wouldn't be able to pick out the voice.  I just

25   could not recall that voice is either the voice of the

835

1   mother, the voice of the brother, or the voice of Maz.

2   Q.   Just as far as your investigation, an older lady -- was

3   there anybody else that Hassan Shirani spoke with that was

4   the older lady besides his mother?

5   A.   Again, I don't recall the individuals that Mr. Shirani

6   had on his phone list that he was in communication with.

7   Q.   Okay.

8           MR. DENIS:  Nothing further, your Honor.

9           THE COURT:  Mr. Gutierrez -- by the way, Exhibits

10  GGG and HHH come from which CD, Exhibit YYY or ZZZ?

11          MR. DENIS:  They come from Exhibit YYY, your Honor.

12          THE COURT:  YYY?  Thank you.

13          MR. DENIS:  Thank you, your Honor.

14          THE COURT:  Mr. Gutierrez?

15          MR. GUTIERREZ:  Yes, your Honor.

16          MR. DENIS:  Oh, actually can I reopen just for one

17  last question, your Honor.

18          THE COURT:  No.

19          MR. DENIS:  Okay.  That's fine, your Honor.

20          THE COURT:  Hold that thought and let me allow Mr.

21  Gutierrez to take any examination he wishes.  Mr. Gutierrez?

22          MR. GUTIERREZ:  Thank you, your Honor.

23                      Cross-Examination

24          BY MR. GUTIERREZ:  Q.  Good afternoon, Agent

25  Lambert?

836

1   A.   Good afternoon.

2   Q.   Are you familiar with the term "double-dealing"?

3   A.   Yes, I am.

4   Q.   Did everybody who was involved in the transaction -- I

5   mean Mr. Krapchan, Mr. Shirani, allegedly Mr. Wedding -- did

6   they all have the same agenda or did somebody else have a

7   different agenda?

8              MR. DENIS:   Objection; calls for speculation.

9              THE COURT:   Sustained.

10             BY MR. GUTIERREZ:   Q.   What the price that the CS

11  was selling the cocaine for when speaking to Mr. Krapchan?

12  A.   $15,000 per kilogram.

13  Q.   What did Mr. Krapchan tell Shirani and Wedding how much

14  he was being charged?

15  A.   $17,000.

16             MR. DENIS:   Objection; assumes facts not in

17  evidence as to Mr. Wedding.

18             THE COURT:   The objection is overruled.

19             BY MR. GUTIERREZ:   Q.   That $2,000 difference, do

20  you have an explanation; do you know why there was a $2,000

21  difference?

22  A.   Yes.   Mr. Krapchan had indicated to the source that he

23  was going to -- that he and Mr. Akhundov were going to be

24  pocketing that additional $2,000, and they were going to

25  apply that $2,000 per kilogram in order to purchase their

1  kilograms of cocaine.

2  Q.  So would it be fair to say that Mr. Krapchan and Mr.

3  Akhundov were inflating the price being charged to

4  Mr. Shirani and, allegedly, Mr. Wedding?

5  A.  Yes.

6         MR. DENIS:  Objection, speculation.

7         THE COURT:  The objection is overruled.

8         BY MR. GUTIERREZ:  Q.  And they were going to use

9  that inflated price to pay for their own drugs?

10  A.  Correct.

11  Q.  At any point in time during the course of the

12  investigation and in furtherance of the conspiracy, did

13  Mr. Krapchan tell Mr. Shirani that he was overcharging

14  Mr. Shirani to pay for his own, Mr. Krapchan's, drugs?

15  A.  No, he did not.

16  Q.  Did he ever tell Mr. Wedding that?

17  A.  No, he did not.

18  Q.  During the course of the investigation as you were

19  monitoring the recordings, did you find situations where

20  Mr. Krapchan was put in a situation where he was almost found

21  out, for example?

22         MR. DENIS:  Objection, vague.

23         THE COURT:  Sustained.

24         BY MR. GUTIERREZ:  Q.  Did Mr. Krapchan make extra

25  efforts to make sure that he was the one who was giving the

1    money to the CS?

2    A.  Yes, he did.

3    Q.  You indicated that you participated in a number of

4    debriefs I believe they were called on cross or direct; do

5    you remember?

6    A.  Yes.

7    Q.  In the first debrief, that was with the Royal Canadian

8    Mounted Police?

9    A.  Yes, and members of Vancouver Police Department.

10            THE COURT:  I'm sorry.  Your voice trailed off at

11   the end.

12            THE WITNESS:  I'm sorry.  And members of Vancouver

13   Police Department.

14            BY MR. GUTIERREZ:  Q.  And then after that there

15   were other debriefs; is that right?

16   A.  That is correct.

17   Q.  Now, during every debrief that followed that first one,

18   was every subsequent debrief as thorough and exhausting as

19   the first one?

20   A.  No, they were not.

21   Q.  Would it be fair to say that the latter meetings were

22   preparatory meetings?

23   A.  Yes.

24   Q.  Would it be fair to say that Mr. Shirani was often only

25   asked just to review jail calls?

1    A.   Yes.

2              MR. DENIS:   Objection; vague as to time.

3              THE COURT:   The objection is overruled.

4              BY MR. GUTIERREZ:   Q.   Unless otherwise given

5    specific permission for his presence not to be there, was Mr.

6    Shirani's attorney always present or his representative?

7              MR. DENIS:   Objection, your Honor; beyond the

8    scope.

9              THE COURT:   Overruled.

10             THE WITNESS:   Yes.

11             BY MR. GUTIERREZ:   Q.   While you were present

12   during those debriefs, did anybody from the United States

13   government instruct Mr. Shirani to lie or say something other

14   than the truth?

15   A.   No.

16   Q.   Was he ever given instructions to minimize a role versus

17   anybody else involved?

18   A.   No.

19   Q.   Now, you were asked some questions about a plea

20   agreement; is that right?

21   A.   Yes.

22   Q.   And what normally happens during a proffer session?

23   A.   Yes.

24   Q.   I believe you indicated that time could come off if a

25   person cooperates?

840

1  A.   I indicated that that was not my decision but that the

2  government could make recommendations.

3  Q.   But you understand that there is a process?

4  A.   Correct.

5  Q.   Are you familiar with the legal details of a plea

6  agreement?

7  A.   No.

8  Q.   Do you know what sort of considerations the U.S.

9  Attorney's Office goes through when making a recommendation

10  to a judge?

11  A.   No.

12  Q.   Is that decision up to you?

13  A.   No.

14  Q.   You were asked some questions about the changes that kept

15  occurring or causing problems for the investigation; I think

16  one point at time he was told to come back.  Do you recall

17  those questions?

18  A.   Yes, I do.

19  Q.   What sort of problems did these constant changes present

20  to the government?

21  A.   Well, it created a longer amount of time.  It was a

22  confusing situation because Mr. Krapchan was acting as the

23  middleman between everybody, and so we were reliant upon the

24  information that he was providing to the source of the

25  investigation, and that information continued to change.  So

1    it was just a confusing situation.

2    Q.   You were asked a question that -- about the 13th where

3    the -- Mr. Krapchan received a kilogram of cocaine.  Do you

4    remember those questions?

5    A.   Yes.

6    Q.   Was that purchase of one kilogram, was that one kilogram

7    a sample of 24 to be ultimately purchased or was it just a

8    kilogram and nothing more?

9    A.   It was a sample of the ultimate 24.

10              MR. DENIS:   Objection; calls for speculation.

11              THE COURT:   The objection is overruled.  Would you

12   restate your answer, please?  The objection came while you

13   were making your answer.

14              THE WITNESS:   The one kilogram sample was a sample

15   of the 24 kilogram total transaction.

16              BY MR. GUTIERREZ:   Q.   On cross-examination you

17   were asked some questions about the CS ordering Mr. Krapchan

18   to bring Mr. Shirani; do you remember those questions?

19   A.   Yes.

20   Q.   Let me ask you, you indicated that Mr. Krapchan left

21   messages for the CS; is that right?

22   A.   That he had repeatedly called.

23   Q.   And was that repeatedly calling after the CS was

24   instructed not to contact him anymore?

