1                    United States District Court

2                  Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                    Plaintiff,      )
                                     )
6       vs.                          ) Case No. 08-CR-2386 JM
                                     ) Jury Trial
7   RYAN WEDDING,                    ) Volume 6
                                     )
8                    Defendant.      ) Tuesday, November 24, 2009
    _____)

9

10             Before the Honorable Jeffrey T. Miller
                    United States District Judge

11

12  Appearances:

13  For the Plaintiff:      Karen P. Hewitt
                            UNITED STATES ATTORNEY
14                          Orlando B. Gutierrez
                            ASSISTANT U.S. ATTORNEY
15                          880 Front Street, Suite 6293
                            San Diego, CA  92101
16
    For the Defendant:      David R. Denis, Esq.
17                          CENTER FOR EXTREME JUSTICE
                            707 Wilshire Boulevard, Suite 3600
18                          Los Angeles, CA  90017

19

20

21  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
22                           940 Front Street, Suite 5190
                             San Diego, CA  92101
23                           (619) 238-4538

24

25        Record produced by certified stenographic reporter

1     San Diego, California - Tuesday, November 24, 2009

2          THE COURT:  Good morning, everyone.  Everyone is

3     present.  We are ready to resume, and --

4          MR. DENIS:  Thank you, your Honor.

5          THE COURT:  Mr. Samani, you've been previously

6     sworn; you are still under oath, sir.  I believe there are

7     some clips ready to be played for you.  Mr. Denis?

8          MR. DENIS:  Yes, your Honor.

9                    Direct Examination, cont'd

10         BY MR. DENIS:  Q.  Mr. Ramini (sic), you indicated

11    that -- how many calls did you translate in total?

12    A.  Forty-four.

13    Q.  And during those 44 calls, were you able to recognize the

14    voices on those calls?

15    A.  I think -- I think there were two men, three, and a

16    woman.

17    Q.  Okay.  And through the course of listening to the

18    recordings, were you able to ascertain that the man in the

19    jail was Hassan Shirani?

20    A.  Yes.

21    Q.  And how were you able to do that?

22    A.  I don't know whether his family is Shirani, but he's

23    introducing himself as Hassan.

24    Q.  Okay.  And you indicated that there was a woman that he

25    spoke to in terms of the 44 recordings.

1    A.   Yes.

2    Q.   What was -- who the person that he was speaking to?

3    A.   Hassan is addressing that woman as "mom."

4    Q.   And were you through the 44 calls, were a number of those

5    to the mother?

6    A.   Excuse me?

7    Q.   During the -- for the 44 calls that you listened to, were

8    a number of those calls --

9    A.   Yes.

10   Q.   -- in regards to conversations with his mother?

11   A.   Correct.

12   Q.   And did he address -- how did he address the older lady?

13   A.   "Mama."

14   Q.   Okay.  So you were able to deduce that was his mother,

15   correct?

16            MR. GUTIERREZ:  Been asked and answered, your

17   Honor.

18            THE WITNESS:  Yes.

19            THE COURT:  The objection is overruled.  But it's

20   on that basis you deduced the relationship?

21            THE WITNESS:  Yes, based on what -- the way they're

22   addressing each other.

23            BY MR. DENIS:  Q.  Okay.  And you indicated there

24   were two men that you also heard conversations -- I mean --

25   strike that.  Between Mr. Shirani and -- or the person named

1    Hassan, and there was another man, correct, or two men?

2    A.   Two men.

3    Q.   Who were the two men that he was speaking to?

4    A.   I have no idea about the second man, but I'm sure that

5    the other one's name is Hossein.  I have no idea about who

6    the third man is.

7    Q.   Okay.  And to the man Hossein, were you able to deduce

8    from listening to the recordings who Hussein (sic) was?

9    A.   Yes.

10   Q.   And who was he?

11   A.   Yeah.  Hossein seems to be Hassan's brother.

12   Q.   Okay.  And you indicated that there was a third man that

13   you don't know who that was, correct?

14   A.   No, I don't know.

15   Q.   Did he ever give his name in any of those recordings?

16   A.   As far as I remember, no.

17   Q.   Okay.  So right now you are -- if you heard the voices of

18   the woman you would deduce that it was the mother, correct?

19   A.   I think I can.

20   Q.   And if you heard the voices of the brother, you would

21   know which voice is the brother's, correct?

22   A.   I think I can, yeah.

23   Q.   And that was based on your translating 44 calls

24   approximately, correct?

25   A.   Yes.

1    Q.   Are you -- I'm going to -- what has been previously

2    marked as Defense Exhibit CCCC, have you seen this binder

3    before, sir?

4    A.   Yes, I did.

5    Q.   Inside that binder -- could you tell us what is contained

6    in that binder.

7    A.   This part or this part?

8    Q.   Just go ahead and tell us --

9    A.   There are some papers and some transcripts and a CD,

10   file.

11   Q.   Okay.  When you indicated there were some papers, can you

12   show me those papers.  What is this?  Okay.

13   A.   Uh-huh.

14   Q.   Do you recognize those papers?

15   A.   Yes.

16   Q.   What are those papers?

17   A.   They are the translations of the calls.

18   Q.   Okay.  When you say those are the translations, are those

19   the clips?

20   A.   The clips?  What do you mean by clips?

21   Q.   Okay.  Actually let's go through the tabs.  There's a

22   number of tabbed papers?

23   A.   Uh-huh.

24   Q.   Could you just look through those and see if you

25   recognize --

1    A.  Yes, these are the translations.

2    Q.  Let's start with No. 2.  Well, actually is there a No. 1

3    on this?

4    A.  There's no No. 1.

5    Q.  Okay.  So you have a tab No. 2, correct?

6    A.  Right.

7    Q.  And what is the date of that call?

8    A.  June 29, 2008.

9    Q.  Okay.  And did you perform the translation on that

10   June 29, 2008 call?

11   A.  I don't know because, you know, out of these calls, they

12   were two translators; I did some of the translations and

13   quality check the other ones.  I mean if I listened to that,

14   I can verify, or if I read it --

15   Q.  Do you need to read it?

16   A.  I can do that, but, you know, in here I'm not highly in

17   focus.  I mean it's difficult for me, but I try.

18   Q.  Okay.  Now, but you had reviewed these calls previous to

19   coming here today, correct?

20   A.  Yeah.

21   Q.  And you had reviewed this call that's in exhibit -- in

22   tab No. 2?

23   A.  Yeah.  I think this is -- has been done by me.  Let me

24   see.  Yeah, I think.

25   Q.  Now, the translations that were done that were put in

1   this binder, did they come from the CDs that are attached to

2   the binder?

3   A.   Yeah.

4   Q.   Okay.   You want to take a look at the CDs?

5   A.   Yeah.

6   Q.   Okay.   Well, right now we're looking at call No. 2 or

7   Exhibit No. 2 of June 29, which you have identified and we'll

8   mark as Defense Exhibit -- well, we'll say --

9            THE COURT:   Why don't we just do this, Mr. Denis.

10   Just to preserve the record on this, you've referred to it as

11   Exhibit 2, as tab 2.   Why don't we just have you --

12            MR. DENIS:   CCCC-2?

13            THE COURT:   Put a -- it's CCCC-2, and if you would

14   put a separate sticker on that, please.

15            MR. DENIS:   I will, your Honor.

16            THE COURT:   Okay, CCCC-2.   I assume you're

17   intending on playing the -- playing the call.

18            MR. DENIS:   An excerpt, yes.

19            THE COURT:   Okay.

20      (Exhibit No. CCCC-2 identified.)

21            BY MR. DENIS:   Q.   And could you -- you looked

22   through this -- this holder previous to coming here, correct?

23   A.   Right.

24   Q.   And you reviewed the translations, and these were

25   translations that you had either done personally or you had

1   relistened and quality checked, correct?

2   A.   Correct.

3   Q.   And that would be for each of the calls that are in this

4   binder?

5   A.   Yeah.

6   Q.   Okay.  So what we'd like to do, it goes from two --

7   what's the next -- the next clip?

8   A.   Next clip is numbered as five.

9   Q.   Or the next translation.  I'm sorry.  CCCC-5.  And what's

10  the date on --

11          THE REPORTER:  Mr. Denis, I'm really having trouble

12  hearing you with your back to me.

13          THE WITNESS:  July 7, 2008.

14          BY MR. DENIS:  Q.  And the next exhibit?

15          THE COURT:  That was five?

16          MR. DENIS:  That was CCC-5 (sic) your Honor.

17          THE COURT:  Okay.

18      (Exhibit No. CCCC-5 identified.)

19          BY MR. DENIS:  Q.  And the next one is --

20  A.   Number 6.  Okay.  Number 6.  July 8, 2008.

21  Q.   Okay.

22          THE COURT:  You're marking those as you go, aren't

23  you?

24          MR. DENIS:  Yes, your Honor.

25      (Exhibit No. CCCC-6 identified.)

 1              BY MR. DENIS:   Q.   And the next call after that?

 2   A.   Numbered as two, is July 18.

 3   Q.   Okay.   So we'll call that seven.   CCC-7?

 4              THE COURT:   CCCC.

 5              MR. DENIS:   CCC-7 will be the --

 6              THE COURT:   It's quad C.

 7              MR. DENIS:   Quadruple C.

 8              THE COURT:   It's confusing.

 9              MR. DENIS:   I understand.

10        (Exhibit No. CCCC-7 identified.)

11              BY MR. DENIS:   Q.   The next one I have, what's the

12   date of that?

13   A.   July 24, 2008.

14   Q.   And that is CCC-8?

15              THE COURT:   CCCC-8.

16              MR. DENIS:   CCCC-8.

17        (Exhibit No. CCCC-8 identified.)

18              THE WITNESS:   You want the next one?

19              BY MR. DENIS:   Q.   Yes, please.

20   A.   July 30, 2008.

21              MR. DENIS:   That one we'll mark as CCCC-13.

22              THE COURT:   It's 13?

23              MR. DENIS:   Yes, your Honor.

24              THE COURT:   Okay.

25        (Exhibit No. CCCC-13 identified.)

1          BY MR. DENIS:  Q.  And the next call?

2     A.  Is July 31 -- 28 -- 2008.

3     Q.  And that will be CCCC-14.  Mr. Ramini (sic), there are

4     some clips that you found in the binder, correct?

5     A.  Yes.

6          (Exhibit No. CCCC-14 identified.)

7     Q.  And these clips, did you -- are these clips found in the

8     CD or did you -- did you quality check or -- did you listen

9     to these clips?

10    A.  Yes.

11    Q.  Okay.  And could you give each of the exhibits of the

12    clips that you quality checked?

13          MR. GUTIERREZ:  I'm sorry, your Honor.  I didn't

14    hear that at all.

15          BY MR. DENIS:  Q.  Could you give us the -- there's

16    a number of exhibits -- well, looking at Defense Exhibit EEE,

17    did you quality check that clip?

18    A.  You want me to identify which I have quality check or

19    translated?

20    Q.  The one that you listened to and quality checked those

21    clips.

22    A.  This one, it's -- you want me --

23    Q.  Start with this one, yes.

24    A.  I did this one.

25    Q.  On the June 29, 2008?

1    A.   Yeah.

2    Q.   Did you quality check Exhibit EEE?

3    A.   Uh-huh.

4              THE COURT:  Is your answer yes?

5              THE WITNESS:  Yes.

6              THE COURT:  Is that a -- is that a CD and

7    recording, counsel?

8              MR. DENIS:  Yes, your Honor.

9              THE COURT:  Okay.

10             MR. DENIS:  It's a clip of the CD that he

11   translated.

12             THE COURT:  I'm sorry?

13             MR. DENIS:  It's a clip, a portion of the clip of

14   the CD that he translated, the transcript that he translated.

15             BY MR. DENIS:  Q.  And looking at Exhibit GGG, did

16   you listen to that clip and quality check that clip?

17   A.   I don't think I have done this.  I think -- but I think I

18   quality checked this one.  I'm not quite sure.

19   Q.   Okay.  But these clips you --

20             THE COURT:  When you say this one -- our record is

21   incomplete, Mr. Denis.  Please have the witness identify

22   which one he did and which one he did not do.

23             BY MR. DENIS:  Q.  Looking at Exhibit GGG, is that

24   the clip that you're referencing?  This is the July 7, 2008

25   call.

1    A.   It's very hard to tell because I have done a lot of

2    translations since then, but I think I have -- I haven't done

3    this; I have quality checked this one.

4    Q.   Okay.

5    A.   I think.  I'm not sure.

6    Q.   Okay.  You quality checked.  Did you listen to the clip

7    of this -- of this call?

8    A.   Yes.

9    Q.   Okay.  And that's what has been marked as GGG, correct?

10   A.   Yes.

11   Q.   And you quality checked this July 7, 2008 call that

12   was -- that was part of the transcript, correct?

13   A.   Correct.

14   Q.   Looking at the next exhibit on page 2, HHH, clip 1, this

15   is a clip from the July 8, 2008 call which you either

16   translated or quality checked.  Do you recall quality

17   checking and reviewing --

18   A.   I have translated this one.

19   Q.   Okay.  And that's HHH, clip 1, correct?

20   A.   Hold on a second.  Yeah, I've translated this.

21   Q.   So we'll identify that with a sticker.

22            THE CLERK:  Counsel, does that exhibit have two

23   exhibit stickers on it?

24            MR. DENIS:  On the back.  There's two clips.

25            THE COURT:  You know, those clips have already been

 1  played; HHH and GGG have already been played for the jury, so

 2  the foundation may not be necessary if they've already been

 3  played.

 4          MR. DENIS:  Then, you know, your Honor, I believe

 5  there may be an error.  Perhaps they're EEEE.  Should I redo

 6  it?

 7          THE COURT:  Well, all I'm saying is the witness has

 8  been referring to Exhibits GGG and HHH.  He indicated that

 9  with respect to GGG, he listened but did not, quote, unquote,

10  quality check.  With respect to EEE, he quality checked that.

11  That's already been played.  With respect to HHH, that's

12  already been played.  So I don't know what you're going over

13  at this point.

14          MR. DENIS:  Okay.  I see the issue here.

15          BY MR. DENIS:  Q.  Looking at which we've

16  accidentally marked as EEE, which I believe is EEEE --

17          MR. DENIS:  I do apologize.

18          THE COURT:  That's all right.

19          BY MR. DENIS:  Q.  Okay.  Mr. Ramini (sic), I do

20  apologize for the error.  You indicated that you had looked

21  at which we have now identified as EEE (sic), correct, which

22  is the June 29, 2008 clip, correct?

23  A.  Pardon me?  Is that -- say that again, please.

24  Q.  Yes.  You've previously testified that you had looked

25  over with -- which we have now marked Defense Exhibit EEEE,

1    the July -- the June 29, 2008 call, correct?

2         (Exhibit No. EEEE identified.)

3    A.   Correct.

4    Q.   And you've also I think there are translated or quality

5    checked the clip GGGG, correct?

6    A.   Correct.

7         (Exhibit No. GGGG identified.)

8    Q.   And that's the July 7, 2008 call, correct?

9    A.   Correct.

10   Q.   Or clip of that call.  You also were asked to look at

11   HHHH, clip 1; that was the July 8, 2008 call.  You had

12   reviewed this and quality checked that clip, correct?

13   A.   Correct.

14        (Exhibit No. HHHH-1 identified.)

15   Q.   Looking at the July 8, 2008 HHH, clip 2, you also either

16   translated that or quality checked that clip, correct?

17   A.   This one is HHHH?

18   Q.   HHHH, correct, clip No. 2.

19             THE COURT:  Is that a second call from July 8, Mr.

20   Denis?

21             MR. DENIS:  Yes, your Honor.  It's clip No. 2.

22   It's the same day, just a different clip.

23        (Exhibit No. HHHH-2 identified.)

24             THE WITNESS:  Yes, I translated this one.

25             BY MR. DENIS:  Q.  Okay.  And looking at HHHH, clip

904

1   No. 3 of the July 8, you also reviewed and quality checked --

2   either translated or quality checked this clip, correct?

3   A.  Hold on a minute.  I was talking about HHHH -- HHHH, clip

4   3.  I say I translated No. 2.  Please.

5   Q.  Sure.

6   A.  Yes, I did that, sir.

7       (Exhibit No. HHHH-3 identified.)

8   Q.  Okay.  And you indicated you had --

9   A.  Number -- clip 3, 2 and 3, HHHH.

10  Q.  All right.  Looking at July 18, 2008, JJJJ, the July 18,

11  2009 (sic) call, did you either quality check or translate

12  that clip, which is part of the July 18, 2009 (sic) call?

13          THE COURT:  You mean 2008?

14          MR. DENIS:  Yes.

15          THE WITNESS:  I don't -- I think I quality check

16  this.  I'm sure -- I think I haven't translated this one.

17  Q.  Okay.  But you had reviewed this clip?

18  A.  Yeah.  There are so many of these files, you know, it's

19  hard.

20  Q.  Okay, Mr. Ramini (sic).  Just answer it.  Do you recall

21  that JJJJ you had reviewed -- either reviewed or translated

22  the July 18, 2008 call, correct?

23  A.  Correct.

24      (Exhibit No. JJJJ identified.)

25  Q.  And you reviewed this clip?

1    A.   Correct.

2    Q.   Which has been previously marked or which is being marked

3    as JJJJ, correct?

4    A.   Correct.

5    Q.   Looking at Exhibit NNNN, which is the July 24, 2008 call,

6    you either translated this call or quality checked this clip,

7    correct?

8    A.   Yes, I've translated this.

9         (Exhibit No. NNNN identified.)

10   Q.   Okay.  Looking now at what's been marked as OOOO, Exhibit

11   OOOO, the July 30, 2008 call, you either translated this call

12   and/or quality checked this clip, correct?

13   A.   Yes.

14        (Exhibit No. OOOO identified.)

15   Q.   Okay.  Looking at Exhibit PPPP, the July 31, 2008 call,

16   you either translated this call and/or quality checked the

17   PPPP clip, correct?

18   A.    The PPPP, yes.

19            THE COURT:  What was the date associated with PPPP?

20            MR. DENIS:  PPPP, your Honor, is July 31, 2008.

21            THE COURT:  Thank you.

22        (Exhibit No. PPPP identified.)

23            BY MR. DENIS:  Q.  Okay, Mr. Ramin (sic).  Mr.

24   Ramini (sic), your resume was included in your translations,

25   correct?

906

1   A.   Yeah.

2   Q.   And could you look at this document?   Is this a current

3   resume for you?

4   A.   Yes.

5   Q.   Okay.

6           MR. DENIS:  Let me just mark that as QQQQ.

7           BY MR. DENIS:   Q.   We went over your background and

8   your credentials, correct, yesterday?

9   A.   Yes.

10      (Exhibit No. QQQQ identified.)

11          MR. DENIS:  Your Honor, I'd like to move Defense

12  Exhibit CCCC and -- okay.

13          BY MR. DENIS:   Q.   Mr. Ramini (sic), also there

14  are -- there are two CDs that are -- that are -- these were

15  the CDs that you -- well, let's take them out.   Now, there is

16  a blue binder or a blue CD which indicates --

17          MR. DENIS:  We'll mark this as Defense Exhibit RRR.

18          MR. GUTIERREZ:  Is that RRRR, your Honor, not RRR?

19          MR. DENIS:  RRRR.

20          BY MR. DENIS:   Q.   Did you review this CD?

21  A.   Yes.

22      (Exhibit No. RRRR identified.)

23  Q.   And from this 120 calls, you were asked to translate

24  approximately 44 calls?

25  A.   Correct.

 1   Q.  And from RRRR there's another CD, a blue -- a red CD,

 2   correct?

 3   A.  Yes.

 4           MR. DENIS:  We'll mark as SSSS.

 5           BY MR. DENIS:   Q.  Were these the clips of the

 6   calls that were associated with Exhibits EEE through PPP?

 7   A.  Correct.

 8           THE COURT:  Did you mean EEEE through PPPP?

 9           MR. DENIS:  EEEE through PPPP.  I apologize, your

10   Honor.  Thank you.

11           THE COURT:  And are you also including the CCCC

12   clips, C-2, -5 through -8, -13 and -14?

13           MR. DENIS:  Yes, your Honor.

14           THE COURT:  Okay.

15           MR. DENIS:  I'd like to move it into evidence at

16   this time?

17           THE COURT:  What are you moving into evidence, all

18   of the clips that you've identified?

19           MR. DENIS:  Yes, the clips that I've identified and

20   just -- yes, just the clips that I've identified.

21           THE COURT:  Well --

22           MR. DENIS:  And the CD, SSS.

23           THE CLERK:  SSSS.

24           MR. DENIS:  SSSS.

25        (Exhibit No. SSSS identified.)

908

1          THE COURT:  Well, I don't know if SSSS contains
2    more calls than were broken out and assigned individual
3    exhibit numbers, but do you have -- Mr. Gutierrez, do you
4    have any objection to the C series, the CCCC series of clips
5    coming in?  Those would be CCCC-2, -5, -6, -7, -8, -13, and
6    -14.  Let's take those first.
7          MR. GUTIERREZ:  Your Honor, that CCCC is the green
8    binder that had a number of other things in it at the outset
9    of counsel's examination.  I would not be able to agree to
10   everything in there.
11         THE COURT:  I'm just referring to the exhibits that
12   were --
13         MR. GUTIERREZ:  If those -- if everything else
14   could be removed from the binder but those specific exhibits,
15   I would have no objection to --
16         THE COURT:  The binder is not being offered, just
17   those clips I identified, CCCC-2, -5, -6, -7, -8, -13, and
18   -14.  Counsel indicates he's put separate exhibit tags on
19   those.  Any objection to those?
20         MR. GUTIERREZ:  To those particular ones, no, your
21   Honor.
22         THE COURT:  All right.
23         MR. DENIS:  Thank you.
24         THE COURT:  You're also submitting EEEE, which is a
25   separate clip; is that correct?

1          MR. DENIS:  PPPP, your Honor?

2          THE COURT:  Are you offering EEEE?  I don't know

3    what you're offering and what you're not offering.

4          MR. DENIS:  I'm going to be playing a clip which is

5    EEEE from the call of June 29, which is part --

6          THE COURT:  I understand that, but you said you

7    were offering exhibits; I didn't know which exhibits you were

8    and which you were not offering.  So we're just trying to

9    determine what's in evidence now and that which you may play

10   and what is not.

11         MR. DENIS:  It's going to be EEE -- sorry -- EEEE,

12   GGGG, HHHH, clip 1, HHHH, clip 2, HHHH, clip 3, JJJJ, NNNN,

13   and OOOO, and PPPP, and that is it.

14         THE COURT:  Okay.

15         MR. GUTIERREZ:  Would those for the limited purpose

16   of keeping the record sounds; it would be the audio that

17   would actually be played?

