```
 1                      United States District Court

 2                    Southern District of California

 3

 4   UNITED STATES OF AMERICA,       )
                                     )
 5                   Plaintiff,      )
                                     )
 6       vs.                         ) Case No. 08-CR-2386 JM
                                     ) Jury Trial
 7   RYAN WEDDING,                   ) Volume 7
                                     )
 8                   Defendant.      ) Wednesday, November 25, 2009
     _____) Monday, November 30, 2009

 9

10              Before the Honorable Jeffrey T. Miller
                   United States District Judge

11

12   Appearances:

13   For the Plaintiff:        Karen P. Hewitt
                               UNITED STATES ATTORNEY
14                             Orlando B. Gutierrez
                               ASSISTANT U.S. ATTORNEY
15                             880 Front Street, Suite 6293
                               San Diego, CA  92101
16
     For the Defendant:        David R. Denis, Esq.
17                             CENTER FOR EXTREME JUSTICE
                               707 Wilshire Boulevard, Suite 3600
18                             Los Angeles, CA  90017

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                               U.S. Courthouse
22                             940 Front Street, Suite 5190
                               San Diego, CA  92101
23                             (619) 238-4538

24

25        Record produced by certified stenographic reporter
```

1      San Diego, California - Wednesday, November 25, 2009

2      THE COURT:  Good morning, ladies and gentlemen.  We

3  have everyone present.  Okay.  We are going to proceed this

4  morning, and the first thing will be the instructions.  I

5  will read the instructions to you that contain the principles

6  of law that will guide you in this case, and then --

7      MR. DENIS:  Your Honor, I have one issue before we

8  begin.  May I have a very brief sidebar?

9      THE COURT:  Does it have anything to do with

10  instructions?

11      MR. DENIS:  No.

12      THE COURT:  Okay.  We'll deal with that a little

13  bit later.

14      MR. DENIS:  Okay.

15      THE COURT:  And then, ladies and gentlemen, you'll

16  hear the arguments of counsel, and then I will give you some

17  concluding instructions, and we'll see if you get started on

18  any of your deliberations today.  We may just give you an

19  opportunity to, you know, get the lay of the land back there

20  in the jury deliberation room, and we can move the exhibits

21  in for you and perhaps allow you to begin your deliberations;

22  of course, we know there's not going to be any verdict today.

23  And the arguments will take some period of time; the

24  attorneys have estimated that they'll in all probability go a

25  total of a couple of hours.  And so that's pretty much a

1    preview of where we are today.  So instructions, arguments,

2    my concluding instructions, and then we'll see how much time

3    is available for you to at least get started or to get a

4    little bit acclimated in the jury room, perhaps pick your

5    presiding juror.  All right.

6              Ladies and gentlemen of the jury, now that you have

7    heard all the evidence, it is my duty to instruct you on the

8    law which applies to this case.  A copy of these instructions

9    will be available in the jury room for you to consult.  And

10   it is your duty to find the facts from all the evidence in

11   the case.  To those facts you will apply the law as I give it

12   to you.  You must follow the law as I give it to you whether

13   you agree with it or not.  And you must not be influenced by

14   any personal likes or dislikes, opinions, prejudices, or

15   sympathy.  That means that you must decide the case solely on

16   the evidence before you; you will recall that you took an

17   oath promising to do so at the beginning of the case.

18             In following my instructions you must follow all of

19   them and not single out some and ignore others.  They are all

20   equally important.  You must not read into these instructions

21   or into anything the Court may have said or done any

22   suggestion as to what verdict you should return; that is a

23   matter entirely up to you.  And I see many of you at the

24   ready, ladies and gentlemen, with your notebooks, and that's

25   all well and good, I don't want to discourage anyone from

1  taking notes during the instructions, and if you're inclined

2  to do that, if that is how you acquire, possess information,

3  then I encourage you to do so, but a copy of these

4  instructions in written form will go in for each of you to

5  have during your deliberations.

6         The defendant is accused in an indictment with

7  knowingly intentionally conspiring to distribute 5 kilograms

8  and more of cocaine, a Schedule II controlled substance

9  beginning on an unknown date and continuing up to and

10 including June 13, 2008 within the Southern District of

11 California.  Cocaine is a controlled substance listed in

12 Schedule II of the Controlled Substances Act.

13        The indictment is not evidence.  The defendant has

14 pleaded not guilty to the charge.  The defendant is presumed

15 to be innocent and does not have to testify or present any

16 evidence to prove innocence.  The government has the burden

17 of proving every element of the charge beyond a reasonable

18 doubt.

19        The defendant has pleaded not guilty to the charge

20 contained in the indictment, and this plea puts in issue each

21 of the essential elements of the offense as described in

22 these instructions and imposes on the government the burden

23 of establishing each of the elements of the charge by proof

24 beyond a reasonable doubt.

25        A defendant in a criminal case has a constitutional

1  right not to testify.  No presumption of guilt may be raised

2  and no inference of any fact may be drawn from the fact that

3  a defendant does not testify.

4         Proof beyond a reasonable doubt is proof that

5  leaves you firmly convinced that the defendant is guilty.  It

6  is not required that the government prove guilt beyond all

7  possible doubt.  A reasonable doubt is a doubt based upon

8  reason and common sense and is not based purely on

9  speculation.  It may arise from a careful and impartial

10  consideration of all the evidence or from lack of evidence.

11  If after a careful and impartial consideration of all the

12  evidence you are not convinced beyond a reasonable doubt that

13  the defendant is guilty, it is your duty to find the

14  defendant not guilty; on the other hand, if after a careful

15  and impartial consideration of all the evidence you are

16  convinced beyond a reasonable doubt that the defendant is

17  guilty, it is your duty to find the defendant guilty.

18         The evidence from which you are to decide what the

19  facts are consists of, one, the sworn testimony of witnesses

20  both on direct and cross-examination regardless of who called

21  the witness; two, the exhibits which have been received into

22  evidence; and three, any fact to which all the lawyers have

23  agreed or stipulated.  Now, ladies and gentlemen, I cannot

24  recall any facts that the lawyers have agreed or stipulated

25  to, but there was the stipulated testimony that was addressed

1   yesterday; and I instructed you on the subject of stipulated

2   testimony, that is, you are to consider that testimony as if

3   it had been given here in court.

4         So let me just read that you should consider all

5   the facts and circumstances in the evidence to determine

6   which of the witnesses are worthy of greater credence.

7         In reaching your verdict, you may consider only the

8   testimony and exhibits received into evidence.  Certain

9   things are not evidence, and you may not consider them in

10  deciding what the facts are; I will list them for you:

11        One:  Arguments and statements by lawyers are not

12  evidence.  The lawyers are not witnesses.  What they have

13  said in their opening statements, what they will say in their

14  closing arguments, and what they may have said at other

15  times -- namely, during jury selection -- was intended to

16  help you interpret the evidence, but it is not evidence.  If

17  the facts as you remember them differ from the way the

18  lawyers have stated them, your memory of them controls.

19        Two:  Questions and objections by lawyers are not

20  evidence.  Attorneys have a duty to their clients to object

21  when they believe a question is improper under the rules of

22  evidence.  You should not be influenced by the objection or

23  by the Court's ruling on it.

24        If a lawyer has asked a question in such a way that

25  it states certain facts, those facts are not evidence unless

1    a witness or witnesses have testified to the existence of

2    those facts or they are established by some other evidence.

3         Three:  Testimony that has been excluded or

4    stricken or that you have been instructed to disregard is not

5    evidence and must not be considered.

6         And four:  Anything that you may have seen or heard

7    when the court was not in session is not evidence.  You are

8    to decide the case solely on the evidence received at the

9    trial.

10        Evidence may be direct or circumstantial.  Direct

11   evidence is testimony by a witness about what that witness

12   personally saw or heard or did; circumstantial evidence is

13   indirect evidence, that is, it is proof of one or more facts

14   from which one can find another fact.  You are to consider

15   both direct and circumstantial evidence.  The law permits you

16   to give equal weight to both.  But it is for you to decide

17   how much weight to give to any evidence.

18        Some evidence was admitted for a limited purpose

19   only.  When I instructed you that an item of evidence was

20   received, that is, was admitted for a limited purpose, then

21   you must consider it only for that limited purpose and for no

22   other.

23        In deciding the facts in this case, you may have to

24   decide which testimony to believe and which testimony not to

25   believe.  You may believe everything a witness says or part

1    of it or none of it.   In considering the testimony of any

2    witness, you may take into account, one, the opportunity and

3    ability of the witness to see or hear or know the things

4    testified to; two, the witness's memory; three, the manner --

5    the witness's manner while testifying; four, the witness's

6    interest in the outcome of the case or any bias or prejudice;

7    five, whether other evidence contradicted the witness's

8    testimony; six, the reasonableness of the witness's testimony

9    in light of all the evidence; and seven, any other factors

10   that bear on believability.

11          The weight of the evidence as to a fact does not

12   necessarily depend on the number of witnesses who testify.

13          You are here only to determine whether the

14   defendant is guilty or not guilty of the charge in the

15   indictment.   Your determination must be made only from the

16   evidence in the case.   The defendant is not on trial for any

17   conduct or offense not charged in the indictment.   You should

18   consider any evidence about the acts, statements, and

19   intentions of others or evidence about other acts of the

20   defendant only as they relate to this charge against this

21   defendant.

22          You have heard evidence of other acts engaged in by

23   the defendant, specifically that defendant provided money to

24   Hassan Shirani on a prior occasion.   You may consider that

25   evidence only as it bears on the defendant's intent,

1  knowledge, opportunity, plan, and any absence of mistake and

2  for no other purpose.

3  You have heard testimony from Hassan Shirani, a

4  witness who pleaded guilty to a crime arising out of the same

5  events for which the defendant is on trial and may receive

6  favored treatment from the government.  This guilty plea is

7  not evidence against the defendant, and you may consider it

8  only in determining this witness's -- that is, Shirani's

9  believability, and you will recall that I so instructed you

10  at the time that Mr. Shirani was questioned on his plea

11  agreement.

12  For this reason, in evaluating Hassan Shirani's

13  testimony, you should consider the extent to which or whether

14  Hassan Shirani's testimony may have been influenced by these

15  factors.  In addition, you should examine Hassan Shirani's

16  testimony with greater caution than that of other witnesses.

17  You have heard testimony about a confidential

18  source or informant who was involved in the government's

19  investigation in this case.  Law enforcement officials are

20  not precluded from engaging in stealth and deception, such as

21  the use of informants and undercover agents, in order to

22  apprehend persons engaged in criminal activities.  Undercover

23  agents and informants may properly make use of false names

24  and appearances and may properly assume the roles of members

25  in criminal organizations.  The government may utilize a

1    broad range of schemes and ploys to ferret out criminal

2    activity.

3           You have heard testimony from persons who because

4    of education or experience are permitted to state opinions

5    and the reasons for the opinions.  Opinion testimony should

6    be judged just like any other testimony; you may accept it or

7    reject it, and give it as much weight as you think it

8    deserves considering the witness's education and experience,

9    the reasons given for the opinion, and all the other evidence

10   in the case.

11          The defendant is charged in the indictment with

12   conspiring to distribute cocaine in violation of Sections 841

13   (a)(1) and 846 of Title 21 of the United States Code.   In

14   order for the defendant to be found guilty of that charge,

15   the government must prove each of the following elements

16   beyond a reasonable doubt:  First, there was an agreement

17   between two or more persons to distribute cocaine as charged

18   in the indictment; and second, the defendant became a member

19   of the conspiracy knowing of at least one of its objects and

20   intending to help accomplish it.  I shall discuss with you

21   briefly the law relating to each of these elements.

22          A conspiracy is a kind of criminal partnership, an

23   agreement of two or more persons to commit one or more

24   crimes.  The crime of conspiracy is the agreement to do

25   something unlawful.  It does not matter whether the crime

1  agreed upon was committed.

2         For a conspiracy to have existed, it is not

3  necessary that the conspirators made a formal agreement or

4  that they agreed on every detail of the conspiracy.  It is

5  enough, however, that they simply met, discussed matters of

6  common interest, acted in similar ways, or perhaps helped one

7  another.  You must find that there was a plan to distribute

8  cocaine as alleged in the indictment as an object of the

9  conspiracy.

10        One becomes a member of a conspiracy by willfully

11  participating in the unlawful plan with the intent to advance

12  or further some object or purpose of the conspiracy even

13  though the person does not have full knowledge of all the

14  details of the conspiracy.

15        Furthermore, one who willfully joins an existing

16  conspiracy is as responsible for it as the originators.  On

17  the other hand, one who had no knowledge of a conspiracy but

18  happens to act in a way which furthers some object or purpose

19  of the conspiracy does not thereby become a conspirator.

20  Similarly, a person does not become a conspirator merely by

21  association with one or more persons who are conspirators nor

22  merely by knowing that a conspiracy exists.

23        If you find the defendant guilty of conspiracy to

24  distribute cocaine, then you must also decide whether the

25  government has proven by evidence beyond a reasonable doubt

1    that the amount of cocaine which was the subject of any such

2    conspiracy was 5 kilograms and more.  Your finding on that

3    question must be unanimous.

4           A conspiracy may continue for a long period of time

5    and may include the performance of many transactions.  It is

6    not necessary that all members of the conspiracy join it at

7    the same time, and one may become a member of a conspiracy

8    without full knowledge of all the details of the unlawful

9    scheme or the names, identities, or locations of all the

10   other members.

11          Even though a defendant did not directly conspire

12   with other conspirators in the overall scheme, the defendant

13   has in effect agreed to participate in the conspiracy if it

14   is proved beyond a reasonable doubt that, one, the defendant

15   conspired with one or more conspirators to carry out at least

16   one of the objects of the conspiracy; two, the defendant knew

17   or had to know that other conspirators were involved with

18   those with whom the defendant directly conspired; and three,

19   the defendant had reason to believe that whatever benefits

20   the defendant might get from the conspiracy were probably

21   dependent upon the success of the entire venture.  It is no

22   defense that a person's participation in a conspiracy was

23   minor or for a short period of time.

24          The defendant is charged in the indictment with

25   conspiracy to distribute cocaine in violation of Sections 841

1   (a)(1) and 846 of Title 21 of the United States Code.   In

2   order for the defendant to be found guilty of that charge,

3   the government must prove beyond a reasonable doubt that a

4   defendant knowingly and intentionally entered into a

5   conspiracy as previously defined to distribute cocaine.   To

6   distribute cocaine means to intentionally deliver or transfer

7   possession of cocaine to another person with or without any

8   financial interest in the transaction.

9           An act is done knowingly if a defendant is aware of

10  the act and does not act through ignorance, mistake, or

11  accident.   The government is not required to prove that the

12  defendant knew that his acts or omissions were unlawful.   You

13  may consider evidence of the defendant's acts or omissions

14  along with the other evidence in deciding whether the

15  defendant acted knowingly.

16          Mere presence at the scene of a crime or mere

17  knowledge that a crime is being committed is not sufficient

18  to establish that the defendant conspired to distribute

19  cocaine unless you find that the defendant was a participant

20  in the conspiracy and not merely a knowing spectator.   Mere

21  proximity to contraband and association with a conspirator

22  are insufficient to establish conspiracy.   The defendant's

23  presence may be considered by the jury along with other

24  evidence in the case.

25          Now, ladies and gentlemen, that concludes the

1   instructions that you will receive at this time.  As I

2   indicated, I have a handful of concluding instructions which

3   you will receive at the end of the arguments, so now we're

4   going to hear the arguments from counsel.  We'll first hear

5   from Mr. Gutierrez, who will open the argument, then from Mr.

6   Denis, who will give his argument on behalf of his client,

7   and then the government will have an opportunity to make a

8   rebuttal argument.

9           MR. DENIS:  Your Honor, I have one issue that I

10  would request a sidebar on.

11          THE COURT:  Okay.

12      (Following is a sidebar conference.)

13          MR. DENIS:  Your Honor, I wanted -- before we

14  started, I wanted to recall one witness, Ms. Wedding.  I know

15  we had some mixup with the jury order -- I mean with the

16  witness order and witnesses out of order and the orders that

17  the Court made, and I didn't have my outline really available

18  of what I was going to actually elicit from Ms. Wedding, and,

19  you know, obviously we didn't get very far, and then when

20  I -- when I did sit down and rest or after we concluded, I

21  realized there was three issues, and it will be like four

22  questions, and I would like five minutes.

23          THE COURT:  Well, counsel, both sides have

24  completely rested, I've already charged the jury, and --

25          MR. DENIS:  I mean it was my mistake.  I should

1    have asked the Court to let me rest the next day just in case

2    something like this had come up, and obviously we've been

3    over ten days of very intense trial.

4            THE COURT:  Well, I can't -- I'm not going to open

5    the evidence again; that would not be appropriate.  If you

6    were to recall her, what would you -- I mean if you hadn't

7    rested and the jury hadn't been charged, what would these

8    limited bits of information be?

9            MR. DENIS:  Could I give that ex parte without Mr.

10   Gutierrez present?

11           THE COURT:  No, no, I don't think so, not at this

12   point.

13           MR. DENIS:  Well, I don't want Mr. Gutierrez to

14   argue these points to the jury that I basically make to the

15   Court, and I think it would --

16           THE COURT:  Well, this may bear on whether Mr.

17   Gutierrez has any objection, whether he's willing to enter

18   into a stipulation to allow you to reopen for the limited

19   purpose of receiving a stipulation as to testimony.  But, you

20   know, this is so irregular after the case is completely

21   closed, after I've instructed the jury now to begin opening

22   up --

23           MR. DENIS:  I did raise the issue before the Court.

24           THE COURT:  But you didn't.  You know, there

25   wasn't -- there was no urgency to it.  It would have been

```
 1   nice to have you mention to the clerk that you needed to
 2   recall a witness so that I had some heads up.  I didn't know
 3   whether it was --
 4           MR. DENIS:  Correct.
 5           THE COURT:  -- a technical issue or --
 6           MR. DENIS:  There was an earlier, different clerk
 7   than Ms. Barkins, and the only -- when I did see the clerk,
 8   she just went out and said I'm bringing in the jury.  And I
 9   was going to try to ask her I have an issue before the jury
10   is brought in, and she was bringing in the jury.
11           THE COURT:  All right.  Mr. Denis, if you don't
12   even want to share with counsel present what the proffer
13   would be, there's really no -- we can't do it.
14           MR. DENIS:  I wouldn't mind at all to give it to
15   the Court ex parte and the Court can just independently rule
16   on that.
17           THE COURT:  I'm not -- at this point I'm not
18   willing to do that because I would -- whatever you would tell
19   me I would go to Mr. Gutierrez and ask Mr. Gutierrez do you
20   have any -- do you have any problems entering into a
21   stipulation as to testimony.
22           MR. DENIS:  I don't believe he would enter into a
23   stipulation.
24           THE COURT:  That's fine.  Then we'll continue with
25   the argument.
```

1    MR. GUTIERREZ:  Could I state for the record that I

2  came here before the time we were supposed to be here, and

3  there was plenty of time where I saw the clerk who was here

4  before sitting waiting for proceedings.  Mr. Denis came in

5  pretty close to the designated hour and maybe didn't have

6  time, but it's not the fault of the Court.  The court clerk

7  was here.

8    THE COURT:  Well --

9    MR. DENIS:  I know.  I'm not blaming anyone.  I

10  mean these were closing arguments.  There was a lot going on

11  yesterday with witnesses out of order, getting witnesses from

12  out of the country, issues like that, and then I had a number

13  of rulings that I had to modify my at least ten-page outline

14  for Mr. Wedick, and then I could not locate Ms. Wedding's

15  outline, and then when I finished with -- we concluded the

16  evidence except for the exhibits, I realized that there were

17  some additional questions I was going to raise with the Court

18  this morning, and at the earliest opportunity I did do that,

19  and --

20    THE COURT:  Well, as I indicated to you, I think

21  I've been reasonable here.  My only suggestion was that you

22  mention here at the side of the bench, make a proffer -- I

23  mean witnesses make proffers -- defense attorneys make

24  proffers all the time in the presence of prosecutors.

25    MR. DENIS:  Sure, but not right at closing, your

1    Honor.  It would put me at a terrible disadvantage if the

2    Court ruled against me in terms of putting on the witness and

3    Mr. Gutierrez --

4            THE COURT:  Okay.

5            MR. DENIS:  -- indicated the areas.

6            THE COURT:  Well, that's your decision.

7            MR. DENIS:  Okay.

8            THE COURT:  The record will reflect that that's a

9    matter of your strategy, so we're moving forward with

10   arguments now.  Thank you.

