1                    United States District Court

2                   Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )
                                      )
6        vs.                          ) Case No. 08-CR-2386 JM
                                      ) Judgment & Sentence
7    RYAN WEDDING,                    )
                                      )
8                    Defendant.       ) Thursday, May 6, 2010
     _____)

9

10              Before the Honorable Jeffrey T. Miller
                   United States District Judge

11

12   Appearances:

13   For the Plaintiff:        Karen P. Hewitt
                               UNITED STATES ATTORNEY
14                             Orlando B. Gutierrez
                               ASSISTANT U.S. ATTORNEY
15                             880 Front Street, Suite 6293
                               San Diego, CA  92101
16
     For the Defendant:        Benjamin L. Coleman, Esq.
17                             COLEMAN & BALOGH
                               1350 Columbia Street, Suite 600
18                             San Diego, CA  92101

19

20

21   Official Court Reporter: Debra M. Henson, CSR, RPR
                               U.S. Courthouse
22                             940 Front Street, Suite 5190
                               San Diego, CA  92101
23                             (619) 238-4538

24

25          Record produced by certified stenographic reporter

<u>San Diego, California - Thursday, May 6, 2010</u>

1

2        THE CLERK:  Calling matter 1 on calendar,

3   08-CR-2386, USA versus Ryan Wedding, for sentence with

4   presentence report.

5        MR. GUTIERREZ:  Good morning, your Honor.  Orlando

6   Gutierrez on behalf of the United States.

7        THE COURT:  Good morning.

8        MR. COLEMAN:  And good morning, your Honor.  Ben

9   Coleman for Mr. Wedding.

10        THE COURT:  Good morning.

11        MR. COLEMAN:  And Mr. Wedding is present.

12        THE COURT:  Okay.  Are counsel ready to proceed

13   this morning?

14        MR. GUTIERREZ:  Yes, your Honor.

15        MR. COLEMAN:  Yes, your Honor.

16        THE COURT:  Okay.  We have several matters that we

17   should be covering here.  First of all, I am advised that

18   there is a sentencing agreement that has been reached by the

19   parties, and so before we get to that, are you withdrawing

20   your motion for judgment of acquittal and new trial at this

21   time, Mr. Coleman?

22        MR. COLEMAN:  Yes, your Honor.  I think they're

23   essentially moot at this point.

24        THE COURT:  Okay.  So you're formally withdrawing

25   them?

1          MR. COLEMAN:  Yes.

2          THE COURT:  Okay.  The request of the defense to

3  withdraw the motions for judgment of acquittal and new trial

4  would be granted at this time.  I do have a sentencing

5  agreement before me, and I would like to inquire of Mr.

6  Wedding, so it's going to take a little time at this point.

7  If we can have Mr. Wedding sworn, please.

8          THE CLERK:  Sir, would you please raise your right

9  hand.  You do solemnly swear that the evidence you shall give

10  in the cause now before the Court shall be the truth, the

11  whole truth, and nothing but the truth?

12          THE DEFENDANT:  Yes.

13          THE COURT:  All right.  Good morning, Mr. Wedding.

14          THE DEFENDANT:  Good morning, your Honor.

15          THE COURT:  Mr. Wedding, I am informed that you've

16  entered into a sentencing agreement with the government,

17  which has been reduced to writing; is that true, sir?

18          THE DEFENDANT:  Yes.

19          THE COURT:  Okay.  I do have what appears to be the

20  original -- I believe it's the original -- before me.  Kind

21  of hard to tell these days sometimes with documents.  It

22  appears to be 11 pages in length and to contain your

23  signature on the last page and your initials on the other

24  pages.  Did you in fact sign and initial this plea agreement,

25  sir?

1          THE DEFENDANT:  Yes, your Honor, I did.

2          THE COURT:  Okay.  And before you did that, did you

3     read it?

4          THE DEFENDANT:  I did read the whole thing, sir.

5          THE COURT:  All right.  And before you signed and

6     initialed this plea agreement, did you fully discuss it with

7     Mr. Coleman, your attorney?

8          THE DEFENDANT:  Yes, I did, your Honor.

9          THE COURT:  Okay.  Do you have any questions about

10    this particular sentencing agreement?

11         THE DEFENDANT:  I don't believe so.

12         THE COURT:  Okay.  I may have referred to it as a

13    plea agreement, but I do realize it is a sentencing

14    agreement.  I do want to cover a few things by virtue of this

15    agreement, some of the things that are included in the

16    agreement.  First of all, Mr. Coleman, let me ask you, before

17    you had your client sign and initial this plea agreement --

18    excuse me, this sentencing agreement -- did you explain what

19    the maximum statutory penalties would be for this particular

20    offense of conviction?

21         MR. COLEMAN:  Yes, your Honor.

22         THE COURT:  Okay.  And do you believe your client

23    understands what they are?

24         MR. COLEMAN:  Yes, your Honor.

25         THE COURT:  Okay.  I would advise you, Mr. Wedding,

1   that the maximum statutory penalties for this particular

2   offense for which you have been convicted, conspiracy to

3   distribute cocaine, would be as follows:  A maximum of life

4   in prison with a mandatory minimum period of ten years in

5   prison unless you are eligible for relief from that ten-year

6   mandatory minimum, a maximum $4 million fine, and a $100

7   special assessment.  Do you understand those to be the

8   maximum statutory penalties that apply?

9           THE DEFENDANT:  Yes, I do, your Honor.

10          THE COURT:  And I would further advise you that

11  after you have completed any custodial sentence that might be

12  imposed in this case, you would be placed on a period of

13  supervised release not to exceed five years with conditions,

14  and if you were to violate any condition of supervised

15  release, your supervised release could be revoked and you

16  could be returned to custody for all or a part of that term;

17  do you understand that as well, sir?

18          THE DEFENDANT:  I do, your Honor.

19          THE COURT:  Okay.  I do also note in this

20  sentencing agreement that there are some provisions relating

21  to the advisory guideline calculations.  Do you have a copy

22  of it, Mr. Coleman, with you?

23          MR. COLEMAN:  Actually no.  I brought the original,

24  so I don't have a copy with me.

25          THE COURT:  Would you like to have the -- let me

```
 1    give you back the original here for just a moment so that you
 2    can have your client refer to this just for ease of what
 3    we're doing at this point.  And if you could turn to page 7,
 4    there are some advisory sentencing calculations at the top of
 5    this page, Mr. Wedding.  You see a base offense level of 32,
 6    although, as indicated in the footnote on the bottom of that
 7    page, you are permitted to argue for a base offense level of
 8    26 for reasons expressed in that -- in that particular
 9    footnote, and the government may argue that the amount of
10    cocaine contemplated within the conspiracy was as much as 24
11    kilograms; there are -- there would be two levels off for
12    safety valve under 5C1.2 and 2B1.1 (b)(11) I believe; and
13    then there's a reduction for acceptance of responsibility.
14    There is also within the sentencing agreement your ability to
15    request downward adjustments, departures, or deviations or
16    variances from the advisory calculations.  Do you understand
17    those things as well, sir?
18              THE DEFENDANT:  Yes, I'm very aware of them, your
19    Honor.
20              THE COURT:  Okay.  And have you had a thorough
21    discussion with Mr. Coleman about the advisory sentencing
22    guidelines and how they may apply to your case?
23              THE DEFENDANT:  Yes, your Honor.
24              THE COURT:  All right.  Do you understand that at
25    this particular point in time, that is, before I accept this
```

1    sentencing agreement and proceed, there is no way I can tell

2    you exactly what the advisory guideline range is going to be

3    for your case nor what the actual sentence is going to be?

4              THE DEFENDANT:  Yes, I understand that.

5              THE COURT:  All right.  And do you understand that

6    at this particular point in time, that is, right now, that

7    neither this Court nor your attorney can tell you what the

8    answers are to these questions, and then I'm going to listen

9    carefully to everything that's said and exercise discretion

10   in this matter; do you understand that, sir?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  All right.  And do you understand that

13   even though you may not be satisfied or happy with the

14   ultimate sentence here or what the advisory guideline range

15   is, that neither the uncertainty you're dealing with right at

16   this moment nor any unhappiness would be a basis for you to

17   attempt to withdrew with this sentencing agreement you have

18   entered into with the government; do you understand that?