25   A.   Yes.

842

1    Q.   So communication was broken off.   Why?

2    A.   As I stated, the transaction had taken a number of days,

3    and we needed to make some investigative decisions as far as

4    how to proceed, so we didn't want the source to talk to

5    Mr. Krapchan until we were able to see what was going to

6    happen.

7    Q.   So when Mr. Krapchan called and left these messages,

8    would it be fair to say he initiated the contact with the CS?

9    A.   He did not leave messages; he called, but they were all

10   incoming calls at that time.

11   Q.   And then when he finally got hold of the CS, what did he

12   say?

13   A.   He expressed some confusion.   He thought that the deal

14   was done because he could no longer get ahold of the source,

15   and so he -- that's when he traveled back to LA to return the

16   money.   But in the days prior, he had displayed that he

17   really, really wanted to get the sample.

18   Q.   And is that when the CS told him that it was available if

19   he chose?

20   A.   Yes.

21          MR. DENIS:   Objection.   Withdrawn.

22          BY MR. GUTIERREZ:   Q.   Throughout the course of

23   your investigation, has there been any indication that the CS

24   deals in stolen cars?

25   A.   No.

 1   Q.  But he does have a business where he buys and sells cars?
 2   A.  Yes, he does.
 3             MR. GUTIERREZ:  May I have a brief moment, your
 4   Honor?  Thank you, Ms. Lambert.  I have no further questions.
 5             THE COURT:  Anything further, Mr. Denis?
 6             MR. DENIS:  No, your Honor.
 7             THE COURT:  All right.  Thank you.  You may step
 8   down.  Defense may call its next witness.
 9             MR. DENIS:  Defense calls Ramin Samani.  Oh,
10   actually, your Honor, I'm going to call Ms. Melissa Garcia.
11             THE COURT:  Is she right outside, counsel?
12             MR. DENIS:  Yes, your Honor.
13             THE CLERK:  Would you raise your right hand to be
14   sworn, please.  Do you solemnly swear or affirm that the
15   evidence you shall give in the cause now before the Court
16   shall be the truth, the whole truth, and nothing but the
17   truth?
18             THE WITNESS:  I do.
19                       Melissa Garcia
20   was called by the defense and testified as follows:
21             THE CLERK:  Please state your name for the record
22   and spell your full name.
23             THE WITNESS:  My name?
24             THE CLERK:  State and spell your name.
25             THE WITNESS:  Melissa Garcia, Melissa,

1    M-e-l-i-s-s-a, Garcia, G-a-r-c-i-a.

2                        Direct Examination

3              BY MR. DENIS:  Q.  Ms. Garcia, are you employed

4    with the law offices of David R. Denis?

5    A.   Yes.

6    Q.   And have you been employed for the last year?

7    A.   Yes.

8    Q.   And you were -- as part of your duties for the law

9    offices of David Denis, have you been working on the case of

10   United States versus Ryan Wedding?

11   A.   Yes.

12   Q.   And have you been in charge with receiving discovery in

13   that case?

14   A.   Yes.

15   Q.   As part of the discovery that you received in preparation

16   for trial, did you receive a final transcript from the

17   government in -- in August of 2008?

18   A.   I believe so.

19   Q.   And is that transcript or -- excuse me -- that CD --

20              THE COURT:  Is it a transcript or CD?

21              MR. DENIS:  It's a CD, your Honor.  I apologize.

22   Is it a transcript or a CD, VVV?

23              THE CLERK:  You don't have a VVV, counsel.  VVV is

24   a transcript.

25              MR. DENIS:  It's a CD.

845

1          THE CLERK:  VVV is marked as a conversation

2  June 20.

3          MR. DENIS:  VVV?

4          THE CLERK:  Correct.

5          MR. DENIS:  That might be UUU.

6          THE COURT:  Yes, we have an Exhibit VVV, but it's a

7  transcript, it's not a CD.

8          MR. DENIS:  Well, I indicated it's CD 1 of the

9  transcripts.

10         THE COURT:  No, Exhibit VVV is a transcript that

11  you showed Agent Lambert from January 20 of '07, which was

12  purportedly a transcript of CD No. 1 to see if it would

13  refresh her recollection on the matter.

14         MR. DENIS:  Okay.  I see.  Then maybe TTT --

15         THE COURT:  Are you looking for TTT?

16         MR. DENIS:  I thought I was looking for UUU, your

17  Honor.

18         THE COURT:  I hadn't heard that designation.  I

19  thought I just heard you mention TTT.

20         THE CLERK:  Counsel, you have UUU as a transcript

21  of clips of Exhibit TTT.

22         MR. DENIS:  Perhaps it's SSS.  I do apologize.

23         THE COURT:  All right, counsel.  We don't know what

24  exhibit --

25         MR. DENIS:  It's SSS, your Honor.  I believe it's

1  SSS.

2  THE COURT:  Well, if it's SSS, why don't you

3  approach the exhibit table and just secure it.

4  BY MR. DENIS:  Q.  Ms. Garcia, are you familiar

5  with the exhibit that's been previously marked as Defense

6  SSS?

7  A.  Yes.

8  Q.  Is that the final transcript that was provided by the

9  government?

10  THE COURT:  Counsel, it's not a transcript.

11  MR. DENIS:  I'm sorry, the CD.

12  BY MR. DENIS:  Q.  Are you familiar with that CD?

13  A.  Yes.

14  Q.  Have you viewed the contents of the CD?

15  A.  Yes.

16  Q.  What's inside that CD?

17  A.  It's what we call the final transcripts of the recorded

18  conversations.

19  Q.  Okay.  And as far as your understanding, was that

20  prepared by Ms. Johnson?

21  MR. GUTIERREZ:  Calls for speculation, lack of

22  foundation.

23  THE COURT:  Do you have any information that this

24  was not prepared by her, Mr. Gutierrez, in the interest of --

25  MR. GUTIERREZ:  No, your Honor.

1        THE WITNESS:  We were --

2        THE COURT:  Hold on.  There's no question pending.

3   You want to verify that, Mr. Gutierrez, if it contains some

4   kind of marking that you can verify.

5        MR. GUTIERREZ:  Your Honor, this would be a disk

6   that we provided from Ms. Johnson's work.

7        THE COURT:  Okay.

8        BY MR. DENIS:  Q.  And, Ms. Garcia, from the CD

9   which we've previously marked as Defense Exhibit SSS, was --

10  was the transcripts that were prepared with the clips in TTT

11  and UUU -- well, strike that.  Are you familiar with what's

12  been previously marked as Defense Exhibit TTT?

13  A.  These are the audio clips?

14  Q.  Yes.

15  A.  Yes.

16  Q.  Was this the audio clip that was provided -- clips that

17  was provided to Miss -- Miss -- I withdraw the question.

18  What was the -- the defense translator that was hired?

19  A.  Nataliya Sidorova.

20  Q.  And were those clips provided to Ms. Saratoga (sic)?

21  A.  Correct.

22  Q.  And the exhibit that you have in front of you, TTT, were

23  those the audio transcriptions of the -- of the clips that

24  were provided to her?

25  A.  These are the transcripts?

```
 1   Q.   Correct.  Are these the audio portions?

 2   A.   Yes.

 3   Q.   And was Ms. Saratoga (sic) provided clips which have been

 4   previously marked as Defense Exhibit UUU?

 5   A.   This is a transcript of the audio clips.

 6   Q.   And was Ms. Saratoga (sic) requested to quality check

 7   four clips?

 8   A.   Correct.

 9   Q.   Which clips was provided to Ms. Saratoga (sic) to quality

10   check?

11   A.   She was asked to quality check Exhibit D, XX, N, and P.

12   Q.   And N and P?

13   A.   N as in Nancy, P as in Peter.

14   Q.   And did Ms. Saratoga (sic) as far as you know review

15   those transcripts with the audio clips?

16   A.   Correct, and then she initialed.

17   Q.   And were those transcripts generated from Ms. Johnson's

18   transcription from Defense Exhibit SSS?

19   A.   Correct.

20   Q.   Okay.  Also going to show you what has been previously

21   marked as --

22             THE COURT:  There is a sticker on the back there,

23   counsel.

24             MR. DENIS:  Correct, your Honor.  It has not been

25   identified presently, but I'm going to identify it as four
```

1   As, AAAA.

2            BY MR. DENIS:   Q.   Ms. Gutierrez -- I'm sorry.

3   Ms. Garcia, are you familiar with the CD which has been,

4   which is now marked Defense Exhibit AAAA?