18         MR. DENIS:  Yes.

19         THE COURT:  Yes.  They're court exhibits; they're

20   not actually -- transcripts themselves aren't admitted into

21   the evidence for the jury's consideration.  They're court

22   exhibits, and the evidence will be what is seen and heard

23   here on the screen.

24         MR. GUTIERREZ:  Certainly.

25         THE COURT:  There being no objection, those

910

1    exhibits are admitted in audio form.

2         (Exhibit Nos. EEEE, GGGG, HHHH-1, HHHH-2, HHHH-3, JJJJ,
     NNNN, OOOO, PPPP are admitted.)
3              MR. DENIS:  Thank you, your Honor.

4              MR. GUTIERREZ:  Your Honor, now that counsel laid

5    the foundation as far as authenticity, I'd ask him to show me

6    which clips he's going to play before he plays them so that I

7    can make appropriate objections.

8              MR. DENIS:  You didn't --

9              THE COURT:  I apologize for the delay, ladies and

10   gentlemen.  It was my understanding counsel were going to do

11   this last night; they were going to get together so that they

12   could review these proposed clips between themselves.

13             MR. DENIS:  Thank you, your Honor.  We're going to

14   be playing for the jury clip exhibit --

15             THE COURT:  Let's hold on and see if there are any

16   objections.

17             MR. GUTIERREZ:  We'd object as to hearsay, not

18   being inconsistent, your Honor, offered for an inappropriate

19   purpose.

20             THE COURT:  Which one?

21             MR. GUTIERREZ:  EEEE.

22             MR. DENIS:  It is inconsistent, your Honor.  This

23   deals with the car dealing.

24             MR. GUTIERREZ:  I have a transcript here, and I'll

25   be happy to talk about it at sidebar.

 1              THE COURT:  Let me see the transcript, please.

 2    Just bring it forward.   The individual -- Mr. Denis, what

 3    you've marked as --

 4              MR. DENIS:  EEE.

 5              THE COURT:  EEEE.

 6              MR. DENIS:  EEEE.

 7              THE COURT:  The objection is sustained as to EEEE.

 8    There will be a record of that.   Next is GGGG?

 9              MR. DENIS:  GGGG, your Honor, but could we have

10    a --

11              THE COURT:  Well, there's no inconsistency here in

12    terms of impeachment; there's no inconsistency.

13              MR. DENIS:  Your Honor, it deals with the car

14    dealing.

15              THE COURT:  I understand.

16              MR. DENIS:  I asked Mr. Shirani specifically --

17    could we have a sidebar on the issue?  It's a very important

18    issue, your Honor.

19              THE COURT:  At this point I'm just ruling, and

20    we'll go on to GGGG.  Any objection to GGGG?

21              MR. GUTIERREZ:  Your Honor, I apologize.  I was

22    just provided what GGGG is.  If I could have just a moment.

23    Your Honor, we'd have an objection as to hearsay.  I don't

24    see it being inconsistent or it's conduct after the offense

25    occurred.

1    MR. DENIS:  Your Honor, the July 7 is when we

2  received the discovery on the call.

3    THE COURT:  Hold on.  Hold on.

4    MR. DENIS:  Your Honor, for the record Mr.

5  Gutierrez has received these clips yesterday.

6    MR. GUTIERREZ:  I received over 40 clips with no

7  indication of what would be used, your Honor.

8    THE COURT:  I apologize, ladies and gentlemen, for

9  this.  This is unfortunate.  Counsel, I am going to allow

10  these clips to be played.  In my view, some of this is

11  probative, and much of it is not probative, is not relevant,

12  and I think this will be readily apparent to anyone who would

13  listen to these clips or to see the translations of these

14  clips.  And so rather than take up additional time and for

15  the sake of just moving forward and controlling the pace of

16  evidence coming in, if you have any objections to these, you

17  may register them, Mr. Gutierrez, at a later time.  I'm going

18  to allow these clips to be played, and we'll preserve these

19  clips as a court record.

20    MR. DENIS:  Thank you, your Honor.  I appreciate

21  it.

22    MR. GUTIERREZ:  The only concern I have, your

23  Honor, is that there's a reference to some speculation as to

24  the government's consideration of the value of its case or

25  the strength of its case, and I think it would be

913

1   inappropriate for the jury to hear the speculation in this

2   context because --

3           THE COURT:  I can always give a limiting

4   instruction.

5           MR. GUTIERREZ:  Certainly, your Honor.  Thank you.

6           THE COURT:  Okay.  We will proceed with the clips.

7   You have them cued up?  Sorry for the delay, ladies and

8   gentlemen.  We are usually able to do these things without

9   that kind of delay.  We'll just play through these once.

10  Obviously this gentleman is only a translator.  He doesn't

11  have underlying information.  So let's go through the clips.

12          MR. DENIS:  I appreciate that, your Honor.  If I

13  can --

14          THE COURT:  Technical difficulties?

15          MR. DENIS:  Could we take a five-minute recess to

16  resolve it?  Maybe have to reboot the computer.  I don't

17  know.  It's cued up, it's just not projecting for whatever

18  reason, or playing.

19          THE COURT:  Are you sure there's nothing you can do

20  right now immediately to solve this?

21          MR. DENIS:  Apologize to the Court, your Honor, and

22  to the other -- I thank the Court for its patience.

23          THE COURT:  Well, might I suggest this?  I think

24  you've laid the -- I mean obviously these clips are now in.

25  Do we need any further testimony from this witness, Mr.

1   Samani?

2           MR. DENIS:  We could just have Mr. Samani there and

3   specifically ask him if he interpreted the specific --

4           THE COURT:  He indicated he did.

5           MR. DENIS:  I know.  Could we keep him on the

6   stand, your Honor, just for a little while?

7           THE COURT:  I'm trying to move this along --

8           MR. DENIS:  Yes.

9           THE COURT:  -- while your technician there is

10  taking care of that glitch, we can call another witness and

11  we can play the clips later.

12          MR. DENIS:  Your Honor, just one moment.  I

13  apologize.  I appreciate it very much and apologize.  I think

14  we might be able to have it right away.  Could we just take a

15  five-minute recess.  I think we'll have it worked out in five

16  minutes, your Honor.

17          THE COURT:  Hold on.  We'll see what he's doing

18  right now.  It may not take that long.  Okay.  We'll take the

19  recess.  Ladies and gentlemen, we'll give it no more than

20  five minutes, and thank you for your patience and

21  understanding.  If you'd take your recess outside, it would

22  be appreciated.  Please remember the admonition.

23      (The jury left the courtroom.)

24          THE COURT:  All right.  Now that we're outside the

25  presence of the jury, I would sustain the one objection you

915

 1   had, Mr. Gutierrez.  Why I overruled it before was that it

 2   would be -- we've taken so much time; we've probably taken

 3   15, 20 minutes just getting set up here, just getting the

 4   clips identified, and now we're -- we have some more down

 5   time.  I would agree with you that --

 6           MR. DENIS:  Your Honor, I would really beg the

 7   Court not to penalize Mr. Wedding for --

 8           THE COURT:  No, you're not -- I'm not going to

 9   penalize Mr. Wedding, but the one point that Mr. Gutierrez --

10   you will recall I said in the interest of time.  I'm sitting

11   up here on the bench with a jury in the box --

12           MR. DENIS:  I understand.

13           THE COURT:  -- and I'm looking for the first time

14   through just a raft of clips.  Out of expediency I was going

15   to allow -- quite frankly, there are other things that are

16   not -- where the undue consumption of time or confusion of

17   issues would outweigh the probative value.  But in terms of

18   Mr. Shirani's characterization of the government's case as

19   strong or weak, I think Mr. Gutierrez is absolutely right

20   there.

21           MR. DENIS:  I agree.  I agree.

22           THE COURT:  That's the one thing that I was going

23   to say should be excised.

24           MR. DENIS:  I agree.  Could we -- could we -- could

25   the judge just strike that when it comes up and just say not

1    to consider that?  That's not the area that I'm focusing on.

2              THE COURT:  Well, just don't play that clip.

3    That's all.

4              MR. DENIS:  Well, the only reason I was trying to

5    establish that is they received the discovery regarding this

6    car thing on the 7th.

7              THE COURT:  Excuse me.  Which clip is --

8              MR. DENIS:  That's the 7th.

9              THE COURT:  -- that, Mr. Gutierrez?

10             MR. GUTIERREZ:  Which exhibit number?

11             MR. DENIS:  Exhibit GGGG.

12             MR. GUTIERREZ:  I don't see how the timing of

13   receipt of discovery at this point is relevant, your Honor.

14             THE COURT:  It's not.  But where was the part about

15   his characterization of the government's case being weak?

16             MR. GUTIERREZ:  At the bottom of the first page,

17   your Honor.  It says and then call me again at 8:00 or 9

18   p.m., but I was with the prosecutor.  He has nothing.

19             THE COURT:  Yes.

20             MR. DENIS:  Yes.

21             MR. GUTIERREZ:  This is -- his case is not very

22   strong so that he can't make a strong claim against us.  And

23   then later I'm characterized as being very happy after having

24   met with Mr. Shirani.

25             THE COURT:  Okay.  Well, you know, this whole

1   exhibit is just talking about, you know, typical greetings --

2              MR. DENIS:  Your Honor, I just want to --

3              THE COURT:  Hold on, sir.

4              MR. DENIS:  I apologize.

5              THE COURT:  -- between Shirani and his brother,

6   there's personal stuff, and then they get right into the

7   government's characterization.  I don't see the probative

8   value of GGGG.

9              MR. DENIS:  The only issue I was trying to

10  establish -- if we could stipulate -- that on July 7 is

11  approximately when this discovery was -- shortly -- shortly

12  around July 7 is when this discovery was released by the

13  government.

14             THE COURT:  What's the relevance of that?

15             MR. DENIS:  Well, I -- there was no issue about

16  this car dealing or -- there's one call referenced by

17  Mr. Shirani where he discusses cars, and that's a recorded

18  call.  That's the only call by Mr. Shirani.

19             THE COURT:  Well, you already have Agent Lambert

20  admitting that there was just one call about cars.

21             MR. DENIS:  Correct.  And I didn't want that -- the

22  inference that when the mother had discussed like what was

23  the line that I'm saying my dear, what kind of car dealing

24  was it that got you so involved in this mess, and Mr. Shirani

25  had told his mother that he was coming down for a car deal.

918

1              MR. GUTIERREZ:  How do we know that?

2              MR. DENIS:  No, no.

3              MR. GUTIERREZ:  It could have been --

4              THE COURT:  Please, please, gentlemen.  The

5    objection to GGGG is sustained.  GGGG is excluded.  The

6    others --

7              MR. DENIS:  Thank you, your Honor.

8              THE COURT:  -- may be played.  And, once again,

9    just for the sake of getting this case --

10             MR. DENIS:  Forgive me.  This has been either a

11   gremlin in here or something I'm --

12             THE COURT:  Well, I just want to get the case back

13   on track.  As I say, there are some things here that are

14   interwoven with other clips that really have no probative

15   value, but it will take you forever at the pace we're going

16   to excise those things out, and they don't seem to be

17   terribly prejudicial.  However --

18             MR. DENIS:  Okay.  Thank you, your Honor.

19             THE COURT:  -- the reference to the government's

20   case by Mr. Shirani in GGGG is I think over the line on --

21             MR. DENIS:  And I would agree with the Court.  And

22   I would just ask can we just reach a stipulation as to the

23   discovery coming in after the June --

24             THE COURT:  No, no.  The timing of discovery --

25             MR. DENIS:  Okay.

 1          THE COURT:  -- just is not relevant because that

 2  gets into other disagreements you've had, intentions --

 3          MR. DENIS:  Okay.

 4          THE COURT:  -- and who is -- I've never seen so

 5  much acrimony between two sides in a case over criminal

 6  discovery.  I mean this really does take the award.  It's

 7  been unfortunate from start to finish.  But it is what it is,

 8  and I don't want to inflict that on the jury; there's no

 9  reason to.  How are we doing with that, Mr. Technician?  Are

10  you ready to go?

11          DEFENSE TECHNICIAN:  Couple more minutes, your

12  Honor.

13          THE COURT:  I'm sorry?

14          DEFENSE TECHNICIAN:  Couple more minutes, your

15  Honor, just two minutes.

16          MR. GUTIERREZ:  Your Honor, since we are on a

17  recess, there is still the issue of -- which counsel I

18  believe is going to try to lay the foundation for what he

19  calls CD-1.  That was the call between the confidential

20  source, who hasn't testified, and his consultant regarding

21  immigration issues.

22          MR. DENIS:  I don't think I'm going to go into that

23  issue, your Honor.  I don't --

24          THE COURT:  Okay.  All right.  I'll accept that

25  representation.  Okay.  So GGGG will not be played, must be

 1   excised.  The other -- the others are going forward.

 2             MR. GUTIERREZ:  And just, your Honor, if I could

 3   have -- since all of these are allegedly inconsistent

 4   statements of Shirani, they cannot be argued for the truth

 5   but just as much as they reflect on Shirani's credibility?

 6   Because I'm not exactly sure if he's made a proffer as to why

 7   they're being offered, but I'm concerned now when something

 8   comes in, he can now argue, such as on page 4, that

 9   prosecutor was very positive and he has changed.  So now Mr.

10   Denis --

11             THE COURT:  Obviously these are not -- these

12   statements are hearsay if they're offered for the truth of

13   the matter.  They're not offered for the truth of the matter,

14   and I will so instruct the jury.

15             MR. GUTIERREZ:  Thank you, your Honor.

16             THE COURT:  These are statements that cannot

17   possibly be to have been made for the purpose of furthering

18   the conspiracy Mr. Wedding is charged with, so these

19   conversations can be considered only on the question of

20   Shirani's credibility.

21             MR. GUTIERREZ:  Thank you, your Honor.

22             THE COURT:  All right.  Two minutes have gone by.

23   Where are we?

24             MR. DENIS:  Just hold on, your Honor.  It's a --

25   it's a -- my slow computer.  I know it's -- I'll be okay.

1          THE COURT:  Okay.  Counsel, we cannot keep the jury

2    waiting any longer.  They've been out longer than the

3    original five minutes.  We've given you another two minutes.

4    You'll need to move to another witness and then play these at

5    a later time.

6          MR. DENIS:  Okay.

7          THE COURT:  It's not necessary to have Mr. Samani

8    on the stand as these are being played.

9          MR. GUTIERREZ:  Your Honor, counsel's used the name

10   Hossein and Hussein interchangeably, and though it's probably

11   a collateral issue, I just wanted to ask the expert if

12   Hossein and Hussein are distinct names in the Farsi language,

13   and that would be the extent of my cross if I could.

14         THE COURT:  Mr. Denis --

15         MR. DENIS:  Yes, your Honor.

16         THE COURT:  -- we need you to get another witness.

17   Who are you going to be calling at the present time?

18         MR. DENIS:  I'm going to be calling -- well, now

19   that we have down time --

20         THE COURT:  We don't have down time.  We're just --

21         MR. DENIS:  Oh, yeah, I know.  I apologize.  I

22   should have -- here we go again.  I prayed not another

23   yesterday.

24         THE COURT:  Sir, I hope you understand this is -- I

25   have no control over your exhibits --

1          MR. DENIS:  I understand, your Honor.

2          THE COURT:  -- or the problems you've encountered

3     in this case.

4          MR. DENIS:  Okay.  Your Honor, I would like to

5     raise -- I'm planning on bringing a character witness in

6     regards to Mr. Shirani -- sorry -- in regards to Mr. Wedding

7     regarding the issue of the -- the, you know, he would

8     peaceability (sic) and --

9          THE COURT:  What now?

10         MR. DENIS:  For peaceability (sic).

11         THE COURT:  Peaceability?

12         MR. DENIS:  Yeah, for peacefulness, that he's not

13    violent, not a violent character.

14         THE COURT:  He's not charged with violence --

15         MR. DENIS:  I know, your Honor, but --

16         THE COURT:  -- or breaching the peace.

17         MR. DENIS:  The issue came up that Mr. Wedding --

18    and this is only coming from Mr. Shirani made a statement

19    that, Mr. Wedding said he was, you know, smack the old guy in

20    the face or something like that.  And that issue has come up.

21    I thought it was going to be resolved with Ms. Lambert.  Ms.

22    Lambert indicated that, you know, she heard Shirani tell her

23    that even though it's not in any report.  I was going to

24    offer a character witness or two in regards to that, very

25    brief, but I -- there -- there was some mention about this

923

 1   Hysslop incident, which I had as the basis of a motion in

 2   limine.

 3            THE COURT:  The what incident?

 4            MR. DENIS:  Hysslop.  There was a con man that

 5   ripped off a bunch of investors, and Mister -- only coming

 6   from Mr. Shirani, said that there was some incident that Mr.

 7   Wedding went over there and beat him up or pistol-whipped him

 8   or kidnapped him, I don't know exactly what it --

 9            THE COURT:  I don't recall that testimony.  There

10   was no -- I didn't hear anyone accuse Mr. Wedding of beating

11   up anyone or pistol-whipping anyone.

12            MR. DENIS:  No, no.  There is another allegation --

13   didn't come up -- that was only made by Mr. Shirani, and I

14   don't want Mr. Gutierrez to use that --

15            THE COURT:  It's not --

16            MR. DENIS:  -- on cross.

17            THE COURT:  It's not in evidence though.

18            MR. DENIS:  Right.  But if he brings it up in cross

19   and says well, Mr. So and So, do you know that Mr. Wedding,

20   you know --

21            THE COURT:  Well, if he brings it up in cross, I

22   will consider what you're saying.

23            MR. DENIS:  That's all I'm saying, your Honor.

24            THE COURT:  Okay.  So let's -- do we have another

25   witness ready to go?

```
 1              MR. DENIS:  Yes.  We have --

 2              THE COURT:  Who are you going to call?

 3              MR. GUTIERREZ:  Is the Court going to allow

 4   witnesses as to peaceability, your Honor?

 5              THE COURT:  I think he meant lack of violence, but

 6   it's not an issue at this point; you're not --

 7              MR. DENIS:  Well, the issue came up that he was

 8   going to smack the old guy in the face.

 9              THE COURT:  That doesn't lay -- establish the need

10   to call a witness on Mr. Wedding's peaceability, as you

11   called it.

12              MR. DENIS:  Well --

13              THE COURT:  That doesn't -- it doesn't cancel out

14   the testimony that the statement was made.  The statement can

15   be seen in context, but this is not a crime of violence that

16   your client has been charged with.  Don't even open up -- why

17   do you even want to open up that door?  Because you don't

18   know what other evidence may be brought in to counter that,

19   and the door would be opened.

20              MR. DENIS:  I understand.

21              THE COURT:  You're creating a real risk there.

22              MR. DENIS:  Well, that's why -- the only issue I

23   was worried is this Hysslop situation.

24              THE COURT:  All right.  Well, the Hysslop situation

25   hasn't come up.  If it comes up, you can deal with that.
```

925

1          MR. DENIS:  Right.  And the other incidents, maybe

2    he was a bouncer, I'm not worried about -- I'm not truly

3    worried about anything else --

4          THE COURT:  Well, we don't have any --

5          MR. DENIS:  -- in terms of opening the door.  I'm

6    not --

7          THE COURT:  We don't have any evidence of him being

8    a bouncer.

9          MR. DENIS:  Correct.

10         THE COURT:  Okay.

11         MR. DENIS:  This would just come out in cross.

12   Yeah.  So I'm not -- so I would like to just establish that

13   he's not -- even though he's a big man, he's not a violent

14   person at all.

15         THE COURT:  Okay.  Violence not being an element of

16   this offense, I'm going to sustain the objection at this

17   point.  It's not in issue, and there's no need to call this

18   witness.  If there's any suggestion in the examination by Mr.

19   Gutierrez that your client is violent or that he was brought

20   along for violent purposes, or for muscle, then you can

21   certainly call that witness.  I assume that witness will be

22   available for the next day or so.

23         MR. DENIS:  No, she's not.  She's actually leaving

24   today at 12:00.  She's been here since -- at least two days.

25         THE COURT:  Okay.  Well, you indicated you were

1    finishing up with your evidence today in any event, so --

2            MR. DENIS:  Correct, so --

3            THE COURT:  -- so you'll know by today whether or

4    not you need to --

5            MR. DENIS:  She has a twelve o'clock flight; that's

6    why I wanted to get her in, five minutes, and then --

7            THE COURT:  Okay.  Well, I'll confirm the ruling

8    that I've made.  As of this point in time, this is just not

9    germane.

10           MR. DENIS:  Okay.  Then I will call John Strauberg

11   (sic).

12           THE COURT:  Okay.  We'll get our jury in then.

13   Hopefully your technician will continue to work on the

14   computer.

15       (The jury entered the courtroom.)

16           THE COURT:  Okay.  We have all of our jurors.  Mr.

17   Samani, may I ask for your patience.  I believe that there

18   was one further question that needed to be asked of you.  If

19   you could resume the stand.

20           Ladies and gentlemen of the jury, Mr. Denis and his

21   assistant are still working on this computer and trying to

22   get these clips set up so that you can hear them, hear the

23   voices and see the translation in the form of rolling script

24   as the conversations are taking place.  They haven't been

25   able to accomplish that yet, but we're hopeful they will be

927

1   able to do that.  Meanwhile, are you done with your

2   examination of this witness, Mr. Denis?

3             MR. DENIS:  Yes, your Honor.  I mean perhaps I

4   could at least -- what I'd like to do is just have him go

5   through the first clip and then I'll --

6             THE COURT:  Well, is it ready?

7             MR. DENIS:  Not ready, but just --

8             THE COURT:  No, no, no.  We can always --

9             MR. DENIS:  Okay.

10            THE COURT:  -- arrange for an alternate

11  presentation if that's necessary if the computer doesn't

12  work, and I have an idea or two along those lines --

13            MR. DENIS:  Okay.

14            THE COURT:  -- that may be of assistance a little

15  bit later.

16            MR. DENIS:  Then I'm done with Mr. Ramini (sic),

17  your Honor.

18            THE COURT:  Okay.  Mr. Gutierrez?

19                      Cross-Examination

20            MR. GUTIERREZ:  Good morning, sir.  Good morning.

21  A.  Good morning.

22  Q.  In the Farsi language is the name Hussein, H-u,

23  interchangeable with the name Hossein, or are they two

24  different names?

25  A.  If you ask me -- in Farsi we don't have the word

1    "Hussein."

2    Q.   Okay.  So when you see the word H-u-s-s and H-o-s-s,

3    could it be the same person?

4    A.   I mean spelling-wise they have to be different.

5    Q.   All right.  Thank you.

6                THE COURT:  Mr. Denis, anything --

7                MR. DENIS:  Nothing further, your Honor.

8                THE COURT:  -- further?  Okay.

9                MR. DENIS:  Thank you, Mr. Ramini (sic).

10               THE COURT:  Thank you, Mr. Samani, for coming in.

11   You are excused at this time.

12               MR. DENIS:  Your Honor, the defense calls John

13   Strauberg (sic).

14               THE CLERK:  Would you raise your right hand to be

15   sworn, please.  Do you solemnly swear or affirm that the

16   evidence you shall give in the cause now before the Court

17   shall be the truth, the whole truth, and nothing but the

18   truth?