11       (Sidebar conference concludes.)

12           THE COURT:  Okay.  Ladies and gentlemen, I believe

13   we are ready to proceed with the arguments.  Mr. Gutierrez?

14           MR. GUTIERREZ:  Thank you, your Honor.  Can

15   everybody see that?  If at any time during the presentation

16   you can't see something on this screen, please let the Court

17   know and we can try to address the concern.

18           Good morning, ladies and gentlemen.  I'm here to

19   talk about what you've heard during the case and how it

20   relates to the law.  I'm going to explain to you the law of

21   conspiracy, what it means, what the term means, and whether

22   or not the facts here are sufficient to show that Mr. Ryan

23   Wedding was in fact part of the conspiracy.

24           Conspiracy has two elements, as the judge has

25   already instructed you.  The first is there has to be an

1    agreement.  A conspiracy is an agreement, two people with the

2    same intention, two people with the same goal in mind coming

3    together and entering into an agreement.  Two people of the

4    same mind coming together and agreeing to do something.

5         Now, the agreement has to be made knowingly.  It

6    can't be accidental.  It has to be a knowing agreement.  Two

7    people coming together and knowingly making a decision to

8    conduct some criminal activity.  Knowingly means it's not

9    accidental, it's not coincidental.  It's more than that.

10   It's a decision.  The two people decide, two people with the

11   same thing in mind decide to come to an agreement to commit

12   some criminal activity, and that's what the law says.  There

13   has to be an intention to help, a knowing, a choice to help

14   conduct that criminal activity.

15         Now, a conspiracy -- can you see this laser?  A

16   conspiracy has to have two people of the same mindset.

17   Mr. Krapchan had in his mind to come to Southern California

18   and buy 24 kilograms of cocaine.  That was his understanding

19   of what he wanted to do.  Did the CI have the same mindset?

20   Did the CI want to up come to San Diego and participate in

21   the sale of cocaine?  No.  He was working with the FBI.  So,

22   ladies and gentlemen, because they didn't have the same

23   mindset, the CI and Mr. Krapchan, there technically could be

24   no conspiracy between the CI and Mr. Krapchan because they

25   didn't have the same mindset.  Does that make sense?

1    But Mr. Wedding and Mr. Shirani, they can be

2    co-conspirators with Mr. Krapchan because they all had the

3    same mindset.  None of them were working for the FBI.  They

4    all intended to travel to Southern California to purchase

5    cocaine.  And we'll talk about that in a moment, but this is

6    to illustrate the fact that you have to have the same

7    intention, the same desire to accomplish the same criminal

8    conduct, and here the CI couldn't be part of it.

9    As the judge instructed you already in the jury

10   instructions and defined in the jury instructions, it's a

11   criminal partnership.  It's an agreement to do something

12   unlawful.  But because it's the agreement that is illegal,

13   the crime never actually has to occur.  There never had to

14   have been a purchase of drugs.  If he was charged with

15   possession of cocaine or distribution of cocaine, then the

16   crime would have had to occur, but because the law makes the

17   agreement to do illegal things illegal, it's the agreement

18   that is the operational point for you to consider.  Was there

19   an agreement?  There's no need to have an actual

20   distribution.  Did they have an agreement to distribute?

21   What was their intention?

22   Now, some people might be asking -- and maybe it's

23   going to be argued -- if an agreement's not necessary, why

24   did you have a kilo of cocaine given to them when they wanted

25   a sample?  You had 23 containers of bunk and one real.  Why

1   did you go through the trouble of getting cocaine?  Why did

2   you go through the trouble of calling the chemist?  Ladies

3   and gentlemen, drug dealers, as you've heard from Mr. Wedick,

4   can be sophisticated and unsophisticated.  But when the FBI

5   negotiates to sell cocaine to somebody, especially

6   24 kilograms, as you will see, that's in the hundreds of

7   thousands of dollars.  So how does the FBI know that the

8   people who are coming to purchase the cocaine are coming to

9   purchase the cocaine or coming with guns to rob the

10  purchaser, often called puffing?  Because if you had in mind

11  to rob the purchaser, you can't have the necessary intent to

12  distribute.  So by having this kilo of cocaine or by actually

13  going through the transaction, FBI is able to show that they

14  weren't just puffing, that they weren't really thinking of

15  just robbing, they were actually thinking of making a

16  transaction.  And when the transaction actually happened, it

17  wasn't a situation where the bad guy said to the CI stick 'em

18  up, give me all your coke.  This is proof that their intent

19  was to purchase, not to rob, something the FBI is not aware

20  and cannot be aware of as they're planning to make the

21  transaction.  It's not necessary for the conspiracy though.

22  Remember, when did the agreement occur?  When did the

23  agreement occur?

24          The judge also told you there's no formal

25  agreement.  You don't have to have some papers drawn up and

```
 1    say I, Ryan Wedding, do formally agree to commit criminal
 2    conduct.  No criminals do that.  What you do in this
 3    situation is you look at to what they did.  The law doesn't
 4    require you to read people's minds.  You're allowed to look
 5    at circumstantial evidence.  And we'll talk about
 6    circumstantial evidence, but the jury instructions say
 7    circumstantial evidence can be just as good as direct.  Just
 8    as good.  Because the law doesn't require you to read
 9    people's minds.  You can't know by cracking open Mr.
10    Wedding's head what he was thinking, but you could look at
11    his actions; you could look at what he said and what he did
12    to see if he was a member of this conspiracy, to see if he
13    agreed.  And we'll talk about it more in rebuttal, but direct
14    evidence and circumstantial evidence can be equal; it depends
15    on what you think.  Circumstantial evidence is not by
16    definition somehow weaker.  I often see on TV:  This is a
17    circumstantial case.  Makes no difference.  It can be the
18    same.
19           Now, you know what conspiracy is about -- an
20    agreement -- but let's talk about what conspiracy is not
21    about.  It's not about ownership.  Conspiracy has nothing to
22    do with ownership.  It doesn't matter who owned the drugs.
23    It doesn't matter who owned the money.  It doesn't matter.
24    Ownership is not an element.  It's about was there an
25    agreement.  And you heard the judge say it doesn't matter
```

1    what role you play, high or low.  If you're a member of the

2    conspiracy, you can be charged and convicted of it.  Doesn't

3    matter if you're an owner.  More importantly, it doesn't

4    technically matter if you were somebody who possessed it.

5    Possession is not necessary an element also because it's the

6    agreement.  There never have to be any drugs technically for

7    a conspiracy to exist.

8           More importantly -- and I'm sure you're going to

9    hear argument about this -- it doesn't matter if you're the

10   boss, a medium bad guy, or a low-level bad guy.  It just

11   doesn't matter.  There was a lot of questioning regarding

12   about Hossein, trying to show that he might be the big bad

13   guy, and that Mr. Shirani was maybe a medium bad guy, and Mr.

14   Wedding was very -- at the bottom, not even a bad guy but

15   somebody who was tricked.  Doesn't matter, ladies and

16   gentlemen.  And don't be distracted.  It's not about who was

17   a bigger player, medium player, and smaller player.  The jury

18   instructions say that.  If you agree, no matter what your

19   status is in the conspiracy, you can be convicted.  It

20   doesn't matter if you're the boss or a low-level player.

21   Please don't be distracted by any argument in that regard.

22          It doesn't matter.  You heard about who gets

23   shares, about who was due what, whose role, who was

24   responsible for what aspect.  Doesn't matter who gets a

25   bigger share, who gets a smaller share.  It's the agreement,

1    was there an agreement.  Shares make no difference.  To beat

2    a dead horse, it's about the agreement.

3            So let's do an overview of the plan, what was the

4    conspiracy, what was the plan, and talk about the evidence

5    that supports that plan.  Vancouver is way north and in

6    Canada.  Tijuana, Mexico, is way south here near San Diego.

7    It's no -- it's not uncommon -- everybody knows that drugs

8    can come from Mexico, but in this the plan was to fly from

9    Vancouver down to Southern California to purchase cocaine.

10   Mr. Shirani told you that, the recordings reflect that where

11   Mr. Shirani was not part of it.  FBI took out 23 plus one

12   kilogram of cocaine to anticipate it.  Mr. Shirani talked

13   about it.  And let's talk about his credibility later, but

14   even if you think -- even if you saw him testify and you

15   think Mr. Shirani is lying about everything he said, what

16   about when he was talking on the phone and he said he wanted

17   the cars.  Do you really think he was here to buy cars,

18   ladies and gentlemen?  He was here to buy cocaine, and that

19   was part of the plan.

20           The plan is to fly to Los Angeles.  And when they

21   fly to Los Angeles, that's where the money was.  And

22   Mr. Shirani said on the stand, Mr. Shirani said at the

23   airport, and Mr. Wedding said at the airport that they have

24   to go get their money, it's already there.  And it makes

25   sense.  If you're going to go buy drugs, are you going to

1    carry hundreds of thousands of dollars in your suitcase,

2    especially if you're coming from another country and you have

3    to go through customs?  Does that make sense?  Or does it

4    make more sense, is it more secure to do that which you've

5    already done in the past, transferring money via the havale.

6    Excuse my -- I don't know how to say it properly -- but the

7    Middle Eastern method of transferring money.  You pay a small

8    percentage and you know it's going to get there.  You don't

9    have to worry about Customs.  You don't have to worry about

10   the excess scrutiny they have at the airports these days.  It

11   gets there; you just pay 15 percent, and your money gets

12   there.  That's what the plan was, to get the money.  And

13   you'll hear Mr. Wedding tell you that; we'll play a

14   recording.

15            Once they were in Los Angeles, the plan was to

16   drive to San Diego.  Now, Mr. Wedick talked about what the

17   FBI should have done.  They should have surveilled the

18   people.  But what Mr. Wedick doesn't understand is the FBI

19   can't read people's minds because the plan that was made --

20   the plan that was told to the FBI from Mr. Krapchan is that

21   they would go to LA and they'd go make the sale in San Diego,

22   so the FBI was geared to conduct surveillance from LA to San

23   Diego.  They had no idea, as you can tell by the

24   recordings -- we'll show you -- that Shirani and Wedding had

25   to pick up the money.  The FBI, as told by Krapchan, thought

1  they were going to go to San Diego right away.  The FBI

2  didn't even know exactly for sure who Hassan Shirani was or

3  Ryan Wedding until they saw them there.  So right there we

4  have a divergence of plans.  And Mr. Wedick I don't think

5  would testify that the FBI should be able to read the minds

6  of people they haven't yet fully identified.  But we'll talk

7  about Mr. Wedick later because he made a lot of assumptions

8  that you need to be aware of.

9            After they come to San Diego, the plan was to go

10 back to Los Angeles.  Their flight tickets show that they

11 were going to leave.  Now, I don't know how a dentist's

12 appointment after the fact you were supposed to be back in

13 Canada affects a drug deal, but let's wait and see what is

14 said about that.  But after the drugs were in Los Angeles,

15 what was supposed to happen next?  Mr. Shirani told you, and

16 it makes sense.  These are people from Canada.  They're not

17 from Southern District of California, San Diego, or LA.  They

18 were going to transport the cocaine back to Canada.  Why?  It

19 almost doubles in value, $30,000 a key in Canada.  So, ladies

20 and gentlemen, that's the plan.  An agreement is to fly down,

21 get some cocaine near the border in San Diego, transport it

22 back to Canada so they can make money.  That was the plan.

23 And that's what the FBI was investigating.  That is what the

24 CI came and told the FBI could ultimately happen.

25            Now, let's look at a time line that focuses on Mr.

1    Wedding.  You've heard some discussion early on about this

2    was a trick by a sophisticated con man who tricked an

3    unknowing and trusting Mr. Wedding to fly down.  Well, ladies

4    and gentlemen, if it was a trick, why is it on the day before

5    the event when he was still in Vegas, they've already

6    identified Krapchan and the CS talking about an Iranian and

7    an athlete.  Now, to be frank, in the government's

8    case-in-chief there was no evidence that Mr. Wedding is an

9    athlete, but thanks to his mother's testimony, we know that

10   he is an Olympian.  That's an athlete of athletes; that's a

11   world-class athlete.  So when he's described as somebody as

12   being an athlete, it makes sense that it would be an

13   Olympian.  And is it coincidence that when they're talking

14   about an Iranian and an athlete coming that an Iranian and an

15   athlete actually come?  So was it an accident, some

16   accidental last-minute trick?  Or did the people in the

17   conspiracy already know that it was going to be Mr. Wedding

18   and Mr. Shirani?  Krapchan knew.  Again, one is a big guy

19   like you two, like you, 2 meters tall, one is Iranian,

20   Krapchan to the CS.  The CS, as you recall, was trying to get

21   as much information about them so the FBI could have an idea

22   of who was coming.  They did not know for sure.  But, again,

23   before the transaction occurs, he's already identified as

24   coming.

25            Now, Krapchan also tells the CS that the Canadian,

1    not the Iranian, was there to make money.  He's a working

2    guy.  You heard the clips; you heard the testimony.  We're

3    going to play it for you in a moment also.  But this is a

4    rough time line.  This was also before they even traveled

5    down, but this is the most important thing.  Mr. Wedding

6    himself talking to the CS because, you remember, the CS

7    wanted to go back to San Diego.  He didn't want to go to LA.

8    Too much traffic.  They had an operation planned with the FBI

9    to do everything in San Diego.  But as you heard Mr. Shirani

10   say, and you'll hear it, the money had to be picked up.

11        Mr. Shirani, if you want to believe him according

12   to the defense, described the CS as getting agitated.  So Mr.

13   Wedding was talking to the CS and Mr. Wedding's own words,

14   his own words on the recording say we have to go get it, I

15   mean obviously I didn't put it in my fucking suitcase.  Does

16   that sound like somebody who was tricked to come down to have

17   a party, dancing at night clubs?  Or does that sound like

18   somebody who knew about the agreement to buy drugs?

19        Mr. Krapchan on the way, on the recording on the

20   way from the airport is telling them no night clubs, you

21   know, we're like Russians, we do it all night long, but no

22   night clubs.  And you know what Mr. Wedding says?  His words:

23   No, we've got work to do.  So why is somebody who was tricked

24   to come to Southern California talking about doing work, in

25   his own words?  Why is he arriving at a location where drug

1   deals happen?  Ask yourself these questions when you listen

2   to the defense's argument.  Why would defendant be saying

3   these things?

4          Now, let's talk about the cocaine.  Twenty-four

5   kilograms was the deal.  That was the original deal.  The

6   reason why that's important is because, as you know, they

7   paid for the one kilogram sample $17,000.  So this deal in

8   total, this -- by gauging the seriousness of this deal, of

9   what kind of stakes are involved, when you make a decision to

10  fly down, how serious do you take it?  This deal is worth

11  $408,000 at least in San Diego.  That's how much money is

12  going to be needed to buy that much cocaine.  So is this a

13  small-time little hand-to-hand deal?  No.  Ladies and

14  gentlemen, these people were dealing seriously with large

15  amounts of money.

16         Now, what is this deal worth?  How do you gauge

17  ultimately how important this deal was to the

18  co-conspirators.  You gauge it by the quantity times what

19  they were going to sell it for or what it was worth in

20  Canada.  Now, we know it was worth $30,000 because much ado

21  and much time was spent talking about Mr. Shirani and Mr.

22  Wedding's backup plans.  And Mr. Shirani's backup plan was

23  trying to set up another deal because the CI they weren't

24  comfortable with, and his friend told him in a text message

25  $30,000.  Twenty-four times $30,000 is $720,000 in Canada.

1    So are you cautious?  If you want to gauge how people act, if

2    you want to gauge the stakes, this deal was worth $720,000.

3    And that's important because if a deal is worth $720,000, are

4    you going to invite a guy who doesn't know anything about it,

5    a guy who apparently was innocently tricked to come down and

6    participate?  Why would you have somebody there who might say

7    well, wait a minute, you guys are dealing drugs, I'm going to

8    tell the cops.  Why would you have a loose end?  You see, Mr.

9    Wedick talked about the unsuspecting.  That's called the

10   blind mule.

11          Ladies and gentlemen, the blind mule theory, which

12   I am curious to hear what's going to be said about it,

13   doesn't make sense.  If you're dealing with a transaction of

14   $720,000, you want to minimize problems.  You want to

15   minimize things that could affect you getting your $720,000.

16   It's the holiday season.  I have relatives in Ohio.  If I

17   want to send an important family heirloom gift to my

18   relatives in Ohio, do I wait for a truck with an Ohio plate

19   driving by my house, throw in the gift, and say Merry

20   Christmas, Aunt Mabel?  Do I do that?  Or do I package it up,

21   go to Federal Express or some other service where I pay them

22   money so I can make sure that which I need to get where I

23   need it to go gets there?  Because this is worth $720,000 to

24   me and it's about minimizing risk.  Because I can almost

25   double my money if it happens, and I'm going to do everything

1    I can to make sure there's no threat of discovery, there are

2    no loose ends.

3            So we'll talk more about blind mule in rebuttal,

4    but in the drug dealing culture, regardless of what Mr.

5    Wedick says, it just doesn't make good business sense, and

6    people who deal drugs do it because of the money.  In this

7    day and age, making almost doubling your money from any

8    business investment is great.  The problem is this particular

9    investment is illegal.

10           Now, let's talk about the recordings because you

11   will hear much about whether or not you should believe

12   Shirani.  You will hear a lot about well, maybe the FBI

13   should have done something differently.  You will hear a lot

14   about maybe they shouldn't have used the CI.  You will hear a

15   lot of things, but the things you should focus on are the

16   recordings because these are the actual things people are

17   saying.

18           When you listen to these recordings, keep in

19   mind -- the question you should be asking yourself is was

20   there an agreement to travel to the U.S. to buy drugs for the

21   purpose of distribution.  That is the primary focus of what

22   this case is about.  Was there an agreement to buy drugs for

23   distribution back to Canada?

24           On 6-9 before, before they traveled here, the

25   confidential source says do you know them.  Krapchan says of

1    course.  Did you meet with them?  Krapchan says of course I

2    met with them.  Did I ever.  Okay.  Then that is that.

3    Unintelligible.  Krapchan says one is big guy, like you, a

4    big guy, 2 meters tall, one is Iranian.

5             Okay.  This happened.  This conversation happened

6    on the 9th, but what is the context?  Mr. Krapchan met with

7    the people who were coming down previously.  He met with

8    them.  He met with the big guy, 2 meters tall, which is about

9    6 feet, and an Iranian.  Is that coincidence?  Or is that

10   more like two people coming together to initiate a serious

11   plan to buy a large amount of cocaine?  That makes sense,

12   ladies and gentlemen.

13            Let's do the next one, 6-9.  Is that the big guy,

14   Hassan?  No.  The big guy is Canadian, and Hassan is Iranian,

15   the main one.  Hassan is the main one?  Yes.  And I guarantee

16   that you'll see this side again, but as you recall, being the

17   main one doesn't matter.

18            Uh-huh.  I believe that's uh-huh affirmative.  And

19   the CS says and that one, an athlete, is he Azerbaijani.  And

20   Krapchan says no, the athlete, Canadian.  There is only one

21   athlete in this case, ladies and gentlemen.  It's the

22   Olympian.

23            What about the second one, talking about the

24   Canadian.  He is a reliable, working guy who's principle, as

25   is that of all of us, as long as it makes money.  This is

1  Mr. Krapchan describing the defendant, who principle is, hey

2  look, as long as it makes money, I'm good.  That's what that

3  conversation was about.  You heard it.  These are clips that

4  you heard in evidence.

5       Why is Mr. Krapchan describing Mr. Wedding as

6  somebody whose principle is hey, as long as it makes money?

7  And this Canadian who kind of -- Krapchan says pure Canadian,

8  you'll see.  Pure Canadian.  When you see him, a taciturn

9  person.  Who.  Who will say, quote, we are here to make

10 money.  He'll say to you.  That sounds like a person

11 describing a co-conspirator about what his disposition is

12 relative to the drug deal.

13       Why would Hassan Shirani want to trick Mr. Wedding

14 and tell the other co-conspirators about this person -- if

15 you're a co-conspirator, you're Krapchan, you're Akhundov,

16 you're the CS, why do you want somebody who's not involved

17 part of it?  It's a loose end.  It affects your possible

18 700-plus thousand dollars.  It doesn't make sense why you

19 would do it.  If I'm going to conduct a drug deal with my

20 drug co-conspirators, I'm not going to invite my best friend.

21 Oh, but they weren't even friends.  They were business

22 acquaintances, which is what the evidence says.  But why

23 would I invite people not involved in my illegal activity?