19             THE DEFENDANT:  Yes, I do, your Honor.

20             THE COURT:  Okay.  Do you also understand that by

21   this agreement, Mr. Wedding -- and this is an important

22   matter that I want to bring to your attention -- you are

23   agreeing to an appellate waiver and a waiver on any

24   collateral attack, and by that I mean by this agreement you

25   are agreeing to forever give up your right to appeal or in

1   any other way attack or challenge both the conviction based

2   on the jury's verdict in this case as well as any sentence,

3   any custodial sentence the Court would impose as long as the

4   Court does not impose a custodial sentence that is greater

5   than 78 months, which is going to be argued for by the

6   government; do you understand that, sir?

7               THE DEFENDANT:  Yes, I do, your Honor.

8               THE COURT:  Okay.  Mr. Wedding, have you taken any

9   drugs, medication, alcohol, or any other substance within the

10  last three days that would in any way affect your ability to

11  understand what we are doing today?

12              THE DEFENDANT:  Absolutely not.

13              THE COURT:  Okay.  Have you entered into this

14  sentencing agreement with the government freely and

15  voluntarily?

16              THE DEFENDANT:  Yes, your Honor.

17              THE COURT:  Okay.  And have any other promises or

18  representations been made to you in exchange for your

19  agreement in this sentencing agreement?

20              THE DEFENDANT:  Not at all.

21              THE COURT:  Okay.  Do you also understand that by

22  this agreement, Mr. Wedding, you are agreeing to forfeit any

23  right, title, and interest you may have in certain properties

24  that are set forth on pages 2 and 3, namely approximately

25  $100,000 in US currency seized on June 15, 2008 from the

1   Comfort Inn, room No. 304, Ventura Boulevard in Woodland

2   Hills, California, approximately $1,570 in US currency seized

3   on June 13 of 2008, approximately $17,000 in US currency

4   seized on June 13 of 2008, and approximately $3,000 in US

5   currency seized on June 13, 2008.  Do you understand you're

6   forfeiting any right, title, and interest you may have to any

7   of those monies?

8           THE DEFENDANT:  I never felt I had it in the first

9   place, your Honor, so yes.

10          THE COURT:  Okay.  Very good.  And, curiously,

11  there's also listed on page 3 of this sentencing agreement

12  one further asset that was seized and in which you would by

13  virtue of this sentencing agreement yield any right, title,

14  and interest in that as well, that is approximately $125 in

15  US currency seized from co-conspirator Michael Krapchan on

16  June 13, 2008; do you understand that as well, sir?

17          THE DEFENDANT:  Yes, your Honor.

18          THE COURT:  Okay.

19          MR. GUTIERREZ:  Your Honor?

20          THE COURT:  Yes?

21          MR. GUTIERREZ:  If I may raise one issue, the

22  appellate waiver is slightly different than what the Court is

23  used to seeing, and I'm sure the Court has noticed it, but I

24  want to memorialize it for the record.  If the Court does

25  sentence him to more than 78, he still will not be able to

1     appeal his conviction, just the sentence.

2              THE COURT:  Yes, and I did read that, and I do

3     understand that, and I appreciate that clarification, and it

4     should be stated on the record.  Mr. Gutierrez is absolutely

5     right.  As I read the sentencing agreement here, Mr. Wedding,

6     that if the Court imposes a custodial sentence that is

7     greater than 78 months, you would be free to appeal that

8     particular sentence in excess of 78 months, but you would not

9     be able to appeal from the judgment of conviction; that would

10    still stand, and your appellate waiver would still apply to

11    that as well as any ability to collaterally attack the

12    conviction.  Do you understand that, sir?

13             THE DEFENDANT:  Yes, I do, your Honor.

14             THE COURT:  Okay.  Anything further, Mr. Gutierrez?

15             MR. GUTIERREZ:  No, your Honor.  Thank you.

16             THE COURT:  Okay.  I will find at this time that

17    Mr. Wedding has entered into his sentencing agreement in a

18    knowing, intelligent, voluntary, and express manner, being

19    fully aware of all of the material provisions of that

20    agreement, and at this time -- as well as the consequences of

21    the agreement, and at this time I would accept the sentencing

22    agreement entered into between the parties.  All right.

23             The next I thing I wanted to discuss basically is

24    a -- deals with a question I have for you, Mr. Gutierrez.  I

25    think I understand the discrepancy here, but in your

1   sentencing summary chart, you have a minus two for acceptance

2   of responsibility, which would result in a total offense

3   level of 28 and an advisory guideline range of 78 to 97

4   months; and in your -- in the sentencing agreement you've

5   entered into here with Mr. Wedding, you also have the same

6   calculation for acceptance of responsibility, a minus two,

7   which would yield a total offense level of 28.  The confusion

8   is in your sentencing memorandum.  On the last page under the

9   conclusion portion, you have a reference to minus three for

10   acceptance of responsibility, but you still have the same

11   reference to a total offense level of 28 and a guideline

12   range of 78 to 97 months.  I don't know whether the minus

13   three was the inadvertent error or the total offense level of

14   28.

15          MR. GUTIERREZ:  I apologize for any errors having

16   occurred in it.  It should be a minus two throughout, your

17   Honor.

18          THE COURT:  All right.  I assumed that to be the

19   case in light of the fact that the total offense level of 28

20   has been consistently set forth in all of your papers as well

21   as the advisory guideline range of 78 to 97 months.  All

22   right then.  If we're ready to proceed to sentencing at this

23   point, I would ask Mr. Wedding, first of all, Mr. Wedding,

24   are you ready to proceed with sentencing at this time?

25          THE DEFENDANT:  I believe so, yes, your Honor.

1          THE COURT:  Okay.  Have you read the probation

2   report in this case, Mr. Wedding, as well as the addendum to

3   the probation report?

4          THE DEFENDANT:  Yes, I did.

5          THE COURT:  Okay.  I have reviewed the probation

6   report, the objections you have filed, Mr. Coleman, the

7   addendum to the PSR, all of your sentencing materials, your

8   original sentencing memorandum, your amended sentencing

9   memorandum, the letters that were attached to the original

10  sentencing memorandum, the request for departures.  Let me

11  just go back to one thing here.  You've entitled it a

12  downward request for departures, but as I go -- if I go

13  through this, it's not really a request for departures.  In

14  this you were requesting an adjustment under 2X1.1; that

15  would be an adjustment.  You're talking about 3553 (a)

16  factors, which is -- so I didn't see any formal request for

17  departures within, you know, per se the advisory guideline

18  calculations.  You can certainly address that if you wish to

19  in just a moment.  But in any event, I've, as I say, reviewed

20  all your papers, the sentencing summary charts, I've read the

21  sentencing memorandum submitted by the government, I've

22  considered the nature and circumstances of the offense and

23  history and characteristics of Mr. Wedding as well as the

24  advisory guidelines and the statutory purposes of sentencing.

25  Mr. Coleman?

1          MR. COLEMAN:  Thank you, your Honor.  Before I

2   begin, I just wanted to let the Court know that Mr. Wedding's

3   mother, two sisters, and friend are sitting here in court in

4   the front row, and I want to do that before I forgot.

5          Firstly, I think both Mr. Wedding and myself are

6   thankful to the government for entering into this sentencing

7   agreement.  It's not all that frequent that you necessarily

8   will enter into a sentencing agreement after a trial, and so

9   I think we're thankful that we have come to agreement on some

10  major issues in the case.  Obviously, the sentencing

11  agreement does leave a few issues open, and that's where I'd

12  like to begin.

13          The first one is the quantity of the drugs for

14  purposes of the guidelines, and the -- I guess the difference

15  that I have between the government's position and the

16  position that was stated in the PSR is that neither engaged

17  in any analysis of application note 12 to Section 2D1.1, and

18  that really is the standard that governs the quantity

19  determination in this case.  And, you know, we agree and

20  acknowledge that there were initial discussions of the

21  24-kilogram purchase in this case, but I feel that the trial

22  testimony, and crediting that trial testimony, certainly that

23  portion of it, is that the deal was called off, and I think

24  everybody agrees that Mr. Krapchan had been sent down to Los

25  Angeles -- I mean to San Diego -- to purchase a one-kilogram

1    sample for $17,000.  The deal was called off, he then was

2    returning with the $17,000 to Los Angeles, and everybody was

3    going to go on their separate ways, and on the way back is

4    when he was notified by the government informant Yuri that he

5    had some more cocaine; it wasn't clear how much more or what

6    quantity was involved but that he had gotten ahold of more

7    product, or however they were phrasing it, and that at that

8    point the decision --

9              THE COURT:  May I interrupt you for just a moment?

10             MR. COLEMAN:  Sure.

11             THE COURT:  You know, I do have a jury that is

12   deliberating here, so what I'm going to do is just turn town

13   the volume --

14             MR. COLEMAN:  I'm sorry if I was talking too loud.

15             THE COURT:  -- just a little bit because I know

16   from personal experience it's possible for us to be heard in

17   that room.  So I'll ask counsel to more or less keep it down

18   to a dull roar, okay?