5   A.   Yes.

6   Q.   And what is that CD?

7   A.   It was one of the many CDs we received during the course

8   of discovery.

9        (Exhibit No. AAAA identified.)

10  Q.   And was that CD No. 1 of the many CDs that we received in

11  the course of discovery?

12  A.   Yes.

13  Q.   And did you provide that CD or -- strike that.   Did you

14  make a copy of that CD for Ms. Saratova (sic)?

15  A.   Yes.

16  Q.   Okay.

17  A.   I labeled it ID No. 1 with the date.

18  Q.   And did you give Ms. Saratova (sic) instructions to

19  translate a portion of that CD from Russian into English?

20  A.   Correct.

21  Q.   And as far as you know, did Ms. Saratova (sic) perform

22  that -- that request?

23  A.   Yes.

24  Q.   Going to show you what's been previously marked as

25  Defense Exhibit VVV.

 1   A.   She mailed me this transcript to my work email, and I

 2   printed it and saved it.

 3   Q.   And was this the portion of the transcript that was

 4   requested for her to transcribe?

 5   A.   Correct.

 6   Q.   So there was a portion from CD 1 that was requested of

 7   Mrs. Saratova (sic) to transcribe, correct?

 8   A.   Correct.

 9   Q.   And she provided that transcript here today, correct?

10   A.   Correct.

11   Q.   And were you present when Ms. Saratova (sic) testified to

12   translating that portion of the transcript from CD 1?

13   A.   No.

14   Q.   Okay.  And that was based, as far as you know -- strike

15   that.  Let me show you another CD which has been previously

16   marked as defense exhibit -- which we will mark as BBB -- I'm

17   sorry -- four Bs, BBBB.  Are you familiar with that CD?

18   A.   Yes.  It's my writing.

19        (Exhibit No. BBBB identified.)

20   Q.   What is that CD purported to be?

21   A.   It's the Shirani proffer in two parts, and it was

22   recorded July 17, 2009.

23   Q.   Okay.  Was that part of the discovery provided by the

24   government to the defense --

25   A.   Correct.

851

1   Q.   -- or to the law office of David Denis?

2   A.   Correct.

3   Q.   And you are the custodian of those -- of that discovery,

4   correct?

5   A.   Correct.

6   Q.   You organized that discovery for the law offices of David

7   Denis, correct?

8   A.   Correct.

9   Q.   And, Ms. Garcia -- and the exhibit which is indicated as

10  a proffer, this was a copy of the proffer, correct?

11  A.   Correct.

12              THE COURT:   What is this, counsel?

13              MR. DENIS:   Your Honor, this is Defense Exhibit

14  BBBB, 4 Bs.

15              THE COURT:   Well, BBBB is a CD, is it not?

16              MR. DENIS:   Yes, your Honor.

17              THE COURT:   Okay.  Did you just hand the witness

18  something else, a transcript of some kind?

19              MR. DENIS:   No.  I apologize.

20              THE COURT:   Okay.  She already indicated what BBBB

21  was.  Okay.

22              MR. DENIS:   Thank you, your Honor.

23              BY MR. DENIS:  Q.  And, Ms. Garcia -- Ms. Garcia,

24  as part -- was the proffer session of the CD sent to a court

25  reporting service to be transcribed?

1   A.   Correct.

2   Q.   Showing you what has been previously marked as Defense

3   Exhibit XXX, are you familiar with that document?

4   A.   Yes.

5   Q.   What is that document?

6   A.   It's a transcript of Exhibit BBBB, the Shirani proffer,

7   and it includes both parts.

8   Q.   And was this -- and who transcribed -- what company

9   transcribed the transcript, the CD?

10  A.   Ubiqus Reporting.

11  Q.   And can you spell that for the reporter.

12  A.   Sure.  U-b-i-q-u-s Reporting.  They're based in Irvine,

13  California.

14  Q.   And the document that you have as XXX, is that a

15  certified report -- reporting of the proffer of the CD?

16          MR. GUTIERREZ:  Calls for speculation, lack of

17  foundation, your Honor.

18          THE COURT:  Sustained.

19          BY MR. DENIS:  Q.  Are you familiar with a

20  certified transcripts?

21  A.   Correct.

22  Q.   Is that a yes?

23  A.   Yes.

24  Q.   As part of your duties, do you regularly receive

25  transcripts of depositions from court reporters?

1    A.   Yes.

2    Q.   And you're familiar with what certifications are?

3    A.   Yes.  The court reporters certify that it's accurate to

4    their ability.

5    Q.   Okay.  And the document that you have, which is

6    Defendant's XXX, that is certified?  It's a certified copy of

7    the proffer session?

8              MR. GUTIERREZ:  Objection; lack of foundation,

9    calls for speculation.

10             THE COURT:  The objection is sustained.  I don't

11   know that the witness is familiar with the particular

12   certification at hand.  Is there any question that the

13   transcript XXX is an accurate transcription of BBBB?

14             MR. GUTIERREZ:  We have not been provided, your

15   Honor, so I would not be able to say.

16             THE COURT:  All right.  I'll sustain the objection.

17             BY MR. DENIS:  Q.  Ms. Garcia, have you read the

18   transcript which is Defense Exhibit XXX and compared it with

19   BBBB, the proffer?

20   A.   Sections of it, but I can't say I've done it all.

21   Q.   Okay.  And based on the sections that you've listened to,

22   were they accurate transcriptions --

23             MR. GUTIERREZ:  Vague as to which sections, your

24   Honor.

25             THE COURT:  Sustained.  If you're going to go about

854

1    it this way, I think you'd have to have the witness compare

2    the entirety of the transcript with the CD.

3              MR. DENIS:  All right.

4              BY MR. DENIS:  Q.  And, Ms. Garcia, could you

5    read --

6              MR. DENIS:  Your Honor, I would like to move in

7    Exhibit XXX, and we will --

8              THE COURT:  Well, I sustained the foundational

9    objection to it, counsel.

10             MR. DENIS:  Like to move the proffer, BBBB, into

11   evidence at this time.

12             THE COURT:  Any objection to BBBB?

13             MR. GUTIERREZ:  Yes, your Honor; hearsay, improper

14   foundation for impeachment, lack of foundation.

15             THE COURT:  Well, I'll sustain the objection to B

16   to the fourth power.  There is a lack of foundation, but

17   probably more importantly is that it would have to be

18   redacted; I would not allow the whole thing to come in, only

19   what's germane, so the objection is also sustained on that

20   basis.

21             BY MR. DENIS:  Q.  Ms. Garcia, looking at page 44

22   of the transcript -- could you take a look at page 44 of the

23   transcript.  Is that a portion of the transcript that you

24   have reviewed previously?

25   A.  I can't -- we got this done back in July, so I can't

1  remember the last time I reviewed this.

2  Q.  And on page 44 does it indicate that --

3            MR. GUTIERREZ:  Not in evidence, your Honor.  We'd

4  object as to hearsay.

5            THE COURT:  Page 44 is not in evidence, counsel.

6  The objection is well-taken.

7            MR. DENIS:  Your Honor, I would wish at this time

8  to play a portion of exhibit -- the CD, which is -- what is

9  the number of the CD on --

10           THE WITNESS:  BBBB.

11           MR. DENIS:  Okay.  On BBB, your Honor, just the one

12 portion.

13           THE COURT:  On triple what?

14           MR. DENIS:  BBB.  There's just one portion.

15           THE WITNESS:  Quadruple.

16           MR. DENIS:  I apologize, BBBB.

17           THE COURT:  It's not in evidence yet, but if

18 counsel has no objection --

19           MR. GUTIERREZ:  Is that the Shirani proffer, your

20 Honor?

21           THE COURT:  It is.  It's what purports to be the

22 Shirani proffer.

23           MR. GUTIERREZ:  Well, there are portions in there,

24 your Honor -- I don't know what he would like, but we would

25 object, your Honor, as hearsay, lack of foundation.