19               THE WITNESS:  I do.

20                       Jonathan Stanbrough

21   was called by the defense and testified as follows:

22               THE CLERK:  Please state your name for the record

23   and spell your full name.

24               THE WITNESS:   Jonathan Stanbrough,

25   J-o-n-a-t-h-a-n, last name Stanbrough, S-t-a-n-b-r-o-u-g-h.

1                        Direct Examination

2              BY MR. DENIS:   Q.   Mr. Stanbrough, what's your

3     current occupation?

4     A.   I'm a electrician.

5     Q.   And where do you currently reside?

6     A.   In Port Coquitlam, British Columbia.

7     Q.   Is that in Canada?

8     A.   Yes.

9     Q.   And how long have you lived there?

10    A.   My entire life.

11    Q.   And do you know Ryan Wedding?

12    A.   Yes.

13    Q.   And how long have you known Ryan Wedding?

14    A.   Since high school, so about 11, 12 years.

15    Q.   Okay.  And in June of 2008, did you go with Mr. Wedding

16    and a number of other individuals to a stag party?

17    A.   Yes.

18    Q.   Whose stag party was that?

19    A.   Friend Peter Kekker's.

20    Q.   And do you recall the date that you -- well, strike that.

21    When you went to this stag party, how many people went to the

22    stag party?

23    A.   To the best of my knowledge, it's probably about 20 of

24    us.

25    Q.   And where was that stag party going to be held?

1   A.   At the MGM Grand Hotel.

2   Q.   And where was that?

3   A.   In Las Vegas.

4   Q.   And do you recall the date when that stag party was to

5   take place?

6   A.   I believe it was June 6th to 9th.

7   Q.   And when -- do you recall the date that you went to Las

8   Vegas from Canada?

9   A.   Yes.

10  Q.   When was that date?

11  A.   June 6.  It was a Friday afternoon.

12  Q.   Did you travel with -- how did you get there?

13  A.   We all drove vehicles down to the Bellingham Airport,

14  which is in Washington State, and flew out of Bellingham

15  there.

16  Q.   And was that all the 20 of you?

17  A.   I believe so, yeah.

18  Q.   Okay.  And so you drove in.  Was Ryan Wedding with you

19  when you guys drove to Bellingham and took the plane to Las

20  Vegas?

21  A.   Not in my vehicle, but he was with the party, yes.

22  Q.   When you say not in your vehicle, was there other

23  individuals that were driving together?

24  A.   Yeah, we had numerous vehicles.

25  Q.   And did you stay in Las Vegas during the 6th through the

931

1   9th?

2   A.   I did.

3   Q.   And did you see Ryan Wedding there during the 6th through

4   the 9th?

5   A.   I did.

6   Q.   And without going into details, did you -- did the group

7   kind stay together during that stag party --

8   A.   Yes.

9   Q.   -- in Las Vegas?

10   A.   Yes.

11   Q.   Okay.   And were you with Mr. Wedding during that time?

12   A.   Yes.

13   Q.   Do you recall Mr. Wedding on the phone discussing

14   anything?

15   A.   No.

16   Q.   Okay.   Do you recall Mr. Wedding discussing any kind of

17   business on a phone?

18   A.   No.

19   Q.   Do you -- now, you mean examples.   From the 6th to the

20   9th, would you guys get up and have lunch, have dinner?   What

21   was the plan?   Was the stag party organized?

22   A.   Not really set schedules.   Basically get up in the

23   morning, have breakfast, spend the day at the pool, have

24   dinner, go to the nightclub at night.   That's basically it

25   for the whole weekend.

1  Q.  And did you guys do that all together as a group?

2  A.  Yes.

3  Q.  And you never -- okay.  Did you see Mr. Wedding on the

4  phone?

5  A.  No.

6              MR. GUTIERREZ:  Been asked and answered.

7              THE WITNESS:  Not that I recall.

8              THE COURT:  I'm sorry?

9              MR. GUTIERREZ:  That's been asked and answered.

10             THE COURT:  That's true.

11             MR. DENIS:  Okay.

12             BY MR. DENIS:  Q.  And on the 9th did you go back

13 to -- how did you guys make arrangements to go back to

14 Canada?

15 A.  We were all on the same flight.  We flew back to

16 Bellingham, Washington, and drove back to Vancouver.

17 Q.  And was that on the 9th?

18 A.  Correct.

19 Q.  What time did you guys arrive in Canada on the 9th?

20 A.  I don't recall exactly.  It was late afternoon.

21 Q.  Did you guys leave from Las Vegas in the morning by

22 flight?

23 A.  Yes.

24 Q.  Do you know the relation of where Las Vegas is in

25 relation to Los Angeles, how far away that is?

933

1  A.  Not really, no.

2  Q.  You don't how many hour drive it is?

3  A.  I would say three or four hours.

4  Q.  And, Mr. Stanbrough, you indicated you've known Mr.

5  Wedding since high school, correct?

6  A.  Correct.

7  Q.  He's a big guy, correct?

8  A.  Correct.

9  Q.  And have you known him to be a violent person?

10        MR. GUTIERREZ:  Objection; relevance, lack of

11  foundation, 403.

12        THE COURT:  I'll see counsel at the side of the

13  bench for a moment, ladies and gentlemen.

14     (Following is a sidebar conference.)

15        THE COURT:  Was the ruling not clear?

16        MR. DENIS:  I am -- I thought -- I meant with

17  this -- you're right, I should not have -- I hesitated when I

18  said -- I do want to get his good -- he's not violent, he's a

19  big guy but not violent.  I think it's important.

20        THE COURT:  Mr. Gutierrez, does this open up the

21  door at all if I allow the question to be asked?

22        MR. GUTIERREZ:  I have RCMP witnesses who can talk

23  about the Hysslop situation.  Apparently the defendant wasn't

24  happy with the man having robbed him, allegedly kidnapped him

25  and beat him up and took the money back.  I think it's

1  irrelevant, but --

2          THE COURT:  No, no.  I tried to send you a bit of a

3  message that sometimes you open up the door, at least to

4  good-faith cross-examination that --

5          MR. DENIS:  I'll withdraw the question.

6          THE COURT:  "Were you aware of this particular

7  incident --

8          MR. DENIS:  Right.

9          THE COURT:  -- when you stated your opinion he's

10 not violent?"  It opens up the door to that kind of

11 cross-examination.

12         MR. DENIS:  Okay.

13         THE COURT:  I don't know where you want to go with

14 this.

15         MR. DENIS:  I'll withdraw the question, okay, your

16 Honor?  I know the Hysslop incident -- there's never been a

17 charge, never been questioned, never -- it was just an

18 allegation from a con man, just took an affirmative --

19 whatever.  I mean you're right --

20         THE COURT:  I don't want to see the case go off

21 into the tiny little capillaries.

22         MR. DENIS:  Okay.

23         THE COURT:  I think its better to stay on the main

24 track here, and --

25         MR. DENIS:  Okay.  I apologize to the Court.  I

 1   just -- bad assessment of the issue.

 2          THE COURT:  I tried to kind of signal you --

 3          MR. DENIS:  Right.

 4          THE COURT:  -- once you open -- once you ask a

 5   question like that, you may open up doors you may not want to

 6   see opened.  You want to withdraw that?  I tell you what.

 7   I'll let you ask the question.  It's really up to you.  If

 8   you want to ask that question, it may well open --

 9          MR. DENIS:  If he can bring in RCMP to actually --

10          THE COURT:  Oh, no.  Oh, no.  He can in

11   cross-examination bring --

12          MR. DENIS:  Okay.  Then that's was what I was

13   asking for.  If he's just going to -- wild baseless claims,

14   then I'm not going -- if the Court was going to allow him to

15   do that, that's fine, but he's --

16          THE COURT:  What do you want do with this, Mr.

17   Denis?

18          MR. DENIS:  I'll withdraw it.  Just move on.

19          THE COURT:  Okay.

20     (Sidebar conference concludes.)

21          THE COURT:  The last question has been withdrawn

22   ladies and gentlemen, but please do not draw any negative

23   inferences whatsoever; the last question has been withdrawn

24   by counsel.

25          MR. DENIS:  Nothing further.

936

 1              THE COURT:  Cross-examination?

 2              MR. GUTIERREZ:  Thank you, your Honor.  I have no

 3    questions of this witness.

 4              THE COURT:  All right.  Thank you, Mr. Stanbrough.

 5    You are excused.

 6              MR. DENIS:  The defense calls Jim Wedick, your

 7    Honor.

 8              THE COURT:  We're not still making any headway on

 9    the computer?  Any help there?  No headway yet?  Leave Mr.

10    Wedick out of the courtroom at this point.  Ladies and

11    gentlemen, once again, this may be a day where we stop and

12    start a few times.  If you'd once again continue extending us

13    your patience and understanding, it will be very appreciated

14    by all of us.  What we'll do at this point is take a

15    regularly scheduled recess; this will be our midmorning

16    recess.  Please remember the admonition not to discuss the

17    case or make any decisions at this time.  Thank you.

18         (The jury left the courtroom.)

19              THE COURT:  Okay.  We are outside the presence of

20    the jury.  With respect to Mr. Wedick, counsel, I have had an

21    opportunity to review the report of Mr. Wedick, former FBI

22    agent, that was provided to Mr. Gutierrez when trial started

23    in this matter.  And, Mr. Gutierrez, was there anything

24    further you wanted to say in connection with your motion?

25              MR. GUTIERREZ:  Your Honor, frankly, I think the

937

1   report speaks for itself.  There are three general issues,

2   and as the Court indicated last night, there are some areas

3   that Mr. Wedick opines I think inappropriately without a

4   basis.  I don't know if this is the type of testimony that

5   would assist the jury; I think in fact it would tend to

6   confuse them given his speculations and what he quotes as

7   opinions as being not really based on anything.

8          It seems to me that he says that Agents Lambert and

9   Kalina didn't interview Shirani properly to determine that he

10   was in fact a liar.  Mr. Wedick operates with the presumption

11   that Mr. Shirani is a liar and uses that presumption to say

12   that if they would have done their job properly, they would

13   have been able to tell he was a liar like he already assumed

14   in the first instance.  I don't think that's an accurate

15   characterization.  Moreover, Mr. Wedick was not present, and

16   he alone could determine that Mr. Shirani is a liar merely by

17   reviewing reports, something that he alleged that the agents

18   couldn't do even though they were actually there.

19          Second, with regard to the CS, they are indicating

20   that somehow they did something inappropriate with regard to

21   signing up the CS because they were aware of this allegation

22   that existed, and being aware of that allegation should, a

23   priori, prevent him from becoming a CS.  And as the Court

24   knows, CSs more often than not have what could be fairly

25   termed as baggage, convictions or working off time.  This

938

1  individual came to them not asking for anything, which is the

2  testimony.  So I think that his characterization, not knowing

3  what the agents actually did relative to the CS, would not

4  assist the jury.

5           And thirdly, there are some allegations that the

6  FBI should have done things relative to fingerprints of the

7  money.  I don't know if an expert's necessary for that to be

8  argued.  I don't know that -- I think it would tend to

9  confuse the jury based on the assumption he makes following

10  those representations.  However, the evidence was handled in

11  a way to get fingerprints.  It will be easily asked of

12  Lambert and Kalina if any of them were submitted because

13  there were -- the money was not submitted.  But I don't know

14  if an expert's testimony is going to assist the jury in that

15  regard.

16          And based on the fact of what I just said, your

17  Honor, and the manner in which this individual stated his

18  opinions without a basis on many of the assumptions, I don't

19  think it would be an asset to the jury and therefore not be

20  something that would benefit them, and I think that it should

21  be precluded.

22          THE COURT:  Okay.  I have marked up my copy of the

23  report, so I assume that both sides have a clean copy.

24          MR. GUTIERREZ:  Yes, your Honor.

25          THE COURT:  You have your own copy, Mr. Denis?

 1          MR. DENIS:  Yes, your Honor.

 2          THE COURT:  Okay.  Go through this with me

 3    carefully, please.  I'm going to allow Mr. Wedick to testify.

 4    Let me preface my remarks by saying that this is -- I don't

 5    think I've ever seen a report like this authored by a former

 6    law enforcement officer.  The tone of it is very, very

 7    unusual; I've never seen a report with a tone like this and

 8    with the patchwork of criticisms and speculative opinions.

 9    But part of it I think may come in, and so please go through

10    this report with me carefully.

11          MR. DENIS:  Yes, your Honor.

12          THE COURT:  I'm on page 4.  I mean the first three

13    pages are the gentleman's investigation in this particular

14    case.  We get to page 4, the top of page 4, and he's talking

15    about what the Manual of Investigative Operations and

16    Guidelines would require with respect to the interviewing or

17    investigation of a particular subject.

18          The first -- the first paragraph is okay.  Starting

19    with the second paragraph on page 4 with the words starting

20    with "had investigators conducted a more thorough interview

21    in an effort to develop corroborating information," down

22    through -- well, I'll read to you what in my view he can

23    testify to:  Had investigators conducted a more thorough

24    interview in an effort to develop corroborating information

25    and/or develop derogatory information as specified in the

1    FBI's MIOG, standing for Manual of Investigative Operations

2    and Guidelines -- I'll refer to it as MIOG, or M-I-O-G -- the

3    writer opines, Agents would have realized mistakes made

4    during Shirani's interviews were not just missteps but false

5    statements made to conceal his role and/or the role of his

6    brother when he sought to purchase 24 kilograms cocaine from

7    the FBI, FBI's cooperating witness.

8            What he's doing there is he's comparing the manner

9    in which the interview was conducted with what he believes is

10   in the manual.  His opinion or observation down through

11   "FBI's cooperating witness" is admissible, but the rest of

12   that sentence consisting of "rendering him useless as a

13   government witness," the objection is sustained.

14           MR. DENIS:  Okay.

15           THE COURT:  This witness may not characterize any

16   of the testimony in this case along those lines, that is,

17   Shirani was useless as a government witness or that, even

18   more significantly, Mr. Wedding had a minor role or a

19   mitigated role or no role at all.  That is a complete

20   usurpation of the jury's function in this case and is highly

21   inappropriate for any law enforcement officer to opine on the

22   guilt or lack thereof of a particular subject.  Furthermore,

23   even if that kind of evidence were admissible, there's an

24   inadequate foundation for this witness to opine.  So are you

25   clear, Mr. Denis, that any -- any characterization by Wedick

1    of Shirani being useless as a government witness is

2    completely out?

3              MR. DENIS:  Yes, your Honor.

4              THE COURT:  Okay.

5              MR. DENIS:  I have it clear.

6              THE COURT:  Okay.  The rest of that paragraph is

7    also out because now he enters into the realm of pure

8    speculation.  He starts off "had investigators been better

9    prepared, the writer opines -- and then he puts "opines" in

10   quotes, "agents would have been better able to question

11   Shirani, realizing he, quote, lied, end quote, about

12   important details."  All of that is nothing more than this

13   witness's speculation as to whether Shirani's a liar or not.

14   That's improper opinion, and all of that is out.  So you're

15   requested not to ask any questions of this witness that would

16   elicit those kinds of comments.  All of page 5 is out.

17             MR. DENIS:  All of page 5?

18             THE COURT:  All of page 5 is out.  The first

19   paragraph it says basically largely his speculation about

20   lies.  Shirani's already admitted when he did lie, but this

21   goes much further than that and speculates that Shirani was

22   lying.  Just take a look at the last sentence.  And when the

23   topic came up again, Shirani apparently forgot.

24             MR. DENIS:  The last sentence of paragraph 5.

25             THE COURT:  Yes, apparently forgot what he said

1   earlier, commenting Wedding got the money as a result of an

2   investment in a fishing boat, adding the fishing boat was

3   used to transport cocaine from South America to Montreal.

4   All of that is out.

5           The first sentence of the second paragraph is out.

6   That's just, once again, the witness's speculation that all

7   of Shirani's answers appear to be just lies.  And all of

8   that -- the rest of that page is out, all on the basis that

9   it's just characterization of Shirani's testimony.

10          And then we get down to the last paragraph where

11  basically there is more of the same, and there are places on

12  page 5 where basically Wedick is just implying that Mr.

13  Wedding is innocent of the charges in this case.  All of that

14  is out.

15          Page 6, all of that is out.  You know, Wedick's

16  statement -- all of that is out, but just to highlight what's

17  most egregious is Wedick's opinion that the government should

18  not have even prosecuted the case.  All of that is out, all

19  of page 6.  All of page 7.  All of page 8.  All of page 9 up

20  until the last paragraph; you may elicit whatever testimony

21  you wish as to -- no, I'm sorry.  All of page 9 is out as

22  well.  Any value judgment made by Wedick that Shirani should

23  not have been signed up -- excuse me -- that the confidential

24  informant should not have been used because he was somehow

25  disqualified from being a confidential informant, once again,

1    is gloss by Wedick and improper opinion.

2            Now, on this question of the confidential informant

3    or the confidential source, if Wedick can point to a part in

4    the manual -- and I'm reluctant to even open up this because

5    I know where this is going to go; it's going to become pretty

6    messy if you want to pursue this -- but if he can point to a

7    portion in the manual that says a confidential source --

8    anyone who has an asylum application pending or who has

9    applied for asylum cannot be considered as a confidential

10   informant or a confidential source, he can testify to that

11   because that's not his opinion; that's just stating what the

12   manual says.  So any opinions that, you know, the

13   confidential source should not have been used in this case

14   would be out.  Furthermore --

15           MR. DENIS:  Is that on page 10, your Honor?

16           THE COURT:  Well, it's on page 10 as well, but

17   there's also some -- you know, it's a little -- on the bottom

18   of page 9, there's a little ambiguity as to whether Shirani

19   is a confidential informant or not.  He seems to be relating

20   Shirani as a confidential informant, but it clearly is on

21   page 10 the discussion about confidential witness, and that

22   relates I think to the person who's been identified as a

23   confidential source in this case, Yuri.  All of that is out.

24           Page 10, all of it's out.  A confidential

25   witness -- it's not as if the confidential witness was called

944

1    by the government as a witness and asked to testify on

2    matters that are not a matter of audio record.  The only

3    thing the confidential source did in this case of admissible

4    evidentiary value is to engage in conversations that are a

5    matter of record.  They're like verbal acts; they're verbal

6    acts.  So all this speculation about whether the government

7    should have used Yuri as a confidential witness because he

8    had an asylum request pending or there were some issues with

9    respect to his asylum request completely misses the point.

10          MR. DENIS:  Your Honor, but in regards to the

11   suitability period and what was known by the agents and the

12   possibility of impropriety or messing up the investigation of

13   a cooperating, I think it's important because --

14          THE COURT:  No, it didn't happen because the

15   cooperating witness is merely -- nothing the cooperating

16   witness offers of any evidentiary value is -- in addition to

17   statements that he's made in connection with his

18   conversations with Krapchan, it's all a matter of record.

19   The statements are what they are.  They're verbal acts --

20          MR. DENIS:  Right.

21          THE COURT:  -- more than anything else.  So it's --

22   this is not an issue involving any credibility on the part of

23   the confidential witness or informant.  It's his statements

24   to Krapchan, matter of record.  We don't need any of the

25   speculation about whether the government should have used

1   him.

2          Lastly, on the question of fingerprinting the

3   money, that is relevant, it is, and you may use -- you may

4   elicit that from the witness.

5          MR. DENIS:  Your Honor --

6          THE COURT:  So just in reviewing, at the beginning

7   you've got -- at the beginning of the report if he wants to

8   indicate how any interviews of Shirani did not accord with

9   the manual on investigation, that's fine.

10         MR. DENIS:  Okay.

11         THE COURT:  You can ask him about fingerprinting

12  the money.

13         MR. DENIS:  Okay.

14         THE COURT:  Fine.  Do not elicit any opinions from

15  him --

16         MR. DENIS:  Regarding the --

17         THE COURT:  -- any characterizations of Shirani or

18  whether Shirani's lying or whether the government should have

19  used him, the cooperating witness, and, most importantly, on

20  his opinions relating to Mr. Wedding's role in this case,

21  whether mitigated, minor, or otherwise.  And if you're going

22  to have a problem with it --

23         MR. DENIS:  If he -- if he --

24         THE COURT:  -- I'm going to sustain the

25  government's objection across the board, and the --

1           MR. DENIS:  Right.

2           THE COURT:  -- and the government would be willing

3    to enter into a stipulation that fingerprints were not

4    obtained, and --

5           MR. DENIS:  I understand.  I appreciate.  I'm

6    just -- I'm just making sure that I -- I don't want, you

7    know, basically deviate from what the Court's instructing.

8           THE COURT:  It's real easy.  There are just two

9    areas where you can question him.

10          MR. DENIS:  Your Honor, as to my initial

11   disclosures that I gave, I had some additional that were

12   still valid points that the Court actually reviewed my

13   initial letter of disclosure to the government.  This was a

14   supplemental, but I think those issues are still germane to

15   this case.

16          THE COURT:  I don't --

17          MR. DENIS:  It was those seven issues the Court

18   raised.  I'll just get my letter.  In regards -- could we

19   relate to the FBI policies as gatekeeping functions?  The

20   Court doesn't want us to go into at least the suitability

21   period at all, correct?

22          THE COURT:  Gatekeeping function?  You can -- if

23   you want to ask him about what gatekeeping function is,

24   that's fine.

25          MR. DENIS:  Okay.  The suitability period at all,

1    is that at least germane or -- there's basically that

2    six-month window they should be, you know, very mindful and

3    cautious.  We won't get into it too much, but just a little

4    bit.

5            THE COURT:  Yes because the -- you can ask him to

6    define a suitability period.  Is that as defined in the

7    manual?

8            MR. DENIS:  Yes, your Honor, I believe so.  And so

9    we will discuss just the policies for interviewing

10   cooperating witnesses.  Just no characterization, correct?

11   And I'll make sure that that's clear.

12           THE COURT:  Mr. Wedick in terms of how -- Wedick

13   setting up how the FBI set up their theory of the case,

14   that's out.

15           MR. DENIS:  Out?  Okay.  And with regard -- they

16   have a group 1 or group 2, and they basically -- what they

17   think at that time and then how -- okay.

18           THE COURT:  I don't see the -- I couldn't even

19   figure that out.  I know Mr. Gutierrez is not familiar with

20   that.  It would not seem to have any particular probative

21   value.