24 And it's not just buying a little line or two.  Why would I

25 involve them in my illegal activity of buying 24 kilos?  It

1    doesn't make sense, ladies and gentlemen.

2           And here's something that was in English, and you

3    heard it.  CS says no LA, no, we're going to San Diego, was

4    his intention.  You heard that.  He was agitated.  No LA.

5    And Shirani says well, we have to grab the money, we didn't

6    bring the money with us.  And it makes sense.

7           Later on in that same conversation Shirani says

8    we're planning to work it out somehow, okay, to get back to

9    LA.  But we can't bring the money with us.  We have to grab

10   the money from LA.  Do you understand?  You heard it, ladies

11   and gentlemen.  And during that same conversation, you also

12   heard that Mr. Shirani was making phone calls.  Okay.

13          While he was making phone calls, guess who was

14   talking to the confidential source?  Mr. Wedding was.  And

15   what do you think Mr. Wedding said?  Well, we'll see if it

16   can work out.  Like I said, it's sitting here waiting for us.

17   The money was sitting there waiting for them.  Mr. Wedding

18   says, but we do have to go get it.  I mean obviously I didn't

19   put it in my fucking suitcase.  Does that sound like somebody

20   who was invited to come down for a party?  Or does that sound

21   like somebody who's aware of the agreement, the agreement

22   that was existing between Mr. Shirani and Krapchan and,

23   because of the statement, you know between Mr. Wedding as

24   well.  Would you play that, play it, please.  Listen

25   carefully.

1       (The audio recording was played.)

2           MR. GUTIERREZ:  That is what was recorded.  So even

3   if Mr. Shirani was lying, even if the FBI didn't do what they

4   should have done, even if whatever, he's an Olympian.  The

5   fact of the matter is his voice said those words.  And it's a

6   case that's about whether or not an agreement exists, ladies

7   and gentlemen, what better evidence is there than this?

8           Further, when they left the airport, Mr. Krapchan

9   was talking about night clubs.  No night club, he says.

10  Okay.  Just Russian mentality.  You know Russians is go all

11  night.  And he laughs.  And then Mr. Wedding says no, in

12  agreement, no, no night clubs, we've got work to do.

13          What kind of work was he referring to, ladies and

14  gentlemen?  The kind of work that makes sense with his

15  actions.  There was a negotiated, coordinated drug deal that

16  was supposed to start off in Southern California, at LAX, and

17  go to San Diego.  And, coincidentally, guess what?  He shows

18  up there.  And he shows up there talking about having work to

19  do and talking about picking it up because he couldn't put it

20  in his suitcase.  His words, ladies and gentlemen.  His

21  words.

22          Now here's Shirani again on the 10th.  So like my

23  first and initial thing that I want to do today, if possible,

24  is I want to see one car, right, and if I want to see if this

25  is the car -- there was a mistake in the transcript that is

1   before you -- I want to see if this is the car that has all

2   the options that I need.  If it's not the car that I need,

3   then I have to try to find something else.

4         That's an important conversation.  He told you he

5   didn't want to have the cocaine that smelled like fish

6   because he was told that if it smells like fish, it's bad

7   quality.  That makes sense.  When you're buying that much

8   drugs and you want to maximize your profits, it's going to

9   hurt your profits if you buy bad quality stuff.  That makes

10  sense.  He also says here that I have to try to find

11  something else.  That makes sense also because they had

12  backup plans.  One was attributed to Mr. Wedding, and

13  Mr. Shirani had other backup plans.  That makes sense with

14  the deal also.

15        But you heard played over and over again -- we can

16  play it for you again -- but in the background Mr. Wedding

17  when he's explaining to the CS about wanting to see cars, I

18  was trying to explain to him that they want to do it small

19  piece at a time.  Mr. Wedding is in the background saying

20  something, and your memory will serve, but it starts with the

21  word "tell," like tell him something.  If Mr. Wedding is

22  there partying on vacation, tricked in to having come to

23  Southern California, why is he right next to a conversation

24  where Shirani's talking about how they want to do the deal?

25  And why is he chiming in to say tell them to do something.

1    Now, it's not exactly clear what exactly was said,
2  but you can get a "tell," and you get the fact that it's Mr.
3  Wedding's voice.  So at the very least he was there.  And if
4  you're there in a car driving to San Diego where the deal was
5  supposed to take, when they're calling you up where you're
6  talking about where to go -- is he just sitting there saying
7  are we going to SeaWorld?

8    Evidence to support the conspiracy, ladies and
9  gentlemen.  What evidence do you have?  You have a lot.  You
10  have the recordings that you heard, the suitcase recording,
11  most importantly of all.  But, more importantly, look at what
12  Mr. Wedding does.  He travels to a drug deal.  He travels to
13  a drug deal that's worth over $700,000.  Why would any drug
14  dealer want to have somebody come with him just for funs and
15  giggles?  He discusses the drug deal, about how he has to go
16  pick up the money, how it's not with them, they couldn't
17  travel with it.  That, ladies and gentlemen, is a discussion
18  of the deal.

19    He rents the car and hotel room.  And you're going
20  to hear some evidence that because he rented, it's really
21  because he was tricked by a sophisticated drug dealer.  Do
22  you believe that?  In light of the statements, do you believe
23  that?  Because the inference it also supports is he bought
24  the room and the car; he paid for it because it was his deal,
25  which is what Shirani said.  But even if you disallow what

1   Shirani said, you still have that statement at the airport

2   that talks about his knowing involvement in the agreement,

3   completely apart from Mr. Shirani.  He's present at all

4   important drug deal events.  He's present upon arrival.  He

5   goes with Mr. Shirani and stays with Mr. Shirani in a hotel

6   room where the two of them are together.  He, if you want to

7   believe Mr. Shirani, was present when they got the initial

8   money.  He stayed with Mr. Shirani the whole time.  He was

9   with Mr. Shirani when Mr. Shirani was trying to make the

10  backup deals.  He was with Mr. Shirani when they go to

11  Anaheim to talk to Krapchan.  He was with Mr. Shirani when

12  they gave Mr. Krapchan $17,000 because he had $17,000.  He

13  was there to pick up Mr. Krapchan when Mr. Krapchan came back

14  and said no deal.  He was with Mr. Krapchan and Mr. Shirani

15  when they drove down to San Diego to buy the drugs.  They

16  observed him in the same car with Shirani and Krapchan when

17  they pulled into Krapchan's hotel.  And all three of them

18  together went up to Mr. Krapchan's room.  Mr. Krapchan comes

19  alone from his room, uses Mr. Wedding's car, and goes to the

20  drug transaction, where he gives $17,000 for the one-kilo

21  sample of cocaine.

22          Mr. Wedding is where he needs to be at every event.

23  He is -- Mr. Wedding is where he needs to be if he was the

24  person who was participating, regardless of whether he was a

25  source of the money, regardless if he was a big shot or a

1    small player.  He was aware of this agreement, and that is

2    all that matters.

3            Testimony of Shirani.  Now, you're going to hear a

4    lot of argument regarding Mr. Shirani.  Listen very carefully

5    to all of it because you have to make the decision.  You have

6    to decide after seeing him on the stand if he is somebody

7    that you can rely on.  Was he telling you the truth?

8            As you heard, he signed a plea agreement, and he

9    agreed to cooperate with the government.  And you heard what

10   he said regarding his agreement to cooperate.  And you heard

11   the judge say that he might -- might -- get beneficial

12   treatment.  So if you want to believe that he came up there

13   and he's lying just to make the government happy in hopes of

14   maximizing his beneficial treatment, you know what?  You can

15   think that because it doesn't change the fact that Mr.

16   Wedding was recorded talking about the drug deal.  Or you

17   could look at what he said and see that it makes sense.  You

18   can look at what he says and see that it's corroborated by

19   the actions.

20           He explained to you what it was, the plan, what his

21   intentions were.  And you know what?  What he told you

22   matches with the fact of his statements.  He told you that

23   they went down there but the money wasn't available.  You

24   could at least believe that because the recordings show that

25   that was true.  He said he didn't feel comfortable dealing

1   with 24 keys at one shot because he was in place he wasn't

2   familiar with and he was scared of getting robbed, which

3   makes sense because you have the recorded conversations where

4   he's saying I just want to do one kilogram sample.  So it

5   makes sense in parts, ladies and gentlemen.

6          Don't be distracted by accusations because just

7   because somebody may receive favorable treatment by the

8   government with regard to his sentence, the jury instructions

9   don't say disbelieve him; the jury instructions say view his

10  testimony with caution.  Doesn't say throw it out.

11         Look at what he says.  Look at what he testified

12  to.  The backup plans.  That's corroborated by the statements

13  as well.  But just because somebody agreed to cooperate

14  doesn't mean -- doesn't necessarily mean he's lying about

15  everything.  It would be convenient and nice if that were

16  true, but does it make sense?  Does it make sense?

17         Now, the verdict form has a certain part on it, and

18  you heard the jury instructions:  You have to prove that the

19  conspiracy contemplated 5 kilograms and more.  That means at

20  least 5 kilograms.  If during your deliberations you find

21  that he is guilty, you'll see in the verdict form and the

22  jury instructions that if you find he was guilty, you have to

23  make another determination:  Did the conspiracy contemplate

24  more than 5 kilograms?

25         So what evidence do you have of more than

1  5 kilograms?  Well, the deal was for 24.  Shirani said that.

2  The agents said that they had 24 kilograms ready to go,

3  although some of it was bunk; that was what the deal was for,

4  and if they had to flash it, they'd have the bunk -- looks

5  like cocaine but really wasn't.  The deal was for

6  24 kilograms, ladies and gentlemen, but even if -- even if

7  you want to say well, wait a minute, they only had a hundred

8  thousand dollars in the room, I want to see the money.

9  Mr. Shirani told you that not all the money was there when it

10  was supposed to be, and he was having to call his brother to

11  help him out.  So even if -- you don't need to, but even if

12  you want to know, you want to see the money, $100,000 divided

13  by 17,000, the price of one kilogram, means that what they

14  had present with them just in the hotel -- not counting the

15  one kilogram they already bought -- because you remember they

16  had $117,000, 100 in the hotel room and one -- the quantity

17  of $17,000 they gave to Mr. Krapchan -- so it really should

18  be 117, but even if -- just for the money they had in the

19  hotel, just for the money that was apart from the kilogram

20  sample could have bought them 5.8 kilograms.  So even if you

21  don't believe that there was more money coming, even if, it

22  doesn't matter because the money that was found in the hotel

23  room, that money alone was enough to buy 5.8 kilograms.  So

24  if you do find him guilty, ladies and gentlemen, you do have

25  a lot of things to consider, a lot of evidence supporting the

1   fact that it was 5 kilograms or more.

2            I'm finished.  I'm going to sit down.  And we're

3   going to hear rebuttal -- excuse me -- argument, if any, by

4   the defense.  When you're listening to counsel argue, I'm

5   going to request that you keep in mind one thing.  Keep in

6   mind that the defendant said this statement, well, we'll see

7   if it can work out.  Like I said, it's sitting here waiting

8   for us.  Sitting here waiting for us.  What does that mean?

9   Sitting here waiting for us.  But we do have to go get it.  I

10  mean obviously I didn't put it in my suitcase.

11           Keep that in mind, ladies and gentlemen, because

12  when you hear all the evidence about what the FBI should

13  maybe have done, could have done, what Shirani did or didn't

14  say, all these other arguments, keep this in kind because

15  this arguably is the most important piece of evidence.  Could

16  you play it, please.

17        (The audio recording was played.)

18           MR. GUTIERREZ:  After you hear the arguments and

19  after you consider all the evidence, you will see that Mr.

20  Wedding is guilty of conspiracy, guilty of participating in

21  an agreement to buy drugs for distribution.  Thank you.

22           THE COURT:  All right, ladies and gentlemen.  We

23  will -- you would probably appreciate a few minutes at this

24  time --

25           MR. DENIS:  Yes.  Thank you, your Honor.

1        THE COURT:   -- Mr. Denis, so we'll take our

2   midmorning recess, ladies and gentlemen, and resume in 15

3   minutes.   Very important that you continue to abide by the

4   admonition not to discuss the case or make any decisions at

5   this time.   Thank you.

6        (There was a break in the proceedings.)

7        THE COURT:   Okay.   We have all jurors present at

8   this time, and we are ready to resume with the arguments.

9   Mr. Denis?

10        MR. DENIS:   Thank you, your Honor.   Ladies and

11   gentlemen, this morning we have a lot to talk about.   You

12   might see my face get red; it's because I'm tired.   But we're

13   going to get through this, and we're going to get to the

14   truth in this case.

15        This is truly a case about the evidence and

16   credibility, that's what this case is about, the evidence and

17   credibility.   When I started out with you ten days or so

18   ago -- I don't even remember; the days have been blurred -- I

19   told you that this was a case about an Olympian snowboarding

20   champion who gets duped by a experienced drug dealer and

21   career criminal.   He is so good at convincing people.   He has

22   convinced the government that he's telling the truth that the

23   government even used him to come up here and testify against

24   Mr. Wedding.

25        What did Mr. Shirani say?   He said that Ryan was

1    the money, was the main guy, and he was so minimally

2    involved, he had like nothing to do in this conspiracy except

3    transport and make $400 per kilogram.  The first thing that

4    Mr. Shirani said back when I asked him about criminal --

5    about the credit card fraud in 1997, he said oh, I was

6    arrested, but the credit cards weren't found on me, they were

7    on someone else, ah-ha-ha, and I didn't get charged.  This is

8    the mindset of Mr. Shirani back in 1997.

9            Now, more than ten years later after just a career

10   of crime and never being detected, never being arrested, he

11   gets arrested here, but he thinks he's so smart -- and, in

12   fact, he might be so smart -- that he lies -- lies himself

13   through this case where he becomes and signs a cooperation

14   agreement with the government and convinces the government

15   that he's telling the truth.  And they put him on the stand

16   to basically come up here and lie for his own benefit so that

17   he could basically walk out of jail -- if he convicts -- if

18   he manages to tell you enough lies and convince you based on

19   the support of the government that Mr. Wedding is guilty,

20   then he's going to walk out of jail.  That is what his plan

21   is.  He's always thinking ahead.  And I'm going to get to

22   that, but that is what -- and basically he's a good liar.  I

23   don't think he's a good liar, but he was able to convince the

24   government that he's somehow telling the truth.  And we

25   showed here on a multiple occasions he's been lying and

1    making things up.

2             Ladies and gentlemen, there are phone conversations

3    in this case galore, and they're all in the Russian language.

4    Who are they between?  Let's break this case down so you

5    understand.  Mr. Gutierrez makes a lot of assumptions, a lot

6    of leaps, and asking the jury to get -- you know, to just

7    believe him because he's the government and, you know, he's

8    telling the truth and the evidence shows this and the

9    evidence shows that.  Why don't we break it down.

10            The only things he keeps showing you is on the

11   10th, and we'll get to the 10th.  Basically obviously this

12   case starts back in 2007, but we're not going to get into

13   that.  Let's look at what was going on leading up to the LAX

14   meeting.  There are phone calls.  Here's a calendar just to

15   help you.  I know the font is small -- can you enlarge it all

16   at?  I'll try and -- I know the font is small; I apologize.

17            In June 3 -- well, leading up to -- let's just get

18   to this point -- leading up to the LAX -- and let me just get

19   your attention for a minute.  Take that off for a second.

20   Take that off for a second.  Leading up to LAX, there is the

21   name brought up, Hassan.  Someone, Krapchan, discussing with

22   Yuri knows the name Hassan.  His name comes up.  There was a

23   meeting there with Hassan.  They know his name.  Did you ever

24   hear before June 10 the name "Ryan" or "Wedding"?  You heard

25   an athlete.  Could Hassan have told someone oh, I'm bringing

1   this big guy or the guy saw him, and I'm going to bring him

2   down to LA?  The government's claimed there must have been

3   some meeting.  If there is a meeting, they would have then

4   the name "Ryan" or something besides this general -- just

5   general description that he's some athlete.

6           There is no doubt -- bar none, there is no doubt

7   that there was a plan, okay, there was a plan to come down

8   to -- from Canada to California to purchase drugs.  The

9   question is who was part of that plan, okay?  This is very

10  important.  Who do we have evidence was part of that plan?

11  We definitely know the confidential source was talking to

12  Michael Krapchan; we have evidence of that galore.  During

13  that conversation they bring up the one name, "Hassan."

14  There was some evidence that the name "Hussein" was brought

15  up, but no one ever brought the name of Ryan up; I've already

16  mentioned that.

17          There was references that these other people were

18  in business for ten years, okay?  On -- on two -- bring that

19  back up.  On Tuesday, June 3, there's a recording that

20  indicates -- and I'm not going to bring all the clips up;

21  we'll just get highlights of the clips; I know you've been

22  clipped-out, so to speak -- but on June 3 flying in with the

23  person who is picking up money.  So just based on the

24  evidence, we realize and we know that that's Hassan.  So from

25  back then on June 3, there is some conversation where

1    Krapchan says he's flying in a person who's picking up money.

2            On June 4 there's a conversation that these others

3    have been in business for ten years.  You can deduce from the

4    evidence that that was Hassan and his brother, and we'll --

5    and we'll further show that based on the evidence and further

6    transcripts.  On the 5th you have no -- no mention of -- no

7    discussions.  And on the 6th we've learned that Ryan Wedding

8    was in Las Vegas for a bachelor party, from the 6th, 7th,

9    8th, and then he returned on the 9th.

10           We know on the 6th Michael Krapchan asks the

11   confidential source to pay for his ticket, and he will pay it

12   when he gets down here.  On the 6th there was a plan

13   apparently, right, talking about a plan of what was

14   discussed.  The plan here, he was going to fly in on Monday

15   and leave at Tuesday at 6:30.  So what's the plan that the

16   government is -- is -- is discussing?  What's the plan we can

17   deduce?  They were supposed so come down to LA with some

18   money, go pick up whatever number of drugs, and that would

19   have been done, and then Shirani would have transported it

20   back.  That was the plan.  There had to have been some plan

21   beforehand, correct?

22           If someone is leaving -- Michael Krapchan, who's

23   obviously part of this conspiracy, who knows what he was

24   doing in it, was going to leave at 6:30 on the same day, this

25   was going to be something done very quickly and short.  That

1    was -- must have been a plan before the 5th, that we were

2    just going the fly in, we'll have money there, make this drug

3    transaction, Krapchan could jump back on a plane and get

4    back.  This was going to be something very quick.  This must

5    have been the plan that was discussed with Michael Krapchan

6    and obviously Hassan -- with Michael Krapchan and Hassan

7    because that's when he purchased his ticket and that was what

8    his understanding of this.

9            Now, we learn that Ryan Wedding is now gone in Las

10   Vegas.  Now, on the 7th we have conversations; the Iranian is

11   in the deal and he gives the money.  And there's some

12   discussion about bringing a torpedo or some muscle.  And

13   Michael Krapchan says no, no, these are not any kind of

14   torpedoes, there's no torpedo involved in this.

15           On the 8th, again when Mr. Wedding is in Las Vegas,

16   tickets are bought.  His brother will be flying for another

17   reason, and there's some discussion about Michael Krapchan

18   not calling Elmar because of the rules of the game; they

19   don't want to be I guess communicating with other

20   conspirators.  You heard evidence how sophisticated drug

21   dealers work; they get unsuspecting individuals, they get

22   someone that they can use to cover their tracks.  You heard

23   evidence that Michael -- that Yuri did some undercover work

24   up in Seattle, or in Washington, and at that time he told the

25   agents that yeah, Elmar, a more sophisticated drug dealer, is

1   using Michael Krapchan to cover his tracks.  But Michael

2   Krapchan knew what was going on, and that's obvious.  He

3   participated, he already knew the rules of the game, he was

4   kind of schooled how to cover his tracks.  And that's going

5   to be a very important point.

6          A huge issue in this case is now knowledge about

7   the plan.  If Mr. Wedding knew of this plan, then he'd had to

8   have known that they were going to arrive there with money

9   and go pick up something and have it done in a day.  He would

10  never make a comment, which is in the recording, that oh,

11  they're planning to be here for a few days.  What would you

12  been doing in a few days?  I've indicated to you and I'm

13  going to show circumstantially that Mr. Wedding was told that

14  he was coming down here for a car deal.  What kind of car

15  deal?  Get multiple cars for his brother.  There's no

16  specific evidence on to that, but you're going to be able to

17  deduce it.

18         If you're going to do a drug transaction, it's not

19  going to take multiple days.  This is something that's going

20  to take at most, what, four hours?  I asked Mr. Kalina on the

21  stand, could that have happened in four hours; he said sure.