19             MR. COLEMAN:  I'm sorry.

20             THE COURT:  That's okay.  That's all right.

21             MR. COLEMAN:  When -- after Krapchan returned to

22   Los Angeles, it was then decided that the three, Mr. Wedding,

23   Mr. Krapchan, and Mr. Shirani, would go down to San Diego to

24   purchase one kilogram of cocaine, and indeed, they only went

25   down to San Diego with enough money to purchase one kilogram

1   of cocaine, and that's all that was ever purchased.  And what

2   I think the government's position is that once 24 kilograms

3   is mentioned and we're talking about a conspiracy charge,

4   it's all said and done, all bets are off, it's a 24,

5   24 kilograms is the quantity, we've proven a conspiracy, case

6   closed, and simply that's just not the case under application

7   note 12.  And, in fact, the Ninth Circuit in interpreting

8   application note 12 in a case called Felix specifically held

9   that when defendant specifically agreed to sell a government

10  informant five kilograms of cocaine -- and that wasn't a

11  reverse sting, that was a regular sting -- and they actually

12  wound up selling him less -- I think it was like four

13  kilograms or something -- the Court held that the proper

14  quantity was four kilograms, not five kilograms, and despite

15  the fact that there may have been an agreement at one point

16  to sell five, the ultimate sale was for four.  And in this

17  case, it's not clear really -- at the point that everybody

18  went down to San Diego, it's not clear that there was an

19  agreement at this point as to any quantity because that deal

20  had been called off, but at the very least, it was clear that

21  nothing else was going to be done at that time other than a

22  purchase of one kilo because in fact all they had was money

23  to purchase one kilo.  And so it's our position that in this

24  case, it's a one-kilo case, the base offense level should be

25  26.  And we cited in our supplemental memo the Forrester

1   case, which is a very recent case, which indicates that the

2   Court in determining drug quantity has to err on the side of

3   caution, and if there is two competing plausible

4   interpretations of the guidelines as to drug quantity, it

5   must choose the one that brings less punishment.  And I think

6   that that is sort of a general framework that certainly

7   applies here and that we have I think certainly not only the

8   correct but at least a plausible interpretation of quantity

9   and that the Court should err on the side of caution and set

10  the offense level -- the base offense level at 26.

11          There is one other argument I guess that is

12  somewhat related to that argument, and that is for years the

13  defense bar has argued that if a defendant is arrested at the

14  border and they were told that there was -- there was only

15  ten pounds of marijuana in the car but in truth there was

16  actually 25 kilos of cocaine in the car, and if that

17  defendant -- and everybody believes that that defendant said,

18  you know, I thought it was only ten pounds of marijuana and I

19  never would have done it had I known it was 25 kilograms of

20  cocaine, it doesn't matter because what actually occurred was

21  the importation and transportation of 25 kilograms of

22  cocaine, and that's what you're on the hook for because

23  that's what occurred.  And even if you weren't --

24          THE COURT:  Well, those are possession cases

25  though.  Those are actual possession cases.  They're not

1    conspiracy cases.  This is a conspiracy case.

2            MR. COLEMAN:  This is a conspiracy case, but I do

3    think that the same principles apply under application note

4    12, and Felix, the case that I had previously mentioned from

5    the Ninth Circuit, was a conspiracy case as well.  So the

6    point I was trying to make -- and there are differences in

7    that instance -- is that -- I think the government's argument

8    here is that well, the defendants were willing to consider

9    doing a bigger deal, they were willing to do it, and,

10   therefore, they should be held accountable for 24 kilograms.

11   And the reality is that under the guidelines, that is not the

12   litmus test.  The test is what actually occurred.  And in

13   this case what occurred was a one-kilogram deal, that's it.

14   There was no scheduled -- there was no scheduled appointment

15   for a further purchase, any specifics as to what was going to

16   happen when, what day, what time, what quantity, what price,

17   who was going to buy it, who was going to show up where.

18   There was nothing.  There was just simply a one-kilogram

19   purchase.  So we think that the base offense level should

20   start off at 26.

21           The other issue I guess that's up for debate is

22   role in the offense, and it's on this issue that we think the

23   government got it right when they initially indicted the case

24   and had Mr. Wedding listed as No. 3 on the scale of 1, 2 and

25   3, and we believe that Mr. Krapchan got a two-level reduction

1   for role and that Mr. Wedding's role was less than Mr.

2   Krapchan's.  We simply -- we take issue with Mr. Shirani's

3   testimony that all the money was Mr. Wedding's; we don't

4   think that that makes sense for a variety of reasons, and I'm

5   not going to belabor that, but Mr. Wedding is rarely heard on

6   the tapes.  The main -- all really the organization was done

7   by Krapchan and Shirani, who were organizing the whole deal.

8   And we agree Mr. Wedding did come to purchase cocaine; he

9   was, if he had an opportunity, was going to take part in a

10  purchase.  But given -- but given when you listen to those

11  tapes and his relative absence from virtually everything, we

12  believe that his role is less than Krapchan's, who got a

13  two-level role reduction.

14           As far as considering the sort of 3553 factors in

15  general, you know, we believe the sentence we've recommended,

16  which is 30 months, is sufficient and not greater than

17  necessary.  Mr. Wedding's obviously been in custody for

18  almost two years now.  This is his first offense.  He does

19  have an impressive background to the extent that he's a

20  former Olympic athlete, which I think shows dedication, hard

21  work, and training, and it's something that I think --

22  they're those characteristics that he can rely upon when he's

23  released from custody to start his life over again.  He will

24  be deported to Canada.  He's not going to be in the United

25  States ever again.  He's a young man who, from the letters

1  that we've submitted, has a lot of potential.  And this has

2  obviously been a big bump in the road for him as far as his

3  life is concerned, but I think it's someone that can give

4  back to the community ultimately in the future.  And given

5  his background, I think a 30-month sentence is a significant

6  sentence in the case.  Also, when you compare that to what

7  the other defendants received in the case, I think it's

8  appropriate.

9          We obviously understand that Mr. Wedding went to

10  trial, and that's -- the bottom line is that in our system,

11  you know, there is -- there are benefits that defendants get

12  for resolving their cases earlier.  On that note, what I'd

13  like to say -- and I, frankly, usually wouldn't say this, and

14  it's maybe the only time in my career that I do do this -- I

15  do feel that Mr. Wedding's case would have been resolved

16  dramatically different had he had a different lawyer from the

17  beginning.  And I don't -- I'm not going to get into all the

18  details, but I've had -- my personal experiences in dealing

19  with the lawyer and some of the things that I've sort of seen

20  going on behind the scenes to me I think reflect a lawyer who

21  really I think was in over his head, didn't have sound

22  judgment, and, frankly, engaged in a variety of inappropriate

23  conduct, and I think all that led to a situation where Mr.

24  Wedding, who was desirous of pleading guilty and getting his

25  case resolved early, never did.  His family wound up spending

1    a considerable amount, as did he, on his legal fees, and has

2    wound up in this situation.  You know --

3         THE COURT:  And that's one of the curious parts of

4    this case, Mr. Coleman.  I've read Mr. Wedding's letter; it's

5    a short letter but a thoughtful letter, certainly very, very

6    well-expressed as to Mr. Wedding's remorse.  There's a

7    reference to prior counsel there.  There's also, as you've

8    just indicated, your belief to be a reference in that letter

9    to Mr. Wedding's desire to plead early in the case.  I don't

10   know Mr. Wedding, but Mr. Wedding strikes me as the kind of

11   individual who's been in control of his life and who's been

12   capable of making some important decisions in his own life.

13   I find it curious as to how and why, if Mr. Wedding had

14   wanted to plead early, it turned out that he did not plead

15   early.  His former attorney, an interesting fellow, didn't

16   seem to be or possess the kinds of qualities that would

17   override Mr. Wedding's decision to plead early.  So that's a

18   bit of a mystery.  It seems to me, bottom line here, if Mr.