856

1          THE COURT:  Well, I'll sustain the objection.

2          MR. DENIS:  Your Honor, it's a --

3          THE COURT:  You need to show counsel what you're

4   even proposing at this point, Mr. Denis; he may have no

5   objection to it.

6          MR. DENIS:  Okay.

7          THE COURT:  Okay, counsel.  Look, if you can't

8   reach an agreement at this point, you can discuss it after we

9   let the jury go for the day, but would you ask another

10  question, please.

11         MR. DENIS:  I'm sorry, your Honor?

12         THE COURT:  Obviously you can't come to some kind

13  of stipulation right now, so please ask another question.

14  The two of you can carry on that conversation after the day

15  is concluded.

16         MR. DENIS:  Okay.

17         MR. GUTIERREZ:  Your Honor, the government will

18  stipulate that when asked, Mr. Shirani indicated that the

19  phone was not in his name, the BlackBerry phone.  We would be

20  willing to stipulate to that so we would be able to move

21  along.

22         THE COURT:  We're back to the BlackBerry?

23         MR. GUTIERREZ:  Yes, your Honor.

24         MR. DENIS:  Your Honor, there was two --

25         THE COURT:  What is the -- all right.  Hold on now.

1    Hold on.  We may have a stipulation here, which would be a

2    first for this trial.  What are you proposing the stipulation

3    is?

4             MR. GUTIERREZ:  That during the debrief when asked

5    about his phone, Mr. Shirani indicated that the BlackBerry

6    phone was not in his name.

7             THE COURT:  Okay.  Hold on.  You accept that

8    stipulation?  Want to think about it?

9             MR. DENIS:  I'll accept -- I'm sorry.  What's the

10   stipulation, that Shirani indicated the BlackBerry was not in

11   his name?

12            THE COURT:  That's correct.  Okay.  If you don't

13   have an agreement --

14            MR. DENIS:  I have an agreement.  That's fine.

15            THE COURT:  All right.  Will that --

16            MR. DENIS:  That's fine.

17            THE COURT:  -- eliminate this area of inquiry?

18            MR. DENIS:  Actually, your Honor -- okay.

19            THE COURT:  If it does, fine.

20            MR. DENIS:  It's not accurate.  It's not accurate.

21            THE COURT:  That's fine.  Counsel's offered to

22   stipulate, and -- why don't you move to another area.

23            MR. DENIS:  I will.  Thank you, your Honor.

24            THE COURT:  Sure.

25            BY MR. DENIS:  Q.  Ms. Garcia, as part of the

858

1    discovery in this case, we received -- the law office of
2    David Denis received Shirani jail calls, correct?
3    A.   Correct.
4    Q.   Going to show you what has been previously marked for
5    identification purposes as YYY and ZZZ.
6              THE COURT:   We already have YYY and ZZZ.
7              MR. DENIS:   This is the -- this is the exhibit.
8              THE COURT:   The ones that have already been marked?
9              MR. DENIS:   Been identified, correct, same ones.
10             THE COURT:   Okay.
11             THE WITNESS:   These are the originals that we
12   received from the government.
13             BY MR. DENIS:   Q.   Okay.   And as part of your
14   duties and assignment at the law offices of David R. Denis,
15   did you -- did the law office of David Denis utilize the
16   translation services of Ramin Samini (sic)?
17   A.   Yes.
18   Q.   And was Mr. Samini (sic) requested to translate from
19   Farsi into English a number of calls?
20   A.   Yes.
21   Q.   Okay.   And as far as your understanding as an employee of
22   the law office -- law offices of David R. Denis, was that --
23   those translation services done?
24   A.   Yes.
25   Q.   Okay.   And have those been -- and these were for -- the

1  translations were for the jail calls, correct?

2  A.  Yes.

3  Q.  And do you recall how many translations Mr. Ramin did?

4  A.  He did 44 calls.

5  Q.  Okay.  And were these 44 calls coming from the CDs that

6  you have, which have been previously been marked as Defense

7  Exhibit YYY and ZZZ?

8  A.  Yes.

9          MR. DENIS:  Nothing further, your Honor.

10          THE COURT:  Mr. Gutierrez, do you have any

11  questions?

12          MR. GUTIERREZ:  No, your Honor.  Thank you.

13          THE COURT:  Thank you, Ms. Garcia.  You may step

14  down.

15          THE WITNESS:  Should I leave the exhibits?

16          THE COURT:  Leave those right there.  Otherwise, we

17  may not find them again.

18          MR. DENIS:  Your Honor, the defense calls Mr. Ramin

19  Samini (sic).

20          THE CLERK:  Would you raise your right hand to be

21  sworn, please.  Do you solemnly swear or affirm that the

22  evidence you shall give in the cause now before the Court

23  shall be the truth, the whole truth, and nothing but the

24  truth?

25          THE WITNESS:  I do.

860

1    . . . . . . . . . .

2                         Ramin Samani

3    was called by the defense and testified as follows:

4              THE CLERK:  Please state your name for the record

5    and spell your full name.

6              THE WITNESS:  Ramin Samani, R-a-m-i-n  S-a-m-a-n-i.

7                    Direct Examination

8              BY MR. DENIS:  Q.  Mr. Ramini --

9              THE COURT:  Is it Samani?

10             THE WITNESS:  Samani.

11             MR. DENIS:  Samani.  I apologize, your Honor.

12             BY MR. DENIS:  Q.  Mr. Samani, are you Farsi

13   translator.

14   A.  Yes, I am.

15   Q.  Okay.  How long have you been working in that capacity?

16   A.  About 15 years.

17   Q.  And do you have a Ph.D in teaching English and foreign

18   linguistics?

19   A.  Yes, I have.

20   Q.  And that's from which university?

21   A.  Azad University in Iran.

22   Q.  And did you receive your doctorate degree in 2001?

23   A.  Yes, I did.

24   Q.  And as part of your translation, you've also translated

25   documents for a number of companies, correct?

1    A.   That's right.

2    Q.   What were just some of the -- can you just name a few of

3    the companies that you translated documents for.

4    A.   I have translated documents for companies like Phillips,

5    I have translated documents for companies like JVC, Kenwood,

6    part of it, some Google things, Google translation.   And I

7    have done some legal documents such as divorce certificates

8    from Farsi to English.

9    Q.   Okay.   And did you also teach English in Iran?

10   A.   Yes, I did.

11   Q.   Okay.   And were you an assistant professor in the English

12   department?

13   A.   Yes.

14   Q.   And how long did you do that?

15   A.   I've been an assistant professor since 2001.   After I

16   received my Ph.D., I started teaching in the same university.

17   Q.   Okay.   During the time you were teaching at the

18   university, you were also translating from --

19   A.   That's right.

20   Q.   -- Farsi into English, correct?

21   A.   Yes.

22   Q.   You were given an assignment from the law office of David

23   R. Denis, correct?

24   A.   Yes.

25   Q.   Going to hand you a binder, which we won't mark

1    collectively but we will -- have you seen this?

2            THE COURT:  You indicated what it was marked, but

3    you voice trailed off there.  You said it was marked

4    collectively, and I didn't get the designation.

5            MR. DENIS:  I wasn't going to mark it collectively.

6            THE COURT:  Okay.

7            MR. DENIS:  I'm going to just --

8            THE COURT:  Are you going to mark it?

9            MR. DENIS:  I'll mark it.

10           THE COURT:  If you're going to hand it to the

11   witness, we should have it marked.

12           MR. DENIS:  Yes.  We'll mark it as Defense Exhibit

13   CCCC.

14           MR. GUTIERREZ:  Mr. Denis, can I take a look at

15   that?

16           MR. DENIS:  I'm sorry, Mr. Gutierrez.

17           THE COURT:  While counsel's looking at that, ladies

18   and gentlemen, we just have a minute or two left until 4:30,

19   so I don't want to take up your time just sitting there in

20   the jury box.  We'll let you go at this point and we'll

21   resume tomorrow morning at nine o'clock.  Please remember the

22   admonition not to discuss the case or make any decisions at

23   this time.  Thank you.

24       (The jury left the courtroom.)