22           MR. DENIS:  The issue there, your Honor, is the

23   FBI, they have -- well, they based on their evidence what

24   they decide for the case is they identify who is who and who

25   is what and what's going on with the case.  And then now the

948

1   theory completely changes based on, you know, obviously

2   Shirani's sole testimony, but we were just going to focus on

3   what was the FBI's group theory and how --

4            THE COURT:  No, no.  Characterizing the FBI's

5   theory of the case would not be appropriate.

6            MR. DENIS:  Okay.  That's fine.  Your Honor, as to

7   could Mr. Wedick go into the FBI's policy as to the use of

8   informants -- well -- or cooperating witnesses, what they,

9   you know, about basically the corroboration to make sure that

10  what they're saying is -- just that they must do that, they

11  should corroborate what these individuals are saying, and

12  perhaps we could discuss whether or not that was done here.

13           THE COURT:  Like I mentioned to you, he can refer

14  to the manual because he mentions the manual.

15           MR. DENIS:  Okay.

16           THE COURT:  He can refer to the manual and what is

17  required or suggested by the manual.

18           MR. DENIS:  Okay.

19           THE COURT:  That's it.

20           MR. DENIS:  And surveillance issue, your Honor,

21  could we raise that?  I think the Court was interested in

22  that as well on Thursday.

23           THE COURT:  I wasn't interested in any particular

24  aspect.

25           MR. DENIS:  Could I raise the surveillance, your

949

 1   Honor.

 2           THE COURT:  In terms of what, how?

 3           MR. DENIS:  About the surveillance done at LAX and

 4   contingency plans that should have been made with the FBI at

 5   LA.  They basically never followed Shirani or Wedding, but

 6   they just went --

 7           THE COURT:  If there's something in the manual that

 8   would have required that, that's fine.

 9           MR. DENIS:  Okay.  And could Mr. Wedick describe

10   the procedure of a controlled purchase of narcotics with the

11   use of informants?

12           THE COURT:  If it's in the manual.

13           MR. DENIS:  Okay.  And so we'll not discuss the

14   role of -- could Mr. Wedick opine as to what the role of

15   muscle is in a conspiracy?  What does -- generally what does

16   muscle do?  What is -- basically when you have muscle in a

17   whatever conspiracy --

18           THE COURT:  If you can lay the foundation for that,

19   I would caution you -- I would caution you as to whether you

20   want to open up that door.

21           MR. DENIS:  Okay.  Got it.  And --

22           THE COURT:  Emphasize with him no opinions, no

23   opinions or characterizations of the witnesses in this case,

24   their credibility --

25           MR. DENIS:  Correct.

950

1    THE COURT:  -- or the government's propriety in

2  using them.

3    MR. DENIS:  Okay.

4    THE COURT:  That's not an issue because all that

5  they did is a matter of record, recorded conversations.

6    MR. DENIS:  Correct.  And the last issue, your

7  Honor, the -- could Mr. Wedick testify as to suppliers of

8  controlled substances use deceptive practice to further

9  facilitate their distribution efforts, what are the types of

10 things they do to, quote, unquote, cover their tracks?  And I

11 think that's germane to the case as well.

12   THE COURT:  I don't -- I don't know what he'd have

13 to testify on that.  I mean he's not going to -- on

14 distribution amounts, he's not going to take issue with a

15 kilogram being a distribution amount.

16   MR. DENIS:  Could the Court defer ruling on that

17 and see if it becomes relevant and if the Court --

18   THE COURT:  I think that may be opening up a door

19 that you, once again, may not want to open up as to what

20 happens to the contraband after it's sold initially.  I don't

21 see how that's particularly probative in the case.

22   MR. GUTIERREZ:  I think counsel is going to try to

23 elicit the fact that -- through Mr. Wedick that some drug

24 organizations rent rooms and cars in other people's names and

25 that they dupe people to do things unwittingly.  From my

1  share of what was provided to me, that's what I deduced he

2  will be trying to do, and I would object to that.  Obviously,

3  your Honor, it would open doors, and I would seek to

4  introduce subsequent evidence, and I just wanted to let the

5  Court be aware of that.

6          THE COURT:  Care to respond?

7          MR. DENIS:  Your Honor, I'll -- if it's okay, I'll

8  make the assessment and proceed on that issue.  If I feel it

9  opens the doors, then I'll --

10         THE COURT:  Well, you don't want to open that up

11 I'm assuming, drug structure, structure testimony, profile

12 testimony.  I don't -- okay.  Do we have our tapes ready?  Do

13 we have the clips?

14         MR. DENIS:  Yes.

15         THE COURT:  Okay.  Well, good.  We have the clips

16 ready to go, so the jury has been out a lot longer than 15

17 minutes.  Let's bring them in, and we'll continue with the

18 tapes.  Okay.  We'll take just a minute or two.

19     (There was a break in the proceedings.)

20         THE COURT:  Okay.  We have everyone present.

21         MR. DENIS:  Your Honor, for the clips can I recall

22 Mr. Ramin (sic) to the stand?

23         THE COURT:  Mr. Samani?

24         MR. DENIS:  Samani.

25         THE COURT:  Yes.  I believe the clips are ready now

952

1     to be played.  You've excised GGGG?

2             MR. DENIS:  I have, your Honor.  There is an issue

3     as to GGGG.  I was going to ask the court if we could --

4             THE COURT:  No, all of it's been excised.

5             MR. DENIS:  I understand, and I've been trying to

6     raise a stipulation with the government that the evidence --

7     that the discovery came after the June 29, which is

8     approximately the July -- July 7, 2008.  The government --

9             THE COURT:  Well, as indicated previously --

10            MR. DENIS:  -- wouldn't --

11            THE COURT:  -- that's not particularly germane.

12    Let's get Mr. Samani on the stand so you can play the clips

13    that are going forward.

14            MR. DENIS:  Thank you, your Honor.  And I was just

15    going to ask if the Court won't reconsider just if we stop

16    before any of the other inappropriate comments, just to

17    establish that the discovery was given after June 29, at or

18    around the time of July 7.

19            MR. GUTIERREZ:  Your Honor, we're going to object

20    to counsel now twice stating before the jury --

21            THE COURT:  That is correct.  That is correct.  The

22    ruling is confirmed.  If you'd like to call Mr. Samani --

23            MR. DENIS:  Thank you, your Honor.

24            THE COURT:  -- you can.

25            MR. DENIS:  Thank you, your Honor.  Playing clip

953

1    number EEEE of June 29, 2009.

2           MR. GUTIERREZ:  Your Honor, it's my understanding

3    counsel is going to bring HHHH, EEEE, and GGGG, and they have

4    been ruled inadmissible.

5           MR. DENIS:  I believe just GGGG.

6           THE COURT:  GGGG.

7           MR. DENIS:  Thank you, your Honor.

8        (The audio recording was played.)

9           BY MR. DENIS:  Q.  Wow.  Mr. Ramin (sic), I'm going

10   to show you --

11          THE COURT:  Hold on.  Let's -- what's happening

12   here?

13          MR. DENIS:  We had it working, and now -- we had it

14   ready to go and it did the same thing again.  Let's see if we

15   can -- is this speaker plugged in?  No.  That's the wrong --

16          THE COURT:  That's G?

17          MR. DENIS:  July 29 -- June 29.

18          THE COURT:  That's out.

19       (The audio recording was played.)

20          BY MR. DENIS:  Q.  Mr. Shirani -- I'm sorry.  Mr.

21   Samini (sic), you recognize this call on June 29, 2009 (sic),

22   correct?

23   A.  Yes, sir.

24   Q.  This was one of the calls you translated, correct?

25   A.  Yes.

954

1   Q.  And there was a line where the mother is speaking and she

2   says my dear, what kind of car dealing was it that you became

3   so involved in this mess.  Is that a statement made by the

4   mother?

5   A.  Yes, it's the statement made by the woman speaking in the

6   audio file.

7   Q.  And she was speaking to Hassan, correct?

8   A.  Correct.

9   Q.  Okay.  Now, we're going to play clip -- Exhibit HHH, clip

10  1.

11          THE COURT:  HHHH.

12          MR. DENIS:  Quad.  Thank you, your Honor.  HHHH,

13  clip 1.

14      (The audio recording was played.)

15          BY MR. DENIS:  Q.  Mr. Shirani -- I'm sorry.

16  Forgive me.  Mr. Ramini (sic)--

17  A.  Mr. Samani.

18  Q.  Mr. Samani, you reviewed this clip, correct?

19  A.  Correct.

20  Q.  You quality checked it, correct?

21  A.  Correct.

22  Q.  And there's a portion in the clip where Mister --

23  Mr. Hassan Shirani asks how are the girls, how are they

24  doing.  And man No. 1 -- and man No. 1 at that time, it was a

25  third male voice, correct?

955

```
 1  A.  Correct.
 2  Q.  And you don't know who that particular individual is?
 3  A.  I don't know.
 4  Q.  Okay.  And that third individual says they're okay, one
 5  of them is fucking sick and the other one is at home fucked
 6  up.  And then man 2 -- which is Hassan in this case, correct?
 7  A.  Correct.
 8  Q.  -- says the one that is sick is still sick.  And then the
 9  man one, which is the third person, said yes, it had shit in
10  her pants and has hurt her legs.  And man 2, which is Hassan,
11  says oh, my.  What I was going to say, listen, do your
12  bookkeeping carefully, okay.
13          MR. GUTIERREZ:  Object as to 403 at this point,
14  your Honor.
15          THE COURT:  The clip is in.
16          MR. DENIS:  Okay.
17          BY MR. DENIS:  Q.  And M-1, which is the third
18  party, says okay.  Then M says I have borrowed $50,000 from
19  Hussein for my lawyer, do you get it.  And M-1 says yes.  And
20  Mr. Shirani, M-2, says do the bookkeeping correctly, maybe
21  someone comes to see you, okay, I have given your number to
22  him, your number to --
23          THE COURT:  Counsel, the clip has been played for
24  the jury, and all of this script is for the jury.  There is
25  no need to simply just read it.
```

 1          MR. DENIS:  I'm just reading a portion, your Honor,

 2   for the record.

 3          THE COURT:  You don't need to do it.  It's a matter

 4   of the record; it's already in the record.

 5          MR. DENIS:  Okay.

 6          BY MR. DENIS:  Q.  And at the bottom it indicates

 7   that they want to give him --

 8          MR. GUTIERREZ:  Your Honor, we'd object under 403.

 9          THE COURT:  Well, the 403 objection is overruled.

10   The clip is in, and it's been played for the jury with the

11   English translation before the jury.

12          MR. DENIS:  Five years --

13          MR. GUTIERREZ:  Object; there's no question

14   pending.

15          MR. DENIS:  Thank you, your Honor.

16          BY MR. DENIS:  Q.  We're going to play clip HHHH,

17   clip 2.  And Mr. Samani, the previous clip, the portion that

18   I translated, that was something you translated from Farsi

19   into English, correct?

20   A.  Correct.

21   Q.  Okay.

22   A.  And can I add something?

23   Q.  Yes.

24   A.  The third person was just using some English expressions

25   too.

1    Q.   The English?

2    A.   Yeah.   Some part of me --

3    Q.   Duplicitous, correct?

4    A.   Yeah, I don't want to repeat those.

5    Q.   Okay.   That's fine.

6         (The audio recording was played.)

7              BY MR. DENIS:   Q.   And that July 8, 2008 call --

8              MR. DENIS:   Please put it up again.

9              BY MR. DENIS:   Q.   -- you translated that call,

10   correct?

11   A.   Correct.

12   Q.   And it indicated that someone was very sad and told him

13   not to go, correct?

14   A.   Excuse me?

15   Q.   On the clip it indicates M-1 said he is very sad because

16   of you, he told you that you should not go.

17   A.   It was in the previous clip that we listen to before.

18   Q.   Clip --

19   A.   Is it the same thing that we listened to?

20   Q.   There is the one we just listened to now.

21   A.   Yeah, yeah.

22   Q.   And M-2 says listen, try to fix that so that while I'm in

23   here, we can enjoy it.   And M-1 says I know, I'll try it, but

24   nothing is going on.   M-2:   There was something going on

25   before I come.   M-1:   I'm working on it.   What was I was

1    going to say?  Listen, when --

2              THE COURT:  Counsel, once again, you don't need --

3    it's unnecessary to read it in the record; it's already a

4    part of the record.

5              MR. DENIS:  I understand, your Honor, but there are

6    just certain portions I want to highlight or underscore.

7              THE COURT:  Well, you can do it in argument at a

8    later point in time, and you can use the transcript for that.

9    But it's a matter of record at this point.

10             MR. DENIS:  Okay, your Honor.  And -- okay.  I'm

11   just not clear if the jury can actually see the text.  It's

12   very small.

13             THE COURT:  No one's indicating they're having any

14   trouble.

15             MR. DENIS:  All right.  So we'll look at HHHH, clip

16   3, your Honor.  This is the July 8, 2008 call, the same from

17   HHHH.

18        (The audio recording was played.)

19             MR. DENIS:  Is that the end of that clip?

20             BY MR. DENIS:  Q.  Mr. Ramini (sic), there was a

21   statement in there, Hassan, it is very important to have

22   money in your account because the money you can buy people.

23   And Hassan goes, I know, I know.  That's an accurate

24   translation, correct?

25   A.  Correct.

1   Q.  And at the end --

2           MR. GUTIERREZ:  Your Honor, we'd object to counsel

3   reading that which is already in the record.

4           THE COURT:  I believe the witness has already

5   stated these are accurate translations --

6           MR. DENIS:  Okay, your Honor.

7           THE COURT:  -- so there's no question about that.

8           MR. DENIS:  The next exhibit will be JJJJ.

9       (The audio recording was played.)

10          BY MR. DENIS:  Q.  Mr. Ramin (sic), that was a

11  July 18 -- July 18, 2008 call, and was that between Hassan

12  and Hussein, his brother?

13  A.  Well, this gentleman who was talking to Hassan or he has

14  repeatedly appeared in there, I think this is his brother,

15  yes.

16  Q.  And he goes by the name of Hussein, correct?

17  A.  Well, your pronunciation is not correct.  It's Hossein, I

18  mean the way they say it.

19  Q.  And -- okay.  And you were asked by the government about

20  the difference between Hussein and Hossein.  What is the

21  difference there?  Is that just -- is that two different

22  people, is that the same name?

23  A.  No, they are not two different people.  It's just a

24  matter of, you know, pronunciation.  And even -- I mean when

25  you convert Farsi names into English names, you know, the

1    orthography of say Farsi and English are different; in Farsi

2    we don't put vowels, we don't write the vowels, but in

3    English we do.  They are not different.  But spelling words,

4    as I explained it before when I was asked the question, I

5    mean in terms of spelling, you may write them differently,

6    but in speaking pronunciation, when you say that, they're not

7    different.

8    Q.   Okay.  So Hussein was the same name but just spelled

9    differently, correct, by whoever was -- wrote it down?   Is

10   that accurate?  Is that what you're saying?

11   A.   Well, in this -- in the Farsi that we listened together,

12   we didn't hear something like Hussein, but in any case, they

13   are not the same.  They are not different people.

14   Q.   Yeah.  And this one is, how you said it, I -- forgive me

15   for mispronouncing it -- it's Hussein, his brother, correct?

16   A.   Wrong.  It's Hossein.

17   Q.   Hossein, okay.

18   A.   Hossein.

19   Q.   Okay.  Thank you.  In the translation there's a portion

20   where Hassan is basically told that he had received the two

21   point -- he got two points and now it's at two years for what

22   he had done on July 18, 2009, correct?

23   A.   If it is in the file, it is correct.

24   Q.   All right.

25             THE COURT:  Let's move to the next clip, Mr. Denis.

961

1        MR. DENIS:  The next clip, your Honor -- could I

2   just underscore a couple things in this clip?

3        THE COURT:  Well, you can underscore them at the

4   time of argument.  You'll have the same transcripts available

5   to you.

6        MR. DENIS:  All right.

7        THE COURT:  You can use them as much as you'd like

8   at the time you address the jury, but the evidence is already

9   in.  Let's go to the next clip.

10        MR. DENIS:  Next clip is NNNN, your Honor.

11        THE COURT:  Ladies and gentlemen, I'd like to give

12   you an instruction with respect to what you're hearing at

13   this point, and it's an instruction you've heard before.  You

14   may not consider any of the contents of these recordings for

15   the truth of the matter as to what is in them; you may only

16   consider them on the question of the credibility, the

17   believability, of Hassan Shirani.  That's the only purpose

18   for these clips being played, and that is the only purpose

19   for which you may consider these recordings.

20        MR. DENIS:  Thank you, your Honor.

21        THE COURT:  All right.  NNNN?

22        MR. DENIS:  NNNN.

23   (The audio recording was played.)

24        BY MR. DENIS:  Q.  Mr. Shirani -- Mr. Samani, this

25   was the July 24, 2008 clip that you quality checked and

1    reviewed, correct?

2    A.  Well, the script that was on the screen doesn't go with

3    what I heard.

4    Q.  What do you mean?

5    A.  Well, I think there is a mistake in synchronizing these.

6    Q.  Okay.  So the -- is that the clip that has -- is that the

7    transcript of the clip?

8    A.  I have no idea, but the one that I listened to on --

9    right before this was not -- the translation that we see on

10   the screen was not what I heard; I think it's just wrong.

11   Q.  The previous one or --

12   A.  The tape doesn't go with the audio.

13   Q.  Was that this clip here, the one we just heard?

14   A.  Can you play it again, please?  Would you --

15           MR. DENIS:  Thank you.  Play it louder.

16       (The audio recording was played.)

17           THE WITNESS:  This is not it.  This is a different

18   clip.  The audio doesn't go with the translation.

19           BY MR. DENIS:  Q.  This is a different clip?

20   A.  This is different clip.

21           THE COURT:  All right.  Let's do this.  We'll for

22   the moment eliminate NNNN, and let's go to the next exhibit,

23   which is OOOO.

24           MR. DENIS:  OOOO.

25           THE COURT:  And for the time being, ladies and

1    gentlemen, please do not consider what you have just seen in

2    terms of the translation for NNNN; I'll strike that for the

3    time being and ask you to disregard it.  Okay.  Let's go to

4    OOOO.

5            (The audio recording was played.)

6            BY MR. DENIS:  Q.  This July 30, OOOO, was that --

7    A.  That is correct.

8    Q.  -- that's correct?  Okay.

9            THE COURT:  PPPP is next.

10           MR. DENIS:  Yes, your Honor, PPPP.  This is the

11   July 30, 2008 call.

12           (The audio recording was played.)

13           BY MR. DENIS:  Q.  Mr. Samani, I'm just -- the NNN,

14   or NNNN, you heard it twice, correct?  It's not the same --

15   that's not the clip that is associated with that translation?

16   A.  This one?

17   Q.  No, no, no.  I apologize.

18   A.  No, it wasn't.

19           (The audio recording was played.)

20           MR. DENIS:  Okay.  Your Honor, we had a mixup with

21   the audio, and I apologize for that, with the N.  We're going

22   to play -- can you look at that clip, NNNN.  Start it.  Start

23   it over.

24           (The audio recording was played.)

25           BY MR. DENIS:  Q.  The clip which we had previously

1    marked as Defense Exhibit NNNN, was that the audio portion?

2    A.   Yeah.

3    Q.   That was --

4    A.   That was correct.

5    Q.   That was the correct?   Okay.   Thank you.

6               THE COURT:   Okay then.   NNNN is back before you,

7    ladies and gentlemen, as it was just played and with the

8    rolling English translation.

9               MR. DENIS:   Thank you, your Honor.

10              THE COURT:   May Mr. Samani be excused?

11              MR. DENIS:   Yes, your Honor.

12              THE COURT:   All right.   Thank you, sir.   You are

13   excused.

14              MR. DENIS:   Your Honor, in light of the Court's

15   ruling previously, I didn't have an opportunity to speak -- I

16   apologize for asking for the recess, but can we have a brief

17   recess or break for lunch early so I can --

18              THE COURT:   Well, we're not going to go lunch now.

19   If you'd like a five-minute recess --

20              MR. DENIS:   Five minutes, your Honor.

21              THE COURT:   -- you certainly may.   Why don't you

22   take it outside with your next witness.   We can just leave

23   the jury right here in the box and --

24              MR. DENIS:   Thank you, your Honor.

25              THE COURT:   -- they can relax and chat amongst

1    themselves.  Five minutes.

2              MR. DENIS:  Thank you, your Honor.

3              THE COURT:  Okay.  Ladies and gentlemen, just relax

4    right where you are.

5         (There was a break in the proceedings.)

6              THE COURT:  Okay.  Next witness, Mr. Denis.

7              MR. DENIS:  Yes, your Honor.  The defense calls

8    Retired FBI Agent James Wedick.

9              THE CLERK:  Would you raise your right hand to be

10   sworn, please.  Do you solemnly swear or affirm that the

11   evidence you shall give in the cause now before the Court

12   shall be the truth, the whole truth, and nothing but the

13   truth?

14             THE WITNESS:  I do.

15                           James J. Wedick

16   was called by the defense and testified as follows:

17             THE CLERK:  Please state your name for the record

18   and spell your full name.

19             THE WITNESS:  My name is James J. Wedick,

20   W-e-d-i-c-k.

21                      Direct Examination

22             BY MR. DENIS:  Q.  Good morning, Mr. Wedick.

23   A.  Good morning.

24   Q.  Sir, what is your current occupation?

25   A.  I am a self-employed -- I'm a consultant.  I retired from

1    the FBI in April 2004.

2    Q.   And when you retired from the FBI in April 2004, how long

3    had you served with the Federal Bureau of Investigation?

4    A.   I joined the FBI in 1969, so I had almost --

5    approximately 35 years.

6    Q.   And just currently -- and currently where do you live?

7    A.   I live in Sacramento, suburb of Sacramento, California.

8    Q.   And you indicated you started the FBI in 1969, correct?

9    A.   Yes, that is correct.

10   Q.   Can you give us just some highlights as to your career

11   with the FBI and what did you do with the FBI.

12   A.   Sure.  I was originally born in New York City.  I entered

13   the Bureau in New York, became an FBI agent and was assigned

14   initially to their Indianapolis division in 1973.  My initial

15   assignments concerned general criminal work, bank robberies.

16   I thereafter was assigned to the Gary, Indiana, RA, which is

17   located just outside of Chicago, and again, I was involved

18   with conducting interstate shipments, thefts from interstate

19   shipments, bank robbery, fugitives, and general criminal

20   work.  And then I was assigned some organized crime activity.