22  Of course it can.  Of course it can.  What work is involved?

23  What are we talking about?  Is it driving cars back and

24  forth?  Is that work?  Or just going and picking up a bag of

25  cash, you know, driving down to San Diego, do a swap or

 1    whatever they're going to do?  What work is that?  Is that
 2    what they're calling work here?  Okay.  And who's saying that
 3    there's work to be done?  Mr. Wedding.  He thinks maybe he's
 4    going to help out driving some cars or something.  And you're
 5    going to be able to deduce that in the recordings.
 6              Now, there was a lot of evidence about rules of the
 7    game.  You say well, why is that important.  If Mr. Wedding
 8    knew that he's coming down here on a drug transaction, would
 9    he -- and he indicated -- and Mr. Shirani said oh, yeah, my
10    credit card was full, so I didn't want to put it on it, and
11    then he switches, well, you know, it wasn't my deal, so I
12    didn't want to pay for the credit card -- for the room and
13    for the -- for the car.  If Mr. Wedding knew this is for a
14    drug transaction and he's like this sophisticated drug dealer
15    or he's done money wire transfers before, which, again, has
16    never been corroborated, there are steps the FBI could have
17    done to corroborate his story, and they never did it.  Either
18    A, they didn't believe it or -- or whatever.  They just
19    wanted to believe what -- or they believed him without
20    corroborating.  Now, again, these were agents with only about
21    four years' experience.  And Mr. Wedick, who testified, a
22    former FBI agent for 34, almost 35 years, these basics that
23    you need to do.  The FBI, they have a certain gatekeeping
24    function, okay?  The Courts have a certain gatekeeping
25    function.  But ultimately each of you have the gatekeepers,

1  okay, of this case.  And I'll get to that.  If you -- the

2  evidence has to be evalued (sic) by each of you.  And we're

3  going to -- and the reason I'm going through it step by step

4  is so that you can actually see what's going on here.

5          Now, we indicated about the rules of the game, and

6  I apologize; I deviated.  Now, the rules of the game.  If you

7  are a drug dealer or something, they know the basic rules is

8  if there's going to be a drug transaction, you don't put your

9  name on a room and then have cash in the room.  You don't put

10  your name in a room and then carry drugs in a room.  These

11  sophisticated drug dealers use these unsuspecting; they get

12  someone who's not involved in drugs, tell them look, why

13  don't you come out for whatever reason -- I have a car deal,

14  I have a paid vacation -- something to lure or let's -- we'll

15  have plenty of fun -- to lure these individuals to come with

16  them.  And whatever story they tell.  I mean, people say

17  well, you can't be that stupid to believe that.  All of us

18  know about Bernie Madoff.  He's able to even dupe --

19          MR. GUTIERREZ:  Object; facts not in evidence, your

20  Honor.

21          MR. DENIS:  It's argument.

22          THE COURT:  I'm going to overrule the objection.

23  Ladies and gentlemen, keep in mind this is argument.  There

24  are some limitations when it comes to arguments, but I think

25  it's permissible for counsel in argument to use historical,

1    literary, some even use Biblical, social references; and the

2    Madoff thing, although it has nothing to do with this case

3    obviously --

4              MR. DENIS:  No, your Honor.

5              THE COURT:  -- is something that Mr. Denis wants to

6    use to emphasize a point, so I'm going to overrule the

7    objection.  That doesn't give either attorney carte blanche

8    to start bringing in other cases and matters having nothing

9    to do with this case, but for a contemporary reference Mr.

10   Denis may want to use in conjunction with his argument, I'm

11   going to allow it at this point.

12             MR. DENIS:  Thank you, your Honor.  We're all

13   familiar with the Bernie Madoff incident.  He was able to

14   even dupe sophisticated individuals, people who are business

15   people, smart individuals.  In this case, you have a young

16   man about 25 years old and told that he's coming down to help

17   his -- his brother's car deal, and basically paid for his

18   flight and paid for the room, and -- well, the room was put

19   in his name, but Mr. Shirani paid for all the meals and paid

20   for all the expenses, he indicated.

21             Now, I know I jumped a little bit ahead, but back

22   on the 9th, Mr. Wedding returns back to -- to Vancouver.

23   Now, if Mr. Wedding before leaving knew that he was going to

24   be coming to Los Angeles, why would he go back to Canada?  He

25   was two or three hours away.  If he's this sophisticated drug

1    dealer as Mr. Shirani tries to portray him to be, why

2    wouldn't he just come straight to Los Angeles and not even

3    have any connection with Shirani and arrive here?  That

4    wasn't done here.  Mr. Wedding returned back to Canada.

5          Shirani -- there was no -- there was no evidence

6    brought out by either the government as to what took place,

7    but Mr. Shirani asked Mr. Wedding to come with him for a

8    couple days, pay for his flight previously, convinced him

9    somehow to come down here.  Mr. Wedding came down.  Flight

10   was paid for.  Mr. Shirani indicated that he -- his credit

11   card was full, that's why he didn't rent the room, and then

12   he flips it and says well, it wasn't my deal, so I asked

13   Wedding should put the credit card in his name.  But we

14   established the credibility of Shirani.  The government says

15   well, you could believe some or not or disregard some.

16   Mr. Shirani -- and the instructions are there -- you have to

17   be view his testimony with extreme caution.  He's trying to

18   get points.

19         In addition to that, as came out, before he

20   testified he was even meeting with the government without his

21   lawyer, without his lawyer, with the government, with the

22   agents before he was going to testify.  They try to come up

23   here and establish oh, nothing inappropriate was asked, we

24   didn't go over his testimony.  We're not there to see what

25   happened, what went on there.  That's very, very unorthodox

1   to have something like that happen where you have a

2   cooperating witness who's trying to get points, who tries to

3   curry favor with the government.  And to be left alone with

4   the government for about half an hour and then with the two

5   lead agents on the case.  Help us out and we'll help you out.

6          A wild comment was thrown out that was not in any

7   of the reports that Mr. Wedding said that he would smash the

8   old guy in his face.  I wonder where that comment came from,

9   okay?  I did ask Ms. Lambert if she had heard that comment

10  before, and she said yeah, I heard a vague reference.  It was

11  never documented in any of the reports.  As you heard here,

12  there were at least ten proffer sessions.  That was never

13  once documented.  Just something made up and thrown out here,

14  basically again an effect on the jury.  And, again, remember,

15  Mr. Shirani was meeting with the government and the agents by

16  themselves right before trial.

17         Now, on the 9th there are further -- on the 9th --

18  on the 9th, the next thing -- okay.  Ryan leaves Las Vegas,

19  as was documented with Mister -- the young man that was with

20  him at the bachelor party.  They flew in, drove the rest of

21  the way, got there in the afternoon.  During this time

22  Krapchan flies into San Diego and is with the -- with the

23  confidential informant.

24         During that conversation it was indicated that

25  Hassan is the main person.  The government keeps saying well,

1    it doesn't matter the roles of the conspirators or what their

2    role is or who.  It does matter.   It matters because look at

3    what Shirani is telling, what story he's telling, that's

4    No. 1; and then No. 2, ask yourself this question, if Ryan

5    wasn't the money person, if Ryan -- ask yourself this:   What

6    was Ryan's role.  What was he here to do?  What was he here

7    to do?  Just to cover the tracks of Shirani, the

8    sophisticated drug dealer?  What was it?  Was he supposed to

9    drive the drugs around?  Was he supposed to bring money

10   anywhere?  This was Shirani's entire gig.  It was everything

11   that dealt with Shirani.  What was Ryan's role?  What did

12   they bring this guy for, for what reason?  You have testimony

13   from Mr. Shirani that's the money doesn't come down.  Money

14   stays away.  Oh, I just brought him down because I didn't

15   want to be responsible, I didn't want to -- I didn't want

16   to -- whatever he said, whatever story he made up.  He

17   testified that money generally doesn't come down, and, again,

18   his brother did not come down.  You can deduce whose money it

19   was, okay?

20            At LAX there was a -- one conversation where

21   they -- Hassan was discussing money.  I need the Elmo.

22   During the first conversation about money, it says do you

23   need a call -- the confidential source:  Do you need a call,

24   do you need to --

25            THE COURT:  Counsel, may I assist you?  Please

1    would you zoom out a little bit so that we don't get seasick

2    with you moving that around?  That's fine.  That's good.

3    You'll be able to see what you want without moving it around

4    and the jury can see that as well.  Thank you.

5              MR. DENIS:  Thank you, your Honor.  Do you need to

6    call?  Do you need to call?  And HS is Hassan Shirani.  Call,

7    no.  I ain't -- I ain't -- I'm calling -- I'm just waiting

8    for my brother to call me.  And this had to deal with money.

9              Now, Mr. Wedding believes he's coming down to do

10   some drug -- to do a car deal for Mr. Hassan's brother, so

11   they're waiting for some money.  Somehow there was some money

12   that was supposed to be brought down or a friend was supposed

13   to bring that money or something.  And what are we going to

14   deduce now at the LAX?  So let's now look at LAX and what

15   happened at LAX.

16             Mr. Wedding comes off of the plane in LAX.  The

17   first person that speaks, which we established, basically

18   Hassan discusses the money.  He brings up that oh, I have to

19   get money, the money wasn't here with us.  During that

20   conversation you hear -- there is some reference that money

21   was supposed to be brought through the airport or the money

22   was supposed to be in the bag, okay?  That's from the

23   evidence.  That contradicts, okay -- that goes to a certain

24   plan.  Who had that plan?  Who had that plan?  The source?

25   I'm sorry.  Mr. Krapchan and Hassan.  Mr. Krapchan knew

1    Hassan's name already.  There was some plan.  There was
2    something in the works, and there was some unforeseen events
3    that happened that that did not work out.
4           Now, was Ryan going to know that there's money in
5    his suitcase?  Obviously he says I wouldn't have any money in
6    my frigging suitcase.  The exact translation is "fucking,"
7    but I'm just trying to make it a little bit politically
8    correct.
9           So you had Shirani testify that the informant was
10   an agitated person.  Even Shirani was afraid of this guy.
11   And he indicated in LA we had a deal.  And let me back up for
12   one minute.  Let's look at the big picture here.  You have
13   two individuals speaking in Russian predominantly, you have
14   Hassan Shirani, and I'm certain -- I'm not going to play the
15   clip; let the government play it.  They've got it all cued
16   up.  They've got it all together.  I hope they play it in
17   toto without giving you slices.  Why don't you hear the whole
18   thing.  What happened?  Here you have Shirani testify -- talk
19   about money.  Ryan comes off the plane, there's some hellos
20   and all that.  Several minutes later they ask where's the
21   money, this and that.  And Mr. Wedding is there.  They're
22   having -- Hassan Shirani is having a discussion with the --
23   with Mr. Krapchan or the confidential source.  There's
24   discussion of money, that they have to get the money.  Mr.
25   Wedding hears this, says he's waiting for a call or he's got

```
 1    to call a friend or whatever, whatever, you'll hear it on the
 2    transcript.  And -- and then there's a phone call that
 3    Mr. Shirani receives, and he goes off and he talks in Farsi.
 4    And this is when already the -- the confidential source is
 5    getting all upset.  We talk about plan.  There was supposed
 6    to be a plan that they were supposed to just get the money
 7    that day, have it somehow in the suitcase or whatever and go
 8    do that drug transaction, four hours so Krapchan can go back.
 9            So who knew about that plan?  There was a -- there
10    was a clip -- I guess I'll show you guys the clip.  I know
11    you recall it, but in case you don't -- you saw these two
12    clips on June 10.  And what I'll focus your attention is --
13    let's just read that entire clip.  Whether they came or did
14    not come, if tomorrow does not work out for him, but he said
15    everything looked okay.  Krapchan, everything looked okay.
16    He told me he had enough time.  Confidential source, didn't
17    they know or you didn't tell them?  No, no, no, I told them,
18    I told them.  Okay?  Who did he tell?  He told Hassan or he
19    told Hassan and his brother.  Probably -- something probably
20    didn't work out with the money or -- at first he said the
21    money should be in this bag, something probably didn't work
22    out well to the end.
23            Now, the confidential source, who knows the plan,
24    says in a later clip -- and there's this discussion going on
25    in the Russian language -- Krapchan, he's doing something, he
```

1   says that's okay.  The confidential source asks Krapchan, so

2   talk to him, see what happened.  Talk to him.  There's a

3   pause.  Now, he'll still -- the confidential source says in

4   English oh, nice watch.  Krapchan comes back after the --

5   Krapchan and Hassan have a quick brief discussion.  He said

6   that the money was supposed to be in their bag, but there was

7   some kind of unseen events.  Ryan was in Vegas.  He couldn't

8   stuff it in the bag, so now there's this delay in the money.

9   He's got to give it to his brother, and then he's waiting for

10  a call from his brother.  Says yeah, I don't have a problem,

11  just waiting for a call from my brother regarding this money.

12          So was Ryan involved in this plan?  I don't think

13  so.  If Ryan knew that there was money put into his bag to do

14  drug deal, would he have agreed to it?  Here's an Olympian.

15  You've seen the mother.  You've heard a little bit about the

16  background, you've seen the family.

17          Now, again, you're going to see comments by Mr.

18  Wedding when Shirani gets off on the phone.  There's a lot of

19  this agitation going on at LAX.  Everybody's angry that this

20  deal didn't happen.  Ryan Wedding, he hears -- there's Russia

21  going on -- you'll hear -- you'll hear the clip -- Russian

22  going on between the two people, Shirani's off talking in

23  Persian in the background, and Mr. Wedding is kind of stuck

24  there going what is going on.  You'll see some comments of

25  Mr. Wedding -- and hopefully they'll play the clip -- and

 1    you'll see that he's basically almost like talking to no one.

 2    The Russian people are talking to each other in Russian,

 3    Mr. Hassan is off in the back, and Mr. Ryan is going just

 4    trying to calm the situation down:  Oh, we're trying to work

 5    out the money thing, you know, we'll do that.  Trying to calm

 6    the situation down.  And you'll hear the confidential source

 7    eventually does calm down.  And any comments after that is

 8    just talking about oh, yeah, we're supposed to go see our

 9    friend, he's supposed to get the money, this and that.

10            You heard those comments, and then you looked at

11    what Mr. Shirani said.  He said that he went to the rug

12    store, got the money, and in his initial one he said took

13    Ryan with him and then he said he took him for both times,

14    and then he changes it, and the agent says that, you know, he

15    went by himself and got the hundred thousand dollars while

16    Mr. Wedding was in the -- in the room taking a shower.

17            Now, if Mr. Wedding knew anything about the deal,

18    where was this friend that was supposed to come and drop them

19    off money and bring the money?  That's not what happened.

20    He's just saying something to calm the situation down.  We

21    heard what the evidence is.  They went -- he went to a rug

22    store, took him to a rug store.  That's his testimony.  It's

23    very possible -- in fact happened -- is that they checked

24    into the hotel.  When he was checking in, he went out to the

25    rug store to see what's the situation with the money.  I

1    think he went to a Persian establishment.  Is he going to be

2    bringing some big white guy with him and they're bringing out

3    all this money and talking about being robbed or different

4    things?  This is a Persian kind of a -- basically money

5    laundering, he indicated, and that he's bringing some white

6    guy there that they don't even know?  Ladies and gentlemen,

7    you have to -- you have to scrutinize this.  You have to look

8    at what makes sense, what's logical.

9            Now, on the 11th, the next day -- and I'm going to

10   play the clip for you in its entirety because it's in

11   English; you don't have to follow transcripts.  There's a

12   call between the confidential source and Hassan Shirani.

13   Now, you say well, why did he pick cars, okay?  Just flow

14   with me as you can that -- that Hassan had told Ryan Wedding

15   he was coming here for some type of a car deal or something

16   dealing with cars.

17           Now, I asked Mr. Shirani was Ryan in the room or

18   did he just walk in.  He didn't remember, but listen to the

19   call, and listen to the inflection of his voice like when --

20   you know, we've all been on the phone and we don't want

21   someone to know either what we're talking about or who we're

22   talking about, but just listen to that recording.  Just use

23   your common sense, not necessarily like you're cheating on

24   your wife or your spouse but like you weren't supposed to be

25   talking about something, and you're using a different

1    conversation, a different thing, and then following it

2    through.  And obviously at that time you know that there's a

3    voice in the background, and most likely -- and I'll admit

4    it -- it was Ryan there, and he tells -- says something, tell

5    Max to note it.  Is this about a drug deal?  Let's play the

6    clip so that you hear what happened.  I'm going to play it in

7    its entirety.  Just listen, no transcript.  Just listen to

8    this conversation and assume you're behind it, behind it just

9    listening.

10          (The audio recording was played.)

11          MR. DENIS:  Now, ladies and gentlemen, remember

12   you're hearing both sides of the conversation.  Ryan Wedding

13   is hearing just something from Hassan's side about talking

14   about cars or two cars or two things at a time.  Very

15   plausible that they could be driving cars back and forth from

16   San Diego to LA.

17          Now, let's go back to the LAX.  If -- there's a

18   statement by Mr. Wedding that says -- well, let me let you

19   take your notes.  There was a statement at LAX that Mr.

20   Wedding says this couldn't -- this wasn't realistic to happen

21   in four hours.  Now, we all know if this was going to be a

22   quick drug transaction -- and Mr. Kalina admitted this could

23   have easily be done in four hours -- but if Mr. Wedding's

24   under the impression that they may be driving cars back and

25   forth from San Diego or doing something, it's just not

1    realistic to have this happen in four hours, okay?  There is

2    that -- the statement by Mr. Wedding -- we'll see if the

3    government plays that -- and these were calls that happened

4    at LAX.

5              Now -- now, on June 9, 2008, there is a discussion,

6    as was brought out, that Mr. Krapchan had with the

7    confidential source, who was drunk, you know, was drunk off

8    the plane, they came -- had a -- at least a bottle of wine

9    where Mr. Krapchan was basically drinking and having a

10   conversation with the confidential source.  He didn't know

11   Ryan's name.  He's just talking about yeah, there's the big

12   guy, he wants to make money.  There's no proof other than

13   that statement that Mister -- other than -- Mr. Krapchan says

14   yeah, he met with them -- though he didn't know their name

15   but he knew Hassan's name -- but that's a very important

16   point.  Just did he know his name at that time when he was

17   discussing with the source?  He did not.  There's no -- in

18   any other transcripts he did not know Ryan's name.  Did he

19   really meet him?  That's part of your deliberations.  If you

20   met with someone and it's a big drug transaction, you know

21   the name.  He knew Hassan's name.

22             Now, a very important point that I want to stress

23   is -- two points.  At -- at LAX when Ryan Wedding was

24   present, there is never one mention of drugs or anything

25   illegal in that discussion, not one.  The confidential source

1  could have easily brought up drugs or something, but there is

2  nothing, never one mention about drugs.  Okay.  That's a very

3  important point to be made.  If Ryan Wedding didn't know of

4  this plan, then when he arrived and there was discussions

5  about drugs, he certainly would have known by then, correct?

6  There was not one discussion of drugs.  The only other

7  conversation that you have is this about cars, okay?  And as

8  we'll get to, there's further discussions in the jail that

9  even Hassan told his mother he was coming down for a car

10  deal.  And we'll get to those jail calls.

11         This is what the evidence shows.  Forget what now,

12  which I indicated, even when I first did my opening of

13  opening statements way back ten days, he's Shifty Shirani.

14  He basically changes his story from basically what the

15  evidence shows -- what are we going to rely on?  The

16  evidence.  And I know the government is going to harp and say

17  yeah, look at the statements of Wedding, he obviously knew

18  this was a drug deal, he obviously knew, you know, money

19  wasn't supposed to be in my suitcase, it was only for drugs.

20  He's asking you again to cross the bridge just way too far.

21  He's making you make very far assumptions without proof in

22  the evidence, without -- without proof that's in the record,

23  the evidence.  Okay.  I'm going to show you proof from the

24  evidence.  We're going to piece it together.

25         The government is asking you to just believe them,

1    that Ryan knew that there's drugs.  We're the government,

2    we're not lying to you, we're not putting up a witness that

3    would lie, he knows it was drugs, just look at his

4    statements.  They're asking you to make all these

5    assumptions.  That's not proof beyond a reasonable doubt,

6    ladies and gentlemen.  They have to prove that, that he knew.

7    Knowledge is a very important element which you're going to

8    consider.  And did they prove knowledge that Mr. Wedding knew

9    that -- when he arrived at the LAX that he knew that he was

10   going to participate in some kind of a drug deal?  Did they

11   prove that to you beyond a reasonable doubt?  That's No. 1.