19   Wedding had wanted to plead early, he could have done so.

20   What prevented that?

21        MR. COLEMAN:  Well, I think your Honor is -- I

22   understand your Honor's point.  And Mr. Wedding is certainly

23   a thoughtful gentleman, and I think that he does have perhaps

24   a better grasp of what's going on than a lot of my other

25   defendants when I was at the Federal Defender office had as

1   to what's going on.  The flip side is that Mr. Wedding is

2   from Canada, he is not as familiar with the US system, he has

3   a lawyer, who he's put his faith in, to give him advice as to

4   what to do and what not to do.  And I think that most

5   defendants are told you need to listen to your lawyer, your

6   lawyer, he knows what's going on, he knows the law, he knows

7   the system, and he knows what to do.  And I think to a large

8   extent he was -- he trusted and listened to this lawyer as to

9   what to do.  My understanding is that I believe Mr. Wedding

10  was even brought over early on in the case for a debriefing

11  session --

12          THE COURT:  And I saw that as well, so hence my

13  question.  I mean is this a circumstance where prior counsel

14  just overrode the will of Mr. Wedding to plead guilty?  If

15  so, that just seems a bit implausible.  But I'm certainly

16  listening to what you have to say -- I know Mr. Gutierrez is

17  going to probably respond here -- because I do understand

18  that at least there was one attempt for a debriefing.  The

19  only reason we're getting into this colloquy right now is

20  because it's been raised in Mr. Wedding's letter to me, it's

21  been raised by you here at the end of your allocution, and if

22  it be something that I should take into account in exercising

23  discretion here, then I just want to be fully informed and

24  make sure I'm doing the right thing with respect to this

25  particular issue.  It doesn't really relate to the suggestion

1    in your papers, Mr. Coleman, that Mr. Wedding was been or has

2    been penalized for going to trial and that therefore he

3    should receive something along the lines of what Krapchan

4    received for a custodial sentence; I don't even think it's

5    appropriate to respond to, you know, any suggestion that the

6    government's recommendation in this case is in effect a

7    punitive sanction for Mr. Wedding having proceeded to trial

8    where the other defendants pled and/or cooperated.

9           But still, getting back to this initial point, I'm

10   still a little bit at a loss as to how any will on the part

11   of Mr. Wedding to plead guilty may have been overridden by

12   prior counsel, who certainly didn't seem to have the

13   charismatic qualities one would associate with being able to

14   override the will of someone like Mr. Wedding.

15          MR. COLEMAN:  Your Honor, let me just speak with

16   Mr. Wedding for a second and then attempt to answer that and

17   also another point that the Court had just raised.

18          THE COURT:  And I'm not really not asking counsel

19   or Mr. Wedding to divulge attorney-client communications,

20   referring to the earlier communications with Mister -- with

21   prior counsel.  You can respond generally, generically.  I

22   just find it curious, as I say.

23          MR. COLEMAN:  Well, I --

24          THE COURT:  Given, you know, the strength of Mr.

25   Wedding's character as demonstrated in much of his personal

23

1   history that it could be -- could have been overridden by

2   prior counsel.

3           MR. COLEMAN:  Well, I think it's one we'll address

4   to some extent when he speaks to you.

5           THE COURT:  Okay.

6           MR. COLEMAN:  I think it's along the lines that I

7   said, which was that he was doing what I think a lot of

8   people with his background would do in a situation, which is

9   listen a lawyer who he's hired and spent a considerable

10  amount of money with and is told is who knows what they're

11  doing and comes recommended to him, to listen to their

12  advice.

13          On the issue -- I didn't mean to suggest in my

14  papers that the government's recommended sentence in this

15  case was in any way punitive for Mr. Wedding going to trial,

16  and in fact, as I indicated at the beginning, I thank the

17  government for the sentencing agreement that we've entered

18  into, and in no way am I trying to say that they've engaged

19  in any type of inappropriate recommendation.

20          THE COURT:  No, you didn't, you didn't suggest

21  that, but I --

22          MR. COLEMAN:  I guess the point I was trying to

23  make, your Honor, was that we agree that the fact that

24  Krapchan and Shirani pled guilty early weighs in their favor,

25  and I think we said that in our memo, we're saying it -- and

1  it weighs against Mr. Wedding that he didn't plead early; we

2  acknowledge that, that this is -- you know, it's better late

3  than never, but it's still late in the day, and we understand

4  that.  But what our point was is that when you weigh

5  everything, when you weigh their backgrounds versus Mr.

6  Wedding's background and you weigh their roles in the offense

7  versus Mr. Wedding's role in the offense -- at least our

8  position as to his role in the offense -- when you weigh

9  those things and, you know, some of the things that Shirani

10  and Krapchan have talked about doing in the past on the

11  recordings and in fact admitted to doing in the past on the

12  stand, when you factor all those things in -- yes, the fact

13  that Mr. Wedding went to trial is a factor, he didn't accept

14  responsibility as early as the other two, whether he had the

15  best attorney in the world or the worst attorney in the

16  world, the bottom line is that it's his ultimate decision and

17  he didn't do it and we acknowledge it, and that should weigh

18  against him in the scheme of things; but on the other hand,

19  we think there are things that weigh in his favor, and so

20  when you balance out all those factors, that his sentence

21  should not be dramatically higher than the other two, and

22  that's all we were trying to say on that point.  I know that

23  Mr. Wedding would like to address the Court as well.

24          THE COURT:  Okay.  Mr. Coleman, thank you for your

25  remarks; I appreciate them.  Mr. Wedding, you do have an

1  opportunity to make any statement you wish to make at this

2  time.

3          THE DEFENDANT:  Would this be my whole statement or

4  just --

5          THE COURT:  No, it would be --

6          THE DEFENDANT:  -- be with regards to --

7          THE COURT:  -- your whole statement, and I'm going

8  to turn these microphones up just a little bit so that you --

9          THE DEFENDANT:  All right.  Well, I prepared

10  something just in case I got tongue-tied up here.

11          THE COURT:  Sure.

12          THE DEFENDANT:  And I'm -- I got to think about

13  this for a second because actually I had planned to address

14  what we just talked about in here, but now that we've brought

15  it up, I kind of want to speak about it separately.

16          I think that your assessment of my character is

17  pretty much right on, and that is a big reason why this has

18  been such a frustrating process for me and my family because

19  I am used to being in control, I'm used to understanding

20  what's going on and always knowing what I should do.  And

21  being put into this situation, I just -- it's -- it was all

22  new; I had never been in trouble before, I've never dealt

23  with attorneys before, I've never been in this system, I was

24  a long way from home, and I just -- I simply didn't

25  understand what was going on, and I counted on my lawyer to

1   deal with that.  And that's why I made a point of hiring my

2   own attorney as opposed to using the court-appointed

3   attorney; I didn't want to burden the -- the government.  I

4   wanted to pay for my own representation because I felt that I

5   could, and I wanted to get the best representation that I

6   could so that he could help me make the right decisions.  And

7   early on I thought that that was the case with my previous

8   attorney.  And we had had many discussions about pleading

9   out, and that's what I wanted to do.  And like I said at one

10  point, I actually did a dry run to the courthouse and sat

11  there all day waiting to get debriefed and it didn't happen.

12  And when I asked my lawyer about it, he said that they just

13  couldn't come to an agreement on something related to a

14  proffer or what -- understand what kind of arrangement I

15  would come in there and talk to them, and that was something

16  I didn't even understand at the time.  And, you know, I've

17  actually come a long way since then.  I've basically

18  memorized this entire book.  I got a job in the law library

19  and worked there for over a year just to understand the

20  system so that I can make these decisions because I was

21  always nervous about what my lawyer was or wasn't doing.  And

22  I don't know if your Honor will recall, there was actually

23  one time where my lawyer was standing right here arguing

24  about well, we'll just go ahead and go to trial, let's set a

25  date, and I was tugging on his arm and going "hold on a

1    second," and I actually recall your Honor making reference to

2    the fact that I was trying to control my attorney and stop

3    him from doing what he was doing.  And I think you probably

4    remember as well during my trial I was very active in writing

5    notes and trying to stay on top of things for my attorney,

6    and it didn't help.  But anyway, I think that's pretty much

7    all I have to say about that, but I thought it was important

8    that I get that out.

9          Anyway, well, I've -- I guess since I've already

10   submitted most of my thoughts to you in writing, I'll keep it

11   brief.  I would like to apologize to the Court, to the

12   government, and to my amazingly supportive family for the

13   stupid and irresponsible decisions that I made that resulted

14   in me coming down to San Diego to buy drugs.  I allowed

15   myself to be lured by the idea of easy money, and the sad

16   thing is I really didn't need money that bad.  And even

17   worse, I knew that it was wrong, and I did it anyway.

18         In the past 24 months I've spent in custody, I've

19   had an opportunity to see firsthand what drugs do to people,

20   and honestly I'm -- I'm ashamed that I became part of the

21   problem because for years, I've -- as part of being an

22   athlete and being -- having an outgoing personality, I was

23   part of the solution; I've always mentored kids and

24   encouraged kids and, well, people of all ages to join sports

25   and stay in school, stay clean, you know, I've always done

1    that, and I guess I lost my way.