25           THE COURT:  We're outside the presence of all

1    jurors.  You may step down, sir.  All right.  Thank you.  Are

2    we going to have any issue on qualifications here, Mr.

3    Gutierrez?

4              MR. GUTIERREZ:  I doubt it, your Honor.  He

5    seems --

6              THE COURT:  Very good.  Go ahead, please.

7              MR. GUTIERREZ:  You know, your Honor, if I could

8    just short-circuit --

9              THE COURT:  You know, I just didn't want to see

10   problems over qualifications develop because nothing has gone

11   easily in this trial, and I thought that would be something

12   we could avoid, but --

13             MR. GUTIERREZ:  What I wanted to do, now that I've

14   seen this, is I'm going to ask for a copy now that it's a

15   court exhibit.  I will fax the copy to our expert, and if

16   everything's accurate, I will stipulate to it, as I've

17   offered to in the past with regard to the Farsi.

18             THE COURT:  Okay.

19             MR. GUTIERREZ:  I can't tell if the --

20             THE COURT:  Well, I don't know.  Mr. Denis may not

21   want a stipulation as to accuracy.

22             MR. GUTIERREZ:  I understand, but what I can also

23   say is that with regard to the four Russian transcripts that

24   he had translated, which he provided to me for the first time

25   today, I compared them with what -- our draft versions, and

1   I've informed -- after my staff finished comparing the two --

2   that they are accurate.  So as I indicated before and as I'm

3   willing to do right now is stipulate to the authenticity and

4   accuracy of those documents.  Not that they come in -- I mean

5   those Russians will; obviously it's a co-conspirator

6   statement.  I'm willing to stipulate to it, and I indicate

7   that to counsel.

8           THE COURT:  As to the authenticity or accuracy?

9           MR. GUTIERREZ:  Yes, your Honor.

10          THE COURT:  Basically foundation, but not as to all

11  of it coming in.

12          MR. GUTIERREZ:  Yes, your Honor.  If I can state

13  with regard to the proffer session, I'm very sure that it is

14  Mr. Shirani's proffer session.  He came to me at the break

15  with a few minutes to go saying will you stipulate to this.

16  I haven't been able to compare -- I photocopied every single

17  CD.  Once I get that done and maybe even listened to it, I'll

18  be happy to stipulate to it.  I would have an objection to

19  its admissibility, but that's another's matter.

20          And then with regard to the other exhibit, which

21  he's calling CD 1, that's regarding some conversations the CS

22  had with an immigration attorney where counsel I believe is

23  going to try to argue that they're talking about illegal

24  things.  So once I compare that disk, if it's from our

25  discovery, I'll agree to its authenticity.  But with regard

1    to it coming in, that's another thing, and I'd like to

2    reserve my objection.  So far as authenticity, I am willing

3    to now and have been once I confirm certain things.

4                THE COURT:  Okay.

5                MR. DENIS:  Your Honor, as to the CD No. 1, it's

6    not a -- an attorney, it's a consultant.

7                THE COURT:  Doesn't make any difference.  I mean

8    what counsel is saying is this, that whatever these

9    evidentiary items are, whether they be a CD or whether be a

10   transcript, he's willing to stipulate to the accuracy and any

11   authentication, authentication meaning the exhibit is in fact

12   what it purports to be.

13               MR. DENIS:  And I appreciate that from the

14   government.

15               THE COURT:  Well, I don't even know if you're

16   willing to accept that.

17               MR. DENIS:  Oh, I absolutely will.

18               THE COURT:  Okay.  But here's the point that he's

19   making, which is a valid point.  Simply stipulating to the

20   authenticity and the accuracy doesn't sanctify all of it

21   coming in.  He's reserving objections as to relevance, as to

22   403 issues, as to just a whole host of objections that may be

23   made depending upon what you want to introduce.  So with that

24   limitation, that is, he's reserving objections, substantive

25   objections, seems to me that this is something that you

1    should consider.

2            MR. DENIS:  Absolutely.  And I appreciate the

3    government for extending that for the translation.

4            THE COURT:  Okay.  My suggestion now so that you

5    don't -- so that things go smoothly from this point forward

6    is that if you are desiring to have put before this jury

7    certain portions of a transcript or -- well, wouldn't really

8    be a transcript; I assume it would be a CD -- that you let

9    counsel know, and he can tell you whether or not he's got any

10   objection to a particular part of a transcript going in.  If

11   not, then you can cue all of that up, you can play it on the

12   screen, and just as importantly -- and this is very

13   important -- you can have extra copies -- not extra but

14   copies in written form of what is being shown to the jury

15   marked --

16           MR. DENIS:  We have all that, your Honor.  We have

17   all of that.

18           THE COURT:  Really?

19           MR. DENIS:  We have all that for the Court.

20           THE COURT:  But the problem is if I were to ask you

21   to give to me what you've -- some of the things you've

22   played, what you're going to tell me is well, it's -- the

23   Court already has it, but the CRD's telling me that we don't

24   have a lot of these things.  And all day on Friday you were

25   trying -- you were working with Mr. Gutierrez to try and

 1   catch up with the exhibits.  We've got to keep an accurate

 2   record of everything that's being played for the jury.  For

 3   example, you played as Exhibit A, Defense Exhibit A, a clip,

 4   a portion of a conversation on June 3 between Krapchan and

 5   the confidential source.  Would you please show that to me

 6   right now --

 7               MR. DENIS:  Sure, your Honor.

 8               THE COURT:  -- in written form where it's a

 9   stand-alone, separate sheet --

10               MR. DENIS:  Of course, your Honor.

11               THE COURT:  -- and marked as Exhibit A, Court

12   Exhibit A.

13               MR. DENIS:  Do we have those exhibits?  Yes.  This

14   is my copy, and we have a copy for the Court, which --

15               THE COURT:  Well, you show me.  You show -- not

16   your copy, the copy that's already been marked as an exhibit.

17               MR. DENIS:  It was up on Ms. Garcia's --

18               THE COURT:  Go ahead.  Check it out.  I'm just

19   trying to underscore the importance of having all of this in

20   the record.

21               MR. DENIS:  I understand.  I appreciate it from the

22   Court, your Honor.  There were --

23               THE COURT:  Well, where is it, sir?

24               MR. DENIS:  I don't know.

25               THE COURT:  That's not it.

 1              MR. DENIS:  No, it's not, but did the --

 2              THE COURT:  You said the Court had it, Exhibit A,

 3      and it should be on the --

 4              MR. DENIS:  Yes, your Honor.  Here we go.

 5              THE COURT:  Okay.  One sheet.

 6              MR. DENIS:  Well, we have all of the clips.

 7              THE COURT:  No, no, no, I don't want all of it.  I

 8      just want one sheet which will comprise Exhibit A as a

 9      separate clip that was played.

10              MR. DENIS:  If the Court could indulge me, I

11      have -- it's right here.

12              THE COURT:  I see a whole stack of materials there.

13      That wasn't all played.

14              MR. DENIS:  Correct.

15              THE COURT:  What I need -- let me say this again --

16              MR. DENIS:  Is one sheet.

17              THE COURT:  What I need is one sheet which is

18      Exhibit A; I need one sheet that was Exhibit E; I need one

19      sheet that was Exhibit G.

20              MR. DENIS:  Okay.

21              THE COURT:  I need one sheet that was Exhibit L.

22              MR. DENIS:  Hold on one second, your Honor.  Could

23      the Court repeat that so I have an accurate -- I apologize --

24      I'm writing down A --

25              THE COURT:  Well, I'm just giving -- these are four

1  examples.

2              MR. DENIS:  Yeah, A --

3              THE COURT:  Exhibits A, E, G, and L.  You played

4  clips of each one of those, and I asked you repeatedly for

5  the stand-alone single pages of sheets containing those

6  clips.