21   I got into doing some undercover work, and because of an

22   informant or two that I developed and worked with, I was

23   assigned an investigation that literally took me around the

24   world; I traveled around the world undercover using my own

25   identity at that time.  Conducting undercover operations

 1   was -- the Bureau normally did not do undercover --

 2              MR. GUTIERREZ:  Objection; narrative, your Honor.

 3              THE COURT:  Well, I think the question calls for a

 4   narrative, which would be appropriate, but you can continue

 5   on with your --

 6              BY MR. DENIS:  Q.  Just hit the major --

 7              THE COURT:  -- brief summary of your --

 8   Q.  -- highlights, Mr. Wedick.

 9   A.  Sure.  I conducted an undercover operation, and that

10   lasted for approximately a year.  There was some follow-up

11   investigation that I had to do.  And then in 1978 I was

12   transfered because of that assignment because the bad guys

13   knew where I lived, I used my own identity, they transfered

14   me here to Sacramento.  I was given a special office of

15   preference, and I remained in Sacramento after I got here in

16   1978 in California, and I remained there until 2004.

17              After I arrived in Sacramento, I was a case agent.

18   I worked organized crime and white-collar crime activity.  I

19   became -- I worked with a couple of informants developing

20   some corruption cases that were much publicized in the area

21   here in California, and then I was promoted to run the

22   corruption desk in Sacramento in approximately 1996-1997, and

23   I ran that desk until I retired in 2004.

24   Q.  Mr. Wedick, during your 34 years of experience, had you

25   been a supervisor for the FBI?

1   A.   Yes, I was.

2   Q.   And how many years had you been a supervisor prior to

3   your retirement?

4   A.   Oh, seven, eight years.

5   Q.   And during your work with the -- with the FBI, did you --

6   did you have assignments that dealt with narcotics?

7   A.   Yes, I did.

8   Q.   Could you please explain that a little bit.

9   A.   Yes.   Just shortly before the Bureau was given

10  jurisdiction for narcotics, which was in the early '80s, I

11  was a -- the narcotics coordinator who worked with the Drug

12  Enforcement Administration; I had that occupation or that

13  position for about six months.   And then I worked a number --

14  after the Bureau received jurisdiction for narcotics, I

15  worked a number of narcotic cases as an undercover agent and

16  -- and -- and the like; I did that for a couple of years.

17  Q.   Okay.   And did you work with other task forces at that

18  time in terms of narcotics?

19  A.   Yes.

20  Q.   Okay.   And you also worked with the DEA you indicated,

21  correct?

22  A.   Yes, that's correct.

23  Q.   Okay.   Was it collaboration or joint efforts at that

24  time?

25  A.   Sure.

1   Q.   Okay.   And during your -- during your work with the FBI,

2   you indicated that you worked undercover, correct?

3   A.   That's correct.

4   Q.   Did you also supervise informants?

5   A.   Yes, I did.

6   Q.   And are you familiar with the policies and procedures

7   when the FBI is using informants?

8   A.   Yes, I am.

9   Q.   And what policies and procedures does the FBI use and

10  follow to conduct its business and itself?

11  A.   Well, informants generally have to be -- the policies

12  concern monitor and control, if you will, to make sure they

13  follow instructions, that they don't get into trouble that

14  you don't know about.   And if there are -- if they get

15  involved in otherwise illegal activities, what they call it,

16  that that is reported to the Bureau and that they're -- they

17  will only do what you ask them to do.   And you have to --

18  you're required to maintain -- monitor them so that you know

19  what is going on.

20  Q.   And when you say otherwise illegal activities, is that an

21  OIA?

22  A.   Yes.

23  Q.   And is that a form that the informants have to sign --

24  A.   It's --

25  Q.   -- periodically?

 1   A.   Yes, that is one of the forms that's -- that's -- that
 2   has to deal with -- that informants are -- have to sign.
 3   Q.   And you indicated that there's a period of time where you
 4   monitor them; is that called by the Bureau a suitability
 5   period?
 6   A.   No, you -- the suitability period is a period where you
 7   evaluate the source to determine whether or not his -- his
 8   background fits the criteria that the Bureau is willing to
 9   use to cultivate someone as an informant.  And -- and -- and
10   so you're always to maintain that control and monitoring, if
11   you will.  But the suitability is to -- just what it says, to
12   analyze whether or not he's suitable for a position with the
13   Bureau, if you will, as an informant.
14   Q.   Okay.  And you indicated that you -- you control and
15   monitor.  When someone is signed up as an informant, does
16   that informant get assigned to one agent or multiple agents?
17   How does that work with the FBI?
18   A.   When an agent wants to open an informant, he'll make
19   contact with his supervisor and submit some paperwork, and
20   the paperwork will establish a file, and it will set that
21   suitability period up so that the individual can be rated and
22   evaluated before he's registered as an informant.
23   Q.   You know, Mr. Wedick, I apologize.  I didn't go into some
24   of the honors that you received at the FBI.  Were there some
25   awards or honors for outstanding performance that you

971

1  received at the FBI --

2  A.  Yes.

3  Q.  -- during your stint with the -- forgive me -- during

4  your career at the FBI?

5  A.  Yes.

6  Q.  Could you just kind of highlight some of those that you

7  received.

8  A.  Sure.  I mentioned that I got involved with a

9  much-publicized corruption case; it concerned a three-year

10  undercover probe where a number of the legislators were

11  charged and prosecuted as a result of my investigation.  So I

12  was -- in 1994 I received the Director's Award, and I was

13  also nominated by the U.S. Attorney in Sacramento to receive

14  the Attorney General's Award.

15  Q.  And is that a prestigious award?

16  A.  Yes, it is.

17  Q.  Okay.  And after you retired with the FBI, have you been

18  hired as an expert witness on cases?

19  A.  Yes, I have.

20  Q.  And was that as a consultant or an expert witness on how

21  many cases?

22  A.  I can't give you an exact number, but it might be about

23  ten.

24  Q.  Ten cases --

25  A.  Yes.

1  Q.   -- that you were retained or consulted as an expert,

2  correct?

3  A.   That's correct.

4  Q.   And in some of your opinions, did you express opinions

5  of -- okay.  Now, you indicated that the suitability

6  period -- you were -- you were asked to -- you were retained

7  by the law offices of David Denis, correct?

8  A.   That is correct.

9  Q.   And you were asked to review this case file?

10 A.   That's correct.

11 Q.   Could you please describe for us what was it that you

12 received and what did you review.

13 A.   I reviewed a lot of material.  It concerned mostly FBI

14 reports of the investigation.  I think the investigation

15 started sometime in the early part of 2007, so it was a --

16 between when the investigation was initiated till when there

17 was an arrest, which was I believe in June 13 of 2008.  So it

18 was an ongoing investigation for about 18 months, and so I --

19 there were a number of FBI reports, FBI statements, there was

20 some search warrants that were conducted, and there was some

21 affidavits that were filed, so I reviewed all of the

22 affidavits, all of the police reports, and all of the

23 statements.  There were some -- a number of documents that

24 were seized and/or subpoenaed that I reviewed.  There were a

25 number of telephone records that went along that I had to

1   review.   There were many transcripts of conversations between

2   the cooperating witnesses and the defendants in the case that

3   I had to review.   And there were a number of -- so there were

4   telephone conversations and there were transcripts of

5   personal meetings.   So it was a lot of paperwork to go over.

6   Q.   Did you also review surveillance -- as part of your

7   review, did you also review surveillance logs?

8   A.   Yes, I did.

9   Q.   Did you also review proffer sessions that -- recorded

10  proffer session on CDs?

11  A.   Yes, there were a number of statements that were provided

12  as a result of a proffer session with the U.S. Attorney's

13  Office.

14  Q.   Did you also review reports regarding those proffer

15  sessions?

16  A.   Yes, I did.

17  Q.   As part of your review, did you also review the files

18  regarding the confidential source?

19  A.   Yes, I did.

20  Q.   Did you review the indictment?

21  A.   Yes, I did.

22  Q.   Did you review a number of motions?

23  A.   Yes, I did.

24  Q.   Okay.   Did you review the cell phone records of the

25  individuals involved in this case?

1    A.   Yes, I did.

2    Q.   Okay.  Did you also review a number of miscellaneous FBI

3    notes and diagrams?

4    A.   Yes.  There were a lot of handwritten notes and

5    diagrams -- copies of these notes and diagrams that you gave

6    me that I did review.

7    Q.   Did you also review photographs regarding this case?

8    A.   Yes, there were also a number of photographs.

9    Q.   And you reviewed those, correct?

10   A.   Yes, I have.

11   Q.   And did you review the photographs regarding the money

12   seized in this case?

13   A.   Yes, I have.

14   Q.   And did you also review the cocaine seized in this case?

15   A.   When you say cocaine, I reviewed the -- there was a

16   report done about the cocaine by the lab.

17   Q.   Okay.  And your understanding of this case was that --

18   was this a reverse sting?

19   A.   Yes.

20   Q.   And what is a reverse sting for those of us that don't

21   know?

22   A.   When the government -- when the government is going to

23   offer narcotics for sale in an effort to see if someone is

24   interested in buying narcotics.

25   Q.   Did you also review the grand jury testimony of Hassan

1    Shirani?

2    A.   Yes, I have.

3    Q.   Okay.  And as part of your review, had you reviewed

4    telephone or body wire or -- strike that -- telephone

5    conversations with Michael Krapchan and the confidential

6    source?

7    A.   Yes, I have.

8    Q.   And as part of your review, did you also listen to

9    telephone -- a telephone call from Mr. Shirani and the

10   confidential source?

11   A.   Yeah.  I read some transcripts, yes.

12   Q.   Okay.  Now, Mr. Wedding -- excuse me -- Mr. Wedick, in

13   terms of your review, did you also consult certain manuals

14   that are used -- and feel free to look at your report if you

15   need to reference something -- certain manuals in regard to

16   what the FBI uses to conduct their investigations or their

17   affairs?

18   A.   Yes.

19   Q.   What were some of those manuals that you consulted?

20   A.   I reviewed the Manual for Investigative Operations and --

21   which is called MIOG, and their may-ah (phonetic), and also I

22   reviewed the special -- the Legal Handbook for Special

23   Agents.

24   Q.   And were these -- were there any other handbooks that

25   you -- that you reviewed?  Were there guidelines regarding

```
 1    FBI confidential informants or confidential --
 2    A.   Oh, yes, there were Attorney General Guidelines for
 3    Confidential Informants.
 4    Q.   Okay.  And just so we know, was there two sets of
 5    guidelines for the attorney general or put out by the
 6    attorney general?
 7    A.   Yes.  The guidelines were amended, yes, so I reviewed
 8    both copies.
 9    Q.   And based on your review of the file and the case file,
10    were you able to render some opinions about this case?
11    A.   Yes, I did.
12    Q.   Okay.  And part of your review, did you take extensive
13    notes in this case?
14    A.   Yes, I did.
15    Q.   Just kind of describe for the jury the type of work you
16    did of the notes you took in this case.
17    A.   When I would review a transcript, I would usually have a
18    legal pad with me and a pencil, and I would write different
19    versions of what I read, what I heard, and applied what I
20    knew to be in the manuals and whether or not I thought
21    something was done right or wrong, if you will.
22    Q.   Okay.  Now, Mr. Wedick, you were familiar with the
23    investigation of this case based on your review of the
24    record, correct?
25    A.   That's correct.
```

1   Q.  And do you have an opinion as to the surveillance done on

2   June 10, 2008 at the LAX?

3          MR. GUTIERREZ:  Objection; lack of foundation,

4   relevance.

5          THE COURT:  The objection the sustained on the

6   basis of lack of foundation.

7          MR. DENIS:  Lack of -- okay.

8          BY MR. DENIS:  Q.  As part of your review, you

9   indicated you reviewed transcripts, correct?

10  A.  That's correct.

11  Q.  And police reports, correct?

12  A.  That's correct.

13  Q.  And in your training and experience at 34, 35 years at

14  the FBI and as a supervisor, did you supervise or manage

15  surveillance teams?

16  A.  Yes, I have.

17  Q.  And as part of your investigations and duties at the FBI,

18  did you conduct -- approximately how many surveillances have

19  you been a part of or coordinating or supervising?

20  A.  Literally hundreds.  I was involved in organized crime,

21  so I did a number of organized crime activity; I arrested and

22  prosecuted Joseph Bonano, so I'm pretty familiar with

23  conducting a number of surveillances.

24  Q.  And that was here in California as well?

25  A.  That's correct.

978

1    Q.  Just so we have a basis, approximately how many years

2    were you at the FBI in California?

3    A.  I was -- I got into -- I was transfered to California in

4    1978, and I retired in 2004, so, you know, it was --

5    Q.  Okay.  And based on your training and experience, were

6    you able to -- did you review the surveillance that took

7    place on June 10, 2008?

8            MR. GUTIERREZ:  Lack of foundation yet again, your

9    Honor.

10           THE COURT:  The objection is overruled.

11           THE WITNESS:  Yes, I have.

12           BY MR. DENIS:  Q.  And what was that opinion?

13           MR. GUTIERREZ:  Lack of foundation.

14           THE COURT:  The objection is overruled subject to a

15   motion to strike, Mr. Gutierrez.  You may answer.

16           THE WITNESS:  That the agents did not do a

17   surveillance of the individuals that flew into the airport at

18   Los Angeles International, which they should have done in

19   order to identify the subjects and money.

20           BY MR. DENIS:  Q.  Okay.  When you say that, what

21   do you mean?

22   A.  Well, at this point the government was reverse sting;

23   they were offering cocaine for sale, and so the only thing

24   that they needed -- the most important thing that they needed

25   to do was to identify those subjects who were going to come

1    to the airport with means or with money to buy that cocaine.

2    So those are the two things that they should have been, No. 1

3    and 2, that the surveillance teams -- that the case agent

4    should have been interested in making sure that those

5    priorities were done first.

6              MR. GUTIERREZ:  Objection; lack of foundation,

7    reference to the MIOG.

8              THE COURT:  The objection is overruled.

9              BY MR. DENIS:  Q.  And, Mr. Wedick, you were -- you

10   were aware that there was surveillance done at LAX, correct?

11   A.  That's correct.

12   Q.  And the surveillance that took place -- what was your

13   understanding of what surveillance was done and what is in

14   your opinion the surveillance that should have been done in

15   this case or after the June 10, 2008 LAX --

16             MR. GUTIERREZ:  Objection, relevance.

17             THE COURT:  The objection's overruled.

18             THE WITNESS:  The agents did surveil the

19   confidential source that they were using, which is of a

20   concern, but that's not the main mission of a surveillance

21   team.  The surveillance team is to identify subjects and

22   collect evidence, and in this case they should have been

23   interested in -- in -- I will acknowledge providing -- if

24   they felt that the source was in some jeopardy, to make sure

25   that the source was protected, but the key -- the key thing

980

1   that they should have been looking out for was who was coming

2   in and where were they going to get the money, and they

3   should have been followed.

4   Q.   And if -- you're aware that this case originated from the

5   FBI from San Diego, correct?

6   A.   That's correct.

7   Q.   And as far as your understanding of surveillance teams,

8   are there different surveillance teams in San Diego and Los

9   Angeles?

10  A.   Sure.  That would not be a problem.

11  Q.   And when you say that would not have been a problem, what

12  could have been done if there --

13  A.   Well, the case agent --

14  Q.   -- was a manpower issue?

15  A.   The case agent just would have made arrangements.  He

16  already had to make arrangements to tell Los Angeles I'm

17  going to come up to Los Angeles, I've got a source, he's

18  going to be recording conversations.  He may have even needed

19  to get help at the airport to get his equipment into the

20  airport because of terrorism these days and the need to check

21  baggages and what have you.  So he would have also should

22  have -- should have made sure that they had enough

23  surveillance teams so that they could have identified who was

24  coming in to the airport.  And since most of the time these

25  deals do not work right, be prepared to -- people to split up

1    and to follow them as they go, not just in pairs but -- in

2    reality, sometimes they'll -- individuals doing these deals

3    they're sophisticated defendants, they're sophisticated drug

4    dealers, they'll split up with the idea they'll try to lose

5    the surveillance teams.

6    Q.   Okay.  And you indicated that more than one team could

7    have or should have been called in this case; is that

8    correct?

9    A.   Absolutely.  This is -- at this point in time, we have an

10   international drug case that they're working, and so that

11   ratchets it up, you know, the level of concentration that

12   the -- each office needs to afford the investigation.

13   Q.   And is it in your opinion an important thing to find out

14   where the money people are going to get the money?

15              MR. GUTIERREZ:  Relevance, lack of foundation, 403

16   at this point.

17              THE COURT:  Well, the question has been asked and

18   answered; that is important.  Would you ask another question,

19   please.

20              MR. DENIS:  Yes, your Honor.

21              BY MR. DENIS:  Q.  And based on your review of the

22   record, there was no surveillance done on the people that

23   were allegedly the money people in this case, correct?

24              MR. GUTIERREZ:  Been asked and answered, your

25   Honor.

1                THE COURT:   The objection is sustained.

2                BY MR. DENIS:   Q.   Now, Mr. Wedick, based on your

3    review of the -- of the record, you learned that there were

4    search warrants that were executed, correct?

5    A.   Yes, I have.

6    Q.   One of those search warrants were executed at the Comfort

7    Inn in the San Fernando Valley, correct?

8    A.   That's correct.

9    Q.   And as part of your review of the record, did you

10   review -- strike that.   There was some money seized, correct?

11   A.   That's correct.

12   Q.   And you also reviewed the proffer session of Mr. Shirani,

13   correct?

14   A.   That's correct.

15   Q.   And as part of that proffer session, there was an issue

16   that came up regarding ownership of money; is that true?

17   A.   That's correct.

18   Q.   And is -- based on your experience what should the FBI

19   have done when the issue of ownership of money or counting of

20   money came up?

21   A.   Well, when the discussion came up as to where the money

22   originated, there was a story that was related by Shirani

23   that said that initially the money --

24   Q.   I'll get to that, Mr. Wedick.   What I'm interested right

25   now, there was a search warrant that was executed at the San

1   Fernando Valley, correct?

2   A.   That's correct.

3   Q.   And there was a sum of money that was seized pursuant to

4   that search warrant; is that correct?

5   A.   That's correct.

6   Q.   And at some point in time, there was a issue of -- well,

7   you've testified there was no surveillance done as to where

8   these individuals went to get money or who went to get money,

9   correct?

10  A.   That's correct.

11  Q.   So as far as you're aware, the investigation does not

12  know, based on law enforcement testimony, who went and got

13  that money, correct?

14  A.   That's correct.

15  Q.   And that's because no surveillance was done?

16  A.   That's correct.

17  Q.   Now, at a proffer session there was a -- a issue about

18  who went and received money; is that true?

19  A.   Yes.

20  Q.   And there was some issue of who counted money?

21  A.   Yes, yes.

22  Q.   And when that issue came up, what -- do you have an

23  opinion about that money or --

24  A.   Well, there was this discussion relative to who owns the

25  money and who demonstrates -- well, first of all, as an

984

1    investigator, ownership is sometimes demonstrated by control,

2    but it also can be demonstrated by other witnesses that will

3    see people in possession of money, and so we might take

4    statements of that.  But the last aid that agents will also

5    use is they'll fingerprint the money, as in the case of --

6    well, it's usually done in bank robberies, if you will, but

7    it's done under any number of circumstances; we do it,

8    kidnappings.  Anytime we recover something that we want to

9    establish who did what and that evidence may take us there,

10   we ask the lab to conduct those -- those examinations.

11   Q.  Based on a proffer sessions, there was a statement

12   that -- made by Mr. Shirani that Ryan Wedding counted the

13   money and Shirani had counted the money, correct?

14   A.  That's correct.

15   Q.  And when that statement or when that fact had come up,

16   should the FBI have fingerprinted the money to see if that

17   was in fact true?

18   A.  It's a definite piece of evidence, yes, that might help

19   to some degree establish ownership by the mere fact that one

20   defendant's prints are all over it and the others are not.

21   Q.  And that was not done in this case, correct?

22   A.  Not to my knowledge.

23   Q.  Okay.  Now, Mr. Wedick, you've also investigated

24   sophisticated criminals?

25   A.  Yes, I have.

985

1    Q.   You've investigated drug cases, correct?

2    A.   Yes, I have.

3    Q.   And part of your investigation, you dealt with

4    sophisticated drug dealers, correct?

5    A.   Correct.

6    Q.   Now, do you have an opinion -- have you heard of the

7    expression "rules of the game"?

8    A.   Yes, I have.

9    Q.   Could you -- could you explain that for the jury.

10   A.   Sophisticated drug dealers are aware that law enforcement

11   is out there actively trying to collect and identify who's

12   dealing what, whether it be leaving documentary evidence

13   around in the form of receipts, credit card receipts, making

14   hotel reservations car reservations, and so sophisticated

15   defendants will make every effort to have other

16   individuals -- or -- or either front for them, if you will,

17   or use cash.

18   Q.   Okay.  And when you say front for them, what do you mean

19   by that?

20   A.   I mean they'll have someone -- they'll sign a document or

21   they'll have someone else check into a hotel or they'll have

22   a telephone in another individual's name.  Nothing will be

23   readily easily available to be traceable to them.

24   Q.   So they try to distance themselves from whatever activity

25   they're doing --

1    A.   That's correct.

2    Q.   -- and as it connects to them, correct?

3    A.   That's correct.

4    Q.   And as part of your review of this case, did you learn

5    that Shirani had names -- or two phones in other people's

6    names?

7              MR. GUTIERREZ:   Objection; lack of foundation,

8    relevance, your Honor.

9              THE COURT:   The objection is overruled.

10             THE WITNESS:   Yes, I did.

11             BY MR. DENIS:   Q.   And during the course of your

12   investigation, you also reviewed the text messages, correct?

13   A.   Yes, I have.

14   Q.   Okay.

15             MR. DENIS:   And, your Honor, this would be a

16   convenient place for me to stop if that would be okay with

17   the Court just so we can clarify the rest of his opinion

18   pursuant to the Court's order.

19             THE COURT:   Its about twelve o'clock, ladies and

20   gentlemen, and we'll resume at 1:30.  Please remember the

21   admonition not to discuss the case or make any decisions at

22   this time.  Thank you.

23             MR. DENIS:   Thank you, your Honor.

24       (There was a break in the proceedings.)

25             THE COURT:   Okay.  Continuing on then with Mr.

1    Wedick.

2              MR. DENIS:  Thank you, your Honor.

3              BY MR. DENIS:  Q.  Mr. Wedick, we -- we were

4    discussing the fingerprint -- fingerprinting of the money; do

5    you recall that this morning?

6    A.  Yes, I do.

7    Q.  And, Mr. Wedick, why was it important to fingerprint the

8    money in this case?

9    A.  Because it establishes -- if we can identify prints of

10   individuals, it establishes that those individuals had

11   handled the money, and therefore we might be able to argue

12   control and -- and ownership.

13   Q.  Was there -- was there any information given, based on

14   your review of the record, that Mr. Wedding allegedly counted

15   the money?

16   A.  Say that again.

17   Q.  In this case was there any information given during the

18   reports that you reviewed or during the material that you

19   reviewed that indicated that Mr. Wedding had counted the

20   money?

21   A.  Yes.

22   Q.  And would have -- if those fingerprints -- if

23   fingerprints were done, what would that answered?