12   Do you firmly believe that based on some of those statements

13   that are said that he's basically parroting from Mr. Shirani

14   that he knew it was drugs?  That's the only statement that he

15   makes in this case except for that background recording.

16            Some of you, please, in these very, very unusual

17   cases will say you know what, he's just there with them, just

18   because he's there, he's guilty.  And I'm sure a number of

19   you -- and you're going to be instructed with the law are

20   going to say well, you know what, he was there, and just

21   because he's there with these people, he's guilty.  But the

22   instructions which you're going to be given indicates that

23   mere presence -- even if somehow during this conversation --

24   before I get to that, there was no evidence from Shirani that

25   he ever told in any discussion while they were in -- while

1    they were in Los Angeles, the question was never asked what

2    did you -- I asked what was discussed on the 13th before they

3    were arrested and Mr. Wedding sleeping -- and I'll get to

4    that point, that he was sleeping right when this supposed --

5    he knows about this big drug transaction about to happen, and

6    he's asleep; that goes to knowledge.

7            But what did they do when they were in Los Angeles?

8    What did they do when they were in Los Angeles?  Mr. Shirani

9    at least testified correctly on some of that.  They were in

10   Los Angeles, they had lunch, they met some friends, Boback

11   took them around in Hollywood, who showed them some real

12   estate, who -- then they went to a hookah lounge, had dinner,

13   the next day they went to a mall.  And the mall -- the day

14   that Mr. Shirani couldn't remember what happened and what

15   time he got there -- and I was trying to box him in on the

16   time because we have a receipt, which is in evidence, that at

17   one o'clock -- and let me get back -- let me just jump back

18   for a minute, for a moment.

19           I was trying to get him, what time did they get up

20   that day.  He said like 12:00.  And then he went to the train

21   station.  And when he went to the train station, he said he

22   took Ryan with him to exchange I guess the $17,000 or

23   something.  Now, Ryan wasn't there, but let's assume you're

24   going to believe him on that thing.  If he actually did pay

25   him $17,000, but the car could have cost $17,000.  But Ryan

1112

1    wasn't there.  There was a receipt that at one o'clock he was
2    there shopping by himself, okay?  He was shopping.  And he
3    testified that they went and had lunch afterwards after he
4    had done whatever business with Krapchan and Krapchan went
5    back to San Diego.  There was no surveillance then.  I know
6    this was kind of brought up.  There was no surveillance done.
7    This goes to that proof beyond a reasonable doubt.  They're
8    asking you -- please understand this -- they're asking you to
9    completely rely on this case and convict Mr. Wedding based on
10   the testimony of Shirani, the cooperating witness.  That's
11   what they're asking you to do here today.  This whole case
12   hinges on Shirani saying oh, yeah, we had a discussion, we
13   had a meeting in Canada, we came down here.  Even Shirani did
14   not say -- it didn't come out, but he never said that while
15   they were here in San Diego -- strike that -- well, when they
16   were in Los Angeles or San Diego that they ever discussed
17   drugs.  The question wasn't asked to him here.  It was asked
18   previously, but they never want to bring that up because
19   there was no discussion of drugs.  But here on the stand in
20   front of you, the question was never asked:  Did you discuss
21   drugs with Ryan Wedding.  So you don't even know if they have
22   discussions about drugs.  Silence.  The evidence you have --
23   and I asked this at the end because I didn't know -- what
24   were they discussing on the 13th, which is the day of the
25   bust, when -- when Mr. Wedding was in the room of Michael

1    Krapchan?  Now, he was sleeping for that hour.

2         Now, we did -- if you go back, Hassan Shirani drove

3    the car to San Diego with Mr. Krapchan.  There was no

4    evidence that there was any discussion of drugs.  There was

5    evidence that there were calls made in the Russian language.

6    Again, Mr. Wedding doesn't speak Russian.  So I think

7    Mr. Shirani indicated on direct by the government the first

8    day he testified that -- that -- that they were speaking

9    Russian with each other.  And in those conversations -- now,

10   I go back to even that first day when Ms. Johnson, the

11   translator, discussed this case.  She was asked -- you heard

12   the entire transcript of this case.  Did you hear anything

13   about drugs.  Answer was no.  She didn't even know what they

14   were discussing.  And that's her listening to the Russian.

15   There's no evidence Mr. Wedding speaks Russian.  So they want

16   you to deduce or jump that he knows that this is a drug deal.

17        And then, which just -- I almost fell off the

18   podium -- when Mr. Wedding is asleep, here's the big drug

19   transaction, all this money involved, supposed to be his

20   money, this and that, this thing is all coming together, and

21   he's asleep in a hotel room where Mr. Shirani is freaking

22   out, has migraine headaches that he says he doesn't generally

23   have.  Whose deal was this?  Who knew about this?

24        Now -- and the point that I wanted to make, there's

25   always some of you say well, even though I didn't hear any

1   evidence, I just -- I believe the government, I believe the

2   agents, even though there's no evidence, that he was there

3   with them and because he's with them, he's guilty.  And I

4   indicated you're going to get an instruction.  It's called

5   mere presence.  Do we have that mere presence?  And before it

6   gets pulled on the screen, before it gets on the screen, mere

7   presence, which you're going to get, says that just because

8   you're with people -- and this is -- this is -- this is the

9   thing -- you have to have done something, you have to have

10  had knowledge of this plan or this conspiracy and been

11  involved in it.  And the law knows that people do get

12  sometimes wrapped up in these incidents where they're just

13  there and they're stuck and they can't really get out of the

14  situation, and in -- and the law has an instruction, which

15  you've been given, that says mere presence, just because --

16  and why don't we just read it.  Mere presence at the scene of

17  a crime or mere knowledge -- even knowledge; you can even

18  know.  So even there's that one or two of you who are going

19  to say you know what -- that said, you know, I'm just going

20  to believe the government, and I'm just going to just believe

21  that he knew.  This is what the legislature, they know about

22  these incidents, it goes through a whole process, and they

23  have an instruction for the jury, which you -- which you each

24  have a duty to follow.  Again, this is just for the one or

25  two of you that say well, even though there's no evidence,

1  I'm just going to believe that he knew.  It says mere

2  presence at the scene of a crime or mere knowledge that a

3  crime is being committed is not -- so just because you know

4  about it, even if you have knowledge of it -- is not

5  sufficient to establish that the defendant conspired to

6  distribute cocaine unless you find that the defendant was a

7  participant, not merely a knowing spectator.

8          He had to have participated.  He had to have done

9  something.  What did he do here?  What did he do here?

10  There's evidence that money was hidden in his room.  Did he

11  get the money?  Was he sitting there guarding the money?  Did

12  he go to the bank and withdraw cash?  Did he do something for

13  this conspiracy?  Was there any evidence of what he was going

14  to get out of this other than being just tricked to come down

15  here and basically use his credit card and do this and his

16  meals are paid for?

17          Ladies and gentlemen, they're asking you to convict

18  a guy who did not know what was going on, who was tricked to

19  come down here.  He's a -- the most telling situation was --

20  I asked him about what happened in 1997, and he talked about

21  this stolen credit card, but they weren't -- they weren't on

22  me.  He's always thinking ahead.  Let's look at what happened

23  on the 13th, the day of the bust.

24          He knew that there's money in the room, and he put

25  it there.  And I asked Mr. Kalina about what was found on

1    Shirani.  When Mr. Wedding, you know, was woken up, they went

2    to eat lunch, was arrested, the key was in his pocket.  If he

3    knew there's money in there -- and Mr. Wedick testified they

4    needed to distance themselves from criminal activity.  If Mr.

5    Wedding knew there was money, why would he have the key?

6    Let's just look at this.  What did Shirani do, the guy that's

7    thinking ahead, the sophisticated drug dealer?  He leaves the

8    key in the car, okay?  And Mr. Kalina first said well, the

9    key was on his person, and then we had to correct him right

10   away, the key was not on his person.  He wanted to say that

11   it was, but it wasn't, it was in the car.  And this is going

12   to the mindset of Shirani and the mindset, the knowledge of

13   Mr. Wedding.

14          So the key was in the car.  And Mr. Krapchan was

15   given the key by Shirani.  He testified that he gave him his

16   key.  So who's in control of this car, okay?  And he drives

17   off.  So when, you know, they know this is a drug deal

18   happening, something can happen, there could be an arrest

19   made.  So Shirani, thinking ahead, he has no key on himself,

20   he knows this.  The room is not in his name.  He's already

21   got that covered.  And remember, this is a guy who's been

22   doing drug dealing for a long time and never been caught,

23   never been caught.  And now that he's caught -- and they're

24   going to show you evidence that he was basically -- we'll get

25   to those jails calls -- in a setup other individuals to lie

1    to corroborate his story.

2              Let me get back to the point about the key.  So the

3    key is in the car.  And when he leaves and he gets arrested,

4    how could you link me to anything?  The room is not in my

5    name.  He knows the money is there.  But Mr. Wedding, he has

6    the key in his pocket.  You know, obviously it he knew, he

7    would also try to distance himself.  Remember the rules of

8    game?  Rules of game?  Sophisticated drug dealers know to

9    distance themselves from criminal activity.  Krapchan knew

10   about it.  Hassan definitely knew about it.  Well, now, does

11   Wedding know about it?  Does he knows these rules of the

12   game?  He's got these charges, the hotel, with his credit

13   card.  He charges the room, the room, and the car with his

14   credit card.  He carries the key with him.  This just goes to

15   show knowledge.

16             The fact that he was sleeping when this was

17   happening.  This is in the evidence.  This is what you heard.

18   I did not take clips out of context and try to put them to

19   you and say see, fucking suitcase, money.  Everything's just

20   taken out of context to kind of have you believe that he's

21   involved in this.  You look at the evidence.

22             Now, as we know, the arrest happens on the 13th.

23   And I think Mr. Gutierrez brought up the fact about Shirani.

24   He thought he's okay as long as he's not participating, you

25   know, but he got arrested for this conspiracy.  He thought if

1  he can distance himself from this thing that he would be

2  safe, but he wasn't.

3            Now, I just jump back.  The first time at LAX, they

4  never arrested Mr. Wedding, right, to say that he was

5  involved in this conspiracy, right?  They're -- the

6  government I guess didn't have enough evidence at that time.

7  So they have a confidential source, okay, and that

8  confidential source -- this was explained by Mr. Wedick -- is

9  supposed to find out who are these new people.  What's their

10 role?  What's the involvement, okay?  And you have this

11 transcript in evidence, and you look at it.  Mr. Krapchan,

12 who is a conspirator, who did meet up with Mr. Shirani and

13 Hassan and knew his name and everything, was asked by the

14 confidential source that he's now known for like two years

15 and they trust each other, they went in the same car and were

16 driving back to San Diego, and the confidential source is

17 doing his job, okay?  He's instructed now, find out who's

18 involved in this.  You know what's going on, this is kind of

19 your deal.  And what does he say?

20            I'll play -- I'm not going to play the whole clip,

21 but I will show you the transcript and you're going to get

22 it; it's Exhibit L.  I'm going to put it up for you.  You've

23 seen it a number of times.  And the question I have for you,

24 aside from Ms. Lambert, who was a very difficult witness, who

25 wouldn't even give basic information that Hassan said that he

1    used two cell phones not in his name, he did identity theft.

2    Think about this for a minute.  He did identity -- I mean and

3    I asked Ms. Lambert.  It was right there on a transcript.  He

4    did identity theft, not only as one, but two individuals and

5    was doing drug transactions using someone else's name, okay.

6    Using someone else's name.  If they didn't catch him -- and

7    there was something involving these phones -- those four

8    individuals would have been investigated for drug

9    transactions.  And as you know, those phones were full of

10   drug -- and I'll get to those phones.  You heard it.  It's in

11   evidence.  You get to look at what was going on.  And I have

12   to discuss -- but let's look at the 10th.

13            They arrive at Los Angeles.  Some comments are

14   made.  There's some confusion as to, you know, things didn't

15   work out the way, they had their original plan.  And the

16   confidential source, after Krapchan and them meet and all

17   that, with Hassan, does his job.  And he asks -- he needs to

18   find out who's involved in this.  Let's just read it.  This

19   is in evidence and you have it.  Let me get a little water

20   because I've got to read.  I'll start from the beginning with

21   the entire thing.  Confidential source, yeah.  Krapchan, you

22   had time to notice that they are -- they are calm people.

23   Confidential source --

24            THE REPORTER:  Mr. Denis, I'm sorry.  I can't hear

25   you with your back to me.

1     MR. DENIS:  I'm sorry.

2     THE COURT:  Everyone can see it.  I think the court

3  reporter is just asking you to speak up a little bit so she

4  can report what you're saying.

5     MR. DENIS:  All right.  Yeah.  Krapchan, you had

6  time to notice that they are calm people?  Confidential

7  course, no.  This -- I don't have anything against that.  The

8  second one, that -- what's his name, Rick or Ruck or --

9  Krapchan, he doesn't even know his name after the second

10 meeting, Bri or Brian, Brian, Bri, Ri.  As far as I

11 understood, he's the driver, right.  And Mr. Krapchan says

12 he's not the driver, he's not the driver.  Then the

13 confidential source, doing his job, asking to find out the

14 roles, but he's not due a share.  And Mr. Krapchan tells the

15 confidential source about who was involved in the deal, he's

16 not due a share.  He's hired to work, hired to work, so to

17 speak.  I think Mr. Krapchan knew that they were going to use

18 this guy to kind of bring money in.  He says hired to work,

19 hired to work, so to speak, accompany, help.  Okay.  Hassan

20 is the main person.  Hassan is the main person.  The

21 confidential source, doing his job, which an informant is

22 supposed to do, to find things out for the FBI.  Hassan is

23 the main person.  Then the confidential, how much money did

24 Hassan contribute?  Krapchan, Hassan contributed -- his are

25 four kilograms, Hassan's four to five kilograms, so the

1    confidential source confirms.  Five kilograms Hassan.  The

2    rest is -- the rest is yours, right.  Krapchan, no, four are

3    ours, plus like your own -- and you heard evidence that the

4    confidential source was supposed to get one, plus own five --

5    sorry, that's what the confidential source says, plus own

6    five, and Mr. Krapchan, plus own five, that's ten.  Half

7    only.  Hassan's, yours, and ours is only half, about ten.

8    And the rest?  And Mr. Krapchan says and the rest is his

9    brother's.  And the confidential source says who, Hassan's?

10   And Mr. Krapchan confirms Hassan's.

11           After this meeting after all this confusion,

12   confidential source has to clear up who's involved in this.

13   After all the recorded calls from that 10th, the only

14   testimony -- and I asked -- Ms. Lambert was a very difficult

15   witness -- was, you know, did anything change or did Mr.

16   Wedding's involvement -- or there was nothing that showed his

17   involvement.  They never showed you any clip, they never

18   showed you anything -- she just said -- go there again -- oh,

19   they're was a transcript that shows he was more involved.

20           Boy, if that were true, I would have assume you

21   would have seen it from the government.  I looked for it.  I

22   know it's not there.  There may have been this discussion

23   about a torpedo, and Mr. Krapchan said there's no torpedo.

24   There is no transcript from where the government learned from

25   the confidential source who is involved and what's the shares

1    of everybody.

2              Based on that transcript, we know from the

3    evidence -- that's all I'm asking you to do, not assumptions

4    and jumpings like Mister -- that the government wishes for

5    you to believe.  We see that Krapchan's involved.  We know

6    Hassan is involved, and he comes up here to try to minimize

7    his role, and again, he testified he just wanted to get out

8    of this drug dealing.  You're going to show -- I'm going to

9    show you jail calls where he's still doing it.  He didn't

10   learn his lesson.  He's still doing drug dealing.  You don't

11   have all the calls.  I just gave you select calls.  I didn't

12   want you to have you here for a hundred more clips and a

13   hundred more days, so I just got the select.  He was still

14   doing drug deals.  Okay.

15             So we know -- we know Michael Krapchan, we know

16   Hassan, and we know his brother was involved.  And they asked

17   about Brian or Ryan or Bri, Ri -- we know who that is, Ryan

18   Wedding -- is not involved, is not due a share.  That had not

19   changed.  That had not changed.  Then you get to -- well, and

20   like I indicated, you heard on the 13th, even as of the day

21   of the bust, that Ryan was asleep.

22             Now, there were phone conversations between the

23   confidential source and Michael Krapchan where it was

24   reconfirmed that Hassan is the boss or the main guy or -- and

25   I'll show it to you.  I'm not going to be able to play the

1  clip again, I'm just going to take you to the calendar of
2  events to help you.  This was a clip that you heard that --
3  on the 13th right before the arrest, the clip was that it was
4  confirmed that Hassan is the boss.  But from the 13th back
5  through after this, there was no discussion that Mr. Wedding
6  had any knowledge or that any -- or this alleged plan had
7  changed to get Mr. Wedding involved in it because if there
8  was that transcript, you would -- you certainly would have
9  been shown it I believe.  The only transcript -- they keep
10 trying to play over and over in different clips -- is the
11 LAX.  That's the only one that he -- you know, it's not --
12 it's not in my fucking suitcase, we have to go to a friend
13 and pick it up.  Mr. Wedding's is trying to calm down a very
14 agitated -- even Mister -- even Mr. Shirani says they call
15 him the crazy person, they call him the crazy, crazy guy.
16 And that was the only meeting that they had with him, and
17 they -- Mr. Shirani called him the crazy man.  He was afraid
18 of that man.  So Mr. Wedding was just trying to calm that
19 situation down.  And you'll hear the voice if they play the
20 clip -- and remember, it's their burden, not mine -- that he
21 calmed the situation down.  And again, when they do play the
22 clip, pay very attention even if he shows the transcript of
23 this overlapping where the two Russian individuals are
24 talking to each other and Mr. Wedding appears to be kind of
25 talking in thin air and nobody's paying attention to what

1    he's really saying.  They know he's nobody in this.  They

2    don't even know what the plan was.  He's nobody in this.  So

3    they don't even really pay attention.

4            I'm going to play for you -- oh, we're going to go

5    over briefly the jail calls.  You recall Mr. Wedding is under

6    the impression it's a car dealing, that had to deal with car

7    dealing.  You have Shirani's call on the 11th that dealt with

8    cars.  Mr. Wedding overheard.  And now you have -- after the

9    13th they get arrested -- and I'm certain the government --

10   there was a -- a tape or a transcript that did not get in;

11   you're not to consider it -- basically on the 13th --

12           MR. GUTIERREZ:  Arguing facts not in evidence --

13           MR. DENIS:  I'm not discussing that.  I'm not

14   discussing that call.  I withdraw it.  I'm not discussing

15   that.

16           THE COURT:  Well, disregard any comment by counsel

17   that there was evidence that you should be aware of that did

18   not get in; that's not an appropriate observation, ladies and

19   gentlemen.

20           MR. DENIS:  Okay.  There is clip EE -- I don't want

21   to show you a call that was not permitted.  This was the

22   June -- there was a call, those of you may recall when we

23   went over it -- and we'll just read the whole clip into the

24   record -- Man 1 and Woman, which we established was the

25   mother.  I don't like it here.  And Woman huh.  And Man 1

 1    just Hassan.  I don't like it here.  I know that.  Nobody

 2    likes it.  Afraid so that the wolf in the desert does not

 3    mess with them.  And then the woman, you know, kind of very

 4    sad in the recording -- and we may play it for you, try to

 5    get through this quicker -- my dear, what kind of car dealing

 6    was it that you became so involved in this mess.

 7            So on June 29, 2008 -- and they were arrested on

 8    the 13th -- there's no call from Hassan to mother or brother

 9    discussing car dealing.  The discovery came out afterwards,

10    so right there, it was like a needle in a haystack.  Hassan

11    even told his mom -- well, of course he's trying to conceal

12    what he's doing -- says that he was going down for a car

13    dealing or some car dealing, and she is the one that says

14    well, what kind of car dealing was it that --

15            THE REPORTER:  Mr. Denis, I'm sorry.  I can't hear

16    you.

17            MR. DENIS:  I'm sorry.  Where she says my dear,

18    what kind of car dealing was it that -- that you became so

19    involved in this mess.  That's evidence.  That's evidence.

20    That is from the clip that was admitted to you, shown to you.

21            Now, again, that is for the limited purpose.  When

22    I asked Mr. Shirani did you tell your mother that you were

23    doing a car dealing, he said no.  I said did you tell your

24    brother that you were coming down here for a car or some car

25    dealing.  He said no.  I said did you tell anyone you were

1    coming down for a car dealing.  He said no.  And his mom

2    knows.  And there's no call before that where he told about

3    it where his mom knows or was told by him that he was coming

4    down for some car deal.