2         Your Honor, what I did was completely out of

3    character for me, and it is a personal mission of mine to

4    rebuild my reputation, and I'm actually looking forward to

5    incorporating some of the things that I've learned over the

6    last couple of years into my daily life, and, in fact, I've

7    actually started doing that already.  I feel like a bad

8    situation was made worse in the months after my arrest,

9    and -- like we just talked about, but I do understand that I

10   bear the sole responsibility in the end for that.  And, you

11   know, I did place tremendous burden on the courts and

12   everyone else involved, and for that and everything else, I

13   am truly sorry.  As an athlete, I was always taught that

14   there is no second chances, and, well, I'm here asking for

15   exactly that.  That's it.  Thank you.

16        THE COURT:  All right, Mr. Wedding.  Thank you.

17   Mr. Gutierrez?

18        MR. GUTIERREZ:  Your Honor, there are three areas

19   that I'd like to cover if I could.  The first would just be

20   an explanation of some of the things that happened early on

21   with Mr. Denis.  Throughout the proceedings I was quite

22   concerned that Mr. Denis wasn't communicating the offers that

23   I gave to him to his client.  During the debrief with Mr.

24   Wedding, he indicated to me that he received the offers, and

25   it was his decision to go to trial.  The reason why he was

1    brought here early on for debrief --

2         THE COURT:  Would you repeat that last?  You had

3    the impression it was whose decision to go to trial?

4         MR. GUTIERREZ:  I was always under the suspicion

5    that Mr. Denis was not communicating the offers --

6         THE COURT:  Yeah, I got that part.

7         MR. GUTIERREZ:  -- so at the debrief I specifically

8    asked Mr. Wedding, "Did Mr. Denis communicate the offers to

9    you all the way up to trial?"  And he said "Yes, the decision

10   to go to trial was mine."

11        THE COURT:  Okay.

12        MR. GUTIERREZ:  With regard to being brought over

13   for debrief, your Honor, it is my personal practice to not

14   debrief people until they've pled.  There are a variety of

15   reasons in my experience, and I will make exceptions, but at

16   this point in time, I told Mr. Denis that he needs to plead

17   and he's not going to plead -- and I'm not trying to talk

18   about negotiations -- but I'm not going to give him role on

19   the front end, you can argue for it.  And Mr. Denis said no,

20   my client wants role on the front end, why don't you speak to

21   him, if you speak to him, he'll tell you that he's worthy of

22   role.  And I go well, I want to speak to him after a plea.

23   So he goes okay.  So he comes up -- I had the defendant

24   brought over, and there was no signed plea agreement, so I

25   told Mr. Denis, I need to have a signed plea agreement or at

1  least something in writing from your client that I could use

2  to gauge whether or not he deserves role on the front end

3  because right now all I have is the evidence gathered during

4  the investigation, I have no evidence that he's worthy of

5  role, can you give me something in writing.  I never got

6  that, so that is why he was brought over here because it was

7  my understanding that the client wanted role on the front

8  end.

9          Throughout the remaining proceedings, I gave Mr.

10  Wedding, to the day of trial, through his attorney, the

11  opportunity to plead to the exact same deal that Mr. Shirani

12  got, the exact same deal, except I was even willing to go

13  better for the defendant because he could argue for more

14  departures where Shirani wasn't allowed to.  I told Mr. Denis

15  repeatedly I'm not going to give you role in the front end

16  because I don't have a good-faith belief that there was a

17  role adjustment, but you can argue for it, and if you think

18  I'm being unreasonable, trust me, the Court is much more

19  reasonable than I am and you can have your shot convincing

20  the Court, you have that ability that Shirani didn't have.

21  So I actually went better than Shirani's deal.  And that

22  offer I believe was communicated because that's the

23  officer -- the offer that was available time and time again;

24  every time I spoke to Mr. Denis, "The offer's still

25  available," and on the day of trial, it was still available.

1           So to that end, your Honor -- I just wanted to add

2    that for the sake of the record, and it's an explanation of

3    the context of how this trial went forth because Mr. Shirani

4    did cooperate, and I could not in good faith give Mr. Wedding

5    a better deal than what Mr. Shirani did, who came early and

6    cooperated, even though he ultimately had the ability to

7    argue for less that Mr. Shirani didn't.

8           With regard to one kilogram versus 24 kilograms,

9    your Honor, the jury believed based on the testimony that it

10   was five kilograms or more, and the evidence does hold true

11   to that.  Now, the government is not saying that all you have

12   to do is talk about 24 kilograms and that's the crime.

13   Although there is no overt act required by the drug statute

14   for conspiracy, there were plenty of overt acts here to show

15   that it was more than just idle talk.  They negotiated to

16   distribute, they had a conspiracy, an agreement to distribute

17   cocaine.  There wasn't a narrowly focused conspiracy to only

18   buy cocaine from the CS, and if that didn't work out, there's

19   no conspiracy.  Mr. Shirani contacted Mr. Krapchan and

20   Akhundov.  Even the defendant admitted that Mr. Shirani came

21   to him as a source of money, and today he even said he was

22   lured by easy money.  The conspiracy was to go down and

23   purchase cocaine, not necessarily from the CS because they

24   had backup sources, and even if they didn't buy from the CS,

25   they were going to buy from the backup sources because

1    Mr. Shirani, his testimony was that his portion of payment

2    was going to come on the transportation that he set up via

3    some truck drivers to go back to up to Canada; that's how he

4    was going to make the majority of his money.

5            So saying that the deal was somehow called off,

6    that may have been true, but at no point in time, equivocally

7    or otherwise, did these individuals withdraw from the

8    conspiracy.  And even if they did, it would just be for

9    future liability.  They still are -- conspired.  And even

10   when the deal was called off, they were still conspiring,

11   just not with CS-1 as part of the picture because as we know,

12   legally CS-1 cannot be part of the conspiracy.  So saying

13   that the deal was called off and was only for one kilogram is

14   missing the big picture because the big picture was they

15   wanted to buy 24 kilograms; through the havale, the cultural

16   money-laundering system that the Persians use, they had

17   enough money brought down, as Mr. Shirani testified that it

18   was enough money for 24 kilograms, even though Mr. Krapchan

19   was going to inflate the price to get more.  Not all the

20   money arrived through the system, but a good portion of it

21   did.  So they came to this country having sent money down to

22   buy 24 kilograms, they wanted to buy 24 kilograms, but even

23   as the calls early on showed and once they arrived in San

24   Diego, Mr. Shirani was worried about being somewhere where he

25   was not familiar, and he himself testified that they're not

1    experienced drug dealers, so they wanted to buy it in

2    portions, two, two, two, two, two, smaller portions, because

3    as Mr. Shirani said, he doesn't know what's going on here, he

4    doesn't want to show up with all this money, he could be

5    robbed.  And that's what the plan was, to buy smaller --

6    small portions after getting a sample.

7         Mr. Shirani testified that he didn't want to buy

8    cocaine that smelled like fish.  He wasn't an experienced

9    drug dealer, he said he didn't use, but he was told by people

10   who were experienced drug dealers that he didn't want to buy

11   if it smelled like fish.  And even the calls that were played

12   for the jury, he said that, I want to buy smaller quantities,

13   and he was using the term at that point "cars," which he

14   explained meant cocaine.  Even calls to the CS from Krapchan,

15   Krapchan was telling him, we want to buy in smaller and

16   smaller amounts.

17        So, your Honor, that was part of the plan.  And

18   just because they couldn't have -- and the agent testified,

19   they thought the money was going to be immediately available,

20   and they can go to San Diego, and that they would buy the

21   cocaine right then and there; that's what the plan was, and

22   that's what the FBI was prepared to investigate.  But when

23   the money wasn't immediately available, counsel at trial even

24   said why didn't FBI follow them and have surveillance at the

25   hotel.  Because they were geared and set up to go back to San

1   Diego and do the transaction at that point.  So just because

2   logistically some of the details weren't working doesn't mean

3   that it was all of a sudden a new conspiracy.  And even if it

4   was, it still doesn't mean that there was never the original

5   conspiracy, which they are still liable for.  I don't believe

6   that there was a separate conspiracy for the one kilogram,

7   but even if counsel's arguments are right and there was a

8   separate one-kilogram conspiracy, there still was the

9   original conspiracy for 24 kilograms.  And it's the

10   government's position that that one-kilogram purchase was the

11   sample, a prelude to the 24 that was originally negotiated.