7              MR. DENIS:  Your Honor, what the defense had tried

8  to do was --

9              THE COURT:  Don't take those, please.

10              MR. DENIS:  No?  I apologize.  We spent innumerable

11  hours putting together the remaining clips as the Court

12  instructed us to do.  As we believed that the transcripts

13  were -- there was foundation laid for transcripts, we had

14  clips from those transcripts -- obviously whatever clips we

15  thought we did not have, we had our Russian --

16              THE COURT:  Counsel, counsel --

17              MR. DENIS:  -- we had our Russian translator --

18              THE COURT:  Hold on.  You're not getting the point

19  I'm trying to make here why it is so important for us to have

20  these clips stand alone.  What happens if the jury is

21  deliberating and they come back with a question:  We want to

22  see replayed Exhibits A and G, the clips that were shown, A

23  and G.  And I want to be able to ask your technician to put

24  up on the board A and G.  You don't know what those are, we

25  don't know what those are because we're only going to be

1  playing back for the jury what the jury has requested.

2          MR. DENIS:  Correct.

3          THE COURT:  That's just giving you one example of

4  why these things are so important.

5          MR. DENIS:  I can --

6          THE COURT:  So let me say this.  I'll repeat this.

7  It is so important for you to get together with Mr. Gutierrez

8  and show him -- you're not required to, but --

9          MR. DENIS:  I've given him all the clips, your

10 Honor.  He has all of the clips.

11         THE COURT:  Would you let me finish?

12         MR. DENIS:  I apologize.

13         THE COURT:  -- to show him the transcripts that he

14 has now agreed to the authenticity and accuracy of so that

15 you can take what part or parts of those materials you may

16 want to display for the jury, if any, show them to Mr.

17 Gutierrez, assuming he has no objection, give them to your

18 technician, have those clips played, and then have marked and

19 received as court exhibits those stand-alone pieces of paper

20 that will complete the record and will aid this Court and the

21 jury in case there is any request for a playback of

22 individual clips.  That's what we're trying to do here.

23         MR. DENIS:  I understand.

24         THE COURT:  So that's why it's very important that

25 you get together on this.  I mean simply having Mr. Gutierrez

1   stipulate to authenticity and accuracy doesn't mean that

2   it's -- it's not an exhibit dump, and you need to be very,

3   very specific about where you're going to go.

4           MR. DENIS:  I understand.

5           THE COURT:  So I'm going to ask counsel to -- I

6   don't how much lead time you need to do this, Mr. Gutierrez.

7   Do you have any idea as to how much -- how many of these

8   clips you'd want to use from these exhibits?

9           MR. DENIS:  Talking to me, your Honor?

10          THE COURT:  I am.

11          MR. DENIS:  Is this the jail calls, your Honor?

12          THE COURT:  I don't know.  Whatever we're talking

13  about.

14          MR. DENIS:  In total?  We're talking in total?

15          THE COURT:  It's not my case.  Just from this point

16  forward, I --

17          MR. DENIS:  Your Honor -- I know the jail calls,

18  your Honor, there are nine clips, and the other clips -- the

19  only additional clips that we asked our expert -- excuse

20  me -- yes, our translator to do us four additional clips.

21          THE COURT:  So you're talking about 13 clips all

22  together?

23          MR. DENIS:  Yes.

24          THE COURT:  And on average --

25          MR. DENIS:  Very short.

1          THE COURT:  They're short clips?

2          MR. DENIS:  Yes.

3          THE COURT:  So what I'd suggest is this, that you

4    create one page of material, of transcript material, the

5    authenticity and accuracy of which is now established

6    pursuant to stipulation; show those to Mr. Gutierrez, see if

7    there's going to be a problem, see if he has an objection --

8          MR. DENIS:  Yes, your Honor.

9          THE COURT:  If there is, let me know.  Give me --

10         MR. DENIS:  Yes, your Honor.

11         THE COURT:  -- the transcripts, the one-page

12   transcript that's the subject of any objection.  I can look

13   it and I can sustain it or overrule it --

14         MR. DENIS:  Yes, your Honor.

15         THE COURT:  -- and that way you'll get these people

16   on and off and it won't be so difficult.

17         MR. DENIS:  It's been quite an event.  I mean I've

18   never had to deal with something like this, ever, in any

19   trial that I've ever done, this type of level of -- okay.  I

20   think -- this is -- this is a very unusual situation.

21         THE COURT:  Well, I can tell you in my experience

22   of over 500 trials, jury trials, I've not seen the kind of

23   difficulty that we're having, so I'm trying to give you a bit

24   of assistance here --

25         MR. DENIS:  I appreciate that.

1          THE COURT:  -- as I have throughout the trial to --

2     as it relates to exhibits, to get these things organized and

3     in a proper form so that when the objections come, if they do

4     come, I can rule on them and we can keep the evidence --

5          MR. DENIS:  Absolutely.

6          THE COURT:  -- moving.

7          MR. DENIS:  We will --

8          THE COURT:  May I ask the two of you to work

9     together and work on this this evening?

10         MR. DENIS:  Yes, your Honor.

11         THE COURT:  Tomorrow night we're going to go over

12    jury instructions.  I have a set of proposed instructions

13    that I have put together, and so plan on spending some time

14    after the close of business tomorrow to go over jury

15    instructions.  You're still planning on concluding your case

16    by about noon?

17         MR. DENIS:  Yes.  Well, with the way today went,

18    your Honor, probably most of the afternoon as well.  I

19    apologize.  It's today --

20         THE COURT:  Most of the afternoon?

21         MR. DENIS:  Yes.  We will conclude tomorrow for

22    sure.

23         THE COURT:  Okay.  In fairness to you, you

24    indicated that was a distinct possibility when we talked

25    about scheduling at the side of the bench here.

1    Mr. Gutierrez, are you considering -- even though the defense

2    hasn't concluded it's case, any kind of a rebuttal case or

3    are we going to move right into arguments and --

4              MR. GUTIERREZ:  I think it may be fair to say that

5    we can move right into argument.  I would like to reserve the

6    ability to reevaluate things, but as of right now --

7              THE COURT:  You do.

8              MR. GUTIERREZ:  -- I can't imagine doing any

9    rebuttal.

10             THE COURT:  All right.  Well, let's do our best to

11   keep the trial moving.  If you need the whole day tomorrow,

12   take the whole day tomorrow.  But in any event, I want to

13   meet with you in the evening after we adjourn so that we can

14   go over jury instructions.

15             MR. DENIS:  Thank you, your Honor.

16             THE COURT:  Okay.  Very good.

17             MR. GUTIERREZ:  Your Honor, I know I can't leave

18   the courtroom with this, but would I please be able to

19   request that your staff or if I can have access to the

20   Court's copier to make a copy.  I don't know if counsel's

21   produced one for me, but Defense Exhibit CCC -- CCCC I

22   believe, I don't have a copy of this.

23             THE COURT:  Do you have an extra copy?

24             MR. DENIS:  I don't have an extra copy, your Honor,

25   but I don't object at all getting a copy from --

1          THE COURT:  Okay.

2          MR. GUTIERREZ:  Could I take this back to my office

3     or can you give me your copy to copy in my office and I'll

4     leave this with the Court?

5          MR. DENIS:  Yes.

6          THE COURT:  Okay.  Anything else we need to discuss

7     before we adjourn?

8          MR. GUTIERREZ:  Will the issue of Mr. Wedick be

9     taken up tomorrow before he testifies?

10          THE COURT:  Well, like I mentioned to you, I think

11     most of -- I don't know exactly what subjects Mr. Denis would

12     like to explore with Mr. Wedick, but I've been through the

13     materials, I've been through his proposed subject areas, and

14     I think that -- you two are going to get together I assume.

15          MR. DENIS:  Yes, your Honor.

16          THE COURT:  Okay.  Would you please advise Mr.

17     Gutierrez of what subject areas -- because there are a whole

18     host of them, A or whatever, H, I, or J -- what subject areas

19     you want to pursue.

20          MR. DENIS:  Okay.

21          THE COURT:  Because some of them are just moot;

22     they don't even necessarily -- they don't shed any -- they're

23     not even relevant to what we're doing here.  Why don't you

24     identify which areas you'd like to explore with Mr.

25     Gutierrez, and if there's any issue, I think that we can

1   address that tomorrow.  Is he your next witness?

2          MR. DENIS:  After Romini (sic), yes, your Honor.

3          THE COURT:  I can do that now.  I'll go back and

4   get my materials and --

5          MR. GUTIERREZ:  I appreciate it, your Honor.

6          THE COURT:  -- that way you can have a bit of a

7   head's up.  Hold on.