24             MR. GUTIERREZ:  Calls for speculation, vague as to

25   what done means, your Honor.

988

1          THE COURT:  I think we know what done means or what

2    was intended, but it does calls for speculation.  The

3    objection is sustained.

4          MR. DENIS:  Okay.

5          BY MR. DENIS:  Q.  And, Mr. Wedick, in terms of the

6    money found, was it important to investigate the origins of

7    that money?

8    A.  Absolutely.

9    Q.  What could have been done to determine the origins of

10   that money?

11   A.  Well, it would ask questions as to where the money'd come

12   from, who owned the money, who put up the money, and then we

13   would have attempted to verify the location of the money,

14   maybe issue some subpoenas, but get some documents that would

15   suggest where the money was located.

16   Q.  Would that also been to the origins of the money?

17   A.  Yes, explain where the money came from.

18   Q.  For example --

19   A.  In other words, the trail, we follow the paper or the

20   money trail.

21   Q.  Would that have been in reverse you mean?

22   A.  Yes.

23   Q.  Should they have -- what should -- what should the FBI

24   have done?

25   A.  Well, first, they should have started asking questions

1   about whose money it was, who put up the money, and from

2   those answers then conduct as much investigation as they

3   could either by making telephone inquiry at different

4   institutions or maybe, you know, today you hear a lot of talk

5   about havales, if you will, and it's -- it's money being

6   transfered around the world by individuals through personal

7   agreements.  So to go out and interview these people see if

8   you could get their cooperation and maybe you could learn a

9   little bit more about the money.

10  Q.  Okay.  And as far as you know, was that done in this

11  case?

12  A.  No.

13  Q.  Now, you discussed -- I believe you touched briefly on

14  rules of the game, correct?

15  A.  Yes.

16  Q.  And you indicated that sophisticated drug dealers cover

17  their tracks, correct?

18          MR. GUTIERREZ:  That's been asked and answered,

19  your Honor.

20          THE COURT:  Sustained.

21          BY MR. DENIS:  Q.  Mr. Wedick, during your -- your

22  tenure at the FBI, had you had occasion where you worked with

23  Interpol?

24  A.  Yes, I had.

25  Q.  And could you please -- approximately how many times have

1    you worked with Interpol?

2            MR. GUTIERREZ:  Objection; relevance and lack of

3    foundation.

4            THE COURT:  The objection is sustained on the basis

5    of relevance.

6            BY MR. DENIS:  Q.  Mr. Wedick, you reviewed -- you

7    discussed the suitability period previously, correct?

8    A.  Yes, I have.

9    Q.  And during that time when an informant is signed up with

10   the FBI, there's a background check done on them, correct?

11   A.  That's correct.

12   Q.  And in this case were you able to render an opinion based

13   on the informant that was selected in this case?

14           MR. GUTIERREZ:  Relevance, lack of foundation.

15           THE COURT:  The objection is sustained on each

16   ground.

17           BY MR. DENIS:  Q.  Now, Mr. Wedick, based on your

18   over 34 years of experience with the FBI, were you able to

19   render an opinion based on the evidence of the individuals

20   you suspect would be involved in the conspiracy to distribute

21   cocaine in this case?

22           THE COURT:  Counsel, you were advised ahead of time

23   that would not be an appropriate opinion to elicit.  The

24   Court will sustain its own objection on that.

25           MR. DENIS:  Okay.

1          THE COURT:  Ladies and gentlemen of the jury, no

2    witness on either side of this case would be able to testify

3    before you as to their opinion as to who is guilty or not

4    guilty in this case, who is responsible or not responsible.

5    That is your decision totally.  It would not be appropriate,

6    and counsel was aware of that ahead of time.

7          BY MR. DENIS:  Q.  Mr. Wedick, based on your 34

8    years of experience working undercover and the use of

9    informants, would the informant have been instructed to learn

10   the roles of the individuals who arrived at LAX?

11   A.  Yes.

12   Q.  And was that done in this case?

13   A.  Yes, it was.

14   Q.  And how do you get that?  How do you know that was done?

15   A.  In a transcript that took place on June 10, if I remember

16   correctly, there was a conversation between Michael Krapchan

17   and the cooperating source where the source was inquiring as

18   to who was involved, who were the principals of the deal, of

19   the cocaine transaction.

20   Q.  And in your working with undercover -- excuse me -- with

21   cooperating witnesses, would that be an instruction given by

22   the FBI to find out who was involved?

23          MR. GUTIERREZ:  That's been asked and answered,

24   your Honor.

25          THE COURT:  It was.

1          BY MR. DENIS:   Q.   And as far as your review of

2    that -- of the -- and you reviewed the transcripts from at

3    least June -- through June 13, 2008, correct?

4    A.   That's correct.

5    Q.   And after the confidential source confirmed the roles of

6    individuals, as far as your reading of the transcript, was

7    there any other information that the roles of the individuals

8    changed?

9          MR. GUTIERREZ:   We'll object as to argumentative

10   form as phrased, your Honor.

11         THE COURT:   The objection is sustained.

12         BY MR. DENIS:   Q.   Now, Mr. Wedick, based on your

13   experience with sophisticated drug dealing drug dealers, have

14   you been familiar with the term the unsuspecting -- the

15   unsuspecting person?

16   A.   Sure.

17   Q.   Could you please explain what that is.

18   A.   In drug transactions that -- there are probably two kinds

19   of transactions; there's sophisticated dealers and there's

20   the unsophisticated cases.   Sometimes you'll see -- in a

21   sophisticated transaction you'll have somebody use what we

22   call a blind mule or someone that's unsuspecting, if you

23   will, and he will act as a courier for someone who is in

24   control of the deal.

25   Q.   When you say the individual acts as a courier, is that

1   knowing or unknowing?

2   A.   It occurs both ways.   The unsuspecting might not know

3   that he's been given drugs to carry or money to carry.   The

4   contraband can be different kinds.

5   Q.   And do some of these sophisticated drug dealers use

6   unsuspecting individuals to rent cars or hotels?

7               MR. GUTIERREZ:   Asked and answered, your Honor.

8               THE COURT:   Sustained.

9               BY MR. DENIS:   Q.   In terms of the unsuspecting, do

10  sophisticated drug dealers often ask the unsuspecting to rent

11  like a storage locker to put drugs into that storage locker?

12              MR. GUTIERREZ:   Lack of foundation, calls for

13  speculation.

14              THE COURT:   The objection is overruled.   You may

15  answer if you're able to.

16              THE WITNESS:   Sure.   They'll frequently try to get

17  unsuspecting individuals to front things for them.

18              BY MR. DENIS:   Q.   And when you say front, would

19  they -- in the cases that you've handled, would they tell the

20  individuals that they're putting drugs in that storage

21  locker?

22  A.   No, they -- no.

23  Q.   And in your -- in your experience you've also dealt with

24  cases dealing with con men and deception, correct?

25  A.   Absolutely.

994

1    Q.  And you've also dealt with the sophisticated drug dealers

2    in your past experience as well, correct?

3    A.  Absolutely.

4    Q.  And what would they tell some of these unsuspecting if

5    they wanted them to like rent a storage locker?

6              MR. GUTIERREZ:  Calls for speculation, relevance.

7              THE COURT:  Sustained on both grounds --

8              BY MR. DENIS:  Q.  What would they tell --

9              THE COURT:  -- primarily relevance.

10             BY MR. DENIS:  Q.  Now, in your experience do

11   sophisticated drug dealers often use cash in their

12   transactions?

13   A.  Yes.

14   Q.  And why do they use cash?

15   A.  Because it's -- it allows them to remain anonymous.

16   There's no document that we might be able to trace or track

17   back that might prove that they were present at a transaction

18   or at a location or did something that was of some pertinence

19   to the investigation.

20   Q.  Now, have you learned through the course of this

21   investigation that Shirani paid for most of the meals in this

22   case?  Is that significant?

23             MR. GUTIERREZ:  Calls for speculation, relevance,

24   your Honor.

25             THE COURT:  Well, the objection is sustained.  You

1    may ask another question.

2            MR. DENIS:  Okay.

3            THE COURT:  There is evidence of that already in

4    the record.  In terms of it calling for speculation, it's not

5    an issue of speculation.  And insofar as theoretically

6    payment of use of meals, this witness has already testified

7    as to the significance of that, counsel.  So please ask

8    another question.

9            MR. DENIS:  Okay, your Honor.

10           BY MR. DENIS:  Q.  Mr. Wedick, the issue came up

11   that Mr. Wedding was in Las Vegas between the period of June

12   6 through June 9; is that information significant?

13           MR. GUTIERREZ:  Lack of foundation, relevance, your

14   Honor.

15           THE COURT:  The objection is sustained.  Ladies and

16   gentlemen, there may be a number of objections that are now

17   coming that will be sustained.  Please don't hold this

18   against either party.  Objections are made by either party.

19   You should not be influenced by the making of the objection

20   or by the Court's ruling on it.  Counsel and the Court did

21   have an opportunity to meet and confer as to permissible

22   areas of examination.  Counsel is well aware of what those

23   areas are.  So if there's questioning outside those areas,

24   obviously the objections will come.

25           MR. DENIS:  Thank you, your Honor.

996

1        BY MR. DENIS:  Q.  Mr. Wedick, you discussed the

2   sophisticated drug dealer covering their tracks.  Do

3   sophisticated drug (sic) like to distance themselves from

4   their criminal activity?

5            MR. GUTIERREZ:  Asked and answered, your Honor.

6            THE COURT:  Sustained.

7            BY MR. DENIS:  Q.  There was evidence that was

8   discussed in this trial that -- that either Hassan or

9   Hassan's brother had purchased the plane ticket to come from

10  Canada to -- to California.  Was that significant?  Do you

11  have an opinion as to that?

12  A.  Yes.

13           MR. GUTIERREZ:  Relevance, lack of foundation.

14           THE COURT:  The objection is sustained on each of

15  the two grounds.

16           BY MR. DENIS:  Q.  Mr. Wedick, there was an issue

17  that was raised regarding the Comfort Inn hotel keys.  I'm

18  going to just direct you to that area.  Was the fact that the

19  key that was found -- that belonged to Mr. Shirani was found

20  in the car and the key that was found on Mr. Wedding play

21  any -- do you have an opinion as to that?

22           MR. GUTIERREZ:  Lack of foundation, your Honor,

23  relevance.

24           THE COURT:  Sustained.

25           MR. DENIS:  As to relevance or foundation?

 1              THE COURT:  Both.

 2              BY MR. DENIS:  Q.  And, Mr. Wedick, you -- you

 3    reviewed the recordings, as you mentioned, and the text

 4    messages on the telephone calls correct?

 5    A.  Yes, I did.

 6    Q.  And that was for Shirani's two call -- two phones and Mr.

 7    Wedding's two phones, correct?

 8    A.  Yes.

 9    Q.  And in Mr. Wedding's phones, there was no indication of

10    any kind of drug -- drug conversation in his text messages?

11              MR. GUTIERREZ:  Lack of foundation, relevance, your

12    Honor; misstates the evidence as well.

13              THE COURT:  The objection is sustained on all

14    grounds actually.  The opinion as to this -- from this

15    witness as to what that may or may not mean and his

16    characterization of what the evidence is at this point would

17    not be relevant.

18              BY MR. DENIS:  Q.  Mr. Wedick, you reviewed the

19    text messages of -- of Mr. Wedding, correct?

20    A.  Yes, I did.

21    Q.  And do you have an opinion as to the text messages from

22    your review of the phone?

23              MR. GUTIERREZ:  Lack of foundation, your Honor.

24              THE COURT:  Sustained.

25              BY MR. DENIS:  Q.  And you also reviewed the text

1  messages of Mr. Shirani, correct?

2  A.  Yes, I did.

3  Q.  And do you have an opinion as to the -- well, strike

4  that.  And in Mr. Shirani's phone were there a number of

5  references to drug transactions or drug discussions in that

6  phone?

7  A.  Yes.

8  Q.  And are text messages significant in a drug

9  investigation?

10  A.  They can be.

11  Q.  Would discussions of drugs show knowledge?

12      MR. GUTIERREZ:  Objection, relevance, lack of

13  foundation.

14      THE COURT:  Sustained.

15      BY MR. DENIS:  Q.  Mr. Wedick, you also -- in

16  reviewing your -- the -- the file, do you have -- there were

17  proffer sessions done, correct?

18      MR. GUTIERREZ:  Been asked and answered, your

19  Honor.

20      THE COURT:  You can just use that as a prefatory

21  lead-in introduction to the real question --

22      MR. DENIS:  Thank you, your Honor.

23      THE COURT:  -- you want to ask at this point.

24      BY MR. DENIS:  Q.  There were proffer sessions done

25  in this case, correct?

1  A.   With Mr. Shirani, yes, that's correct.

2  Q.   And the FBI conducted the questioning of the -- of

3  Mr. Shirani, correct?

4  A.   That's correct.

5  Q.   What -- what are the -- what are the -- are the

6  guidelines in terms of what is required of -- of

7  investigators when they are eliciting information from a --

8  from a witness?

9  A.   They are to develop information that would support their

10  investigation, try to corroborate information that they learn

11  during the interview or the interrogation, and they're to ask

12  probing questions so that they might either conduct follow-up

13  questions there, as I think I've just indicated, and/or do

14  follow-up investigation as they -- when the interview

15  concludes.

16  Q.   And when you say corroboration, can you explain that.

17  A.   Yes.   There they are to develop as much information -- in

18  particular derogatory information.   If they receive

19  information that suggests allegations involving wrongdoing,

20  illegality or what have you, they should pursue those

21  allegations and -- and try to get the facts that are behind

22  those allegations versus often some person, if allowed to

23  just ramble on, they might just start make allegations that

24  have no basis in fact, so -- this is not an unusual practice

25  and because of that we actually have regulations that say

1   that agents are supposed to develop that derogatory

2   information, and if they can't develop and if they don't

3   answer those questions, ask those questions, then they're not

4   following the appropriate methods that the Bureau uses.

5   Q.  When you say follow-up, you mean if it's a statement is

6   made, they have to try to find out if that statement is true

7   through some other source or way?

8   A.  Exactly.

9   Q.  Okay.  And based on the information that was provided to

10  you in the reports, were many of the -- were the statements

11  that were made by Mr. Shirani verified or corroborated?

12              MR. GUTIERREZ:  Objection; lack of foundation,

13  relevance as phrased.

14              THE COURT:  It's sustained.  There's a lack of

15  foundation.  And the opinion of the witness is also

16  irrelevant.

17              BY MR. DENIS:  Q.  And, Mr. Wedick, when you

18  indicated this corroboration of the information, is that kind

19  of the gatekeeping function of the FBI, to make sure what is

20  said is true --

21  A.  The agency --

22  Q.  -- or to weed out what is true and not true?  I'm sorry.

23  A.  The agency is a fact-collecting agency, so they would be

24  interested in making sure that the -- whoever is being

25  interrogated or interviewed supplies facts, and they keep

1    asking questions that would suggest or -- or get facts in

2    return.

3    Q.  And are these -- the issue of the corroboration, are

4    these found in any FBI handbook?

5    A.  Yes.

6    Q.  Which one is that?

7    A.  It's -- there is a section that deals with -- it's not a

8    handbook, but it's the manual of investigative guidelines,

9    and it's section that deals with interviews.

10   Q.  And in it they deal extensively with corroborating

11   information?

12   A.  Yes.

13   Q.  And as far as you know, based on your review of this

14   file, was that done, corroborating Mr. Shirani's statements?

15   A.  They were --

16             MR. GUTIERREZ:  Objection; lack of foundation as

17   phrased, your Honor, relevance.

18             THE COURT:  The objection is sustained.

19             BY MR. DENIS:  Q.  All right.  Now, Mr. Wedick,

20   based on your review of the attorney guidelines or the FBI

21   handbooks, is the FBI allowed to use as a cooperator a

22   fugitive from law, a -- basically a fugitive?

23   A.  In general, no.

24   Q.  Is there a specific guideline that indicates whether or

25   not a fugitive could be used for or with the FBI?

1  A.   Yes.   In the Attorney General Guidelines, it prohibits

2  using fugitives.

3  Q.   And do you --

4  A.   It deals with fugitives I should say and doesn't let

5  agents communicate with them.

6  Q.   So if an agent knows that someone is a fugitive, what is

7  the policies and procedures that the FBI's supposed to

8  follow?

9  A.   If it's a -- if the informant is open, that information

10  should be transfers admitted to headquarters so that they can

11  make an appropriate judgment as to whether or not they should

12  continue to maintain this individual as an informant or not,

13  and the agents will undoubtedly be told to make contact with

14  the originating agency and find out what the problem is.

15  Q.   If that procedure isn't followed, would that interfere

16  with the suitability period of that informant?

17  A.   Sure.   That should be verified and those -- that

18  explained for sure because if it's not explained, the

19  individual can't be used as an informant.

20  Q.   Why -- why wouldn't -- why doesn't the FBI want to use

21  criminals or -- as informants?   What's the issue there?

22  A.   We have cooperating agreements with not only other

23  countries but other states, other local municipalities, and

24  they maybe have prosecutions or have issues, conducted

25  investigations and they're looking for individuals, and we

1   just can't of our own volition decide that we're going to

2   ignore some other originating agency's investigation.   We

3   have to make contact with that agency and find out to the

4   Bureau's satisfaction whether or not there is an offense or

5   there is a problem, and until that's resolved we will not

6   operate that individual.

7   Q.   Are -- are fraud crimes of importance or significance to

8   the FBI?

9            MR. GUTIERREZ:   Relevance, calls for speculation as

10   phrased.

11            THE COURT:   It is vague without any context.   The

12   objection is sustained.

13            BY MR. DENIS:   Q.   If the FBI was aware that an

14   individual was -- was wanted in another country for an

15   aggravated fraud, would that raise -- would that raise red

16   flags with the FBI regarding that individual for use as an

17   informant?

18   A.   Absolutely.

19            MR. DENIS:   Nothing further, your Honor.

20            THE COURT:   Cross-examination?

21            MR. GUTIERREZ:   We have no questions of this

22   witness, your Honor.

23            THE COURT:   Thank you, sir.   You are excused.   Call

24   your next witness, please.

25            MR. DENIS:   Yes, your Honor.   The defense calls

1    Ms. Karen Wedding.

2            THE CLERK:  Would you raise your right hand to be

3    sworn, please.  Do you solemnly swear or affirm that the

4    evidence you shall give in the cause now before the Court

5    shall be the truth, the whole truth, and nothing but the

6    truth?

7            THE WITNESS:  I do.

8                           Karen Wedding

9    was called by the defense and testified as follows:

10           THE CLERK:  Please state your name for the record

11   and spell your full name.

12           THE WITNESS:  Karen Wedding, Karen, K-a-r-e-n

13   W-e-d-d-i n g.

14                      Direct Examination

15           BY MR. DENIS:  Q.  Good afternoon, Ms. Wedding.

16   A.  Hi.

17   Q.  Ms. Wedding, where do you currently -- do you live in

18   Canada?

19   A.  Yes, I do.

20   Q.  And what do you do in Canada?  What's your work?

21   A.  I'm a registered nurse.

22   Q.  And aside from being a registered nurse, do you do

23   other -- do you do charitable -- do you run a charitable

24   organization?

25   A.  I do a charity event, yes, annually, and I do other

1005

1    community things.

2    Q.   And how long have you been a registered nurse?

3    A.   Since 1979.

4    Q.   And how long have you lived in Canada?

5    A.   All my life.

6    Q.   Is your son Ryan Wedding?

7    A.   Yes.

8    Q.   And when did Mr. Wedding begin skiing or snowboarding?

9    A.   Well, the skiing part he started actually when he was 16

10   months old, but competitively, he probably -- the skiing was

11   when he was nine; he was in a junior development program that

12   was coached by a national level team coach.  And then when we

13   moved out to Coquitlam, he got involved with snowboarding and

14   became passionate about that.

15   Q.   How old was he when he started becoming passionate with

16   snowboarding?

17        MR. GUTIERREZ:  Your Honor, we'd object as to

18   relevance.

19        THE COURT:  The objection is sustained.  I think

20   just a general -- if you're looking to establish just a brief

21   summary of Mr. Wedding's life, that's fine, but in terms of

22   going into any detailed recitation, it would not be relevant.

23        MR. DENIS:  Okay, your Honor.

24        BY MR. DENIS:  Q.  So did Mr. Wedding -- did Mr.

25   Wedding snowboard professionally?

1    A.   Yes, he did.

2    Q.   And did he win any awards?

3    A.   Yes, he did.

4    Q.   What awards did he win?

5    A.   He was Canadian Junior Champion, he was Men's National

6    Champion for Canada, he's a World Cup Podium, he's had U.S.

7    Grand Prix placings, and he was a member of the national

8    team, and he raced for Canada in the Olympics in 2002.

9    Q.   How old was he when he raced for Canada in the Olympics

10   in 2002?

11   A.   He was born in '81, so 2002 -- so 21.

12   Q.   And has Mr. Wedding -- did Mr. Wedding live in your home

13   with your husband?

14   A.   Yes, he did.

15   Q.   Okay.  And after the Olympics in 2002, or at any time,

16   did you -- were you aware -- or was there anything that --

17   that showed that Mr. Wedding was involved in any drug dealing

18   that you've seen?

19            MR. GUTIERREZ:  Objection; calls for speculation,

20   relevance, your Honor.

21            THE COURT:  Sustained.

22            BY MR. DENIS:  Q.  Now, Ms. Wedding, now, Mr.

23   Wedding, your son, he was raised by you and your husband,

24   correct?

25   A.   Yes.

1   Q.  And was he raised to be trusting?

2   A.  Absolutely.

3   Q.  In your family do you lie to each other in your -- in

4 your home?

5         MR. GUTIERREZ:  Objection; relevance, your Honor,

6 lack of foundation.

7         THE COURT:  The objection is sustained on the basis

8 of relevance.

9         BY MR. DENIS:  Q.  Does your son -- you indicated

10 that he's trusting, correct?

11         MR. GUTIERREZ:  Objection; relevance, your Honor,

12 asked and answered.

13         THE COURT:  It has been asked and answered.

14         BY MR. DENIS:  Q.  And your son was -- when he was

15 in the snowboarding with the Olympics, was this a team event

16 or a team sport?

17         MR. GUTIERREZ:  Objection, relevance.

18         THE COURT:  The objection is sustained.

19         BY MR. DENIS:  Q.  Ms. Wedding, your -- what does

20 your husband do?

21   A.  He's a professional engineer.

22   Q.  And is he a successful engineer?

23   A.  Very.

24   Q.  And does he assist your kids with -- has you and your

25 husband helped your kids out financially in the past?