5            I'm certain the government is going to try to come

6    up here and try to explain away this call by making argument,

7    no facts to back it up, and just say oh, he must have heard

8    it from the discovery, he must have gotten information that

9    he was car dealing.  No evidence has been given to you that

10   discovery was given at that time, that after they were

11   arrested, that discovery was given or that they had lawyers

12   at that time.  That was not shown you.  And you have to take

13   that statement.  He will explain it away, I'm certain of it,

14   he's going to try explain it away.  Please view that argument

15   by counsel with extreme caution, okay?

16           And as Mister -- and I'm not going to go through

17   all the clips -- Mr. Shirani admitted that he was doing drug

18   dealing in the jail, discussing girls, after -- he admitted

19   that he mentioned girls, and I don't want to -- we heard it

20   yesterday.  I'm not going to run it all through again.  But I

21   am going to go through the most egregious thing that he did.

22           We know he talked about car dealing.  We know that

23   the government promised him a reduction in points if he

24   testifies.  He came up here, he said well, I wasn't promised

25   anything.  Probably show it to you.  I wasn't promised

1    anything.  I'm just doing this because I want to -- I want to

2    stop doing this business, this career drug dealer criminal

3    who's still doing drug dealing in jail.  He was asking his

4    brother to go collect money for him in drug dealing.  It's

5    all on the jail calls.  The government had this, the

6    government reviewed them and still called this guy on the

7    stand to testify against Mr. Wedding.

8            And the most egregious part was where Mr. Shirani

9    in a proffer session as it came out testified that he went to

10   Ryan's house and picked up a box of money the size of

11   whatever box was there that day -- I think you all recall

12   it -- and got the box from Ryan at Mr. Adrian -- or Adrian

13   was at the house.  And you heard stipulated, agreed-upon

14   testimony that Adrian would come here, stipulated by the

15   government, okay, that's very important for you to

16   understand, agreed to by the government that Adrian Williams

17   would have come up here and testified; so in fact it's as

18   though he did under oath testify to you that that's a lie.

19   He never came and picked up any money from Mr. Wedding, and

20   No. 2, any money, and didn't see it of course, and No. 2,

21   then Shirani out of the blue comes up with another thing

22   that -- first he says he gave his brother a thousand dollars

23   cash to buy the two tickets and a phone, and he said his

24   brother paid it on the credit card and we saw that wasn't

25   true, and he said he got that money from Adrian.  And the

1    stipulated testimony was he did not pick up a thousand

2    dollars or any money or give any of that money to Hassan.

3    That was, again, stipulated testimony contradictory of Shifty

4    Shirani.

5            And now to corroborate -- I didn't even get to --

6    well, my ADD kicked in.  I'm sorry.  The most egregious was

7    where -- and I'm going to show you those calls -- where

8    Hassan and his brother conspired to get a guy named Hamid --

9    and we're going to go through those calls; those are

10   important calls -- because -- let me just back up.  At a

11   proffer session I asked Mr. Shirani, you said there was no

12   way to corroborate it, and he said right, there was no way,

13   and they asked me to take a lie detector, but he never took a

14   lie detector.  He needed to corroborate this story about him

15   picking up the money from Mr. Wedding which, No. 1, is now

16   contradicted of course, stipulated to by the government; and

17   No. 2, let's look at the jail calls.  Let's see -- and I

18   asked him did you conspire, did you try to get Hamid to

19   corroborate or pay him to corroborate for something or did

20   you and your brother or your brother, and he said no on all

21   of these.  Well, let's look at the jail calls.

22           And if we have time, I'll just go through the drug

23   dealing in the jail.  Right now the most egregious conduct

24   is -- I'm going to show you -- okay.  Going to look at what

25   is July 24 -- double check on my pages -- July 24, 2008 call.

 1   And the translator -- and I'll read it for the record for you

 2   individually as loud as I can.  Ring, ring, Man 1, hello.

 3   Man 2, hello, Hussein.  Man 1, hello, hello, Hussein.  I

 4   adore you, how are you, I adore you, thank you.  What's going

 5   on.  I'm with Hamid, and Hamid said that in his opinion there

 6   is no problem at all.  Yeah?  Yeah, there's no problem at

 7   all.  He's here himself.  You can talk to him if you like.

 8   No, no, no.  Yeah, he's here himself.  Hamid said with your

 9   permission anything you two brothers need, I will do it, I

10   will do for you, but all he has to do is inform the lawyer,

11   right?  Maybe he needs to come here himself, will come,

12   that's no problem.  Has this problem been solved?  Yeah, it's

13   been solved.  So it's been solved.  Yes, it's been solved.

14   Did he give you the name and number?  What name and number?

15   He's supposed to give you a name and number.

16              Now we'll look at 30th.  That previous call was the

17   24th.  I'll just skip the first part and get into it.  Man 1,

18   nothing much.  Even if I put my life on the line, I will do

19   everything and anything to get you -- and this is a

20   conversation between Hassan and his brother Hussein --

21   nothing much.  Even if I put my life on the line, I will do

22   everything and anything to get you -- to get you out.  Don't

23   worry.  I adore you.  Man 2, Persian expression.  We planned

24   a lot of things, but they haven't called him yet.  Someone

25   called for me, but someone called Hamid but one more -- I

1  mean two more people are going to call him, and then I might

2  pick him up and bring him over there.  Oh, okay.  I vaguely

3  squeezed him, Persian expression, you know how he is, yeah,

4  we went out for a ride and I told him that this is -- that in

5  this situation they don't -- they won't involve you but this

6  is the Koran truth and you have to go and tell.  He said that

7  I will also do anything for Hassan.  Man 2, hope his hand is

8  not in plane -- pain.  Man 1, hope his hand is not in pain.

9  He's important to us.

10          Now we're going to the July 31 call.  This is a

11  conversation between Hassan and Hussein.  We only have one

12  more thing -- this is, again, the July 31 call between Hassan

13  and Hussein -- we only have one more thing to do, and it is

14  to prove that the money is his money.  He said if you can

15  prove this, I said how -- how we can prove it, our guy who

16  went with them and took it and took the money and the place

17  he delivered the money is known, and it is known from where

18  they got the money, it is quite clear this is the story.

19  Yes, Hamid and I went and took the money.  Pardon me?  I'm

20  saying Hamid and I took the money, and I took Hamid home.

21  Yes, you took him home.  And Hamid there where you delivered

22  the money.  No, Hamid was not there.  Oh, oh, Hamid was not

23  there.  Anyway, he said he went there and took it in a box.

24  And tell you what, this is what the whole story I saw and I

25  will come and say it whenever you want me.

1           And these are -- these are the clips from recorded

2    calls where Mr. Hussein basically asks Hamid to come and say

3    this story so that he can corroborate or prove.  When the

4    question was asked could that be corroborated and he said no,

5    that they wanted to try to fix this.  So they can get a

6    witness or someone, who did not come here and testify, okay.

7    The government is aware of these recorded calls and did not

8    bring them, and there is nothing to corroborate that.  And

9    again, they agreed and stipulate to the testimony that

10   someone would say that is not true, they did not pick up the

11   money.

12          There is another call that dealt with a drug

13   dealing, but there's one statement in there that's important.

14   I'll just play that just to -- this is clip HHH, clip 3, and

15   I'm just going to go through that very briefly, and this is a

16   conversation between a third party and Hassan.  It starts Man

17   1, fucking jail, just -- just take care of yourself, Hassan.

18   It is very important to have money in your account because

19   money you can buy people.  And M-2, I know, I know.  And he

20   says Hussein can't do it.  If Hussein can't do it, tell me to

21   do it for you.  Okay.

22          And, again, to summarize, we discussed the car

23   dealing from the mother, the Shirani calls, the fact that

24   Hassan was trying to put up a fake witness to corroborate his

25   version, the fact that Hassan continued drug dealing while he

1132

1    was in jail, and he still maintained contact and relationship

2    with other drug dealers when he was still in jail.  We

3    discussed the rules of game, that you don't use your credit

4    card if you're involved in drug dealing.  You have to

5    distance yourself.  That was established.  Krapchan knew the

6    rules of the game.  Hassan obviously knew the rules of the

7    game.  And in exchange for his testimony, he wasn't charged

8    with these additional conspiracies that he was involved in.

9    That came out in the testimony.  He wasn't charged with

10   aggravated identity theft or some identity theft.

11            There was no contact with Mr. Wedding after the

12   June 10 LAX call.  He never met with Krapchan, he never met

13   with Yuri.  He just came from LAX and got out of that

14   situation and never had any contact with them until the day

15   of the bust and he went to San Diego, and when he was in San

16   Diego, he was just sleeping in the room and then was

17   arrested.  Nothing changed from the 10th -- from that who's

18   due a share or any proof that he had knowledge of a drug

19   deal.  Hassan never said he discussed drug dealing in the --

20   with Mr. Wedding when they were in Los Angeles.  The

21   government had plenty of opportunities to ask him.  I wasn't

22   going to ask a cooperator who's just making stuff up in thin

23   air.  The government could have asked him, and they didn't

24   ask that.  They did ask in a previous proffer and if he had

25   said something that he did, that obviously would have come up

```
 1   here, but he never did, never asked him that because the
 2   answer would have been no.
 3            Again, there's no calls, no recorded calls.
 4   Obviously members of the conspiracy -- and Mr. Gutierrez
 5   liked to draw his little diagram -- there would be calls.
 6   There is a call obviously between Hassan and Yuri, there's a
 7   number of calls between Yuri and -- Yuri and Michael
 8   Krapchan, but there's not one single call on Ryan Wedding's
 9   phone.
10            That leads me or brings me to the following.  I put
11   in the phone log, the phone records -- I did it -- for you to
12   look at and review.  If this is a drug dealer or somebody
13   involved in drugs, you would see stuff in the phone, the text
14   messages.  They even do a sync, they go deep in the memory of
15   the phone, they have a extraction method.  Everything is
16   there.  And I gave you the whole thing to look at.  I'm not
17   hiding -- there's a couple blackouts with some explicatives
18   (sic) where he's a little bit -- makes some comments with
19   females dealing with a sexual nature, which I didn't want to
20   offend anyone, so we blacked those out.  But other than that
21   you have everything.  And so if you see a couple of
22   blackouts, it's not something bad, it's just something
23   dealing with women might be inappropriate and I didn't want
24   to offend you, so that was agreed to be blacked out.  But
25   other than that you have everything.  You can scour it.  And
```

1   you have Hassan's phone records, full of drug dealing having

2   deals being done.

3          Now, Mr. Gutierrez said so why did I bring up the

4   dentist.  In Hassan's phone the text message indicates -- can

5   I get that?  In Shirani's' call, in his text messages you're

6   going to see reference to the TP, the transport, and when

7   that transport is supposed to come.  And we had Mr. Shirani

8   read the majority of the part of the call.  And this is giant

9   big set, and you'll have Ryan's calls and call logs and who

10  he knows.  You scour through that, ladies and gentlemen.  I

11  put that in for you so you could look at.

12         THE COURT:  Counsel, let me see you both at the

13  side of the bench.  Ladies and gentlemen, I just want to

14  discuss scheduling and when we're going to be taking a break,

15  so we'll be with you momentarily.  Please remain in the jury

16  box.

17         (Unreported bench conference between the Court and

18          counsel out of the hearing of the jury.)

19         THE COURT:  All right, ladies and gentlemen.  We

20  are going to allow Mr. Denis to complete his argument, which

21  will probably be on the order of another 15 minutes or so,

22  and then what we're going to do is we're going to take an

23  extended recess; we're not going to take a full lunch recess,

24  and I'll tell you how long the extended recess will be once

25  Mr. Denis completes his argument, and then we'll hear the

1   rebuttal argument of the government after the recess.  Okay,

2   counsel.

3               MR. DENIS:  Thank you, your Honor.

4               THE COURT:  Thank you.

5               MR. DENIS:  Getting back to the phone calls, you'll

6   have Mr. Wedding's phone calls, and we went over some of the

7   text messages with Mr. Shirani, and he indicated the

8   transportation that was supposed to be coming to pick up

9   these drugs were coming the following Tuesday.  And

10  Mr. Shirani also testified that he was extending his stay.

11  And on the 13th as well, it was confirmed -- there was an

12  earlier reference to the transportation coming the following

13  Tuesday or picking up a load and coming down.  And on the

14  13th -- on the 13th with Blondyy, the ride will be I think

15  Monday -- remember, Blondyy was in Canada -- ride will be in

16  Monday or Tuesday, bro', I'm going to find out now.  And

17  you'll be able to look through those, the text messages, on

18  your own.

19          So Mr. Wedding is scheduled -- and, again, this

20  goes to role -- is leaving.  They did their little vacation

21  going here and there, sightseeing, and hookah lounges,

22  restaurants, and he's going back on Saturday, the 14th.  His

23  ticket is confirmed for that.  He has to go back.  The reason

24  I brought the dentist -- he had a very major, serious dental

25  surgery that he had to go to.  There is no way he would have

1    extended his trip and stayed here to conclude or participate

2    in their drug transaction.  That's why he had the dentist

3    here to testify he had a very serious appointment he had to

4    go to.  Okay.  And Mr. Shirani testified that he would remain

5    and extend his trip, and his brother was going to be coming.

6    Okay.  And as I've shown through the record, this is the guy

7    who has a stake in this -- in this thing, in this drug

8    transaction.

9             Again, there was a lot of statements made by -- I

10   just don't want to repeat myself.  Ladies and gentlemen, when

11   you view the evidence and you read the jail calls, you

12   understand a little bit more of what was going on in this

13   case.  I know it was a long closing.  You had an idea to --

14   you've seen the family.  You hear -- you heard testimony that

15   Hassan was still doing drug dealing or having this --

16   Mr. Shirani admitted that -- Shirani had his brother

17   collecting drug money for him and was doing -- was testifying

18   and cooperating with the government to get points.  And

19   basically he is arrested and has been charged for a very,

20   very serious crime, and that very, very serious crime is what

21   Mr. Wedding has been charged.

22            And basically if -- as I said, if Shirani is able

23   to convince you that he, this career drug criminal, was also

24   implicated in 2001 or '97 about -- there was a murder that he

25   was connected to, which he said he was not charged with, this

1  career criminal that got away, escaped from the law, if he's

2  able to convince you or you believe his testimony, which was

3  full of holes and inconsistencies, and he is able to get a

4  conviction against Mr. Wedding, then he's basically going to

5  walk.  He lied to the grand jury.  He cooperated with the

6  government, giving information that could not be

7  corroborated, made a whole bunch of statements that the

8  government wanted to hear, testified here, and basically

9  wanting to be of substantial assistance based on his plea

10 agreement, and if he's able to do that, ladies and gentlemen,

11 for all the things that he did, he's basically going to walk

12 out of jail and praise his God that he was able to continue

13 to evade law enforcement and basically blames a dupe, an

14 innocent person, okay?

15         He covered his tracks.  The evidence is clear.

16 You've seen a number of things and you're going to review the

17 evidence, and when you have reviewed the evidence and applied

18 your logic and common sense, but based on what you've heard

19 about how sophisticated drug dealers use individuals to trick

20 them to cover their tracks, you cannot and will not convict

21 the guy that's been tricked.  And I'm going to ask you to

22 find for a verdict of not guilty to the charge of conspiracy

23 to distribute cocaine.  The government has not met their

24 burden, has not shown you agreement, but has actually showed

25 you the lack of it.  Okay?  Thank you, ladies and gentlemen.

1   THE COURT:  Thank you, counsel.  Ladies and

2   gentlemen, we're going to take a break, but before we do

3   that, I just need to mention a couple of things to you.  The

4   instruction that was put up on the board that you were asked

5   by counsel to see, instruction No. 20 entitled mere presence,

6   it was not -- it was not a complete instruction, and so when

7   you do have your instructions, you need to look at that

8   carefully, as I'm sure you'll look at all the instructions

9   carefully.  Part of that instruction was left off.

10   And another thing I wanted to mention to you is

11   there is absolutely no evidence before you that Mr. Shirani

12   is going to walk and that any verdict you reach is going to

13   in any way dictate whether Mr. Shirani walks or he doesn't

14   walk.  That is not up to you, and it's not up to the

15   government, it's not up to Shirani.  The Court makes those

16   types of determinations, and you are not to consider that.

17   What you can consider is set forth in the instructions and

18   how you may and should deal with Mr. Shirani's testimony with

19   extra caution.

20   And, finally, I wanted to briefly mention to you

21   that the reference by counsel at the end of his argument,

22   praise God, which he attributes to Shirani with his hands

23   upheld in a prayerful way, as we've seen many Muslims do in

24   recent times, should in no way prejudice you for or against

25   anyone in this case because of any identifiable group they

1    belong to, be it religious or otherwise.

2           We are going to break until one o'clock.  It's

3    12:15 at the present time.  So it's going to be a shortened

4    lunch or a long recess, any way you want to do it or consider

5    it, but I do want to give you some time to have a bite to eat

6    if you wish to do so, then come back after a shortened lunch

7    hour.  We'll hear the rebuttal argument of the government; it

8    is not going to be lengthy from what has been estimated here

9    at the side of the bench.  And then we will at least allow

10   you to get your bearings in the jury deliberation room,

11   perhaps elect one of your number as your presiding juror, and

12   then let you go earlier.  We'll be letting you go before two

13   o'clock.  And so obviously you're not going to reach any

14   verdict at this time.  You'll come back on Monday to commence

15   your deliberations in earnest.  So that's the schedule for

16   the remainder of today.  So remember the admonition.  The

17   case is not before you yet.  We'll meet at one o'clock and

18   hear the rebuttal argument of the government and then

19   continue on.  Thank you.

20      (There was a break in the proceedings.)

21           THE COURT:  Good afternoon, everyone.  Everyone is

22   present.  We are ready to conclude then with the arguments at

23   this time.  Mr. Gutierrez, do you wish to proceed with your

24   rebuttal?

25           MR. GUTIERREZ:  Yes, your Honor.  Thank you.

1    Counsel for the defendant had a lot to say about the

2    evidence, but one thing he said I want to draw particular

3    attention to was the fact that counsel conceded that there

4    was a conspiracy.  And he was right when he told you that the

5    only thing you have to do now is determine whether or not Mr.

6    Wedding was a knowing member of that conspiracy.  The defense

7    has already done a lot of the work for you with that

8    concession, so please keep that in mind.  There was a

9    conspiracy.  Is there enough evidence presented to you by the

10   government to prove that he was a knowing member of that

11   conspiracy?

12          Shifty Shirani.  Ladies and gentlemen, I urge you

13   not to be distracted by such terms.  This isn't high school;

14   it's federal court, and if Shifty Shirani holds some weight

15   for you, by all means -- name calling is important as it is

16   to you not because of what any one party has said, but just

17   keep in mind that what we're here to do is talk about the

18   evidence.

19          And counsel was right about one more thing:  Don't

20   speculate about evidence that wasn't presented.  Counsel

21   repeatedly indicated that the government asked you to

22   speculate.  Ladies and gentlemen, the government's not asking

23   you to speculate.  We would like you to pay close attention

24   to the recording of Mr. Wedding at the airport where he's

25   talking about the money for the drug deal, but that's not

1141

1    asking you to speculate.  It's played right there over and

2    over again.  You will have access to it in the back in the

3    form of a transcript.  If not, it can be played for you

4    again.  That's not asking you to speculate.  What's asking to

5    speculate is what counsel did on five occasions when he told

6    you that Ryan thought it was a car deal.  Just because Mr.

7    Denis says that five times doesn't make it true.  The state

8    of the evidence before you is that there is no evidence

9    before you indicating that Ryan Wedding thought it was a car

10   deal; there's no evidence from any of the witnesses who

11   testified that he was told that, that he believed that, or

12   the state of the evidence is such it would be asking you to

13   speculate.  And just because counsel would like it to be true

14   five times over doesn't mean it's true.  You can only

15   consider the evidence that was provided to you, and there is

16   no evidence regarding what he thought in the state of the

17   evidence that's before you.

18          Using terms like very possible, which counsel did

19   twice, very possible; asking you to deduce information four

20   times, deducing and telling you that something's very

21   possible is asking you to do that which he asked you to not

22   to do.  You can't speculate, ladies and gentlemen.  You can't

23   deduce something that's not there.  You can make inferences

24   from testimony that's been presented, but, for example, when

25   it was very possible that Ryan was driving two cars during

1142

1    the phone call, why is that very possible?