12   Because price was never renegotiated, quantity was never

13   renegotiated, it was all assumed that it was going to be the

14   original 24 kilograms.

15         So, your Honor, the acts and the evidence and the

16   jury's verdict show that it was 24 kilograms.  So why then

17   did the government agree to seven kilograms?  It's a sad

18   statement to say that in this district, your Honor, we see

19   kilograms of cocaine like every day.  When I was a DA, we'd

20   fight over ounces and grams; when I come here, my first case

21   was 14 kilograms of cocaine.

22         It's -- there was nothing exceptionally unusual

23   about this case other than maybe perhaps the character of the

24   defense attorney and the fact that Mr. Wedding's an Olympian;

25   we see these cases every day.  And maybe there are some

1    equities.  We believed that it was an equitable offer to give

2    to Mr. Shirani, seven kilograms, because factually that's how

3    many kilograms at the price they negotiated could be

4    purchased with the money that was actually found; even though

5    the government believed that there was more money coming

6    through the havale, that's how much money was actually there,

7    so it was the middle ground because we're trying to be

8    reasonable.

9          So in this situation, given the fact that these

10   crimes are fairly common, there's nothing extraordinarily

11   unusual, Mr. Wedding's not a kingpin, he's not the subject of

12   an OCDETF investigation; he is a person who was trying to

13   break into the drug trade, and it didn't work out.  So that

14   is why we offered to have essentially the same deal that Mr.

15   Shirani did, as a way to recognize that there are some

16   equities here.  There are some equities here.  So he's

17   already realized a pretty significant -- I believe

18   essentially a two-point departure based on our willingness to

19   come down a little bit and, for lack of a better term, meet

20   him partially in that regard.

21         THE COURT:  When you say a two-point departure,

22   you're referring to safety valve?

23         MR. GUTIERREZ:  No, I'm referring to that if he

24   would have been -- if we wouldn't have had the agreement, the

25   24 kilograms would have had a base offense level two points

1    higher than what it is.

2            THE COURT:  The base offense level would have been

3    higher, but you're not talking about a departure per se, are

4    you?

5            MR. GUTIERREZ:  No, I'm talking base offense level,

6    your Honor.

7            THE COURT:  Okay.

8            MR. GUTIERREZ:  Now, with regard to role, your

9    Honor, there's no evidence to really support role in this

10   situation.  Mr. Wedding himself here and at the debrief said

11   that he was lured by easy money, and that's a very telling

12   statement because he stood to gain.  He was not a courier, he

13   was not a packager, he was not a compartment-maker; he was

14   somebody who was going to make money from this transaction.

15   It was his intention to use Mr. Shirani to purchase cocaine

16   and transport it to Canada, where he would sell it.  Even if

17   Mr. Shirani was the bigger fish, even if Mr. Shirani was --

18   organized the transportation, it was still Mr. Wedding's

19   money.  A role adjustment is more proper for a courier,

20   somebody's who's less, but it's the government's position the

21   defense hasn't met their burden and given this Court facts to

22   demonstrate that he's deserving of role.  What has been

23   presented to the Court, he was going to make money.

24           He is an individual who is used to being in control

25   and always understanding what's going on.  He was here for a

1    purpose because he was part of the transaction.  It was his

2    money.  Shirani says it was all his money and he was only

3    making money from the transportation and the transportation

4    of the money, but Mr. Wedding's saying it was only I guess

5    partially some of his money.  But whatever the case is, your

6    Honor, somebody who stands to make a profit from the purchase

7    and distribution of cocaine does not seem worthy of role in

8    that he stood to make money and easy money at that.  He

9    indicated that he was not wanting for money, so it's not like

10   a situation in Mexico that we see regularly where somebody

11   has no funds and they're put in a minor role because they're

12   viewed expendable to cross the border, and if they get

13   caught, it doesn't matter.  This is a situation where an

14   individual had money and wanted to make more money illegally,

15   the easy way.  He provided the money.  He even said in his

16   debrief that Shirani came to him as a source of supply for

17   money.  So this is a person who's providing the money for the

18   purchase, for the distribution, and it's the person who

19   provides the money who will be the essential owner that we

20   really rarely get to prosecute, is the person that Mr.

21   Wedding is in this situation.  Whether he was the provider of

22   money and the owner of all 24, which the government believes,

23   it doesn't matter because even if it was a portion, he was at

24   least co-equal to the other people with regard to being a

25   provider of money.  So in that instance we believe as a

1   result the defense has failed to at least rebut that because

2   it is their burden that he was in fact -- is in fact entitled

3   to role adjustment, and we'd submit that he isn't based on

4   the evidence that has been presented to the Court.  And if

5   the Court has any other further questions, I'm more than

6   happy to answer; otherwise, I'm prepared to submit based on

7   the negotiated disposition of 78.

8           THE COURT:  Mr. Gutierrez, you've made reference to

9   equities a couple of times; you felt there might be some

10  equities in favor of Mr. Wedding.  If you're using that term

11  in the context of a departure, combination of circumstances

12  departure or a variance under 3553 (a), then you might

13  clarify that.  If you meant that to be the basis for your

14  agreement to achieve a base offense level, an initial base

15  offense level of 32 based on seven kilograms as opposed to

16  24, you can clarify that.  But if you were -- if you were

17  implying that there are other equities that you would

18  recognize in this case based on what you know, I would

19  appreciate your expanding on that a bit.

20          MR. GUTIERREZ:  Certainly, your Honor, and I say

21  this with the caveat that I'm not trying to use this to

22  enhance the defendant's sentence at all.  Throughout the

23  course of the investigation, I was made aware by several

24  sources about certain things about Mr. Wedding, things which

25  that if the government were able to possess could use at

1    sentencing to show that he might not be the person he's

2    portraying himself to be.  I requested that from Canada, and

3    for whatever the reason is, the long process that is

4    required, the only thing I received was property information

5    about what kind of property his family owns because it was

6    told to me that shortly after his arrest -- and there's no

7    proof of this that I have, so therefore I'm reticent to

8    say -- that he transfered property.  So the fact of the

9    matter is, your Honor, I have no evidence about what sort of

10   person -- that I could give to the Court -- he was in Canada.

11   That aside, even though I think there may be some things

12   which I can't prove, he's still a young man who did something

13   that some of us have done, made a mistake, and I think there

14   are some equities that the Court could take into

15   consideration given the fact he does have strong family

16   support, he does -- he is of a young age, and if he has led

17   the lifestyle of easy money, driving Range Rovers, having

18   boats, multiple cars, marijuana grow operations, hopefully

19   this will teach him a lesson because I really don't think

20   time, your Honor, quite frankly, is going to teach him that

21   lesson.  He has a felony conviction.  He likes to come to the

22   United States; he has friends here, he likes to go to Las

23   Vegas, but he can allegedly never come back now.  So I really

24   think the fact there's a felony conviction is the biggest

25   hammer for this individual.  Time, quite frankly, it's

1    important.  If I had to put forth an opinion personally, it

2    should be more than what Krapchan got but something less than

3    the maximum.  But those are equities I think are better

4    handled by the Court, but I just pretty much credit it to

5    he's young, he still has the potential to change if he

6    decides to change.  And based on that, I think the most

7    important thing is the conviction itself, the ability not to

8    come back to the United States, and whatever time he does

9    get.  The guidelines say for 24 kilograms it should be

10   significantly more.  We believe that to the extent that I

11   feel comfortable giving him 78 as a recommendation to the

12   Court, we'll let the Court know that we recognize that there

13   are equities here as far as his youth, his lack of

14   convictions, and hopefully this will be a wake-up call, your

15   Honor, to that extent.  I don't know if that was responsive,

16   your Honor.

17          THE COURT:  Well, I think it was.  Thank you,

18   Mr. Gutierrez.  I know we may have to just take a bit of a

19   break here; the bailiff is going to see the jury at this

20   moment.  Why don't you seat Mr. Wedding at counsel table,

21   please, for just a moment.

22          MR. COLEMAN:  Should I sit as well?

23          THE COURT:  Why don't you sit in the first seat and

24   have Mr. Wedding sit in the second seat.  All right.  Thank

25   you for your patience, everyone.  Mr. Coleman, anything

1    further?