8          MR. DENIS:  I recall the Court already discussed

9   these issues with us last week.

10          THE COURT:  The what now?

11          MR. DENIS:  The Court already discussed this issue

12   with us last week and gave counsel direction as to --

13          THE COURT:  No, what I did was I said that the

14   objection that Mr. Gutierrez had to the witness even

15   testifying was overruled, that you had given adequate notice

16   in the materials that you had supplied the government as to

17   what the subject areas would be.  They might have been a

18   little bit more detailed in specific conclusions, but I think

19   the government is put on sufficient enough notice that you

20   can go ahead and call this witness on the areas that are

21   relevant to the case.  So I think that's where we are.

22          MR. DENIS:  Okay.

23          THE COURT:  Okay.  So if you'll hang tight, I'll

24   get the list and we can review those together.

25          MR. GUTIERREZ:  Your Honor, with your permission

1    could I have some of my staff leave that I don't need?

2              THE COURT:  Sure.  Now, if you want to waive Mr.

3    Wedding's presence, you can do that as well, Mr. Denis.

4              MR. DENIS:  That's okay.

5              THE COURT:  Mr. Wedding, you don't have to be here

6    for this, but if you wish to be, you certainly may.

7              THE DEFENDANT:  I'd like to stay.

8              THE COURT:  And I want to thank you for the

9    patience that you've shown thus far.  I know that some of

10   this has been a little frustrating and you've kept a pretty

11   good game face on, and there are other people in your

12   position that would not have done that.

13             Okay.  I've got the various -- look, you're talking

14   about the following subject areas here, counsel:  Testimony

15   on the FBI gatekeeping functions with respect to informants,

16   and I'll just summarize these at this point.  Maybe you can

17   tell me what areas you truly want to examine Retired FBI

18   Agent Wedick on.

19             No. 1:  You've got the testimony of FBI gatekeeping

20   functions with respect to informants; two, the testimony as

21   to the suitability periods of informants and what is required

22   to have the informant pass the suitability period; three,

23   testimony on the policies of interviewing CIs; four,

24   testimony on the use of informants, cooperating witnesses,

25   surveillance, and corroboration; five, testimony on the use

 1   of Group I or II proposals in the use of confidential

 2   informants to support their theories.  I must confess I

 3   didn't know what that related to, what that is.  But carrying

 4   on, six, testimony on the procedures of the controlled

 5   purchase of narcotics using informants and the defendant's

 6   conduct as it relates to those policies; seven, testimony on

 7   the role of muscle; and eight, testimony on how suppliers of

 8   controlled substances use deceptive practices to further the

 9   distribution efforts.

10         Seems to me that a lot of this is just very general

11   and is going to be extremely of limited value, limited

12   probative value.  Which of those subject areas did you want

13   to question Mr. Wedick about?

14         MR. DENIS:  Your Honor, did the Court receive the

15   actual report from Mr. Wedick?

16         THE COURT:  Yeah, I've got it.

17         MR. DENIS:  Okay.  That goes into greater detail

18   and actually different issues as well regarding the policies

19   and the procedures.

20         THE COURT:  This is what I have.

21         MR. GUTIERREZ:  The Court was reading from my

22   submission initially.

23         THE COURT:  I've got 13 pages of what you've

24   submitted under your letterhead, your own letterhead, and

25   then the first part of that purports to be your letter to Mr.

1    Gutierrez indicating what areas, what the expert's --

2              MR. DENIS:  Your Honor --

3              THE COURT:  -- opinions --

4              MR. DENIS:  -- Mr. Wedick is prepared to testify

5    about the surveillance conducted in this case as it relates

6    to standard procedural policy of the FBI.  He's going to

7    discuss the issue of fingerprinting evidence --

8              THE COURT:  Fingerprinting?

9              MR. DENIS:  Yes, as it relates to this case in

10   terms of the money.  Mr. Wedick is going to describe in a

11   little bit of detail the rules of the game of sophisticated

12   drug dealers and how they cover their tracks and conceal

13   their criminal activity.  Mr. Wedick is going to discuss the

14   Interpol and what the function of Interpol is and how cases

15   are brought to Interpol and what types of cases are enforced

16   or policed by -- what types of cases Interpol actually gets

17   involved in.  Mr. Wedick will testify about the confidential

18   informant, CW in this case, as it relates to the suitability

19   period, as it relates to the attorney guidelines, and the

20   facts that are aware to the FBI as it relates to the warrant,

21   the wants, the immigration issue that had come up that was in

22   the knowledge of the government, the CV (sic), regarding

23   what -- what was -- during the suitability period what the

24   FBI knew in terms of the CW.

25             THE COURT:  Well, I can see you're going to have

1    some problems already.  If you're just going call the FBI

2    agent just have him go over the entirety chronology of the

3    case and testify as to what the FBI knew at all points in the

4    case, I don't see what the utility of that would be.

5              You know, I had looked to that part of your letter

6    to Mr. Gutierrez in which you set forth what the expert

7    opinions are or the expert areas --

8              MR. DENIS:  Your Honor, this was --

9              THE COURT:  -- in which Mr. Wedick will state his

10   opinions.  That's on the bottom of page 1 of your letter and

11   the top of page 2.

12             MR. DENIS:  But if the Court recalls, the report is

13   actually prepared by Mr. Wedick and it expounds on in detail

14   these areas as it relates to the policies and procedures --

15             THE COURT:  Well, I don't have the report.  I guess

16   I don't have the report.  Let me tell you what I do have.

17   I've got your letter, which I thought was the notice you were

18   giving as to the areas where he would be testifying.  Then I

19   have a long CV, probably close to 13 pages, and perhaps the

20   balance of your submission to Mr. Gutierrez.  And then --

21             MR. DENIS:  Well, your Honor --

22             THE COURT:  -- that's pretty much it.  Then I have

23   the opposition from the government.  I asked for one fully

24   integrated package where everything would be included, and I

25   guess I didn't get the report.  I thought your letter was a

881

1    summary of that.

2              MR. GUTIERREZ:  The report arrived at the

3    government on November 13 at four o'clock the day before

4    trial.  Your Honor, I have a copy of it here.  I'd be happy

5    to show it to you.  But this is something I would ask the

6    Court to read because I think it will clear up a lot of

7    issues if the Court had a chance to consider it.  I could

8    present a copy to the Court.

9              THE COURT:  All right.  I'll take time to read it,

10   but we may not be able to discuss this further tonight then.

11             MR. DENIS:  Okay.  Is that a ten-page document,

12   your Honor?

13             THE COURT:  Looks like it's more than that.  It's

14   12 pages but -- well, it is ten pages actually.

15             MR. DENIS:  Oh.

16             THE COURT:  That's the first time I've seen this.

17             MR. DENIS:  And that was a supplemental report that

18   was provided to the government.

19             THE COURT:  And what was the initial report?

20             MR. DENIS:  The one that the Court had.

21             THE COURT:  It's not a report, it's a letter from

22   you.

23             MR. DENIS:  Correct, that's the initial disclosure,

24   and then I did a supplemental disclosure with the actual

25   report prepared by Mr. Wedick for the government.

882

1          MR. GUTIERREZ:  The day before trial.

2          THE COURT:  Well, you may -- it may not work, it

3     may not work in all particulars, Mr. Denis.  I'll have to

4     look at this.  But I was going by the areas that you had

5     identified in your letter, and that was the basis of my

6     initial ruling that the government's objection as to this

7     gentleman even being called would be overruled.  So if you've

8     loaded up Mr. Wedick with a number of others areas and

9     opinions --

10         MR. DENIS:  No, your Honor.

11         THE COURT:  -- where the government didn't even

12    have notice of this until the day of trial, the date we

13    started trial, that would not be a good thing.

14         MR. DENIS:  This was just further -- you know,

15    further detailed -- detailing of the actual testimony and

16    which documents he relied on and --

17         THE COURT:  I see some of that.  I see some of the

18    materials he reviewed and all.  Mr. Gutierrez, have you had

19    an opportunity to compare the actual report that you've just

20    given me and which you received in the first day of trial,

21    with the areas identified by Mr. Denis on page 1 of his

22    letter to you where Mr. Wedick apparently was going to

23    provide his opinions?