 1          MR. GUTIERREZ:  Objection; relevance, your Honor.

 2          THE COURT:  The objection is the sustained.

 3          MR. DENIS:  Okay.  Nothing further, your Honor.

 4          MR. GUTIERREZ:  Ma'am, I have no questions.  Thank

 5  you.

 6          THE COURT:  Thank you, Ms. Wedding, for coming in.

 7  Appreciate it.  You are excused.

 8          MR. DENIS:  Your Honor, could I have a brief

 9  sidebar?

10          THE COURT:  Do you have any further witnesses?

11          MR. DENIS:  I do have one, your Honor, who will be

12  here in the morning.  That's the soonest they could make it.

13  That's the issue that I was going to raise.  It will be a

14  ten-minute witness.

15          THE COURT:  Well, I'll see you at the side of the

16  bench, counsel.  Ladies and gentlemen -- let's see.  Why

17  don't we take a brief recess.  Try not to go too far from the

18  courtroom.  We'll call you back just as soon as we can.

19  Thank you.

20      (The jury left the courtroom.)

21          THE COURT:  Who is it?

22          MR. DENIS:  It's Adrian Williams.  He's the

23  individual that Shirani said saw him take the money and give

24  the thousand dollars, and I want to counter that.

25          THE COURT:  And when is he coming?  Is he here now?

1        MR. DENIS:  He's on his way.

2        THE COURT:  You said you'd be concluded by today.

3   Why didn't he get here?

4        MR. DENIS:  I was hoping he'd be here by this

5   afternoon.  He got held up.  He said he's going to be here by

6   tonight.

7        THE COURT:  How did he get held up?

8        MR. DENIS:  Well, he said that he --

9        THE COURT:  Tell me what he told you.

10        MR. DENIS:  Well, what I was told is he was at the

11   border and -- actually the border person actually called me

12   and kind of confirmed --

13        THE COURT:  He got stopped at the border?

14        MR. DENIS:  Yeah.  Well, they were just asking to

15   make sure that the subpoena was valid.

16        THE COURT:  He got detained?

17        MR. DENIS:  No.

18        THE COURT:  When was this?

19        MR. DENIS:  Today.

20        THE COURT:  He was coming down from Canada?

21        MR. DENIS:  Yes.  This is the number they called

22   me.

23        THE COURT:  Why was he leaving so late if you

24   intended on finishing up today?  That's been the question

25   that I --

1           MR. DENIS:  We were -- we were -- we were trying

2      to -- well, I thought we had enough witnesses.  When we were

3      scheduling witnesses, I thought we had enough witnesses for

4      today, and I thought I would need him first thing in the

5      morning if necessary, and I think the issue is we do need

6      him.

7           MR. GUTIERREZ:  Your Honor, the question that he's

8      talking about came on cross-examination of Shirani.  The

9      government didn't elicit that, nor do I intend to argue in

10     the close in any way, shape, or form.  But that's just my two

11     cents on the issue.

12          THE COURT:  Would you care to make a proffer to see

13     if it's even necessary to bring him in?  You say he's a very

14     short witness.

15          MR. DENIS:  Yeah.  Basically --

16          THE COURT:  What is your proffer?

17          MR. DENIS:  -- the issue about picking up -- while

18     Shirani indicated that his proffer that he picked up a box of

19     money from Mr. Wedding and Mr. Williams was there, and that's

20     not true.

21          THE COURT:  This is Adrian Williams?

22          MR. DENIS:  Yes, Adrian Williams.  And then the

23     other issue was that he paid Hassan a thousand dollars to buy

24     tickets, plane tickets for Ryan Wedding and Hassan and an

25     extra $200 for a phone, and that's not true.

 1            THE COURT:  Do you have -- were you going to put on

 2    rebuttal case?

 3            MR. GUTIERREZ:  I was just concerned about calling

 4    Ms. Lambert to talk about why she didn't fingerprint.  Other

 5    than that, frankly, no, I was actually considering not doing

 6    it.

 7            THE COURT:  Well, this is -- are you representing

 8    as an officer of the Court that you have one witness left,

 9    ten minutes, who will be available tomorrow morning at nine

10    o'clock?

11            MR. DENIS:  Yes.

12            THE COURT:  How long do you anticipate your

13    argument to go?

14            MR. DENIS:  At least an hour and a half at least,

15    with the clips maybe two.

16            THE COURT:  How about you?

17            MR. GUTIERREZ:  I think I can do my open and close

18    in 30 minutes and then whatever rebuttal comes, I'd respond

19    to.  I have a PowerPoint presented ready to go.  Maybe 30, 40

20    minutes, but I'm thinking 30's a good estimate.

21            THE COURT:  Your schedule -- the lack of your

22    ability to get your ten-minute witness --

23            MR. DENIS:  They're out of --

24            THE COURT:  -- has really, really thrown a monkey

25    wrench into this.  I hope you understand that first of all.

1012

1    MR. DENIS:  I do.  I was trying to get him here.  I

2    asked the individual, and he just told me that he has to get

3    on a plane from Washington to get down here.

4    THE COURT:  Is he that cavalier he'd cut it that

5    close, that he might not even be here when you're ready to

6    call him?

7    MR. DENIS:  We were debating whether or not if we

8    needed to call him, and he wants to come and testify.  The

9    ultimate is he wants to come and testify.

10    THE COURT:  Okay.  So he's got the ultimate

11    decision there; he wants to come and testify, and my only

12    concern was he just seems -- he seems to be the tail wagging

13    the dog here, and he shouldn't -- you shouldn't have

14    permitted him to put us all in this position.

15    MR. GUTIERREZ:  Your Honor, I could offer to

16    stipulate if this individual were to come and testify, they

17    would say X and Y.  I don't think it really affects the case.

18    THE COURT:  I was thinking about an offer -- well,

19    stipulated testimony -- not stipulation as to fact but

20    stipulation as to testimony, which would be the same thing as

21    basically having him come in.  Would that satisfy you?

22    MR. DENIS:  Yes.

23    THE COURT:  Okay.  You want to work on this

24    stipulation?

25    MR. GUTIERREZ:  I'm amenable to it, but given the

1   track record, I don't know how fruitful it will be.

2           MR. DENIS:  I'm on the record.

3           THE COURT:  Well, you could frame the

4   stipulation -- here's my concern.  I'd like to get this case

5   in the posture, if at all possible, where you could start

6   your arguments -- you feel you can start your argument today?

7           MR. GUTIERREZ:  Yes, your Honor.  I'm ready to go

8   right now.

9           THE COURT:  Okay.  And then you could start today.

10  Are you ready to start your argument today?

11          MR. DENIS:  No.  Well, no.

12          THE COURT:  Would it help you if we gave you the

13  evening to go over and organize yourself and --

14          MR. DENIS:  Yes.

15          THE COURT:  I'm willing to do that, but I think I'd

16  like to get the arguments completed by tomorrow --

17          MR. DENIS:  Yes.

18          THE COURT:  -- and I'll work with you in that

19  regard.

20          MR. DENIS:  Your Honor, I would just ask even

21  the -- it's a long four-day weekend, giving this case to the

22  jury this late into a four-day weekend.  I know there's a

23  very, very strong prejudice I think that would be argued that

24  if this case is given early enough on Wednesday it would be

25  very dangerous.  I don't know if --

1014

 1          MR. GUTIERREZ:  Your Honor, it could also be

 2   inferred that the failure to stipulate, which is not an

 3   obligation on the defense, could have engineered such a

 4   time-sensitive issue.

 5          THE COURT:  No, I could just have you both argue

 6   and then just dismiss the jury.  They're not going to reach a

 7   verdict tomorrow; I would counsel against that, so I'm not

 8   concerned about that.

 9          MR. DENIS:  Okay.  I appreciate that, your Honor.

10   That's the only thing I'm worried about.  There's some force

11   to issue.

12          THE COURT:  No, they're not going to rush to a

13   judgment.  I'm trying to give you an opportunity here.  I

14   know that you've been at a disadvantage with the clips, the

15   exhibits.  And if it helps you organize your thinking so that

16   you can prepare your argument in better fashion so that you

17   take less time, then that will be to everyone's benefit as

18   far as I'm concerned.

19          MR. DENIS:  Okay.

20          THE COURT:  But the reason I'm not starting the

21   arguments today and just -- you know, we could certainly

22   start them today, but the reason I'm not -- and actually if

23   you want to give your opening today, you could, and you could

24   start tomorrow --

25          MR. DENIS:  That's fine.

1015

1           THE COURT:  -- and then you would close tomorrow.

2           MR. GUTIERREZ:  If it's all the same to the Court,

3   I would prefer, if I have any say, to have it all one at one

4   shot.

5           THE COURT:  All right.  Well, I would consider that

6   with the understanding that we finish arguments tomorrow by

7   noon.  We're starting at 9:00.  Sounds like we can accomplish

8   that, both of you.

9           MR. GUTIERREZ:  My only concern is this Adrian is

10  Mr. Wedding's good friend.  I understand that there's some

11  alleged criminal conduct.  I'll work with it, and I don't

12  think I'll even be bringing it up anyway, but I need to talk

13  to the agent so that I can be reminded of exactly who this

14  Adrian is.  And there may be some -- I need to talk to find

15  out -- I'm willing to work on a stipulation, but I need to

16  talk to the agent to find out exactly what the past history

17  was between Adrian, whether it would be admissible; I haven't

18  been able to determine that.  This is the first I heard that

19  this Adrian would be coming.  But in the --

20          MR. DENIS:  Whatever, whatever you want, I'll do.

21  I'll have him here, I'll do --

22          MR. GUTIERREZ:  I've heard that before, Mr. Denis.

23          MR. DENIS:  Okay.  I mean --

24          THE COURT:  Okay.

25          MR. DENIS:  I put on the record that I would

1    stipulate to it, and -- whatever you want, Mr. Gutierrez.

2              THE COURT:  I think that was generous of Mr. Denis;

3    at least he was willing to stipulate as to testimony, so I

4    don't think you should discard it that easily.

5              MR. GUTIERREZ:  Well, I'm willing to work on it

6    right now if I could just talk to my agent real quick.  But

7    I'm willing to work on it.

8              MR. DENIS:  I guess we could do jury instructions

9    this afternoon.

10             THE COURT:  Well, we'll work on -- quite frankly,

11   the jury instructions are so straightforward; they're the

12   pattern instructions, I have an entire draft, and I don't

13   anticipate any significant issues over jury instructions.  We

14   should be able to start with the jury first thing in the

15   morning.  You want a few minutes to see where you are?

16             MR. GUTIERREZ:  If I could just have --

17             THE COURT:  Okay.  Laura, would you --

18             MR. GUTIERREZ:  May I be excused to go ask her --

19             THE COURT:  Please.  You can join your -- join Mr.

20   Wedding if you'd like, Mr. Denis.

21        (Sidebar conference concludes.)

22        (Following is a sidebar conference outside the presence

23   of counsel.)

24             THE COURT:  Hi, Mr. Westin.  How are you?

25             JUROR WESTIN:  Good.

1           THE COURT:  I know you mentioned to Laura that you

2   got some pressure at work, that your employer only gives you

3   five days.

4           JUROR WESTIN:  Yes.

5           THE COURT:  We're probably there right about now,

6   but I'd hate to lose you.  I don't know what your entire

7   motivation was in mentioning that to the courtroom deputy,

8   but let me say that I'd be willing to make a call for you to

9   your employer --

10          JUROR WESTIN:  Yes.

11          THE COURT:  -- if it got to the point where you

12  were --

13          JUROR WESTIN:  Yes.

14          THE COURT:  -- in trouble -- not in trouble but,

15  you know, your continued service here was creating a problem

16  for you.

17          JUROR WESTIN:  I just found out Friday they only

18  pay five days, and yesterday I tried to go in and talk to my

19  HR and they'd left for the day.  I sent an email, so -- and I

20  haven't been able to check what their response is.

21          THE COURT:  Well, you know, it might come down to a

22  situation where you're -- if they won't extend you the

23  courtesy of reimbursing you for all your time spent on jury

24  duty that you would be asked to serve for a few days without

25  compensation, that is, without compensation from your

1  employment.  I will tell you this, that many jurors, many,

2  many jurors do serve where they're not fully compensated; we

3  have people in business for themselves who come in and miss

4  days of work, sole proprietors, that --

5          JUROR WESTIN:  I'm just worried that it will

6  continue over --

7          THE COURT:  Okay.  Well --

8          JUROR WESTIN:  I'm okay with a few gays.

9          THE COURT:  A few days.

10         JUROR WESTIN:  Yes.

11         THE COURT:  But as I say, I'm certainly willing to

12  contact your employer if you wish me to do that at some point

13  just to emphasize how important it is for employers to

14  support their employees when it comes to jury duty.  May I

15  ask who your employer is.

16         JUROR WESTIN:  It's Genomics Institute, the

17  Novartis Foundation.

18         THE COURT:  You know, it's interesting sometimes

19  it's the largest employers who have the greatest access to

20  the courts who limit their own employees in terms of the

21  number of days they can serve on jury duty.  Large companies

22  like Novartis, they just assume that they'll have jurors as

23  needed present for their litigation and, as you know,

24  pharmaceutical companies do have litigation -- and I'm sorry,

25  its Doctor; I overlooked the fact that you're a Ph.D.  I'm

1    sorry.

2            JUROR WESTIN:  So there was -- I read the handbook

3    yesterday, employee handbook, and it specifically said five

4    days.  There was another sentence in there that said except

5    employees -- you know, it may be a different -- so that's

6    what I'm waiting, to see if there is any way --

7            THE COURT:  Well, usually anytime I call an

8    employer under these circumstances, it's usually in a company

9    like yours, and I'm talking to some HR person, and I'm

10   explaining to them the irony of them having access to the

11   courts as they do for some very long cases dealing with

12   patent cases or other long cases, expecting that jurors are

13   going to be there for 10, 20, 30 days, and then limiting

14   their own employees to five days.  And I've never had any

15   difficulty in having a company say well, we'll support that.

16   So what I'm saying is I'll certainly make that --

17           JUROR WESTIN:  Well, let's wait until I see what

18   the response is.

19           THE COURT:  Okay.

20           JUROR WESTIN:  And I can think about it and talk to

21   the clerk tomorrow.

22           THE COURT:  Okay.

23           JUROR WESTIN:  If that's okay.

24           THE COURT:  That's okay.  Thank you, Doctor.  You

25   can rejoin your fellow jurors.  Counsel?

1        (Juror Westin left sidebar.)

2        (Following is a sidebar conference.)

3            MR. DENIS:  Your Honor, I have a question before --

4            THE COURT:  By the way, I just spoke with Juror

5    Dr. Westin, who was the juror who expressed some concern

6    about whether he was being compensated by his employer.  He

7    told me was concerned about it but that he would see whether

8    in effect he has any access to having his employer extend his

9    pay while he's on the jury should it go a longer period of

10   time, and I told him I'll be happy to contact his employer

11   for that purpose.  He's with us.

12           MR. DENIS:  Okay.  I have a question.  I'm not

13   familiar.  Does this Court just admit evidence based on the

14   witnesses that testify or could we move to have certain

15   exhibits that been identified and there has been foundation

16   laid in as evidence at the conclusion right before we close?

17   Could I move evidence in if a person is -- or only with a

18   witness there?

19           THE COURT:  Well, that's a -- if there are exhibits

20   that -- for which a foundation has already been found

21   established but have not been received into evidence,

22   actually admitted into evidence --

23           MR. DENIS:  Correct.

24           THE COURT:  -- then that can be done at the end of

25   the case.  If there's a stipulation that certain things come

1    in, that's also another method.  But it's certainly not my

2    intention to plow through all the exhibits at this point.

3    They've been proffered as the case has proceeded.  That's not

4    why we're here.  Mr. Gutierrez, any headway on the

5    stipulation?

6              MR. GUTIERREZ:  I don't know exactly what it would

7    say.  So far I have written proposed the parties hereby

8    stipulate that if so and so were called as a defense witness,

9    he would testify that -- and from what I gather from my

10   limited introduction -- that he never gave Hassan Shirani

11   money for plane tickets.  Is that what he would say?

12             MR. DENIS:  Right.  He never gave him a thousand

13   dollars for plane tickets --

14             MR. GUTIERREZ:  And he never saw Ryan Wedding give

15   Shirani any money.

16             THE COURT:  Acceptable?

17             MR. DENIS:  Acceptable.

18             THE COURT:  Okay.  Why don't --

19             MR. DENIS:  Or didn't give him a box or -- a box of

20   money or something like that, which is what his testimony

21   was.

22             MR. GUTIERREZ:  Never gave Ryan --

23             THE COURT:  You want to --

24             MR. GUTIERREZ:  -- a box --

25             THE COURT:  He's willing to --

1           MR. DENIS:  Any money, you got it.

2           THE COURT:  That's more narrow.  And I think --

3           MR. DENIS:  Thank you.

4           THE COURT:  -- the effect of what you want is that

5    he didn't observe any money given --

6           MR. DENIS:  Right.

7           THE COURT:  -- by Shirani to -- given by Wedding to

8    Shirani.

9           MR. GUTIERREZ:  Your Honor, my blind mule expert

10   was able to get here off an operation, but I understood he

11   was gone, so I'm prepared to put Ms. Lambert briefly about

12   the fingerprint, and the blind mule expert is here to talk

13   about blind mule; I do believe the door has been opened up.

14          THE COURT:  It's really up to you.

15          MR. GUTIERREZ:  So I could read this into the

16   record when the jury comes back, or if we could do it

17   before --

18          MR. DENIS:  Mr. Gutierrez, I was wondering about

19   the phone records.  I know they're on reports, and there's --

20   these reports are purported from agents, what was on the

21   phone into the reports.  And I know the reports aren't

22   personally admissible, but I was wondering if we could redact

23   the --

24          THE COURT:  You fellows need to talk about that.

25   Just extend --

1        MR. DENIS:  Or I can call a witness --

2        THE COURT:  Extend to one another the good faith

3   you can at this point because we're at the end of the case

4   now, I mean we've just got a few loose ends.  Let's get those

5   tied up by way of the evidence, any witnesses and this

6   stipulation here, and we can have the jury return tomorrow

7   for instructions and argument.

8        MR. GUTIERREZ:  Your Honor, with regard to the -- I

9   think we're in quadruple letters now.  Rather than ask to

10  have all of those moved in front of the jury, could we maybe

11  have --

12       THE COURT:  You can do that outside the presence of

13  the jury.

14       MR. GUTIERREZ:  Thank you, your Honor.  I will do

15  my best to accommodate counsel more than I already have in

16  the spirit of moving this thing along, but I know the record

17  is such now that I've been accused and it will be for the

18  record of appeal if I get a conviction, that I have been

19  uncooperative, but I'm doing everything I possibly can, your

20  Honor.

21       THE COURT:  It's really unfortunate.  The

22  relationship the two of you have had from the beginning of

23  the case to now is really unfortunate.  I've tried to -- it

24  may not seem like it, but I've tried to bring you together at

25  various times in the past, I've encouraged cooperation, but

1    there are those cases where it just doesn't seem to work, and

2    this is one of those cases.

3             In any event, I think I know where we are now.

4    Just to sum up, I'll call the jury in, we are going to have

5    this stipulation given to them, Adrian Williams is not going

6    to be called.  Basically you're going to rest after the

7    stipulation.

8             MR. DENIS:  Yes.

9             THE COURT:  The government's going to call two

10   shorts witnesses --

11            MR. DENIS:  I'm only going to rest --

12            THE COURT:  Subject to exhibits.

13            MR. DENIS:  To exhibits, okay.

14            THE COURT:  Subject to exhibits, you'll rest.

15            MR. DENIS:  And if necessary, I may have to recall

16   a witness if we don't reach an agreement.

17            MR. GUTIERREZ:  I'm going to read this in.

18            THE COURT:  Counsel, this contains the seeds of

19   destruction from what we're trying to do, recalling witnesses

20   to go over exhibits that should have been done the first

21   time.  I know Mr. Gutierrez is going to try to extend a

22   little more cooperation than he has, but a stipulation

23   resting subject to exhibits for you, two short rebuttal

24   witnesses, and then we're going to let the jury go and we're

25   going to work on jury instructions.

1    MR. GUTIERREZ:  Thank you, your Honor.

2    THE COURT:  And I think that's it.  Okay.

3    (Sidebar conference concludes.)

4    THE COURT:  All right, ladies and gentlemen of the

5    jury.  Thank you once again for your patience.  Let me tell

6    you exactly where we are at this point after conferring with

7    counsel.  First you're going to hear a stipulation as to

8    testimony.  The parties have agreed that Mr. Adrian Williams,

9    whose name I'm sure is familiar to most of you, whose name

10   has been mentioned in this trial, if called as a witness

11   would give certain testimony.  We call that stipulated

12   testimony.  It's not a stipulation as to fact but stipulated

13   testimony, and you are to consider that testimony, that

14   stipulated testimony, as if it had been given here in court

15   under the same conditions.  So it's going to be a short

16   stipulation as to testimony, which I believe Mr. Gutierrez

17   will read to you or recite to you.  Then the defense is going

18   to rest subject to some matters dealing with exhibits, and I

19   will be working with the attorneys on exhibits, but the

20   defense will rest subject to some issues related to exhibits.

21   Then the government will call two witnesses in rebuttal whose

22   testimony I understand will be very short such that all of

23   the evidence will be concluded today.

24   It does not appear as though we're going to go to

25   4:30 today, that we will adjourn for your purposes before

1   4:30.  Counsel and I will then work on jury instructions so

2   that the case is ready to be presented to you tomorrow in the

3   form first of jury instructions, your charge, and then you'll

4   hear the arguments of counsel.  Tomorrow is a short day for

5   us.  And then you will be returning after the holiday weekend

6   and beginning your deliberations.  So that is the schedule at

7   this point.  Okay.  Mr. Gutierrez, would you like to proceed

8   with the stipulated testimony?

9           MR. GUTIERREZ:  Your Honor, the parties do hereby

10  stipulate and agree that if a person by the name of Adrian

11  Williams were called to testify as a defense witness, this

12  individual would testify to the following two things:  One,

13  he never gave Mr. Hassan Shirani money for plane tickets;

14  two, he never saw Ryan Wedding give Hassan Shirani any money.

15          THE COURT:  Agreeable, Mr. Denis?

16          MR. DENIS:  Yes, your Honor.

17          THE COURT:  All right.  That is the stipulated

18  testimony.  Once again, the name of the individual or the

19  witness is Adrian Williams.  And you must consider that

20  testimony in the same way as if it had been given here in

21  court.  All right.  You rest at this time subject to

22  exhibits, Mr. Denis?

23          MR. DENIS:  Yes, your Honor.

24          THE COURT:  Okay.  Mr. Gutierrez, you may call your

25  first rebuttal witness.

1    MR. GUTIERREZ:  Government will call Natalie

2  Lambert to the stand.  She is outside, and she'll be coming

3  in shortly.

4    THE COURT:  Ms. Lambert, you've been previously

5  sworn, and you are still under oath.