2             Asking you to speculate about the jail calls.

3    Hassan Shirani's mother thought Hassan was doing some car

4    dealing; that's what she thought.  And Hassan said he never

5    told her that.  So counsel wants you to make the speculation

6    that Hassan Shirani is the person who told her that.  There

7    are a number of reasonable inferences or -- that can be made.

8    Maybe it was the brother who told mom, trying to explain why

9    Hassan is in jail in the United States.  There are a number

10   of other explanations, but asking you to speculate as truth

11   and proven that Hassan was the one is speculation.  So,

12   ladies and gentlemen, please, just look if there's evidence

13   to support any claim that you consider.  That is all the

14   government's asking you to do.

15            I think Krapchan knew they were going to use Ryan

16   Wedding.  We appreciate Mr. Denis's opinion, but there's no

17   evidence to support that.  Ladies and gentlemen, the evidence

18   we ask you to consider is that which we showed you on the

19   board earlier, the recordings, Mr. Wedding's conduct, and, if

20   you like -- you don't need to because there is enough

21   evidence without it -- Mr. Shirani.

22            Counsel already also alleged that Mr. Shirani lied

23   before the grand jury.  We were all here and heard the same

24   evidence, ladies and gentlemen, and that never came up from

25   any witness who testified before you.  Why would you be asked

1143

1  to consider that?  It's not in evidence.  So, ladies and

2  gentlemen, the most we'd ask you to do with that information

3  is to not consider it because it's not before you.

4          Unfortunately, ladies and gentlemen, there were a

5  lot of instances on both sides where objections were made and

6  the Court ruled on those objections, but there is a specific

7  jury instruction that you are not supposed to take that into

8  consideration.  And we'd ask you to listen to that jury

9  instruction because even though there were a number of

10  objections and information that maybe some people would like

11  to come in, there are rules about what can come in.  And it's

12  not up to me, the government, or defense to decide what comes

13  in; it's up to the judge.  And the rulings were a result of

14  the judge's decision, not the government's, not the

15  defense's.  And you're to adhere to the rules and listen to

16  only the evidence that was presented.

17          More speculation.  This whole phone call about

18  Hamid.  First of all, the government never asked you to

19  consider Hamid.  It was brought up on cross-examination.  And

20  then to impeach that which was brought up on

21  cross-examination, the defense gets a number of jail calls

22  about Hamid.  First of all, if Hamid had anything to do with

23  this, the judge has already told you Hamid has only to do

24  with Shirani's credibility, okay?  So even if this Hamid

25  thing were true and you want to completely discount Shirani,

1144

1    go ahead.   There is enough evidence to support a conviction.

2    But I urge you, if you really are struggling with Shirani,

3    look at those Hamid phone calls.   There's nothing wrong with

4    them.   There is nothing facially criminal.   Mr. Shirani was

5    asking for his brother's assistance to have a witness to some

6    conduct he thought would help him.   His brother contacted

7    that witness and secured that witness's cooperation.   Is that

8    illegal?   Is that wrong?   But whatever.   Read it for yourself

9    and make your own decision because even if it was true, it

10   goes to Shirani's credibility.

11       Calling Shirani a career criminal.   What do we know

12   about Shirani?   He is an admitted drug dealer who has been

13   doing drug dealing for a very long time.   He made no qualms

14   about that.   Counsel said that he went up there and minimized

15   his role.   Ha, ha, ha I believe was the quote.   Mr. Shirani

16   didn't try to minimize his role.   If you look at his actual

17   testimony, no, I -- my part was transporting the money down,

18   delivering the cocaine back, and making the introduction.   I

19   never said I had a small part.   I just said I had no stake in

20   the cocaine.   Mr. Denis asked were you the main person in

21   this deal.   I was the main facilitator in this deal.

22       So he wasn't trying to make light.   He wasn't

23   trying to say shift all blame on Mr. Wedding.   He was

24   describing to you that he had a role, an important role, but

25   that he said because he wanted to get out of this, he was

1   telling what he thought, what he believed to be the truth.

2         Now, this discussion -- the judge has already

3   admonished you about how to consider this walk-away.  Even

4   Mr. Shirani has said it's the judge's decision.  So, ladies

5   and gentlemen, if you want to attribute any malfeasance on

6   the part of the government because defense counsel would like

7   to say we did something inappropriate, that's your choice,

8   but in this situation, Mr. Shirani said it's the judge who

9   was going to make the determination.

10        Counsel went to great length to make this case

11  about Mr. Shirani.  And what explanation -- do you recall

12  when I finished my opening closing argument, I asked you to

13  consider that statement, the statement where Mr. Wedding is

14  speaking to the CS, and what was the explanation by the

15  defense?  There were two.  Did you get them?  That he really

16  wasn't speaking to anybody, he was just speaking to thin air.

17  Okay.  Even if he's speaking to thin air, it was recorded.

18  So if you're speaking to thin air, why would you lie?  Why

19  would you make something up?  Is that a good explanation?

20  No.

21        What was the second explanation you heard in

22  argument?  He was just trying to calm things down.  If you

23  don't know about the plan, how was it that you're able to use

24  the plan to calm somebody down?  I don't need to play it

25  again.  I'd be happily -- I would happily do it.  He said we

1   have to go get it.   It's -- obviously, I'm not going to put

2   it in my suitcase.   So, ladies and gentlemen, there has been

3   no explanation because you know what?   There is no innocent

4   explanation for that statement.

5            Now, you can try to have all the attention drawn to

6   Mr. Shirani and say he's an evil, bad person and because the

7   government decided to use him, Mr. Wedding should be able to

8   be absolved of all criminal wrongdoing.   Is that what you

9   believe?   Just because a witness who openly talked about his

10  past drug dealing came before you, do you think that

11  automatically equates into a not-guilty verdict?   Mr. Shirani

12  stood before you, and the reason you're allowed to see him

13  testify is you can watch his expressions, you can gauge his

14  body language, you can listen to what he says and determine

15  for yourself:   Was he credible?   You are the lie detector.

16  You are able to see if you believe him, and if you don't,

17  that's fine.   But even if you do or you don't, how did the

18  defense explain in their argument the statement?   There was

19  none.

20           And much of the defense was on how Mr. Shirani was

21  sophisticated, and he tricked the defendant in to coming

22  down, and he -- he removed himself by having Mr. Wedding pay

23  for the hotel.   Okay.   First of all, this isn't a conspiracy

24  to sophisticatedly commit a crime.   Sophistication has really

25  nothing to do with it.   Sophistication is convenient way to

1    try to explain certain things that help the defense.   But is

2    Mr. Shirani a sophisticated drug dealer?   What evidence do

3    you have of that?   Did he do things sophisticatedly?   Was

4    this a sophisticated drug deal?

5            If he was so sophisticated, let me ask you one

6    question?   If he's so sophisticated and so adept, as the

7    defense would have you think, in covering his tracks and the

8    money was really his, why did he wrap it up in Farsi

9    newspaper?   He's the only person there who speaks Farsi.   So

10   if you're really going to be sophisticated and distance

11   yourself from the money, why are you going to wrap it in

12   Farsi newspaper.   When all the players and cards come up and

13   you're the only one that speaks Farsi, that's a direct signal

14   to you.   I ask you to consider the evidence carefully and

15   don't be distracted by sophisticated or not sophisticated.

16   Nobody said it had to be a sophisticated crime.

17           If Mr. Wedding was tricked into coming down because

18   they needed a vessel for the money -- what is it they ask you

19   at the airport all the time?   Sir or ma'am, has anybody

20   offered to put something into your suitcase?   The answer is

21   usually no.   If Mr. Wedding was an innocent person and

22   Mr. Shirani said hey, why don't you go stand over there and

23   give me your luggage.   Why?   Why do you want my luggage?

24   Well, because I want to put something in there.   No, he can't

25   say that, right?   So he would have had to sneak the luggage

1    away from Mr. Wedding, right, hide the money in there hoping

2    Mr. Wedding wouldn't need to get something out when they got

3    to LA.  Does that makes sense?

4            Are you going to have a friend come to a drug deal

5    that's worth almost $700,000 -- let's just say that that's

6    true.  Let's just say for whatever reason -- we'll talk about

7    that in a sec, the blind mule -- but let's just say that's

8    true.  If his purpose was to come down to bring the money,

9    why did he also go to Anaheim twice to pick up Krapchan?  If

10   he was only a vessel for the money and he was partying up at

11   the mall, why did he go to San Diego where they were going to

12   do a sample?  If his only purpose was to be a vessel, why is

13   he hanging out with these guys?  Why is he going to all the

14   major drug deal events if he's just a tourist?

15           And an argument was made about he went to a Persian

16   rug store, that doesn't makes sense because if there's a big

17   white guy going to a Persian drug (sic) store, that would be

18   suspicions.  Well, he was going to hookah lounges.  That's

19   Persian as well.  Don't be distracted by all this, ladies and

20   gentlemen.  The issue here is was there an agreement.

21           Counsel said that there was some things that

22   weren't played that should have been played.  Let's not play

23   games.  You have evidence before you.  Your job is to say

24   that which was given to me -- that which was given to you via

25   the code of evidence, which applies to everybody equally, is

1   that enough?  And you have a enough based on the recordings,

2   his actions, and, if you choose, gravy, icing, the testimony

3   of Mr. Shirani, which frankly makes sense if you consider it

4   with regard to the recordings.

5            Was he here to help Shirani in a car deal?  If you

6   were going to be here to buy cars and drive them back to

7   Canada, why do you have a return plane ticket if you're going

8   to be driving cars back up there?  It doesn't make sense.

9   There is no evidence of car dealing.  The only evidence of

10  car dealing is when -- he was talking in code.  And if any of

11  you believe that that code was really in reference to cars,

12  well, there you have it.  That was code words used for drugs.

13  The only indication of drug dealing is what somebody -- we

14  don't know who -- but somehow his mother found out that that

15  might be what they were doing.  I could tell you growing up

16  I'm sure many people have not told their mothers the truth

17  about what another sibling is doing.  Who knows?  But we're

18  not asking you to speculate about what could have come in,

19  what it might be.  We're asking you to consider what is

20  before you.

21           Now, let's talk about circumstantial evidence and

22  reasonable doubt, and that will be it.  Counsel was right,

23  you have to consider circumstantial evidence, and we touched

24  on that.  How do we know if Ryan Wedding knowingly was part

25  of this agreement?  Mere presence isn't enough.  Why is

1  counsel giving you a number of jail calls that happened after

2  the plan was over when we're trying to focus on whether the

3  plan was there?  Ladies and gentlemen, the crime of

4  conspiracy was complete arguably right when they arrived at

5  LAX because their action of coming to the United States

6  pursuant to that plan is an act of furtherance in that plan.

7  The agreement already existed before they came, so the crime

8  technically was already complete in Los Angeles.  All the

9  other things that happened is more proof on top of what

10 already existed.

11         But what is circumstantial evidence?

12 Circumstantial evidence is evidence that you can gather from

13 the surrounding circumstances, and let me give you an

14 example.  Let's say that you were on your way to a birthday

15 party, and you have your child, and you have to be to that

16 birthday party in a timely fashion.  So you go in your car,

17 and the car doesn't start.  You have to get to the party, the

18 baby's crying, so what do you do?  You call a taxicab and you

19 say I'm in a hurry.  Thirty minutes go by.  You look down the

20 street and you hear screeching.  You see a taxicab turn the

21 corner at a high rate of speed, slamming on its brakes,

22 smashing into one of your neighbors' cars.  After it wrecks

23 itself, it drives down the street at a high rate of speed

24 swerving, sideswiping some more of your neighbors' cars,

25 screeches to a halt in front of your house, jumps the curb,

1    lands on your front lawn, and out comes the taxi driver with

2    alcohol on his breath, and in slurring speech he says to you

3    okay, get in.

4            Are you going to get into that taxicab?  Some

5    people might say hey, wait a minute, you didn't see him

6    drinking, you don't have any direct evidence of his drinking,

7    so you have to get into that taxicab.  Ladies and gentlemen,

8    you don't have to see that this person was drinking to know

9    that it's not safe to get into that cab.  You can look at the

10   surrounding circumstances, the speeding, the slurred speech,

11   and that is good enough.  The jury instructions say that's

12   good enough because you can't read people's minds.  So when

13   you look at what Mr. Wedding said and you look at what Mr.

14   Wedding did, that alone is sufficient as circumstantial

15   evidence as to what he was thinking, and what he was thinking

16   is I am a knowing member of this agreement, I'm here to help

17   purchase narcotics for distribution in Canada.  That's what

18   circumstantial evidence is all about.

19           Counsel said that the government has to prove to

20   you each and every element beyond a reasonable doubt, and

21   that's true.  Reasonable doubt is the highest burden in our

22   legal system, and there has to be proof as to each element.

23   You saw the two elements, that there was an agreement, and

24   that it was a knowing agreement, became a member knowing what

25   one of the parts were.  Those are the two things the evidence

1    has to support.  It's not if it was a sophisticated crime,

2    but you have to look at all the evidence and ask yourself is

3    there enough evidence.  It's not proof beyond all possible

4    doubt; it's proof beyond a reasonable doubt.  You don't have

5    to have all the pieces filled in.

6            Let me take, for example, what is this a picture

7    of?  Most people would say it's a picture of a dollar bill.

8            MR. DENIS:  Your Honor, I'm going to object.  This

9    has not been -- this hasn't been shown to counsel, and I

10   think it's inappropriate.

11           THE COURT:  The objection is overruled.

12           MR. GUTIERREZ:  Some people will say wait a minute,

13   you can't tell this is a dollar bill, there are pieces

14   missing.  Ladies and gentlemen, if you could look at this

15   picture, even with the missing pieces, and see a dollar bill,

16   you've met that burden.  It's not proof beyond all possible

17   doubt; it's proof beyond a reasonable doubt.  And you have

18   enough evidence.

19           Just put up that one slide, and I'll be done.

20   There was a lot of evidence, but I'm going to sit down and

21   leave with one last statement that I'd like you to keep in

22   mind:  Mr. Ryan's own -- Mr. Wedding's own words at the

23   airport, words.  Counsel said that this was given to you out

24   of context, saying that it only a snippet out of context, and

25   I think it was like this that it was said, but the important

1   point is look, what more context do you need?  Well, we'll

2   see if it can work out.  Like I said, it's sitting here

3   waiting for us.  What does that mean, it's sitting here

4   waiting for us?  But we do have to go get it.  I mean

5   obviously I didn't put it in my suitcase.  That is the most

6   important piece of evidence because it's the defendant's own

7   words said not via a witness but via recording.

8          And, ladies and gentlemen, it doesn't make sense to

9   use a blind mule.  It doesn't make sense.  I mentioned before

10   that when you have something that's worth $750,000, in

11   excess, and you need to get it from point A to point B,

12   you're not going to invite liabilities.  I made an analogy.

13   Let's do one more.  That's like me in Mexico wanting to get

14   my heirloom engagement ring to my fiancee in Coronado.  Am I

15   going to tie it to a hot air balloon and push it in the

16   direction hoping it gets there -- because this is a valuable

17   piece of jewelry that I have -- or am I going to do what I

18   can to minimize risk, to make sure that it goes to somebody

19   who can get it to where it needs it to go?  It makes sense to

20   have somebody who knows about it.  It doesn't make sense to

21   have somebody who doesn't know because you can never know

22   what happens.  What if Mr. Wedding at the last second before

23   he checks his baggage in needed to get a sweater, or what if

24   he forgot his passport in there, and he found the money in

25   front of an airline attendant, in front of all these people

1  waiting in line, $100,000 falls out.  Does that make sense?

2  Or does it make sense what Mr. Ryan Wedding said in his own

3  words:  It's waiting for us.  We got to go get it.

4           Ladies and gentlemen, when you go back to

5  deliberations, please just consider this most of all and all

6  the other evidence, and you will see the defendant is,

7  notwithstanding, the defendant is guilty as charged.  Thank

8  you.

9           THE COURT:  Ladies and gentlemen, I do have a

10  handful of concluding instructions for you, and once again, I

11  didn't want to interrupt counsel during his argument, but a

12  couple of things I wanted to emphasize.

13           Counsel at one point when he was talking about a

14  conversation, recorded conversation at LAX -- and this might

15  have been the conversation he was referring to -- indicated

16  that a transcript of the conversation will be before you and

17  just kind of motioned toward the jury room.  I wanted to

18  emphasize that there are many transcripts of many different

19  conversations that were recorded, and as I've said during the

20  course of the trial, unless a particular transcript came in

21  and was admitted into evidence for all purposes and for you

22  to take back with you during your deliberations, the

23  transcript itself does not go back, it is not part of that

24  universe of evidence physical evidence you will have.  That

25  being said, if there is any request by the jury for a replay

1   of any of the conversations, recorded conversations, the

2   so-called audio clips, then do not hesitate to send out a

3   request in the form of a written note -- and I'll have more

4   to say about written notes in just a moment -- and they can

5   be replayed for you here in the courtroom with the rolling

6   translation, English translation of any foreign language that

7   may have been spoken.  So that is the evidence, the oral

8   recordings.  You're aided by a transcript or translated

9   material, but it's not the translated paper transcriptions

10  that go into the jury unless, as I say, there may be a few

11  exceptions where both sides have stipulated that they may go

12  in.  Okay.

13        So returning back to the instructions, I wanted to

14  further instruct you that you shall now retire and elect one

15  of your own as your foreperson.  That foreperson will preside

16  over your deliberations and speak for you here in court.  You

17  will then discuss the case with your fellow jurors to reach

18  agreement if you can do so.  Your verdict, whether guilty or

19  not guilty, must be unanimous.

20        Each of you must decide the case for yourself but

21  should do so only after you have considered all the evidence,

22  discussed it fully with the other jurors, and listened to the

23  views of your fellow jurors.  Do not be afraid to change your

24  opinion if the discussion persuades you that you should, but

25  do not come to a decision simply because other jurors think

1    it is right.  It is important that you attempt to reach a

2    unanimous verdict but, of course, only if each of you can do

3    so after having made your own conscientious decision.  Do not

4    change an honest belief about the weight and effect of the

5    evidence simply to reach a verdict.

6         Your verdict must be based solely on the evidence

7    and on the law as I have given it to you in these

8    instructions.  However, nothing I have said or done is

9    intended to suggest what your verdict should be; that is

10   entirely for you to decide.

11        With respect to the subject of notetaking, some of

12   you, most of you, and perhaps every single one of you have

13   taken notes during the course of the trial.  As I stated

14   earlier before we actually began the trial of this case, the

15   evidence, whether or not you took notes, you should rely on

16   your own memory of what was said, and notes are only to

17   assist your memory.  You should not be overly influenced by

18   the notes.

19        The punishment provided by law for this charged

20   crime is for the Court to decide.  You may not consider

21   punishment in deciding whether the government has proved its

22   case against the defendant beyond a reasonable doubt.

23        If it becomes necessary during your deliberations

24   to communicate with me, you may send a note through the

25   bailiff or one of the two bailiffs who will be sworn shortly

1  in this case, signed by your foreperson or by one or more

2  members of the jury.  No member of the jury should ever

3  attempt to communicate with me except by a signed writing;

4  and I in turn will communicate with the jury with a return

5  signed writing or here in open court and on the record.  By

6  the way, even though I'm not soliciting questions, although

7  they may be perfectly appropriate if you did need to send out

8  a question, it is always appreciated if any question you do

9  send out is legible.

10       Now, while or after any question is sent out --

11  once again, I'm not suggesting that you start writing

12  questions -- but if you do send out a note, in all

13  probability I will confer with the attorneys about that.  It

14  may take some time to formulate a response to any note or

15  question that is sent out.  You are certainly free to

16  continue on with your deliberations while you await a

17  response to any note that you do send out.

18       Remember that you are not to tell anyone, including

19  me, how the jury stands numerically or otherwise on the

20  question of whether the defendant, Mr. Wedding, is guilty or

21  not guilty of the charge until after you have reached a

22  unanimous verdict or have been discharged.

23       After you have reached a unanimous verdict,

24  assuming that you do, then that verdict will be reflected on

25  a form that will be given to you.  The verdict will be dated

1   and signed, and then you will advise the bailiff that you are

2   ready to return with your verdict.

3            Now, with respect to the verdict form, ladies and

4   gentlemen, it is a very straightforward, self-explanatory

5   verdict form.  It states, We, the jury in the above-entitled

6   cause, find the defendant, Ryan Wedding, and then there's a

7   blank line on which you will place your verdict if you reach

8   a verdict.  And underneath that in the event that you find

9   Mr. Wedding guilty, you are required to answer that

10  additional question:  If you found the defendant guilty of --

11  it says Count 1, but that's the only count in the indictment,

12  ladies and gentlemen -- if you found the defendant guilty, do

13  you further find that the government has proven beyond a

14  reasonable doubt that the amount of cocaine which was the

15  subject of any such conspiracy weighed 5 kilograms and more.