2              MR. COLEMAN:  A few comments, your Honor.  On the

3    quantity issue, I still think that to a large extent we're

4    talking apples and oranges in the sense that the government

5    continues to focus on conspiracy law and whether there was a

6    conspiracy and a withdrawal of the conspiracy and so forth

7    and so on, and there's still no recognition of application

8    note 12.  And application note 12 doesn't discuss the fine

9    points of conspiracy law and then whether there was a

10   withdrawal.  What application note 12 says is was there an

11   agreed-upon quantity and was that agreed-upon quantity going

12   to be intended to go forward at some set delivery time, et

13   cetera, et cetera, and in this case we don't have that.  We

14   don't even have -- ultimately we don't have an agreed-upon

15   quantity because the 24-kilo deal was called off, they went

16   back down to look at one sample, that was it, and then

17   whatever happened from the sample -- maybe in the future they

18   would have gone forward with a further buy, two by two by

19   two, maybe it would have been five by five by five, maybe it

20   would have occurred in two weeks, maybe it would have

21   occurred in a month.  There is nothing set.  It's just a

22   one-kilo purchase.  And under application note 12, regardless

23   of whether we agree or disagree with conspiracy law with the

24   government, under application note 12, which applies to

25   conspiracies, substantive offenses, all drug offenses, the

1    quantity is one kilogram.

2              Finally, on the issue of role, Mr. Wedding has

3    given a lengthy debriefing, and as far as the issue of the

4    purchasing the cocaine, he was going down there to

5    potentially purchase cocaine if there was a lucrative deal to

6    be had.  The money that was down was not his, and we've made

7    that clear.  And our position has been that the government

8    may be right in sort of a general case that, you know,

9    someone who's going down to potentially purchase cocaine is

10   not entitled to a role reduction, but we have Mr. Krapchan

11   here, who did get a role reduction, and not only was he going

12   to purchase cocaine for himself, he also discussed laundering

13   I think a million -- I think in the government's sentencing

14   memo a million dollars worth of proceeds, he discussed all

15   sorts of other possible drug transactions, and was the

16   critical key figure in organizing this whole thing.  So if he

17   gets a two-level role reduction, it's our position that when

18   you look at the relative culpability in the case, Mr. Wedding

19   should get a role reduction.

20             Finally, we appreciate the government's final

21   comments.  I think actually they were comments that I wish I

22   had made, and sometimes I get too caught up in the guidelines

23   and responding to questions that I do lose sight of part of

24   the bigger picture, which is, you know, that the sentence

25   should be sufficient but not greater than necessary.  Mr.

1    Wedding has served -- he's a young man that's served two

2    years in custody.  How much more time is going to benefit

3    him, society, everybody else?  I don't know.  Obviously your

4    Honor makes those calls.  I do think that he's certainly

5    learned his lesson at this point.  He's served a substantial

6    time, and I think that he can get over this felony conviction

7    and have a productive life, and obviously we'd assume that

8    he'd do that sooner rather than later.  So for all those

9    reasons, you know, the sentence that we've recommended we

10   think is sufficient and not greater than necessary.

11              THE COURT:  Okay.  Thank you.  Well, with respect

12   to the objections to the PSR, you've made a factual objection

13   and you've made some legal objections, Mr. Coleman.  As to

14   the factual objection, that is, the reference to the Akhundov

15   drug trafficking organization and Mr. Wedding being an

16   associate of that, I think the response of the PSR or the

17   probation officer in the PSR is appropriate; I would

18   incorporate that as my own response here.  I would also say

19   that the subject of that objection is not going to be

20   material for any sentencing choice I'm going to make.  With

21   respect to the guideline or legal objections, I think those

22   will turn out to be addressed in the allocution.

23              Beginning with the guideline -- the advisory

24   guideline analysis, the base offense level is a 32 based on

25   five kilograms and more of cocaine.  Although one can argue

1    the object of the conspiracy in this case was to acquire and

2    distribute ultimately 24 kilograms of cocaine, the intended

3    initial phase of the conspiracy was to purchase that amount

4    of cocaine that $100,000 plus, if you add the $17,000,

5    $117,000 would bring, that was clearly five kilograms and

6    more, and the jury after hearing all of the evidence in this

7    case found that, and I think that their decision was

8    rationally based and should be upheld.  So the starting

9    offense level or base offense level would be a 32.

10           There would be two levels off for safety valve, the

11   government has moved for that reduction, and -- there are two

12   levels off for safety valve, which provides eligibility for

13   relief from the ten-year mandatory minimum that would

14   otherwise apply in this case.

15           With respect to the reduction under 2D1.1 (a)(5),

16   that being a two-level downward adjustment requested by the

17   defense as an adjustment to the base offense level on the

18   hypothesis that Mr. Wedding is role-eligible, I would deny

19   that; I would find that Mr. Wedding is not eligible for a

20   minor role adjustment, and I will explain my reasons shortly

21   on that one.

22           There was another adjustment, downward adjustment,

23   requested by you under 2X1.1, Mr. Coleman, and for the

24   reasons stated by Mr. Gutierrez in his sentencing memorandum,

25   and specifically at page 5 of his sentencing memorandum, I

1    would find that the 2X1.1 reduction would not apply in this

2    case, that for drug conspiracies there are express guideline

3    calculations and provisions.  I think Mr. Gutierrez's

4    analysis there is unassailable, and it's also something that

5    you didn't stress in your allocution, I think perhaps because

6    you see the wisdom of the position taken by the government in

7    this case with respect to that particular reduction.  Now --

8              MR. COLEMAN:  Your Honor --

9              THE COURT:  -- getting back to the issue of role, I

10   would not adjust downward for minor role or mitigating role.

11   I think Mr. Wedding was fully complicit in the offense of

12   conviction, which is conspiracy to distribute cocaine in this

13   case.  He participated in the planning and arrangements, and

14   he participated in the transfer of money to Los Angeles.  It

15   did appear from the great weight of the evidence that Mr.

16   Wedding was the source of money that was transfered to Los

17   Angeles through the havale process, the cultural

18   money-transfer process as referred to it by Mr. Gutierrez.

19   So I think that not only was Mr. Wedding fully participatory

20   in that part of it, but obviously he participated in the

21   pick-up of the money from the broker or the transferee in the

22   San Fernando Valley, ended up taking that money, taking

23   possession of the money, and depositing it in the motel room,

24   rented the vehicle, came down to San Diego, and participated

25   in all of that.  The bottom line here is that the government

1    has not established by a preponderance -- excuse me -- the

2    defense has not established by a preponderance of the

3    evidence that Mr. Wedding is responsible enough in this case,

4    had a mitigating role sufficient to adjust downward for minor

5    role, so there will be no minor role adjustment.

6          With respect to acceptance of responsibility, I

7    will adjust downward two levels for acceptance of

8    responsibility.  I would also acknowledge at this point that

9    I think Mr. Wedding made a very full and heartfelt statement

10   of remorse.  One can be cynical at these times and obviously

11   interpret any kind of a statement of remorse as the statement

12   made in one's self-interest and for ulterior purposes, but I

13   certainly had the impression that Mr. Wedding was making a

14   full and heartfelt statement of remorse in which he also

15   acknowledged I think responsibility for what was done here.

16         There is no combination of circumstances departure

17   request -- I think I clarified that at the beginning of my

18   remarks -- that there is a request for essentially what is a

19   variance under 3553 (a).  So to finish up the first phase of

20   this, the guideline analysis, the total offense level would

21   be a 28, the criminal history score is a zero, which is a

22   category I, the advisory range is 78 to 97 months.  The

23   government has recommended 78 months in its papers but

24   perhaps has acknowledged that a lesser sentence would be

25   appropriate given equities on the part of Mr. Wedding.

1    Probation has recommended 121 months or approximately ten

2    years.

3            Insofar as the 3553 (a) analysis goes, I would

4    first address the seriousness of the offense.  Obviously this

5    is a serious offense.  It's not as aggravated as some of the

6    drug offenses we see in this district, that we have many

7    offenses that involve much greater quantities of controlled

8    substances consisting of cocaine, methamphetamine, heroin;

9    but it's also not, you know, along the lines of some of the

10   more modest drug offenses we see in this district that form

11   the common currency of what we see moving through these

12   courtrooms, that is, much of the border-related convictions

13   for importation of marijuana.  So in terms of the seriousness

14   of the offense, I don't think that cuts one way or the other

15   in terms of aggravating or mitigating circumstances.

16           The nature and circumstances of the offense, well,

17   this was a pretty sophisticated deal.  It took a lot of

18   planning, it took a lot of sophistication, there were, you

19   know, financing arrangements that were pretty complicated,

20   involved several people in different countries and,

21   ultimately, the aggregation of in excess of $100,000.  So

22   this was involved, it was sophisticated, and it seemed to be

23   the, you know, the functioning of a drug trafficking

24   organization at work.