24         MR. GUTIERREZ:  Yes, your Honor, I have compared

25    the two, and in all candor, after you read the first letter,

1    there's really no indication of what the opinion would be or

2    what the basis of the opinion would be.  In response to

3    receiving that first letter, I called Mr. Denis and I asked

4    him, I'm entitled pursuant to the code to some notice as to

5    what the opinions are and what the basis is.  He indicated to

6    me that I'd be able to discover that on cross-examination.  I

7    think that's why in the subsequent report dated the day

8    before trial, a business day before trial, the word "opinion"

9    is in quotes every time Mr. Wedick ventures to render an

10   expert opinion.

11           It can be divided into three subsections, which I

12   can summarize for the Court now, but I imagine the Court

13   would want to summarize it itself by reading it.  Essentially

14   Mr. Shirani, when he was interviewed, the agents did not

15   properly investigate him so they were able to determine that

16   his initial statements were untruthful, and, as such, because

17   of that initial failure to investigate or question him

18   properly, they should not have used him as a cooperating

19   defendant, which is really up to the U.S. Attorney, not the

20   FBI.  Moreover, they say that by virtue of questioning that

21   didn't occur, they weren't able to determine that he was

22   lying, a fact that Mr. Wedick presumes that it was a lie in

23   making his hypothesis, and he didn't have the benefit of an

24   interview.  So there is some issues there with regard to Mr.

25   Shirani.  Similar issues with regard to the CS.  And with the

1    fingerprinting I imagine an argument could be made that

2    fingerprinting of the money should have been done, but I

3    don't know if it's necessary for an expert to come and say

4    that.  But those are the three main areas that that letter

5    ventures to discover which is a little different than the

6    initial notice.

7            THE COURT:  Well, okay.

8            MR. DENIS:  And, your Honor, I presented this

9    supplement.  I've never told Mr. Gutierrez that he can

10    venture into it on cross-examination.  I told him I would

11    supplement the initial disclosure, and I even told him

12    further that I would have Mr. Wedick prepare a report

13    detailing his opinions, which I believe I provided to him at

14    least by the 13th of November; that was as soon as Mr. Wedick

15    had, you know, thoroughly put this report together.

16            THE COURT:  Well, let me just give you one example

17    here of where I think you might have taken unfair advantage

18    of the government, and I say might have taken unfair

19    advantage of the government.  Your letter doesn't indicate --

20    why don't you turn to page 5 of Wedick's report.  In the

21    second --

22            MR. DENIS:  Your Honor, Mr. Wedick is outside.

23            THE COURT:  I don't need him.

24            MR. DENIS:  Okay.

25            THE COURT:  Take a look at page 5, paragraph 2.

1   Starts, as noted above -- and then he goes on -- as noted

2   above, Shirani's answers appear to be just lies.  Because he

3   wanted to deflect investigators' interest in his activities,

4   he apparently merely made up allegations concerning Wedding.

5          Now, that to me is an outrageous statement where

6   any FBI agent currently working for the FBI or retired would

7   ascribe a certain motivation to a defendant in the hopes that

8   he can convince a jury of his subjective musings about the

9   guilt or non guilt of a particular defendant.

10          Now, nowhere in your letter to Mr. Gutierrez -- now

11   that's just one example that kind of stands out.  But nowhere

12   in your letter to Mr. Gutierrez do you indicate that that's

13   going to be the subject of his testimony, nowhere, I mean not

14   even close.

15          MR. DENIS:  Your Honor, I do apologize.  I don't

16   have that letter before me.

17          THE COURT:  Okay.  But I'm just giving you one

18   example of where I'm going to have to go over this pretty

19   carefully.  And those kinds of opinions -- I mean he might as

20   well come in here and testify that in his view, in his

21   subjective view, the government doesn't have any case against

22   your client.  I have never seen any former law enforcement

23   officer come in and purport to render such an opinion on any

24   case, state or federal.  It's really quite stunning.  But I'm

25   sure the foundation for that cannot be established, and the

1    question is before the Court right now would that even be

2    appropriate, and I don't think it would.

3              MR. DENIS:  Your Honor, there are other areas that

4    Mr. Wedick will address as they relate to --

5              THE COURT:  Okay.  Well, I'm pointing that out --

6              MR. DENIS:  I understand.

7              THE COURT:  -- I'm pointing that as one example of

8    where the government did not -- apparently did not get notice

9    of what this gentleman's opinion would be.  That's the kind

10   of thing I think the government would want to know about

11   sooner than the day of trial.  So I'll go over this; I'll be

12   able to give you more definitive guidance tomorrow, but I

13   think there may be some limitations placed on Wedick.  Okay.

14             MR. GUTIERREZ:  Your Honor, if I can just give the

15   Court some background.  That initial letter that Mr. Denis

16   gave me, I had put a nationwide request across the country

17   for other jurisdictions that Mr. Wedick testified, and

18   strangely enough, I got letters very similar to that where

19   that letter was given to a court in other jurisdictions.

20   Now, I won't tell the Court what the courts did, but I think

21   that they were just using a form letter that was produced for

22   other jurisdictions and that the second letter really is what

23   they intended to do here.  But I just thought I'd just tell

24   the Court as far as background where that first letter came

25   from; it seems to me, based on what I've received from other

1    districts, something that was used in other districts.

2           MR. DENIS:  That's not -- well, that's

3    hypothetical, that's complete speculation.  I prepared that

4    letter.  It's not from any form letter at all.  That's the

5    basis of it.

6           THE COURT:  Okay.  Very good.  We'll see you

7    tomorrow morning.

8           MR. DENIS:  Thank you, your Honor.

9           MR. GUTIERREZ:  Your Honor, one last issue here as

10   far as the CS has been here all day.  He's missed a day from

11   work, and granted, this is a very important proceeding, but

12   is he going to be needed tomorrow?  Can he be on maybe an

13   hour call or half hour call?

14          THE COURT:  Sure.

15          MR. GUTIERREZ:  Would a half hour be okay, your

16   Honor, or an hour?

17          THE COURT:  Either one.

18          MR. GUTIERREZ:  All right, your Honor.  Thank you.

19          THE COURT:  Okay.

20      (There was a break in the proceedings for the evening

21   recess.)

22

23

24

25

1                                I n d e x

2    Witnesses                                          Page

3    **Oleksandra Johnson  (Defense)**
     Direct Examination by Mr. Denis                    692
4
     **Nataliya Sidorova  (Defense)**
5    Direct Examination by Mr. Denis                    697
     Cross-Examination by Mr. Gutierrez                 700
6    Redirect Examination by Mr. Denis                  703

7    **Natalie Lambert  (Defense)**
     Direct Examination by Mr. Denis                    708
8    Cross-Examination by Mr. Gutierrez                 836

9    **Melissa Garcia  (Defense)**
     Direct Examination by Mr. Denis                    844
10
     **Ramin Samani  (Defense)**
11   Direct Examination by Mr. Denis                    861

12
                              E x h i b i t s
13
     Exhibits        Description            For ID   In Evd
14   SSS             CD                     694
     TTT             CD                     699
15   Court's UUU     Transcript excerpts    699
     Court's VVV     Transcript excerpt     705
16   WWW             Document               716
     Court's XXX     Transcript excerpt     746
17   A               Audio recording        768
     L               Audio recording        773
18   Court's BBB     Transcript excerpt     781
     YYY             CD                     786
19   Court's O       Transcript excerpt     794
     Court's SS      Transcript excerpt     799
20   Court's UU      Transcript excerpt     802
     Court's WW      Transcript excerpt     806
21   Court's ZZ      Transcript excerpt     809
     Court's AAA     Transcript excerpt     816
22   YYY             CD                     826
     ZZZ             CD                     826
23   Court's EEE     Transcript excerpt     829
     Court's GGG     Transcript excerpt     831
24   Court's HHH     Transcript excerpt     833
     AAAA            CD                     849
25   BBBB            CD                     850

1                        Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated  _____  at San Diego, California.

12

13                          _____
                            /s/ Debra M. Henson  (electronic)
                            Debra M. Henson
14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25