6    THE WITNESS:  Okay.

7    Natalie Lambert

8  was previously sworn, was recalled by the government, and

9  testified as follows:

10    Direct Examination

11    BY MR. GUTIERREZ:  Q.  Good afternoon.

12  A.  Good afternoon.

13  Q.  Were you the individual who discovered -- I'd like to

14  draw your attention to the hundred thousand dollars that was

15  found in the Wedding -- Mr. Wedding's room at the Comfort

16  Inn.

17  A.  Okay.

18  Q.  Okay.  Now, when you discovered that amount of money, did

19  you handle it in a way to preserve prints?

20  A.  Yes, I did.

21  Q.  Could you explain to the jury what you did in that

22  regard.

23  A.  All of the individuals that participated in the search of

24  the hotel were wearing gloves.

25  Q.  Did you ever submit the money for a fingerprint analysis?

1  A.  No, we did not.

2  Q.  Could you please explain to the jury why that is.

3  A.  Well, as I indicated, at the time that we located the

4  money, we were wearing gloves, and every time we handled the

5  money as it was being processed into evidence at the FBI

6  office, we continued to wear gloves.  So the money had been

7  seized in a manner that would have preserved prints.

8  However, money is considered a valuable evidence --

9  Q.  What does that mean?

10  A.  Meaning that it has a monetary value.

11  Q.  Are there any special practices you have to adhere to

12  when dealing with valuable evidence?

13  A.  It is maintained in a separate vault area of the evidence

14  room.

15  Q.  And is there anything about money, bills per se, that

16  would affect your ability to conduct a fingerprint analysis?

17  A.  Bills, like other types of paper, are a porous surface,

18  so in order to get fingerprints from a porous surface, it's

19  not just a matter of using dust; it has to be processed

20  through the use of chemicals.

21  Q.  And do these chemicals cause -- do they affect the bill

22  in any way?

23  A.  It can.  It changes the color of the bill as well as --

24  like I said, it's a chemical process.

25  Q.  Let me ask you, during the days and weeks after this

1    seizure, was notice sent regarding -- was notice sent

2    regarding forfeiture?

3    A.   Notice is sent in order for individuals to make a claim

4    to the money.

5    Q.   Did anybody make a claim as to ownership for the $100,000

6    that was found in the Comfort Inn?

7    A.   Not to my knowledge.

8    Q.   When you decided not to submit the fingerprints -- the

9    money for fingerprint analysis, did you take into

10   consideration the fact that it was in a particular location,

11   in other words, Mr. Wedding's room?

12   A.   Yes.   Under those circumstances we knew the individuals

13   that were staying in the room, and as the money was being

14   maintained at the FBI facility during that claim process, we

15   talked to Mr. Shirani, and at that point, as has previously

16   been stated, Mr. Shirani indicated that he himself had picked

17   up the money and had put the money in the hotel room and was

18   able to describe where the money was in the hotel room and

19   how it was packaged.

20   Q.   Thank you very much, Agent Lambert.

21          MR. GUTIERREZ:  Your Honor, I have no further

22   questions.

23          THE COURT:  Cross-examination?

24          MR. DENIS:  Thank you, your Honor.

25                      Cross-Examination

1    BY MR. DENIS:   Q.   Ms. Lambert, I missed your

2  last -- your last answer.   You indicated -- what did you say,

3  that the -- that Mr. Shirani indicated where he picked up the

4  money and where he hid it, correct?

5  A.   That is correct.

6  Q.   And he indicated that he did that by himself, correct?

7  A.   He indicated that he had picked up the money by himself

8  and put the money in the piece of furniture.

9  Q.   Okay.   And you recall that the money was wrapped in

10  Farsi -- in a Farsi newspaper, correct?

11  A.   Yes, it was.

12  Q.   And it was wrapped into a to-go bag, correct?

13  A.   It was in a -- in a plastic bag, yes.

14  Q.   And that plastic bag was hidden within the bottom drawer

15  of a shelf, correct?

16  A.   It was under the bottom drawer of the shelf.

17  Q.   And when you immediately entered upon the room and you

18  opened the drawer, were you able to see the money in the

19  drawer?

20  A.   No.

21  Q.   Based on your investigation and the statements made by

22  Mr. Shirani, did you feel that you needed to actually do dust

23  prints on the money?

24  A.   Well, as I indicated, you cannot do dust prints on money,

25  and based upon his statements, we -- because he was able to

1   describe how the money was packaged and where it was located,

2   I did not doubt him at that time that he was the individual

3   who put that money there.

4            MR. DENIS:  Nothing further.

5            THE COURT:  Anything further, Mr. Gutierrez?

6            MR. GUTIERREZ:  No, your Honor.  Thank you.

7            THE COURT:  Thank you, Agent Lambert.  You may step

8   down.  You may call your next witness, Mr. Gutierrez.

9            MR. GUTIERREZ:  TFO McGill, your Honor.  He's right

10  outside.

11           THE COURT:  Okay.  Counsel, let me see you, please.

12       (Following is a sidebar conference.)

13           THE COURT:  There is a motion to exclude witnesses,

14  and so Agent Wedick is in the courtroom now, so if you

15  intended on recalling him, he's got to be outside.  If you

16  don't intend on recalling --

17           MR. DENIS:  I do.  Okay.  I'll get him out.  I

18  didn't see him walk in.  Thank you, your Honor.

19           THE COURT:  Did you intend on recalling him?

20           MR. DENIS:  Possibly.

21           THE COURT:  Then you have to ask him to leave.

22           MR. DENIS:  Okay.

23           MR. GUTIERREZ:  Well, your Honor, I could still

24  argue this, but for fear of dragging it out and having expert

25  against expert, since I'm still entitled to argue the blind

1    mule, I'm more than happy just to argue it without the

2    expert.

3           THE COURT:  It's up to you.

4           MR. GUTIERREZ:  I'd be more than happy to.  If I

5    could just apologize to him for calling him out of the

6    field --

7           THE COURT:  Okay.

8           MR. GUTIERREZ:  -- and let him go.  If you can

9    maybe let him know that it's thank you for coming but we're

10   not going to need you because I literally pulled him off an

11   operation.

12          THE COURT:  So thanks for coming, but get out of

13   here?

14          MR. GUTIERREZ:  I'll do that, your Honor.

15          THE COURT:  Okay.  Go ahead and take care of it.

16      (Sidebar conference concludes.)

17          MR. GUTIERREZ:  Your Honor, given our discussion

18   I'm going to withdraw my request to have this witness

19   testify.

20          THE COURT:  Okay.  The way the evidence has come

21   in, ladies and gentlemen, there is no need for this witness

22   to testify.  And so, sir, thank you for your time in any

23   event.  You are excused at this time.

24          THE WITNESS:  Thank you, your Honor.

25          THE COURT:  All right.

1033

1    MR. GUTIERREZ:  Your Honor, we have no further

2  witnesses.

3    THE COURT:  Does the government rest at this time?

4    MR. GUTIERREZ:  We do, your Honor.

5    THE COURT:  Okay.  Ladies and gentlemen of the

6  jury, both sides have completely rested, and we will proceed

7  with the schedule as I indicated to you.  We will start

8  tomorrow at nine o'clock, and the first thing that will

9  happen is you will hear the instructions that will guide you

10  in this case, and then you will hear the arguments of

11  counsel.

12    Now, I know that we have a couple of people that

13  need to be leaving the courthouse by no later than -- was it

14  1:30 or two o'clock?  I've gotten estimates from counsel that

15  seem to indicate that we will be able to conclude with the

16  arguments easily by that time.  Was there anyone who had to

17  leave any earlier than that, let's say two o'clock?  I see no

18  affirmative indications of that.  Okay.  Then we'll see you

19  tomorrow morning at nine o'clock.  Remember the admonition

20  not to discuss the case or make any decisions at this time.

21  Thank you.  Have a good evening, ladies and gentlemen.

22    (The jury left the courtroom.)

23    THE COURT:  Okay.  We're going to go over jury

24  instructions, counsel -- I'll have those out to you -- in an

25  in-camera setting here in the courtroom with the Court and

1    counsel present, and so I'll bring out the instructions.  You

2    can take some time going over those.  Just let Laura know

3    when you're ready to proceed with jury instructions.

4              MR. GUTIERREZ:  Thank you, your Honor.

5              MR. DENIS:  Thank you, your Honor.

6         (There was a break in the proceedings.)

7              THE COURT:  Let's go on the record here with

8    instructions and we'll save the conversation for exhibits.

9    Okay.  We are on the record.  Court and counsel are present.

10   We've had an opportunity to informally conference on jury

11   instructions.

12             Basically I'm just going to summarize briefly --

13   well, before I go further, basically the Ninth Circuit

14   pattern instructions will be the instructions that will be

15   given and govern in this case.  There may be an exception or

16   two.  I will summarize the instructions to be given, I will

17   attempt to summarize any objections or concerns Mr. Denis

18   has -- I think he has a couple of concerns or objections --

19   and it's my understanding Mr. Gutierrez does not have any

20   objections to the instructions that are about to be

21   summarized, but I'll let him speak to that.  The following

22   instructions will be given.  They are all Ninth Circuit

23   pattern instructions unless otherwise stated.

24             First, 3.1, duty to follow the law; next, 3.2,

25   charge against defendant not evidence/presumption of

1   innocence/burden of proof.  Next, an instruction that is not

2   a Ninth Circuit pattern instruction, it's an introductory

3   instruction entitled defendant has pleaded not guilty.  It

4   reads as follows:  The defendant has pleaded not guilty to

5   the charge contained in the indictment.  This plea puts in

6   issue each of the essential elements of the offense as

7   described in these instructions and imposes on the government

8   the burden of establishing each of the elements of the charge

9   by proof beyond a reasonable doubt.

10          Next -- back to Ninth Circuit pattern

11   instructions -- 3.3, defendant's decision not to testify;

12   next, 3.5, reasonable doubt defined; next, 3.6, what is

13   evidence; next, 3.7, what is not evidence; next, 3.8, direct

14   and circumstantial evidence; next, 1.5, evidence for limited

15   purpose; next, 3.9, credibility of witnesses; next, 3.10,

16   evidence of other acts of defendant or acts and statements of

17   others; next, 4.3, other crimes, wrongs, or acts of

18   defendant.

19          MR. DENIS:  And then there was just the one issue

20   there.  Should I raise it now or later?

21          THE COURT:  No, later.

22          MR. DENIS:  Oh, later.  I'm sorry.

23          THE COURT:  That's okay.  Okay.  Continuing on,

24   4.9, testimony of witnesses involving special circumstances,

25   immunity, benefits, accomplice plea; next, 4.13, government's

1  use of undercover agents and informants; next, 4.17, opinion

2  evidence/expert witness; next, 8.16, conspiracy elements.

3  And it is noted that there is no reference to overt act as an

4  element.

5          Next, 8.18, conspiracy, knowing of and association

6  with others.  Mr. Denis on behalf of the defendant objects to

7  this.  As I understand it, he feels there's some redundancy

8  between 8.18 and 8.16.  I've looked at the instructions

9  carefully.  They do speak to different principles; the two

10 different instructions speak to different principles, and

11 even if there is some overlap, it would be very minimal, and

12 I see no prejudice in giving both 8.16 and 8.18.  Next --

13         MR. DENIS:  Then I would raise something about

14 that, your Honor, and it would --

15         THE COURT:  Yes, but --

16         MR. DENIS:  -- oh, yeah, bring it up later.

17         THE COURT:  Yes.  Next. 9.13, controlled substance,

18 possession with intent to distribute.  Actually, you know

19 what I'm going to do is I'm just going to take the subtitle

20 of this out, controlled substance, and then I'm just going

21 to --

22         MR. DENIS:  Thank you, your Honor.

23         THE COURT:  -- distribution, the word

24 "distribution" will be placed in lieu of possession with

25 intent to distribute.  I assume you have no objection.

 1              MR. DENIS:  No, your Honor.

 2              THE COURT:  Mr. Gutierrez?

 3              MR. GUTIERREZ:  No objection, your Honor.

 4              THE COURT:  And Mr. Denis doesn't either.  Okay.

 5    Next, 5.6, knowingly defined; next, 6.9, mere presence; next,

 6    the closing instructions of 7.1, 7.2, 7.3, 7.4, 7.5, 7.6 as

 7    well as 7.5 at the end.

 8              First, did you have any other issues relative to

 9    the pattern instructions, Mr. Denis?

10              MR. DENIS:  Any other?  No, your Honor, just back

11    to 8.18.  Just basically it is a -- as we indicated, the

12    elements of conspiracy have been defined.  This one is a --

13    kind of a prejudicial jury instruction.  I don't see that

14    it's necessary for any kind of conviction for conspiracy.

15              THE COURT:  Well, it does discuss conspiracy.

16              MR. DENIS:  And it does --

17              THE COURT:  The first paragraph indicates a

18    conspiracy may continue for a long period of time, and it may

19    include the performance of many transactions.  So it talks

20    about the element of time --

21              MR. DENIS:  And I think there would be confusion

22    with this instruction with the other bad acts.  I just --

23    then in combination --

24              THE COURT:  Okay.  Well, your objection is on the

25    record.  Did you have anything further you want to say on

1    this one?

2              MR. DENIS:  Not at all.  Thank you.

3              THE COURT:  Very good.  Okay.  Then we had -- and

4    you're in agreement with these, Mr. Gutierrez?

5              MR. GUTIERREZ:  Yes, your Honor.

6              THE COURT:  Then we have the defendant's proposed

7    instructions, most of which have been withdrawn.  I'll

8    attempt to address any instruction that is in issue that has

9    not been withdrawn.  Okay.  The first ten instructions, pages

10   1 through 10, are withdrawn by Mr. Denis.  Page 11 --

11             MR. DENIS:  Oh, your Honor.  Before we get to this,

12   I do recall the Court when -- back on the model ones -- did

13   the Court withdraw any of the -- I saw that the impeachment

14   of witness, and -- oh, I see.  So the Court did withdraw 4.8,

15   correct?

16             THE COURT:  Yes, 4.8 doesn't apply.

17             MR. DENIS:  All right.  So that's what I was going

18   to ask.

19             THE COURT:  Okay.  All right.  So getting back to

20   the defendant's instructions that were submitted, page 11 I

21   believe is offered by the defense, and it deals with

22   presumption of innocence and reasonable doubt.  I will

23   decline to give this.  I don't know what the source of it is,

24   but I will decline to give this in light of the Ninth Circuit

25   pattern instructions on these issues.

1039

 1          And then the next special instruction or

 2   instructions submitted by the defense is on page 15 of 31,

 3   Mr. Denis indicates he'd like the second sentence of that

 4   instruction given.  This instruction relates to the subject

 5   of defendant's decision not to testify.  I am giving 3.3, a

 6   pattern Ninth Circuit instruction.  I won't change it.  I

 7   won't modify 3.3.  Mr. Denis would like the following

 8   sentence added:  As stated before, the law never imposes upon

 9   a defendant in a criminal case the burden of or duty of

10   calling any witnesses or producing any evidence.  The jury

11   has already been instructed about this principle almost in

12   these exact words in my preliminary instructions, so there's

13   no need to add that to the final instructions.

14          MR. DENIS:  Thank you, your Honor.

15          THE COURT:  Okay.  The next issue Mr. Denis wanted

16   to pursue was on page 22, and this is, once again, another

17   instruction dealing with presumption of innocence/burden of

18   proof.  It is -- it purports to be from Devitt and Blackmar

19   Section 12.10 modified.  I will decline to give this and will

20   give the Ninth Circuit instructions 3.1 and 3.2 instead.

21          MR. DENIS:  And as this indicates, it's modified to

22   include the "firmly convinced" language found in the Ninth

23   Circuit model instruction 3.5 from 2003.

24          THE COURT:  Right.  Understood.

25          MR. DENIS:  Okay.

1    THE COURT:  And then the last instruction being

2  pursued of the specials submitted by the defense is on

3  page 27.  It's special instruction No. 5.  It has already --

4  this has already been explained to the jury in the Court's

5  preliminary instructions, in preliminary questioning of

6  jurors, and is adequately addressed in the Ninth Circuit

7  pattern instruction on credibility of witnesses, so I will

8  decline special instruction No. 5.

9    I think that's it.  Anything else on instructions,

10 Mr. Denis?

11   MR. DENIS:  Your Honor, if we just noted already

12 was for the four other bad acts, I did make that request to

13 have -- in line 2 of 4.3, if believed, you may consider the

14 evidence only as it bears on defendant's intent, knowledge,

15 opportunity, and in the absence of mistake and for no other

16 purpose.  That was because the way it is stated, it's almost

17 as a matter of fact, and I was just hoping for some

18 neutrality there, or it's up to the -- to give the discretion

19 to the jury as to whether or not they are going to believe

20 that evidence, No. 1; and then No. 2, what weight they're

21 supposed to give it if they do believe it.

22   THE COURT:  Okay.  You've asked basically to have

23 the words "if believed" inserted at the beginning of the

24 second and last sentence there on 4.3, and I think the Ninth

25 Circuit pattern language is adequate; I think it is a neutral

1   comment.  But as I mentioned earlier before we went on the

2   record, Mr. Denis, you can certainly argue that; you can

3   certainly argue to the jury that -- that the instruction does

4   not require any belief, and you may certainly question the

5   veracity of any of that testimony from Shirani.

6            Okay.  That's it on jury instructions.  We have

7   a -- you know, there's one thing I'm thinking of, the

8   instruction on weight.  Yes, we need a weight --

9            MR. GUTIERREZ:  You did put 5 kilograms or more in

10  the body of the conspiracy language.

11           THE COURT:  Yeah, I just want to make sure it's in

12  there.

13           MR. GUTIERREZ:  Yes, on page 3.

14           THE COURT:  No, but they have to make a finding

15  that the amount of the --

16           MR. DENIS:  -- drugs --

17           THE COURT:  The amount of --

18           MR. GUTIERREZ:  Is 5 kilograms or more.

19           THE COURT:  The amount of cocaine contemplated

20  within the conspiracy was 5 kilograms and more.

21           MR. DENIS:  Is it of the conspiracy or of the -- I

22  mean there's a difference for sentencing.  Is it of the

23  conspiracy?

24           THE COURT:  It's charged that way.

25           MR. DENIS:  Of the conspiracy?  Okay.

1    THE COURT:  Let me see where that is.  I thought I

2    included that.  Should be at the end of 8.16.

3    MR. DENIS:  And just what I've seen on 8.16, your

4    Honor, I saw a couple of the --

5    THE COURT:  No, it's not --

6    MR. DENIS:  -- where it says of, it's f-o, and I

7    think I found one other.

8    THE COURT:  Okay.  A typo?

9    MR. DENIS:  A typo.  And I found one other.

10   THE COURT:  I'm open to typos.

11   MR. DENIS:  Okay.  There was one other one.

12   THE COURT:  Well, that language has to be added.

13   MR. GUTIERREZ:  Yeah, I agree, your Honor.  I

14   missed that.  I agree.

15   MR. DENIS:  That's under 8.16?

16   THE COURT:  And I had it in my written --

17   MR. GUTIERREZ:  Twenty-two.

18   THE COURT:  We're off the record at this point.

19   (There was a break in the proceedings.)

20   THE COURT:  Back on the record.  In any event, 8.16

21   will be modified to include the last sentence with the

22   agreement of both parties, quote, if you find the defendant

23   guilty of conspiracy to distribute cocaine, then you must

24   also decide whether the government has proven by evidence

25   beyond a reasonable doubt that the amount of cocaine which

1043

1    was the subject of any such conspiracy was 5 kilograms and

2    more.  Your finding on that question must be unanimous.

3    Okay.  That will complete it then.  We'll have it reflected

4    here.  And I want to let you go as soon as possible here.

5    This can be off the record now, Deb.

6        (There was a break in the proceedings.)

7            THE COURT:  All right.  We are on the record.

8    Exhibit DD by stipulation is admitted.

9            MR. GUTIERREZ:  And we will make some appropriate

10   redactions.

11           MR. DENIS:  That's fine.  Whatever the --

12           THE COURT:  You make the redactions.  Mr.

13   Gutierrez, you're the one who's accommodating Mr. Denis here,

14   so make the redactions, and Exhibit DD will be admitted as

15   redacted.

16       (Exhibit No. DD admitted.)

17       (There was a break in the proceedings for the evening

18   recess.)

19

20

21

22

23

24

25

1                         I n d e x

2    Witnesses                                      Page

3    Ramin Samani  (Defense)
     Direct Examination, cont'd by Mr. Denis          891
4    Cross-Examination by Mr. Gutierrez               927

5    Jonathan Stanbrough  (Defense)
     Direct Examination by Mr. Denis                  929
6
     James J. Wedick  (Defense)
7    Direct Examination by Mr. Denis                  965

8    Karen Wedding  (Defense)
     Direct Examination by Mr. Denis                 1004
9
     Natalie Lambert  (Government)
10   Direct Examination by Mr. Gutierrez             1027
     Cross-Examination by Mr. Denis                  1030
11
                        E x h i b i t s
12
     Exhibits        Description           For ID   In Evd
13   CCCC-2          Audio                  896       908
                     recording/transcript
14
     CCCC-5          Audio                  897       908
15                   recording/transcript

16   CCCC-6          Audio                  898       908
                     recording/transcript
17
     CCCC-7          Audio                  898       908
18                   recording/transcript

19   CCCC-8          Audio                  898       908
                     recording/transcript
20
     CCCC-13         Audio                  899       908
21                   recording/transcript

22   CCCC-14         Audio                  899       908
                     recording/transcript
23
     EEEE            Audio recording        903       910
24
     GGGG            Audio                  903
25                   recording/transcript

1045

1 | Exhibits, continued

2

3 | HHHH-1 | Audio recording/transcript | 903 | 910

4 | HHHH-2 | Audio recording/transcript | 903 | 910

5

6 | HHHH-3 | Audio recording/transcript | 904 | 910

7 | JJJJ | Audio recording/transcript | 904 | 910

8

9 | NNNN | Audio recording/transcript | 905 | 910

10 | OOOO | Audio recording/transcript | 905 | 910

11

12 | PPPP | Audio recording/transcript | 905 | 910

13 | QQQQ | Resume (Samani) | 906

14 | RRRR | CD | 906

15 | SSSS | CD | 908

16 | DD | | 1043

17

18

19

20

21

22

23

24

25

<u>Certificate of Reporter</u>

I hereby certify that I am a duly appointed, qualified, and acting Official Court Reporter for the United States District Court; that the foregoing is a true and correct transcript of the proceedings had in the mentioned cause on the date or dates listed on the title page of the transcript; and that the format used herein complies with the rules and requirements of the United States Judicial Conference.


Dated  _____  at San Diego, California.


_____
/s/ Debra M. Henson  (electronic)
Debra M. Henson
Official Court Reporter