16  You place your answer on that line, and then, as I say, you

17  date it, and it is to be signed by your presiding juror.

18           By the way, just for your own edification, the

19  legislature does not write jury instructions; this is a

20  judicial function.  Now, what the legislation does do is

21  identify and define certain offenses, criminal offenses, that

22  ultimately are transformed into jury instructions, but the

23  creation of jury instructions are a judicial function.

24           Very shortly, you're going to be escorted by the

25  bailiffs into that jury deliberation room there.  The

1  evidence in the case will be very shortly brought to you.  I

2  strongly suggest you not do anything more than just more or

3  less get your bearings, you can leave your notebooks in

4  there.  If you want to take a few minutes and elect one of

5  your number as your presiding juror, that would be perfectly

6  appropriate.  I strongly urge you not to engage in any

7  deliberations today; I think that should wait until next

8  Monday over the weekend when you can face the -- come to the

9  case and with fresh minds begin to deliberate on the case.

10         Rest assured that all of the evidence that is

11  actually received at this time and should be available for

12  you will be given to you.  That being said, if you're of a

13  mind that something is missing and you have a question about

14  it, you can certainly send out a note, and we will attempt to

15  respond to it ourselves.

16         Another very important matter is that the only time

17  you may deliberate is when all 12 of you are in the jury room

18  deliberating on the case.  If one or two of you have to

19  momentarily excuse yourselves to use the facilities in the

20  deliberation room, then please, remaining jurors, wait until

21  everyone is back together and you can be deliberating on the

22  case.  When you're not all 12 deliberating around that table,

23  then the admonition applies; you may not discuss the case

24  further amongst yourselves or with any grouping of remaining

25  jurors, and of course, you know not to discuss it after you

1    leave the courthouse.

2              Your hours of deliberations will be the hours that

3    we've attempted to maintain during the course of trial, 9:00

4    to 12:00 and 1:30 to 4:30 with your customary breaks and your

5    noon recess.  Now, we do have another case starting on

6    Monday, and it may be a little bit busy in here.  What I'd

7    like to ask you to do, if you can remember, is report just a

8    little bit early, like ten to 9:00, so that we can get you

9    into the jury deliberation room before the courtroom starts

10   to fill up with other people and the participants in another

11   case.  If it turns out that we have to wait for one or more

12   of you and you don't get in until 9:00, that's fine.  I'm

13   just trying to get you a little bit of a head start.

14             I do want to ask Dr. Riste to be here in the

15   courthouse complex while the jury is deliberating, so,

16   Doctor, if you don't mind being present for us, we would

17   appreciate that.  You are our sole remaining alternate, and

18   it still is entirely foreseeable that you could be asked to

19   substitute for a regular member of the jury who has been

20   excused for some significant reason.  So if we know you're in

21   the jury lounge, then we know where to get you.  And if the

22   jury reaches a verdict, we do want you to be here for that.

23   And pending that, you can -- actually it's probably better

24   that you leave your notebook with the courtroom deputy, Laura

25   Barkins, who will keep your notebook in trust.  I know we'll

1  be using the jury box for another case, and I don't want your

2  notebook up there just floating around.

3         I think that probably covers most of these

4  preliminary matters I wanted to address.  Do any of you have

5  any questions before we proceed further and have the bailiffs

6  sworn and you escorted to the jury deliberation room?  Okay.

7  Apparently not.  Okay.

8         Well, these two very fine gentlemen, Jon Cieslak to

9  your left and Randy Rein to your right are law clerks.  Each

10  judge works -- is very privileged to work with at least two

11  law clerks in this courthouse, and so at the present time

12  these gentlemen are working with me as law clerks.  In this

13  district, in the Southern District of California, law clerks

14  have the added responsibility -- and I think it's a

15  privilege; it's also a responsibility -- of bailiffing, so

16  these are not the uniformed, armed bailiffs that you

17  customarily see in state courts and perhaps other venues as

18  well.  They will be the bailiffs on this case.  You will

19  communicate with the Court through the bailiffs, as I

20  indicated previously, in the form of any note that you may

21  need to reflect a question or a request.  So without further

22  ado, I'll ask the courtroom deputy to swear the bailiffs.

23         THE CLERK:  Please raise your right hands to be

24  sworn.  You, and each of you, do solemnly swear that you will

25  keep this jury in some private and convenient place, that you

1  will not allow any person to speak to or communicate with

2  them, nor do so yourself except by order of the Court or to

3  ask them if they agreed upon a verdict, and that you will

4  return them into court when and if they have so agreed?

5      (The bailiffs answered in the affirmative.)

6      THE COURT:  Okay.  Just a few things.  Ladies and

7  gentlemen, when you're deliberating in the jury deliberation

8  room, we do relieve you of your cell phones and other

9  electronic devices through which you can communicate with the

10 outside world, but they're always available for recesses.  My

11 suggestion is you just kind of get settled in there and then

12 allow the bailiffs to secure the room, just buzz them --

13 they'll show you how the intercom system works.  Just buzz

14 them when you're ready to leave, and then they'll allow you

15 to leave for the day -- actually until next Monday.  So I may

16 not have a chance to see you early Monday morning.  Of course

17 I'll be here.  But I think on behalf of everyone, on behalf

18 of the parties and representatives of parties and the

19 attorneys, I include myself and my own staff, we want to

20 thank you for your time, your service, your patience, your

21 understanding.  We come through this trial at a holiday time.

22 We know that it's not easy on families, on individuals to

23 perform this important civic responsibility, but it is very

24 important to all of the parties here, all of the participants

25 in this trial that you give this case the thought and

1    deliberation that it deserves, and we know you will.  And in

2    advance we appreciate all of the time and patience you've

3    shown with the modified scheduling from time to time and a

4    few of the delays we've had to encounter unavoidably,

5    unfortunately.  So with that, have a happy holiday, each and

6    every one of you.  And we will see you on Monday.  I will see

7    you on Monday, and then we'll carry on at that point.  Dr.

8    Riste, you're free to go home.  If you just hand your

9    notebook with the cover closed to one of the bailiffs.  Thank

10   you.

11          (The jury left the courtroom.)

12          THE COURT:  Counsel, on Monday now, I assume you're

13   willing to waive your client's presence when, at the

14   beginning of each day, each session of deliberation, Mr.

15   Denis?

16          MR. DENIS:  Let me ask.

17          THE COURT:  Okay.

18          MR. DENIS:  Your Honor, is he in the courtroom or

19   just in the tank here?  When there's a jury question, I --

20          THE COURT:  When there's a jury question -- well,

21   it's really up to you.  If there's a jury question and you'd

22   like to have your client here, that can certainly be

23   arranged.  Oftentimes -- it's typically not the case that

24   that's done, but it's really between you and your client.

25   What I'm asking is each day or session when they're

1    beginning, when they're coming back, 9:00 in the morning --

2              MR. DENIS:  No.

3              THE COURT:  -- or 1:30 in the afternoon, I don't

4    think it's necessary for any of the parties to be here or any

5    of the attorneys, but if you wish to be here with your

6    client, then I'm going to require everyone to be here.

7              MR. DENIS:  No, I'll waive it.

8              THE COURT:  Okay.  And if you -- if there is a

9    question coming out, how would you like -- would you like to

10   have your client here or not?  Might be pretty --

11             MR. DENIS:  Yes.

12             THE COURT:  Might be pretty impractical to have him

13   dressed out.  It might be a very simple question.  Oftentimes

14   I'll just deal with a question of a ministerial nature with

15   counsel over the telephone, but it's reported, so --

16             MR. DENIS:  Mr. Wedding is really involved in this

17   case, your Honor.  This is a very serious matter for him, and

18   I think we're --

19             THE COURT:  Why don't you talk about it.  Why don't

20   you talk about it with Mr. Wedding.  Obviously if it's a

21   significant matter, if they're requesting a readback or --

22             MR. DENIS:  Right.

23             THE COURT:  -- that they view certain transcripts

24   or recordings, you have to distinguish something like that

25   from a simple question that can come out, may we have -- is a

1    transcript of such and such a day in evidence, you know.

2    That's the kind of thing that can be answered pretty easily

3    and wouldn't require any presence of the defendant.

4             MR. DENIS:  Could I make that call depending on the

5    question, your Honor?

6             THE COURT:  Okay.  Then what I'm going to do --

7    because I'm concerned about how long it would take to get

8    ahold of you --

9             MR. DENIS:  I'm going to be here.

10            THE COURT:  Oh, you're going to be here the entire

11   time?

12            MR. DENIS:  Yes.

13            THE COURT:  Okay.  That solves a lot of issues.

14   You'll be waiting in the courthouse somewhere?

15            MR. DENIS:  Very close by, yes.  Very close by.

16            THE COURT:  In the courthouse?

17            MR. DENIS:  Yes, within -- yes.

18            THE COURT:  Okay.  As long as it's in the

19   courthouse, I don't have a problem.  We can reach you

20   immediately --

21            MR. DENIS:  Yes.

22            THE COURT:  -- and then you can let us know whether

23   you want to have Mr. Wedding present or not for even the most

24   simple of questions.

25            MR. DENIS:  Thank you, your Honor.

1166

```
 1            THE COURT:  But be in the courthouse somewhere.
 2   You don't need to be in the courtroom, but if you're going to
 3   be in, for example, the library or some other location, just
 4   let Laura know --
 5            MR. DENIS:  I will.  Thank you, your Honor.
 6            THE COURT:  -- I'd appreciate it.  Thank you.  Have
 7   a good weekend.
 8            MR. GUTIERREZ:  Your Honor, if I could submit for
 9   the record Court Exhibit No. 38, which would be a printout of
10   my slides.  I would ask if I could submit these for the sake
11   of the record, and counsel could also, the slides we used for
12   closing.
13            MR. DENIS:  No, your Honor.
14            THE COURT:  I'm sorry?
15            MR. DENIS:  I object.  The slides are not evidence.
16   The evidence is the evidence.
17            THE COURT:  You're talking about the slides going
18   in with the jury?
19            MR. GUTIERREZ:  No.
20            THE COURT:  Just to complete the record as to what
21   was shown?
22            MR. GUTIERREZ:  Exactly.
23            MR. DENIS:  Oh, I'm sorry.  I misunderstood.
24            THE COURT:  It can be just identified as a court
25   exhibit.
```

1   MR. GUTIERREZ:  If we could, your Honor.

2   THE COURT:  Yeah, but it won't go in with the jury.

3   MR. GUTIERREZ:  Could we have counsel do the same?

4   THE COURT:  Which --

5   MR. GUTIERREZ:  I believe there was evidence that

6   wasn't submitted before the jury on one of their slides --

7   two of their slides.  I didn't make an issue of it, but I

8   would just like it for the record.

9   THE COURT:  Sure.  If it wasn't in evidence -- are

10  you talking about the charts?

11  MR. GUTIERREZ:  Yes.  There were references on the

12  calendars to evidence they said was in evidence, but I didn't

13  make an issue of it, I don't think it will be an issue, but

14  just to memorialize, I think we would all be protected in the

15  event there was an appeal.

16  THE COURT:  Well, once again, are you talking about

17  the time lines?

18  MR. GUTIERREZ:  Yes.

19  THE COURT:  Okay.  Do you have paper copies of the

20  time lines?

21  MR. DENIS:  I do, your Honor.

22  THE COURT:  Okay.  Why don't you bring those

23  forward and then you bring those forward.  They'll be marked

24  as court exhibits.

25  MR. GUTIERREZ:  Thank you, your Honor.

1    THE COURT:  And there should be something on the

2  record as to which is which.

3    MR. GUTIERREZ:  Okay.  Mine is a ten-page document,

4  your Honor.  I think it will be marked court exhibit next in

5  order.  I'm cutting out the lower right-hand corner of

6  page 10.

7    MR. DENIS:  Can we get Xerox copies of this?

8    THE COURT:  Of the dollar bill?

9    MR. DENIS:  Whatever one you used.  I had no

10 knowledge of it.

11   MR. GUTIERREZ:  And if I could submit the dollar

12 bill to your court deputy today, your Honor.

13   THE COURT:  That's fine.  Anything else, counsel?

14 Counsel, you've got to let one another walk out of the

15 courtroom with your jackets on.

16   MR. DENIS:  I'm sorry?

17   THE COURT:  You don't need to check those, do you?

18 Thank you.  Have a good weekend.  The ten-page document is

19 Court Exhibit 3.  And then what do we have?  The grouping of

20 time lines used by the defense will be No. 4.  How about the

21 dollar bill?

22   MR. GUTIERREZ:  If we could make that No. 5, your

23 Honor, I'll present it to the court as soon as I make a

24 photographic copy of it.

25   MR. DENIS:  You making a copy for me too?

1           MR. GUTIERREZ:  Certainly.

2           THE COURT:  Can you reduce it?

3           MR. GUTIERREZ:  Yes.  I'm going to take a

4    photograph, an 8 by 10, so I'll give you a photograph of it.

5           THE COURT:  That's fine.

6           MR. GUTIERREZ:  Thank you, your Honor.

7        (Exhibit Nos. Court's 3, 4, 5 identified.)

8        (There was a break in the proceedings.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      <u>San Diego, California - Monday, November 30, 2009</u>

2           THE COURT:  Good morning, everyone.  Okay.  In U.S.

3      versus Wedding, let the record reflect that counsel are

4      present, Mr. Wedding is present.  Ladies and gentlemen, I

5      have received a note marked with today's date, November 30.

6      It reads:  Your Honor, the jury has reached a verdict.  And

7      it's signed by Diane Ferreria, the foreperson.  It was

8      received today at 11:25 a.m.  We do not have our alternate

9      juror; apparently the alternate juror was not in the jury

10     lounge.  So if I may ask the bailiffs to seat all jurors in

11     the jury box, please.

12          MR. DENIS:  I saw him outside, your Honor.  He was

13     in the --

14          THE COURT:  Okay.  Well, hold on just for a moment.

15     All right.  Dr. Riste, thank you for being here, sir.  May I

16     ask the bailiffs to get the jurors, secure the jurors, have

17     them placed in the jury box.  Dr. Riste, you can take your

18     seat in the jury box there.  Sure.

19          (The jury entered the courtroom.)

20          THE COURT:  All right.  We have all jurors present;

21     our alternate juror, Dr. Riste, is present as well.  I have

22     received a note from the jury; it reads as follows:  Your

23     Honor, the jury has reached a verdict.  And it's signed by

24     Diane Ferreria, foreperson.  Ms. Ferreria, has the jury

25     indeed reached a verdict?

1    PRESIDING JUROR FERRERIA:  Yes, we have.

2    THE COURT:  All right.  Do you have the verdict

3    form in the red folder?  Okay.  If you would kindly hand the

4    verdict to the bailiff.  Thank you.  By the way, the note

5    will be marked as the Court's exhibit next in order.  Okay.

6    I will ask that the courtroom deputy read the verdict,

7    please.

8    THE CLERK:  United States District Court, Southern

9    District of California; United States of America, plaintiff

10   versus Ryan Wedding, defendant; case No. 08-CR-2386 JM,

11   verdict:  We, the jury in the above-entitled cause, find the

12   defendant, Ryan Wedding, guilty of conspiracy to distribute

13   cocaine as charged in Count 1 of the indictment.

14   If you found the defendant guilty of Count 1, do

15   you further find that the government has proven beyond a

16   reasonable doubt that the amount of cocaine which was the

17   subject of any such conspiracy weighed 5 kilograms or more?

18   Yes.  Dated November 30, 2009, Diane Ferreria, foreperson of

19   the jury.

20   Ladies and gentlemen of the jury, is this your

21   verdict as presented and read the verdict of each of you, so

22   say you all?

23   (The jurors answered.)

24   THE COURT:  Counsel, do you wish to have the jury

25   polled?

1     MR. DENIS:  No, your Honor.

2     THE COURT:  All right.  It appeared that the

3  verdict was unanimous from my observation of the jurors as

4  they were polled generally.  Ladies and gentlemen -- and

5  please record the verdict.

6     THE CLERK:  Your Honor, the verdict has been

7  recorded.

8     THE COURT:  Thank you.  Ladies and gentlemen of the

9  jury, I am about to discharge you on this case, but before I

10 do that, I would like to make a couple of comments.

11     First of all, I want to thank you on behalf of the

12 entire bench here in the Southern District of California.

13 Thank you very much for your time, your service, and of

14 course your patience with us on a few occasions when you were

15 asked to wait or when we had to modify the hours a bit.

16     Throughout the entirety of this trial I have

17 repeatedly advised you that you may not discuss this case

18 with anyone, but now that the case is over for your purposes,

19 you may discuss this case with whomever you wish.  I want to

20 emphasize that the decision as to whether or not you discuss

21 the case is your decision.  You are under no obligation to

22 discuss the case even if someone indicates they would like to

23 discuss the case with you.

24     If you choose to discuss the case, then my only

25 watchword would be that you use judgment and discretion in

1   what you say about the case, how you characterize the case

2   and participants.  In my view, you should not be willing to

3   make any statement you would not make in the form of a

4   declaration signed under penalty of perjury, nor should you

5   make any statement that you would not be willing to make in

6   the presence of all of your fellow jurors.  Keep in mind what

7   happens in that jury room there is a solemn process, and

8   statements made by jurors during that, during the

9   deliberations, deserve solemnity and the kind of discretion

10  and judgment that I have been referring to here in the last

11  minute or so.

12          If you were ever to be contacted by any person to

13  discuss the case, either someone who's involved with this

14  trial or someone other than that -- and we do not provide

15  private information, private contact information -- but

16  keeping that in mind, if you were ever to be contacted by

17  anyone, any contact must be reasonable in terms of time,

18  place, and manner.  I'm not suggesting anyone associated with

19  this case would cause any difficulty or unpleasantness, but

20  you should know what your rights are for future trials that

21  you may sit on.  If you should ever have any concern about

22  the manner of any contact with you, never hesitate to bring

23  that to the attention of the judge who presided over the jury

24  and over the case, and I'm sure that judge would address the

25  problem appropriately.

1    I know that many of you have taken notes during the

2 course of the trial, and you're free to take those notes with

3 you; you're free to remove them from the notebooks and take

4 them with you.  If you leave them here, they will be

5 shredded, so you need not worry about your own personal notes

6 remaining in the notebook or circulating around the

7 courthouse; that does not happen.

8    So that pretty much sums up what I wanted to say to

9 you at this time.  I want to again thank you on behalf of all

10 of the judges here in the Southern District of California,

11 and I appreciate the time, the attention, and the

12 conscientiousness you've given to this case.

13    Dr. Riste, thank you very much for being our

14 alternate juror, our remaining alternate juror, and being

15 ready, willing, and able to step into the breach if there had

16 been any breach.  I appreciate your commitment as well.

17    All right, ladies and gentlemen.  If you have left

18 any of your belongings in the deliberation room, please feel

19 free to obtain those, and any notes that you may want to

20 secure.  I know that your cell phones are here as well.  Jon

21 Cieslak, one of our bailiffs, has those.  Once again, ladies

22 and gentlemen, thank you very much.  Once you return to the

23 jury lounge, I'm sure you'll be advised of what your

24 immediate future may hold for you in terms of this tour of

25 duty.

1        (The discharged jurors left the courtroom.)

2            THE COURT:  Counsel, we're not done yet.

3            MR. DENIS:  I'm sorry?

4            THE COURT:  We're not done yet.  May I see the

5    bailiffs, please?  All right.  We will set a sentencing date,

6    and a presentence report is ordered.

7            THE CLERK:  Sentencing will be set for Thursday,

8    March 11, 2010 at 9 a.m.

9            THE COURT:  Thursday, March 11.  At what time?

10           THE CLERK:  At 9 a.m.

11           THE COURT:  Nine a.m.  All right.  A probation

12   report is ordered.  All right.  Thank you.

13           MR. GUTIERREZ:  Thank you, your Honor.

14       (The proceedings were concluded.)

15

16

17                        E x h i b i t s

18   | Exhibits     | Description          | For ID | In Evd |
     |--------------|----------------------|--------|--------|
     | Court's 3    | Government document  | 1169   |        |
19   | Court's 4    | Defense document     | 1169   |        |
     | Court's 5    | Photocopy, dollar bill | 1169 |        |
20

21

22

23

24

25

1                         <u>Certificate of Reporter</u>

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated  _____  at San Diego, California.

12

                       _____
13                     /s/ Debra M. Henson  (electronic)
                       Debra M. Henson
14                     Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25