25           With respect to the history and characteristics of

1    Mr. Wedding, there are some positive qualities here; there's

2    no denying that.  Mr. Wedding is a man of accomplishment, of

3    education, of discipline, of obviously a work ethic that

4    allowed him to obtain fame, fortune, a life that other

5    people, many other people, can merely dream about.  He's got

6    a loving family, he's got many, many friends, and, before

7    this crime, a bright and unlimited future.

8            In terms of the negatives here, it would be exactly

9    the same; all the things that I just mentioned also have a

10   negative component or quality because Mr. Wedding had it all.

11   He was living the dream, an Olympic athlete, a storybook

12   life, without any of the destitution, the desperation, the

13   grinding poverty, the mental or physical issues that we see

14   that drive so many people to engage in this kind of activity,

15   including serious drug addiction.  There was no need, as Mr.

16   Wedding has pointed out, there was no -- he had no financial

17   need; he was not dependent upon this offense to get by, he

18   was not -- he was not thoroughly dependent in a co-dependency

19   relationship like we see so many of our drug defendants who

20   are compelled under circumstances or by other people to do

21   what they do.  This was just a function of greed and nothing

22   more unfortunately.  So, you know, there are positives and

23   negatives associated with Mr. Wedding's status and what he's

24   accomplished and what all of this means when we look at the

25   history and circumstances of Mr. Wedding.

1          Obviously, there's a need for deterrence here;

2     that's one of the more relevant sentencing purposes,

3     deterrence in both general and specific terms, and also a

4     need to promote respect for US drug laws that would proscribe

5     this kind of conduct.  I really have no doubt in my mind that

6     Mr. Wedding will not be involved in this kind of conduct in

7     the future, certainly not in the United States, that's for

8     sure, and I believe that he has learned a very, very

9     important lesson here, but still there's a need to send a

10    general deterrent message as well.

11         Ultimately I think there is a valid argument for a

12    deviation under 3553 (a), and that would be to avoid

13    unwarranted sentencing disparity between this and similar

14    cases.  I think that the guideline range exceeds what we

15    would typically see as an appropriate custodial sanction in

16    cases such as this.  There is a need to impose a custodial

17    sentence that is sufficient but no greater than necessary to

18    subserve the relevant sentencing purposes that have been

19    discussed.  And also I take into account one other factor

20    here that wasn't emphasized too much by counsel; you may have

21    made reference to this in your papers, Mr. Coleman.  Although

22    it is possible that Mr. Wedding may be transferred to Canada

23    for the balance of any custodial sentence that is imposed,

24    custody in the Southern District of California or wherever

25    else Mr. Wedding may be placed is no doubt an extra hardship

1    for Mr. Wedding because he is away from family and friends,

2    it's a hardship on family and friends to see him, and so they

3    would perhaps not be seeing him, he would not be seeing them

4    as often as if they were US citizens or lived in the United

5    States and had easier access, so this makes custody a bit

6    harder for Mr. Wedding, I'm aware of that, and I've

7    recognized that in other cases where foreign nationals who

8    are -- don't have proximity to Mexico, don't have the access

9    to Mexican family and relatives are placed in US custodial

10   facilities, including Europeans and other individuals for

11   whom custody may represent that additional hardship.  So I

12   think that is another factor that comes into play here.

13          I also take into account the fact that we have a

14   sentencing agreement here that's been reached after a very,

15   very difficult road.  I don't want to criticize Mr. Denis;

16   I'm sure he had his strategy in mind and in all probability

17   approached this case with some level of confidence that he

18   could successfully prevail.  But it was I know a very, very

19   difficult trial for the parties involved.  For Mr. Gutierrez,

20   I don't think I've ever seen an AUSA suffer under a greater

21   case of heartburn than Mr. Gutierrez representing the

22   government or the United States as he had to deal with the

23   constant barrage of unnecessary motion work, personal

24   insults, and other minor outrages hurled at him and his

25   office from time to time.

1          In any event, after all of that, the parties have

2     entered into a sentencing agreement I think which has

3     certainly calmed the turgid waters and allows everyone to

4     look at this case objectively and to try to evaluate it from

5     that perspective, and I'm happy the parties were able to

6     achieve that.

7          I must decline, Mr. Coleman, your suggestion that a

8     30-month custodial sentence would be fair, just, and

9     reasonable as a result of some kind of parity of reasoning or

10    comparison with Mr. Krapchan.  Mr. Krapchan obviously is a

11    different circumstance.  He pled very early, he entered into

12    an agreement with the government for certain benefits.

13         I don't think Mr. Wedding's case can be compared to

14    Mr. Shirani's either.  As you know, Mr. Shirani was a

15    cooperator; he testified as a witness called by the

16    government.  I know you weren't trial counsel, so you didn't

17    have an opportunity to personally observe the manner in which

18    Mr. Shirani testified, the character and quality of that

19    testimony, but I can tell you it is one of the most

20    believable and impressive testimonial episodes I have ever

21    personally witnessed from someone in Mr. Shirani's position

22    or under similar circumstances.  Mr. Shirani provided a great

23    benefit to the government in proceeding with its case against

24    Mr. Wedding.

25         I've listened carefully to all of the allocutions

1   here; I want you to know that.  I've listened carefully to

2   Mr. Wedding's statement of remorse.  Originally I had planned

3   on imposing a custodial sentence greater than I am about to

4   state at this particular point in time, but taking into

5   account all of the allocutions that have been mentioned and

6   Mr. Wedding's statement, I'm going to reduce even further

7   what I had tentatively thought would be a fair, just, and

8   reasonable sentence here.

9          For all of the reasons I've indicated, I would find

10  that a 48-month custodial sentence will be fair, just, and

11  reasonable and subserve the relevant sentencing purposes that

12  I have attempted to articulate.  As I say, I had been

13  prepared to impose even a greater custodial sentence, but

14  taking all things into consideration, a 48-month sentence

15  just appears to be the right sentence in this case.

16         Pursuant to the 1984 Sentencing Reform Act, it is

17  the judgment and sentence of the Court that Mr. Wedding be

18  and hereby is committed to the custody of the Bureau of

19  Prisons for a term of 48 months.  No fine is imposed.  I know

20  probation has made a strong recommendation for the imposition

21  of a fine, but I'm not going to impose a fine in this case.

22  I will impose a $100 special assessment, the mandatory

23  assessment.

24         Following completion of the custodial sentence in

25  this case, Mr. Wedding is to be placed upon a three-year

 1   period of supervised release with the standard conditions of

 2   supervision applying as well as the following special

 3   condition:  If deported, excluded, removed, or allowed to

 4   voluntarily return to Canada -- which will be the case, Mr.

 5   Wedding; you will be returned to Canada -- you are to neither

 6   attempt unlawful entry into the United States nor enter the

 7   United States unlawfully; and you are to report to probation

 8   within 24 hours of any lawful entry into the United States

 9   during that three-year period of time.  Supervision is waived

10   upon deportation, exclusion, removal, or voluntary departure.

11          Furthermore, I will at this time order forfeiture

12   of any right, title, and interest on the part of Mr. Wedding

13   in the properties that are set forth on pages 2 and 3 of the

14   sentencing agreement that has been entered into between the

15   parties, that being the sums of $100,000, $1,570, $17,000,

16   and $3,000 in items 1 through 4 of paragraph II on page 2, as

17   well as to the $125 amount set forth on page 3 at lines 12

18   and 13.  Mr. Wedding has forfeited any right, title, and

19   interest in those assets.

20          Mr. Wedding, I have imposed sentence under the

21   agreement you have entered into and in such a way that you

22   have waived your right to appeal or in any other way attack

23   or challenge both the conviction based on the jury's verdict

24   in this case as well as the sentence imposed; do you

25   understand that, sir?

1          THE DEFENDANT:  I do, your Honor.

2          THE COURT:  All right.  If you come forward, Mr.

3    Coleman, we'll have you provided with a copy of the terms and

4    conditions of supervised release; if you would kindly provide

5    those to your client, and you have done that.  Anything

6    further, counsel?  Mr. Gutierrez?

7          MR. GUTIERREZ:  No, your Honor.  Thank you very

8    much.

9          MR. COLEMAN:  No.  Thank you, your Honor.

10          THE COURT:  Good luck to you, Mr. Wedding.

11          THE DEFENDANT:  Thank you, your Honor.

12      (The proceedings were concluded.)

1                        <u>Certificate of Reporter</u>

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated  _____ at San Diego, California.

12

                            _____
13                          /s/ Debra M. Henson  (electronic)
                            Debra M. Henson
14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25